IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VIIV HEALTHCARE COMPANY, | ) | |
| SHIONOGI & CO., LTD. and VIIV | ) | |
| HEALTHCARE UK (NO. 3) LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-224 (CFC) |
| | ) | |
| GILEAD SCIENCES, INC., | ) | **REDACTED –** |
| | ) | **PUBLIC VERSION** |
| Defendant. | ) | |

**DEFENDANT GILEAD SCIENCES, INC.'S OPENING BRIEF IN
SUPPORT OF ITS MOTION TO STRIKE THE EXPERT REPORT OF
JAMES T. CARMICHAEL**

OF COUNSEL:

Adam K. Mortara
J. Scott McBride
Mark S. Ouweleen
Matthew R. Ford
Nevin M. Gewertz
Tulsi E. Gaonkar
Rebecca T. Horwitz
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL  60654
(312) 494-4400

Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO  80202
(303) 592-3100

Nao Takada
TAKADA LEGAL, P.C.
112-01 Queens Blvd.
Forest Hills, NY  11375
(212) 380-7804

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Defendant Gilead Sciences, Inc.*

Original Filing Date: December 9, 2019
Redacted Filing Date: December 23, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ ii

INTRODUCTION ...................................................................1

NATURE AND STAGE OF THE PROCEEDINGS ...............................2

SUMMARY OF THE ARGUMENT ...........................................3

STATEMENT OF FACTS .........................................................4

    A.    Carmichael's Background And Experience ..........................4

    B.    Carmichael's Report..................................................5

ARGUMENT ........................................................................6

I.    The Court Should Strike Carmichael's Legal Opinions..................7

    A.    Carmichael's Legal Opinions Regarding Claim Scope Are Improper ..........................................................................8

    B.    Legal Opinions Describing Duties Owed To The Patent Office Are Improper .......................................................10

    C.    Legal Opinions Describing Patent-Prosecution Law Are Improper .......................................................................11

II.    Carmichael's Opinions Regarding Intent Or Motive Are Improper .............13

III.    Carmichael's Disparagement Of The Patent Office Is An Improper Expert Opinion...................................................................14

IV.    Carmichael's Remaining Opinions Are Not Helpful To The Jury...............17

CONCLUSION ....................................................................18

# TABLE OF AUTHORITIES

**Other Authorities**

*Am. Med. Sys., Inc. v. Laser Peripherals, LLC*,
    712 F. Supp. 2d 885 (D. Minn. 2010) ................................................................16

*Apeldyn Corp. v. Sony Corp.*,
    87 F. Supp. 3d 681 (D. Del. 2015) ......................................................................9

*AstraZeneca LP v. Tap Pharm. Prod., Inc.*,
    444 F. Supp. 2d 278 (D. Del. 2006) ...................................................................13

*AstraZeneca UK Ltd. v. Watson Labs., Inc. (NV)*,
    No. CA 10-915-LPS, 2012 WL 6043266 (D. Del. Nov. 14, 2012) .......... 7, 10, 13

*Brigham & Women's Hosp. Inc. v. Teva Pharm. USA, Inc.*,
    No. CIV 08-464, 2010 WL 3907490 (D. Del. Sept. 21, 2010).............. 11, 17, 18

*Corning Inc. v. SRU Biosystems*,
    No. CIV. 03-633 JJF, 2004 WL 5523178 (D. Del. Nov. 5, 2004)......................17

*Crawford v. George & Lynch, Inc.*,
    No. CV 10-949-GMS-SRF, 2013 WL 6504361 (D. Del. Dec. 9, 2013) ........ 7, 12

*DNT, LLC v. Sprint Spectrum, LP*,
    No. 3:09CV21, 2010 WL 582164 (E.D. Va. Feb. 12, 2010) ..............................16

*EZ Dock, Inc. v. Schafer Sys., Inc.*,
    No. CIV. 98-2364(RHK/AJB), 2003 WL 1610781 (D. Minn. Mar. 8,
    2003) ...................................................................................................................16

*F. Hoffmann-La Roche, Ltd. v. Igen Int'l, Inc.*,
    No. 98-cv-00318-JJF (D. Del. Oct. 24, 2000)......................................................7

*Highland Capital Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005).......................................................... 7, 18

*In re Rosuvastatin Calcium Patent Litig.*,
    MDL No. 08-1949, 2009 WL 4800702 (D. Del. Dec. 11, 2009),
    *report and recommendation adopted*, MDL No. 08-1949-JJF, 2010 WL
    661599 (D. Del. Feb. 19, 2010)..........................................................................13

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
   887 F.2d 1050 (Fed. Cir. 1989) ...........................................................................15

*Lucas Aerospace, Ltd. v. Unison Indus., L.P.*,
   No. CV 93-525-JJF, 1995 WL 17958343 (D. Del. Mar. 9, 1995) ........................7

*Magnivision, Inc. v. Bonneau Co.*,
   115 F.3d 956 (Fed. Cir. 1997) ............................................................................15

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ............................................................................9

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000) .................................................................................6

*Ondeo Nalco Co. v. EKA Chems., Inc.*,
   No. CIV. 01-537-SLR, 2003 WL 1524658 (D. Del. Mar. 21, 2003)...................18

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
   345 F. Supp. 2d 431 (D. Del. 2004) ...................................................................6, 7

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ..........................................................................10

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
   No. CIV.A. 04-940-JJF, 2006 WL 2241018 (D. Del. Aug. 4, 2006)...................12

*Revlon Consumer Prods. Corp. v. L'Oréal S.A.*,
   No. CIV 96-192 MMS, 1997 WL 158281 (D. Del. Mar. 26, 1997) ............ 11, 12

*S.O.I.Tec Silicon On Insulator Techs., S.A. v. MEMC Elec. Materials, Inc.*,
   745 F. Supp. 2d 489 (D. Del. 2010) ............................................................ 15, 17

*Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
   637 F.3d 1269 (Fed. Cir. 2011) ..........................................................................10

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*,
   No. 03-cv-00241-JJF (D. Del. Sept. 16, 2004) .....................................................8

*Syngenta Seeds, Inc. v. Monsanto Co.*,
   No. CIV. 02-1331-SLR, 2004 WL 2106583 (D. Del. Sept. 8, 2004) ..................17

*Tap Pharm. Prods., Inc. v. Owl Pharm., L.L.C.*,
No. 1:99 CV 2715, 2003 WL 25695241 (N.D. Ohio Feb. 18, 2003) ..................16

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
No. CV 11-515-LPS-CJB, 2015 WL 12815314 (D. Del. Nov. 20, 2015) 8, 10, 14

*Zygo Corp. v. Wyko Corp.*,
79 F.3d 1563 (Fed. Cir. 1996) ..............................................................................1

**Statutes**

35 U.S.C. § 282 .......................................................................................................15

**Rules**

Fed. R. Evid. P. 702 ......................................................................................... 3, 6, 7

## INTRODUCTION

This is a patent case in which ViiV alleges that Gilead's bictegravir anti-HIV medication infringes two claims of ViiV's U.S. Patent No. 8,129,385 under the doctrine of equivalents.

Gilead has its own patent that covers bictegravir literally, which the United States Patent Office granted after considering ViiV's '385 patent. It is settled law that the "nonobviousness of the accused device, evidenced by the grant of a United States patent, is relevant to the issue of whether the change therein is substantial" under the doctrine of equivalents. *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996). Gilead is relying on its own patent as part of its defense against ViiV's allegations of infringement by equivalents.

ViiV responded by hiring attorney James T. Carmichael as an expert to opine on legal issues relating to patent prosecution. Carmichael's report seeks to undermine the Patent Office's examination of Gilead's patent by (1) disparaging the Patent Office and its examiners; and (2) providing legal conclusions on claim scope, Gilead's intent, and the law governing patent examination. These opinions are inadmissible legal conclusions (or speculations about motive and other things) that usurp the role of the judge and jury and that courts in this District routinely exclude.

As a result, Gilead is in the position of either offering an expert on improper subject matter to rebut Carmichael (and incur the attendant costs, time at trial, and potential juror confusion) or forgoing a legal expert altogether. To avoid this Hobson's choice, Gilead moves now to strike Carmichael's expert report. For the reasons set forth below, the Court should grant the motion. If the Court denies the motion, Gilead asks for leave to submits its own responsive report.

## NATURE AND STAGE OF THE PROCEEDINGS

ViiV filed its Complaint on February 7, 2018 accusing Gilead's bictegravir of infringing the '385 patent. D.I. 1. Gilead answered ViiV's complaint on April 16, 2018, including defenses of invalidity and non-infringement. D.I. 9. Fact discovery ended on October 4, 2019. D.I. 87 at 3.

The parties served their opening expert reports on November 15, 2019. *Id.* at 6. One of ViiV's experts in support of its infringement allegations is James T. Carmichael, whom ViiV offers as an expert on "USPTO Patent Practice and Procedure." Ex. A, Opening Expert Report of James T. Carmichael Concerning USPTO Patent Practice & Procedure, at 1. The parties will submit responsive expert reports on January 10, 2020 and reply expert reports on February 7, 2020. D.I. 87 at 6.

Expert discovery closes on April 17, 2020, and a seven-day jury trial is scheduled to begin on September 21, 2020. *Id.* at 3, 11.

## SUMMARY OF THE ARGUMENT

The Court should strike Carmichael's report because it is a lawyer's brief disguised as an expert report. Carmichael is not a person of ordinary skill in the art. But he has submitted a report mostly addressing claim scope, which has already been decided by the Court. He improperly opines on the legal conclusions to be drawn from prosecution activities, and offers "opinions" on Gilead's intent, motive, and state of mind from reading documents—all of which are committed to the judgment of the factfinder (not a retained expert).

Carmichael's report is an object lesson in improper attorney-expert opinion. Courts in this District have encountered these types of opinions before and have uniformly excluded them. Because Carmichael's report does not comply with Federal Rule of Evidence 702 and the clear and consistent guidance of courts in this District, the Court should strike his report.

For ease of reference, the below chart summarizes the grounds Gilead advances for striking specific sections of his report:

| Rpt. Sect. | Shorthand Reference | Grounds For Striking Section | | | | |
|---|---|---|---|---|---|---|
| | | Rule 702 | Disparaging PTO | Claim Scope | Gilead's Intent | Statement of Law / Duty |
| IV.A | General Patent Prosecution | X | | | | |
| IV.B | PTO Statistics | X | X | X | | X |
| V | Prosecution History of Gilead's Patent | X | | | | |
| VI.A | Same Examiner | X | | X | | X |
| VI.B | Consideration of Patent-In-Suit | X | X | X | X | X |
| VI.C | Equivalents Analysis During Prosecution | X | | X | | X |

## STATEMENT OF FACTS

### A.    Carmichael's Background And Experience

Carmichael has been an attorney in private practice for the last twenty years, focusing on patent prosecution, litigation, and expert testimony. Ex. A at ¶¶ 27-33. He is the founder of his current law firm (Carmichael IP, PLLC) and represents clients in patent prosecution and litigation. *Id.* at ¶ 33. He works regularly as an expert witness and has been deposed over 70 times. Ex. B, Carmichael CV at 8-12.

Prior to entering private practice, Carmichael spent eight years in the Patent Office where he first worked as an attorney in the Office of the Solicitor. Ex. A at ¶ 15. He eventually became the Examiner-in-Chief in the electrical and computer division of the Board of Patent Appeals and Interferences. *Id.* at ¶ 23. Carmichael's background is in high-technology and physics. *Id.* at ¶¶ 10-11. Carmichael is not a

4

person of ordinary skill in the art for the technology at issue here, let alone experienced in examining pharmaceutical patents.

### B.    Carmichael's Report

Carmichael's overall opinion is that "the scope of the '385 patent claims is not affected by the examination and issuance of the Gilead patent." Ex. A at ¶ 42. His opinions on claim scope are set out in three sections.

The first two sections are by way of background. Section IV describes patent-prosecution activities, regulations, and statistics. Carmichael describes what he calls the "duty of candor and good faith" before the Patent Office and what he thinks this duty requires applicants to do as a matter of law to highlight prior-art references during prosecution. *Id.* at ¶¶ 64-68. Carmichael also includes several pages of statistics to describe the general burden and workload at the Patent Office, from which he concludes that examiners do not meaningfully review prior art during patent prosecution. *Id.* at ¶¶ 69-71. Section V then recites without elaboration various events that occurred during the prosecution of Gilead's patent. *Id.* at ¶¶ 73-96.

Section VI provides the substance of Carmichael's legal opinions on claim scope. He first opines that claim scope is unaffected under the doctrine of equivalents when the same examiner allows a patent covering the accused product over the patent-in-suit, as occurred in Gilead's prosecution. *Id.* at ¶¶ 97-99.

Carmichael then opines that an examiner's consideration of the asserted patent as a prior-art reference does not impact claim scope. He marshals the statistics from Section IV to say that patent examiners do not really "consider[]" a prior-art reference during prosecution even when they say they do. *Id.* at ¶¶ 100-03. He also suggests that the examiner here did not really consider the '385 patent when granting Gilead's patent, even though he indicated that he did. In so doing, he divines Gilead's intent to "bur[y]" the '385 patent during prosecution, things Gilead knew and should have "explain[ed]" to the examiner, and Gilead's "aware[ness]" of the '385 patent during prosecution. *Id.* Carmichael concludes by discussing the law governing patent prosecution and how the examiner would not have reviewed Gilead's patent application using the doctrine-of-equivalents standard. *Id.* ¶¶ 104-09.

## ARGUMENT

Federal Rule of Evidence 702 requires courts to ensure that expert testimony is both reliable and relevant. *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 434 (D. Del. 2004). To be reliable, an expert's opinion must be "based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 155 (3d Cir. 2000) (internal quotation marks omitted). Those opinions must constitute more than "mere personal belief as to the weight of the evidence" and cannot "invade[]

the province of the fact-finder." *Oxford Gene Tech.*, 345 F. Supp. 2d at 435. As such, parties cannot hire experts to provide what would otherwise be fact testimony, such as by allowing experts to "simply rehash[] otherwise admissible evidence about which [the expert] has no personal knowledge." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005). As described below, each of Carmichael's opinions falls short of satisfying Rule 702.

## I.   The Court Should Strike Carmichael's Legal Opinions

Courts in this District have not permitted parties to hire attorneys to give legal opinions under the guise of expert testimony. *AstraZeneca UK Ltd. v. Watson Labs., Inc. (NV)*, No. CA 10-915-LPS, 2012 WL 6043266, at *1 (D. Del. Nov. 14, 2012) ("[T]he judges in this District have a well-established practice of excluding the testimony of legal experts, absent extraordinary circumstances."); *Crawford v. George & Lynch, Inc.*, No. CV 10-949-GMS-SRF, 2013 WL 6504361, at *3 (D. Del. Dec. 9, 2013) (excluding opinions that relied on "impermissible legal conclusions"); *Lucas Aerospace, Ltd. v. Unison Indus., L.P.*, No. CV 93-525-JJF, 1995 WL 17958343, at *1 (D. Del. Mar. 9, 1995) (patent-law experts may not "draw inferences or make statements or conclusions about the patent law of the case"); Ex. C, Transcript of Hearing at 64:22-65:6, *F. Hoffmann-La Roche, Ltd. v. Igen Int'l, Inc.*, No. 98-cv-00318-JJF (D. Del. Oct. 24, 2000) ("[I]n this district, when you get into that patent law / expert / et cetera area, we have a very

consistent view. And the view is that they are not helpful. And not only do we mostly exclude them on [b]ench trials, but in jury trials they are so severely limited, I can't figure out why anybody continues to propose them.").

Instead, the Court is "presumed to be the patent law expert," and the jury does not need an additional explanation of the law from a retained expert. *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, No. CV 11-515-LPS-CJB, 2015 WL 12815314, at *3 n.8 (D. Del. Nov. 20, 2015); *see also* Ex. D, Judge Sue L. Robinson, *Additional Civil Trial Guidelines for Patent Cases* (Dec. 21, 2010) ("[D]escriptions of the law and instructions on the law are matters for the [C]ourt."); Ex. E, *St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*, No. 03-cv-00241-JJF, slip op. at 1 (D. Del. Sept. 16, 2004) (same).

### A.   Carmichael's Legal Opinions Regarding Claim Scope Are Improper

Carmichael's legal opinions regarding the scope of the asserted claims under the doctrine of equivalents are improper legal conclusions. Section VI of Carmichael's report provides three opinions on claim scope. Each follows the same pattern: Carmichael recites a fact that ViiV does not like and then gives the legal conclusion that this fact does not affect the scope of the asserted claims.

- "[T]he fact that the same examiner prosecuted the '385 patent and the Gilead patent does not indicate that the scope of the claims of the '385 patent is distinct from the scope of the claims of the Gilead patent, including under the doctrine of equivalents." Ex. A at ¶ 99.

- "The fact that the examiner 'considered' the '385 patent during the prosecution of the Gilead patent does not create a presumption that the scope of the two patents do not overlap." *Id.* at § VI.B. (p. 29).

- "[T]he fact that the claims of the Gilead patent were found to be patentable by Examiner Willis and eventually issued does not indicate that the scope of those claims is distinct from the scope of claims 2 and 6 of the '385 patent under the doctrine of equivalents." *Id.* at ¶ 109.

Claim scope is a question of law for the Court and not a factual issue for the jury to resolve through expert testimony. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *Apeldyn Corp. v. Sony Corp.*, 87 F. Supp. 3d 681, 695 (D. Del. 2015) ("Such a question of claim scope is a matter of law reserved entirely for the court." (internal quotation marks omitted)). And without any relevant experience in the pharmaceutical arts, Carmichael is just providing conclusions that "facts" from patent prosecution do not legally affect claim scope.

For these reasons, expert testimony from an attorney on the scope of asserted claims is improper. *See AstraZeneca UK*, 2012 WL 6043266, at *1 (excluding expert testimony from an attorney and PTO examiner on the scope of equivalents based on the asserted patent's prosecution history).[1] Such opinions usurp the purely judicial function to explain the law. *W.L. Gore*, 2015 WL 12815314, at *3 n.8.

The Court should strike these sections of Carmichael's report.

## B.   Legal Opinions Describing Duties Owed To The Patent Office Are Improper

Carmichael's second opinion in Section VI relies on a discussion of the duty of disclosure owed to the Patent Office. Ex. A at ¶¶ 100-03 & 102 n.79. The validity or enforceability of Gilead's patent is not at issue in this case, and "disclosure" before the Patent Office has nothing to do with the relevance of Gilead's patent in defense against infringement by equivalents. *See Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1282 (Fed. Cir. 2011) (explaining differences between validity and infringement as it pertains to separate patentability). Nonetheless, in Section VI and in earlier sections of his report, Carmichael describes federal regulations and MPEP sections

---

[1] To the extent expert testimony is ever relevant to claim scope, it is as extrinsic evidence during claim construction and must be from the perspective of someone having ordinary skill in the art, which Carmichael does not. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005).

as requiring certain disclosures by the applicant. *Id.* at ¶¶ 64-67. He then contrasts these requirements with his characterizations of Gilead's actions. *Id.* at ¶ 102.

But "expert witnesses may not testify as to the law governing a dispute or offer conclusions concerning a party's compliance with legal duties." *Brigham & Women's Hosp. Inc. v. Teva Pharm. USA, Inc.*, No. CIV 08-464, 2010 WL 3907490, at *2 (D. Del. Sept. 21, 2010). Opinions regarding legal duties owed to the Patent Office and whether the applicant met them are legal conclusions that are not permissible. *Revlon Consumer Prods. Corp. v. L'Oréal S.A.*, No. CIV 96-192 MMS, 1997 WL 158281, at *3 (D. Del. Mar. 26, 1997) (precluding expert from testifying about "duties and responsibilities of an inventor, his or her attorney or agent, and others substantively involved in the preparation and prosecution of a patent application in the PTO" (internal quotation marks omitted)). That prohibition applies with extra force here, where the validity and enforceability of Gilead's patent has not been placed at issue.

The Court should strike these sections of Carmichael's report.

## C. Legal Opinions Describing Patent-Prosecution Law Are Improper

Carmichael's third opinion in Section VI recites one aspect of the law governing patent prosecution: "Examiners do not assess patentability under the doctrine of equivalents analysis." Ex. A at § VI.C. (p. 30). From this, Carmichael concludes that Gilead's obtaining its own patent covering bictegravir does not

impact the scope of the asserted claims in ViiV's patent for purposes of the doctrine of equivalents. *Id.* at ¶ 109.

This opinion is a naked legal conclusion regarding patent law—in short, certain activity before the Patent Office has no legal effect on claim scope. *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, No. CIV. A. 04-940-JJF, 2006 WL 2241018, at *1 (D. Del. Aug. 4, 2006) ("This Court excludes testimony by patent law experts on substantive issues of patent law."); *Crawford*, 2013 WL 6504361, at *3 (excluding opinion that was "impermissible legal conclusion"); *Revlon*, 1997 WL 158281, at *3 (expert "may not testify as to substantive issues of patent law").

For example, in *Procter & Gamble*, the expert offered legal opinions about "whether the one-way or two-way test should be used for determining obviousness-type double patenting in this case" and other legal conclusions. 2006 WL 2241018, at *1. And in *Revlon*, the court struck an expert's proposed testimony on the law of inequitable conduct because that would "usurp the respective functions of the jury and the Court." 1997 WL 158281, at *3. Carmichael's statement regarding the law governing patentability and its relationship to the doctrine of equivalents is the same type of legal conclusion. The Court—not a retained expert—instructs the jury on the law of infringement and the relevance of Gilead's patent on the question of infringement.

The Court should strike this section of Carmichael's report.

## II.    Carmichael's Opinions Regarding Intent Or Motive Are Improper

Carmichael's second opinion in Section VI misstates that Gilead intentionally or knowingly breached a duty to disclose the '385 patent in the Patent Office during prosecution of its own application (even though Gilead in fact disclosed the '385 patent). Ex. A at ¶¶ 100-03; *see also id.* at ¶ 102 n.79. For support, Carmichael offers several opinions on Gilead's intent or state of mind:

- "Gilead appears to have 'buried' the '385 patent reference among numerous other references." *Id.* at ¶ 102.

- "Gilead also did not explain to Examiner Willis the significance of the '385 patent …." *Id.* at ¶ 103.

- Gilead employees "were aware of the structure of dolutegravir and the '385 patent …." *Id.*

But "expert witnesses are not permitted to testify regarding intent, motive, or state or mind, or evidence by which such state of mind may be inferred." *AstraZeneca UK*, 2012 WL 6043266, at *2 (internal quotation marks omitted); *AstraZeneca LP v. Tap Pharm. Prod., Inc.*, 444 F. Supp. 2d 278, 293 (D. Del. 2006) (same); *In re Rosuvastatin Calcium Patent Litig.*, MDL No. 08-1949, 2009 WL 4800702, at *8 (D. Del. Dec. 11, 2009) (same), *report and recommendation adopted*, MDL No. 08-1949-JJF, 2010 WL 661599 (D. Del. Feb. 19, 2010). Carmichael's testimony about Gilead's "aware[ness]," intent to "bur[y]," and

knowledge of a reference's significance is just "speculation as to what may have been in another's mind," and is therefore improper. Ex. A at ¶¶ 100-03; *W.L. Gore*, 2015 WL 12815314, at *5.[2]

The Court should strike this section of Carmichael's report.

## III.   Carmichael's Disparagement Of The Patent Office Is An Improper Expert Opinion

In two places in his report, Carmichael opines that his former colleagues at the Patent Office do not do their jobs very well, if at all. In Section IV.B, he states that an examiner's statement that she "has 'considered' a reference does not mean that the examiner has diligently read and understood every claim and disclosure." Ex. A at ¶ 69. He likewise estimates (without support) that examiners only spend 1/10 of a second reviewing prior-art references. *Id.* at ¶ 71. In Section VI, he suggests (again without support) that the examiner did not do his job when allowing Gilead's patent over the patent-in-suit. *Id.* at ¶¶ 100-01.

Carmichael provides these opinions so that ViiV can argue that the Patent Office did not *really* consider the patent-in-suit when granting Gilead's patent for bictegravir, contrary to what the Patent Office indicated. In Carmichael's estimation, examiners just use an automated computer program that "automatically

---

[2] Carmichael states that he is not providing evidence of intent. But such formalism does not insulate otherwise improper testimony. *See W.L. Gore*, 2015 WL 12815314, at *5 ("Despite Gore's attempt to paint it as such, this is not testimony about 'PTO practices and procedures' of the type the Court has sometimes permitted in the past.").

flips and quickly flashes the first page" of prior art references. *Id.* at ¶ 71. Carmichael has no evidence that such a dereliction of duty occurred with Gilead's patent or that it occurs generally.

These opinions run afoul of the presumed validity of an issued patent and the protections against fact discovery into how examiners analyze specific references during patent prosecution. *S.O.I.Tec Silicon On Insulator Techs., S.A. v. MEMC Elec. Materials, Inc.*, 745 F. Supp. 2d 489, 530 (D. Del. 2010) ("'The presumption of validity under 35 U.S.C. § 282 carries with it a presumption that the examiner did his duty and knew what claims he was allowing.'" (quoting *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989))); *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 960 (Fed. Cir. 1997) ("patent examiner's thought processes are shielded from discovery as to their bases, reasons, mental processes, analyses or conclusions" (internal quotation marks omitted)). Carmichael is opining that examiners do not do any analysis when they consider prior-art references, notwithstanding the statutory presumption that examiners do their jobs and his lack of knowledge regarding what happened when Gilead obtained its own patent over the '385 patent. These conclusions would apply equally to the patent-in-suit, resulting in mini-trials on the Patent Office's workload and its impact on the presumed validity of Gilead's and ViiV's patents.

For these reasons, courts exclude testimony from former Patent Office officials seeking to disparage the Patent Office and undermine the statutory presumption of validity of issued patents. *See DNT, LLC v. Sprint Spectrum, LP*, No. 3:09CV21, 2010 WL 582164, at *4 (E.D. Va. Feb. 12, 2010) (precluding "a negative, direct, or individualized attack on the patent examiner, performance, or a generalized attack on the entire PTO"); *EZ Dock, Inc. v. Schafer Sys., Inc.*, No. CIV. 98-2364(RHK/AJB), 2003 WL 1610781, at *13 (D. Minn. Mar. 8, 2003) ("Aspersions [regarding the Patent Office] are not evidence."); *Am. Med. Sys., Inc. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 903 (D. Minn. 2010) ("Such statements [about limitations at the PTO] are inadmissible because they seek to call into question the statutory presumption of validity …."); *Tap Pharm. Prods., Inc. v. Owl Pharm., L.L.C.*, No. 1:99 CV 2715, 2003 WL 25695241, at *1 (N.D. Ohio Feb. 18, 2003) (evidence of the "relative shortage of patent examiners at the PTO is inadmissible" because "[t]he only purpose such testimony would serve would be to undermine the presumption of validity of the patents-in-suit").

The Court should do the same here with respect to Sections IV and VI of Carmichael's report.

## IV.    Carmichael's Remaining Opinions Are Not Helpful To The Jury

Carmichael's only remaining opinions concern the general process of prosecuting patents at the Patent Office or reiterate portions of the prosecution history for the unasserted Gilead patent. Ex. A at ¶¶ 43-58, 73-96. These sections are not helpful to the jury because (to the extent they are even relevant) they are either duplicative or repeat otherwise admissible evidence. The Court should strike them as well.

It is unnecessary to have an expert in this case explain the process by which the Patent Office issues a patent.[3] The jury will be shown a Federal Judicial Center video about patent law and the policies and procedures before the PTO, which is enough for the jury to understand the process. *See Syngenta Seeds, Inc. v. Monsanto Co.*, No. CIV. 02-1331-SLR, 2004 WL 2106583, at *2 (D. Del. Sept. 8, 2004); *Corning Inc. v. SRU Biosystems*, No. CIV. 03-633 JJF, 2004 WL 5523178, at *1 (D. Del. Nov. 5, 2004) (excluding expert testimony on "internal patent office procedures"); *S.O.I.Tec*, 745 F. Supp. 2d at 507 n.16 (excluding evidence on various patent procedures). Carmichael's testimony on these topics would add nothing. Ex. A at ¶¶ 43-58 (discussing a notice of allowance, the prohibition against double patenting, prior-art searches, and the federal regulations for what

---

[3] Gilead recognizes that courts in this District have occasionally allowed experts to testify regarding this aspect of patent-prosecution procedures. *Brigham & Women's Hosp. Inc. v. Teva Pharm. USA, Inc.*, No. CIV 08-464, 2010 WL 3907490, at *2 (D. Del. Sept. 21, 2010).

must appear in the patent). And there is no fact in dispute that warrants an additional explanation from a retained expert about the procedure for obtaining a patent. The Court should exclude Section IV.A of Carmichael's report.

With respect to the prosecution history of Gilead's patent, Carmichael rehashes the content of patent-prosecution documents without analysis. Providing an expert just to create a factual narrative through otherwise admissible patent-prosecution documents of this sort is not proper expert testimony—it is simply reading documents into the record. *See Ondeo Nalco Co. v. EKA Chems., Inc.*, No. CIV. 01-537-SLR, 2003 WL 1524658, at *3 (D. Del. Mar. 21, 2003) (preventing expert from providing a "walk[] through [of] the file history" (internal quotation marks omitted)); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) ("[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."). For that reason, "in this district parties are generally not permitted to explain patent prosecution histories through expert testimony." *Brigham & Women's*, 2010 WL 3907490, at *2. The Court should exclude Section IV.B of Carmichael's report.

## CONCLUSION

For the foregoing reasons, Gilead respectfully requests that the Court strike Carmichael's expert report. If the Court does not strike Carmichael's report, Gilead asks for leave to submit its own responsive report.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

_____

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

OF COUNSEL:

Adam K. Mortara
J. Scott McBride
Mark S. Ouweleen
Matthew R. Ford
Nevin M. Gewertz
Tulsi E. Gaonkar
Rebecca T. Horwitz
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL  60654
(312) 494-4400

Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO  80202
(303) 592-3100

Nao Takada
TAKADA LEGAL, P.C.
112-01 Queens Blvd.
Forest Hills, NY  11375
(212) 380-7804

December 9, 2019

*Attorneys for Defendant
Gilead Sciences, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief has been prepared in Times New Roman 14-point typeface using Microsoft Word, and contains 4,095 words as determined by the Word Count feature of Microsoft Word.  The foregoing word count does not include the cover page, tables, or counsel blocks.


December 9, 2019


/s/ Jeremy A. Tigan
Jeremy A. Tigan (#5239)

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **VIIV HEALTHCARE COMPANY, SHIONOGI & CO., LTD., and VIIV HEALTHCARE UK (NO. 3) LIMITED,** | **C.A. No. 1:18-cv-00224-CFC-CJB** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **GILEAD SCIENCES, INC.,** | |
| **Defendant.** | |

## OPENING EXPERT REPORT OF JAMES T. CARMICHAEL CONCERNING USPTO PATENT PRACTICE AND PROCEDURE

Dated:  November 15, 2019

_James T. Carmichael_
James T. Carmichael

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................1

II. QUALIFICATIONS ...............................................................................................2

    A. Education and Experience.......................................................................2

    B. Compensation ........................................................................................8

    C. Materials Considered .............................................................................8

III. SUMMARY OF OPINIONS .................................................................................8

IV. PATENT EXAMINATION PROCEDURES, POLICIES AND PRACTICES AT THE UNITED STATES PATENT AND TRADEMARK OFFICE ...............................10

    A. Patent Examination Procedures at the United States Patent and Trademark Office ....................................................................................................10

    B. Patent Examination Practices Relating to Prior Art Evaluation ...........................14

        i. USPTO Examiners Have Limited Time to Evaluate Applications............14

        ii. USPTO Examiners Have Limited Time to Evaluate Prior Art.................17

V. PROSECUTION OF THE GILEAD PATENT ....................................................19

VI. THE SCOPE OF THE ASSERTED CLAIMS OF VIIV'S '385 PATENT IS NOT INFORMED BY THE FACT THAT THE USPTO ALLOWED THE CLAIMS OF GILEAD'S PATENT THAT IT CONTENDS LITERALLY COVER BICTEGRAVIR....................................................................................................28

    A. The Fact that The Same Examiner Allowed the Claims of the '385 Patent and Gilead's Patent Does Not Bear on Whether the Two Patents Include Overlapping Claim Scope, Including Under the Doctrine of Equivalents............28

    B. The Fact that the Examiner "Considered" the '385 Patent During the Prosecution of the Gilead Patent Does Not Create a Presumption That The Scope of the Two Patents Do Not Overlap...........................................................29

    C. Examiners Do Not Assess Patentability Under The Doctrine of Equivalents Analysis....................................................................................................30

VII. RESERVATION OF RIGHTS ............................................................................32

VIII. CONCLUSION....................................................................................................33

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXHIBIT A – Curriculum Vitae of James T. Carmichael
EXHIBIT B – Materials Considered

## I.       INTRODUCTION

1.       My name is James T. Carmichael and Plaintiffs ViiV Healthcare Company, Shionogi & Co., Ltd. and ViiV Healthcare UK (No. 3) Limited (collectively, "ViiV") have retained me, through their counsel Desmarais LLP, to provide independent expert opinions with respect to United States Patent and Trademark Office ("USPTO") patent practice and procedure as applied to the patent-in-suit (U.S Patent No. 8,129,385, the "'385 patent") and related applications, in addition to U.S. Patent No. 9,216,996 (the "'996 patent" or "the Gilead patent").

2.       I understand that ViiV has sued Gilead Sciences, Inc. ("Gilead") for infringement of the '385 patent.  I understand that ViiV contends that the bictegravir component of Gilead's Biktarvy pharmaceutical anti-HIV drug infringes claims 2 and 6 of the '385 patent under the doctrine of equivalents.

3.       I was asked to:

- Provide background information regarding procedures and practices at the USPTO, including those relating to the patent application process; and

- Review and analyze the prosecution history of Gilead Sciences, Inc.'s Application No. 14/133,858 ("Gilead's patent application") under USPTO procedure, which issued as the Gilead patent.

4.       Unless otherwise indicated, all factual and technical analysis and assertions in my Report are based on my personal knowledge and experience.  I reserve the right to supplement my opinions and/or this Report should I receive additional information, *e.g.*, expert reports, testimony, pleadings, trial testimony, exhibits, documents, discovery, opinions, or additional evidence pertinent thereto.

5.       The following Report details subject matter areas and opinions about which I may testify in this litigation if called upon to do so.  I may also prepare and present demonstratives at

trial that summarize and illustrate these opinions.  I am familiar with and am prepared to testify about the following as applicable to the patent-in-suit:

- Patent practice and procedure in the USPTO;

- The application process for obtaining a patent;

- USPTO policies and procedures with regard to examination;

- USPTO policies and procedures applicable to the patent-in-suit and Gilead's bictegravir patent; and

- The procedural prosecution history of the patent-in-suit and of Gilead's patent.

6. I have reviewed and considered the documents and other materials listed below in Exhibit B in light of my specialized knowledge provided by my education, training, research, and experience, as summarized in Section II and described in detail in my curriculum vitae, provided as Exhibit A.  My analysis of those materials, combined with the specialized knowledge that I have obtained over the course of my education and career, form the basis for my opinions in this Report.

7. I offer no opinions on anyone's state of mind or intent.  Nothing in this Report should be construed as providing any such opinion.

8. I offer no opinion on the law.  Nothing in this Report should be construed as providing any such opinion.

## II. QUALIFICATIONS

### A. EDUCATION AND EXPERIENCE

9. My education and experience are summarized in the curriculum vitae attached hereto as Exhibit A.

10. I attended Yale University from 1980 to 1984.  I had a "Special Divisional" major focusing on city planning.  My coursework included Computer Science and Physics, among other

things.  During college, I had a job one summer as a computer programmer for State Farm Insurance.

11.    Upon graduating from Yale University with a Bachelor of Arts degree in 1984, with a major in city planning, I enrolled in the University of Wisconsin to study both electrical engineering and law concurrently.  In 1987, I received a Juris Doctor degree from the University of Wisconsin, graduating with honors (cum laude).  I later enrolled in the Master of Science in Electrical and Computer Engineering program at George Mason University.  I completed about ten of the twenty courses required for that degree before leaving the program in 1996.

12.    From 1987 to 1990, I was an associate attorney with Lyon & Lyon LLP, a large patent law firm based in Los Angeles, California.  As an associate, I assisted in patent litigation in various technologies including biotech-related inventions and patent prosecution.  I also took a course in biotechnology at UCLA.

13.    In 1990, I became the sole law clerk for Circuit Judge Howard T. Markey at the U.S. Court of Appeals for the Federal Circuit.  In that role, I assisted Judge Markey in drafting opinions and discussing pending cases with the other Federal Circuit judges.  Judge Markey was the original Chief Judge of the Federal Circuit, from 1982 to 1990.

14.    In 1991, I took and passed the examination for registration to practice in patent cases before the U.S. Patent and Trademark Office (the "Patent bar exam").  This required the USPTO to determine that I had taken coursework equivalent to an engineering or science degree.

15.    From 1991 to 1996, I was an attorney in the Office of the Solicitor at the USPTO. This appointment required the USPTO once again to determine that I had taken coursework equivalent to an engineering or science degree.

16.     While in the Solicitor's Office, I briefed and argued approximately thirty appeals at the U.S. Court of Appeals for the Federal Circuit in cases involving patentability and USPTO procedure.  I also represented the USPTO in U.S. District Courts cases on USPTO procedure.  In some cases I searched for prior art in support of my duties.

17.     In the Solicitor's Office, I was appointed coordinator of enrollment and disciplinary proceedings.  In that role, I assigned and supervised all enforcement proceedings against registered patent attorneys charged with violating the USPTO Code of Professional Responsibility. The issues in these matters included violation of attorneys' duty to disclose information known to be material under 37 CFR § 1.56 (duty of disclosure).[1]  I evaluated hundreds of patent applications for possible violations.

18.     I also assisted the USPTO in developing federal regulations. For example, I consulted with my then-colleagues in the Solicitor's office in helping to develop the USPTO's 1992 revision of 37 CFR § 1.56.

19.     I advised the head of the USPTO (then called the Commissioner of Patents and Trademarks) concerning means plus function claims and whether examiners should be instructed to analyze equivalents under 35 U.S.C. 112, sixth paragraph (now 112(f)). This involved the Commissioner issuing an official Notice that I worked on,[2] and an en banc Federal Circuit case in which I advised and represented the USPTO.[3]

20.     As an Associate Solicitor, I helped revise sections of the Manual of Patent Examining Procedure ("MPEP").  The MPEP is a reference work used as a handbook by patent

---

[1]*See* 37 CFR § 10.23(c) (10).
[2]PTO Official Gazette, 1134 TMOG 632-637 (January 7, 1992), "Applicability of the last paragraph of 35 U.S.C. § 112 to patentability determinations before the Patent and Trademark Office."
[3]*In re Donaldson*, 16 F.3d 1189 (Fed. Cir. 1994) (en banc).

attorneys and examiners alike concerning USPTO policy and procedure. Attorneys are tested on the procedures contained in the MPEP before they can become registered to practice before the USPTO. USPTO procedures are also found in Board decisions, Commissioner decisions, Federal Register notices, the Board Trial Rules and Practice Guide, and customary practice inside the USPTO.

21.     I was responsible for legal review of MPEP Chapter 2000 (Duty of Disclosure) and Chapter 2200 (Reexamination), among others. I also wrote some of the questions appearing on the Patent bar exam and helped decide petitions from attorneys who received a failing grade. Other duties included helping train groups of USPTO employees on proper procedures and ethics.

22.     I personally oversaw all requests for examiner depositions at the USPTO, and defended such depositions as well. As part of my duties at the USPTO, I personally helped train examiners on how to handle questions related to the duty of candor and good faith, by lecturing to over five hundred (500) examiners and preparing materials to train the remainder of the examining corps.

23.     In 1996, I was appointed Examiner in Chief (also known as Administrative Patent Judge) in the electrical and computer division of the Board of Patent Appeals and Interferences. This position required me to have the equivalent of a B.S. in electrical engineering, as well as graduate level education in electrical engineering.

24.     In that post, which I held until 1999, I was responsible for hearing and deciding appeals taken from final rejections imposed by patent examiners. In each case, I examined the applications, evaluated the arguments of the USPTO examiner and the arguments of the patent applicant's attorney, weighed the evidence of record, and rendered a decision affirming or reversing the examiner's decision. I also considered entry of any new rejection I deemed

appropriate and occasionally searched for prior art.  For example, I analyzed applications for possible rejection under the doctrine of prosecution laches.  I sometimes formulated and entered a new ground of rejection against the claims under consideration, in addition to or instead of the examiner's grounds for rejection.

25.     As an Examiner-In-Chief, I participated in panel review to evaluate about eight hundred (800) patent applications for electrical and computer inventions.  In about two hundred (200) of those, I authored opinions determining patentability.  Although my decisions were appealable directly to the U.S. Court of Appeals for the Federal Circuit, only one of my decisions was appealed.  That decision was affirmed.[4]

26.     In all, I participated in examination of more than one thousand (1,000) pending patent applications at the USPTO.

27.     I completed my public service in 1999 and opened a Washington, D.C. office for Lyon & Lyon LLP, the same patent law firm I was with in the 1980's.  I served as managing partner of that office until the firm closed nationwide in 2002.  Most of my work for Lyon & Lyon LLP in that period involved patent applications for electrical and computer inventions.  I primarily performed patent prosecution, opinions, and licensing.  I was the responsible partner for hundreds of patent applications on chemical inventions.

28.     I also served as the Secretary of the National Association of Patent Law Firms, a group consisting of more than twenty U.S. law firms specializing in patent prosecution.

29.     From 2002 to July 1, 2015, I was a principal in the Northern Virginia office of Miles & Stockbridge P.C., a law firm of approximately two hundred attorneys in the greater Washington, D.C. area.  The largest focus of my work was preparing and prosecuting patent

---

[4]*See In re Hyatt*, 211 F.3d 1367 (Fed. Cir. 2000).

applications before the USPTO.  I also worked on post-grant proceedings before the USPTO including AIA, interference, and reexamination.

30.     My practice further included attorney misconduct proceedings, expert consulting, patent licensing, due diligence, litigation, appeals, freedom to operate searching and analysis, patentability searching and analysis, transactions, and opinions.  I conducted dozens of freedom to operate studies for my clients concerning patents in their field.  I worked for the USPTO itself as an independent expert on patent practice and procedure.

31.     I also prosecuted patent applications through the Patent Cooperation Treaty.  For my clients who wished to obtain patent protection in Europe and other countries, I coordinated with foreign associates that were then admitted to practice before the EPO or the respective foreign countries.

32.     I served as the Chair of the American Intellectual Property Law Association (AIPLA) Professional Programs Topics sub-committee.  The AIPLA is a national organization of intellectual property professionals with over fourteen thousand members.

33.     In July 2015, I founded Carmichael IP, PLLC, a law firm focused on practice before the USPTO and advising clients on related issues including freedom to operate. My current practice includes preparing and prosecuting patent applications in the U.S. Patent and Trademark Office, as well as freedom to operate counseling, due diligence, expert consulting, and post-grant proceedings such as *Inter Partes* Review, reissue, and certificates of corrections before the USPTO.  The cases where I have offered deposition and/or trial testimony during the past 4 years are listed in my C.V. attached hereto as Exhibit A.

34.     I am admitted to the bars of California and Washington, D.C., and I am registered to practice in patent cases before the U.S. Patent and Trademark Office.  I have authored several articles, which are listed in my C.V. attached hereto as Exhibit A.

35.     I have given lectures on patent procedure and ethics for various organizations, including the Federal Circuit Bar Association and the U.S. Patent and Trademark Office.  A list of speeches is included in my C.V. in Exhibit A.

36.     Occasionally, reporters seek my input for articles on developments in patent law. A list of press interviews is included in my C.V. in Exhibit A.

**B.     COMPENSATION**

37.     I am being compensated at my customary rate of $795/hour for my work in this proceeding and receiving reimbursement for expenses incurred in the course of my work.  My standard rate is typically adjusted in January, and will increase on January 1, 2020.  My compensation is not contingent in any way on the opinions I have reached, the specifics of my testimony, or the outcome of this case.

**C.     MATERIALS CONSIDERED**

38.     In forming the opinions expressed herein and preparing this Report, I have relied on my professional and academic experience and considered the materials cited in this Report and the materials listed in Exhibit B.  This Report provides a summary of my current opinions based on my analysis of the information and materials relevant to the opinions expressed in this Report as of this date.

**III.   SUMMARY OF OPINIONS**

39.     I have reviewed the relevant portions of Gilead's responses to Interrogatory 4.  I understand that Gilead contends bictegravir—the alleged infringing component of its Biktarvy®

product—does not infringe claims 2 and 6 of the '385 patent because, among other reasons, Gilead claims to have invented and obtained a patent on bictegravir, namely the Gilead patent.

40.     In particular, Gilead asserts that (a) both the '385 patent and the Gilead patent were examined by the same patent examiner, and (b) when the examiner reviewed and eventually allowed the claims of Gilead's patent application, he "had before [him] the '385 patent's disclosures and claims," noting the '385 patent "is listed on the face of" Gilead's patent."[5]   I understand that Gilead contends that because it obtained literal coverage of bictegravir in the claims of the Gilead patent, it somehow cannot infringe claims 2 and 6 of the '385 patent, including under the doctrine of equivalents.

41.     I offer no opinion on whether bictegravir infringes claim 2 or 6 of the '385 patent. Nothing in this Report should be construed as providing any such opinion.

42.     I offer an opinion on the relevance or lack thereof of Gilead's contention that the fact that it obtained patent claims that cover the literal scope of bictegravir somehow means that it does not infringe claims 2 or 6 of the '385 patent, including under the doctrine of equivalents.   In my opinion, based on my expertise in patent examination procedures, the scope of the '385 patent claims is not affected by the examination and issuance of the Gilead patent.

---

[5]ViiV Healthcare Company, Shionogi & Co., Ltd. And ViiV Healthcare UK (No. 3) Limited v. Gilead Sciences, Inc., in the United States District Court for the District of Delaware, C.A. No. 18-224 (VAC) (CJB), Defendant Gilead Sciences, Inc.'s Fourth Supplemental Responses to Plaintiffs' First, Second, & Third Sets of Interrogatories (Nos. 1-14), pp. 25-27.

IV.   **PATENT EXAMINATION PROCEDURES, POLICIES AND PRACTICES AT THE UNITED STATES PATENT AND TRADEMARK OFFICE**

A.   **PATENT EXAMINATION PROCEDURES AT THE UNITED STATES PATENT AND TRADEMARK OFFICE**

43.   Based on my experience as a patent practitioner, an Examiner-in-Chief on the USPTO's Board of Patent Appeals and Interferences, an Associate Solicitor in the USPTO Office of the Solicitor, and a law clerk at the U.S. Court of Appeals for the Federal Circuit, I have become intimately familiar with patent prosecution.

44.   Patents are often compared to contracts between the public and the inventor. Since issued patents are publicly available, the public benefits by gaining access to the information disclosed therein. In return for this benefit, the public grants the inventor a limited term of exclusivity enforceable through the courts.

45.   Procedurally, an inventor must apply for a patent by submitting an application to the USPTO. Individuals named as inventors in a patent application are considered "applicants."

46.   The application must describe the invention sufficiently to enable one of ordinary skill in the art to practice the invention, and conform to other statutory requirements.

47.   A patent application is typically arranged in the sequence described in 37 CFR § 1.77:[6]

> (a) The elements of the application, if applicable, should appear in the following order:
> (1) Utility application transmittal form.
> (2) Fee transmittal form.
> (3) Application data sheet (see § 1.76).
> (4) Specification.
> (5) Drawings.
> (6) The inventor's oath or declaration.
> (b) The specification should include the following sections in order:
> (1) Title of the invention, which may be accompanied by an introductory portion stating the name, citizenship, and residence of the applicant (unless included in the application data sheet).

---

[6]MPEP 608.01(a) Arrangement of Application.

(2) Cross-reference to related applications.
(3) Statement regarding federally sponsored research or development.
(4) The names of the parties to a joint research agreement.
(5) Reference to a "Sequence Listing," a table, or a computer program listing appendix submitted on a compact disc and an incorporation-by-reference of the material on the compact disc (see § 1.52(e)(5)). The total number of compact discs including duplicates and the files on each compact disc shall be specified.
(6) Statement regarding prior disclosures by the inventor or a joint inventor.
(7) Background of the invention.
(8) Brief summary of the invention.
(9) Brief description of the several views of the drawing.
(10) Detailed description of the invention.
(11) A claim or claims.
(12) Abstract of the disclosure.
(13) "Sequence Listing," if on paper (see §§ 1.821 through 1.825).

48.     The application must conclude with numbered statements, called "claims," defining the subject matter sought to be patented.

49.     A claim that stands on its own is called an "independent" claim.  A "dependent" claim refers to another claim, incorporates the limitations of the other claim, and adds additional limitations thereto.

50.     The submitted application would then be assigned to an examiner at the USPTO. The assigned examiner reviews the patent application and determines whether it meets certain requirements.  That process of examining a patent application to determine whether it meets those requirements and other issues is referred to as an "examination"

51.     The examiner determines whether the application, among other things, meets the following requirements:

- contained an adequate written description of the invention;[7]
- enabled one of ordinary skill in the art to practice the invention;[8]

---

[7]*See generally* MPEP 2103 Patent Examination Process.
[8]*Id.*

- contained at least one distinct "claim" particularly pointing out the boundaries of the invention;[9]
- claimed an invention that was new, useful, and nonobvious in light of the previous technology (also known as the "prior art"); [10]
- would not grant more than one patent for the same invention;[11]
- would not result in an undue time-wise extension of a previously issued patent;[12]
- did not violate the doctrine of prosecution laches;[13] and
- was otherwise proper for issuance as a patent.

A perceived failure to meet any of these requirements would cause the examiner to reject the affected claims.[14]

52.    The examiner's required duties include, among other things, conducting a search of publicly available documents for prior art and other information relevant to granting of a patent. In addition, the examiner studies the information presented by the applicants in any timely Information Disclosure Statements ("IDS").  As explained further below, an IDS is "[a] list of all patents, publications, applications, or other information submitted [by the applicant] for consideration by the Office."[15]

53.    The examiner's search generally includes reviewing patents and other references categorized as relevant to various classifications connected with the claimed invention, and searches of computer databases.  As part of his or her duty to search for prior art, the examiner also searches parent applications for pertinent prior art.

---

[9]*Id.*
[10]*Id.*
[11]MPEP 804 Definition of Double Patenting.
[12]*See generally* MPEP 2701 Patent Term.
[13]MPEP 2190 Prosecution Laches.
[14]*See generally* MPEP 2103 Patent Examination Process.
[15]MPEP 609 Information Disclosure Statement.

54.     The examiner also reviews any statements regarding the prior art or co-pending applications made by the inventor in the specification of the application.  The examiner generally has access to all applications that are pending at the USPTO.

55.     After performing the prior art search and the initial examination of the application, the examiner either allows the application to issue as a patent or, more frequently, determines that the application should not issue in its present form and rejects one or more claims.  The examiner presents this evaluation to the patent applicant in a written communication generally referred to as an "Office action."  If an Office action rejects claims as unpatentable, an applicant can respond by amending the application and/or arguing against the rejection.

56.     After receiving an amendment, declaration, or other response to a rejection, an examiner then reexamines the application in light of the applicant's response.  If the examiner determines that the claims of the application are still do not meet the criteria for patentability, he or she issues another Office action.  This back-and-forth process between the applicant and the USPTO is generally referred to as patent "prosecution."

57.     In cases where the examiner finds that an application should be allowed to issue as a patent, a "Notice of Allowance" is issued.  For example, if an examiner becomes satisfied that all the above-mentioned criteria were satisfied for all of the claims remaining in an application, the examiner would indicate that the USPTO would allow the application to issue as a patent.

58.     The process described above is generally referred to as patent "examination."  The USPTO's official record of the examination and prosecution process is referred to as the "prosecution history," the "file history," or the "file wrapper."

## B. PATENT EXAMINATION PRACTICES RELATING TO PRIOR ART EVALUATION

### i. USPTO Examiners Have Limited Time to Evaluate Applications

59. The USPTO receives hundreds of thousands of patent applications every year, with a limited number of examiners to evaluate them.  In 2013, the USPTO received 601,464 patent applications and issued 290,083 patents, which increased to 322,448 issued patents by 2015.[16]

TABLE 1: Summary of Patent Examining Activities (FY 2011–FY 2015) (Preliminary for FY 2015)[1]

| Patent Examining Activity | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| Applications filed, total[1,3] | 537,171 | 565,566 | 601,464 | 618,457 | 617,216 |
| Utility[3] | 504,663 | 530,915 | 564,007 | 579,873 | 578,321 |
| Reissue | 1,158 | 1,212 | 1,074 | 1,207 | 887 |
| Plant | 1,103 | 1,181 | 1,318 | 1,123 | 1,119 |
| Design | 30,247 | 32,258 | 35,065 | 36,254 | 36,889 |
| Provisional applications filed[2,4] | 150,187 | 163,031 | 177,942 | 169,173 | 170,676 |
| First actions | | | | | |
| Design | 25,042 | 26,578 | 27,669 | 28,341 | 33,549 |
| Utility, Plant, and Reissue | 505,651 | 542,081 | 595,110 | 578,352 | 632,337 |
| PCT/Chapter | 13,297 | 18,400 | 15,060 | 19,787 | 22,193 |
| Patent application disposals, total | 533,943 | 574,854 | 605,994 | 637,263 | 641,665 |
| Allowed patent applications, total | 266,580 | 305,840 | 334,560 | 346,909 | 353,700 |
| Design | 22,683 | 24,231 | 24,967 | 24,695 | 28,663 |
| Utility, Plant, and Reissue | 243,897 | 281,609 | 309,593 | 322,214 | 325,037 |
| Abandoned, total | 267,353 | 269,009 | 271,424 | 290,354 | 287,965 |
| Design | 2,701 | 2,567 | 2,705 | 2,828 | 3,725 |
| Utility, Plant, and Reissue | 264,652 | 266,442 | 268,719 | 287,526 | 284,240 |
| Statutory invention registration disposals, total | 10 | 5 | 10 | - | - |
| PCT/Chapter II examinations completed | 3,191 | 2,671 | 2,016 | 1,450 | 1,655 |
| Applications published[5] | 321,115 | 328,620 | 339,775 | 382,056 | 362,536 |
| Patents issued[2,6] | 244,430 | 270,258 | 290,083 | 329,612 | 322,448 |
| Utility | 221,350 | 246,464 | 265,979 | 303,930 | 295,459 |
| Reissue | 969 | 921 | 809 | 661 | 531 |
| Plant | 816 | 920 | 842 | 1,013 | 1,020 |
| Design | 21,295 | 21,953 | 22,453 | 24,008 | 25,438 |
| Pendency time of average patent application[7] | 33.7 | 32.4 | 29.1 | 27.4 | 26.6 |
| Reexamination certificates issued | 909 | 893 | 819 | 790 | 764 |
| PCT international applications received by USPTO as receiving office | 48,285 | 52,417 | 56,226 | 62,697 | 56,480 |
| National requirements received by USPTO as designated/elected office | 65,463 | 67,573 | 73,488 | 78,213 | 85,387 |
| Patents renewed under Public Law (Pub. L. No.) 102–204[8] | 378,830 | 308,812 | 348,658 | 419,563 | 401,647 |
| Patents expired under Pub. L. No. 102–204[8] | 82,146 | 80,050 | 79,689 | 89,523 | 98,283 |

- Represents zero.
[1] FY 2015 filing data are preliminary and will be finalized in the FY 2016 PAR.
[2] FY 2014 application data has been updated with final end of year numbers.
[3] Utility patents include chemical, electrical and mechanical applications.
[4] Provisional applications provided for in Pub. L. No. 103–465.
[5] Eighteen-month publication of patent applications provided for the American Inventors Protection Act of 1999, Pub. L. No. 106–113.
[6] Excludes withdrawn numbers.  Past years' data may have been revised from prior year reports.
[7] Average time (in months) between filing and issuance or abandonment of utility, plant, and reissue applications. This average does not include design patents.
[8] The provisions of Pub. L. No. 102–204 regarding the renewal of patents superseded Pub. L. No. 96–517 and Pub. L. No. 97–247.

---

[16]United States Patent and Trademark Office, *Performance and Accountability Report Fiscal Year 2015*, Table 1, 6 (2015), *available at* https://www.uspto.gov/sites/default/files/documents/USPTOFY15PAR.pdf.

In 2013, there were 7,928 utility patent examiners at the USPTO handling not only the ~564,000 utility patent applications filed that year, but also all pending utility applications.[17]

**TABLE 29: End of Year Personnel¹ (FY 2011–FY 2015)**

| Activity | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| Patent Business Line | 9,234 | 10,632 | 10,847 | 11,484 | 11,855 |
| Trademark Business Line | 976 | 899 | 926 | 966 | 812 |
| **Total USPTO** | **10,210** | **11,531** | **11,773** | **12,450** | **12,667** |
| **Examination Staff** | | | | | |
| **Patent Examiners** | | | | | |
| UPR Examiners | 6,685 | 7,831 | 7,928 | 8,466 | 8,977 |
| Design Examiners | 95 | 104 | 123 | 145 | 184 |
| **Total UPR and Design Examiners** | **6,780** | **7,935** | **8,051** | **8,611** | **9,161** |
| Patent Examiner Attrition Rate | 2.96% | 3.07% | 4.23% | 3.40% | 4.32% |
| Trademark Examining Attorneys | 378 | 386 | 409 | 429 | 456 |
| Trademark Examining Attorneys Attrition Rate | 2.83% | 3.98% | 1.92% | 2.40% | 3.51% |

¹ Number of positions.

60.    In 2015, there were 1,203,775 pending patent applications.[18]

**TABLE 5: Summary of Total Pending Patent Applications (FY 2015)**

| Stage of Processing | Utility, Plant, and Reissue Applications | Design Applications | Total Patent Applications |
|---|---|---|---|
| **Pending patent applications, total** | **1,147,595** | **56,180** | **1,203,775** |
| **In preexamination processing, total** | **140,517** | **2,051** | **142,568** |
| **Under examination, total** | **910,495** | **45,970** | **956,465** |
| Undocketed | 36,746 | 7,034 | 43,780 |
| Awaiting first action by examiner | 375,958 | 30,111 | 406,069 |
| *Subtotal applications awaiting first action by examiner³* | *553,221* | *39,196* | *592,417* |
| RCE awaiting first action | 26,901 | - | 26,901 |
| Rejected, awaiting response by applicant | 342,567 | 7,293 | 349,860 |
| Amended, awaiting action by examiner | 87,724 | 1,358 | 89,082 |
| In interference | 61 | - | 61 |
| On appeal, and other¹ | 40,538 | 174 | 40,712 |
| **In postexamination processing, total** | **96,583** | **8,159** | **104,742** |
| Awaiting issue fee | 78,125 | 6,925 | 85,050 |
| Awaiting printing² | 15,050 | 1,228 | 16,278 |
| D-10s (secret cases in condition for allowance) | 3,408 | 6 | 3,414 |

- Represents zero.
¹ Includes cases on appeal and undergoing petitions.
² Includes withdrawn cases.
³ Subtotal is not included in pending patent applications total.

61.    The Department of Commerce estimated that on average, examiners spend only **18 hours** throughout the prosecution of each application.  This includes reading the application and

---

[17]*Id.* at Table 29.
[18]*Id.* at Table 5.

claims, searching for prior art, formulating Office actions, and preforming subsequent art review, among other things.[19]

62.     As part of its determination of examiner compensation, the USPTO allocates a specified number of hours to applications in different technology groups, with further adjustments to this allocation based on examiner seniority.  Only a very small slice of that time is allocated to the task of "Perform Subsequent Search."[20] This would include reviewing an IDS submitted after the examiner had already performed an initial search.



63.     Examiners are placed on a production schedule that limits the amount of time they can spend per application.  Examiners earn cash bonuses depending on how many applications they dispose of, for example, by allowing an application to issue as a patent or finally rejecting an application that goes abandoned.

---

[19]United States Government Budget For Fiscal Year 2004, "Building Infrastructure for Technological Innovation." Department of Commerce, 69-71.
[20]United States Patent and Trademark Office, *Examination Time and the Production System*, at 9 *available at* https://www.uspto.gov/sites/default/files/documents/Examination%20Time%20and%20the%20P roduction%20System.pdf (time for "Perform Subsequent Search" shown in orange in pie chart as a share of the total time to examine an application).

### ii.  USPTO Examiners Have Limited Time to Evaluate Prior Art

64.     Identifying and evaluating prior art is an important step to granting valid patents. As explained by the current USPTO director, "[w]e all want high quality patents [and] surfacing the most relevant prior art during examination—and examining in light of that prior art—is critical to ensuring this level of quality for the patents."[21]

65.     Due to the limited amount of time to examine a patent application explained above, the USPTO instructs examiners to rely on patent applicants to disclose prior art.  Patent applicants and their representatives are required to act with candor and good faith in dealing with the USPTO, including a duty of disclosure.  The USPTO sets forth those duties in 37 C.F.R. § 1.56 (Rule 56) and describes them in Chapter 2000 of the MPEP.[22]  The duty of disclosure requires disclosure of certain information that is known to be "material" to patentability.[23]  Patent applicants are required and expected to disclose information known to them to be material to patentability.[24]  Prior art is submitted to the USPTO by filing an IDS. [25]

66.     The duty of candor and good faith applies to information that is actually known, not information that could have been or should have been known.[26]  Although the examiner has a duty to search for prior art, patent applicants do not.

---

[21]United States Patent and Trademark Office, *Remarks by Director Iancu at the Prior Art Archive Launch Event*, www.uspto.gov, "About Us" (2018) *available at* https://www.uspto.gov/about-us/remarks-director-iancu-prior-art-archive-launch-event.

[22]MPEP 2000 Duty of Disclosure; 37 C.F.R. § 1.56.  Of note, when I was employed by the USPTO as an Associate Solicitor, I was responsible for legal review of that Chapter.

[23]MPEP 2001 Duty of Disclosure, Candor, and Good Faith ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section").

[24]*Id.*

[25]MPEP 609 Information Disclosure Statement.

[26]MPEP 2001.04 Duty of Disclosure, Candor, and Good Faith ("The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known

67.     Applicants are instructed that, if they submit a long list of documents for consideration, they should highlight (*e.g.* explain the significance of) any that they feel are more significant. The MPEP says: "If a long list is submitted, highlight those documents which have been specifically brought to applicant's attention and/or are known to be of most significance."[27] Patent examiners have to consider the patent and non-patent literature cited by applicants in addition to the literature identified in their own searches.  Identifying all relevant prior art is a known challenge, as discussed below.

68.     Logically, when a patent examiner must review over 6,500 pages in over 180 references—such as in the case of the prosecution of the Gilead patent as discussed below—in addition to conducting a search and reviewing relevant prior art from their own search in a limited amount of time, the quality of review can be negatively impacted.  This bottleneck around reviewing prior art is also a well-known problem recognized by the USPTO.[28]

69.     A notice that an examiner has "considered" a reference does not mean that the examiner has diligently read and understood every claim and disclosure.  Such consideration signifies nothing more than the type of treatment an examiner gives documents found in USPTO search files in a given field of search. As stated by the MPEP:

---

to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98").

[27]MPEP 2004 Aids to Compliance With Duty of Disclosure at 13 ("It is desirable to avoid the submission of long lists of documents if it can be avoided").

[28]More recently, the USPTO director Andrei Iancu said "uncovering the most relevant prior art during examination has become an increasingly more difficult task; especially with non-patent literature. This is because over the past couple of decades we have been experiencing both a publication explosion and an accessibility explosion. The result is that the amount of published literature has been increasing exponentially. Yet, for any one patent application, there is generally still one examiner with a certain— necessarily limited— number of hours available for examining that application."  United States Patent and Trademark Office, *Remarks by Director Iancu at the Prior Art Archive Launch Event*, www.uspto.gov, "About Us" (2018) *available at* https://www.uspto.gov/about-us/remarks-director-iancu-prior-art-archive-launch-event.

Consideration by the examiner of the information submitted in an IDS means nothing more than considering the documents in the same manner as other documents in Office search files are considered by the examiner while conducting a search of the prior art in a proper field of search. The initials of the examiner placed adjacent to the citations on the PTO/SB/08A and 08B or its equivalent mean that the information has been considered by the examiner to the extent noted above.[29]

70.    Under USTPO policy, this type of treatment may be nothing more than a cursory review.[30]

71.    In my experience, "consideration" by an examiner can mean that the examiner spent as little as 1/10 of a second on the first page of a reference.  In the digital age, an examiner can mark all stored documents as "considered" after a computer automatically flips and quickly flashes the first page of each document serially on a display.  The examiner does not even need to touch the computer while this digital flipping occurs.

72.     Any reference listed on an IDS form and marked as "considered" by the examiner will be printed on the face of the Patent.[31]

## V.    PROSECUTION OF THE GILEAD PATENT

73.     In the discussion of the prosecution history of Gilead's patent application  (No. 14/133,858 which issued as U.S. Patent No. 9,216,996) provided herein, the dates used for Gilead's filings are generally those discernible from the prosecution history file, including for example the USPTO's file wrapper contents page, dates indicated on papers filed by Gilead, certificates of mailing, and/or USPTO date stamps.  The dates used for USPTO actions are generally those

---

[29]MPEP 609 Information Disclosure Statement.

[30]See Notice, 64 Fed. Reg. 15346 at 15347 (March 31, 1999) (superseded on other grounds), Response to Comment 6 ("Where the IDS citations are submitted but not described, the examiner is only responsible for cursorily reviewing the references.  The initials of the examiner on the PTOL-1449 indicate only that degree of review unless the reference is either applied against the claims, or discussed by the examiner as pertinent art of interest, in a subsequent office action").

[31]MPEP 609.06 Information Printed on Patent ("A citation listed on [an Information Disclosure Statement form] and considered by the examiner will be printed on the patent").

discernible from the prosecution history file, including for example the mail date stamps on USPTO Office actions, the USPTO's file wrapper contents page, and dates indicated by the USPTO.

74.     On December 19, 2013, Gilead filed the Gilead patent application[32]  The original title of the application was "Polycyclic-carbamoyl Pyridone Compounds and Their Pharmaceutical Use."  The Gilead patent initially named Haolun Jin, Scott E. Lazerwith, Teresa Alejandra Trejo Martin, Elizabeth M. Bacon, Jeromy J. Cottell, Zhenhong R. Cai, Hyung-Jung Pyun, Phillip Anthony Morganelli, Mingzhe Ji, James G. Taylor, Xiaowu Chen, Michael R. Mish, and Manoj C. Desai as co-inventors. [33]   Emily Woodson Wagner and Susan Clingeman of Cooley LLP filed the application.  No power of attorney to prosecute the Gilead patent application was assigned on December 19, 2013.  Gilead documented that the inventors were obligated to assign the patent to Gilead.  The application claimed priority to prior Application No. 61/845,803 filed 07/12/2013, Application No. 61/788,397 filed 03/15/2013, and Application No. 61/745,375 filed 12/21/2012. The specifications included a 1-page abstract, 224 pages of written description and 34 pages of claims, numbered 1-108.[34]  Of the 108 claims, there were two independent claims (claims 1 and 47). [35]

75.     On January 9, 2014, the USPTO sent Cooley LLP a Notice to File Missing Parts of the Non Provisional Application.[36]  The documents identified as missing by the examiner included

---

[32]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Electronic Acknowledgement of Receipt, submitted December 19, 2013, p.1-2.
[33]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Application Data Sheet, submitted December 19, 2013 p.1-11.
[34]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Abstract, Claims, Specifications, submitted December 19, 2013, p.1-258.
[35]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Claims, submitted December 19, 2013, p.1-34.
[36]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Notice to File Missing Parts, dated January 9, 2014, p1-3.

$11,720 total fees and the oaths or declarations from each of the 13 inventors.  In addition, the USPTO communicated that a foreign filing license was granted on January 03, 2014.

76.     On February 11, 2014, Gilead submitted an oath or declaration for each of the 13 inventors, an assignment of power of attorney, and an assignment of ownership per 37 CFR § 3.73 to Gilead.[37]  On March 10, 2014, Gilead submitted a fee payment of $2,540.[38]  On April 30, 2014, the USPTO filed a notice accepting the power of attorney, a filing receipt, and a notice to file missing parts for additional claim fees.[39]

77.     On July 30, 2014 Gilead responded to the Notice to File Missing Parts with a request for a one-month extension and claim amendments.[40]  Generally, the amendments added the phrase "or a pharmaceutically acceptable salt thereof" after the claimed compounds and limited claims, stating, "any one of claims 1-22" to "of claim 1" to remove multiple dependencies.  Gilead also canceled claims 41 to 108.  The USPTO filed a filing receipt of this information on August 6, 2014.[41]

---

[37]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Oath or Declaration Filed, submitted February 2, 2014, p1-13; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Power of Attorney, submitted February 2, 2014, p1; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Assignee showing of Ownership per 37 CFR 3.73, submitted February 2, 2014, p1-3.

[38]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Fee Worksheet (SB06), submitted March 10, 2014, p1-2.

[39]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Communication Re: Power of Attorney (PTOL-308), dated April 30, 2014, p1; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Miscellaneous Communication to Applicant-No Action Count, dated April 30, 2014, p1; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Notice to File Missing Parts, dated April 30, 2014, p1-2.

[40]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Preliminary Amendment, Claims, submitted July 30, 2014, p1-20; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Applicant Arguments/Remarks Made in an Amendment, submitted July 30, 2014, p1.

[41]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Filing Receipt, dated August 6, 2014, p1-4.

78.     On August 7, 2014, the USPTO filed a Notice of Publication of the Gilead patent application.[42]

79.     On October 1, 2014, Examiner Douglas M. Willis at the USPTO filed a Requirement for Restriction/Election reviewing claims 1-40 of the pending application.[43]

80.     On January 2, 2015, Gilead "elect[ed] Group II, Claims 1, 5, 8-13, 22-31 and 33 […] classified in class 514, subclass 250, without traverse for examination on the merits" and elected compound 42 for the election of species requirement. (emphasis omitted).[44]  Gilead also requested a telephonic or in person interview to discuss any claims not in condition for allowance.

81.     On February 2, 2015, the USPTO sent Gilead a non-final rejection, rejecting claims 1, 5, 8-13, and 22-33 in addition to the specifications.[45]  Of note, claims 2-4, 6, 7, 14-21 and 34-40 were marked as withdrawn from consideration.  The Examiner found the "specification of the prior-filed invention, U.S. Provisional Application No. 61/745,375, fails to provide adequate support or enablement in the manner provided by the first paragraph of 35 U.S.C. § 112" and determined, "all relevant claims drawn to Group II will be prosecuted according to the earliest effective filing date afforded this intervention, which is that of U.S. Provisional Application No. 61/788,397, filed March 15, 2013."[46]  The Examiner found "the elected species [] was found to be free of the prior art."[47]  The objection to the specification related to formatting and the title, which

---

[42]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Notice of Publication of Application, dated August 7, 2014, p1-4; *see also* MPEP 1120 Eighteen-Month Publication of Patent Applications.
[43] U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Requirement for Restriction/Election, dated October 1, 2014, p1-14.
[44]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Response to Election/Restriction Filed, submitted January 2, 2015, p2.
[45]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Non-Final Rejection, dated February 2, 2015, p1-11.
[46]*Id.* at 2.
[47]*Id.* at 4.

was found to be "not technically accurate and descriptive."[48]  The Examiner recommended several modifications to claim 1 and 33 for clarity.  The Examiner also found claim 33 to be indefinite for failing to set forth the subject matter which the inventor regards as the invention.  Claims 1, 5, 8-13, and 22-33 were rejected for improper Markush groupings.  Specifically, the Examiner stated that the chemicals as recited in claim 1 "do not belong to the same recognized physical or chemical class, or to the same art-recognized class."[49]  Finally, claims 1, 5, 8-13, and 22-33 received a provisional obviousness-type double-patenting rejection over claims 1, 2, 10, 14, 17, and 20-24 of co-pending Application No. 14/133855.  The rejection was provisional because the conflicting claims were in an application and not an issued patent.

82.     Also on February 2, 2015, the Examiner conducted searches for relevant prior art.[50]

83.     On May 2, 2015, Gilead communicated to the USPTO that it canceled claims 1-31 in response to the February 2, 2015 non-final office action.[51]  Therefore, of the original 108 claims submitted in December 2013, only claims 32 and 33 were active.  Gilead amended claims 32 and 33, accepting the changes recommended by the Examiner in the previous non-final rejection and added new claims 109 – 116, directed towards 4 chemical structures.  Gilead also communicated that the '855 application was abandoned to address the double-patenting objection.  However, they noted that Application No. 14/629,290 is a continuation of the '855 application and remained active.

---

[48]*Id.* at 5.
[49]*Id.* at 7.
[50] U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Examiner's search strategy and results, dated February 2, 2015, p1-4; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Search information including classification, databases, and other search related notes, dated February 2, 2015, p1.
[51]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Applicant Arguments/Remarks Made in an Amendment, submitted May 2, 2015, p1-9.

84.     Also on May 2, 2015, Gilead submitted its first IDS in which it identified over 180 prior art references, including 40 patents.[52]  It is worth noting that Gilead submitted over 6,500 pages of non-patent literature alone.  In combination with the 40 patents, Gilead presented the Examiner with well over 110 hours of reading,[53] whereas in reality the Examiner has only a small fraction of the 18 hours[54] to devote to such activity.  One of the over 180 documents Gilead identified was the patent-in-suit, the '385 patent.  The '385 patent was not highlighted and no significance was attached to it by Gilead on the record.  Gilead also submitted an international search report which identified WO 2006/116764 and EP 2 412 709 A1 as international patent applications related to the '385 patent.  There were not highlighted and no significance was attached to it by Gilead on the record.

85.     The Examiner signed the IDS on May 8, 2015 with the note that all references were considered except where lined through.[55]  Nine of the over 180 documents were lined through, all of which were non-patent literature.[56]

---

[52]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Information Disclosure Statement, submitted May 2, 2015, p1-13.

[53]Assuming he could read at a rate of 1 minute per page, the examiner would need approximately 110 hours to read the non-patent literature, far more than the average 18 hours allotted for the entire examination process.

[54]United States Government Budget For Fiscal Year 2004, "Building Infrastructure for Technological Innovation." Department of Commerce, 70; *see also* United States Patent and Trademark Office, *Examination Time and the Production System*, at 9 *available at* https://www.uspto.gov/sites/default/files/documents/Examination%20Time%20and%20the%20Production%20System.pdf (time for "Perform Subsequent Search" shown in orange in pie chart as a share of the total time to examine an application).

[55]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* List of References cited by applicant and considered by examiner, dated May 8, 2015, p1-13.

[56]*Id.* at 7, 13.

86.     On May 14, 2015, twelve days after submission of the IDS, the Examiner issued a notice of allowance, stating "the prior art is silent with respect to the instantly recited substituted 2,3,4,5,13,13a-hexahydro-2,5-methanopyrido[1',2':4,5]pyrazino[2,1-*b*][1,3]oxazepines, as recited in claims 32, 109, 111, 113 and 115 respectively."[57]

87.     Also on May 14, 2015, the Examiner conducted searches for relevant prior art.[58]

88.     On May 29, 2015, Gilead provided a summary of a courtesy interview that occurred on May 29, 2015 between Gilead and Examiner Willis regarding references not considered due to formalities in the Form PTO/SB/08a.[59]   Gilead resubmitted those nine references for consideration.[60]

89.     On June 9, 2015, the USPTO confirmed consideration of the documents in the IDS submitted on May 29, 2015 (that was filed after the May 14, 2015 Notice of Allowance.)[61]  The allowed claims and reasons for allowance did not change.

90.     On July 31, 2015, Gilead filed a Petition that was automatically granted to withdraw the application from issue after payment of issue fees.[62]  Gilead concurrently filed an amendment

---

[57]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Notice of Allowance and Fees Due (PTOL-85), dated May 14, 2015, p1-3.

[58] U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Examiner's search strategy and results, dated May 14, 2015, p1-4; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Examiner's search strategy and results, dated May 14, 2015, p1; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Search information including classification, databases, and other search related notes, dated May 14, 2015, p1.

[59]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Applicant summary of interview with examiner, submitted May 29, 2015, p1-2.

[60]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Information Disclosure Statement, submitted May 29, 2015, p3-4.

[61]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Miscellaneous Communication to Applicant, dated May 8, 2015, p1-5.

[62]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Petition auto-grant letter from EFS, submitted July 31, 2015, p1-2.

after allowance to correct the chemical name contained in the title of the application.[63]  Gilead also concurrently filed a request for correction of inventorship, where co-inventors Teresa Alejandra Trejo Martin, Elizabeth M. Bacon, Jeromy J. Cottell, Zhenhong R. Cai, Phillip Anthony Morganelli, Mingzhe Ji, James G. Taylor, Xiaowu Chen, and Michael R. Mish were removed from the patent application.[64]  The remaining co-inventors were Haolun Jin, Scott E. Lazerwith, Hyung-Jung Pyun, and Manoj C. Desai.

91.    Also on July 31, 2015, Gilead filed an additional IDS and an Other Reference-Patent search document identifying two foreign patent documents and an international preliminary report on patentability dated 06/23/2015 for PCT/US2013/076367.[65]  The international preliminary report on patentability dated 06/23/2015 for PCT/US2013/076367 states, "[t]hus the subject-matter of the claims 1 to 108 containing such compounds is not new in the sense of Article 33(2) PCT in view of document D1."[66]  Further, the document says, "a surprising and unexpected effect is not evident also at the light [sic] of the quite disparate/ irregular results provided in Table 1 in order to demonstrate the antiviral activity and the cytotoxicity concentration of the compounds claimed" and "it is also not evident that the problem posed has solved within the entire scope of protection covered by the claims."[67]

---

[63]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Amendment after Notice of Allowance (Rule 312), submitted July 31, 2015, p1-4.

[64]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Request under Rule 48 correcting inventorship, submitted July 31, 2015, p1-2.

[65]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Information Disclosure Statement, submitted July 31, 2015, p1-2; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Other References-Patent/App/Search documents, submitted July 31, 2015, p1-8.

[66]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Other References-Patent/App/Search documents, submitted July 31, 2015, p8.

[67]*Id.*

92.     On August 7, 2015, the USPTO communicated that the additional references cited on July 31, 2015 were considered.[68]  The USPTO also acknowledged the correction of inventorship and corrected the title.[69]  Another Notice of Allowance was filed, and the Examiner did not change the reason for allowance in light of the additional references.[70]  On August 8, 2015, USPTO again confirmed consideration of the documents in the IDS submitted May 29, 2015 in the list of references cited by the Examiner.[71]

93.     On August 26, 2015, Gilead filed another request for continued examination and response after final action, an additional IDS, and another request to change inventorship.[72]  In the Response After Final Action, claims 113-116 were canceled.  Gilead changed inventorship to remove Manoj C. Desai.  The remaining co-inventors were Haolun Jin, Scott E. Lazerwith and Hyung-Jung Pyun.  The IDS contained 30 references, including seven U.S. patents, twelve foreign patents and eleven non-patent literature documents.

94.     On October 8, 2015, the Examiner issued another notice of allowance for claims 32, 33, and 109-112 in response to the August 26, 2015 communication.[73]  The USPTO marked

---

[68]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* List of References cited by applicant and considered by examiner, dated August 7, 2015, p1-2.
[69]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Response to Amendment under Rule 312, dated August 7, 2015, p1.
[70]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Notice of Allowance and Fees Due (PTOL-85), dated August 7, 2015, p1-6.
[71]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* List of References cited by applicant and considered by examiner, dated August 8, 2015, p1-2.
[72]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Request under Rule 48 correcting inventorship, submitted August 26, 2015, p1-2; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Request for Continued Examination (RCE), submitted August 26, 2015, p1; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Information Disclosure Statement (IDS) Form (SB08), submitted August 26, 2015, p1-3; U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Response after Final Action, submitted August 26, 2015, p1-3.
[73]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Notice of Allowance and Fees Due (PTOL-85), dated October 8, 2015, p1-3.

the 30 documents submitted in the August 26, 2015 communication as considered.  The USPTO

acknowledged the inventorship change and cancelation of claims 113-116.  The USPTO did not

change the reasons for allowance.

95.     On November 16, 2015, Gilead filed fees for the October 8, 2015 notice of

allowance.[74]

96.     The USPTO filed two corrected list of references cited by applicant and Examiner

on November 20, 2015[75] and December 1, 2015.[76]  An issue notification was filed on December

2, 2015 and the patent issued on December 22, 2015.[77]

## VI.   THE SCOPE OF THE ASSERTED CLAIMS OF VIIV'S '385 PATENT IS NOT INFORMED BY THE FACT THAT THE USPTO ALLOWED THE CLAIMS OF GILEAD'S PATENT THAT IT CONTENDS LITERALLY COVER BICTEGRAVIR

### A.   THE FACT THAT THE SAME EXAMINER ALLOWED THE CLAIMS OF THE '385 PATENT AND GILEAD'S PATENT DOES NOT BEAR ON WHETHER THE TWO PATENTS INCLUDE OVERLAPPING CLAIM SCOPE, INCLUDING UNDER THE DOCTRINE OF EQUIVALENTS

97.     I note that both the Gilead patent and ViiV's '385 patent were both prosecuted by

the same examiner, Douglas M. Willis.

98.     The Manual of Patent Examining Procedure makes clear that no significance should

be attributed to the fact that both the '385 patent and Gilead's patent were prosecuted by the same

examiner.  As set forth in section 2001.06(b): "[W]e think that it is unfair to the busy examiner,

no matter how diligent and well informed he may be, to assume that he retains details of every

---

[74]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Issue Fee Payment (PTO-85B), submitted November 16, 2015, p1-2.

[75]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* List of References cited by applicant and considered by examiner, dated November 20, 2015, p1-2.

[76]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* List of References cited by applicant and considered by examiner, dated December 1, 2015, p1-3.

[77]U.S. Pat. App. Pub. No. 14/133,858 to Jin *et al,* Issue Notification, dated December 1, 2015, p1.

pending file in his mind when he is reviewing a particular application... [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent."[78]

99.     Therefore, in my opinion, as supported by the MPEP, the fact that the same examiner prosecuted the '385 patent and the Gilead patent does not indicate that the scope of the claims of the '385 patent is distinct from the scope of the claims of the Gilead patent, including under the doctrine of equivalents.

### B.     THE FACT THAT THE EXAMINER "CONSIDERED" THE '385 PATENT DURING THE PROSECUTION OF THE GILEAD PATENT DOES NOT CREATE A PRESUMPTION THAT THE SCOPE OF THE TWO PATENTS DO NOT OVERLAP

100.     As explained above, Gilead submitted over 180 references to the Examiner in its first IDS on May 5, 2015.  This was 12 days before a Notice of Allowance was issued.  The IDS contained 40 U.S. Patent Documents, 46 Foreign Patent Documents, and 102 Non Patent Literature Documents.  Of the numerous pages submitted, one reference was the '385 patent.

101.     As explained above, the IDS was marked as "considered" by the Examiner on May 8, 2014.  The Examiner did not issue a rejection based on the '385 patent or refer to this specific patent during the prosecution history.

102.     From the information that I have reviewed, Gilead appears to have "buried" the '385 patent reference among numerous other references.  For example, Gilead did not highlight the '385 as having any special significance when submitting it in a long list of references.[79]  As a

---

[78]MPEP 2001.06(b) Information Relating to or From Copending United States Patent Applications; *see also* MPEP 2004 Aids to Compliance With Duty of Disclosure at paragraph 9 ("Do not assume that an examiner will necessarily remember, when examining a particular application, other applications which the examiner is examining, or has examined").
[79]*See* MPEP 2004 Aids to Compliance With Duty of Disclosure at 13 ("If a long list is submitted, highlight those documents which have been specifically brought to applicant's attention and/or are known to be of most significance").

29

result, Examiner Willis was required to spend time reviewing all the references cited by Gilead which reduced the amount of time available to review the '385 patent and appreciate the significance of that patent.

103.    Gilead also did not explain to Examiner Willis the significance of the '385 patent to Gilead's development of its alleged inventions of the Gilead patent.  For example, Gilead employees, including co-inventor Scott Lazerwith, were aware of the structure of dolutegravir and the '385 patent before beginning the Integrase 2 project, from which the technology in the Gilead patent was developed.[80]

### C.    EXAMINERS DO NOT ASSESS PATENTABILITY UNDER THE DOCTRINE OF EQUIVALENTS ANALYSIS

104.    Counsel has informed me that ViiV is asserting that Gilead's bictegravir infringes claims 2 and 6 under the doctrine of equivalents ("DOE").  Examiners do not examine whether the claims of a patent application are patentable under the doctrine of equivalents.

105.    Counsel has informed me that there are at least two frameworks for evaluating whether a feature of an accused product is equivalent to a claim element under the doctrine of equivalents.

106.    One way to evaluate equivalency is by applying the "insubstantial differences test." Under the insubstantial differences test, an element in the accused product is equivalent if it is insubstantially different from the claimed element.  I understand that another way to determine

---

[80]ViiV Healthcare Company, Shionogi & Co., Ltd. And ViiV Healthcare UK (No. 3) Limited v. Gilead Sciences, Inc., in the United States District Court for the District of Delaware, C.A. No. 18-224 (VAC) (CJB), Complaint at 14-15; Deposition of Scott Lazerwith Ph.D., p. 35; Deposition of Xiaowu Chen, Ph.D., October 2, 2019, Exhibit 11 (BICVIIVUS0703288-308); ViiV Healthcare Company, Shionogi & Co., Ltd. And ViiV Healthcare UK (No. 3) Limited v. Gilead Sciences, Inc., in the United States District Court for the District of Delaware, C.A. No. 18-224 (VAC) (CJB), Defendant Gilead Sciences, Inc.'s Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1-10), pp. 5-8.

whether an accused feature is equivalent to a claimed element is by applying the "function-way-result test." Under the function-way-result test, an element in the accused product is equivalent if it performs substantially the same function, in substantially the same way, to obtain substantially the same result.

107.    In the context of a means plus function claim, the examiner can raise a *prima facie* case of equivalents, but an examiner must meet a high burden to demonstrate equivalence. According to the USPTO:

> "If the examiner finds that a prior art element (A) performs the function specified in the claim, (B) is not excluded by any explicit definition provided in the specification for an equivalent, *and* (C) is an equivalent of the means- (or step-) plus-function limitation, the examiner should provide an explanation and rationale in the Office action as to why the prior art element is an equivalent."[81] (emphasis added)

The examiner carries the initial burden of proof for showing that the prior art structure or step is the same as or equivalent to the structure, material, or acts described in the specification or claims of the pending patent application.[82] "The examiner should then conclude that the claimed limitation is met by the prior art element. In addition to the conclusion that the prior art element is an equivalent, examiners should also demonstrate, where appropriate, why it would have been obvious to one of ordinary skill in the art at the time of the invention to substitute applicant's described structure, material, or acts for that described in the prior art reference. The burden then

---

[81]MPEP 2183 Making a *Prima Facie* Case of Equivalence.
[82]*Id.* ("If the examiner finds that a prior art element
    (A) performs the function specified in the claim,
    (B) is not excluded by any explicit definition provided in the specification for an equivalent, and
    (C) is an equivalent of the means- (or step-) plus-function limitation,
the examiner should provide an explanation and rationale in the Office action as to why the prior art element is an equivalent."

shifts to applicant to show that the element shown in the prior art is not an equivalent of the structure, material or acts disclosed in the application."[83] (citations omitted).

108.   For equivalents of a means plus function element, an examiner needs to demonstrate at least one of the following:

> a) that the prior art element performs the identical function specified in the claim in substantially the same way, and produces substantially the same results as the corresponding element disclosed in the specification,
>
> b) a person of ordinary skill in the art would have recognized the interchangeability of the element shown in the prior art for the corresponding element disclosed in the specification, and
>
> c) there are insubstantial differences between the prior art element and the corresponding element disclosed in the specification.[84]

109.   The claims of the Gilead patent, as issued, do not include means plus function elements.  Thus, following USPTO procedure, Examiner Willis would have not have examined the claims under the means plus function equivalence standard.  Nor would Examiner Willis have examined the claims under either the "insubstantial differences test" or the "function-way-result tests."  As a result, the fact that the claims of the Gilead patent were found to be patentable by Examiner Willis and eventually issued does not indicate that the scope of the those claims is distinct from the scope of claims 2 and 6 of the '385 patent under the doctrine of equivalents.

## VII.   RESERVATION OF RIGHTS

110.   In connection with my anticipated testimony in this action, I may use as exhibits various documents produced in this case that refer or relate to the matters discussed in this Report. I have not yet selected the particular exhibits that might be used.  In addition, I may create or assist

---

[83] *Id.*
[84] *Id.*

in the creation of certain demonstrative evidence to assist me in testifying, and I reserve the right to do so to further support the positions in this Report.

111.    At trial, I may rely on visual aids and may rely on analogies concerning the events in the prosecution history.  My opinions are based upon the information that I have considered to date.

112.    I reserve the right to supplement or amend my opinions in response to decisions by this Court or any additional evidence, testimony, or other information that may be provided to me after the date of this Report, including at trial.  I likewise reserve the right to supplement or amend my opinions based on additional opinions that Gilead and Gilead's experts may present and information I may receive in the future or additional work I may perform, including any expert on patent practice and procedure, to amplify what is stated above, where necessary, and especially in view of information not presently known to me or new information presented by witnesses prior to, or at trial, and to supplement this Report should additional information be brought to my attention during the course of this proceeding.  I also reserve the right to testify about matters that may be: (1) raised on cross-examination; (2) raised in depositions; (3) raised in expert reports I may receive in the future; (4) necessary to rebut any other matters about which experts may testify at deposition or trial; and (5) otherwise raised at trial by counsel, or this Court in relation to the matters set forth in this Report concerning which I am qualified to testify.

## VIII.  CONCLUSION

113.    Under USPTO procedure, issuance of the Gilead patent is neither significant nor relevant to the scope of the claims in ViiV's '385 patent.

# EXHIBIT B

# JAMES THOMAS CARMICHAEL

## __EXPERIENCE__

2015-present   *Managing Member*              Carmichael IP, PLLC (Tysons Corner, VA)

--Handling AIA post-grant review proceedings and reexaminations at USPTO
--preparing and prosecuting patent applications at USPTO
--due diligence, freedom to operate, expert testimony, consulting to USPTO

2002-2015   *Principal*                     Miles & Stockbridge (Tysons Corner, VA office)

--Preparing and prosecuting patent applications, interferences, AIA post-grant reviews, reexaminations, attorney discipline proceedings
 -- licensing, consulting to U.S. Patent and Trademark Office and private parties, opinions, due diligence, litigation, freedom to operate, expert testimony

1999-2002   *Managing Partner*              Lyon & Lyon (Washington, D.C. office)

--managed ten-attorney office focusing on patent prosecution and freedom to operate

1996-1999   *Examiner in Chief/*            U.S. Patent and Trademark Office
            *Administrative Patent Judge*   Board of Patent Appeals and Interferences
                                            (now Patent Trial and Appeal Board)

--reviewed rejections of patent applications for electrical and computer-related inventions
--authored two hundred opinions affirming or reversing patent examiners
--examined applications and entered new grounds of rejection
--Bronze Medal for Outstanding performance

1991-1996   *Associate Solicitor*          U.S. Patent and Trademark Office

--Oversight of MPEP Sections on Duty of Disclosure and Reexamination
--Consulted on PTO rule changes, *e.g.,* 37 C.F.R. § 1.56 ("Rule 56")
--Evaluated hundreds of patent applications for intentional violations of Rule 56
--Coordinator of attorney discipline proceedings
--Represented PTO in federal courts
--advised PTO on patent examination and drafted Office actions and petition decisions
--PTO attorney of the year award from U.S. Department of Commerce

1990-1991   *Judicial Law Clerk to*        U.S. Court of Appeals for the Federal Circuit
            *Hon. Howard T. Markey*

1987-1990   *Associate*                    Lyon & Lyon (Los Angeles office)

1

--assisted in patent prosecution and litigation

**EDUCATION**:

Yale University          B.A. 1984 (summer job as computer programmer at State Farm Insurance)


University of Wisconsin   J.D. *cum laude* 1987 (plus Electrical and Computer Engineering courses)
                         Assistant Editor, Wisconsin Law Review

George Mason University   1990-95 Courses in Electrical and Computer Engineering (E.C.E.) as
                         candidate for M.S.E.C.E.  (no degree)

**BAR MEMBERSHIPS:**     U.S. Patent and Trademark Office, District of Columbia, and California

**OFFICES HELD:**
                    *Events Coordinator*, American Association of Patent Judges, 2019-
                    *Chair,* AIPLA Professional Programs Topics SubCommittee, 2013
                    *Secretary,* Association of Patent Law Firms, 2001-2002
                    *Chair*, AIPLA Committee on Inventors, circa 1993-94


**PUBLICATIONS:**

   *A Possible USPTO Solution To PTAB Constitutionality Ruling*, IP Law360 (November 13, 2019)
co-author

   *Despite Oil States, Inter Partes Review May Still Be Held Unconstitutional*, IPWatchdog.com
(April 25, 2018) co-author

   *Federal Circuit Opens the Door to Extrinsic Evidence in Support of Patent Eligibility*,
IPWatchdog.com (March 19, 2018)

   *Petitioning for Inter Partes Review,* 41 New Matter 5 (Spring 2016) co-author

   *Lawyers Weigh In On Obama 'Patent Troll' Initiatives*, IP Law360 (June 5, 2013)

   *Attorneys Discuss Impact Of CLS Bank Decision,* IP Law360 (May 13, 2013)

   *Beyond Affirmed:  Will the Supreme Court Use In re Bilski to Restrict Patentable Subject Matter
Even Further Than the Federal Circuit?*, 78 BNA's Patent, Trademark & Copyright Journal 807
(October 30, 2009) co-author

   *Ducking the Big Issues in Bilski?*, IP Law360 (November 30, 2009)

2

*Inequitable Conduct, Gross Negligence and the Kingsdown Decision,* 8 John Marshall Law School Review of Intellectual Property 18 (Summer 2009) co-author

*How to Preempt New PTO 101 Rejections*, IP Law360 (February 2009)

*A Radical Approach to Effective Patent Applications*, 8 Terralex Intellectual Property Newsletter 59 (June 2003) co-author

*Anmerkung (Festo)*, 6 Mitteilungen der deutschen Patentanwalte 286 (June 2002)

*The Unspoken Loss In Shareholder Value: Patent Rights Take A Hit*, 8 MEALEY'S LITIGATION REPORTER 1 (April 2, 2001) co-author

*E-Commerce and Equivalence: Defining the Proper Scope of Internet Patents*, introduction, 7 UNIVERSITY OF MICHIGAN TELECOMMUNICATIONS AND TECHNOLOGY LAW REVIEW 251 (2001) co-author

*Invention Tax Stifles Progress*, THE NATIONAL LAW JOURNAL page A21 (April 9, 2001)

*The Untold Story of Edison's Patent Files*, 15 AMERICAN BAR ASSOCIATION SECTION OF INTELLECTUAL PROPERTY NEWSLETTER 1 (Winter 1997).

*Appealing PTO Decisions To Court In View Of The Twenty-Year Term*, AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION BASIC PATENT PRACTICE SEMINAR 61 (1996)

*Summary Judgements Against Unauthorized Users of an Automobile Manufacturer's Trademarks*, 74 JOURNAL OF THE PATENT AND TRADEMARK OFFICE SOCIETY 34 (1992).

*Winning Bio-tech Patent Infringement Suits on Summary Judgment*, 30 IDEA: THE JOURNAL OF LAW AND TECHNOLOGY 279 (1990).

*Protection of United States Semiconductor Chip Designs in Foreign Countries Under the Semiconductor Chip Protection Act of 1984*, 12 RUTGERS COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 422 (1987).

**LECTURES:**

| | |
|---|---|
| November 13, 2019 | Rose PTAB Annual Institute |
| Chicago, IL | The Future of ADR and PTAB Litigation |
| | |
| June 25, 2019 | IP Watchdog *Patent Masters* seminar |
| Arlington, VA | PTAB Treatment of 35 U.S.C. 101 |

3

| June 24, 2019<br>Arlington, VA | IP Watchdog *Patent Masters* seminar<br>Best Practices Before the USPTO concerning patent eligibility |
|---|---|
| September 18, 2018<br>webinar | IP Watchdog<br>Best Practices for Avoiding Patent Prosecution Malpractice |
| June 28, 2018<br>webinar | IP Watchdog<br>Strategies for Responding to 101 Rejections at the PTO (co-presenter) |
| March 8, 2018<br>webinar | IP Watchdog<br>Breaking Through on Patent Eligibility, From Drafting to Litigation<br>(co-presenter) |
| February 22, 2018<br>webinar | IP Watchdog<br>Drafting Quality Patents: Avoiding 112 Rejections at the USPTO<br>(co-presenter) |
| May 1, 2014<br>Tysons Corner, VA | Association of Corporate Counsel, Washington Metropolitan Area Chapter<br>An Insider's Practical Guide to New Procedures for Avoiding Costly IP Litigation |
| December 11, 2013<br>Tysons Corner, VA | American Intellectual Property Law Association webinar<br>Inter Partes Review |
| October 26, 2013<br>Washington, D.C. | AIPLA Annual Meeting<br>*Therasense* and its Aftermath |
| September 26, 2013<br>Chicago, IL | IPXI First Annual Members Meeting<br>Keynote address:  Standard Essential Patents and FRAND |
| May 7, 2013<br>Chicago, IL | Inside Counsel SuperConference<br>An Insider's Guide to *Inter Partes* Review (co-presenter) |
| February 27, 2013<br>New York, NY | U.S. Patent and Trademark Office<br>Software Patent Roundtable |
| June 2012<br>San Diego, CA | Federal Circuit Bar Association<br>Ethical Challenges in 21st Century Discovery (moderator) |
| January 2011<br>Amsterdam, NL | C-5 Intellectual Property Conference<br>U.S. Patent Law Update |
| May 2010<br>New York, NY | American Intellectual Property Law Association<br>Bilski v. Kappos – Prospective Impact Upon Patent Eligibility (moderator) |
| 2005 | John Marshall Law School |

4

| | |
|---|---|
| Chicago, IL | The Legacy of Judge Markey |
| September 23, 2005<br>Washington, D.C. | Federal Circuit Historical Society<br>Oral history of Judge Markey (co-presenter) |
| February 10, 2004<br>McLean, VA | Northern Virginia Patent Lawyers Club<br>New Requirements For Patent Attorneys Proposed by the PTO |
| Spring 2003<br>McLean, VA | Northern Virginia Patent Lawyers Club<br>Antitrust issues in patent law (moderator) |
| February 4, 2003<br>Reston, VA | Northern Virginia Patent Lawyers Club<br>A Radical Approach To Drafting and Prosecuting A Patent Application |
| August 24, 2002<br>Washington, D.C. | American Intellectual Property Law Association<br>Advanced Patent Prosecution Seminar<br>How to Win Appeals in Patent Cases |
| Spring 2002<br>White Plains, NY | Eastern New York Intellectual Property Law Association<br>Advanced patent prosecution strategies |
| January 10, 2002<br>Washington, D.C. | Association of Patent Law Firms<br>Virtual Roundtable:  The Supreme Court Hearing in Festo |
| October 24, 2001<br>Washington, D.C. | Association of Patent Law Firms<br>Virtual Roundtable:  Current Issues in Patent Law (moderator) |
| October 23, 2000<br>Washington, D.C. | George Washington University<br>Intellectual Property Law Conference<br>E-Commerce and Equivalence:  Defining the Proper Scope of<br>    Internet Patents (moderator) |
| September 2000<br>Washington, D.C. | American Intellectual Property Law Association<br>Patent Appeals |
| January 19, 2000<br>Costa Mesa, CA | Orange County Intellectual Property Law Association<br>Patent Cases in Court |
| October 5, 1999<br>New Haven, CT | Quinnipiac Law School<br>Patent Law Fundamentals |
| September 9, 1999<br>San Diego, CA | San Diego Intellectual Property Law Association<br>Effective Appellate Advocacy |
| November 4, 1998 | Southwestern Legal Foundation |

| Dallas, TX | Winning Appeals in Patent Cases |
|---|---|
| June 12, 1998<br>San Diego, CA | American Intellectual Property Law Association<br>Arguing Appeals at the Board of Patent Appeals and Interferences |
| June 18, 1996<br>Arlington, VA | U.S. Patent and Trademark Office Legal Lecture Series<br>Ethical Issues in Prosecution Before the Office |
| June 14, 1996<br>San Francisco, CA | American Intellectual Property Law Association<br>Appealing PTO Decisions to Court |
| June 7, 1996<br>Chicago, IL | American Intellectual Property Law Association<br>Appealing PTO Decisions to Court |
| May 24, 1996<br>Washington, D.C. | Federal Circuit Bar Association<br>Ethics In Arguing Cases at the Federal Circuit |
| May 17, 1996<br>Arlington, VA | American Intellectual Property Law Association<br>Appealing PTO Decisions to Court |
| October 10, 1995<br>Los Angeles, CA | Los Angeles Intellectual Property Law Association<br>Patent Appeals |

## PRESS INTERVIEWS:

*Former APJ James Carmichael's Firm Wins Most IPRs For Patent Owners at PTAB*, IP Watchdog (September 4, 2019)

*USPTO Sued For Declaring Power Outage A 'Federal Holiday'*, IP Law360 (August 18, 2016)

*Late PTAB Judge McKelvey Recalled As Tireless Patent Leader*, IP Law360 (April 4, 2016)

*After Supreme Court Clamps Down on Patents, Some New Guidance*, Inc.com (June 27, 2014)

*Alice Loses U.S. Supreme Court case on software patents*, InsideCounsel.com (June 19, 2014)

*Saying 'Do It On A Computer' Not Enough To Save Patent, Supreme Court Rules*, Forbes.com (June 19, 2014)

*Will Supreme Court Patent Ruling Hobble the Trolls?*, San Francisco Business Times Online (June 19, 2014)

*Justices Wary of Making Call on Patent Eligible Software,* IP Law360 (March 31, 2014)

*Supreme Court Justices Give Software Patents A Pass, Zero In On Business Methods*,
Forbes.com (March 31, 2014)

*Court Seeks to Draw the Line Between Abstract Ideas, Patentable Business Methods*, Bloomberg
BNA Patent Trademark & Copyright Law Daily (March 31, 2014)

*1st AIA Ruling Opens Door To More Patent Challenges*, IP Law360 (June 12, 2013)

*America Invents Act (AIA) Reform: An Interview with a Former Patent Judge of the U.S. Patent
and Trademark Office*, National Law Review (May 29, 2013)

*1st AIA Review Hearing Less Like A Trial Than Expected,*
IP Law360 (April 18, 2013)

*Former Administrative Patent Law Judge Weighs in on Bilski,*
INTELLECTUAL PROPERTY LAWCAST recorded interview (December 14, 2009)

*Stakeholders Question Future of Business Method Patents After Bilski Oral Argument,* BNA
PATENT, TRADEMARK, & COPYRIGHT JOURNAL (November 13, 2009)

*Patent Case Goes to Supreme Court*, WASHINGTON TIMES (November 9, 2009)

*Software Cos. Eye Key Patent Case in Supreme Court*, ASSOCIATED PRESS (November 7,
2009)

*Supreme Court May Invalidate Software Patents*, WASHINGTON BUSINESS JOURNAL
(November 6, 2009)

*Patents*, NEW YORK TIMES (June 3, 2002)

*Supreme Court Bolsters Protections for Patents,* LOS ANGELES TIMES (May 29, 2002)

*Supreme Court Supports Patent Protection*, USA TODAY (May 29, 2002)

*U.S. Supreme Court Bolsters Rights of Patent Holders*, BLOOMBERG.COM (May 28, 2002)

*Perspectives on Festo*, ANDREWS LITIGATION REPORTER (January 22, 2002)

*Patent Law and the Supreme Court*, LAWCAST recorded interview (January 21, 2002)

*This Web Site Is a Patent Pressure Cooker,* BUSINESS WEEK ONLINE (March 5, 2001)

*British Telecom's Internet Patent*, KIPPLINGER LETTER (March 2001)

7

*Tax on Invention*, WASHINGTON INTERNET DAILY (January 24, 2001)

*Patent Upending*, WIRED magazine (June 2000).

## EXPERT WITNESS TESTIMONY BY DEPOSITION

1. *ACTV v. the Walt Disney Corporation* (S.D.N.Y. 2002)

2. *Donnelly Corporation v. Johnson Controls Technology Company* (W.D. Mich. 2003)

3. *Ferring B.V. and Aventis Pharmaceuticals, Inc. v. Barr Laboratories, Inc.*, case No. 02-CV 9851 (S.D.N.Y. 2004), *aff'd* (Fed. Cir. 2006), *cert den.* (2006)

4. *Accuweb v. Quarles & Brady*, (E.D. Wis. 2004)

5. *PPC v. IBM*, (S.D.N.Y. 2004)

6. *Gateway v. Hewlett-Packard, sub nom In the Matter of Certain Personal Computers, Monitors and Components Thereof*, Inv. No. 337-TA-519 (Int'l Trade Commission 2005)

7. *ICU Medical v. B. Braun Inc.* (N.D. Cal. 2005)

8. *Shufflemaster v. Mindplay* (D. Nev. 2006)

9. *University of Texas v. BenQ et al.* (W.D. Tex. 2006)

10. *Lucent v. Microsoft, Gateway, et al* (S.D. Cal. 2007)

11. *DE Technologies v. Dell*, Case No. 7:04-CV-00628 (W.D. Va. 2007)

12. *DePuy Spine, Inc., et al. v. Medtronic Sofamor Danek et al.*, Case No. 01-CV010165-EFH (D. Mass. 2007)

13. *Multimedia Patent Trust v. Microsoft* (S.D. Cal. 2008)

14. *Medtronic v. Abbot Laboratories and Boston Scientific Corp.* (N.D. Cal. 2008)

15. *Diagnostic Systems Corp. v. Oracle et al.* (C.D. Cal. 2009)

16. *Semiconductor Electronics Laboratory v. Samsung* (W.D. Wis. 2010)

17. *Software Tree, LLC v. Red Hat, Inc., et al*, (E.D. Tex. 2010) Case No. 6:09-CV-0097-LED

18. *Kinetic Concepts, Inc. v. Smith & Nephew* (W.D. Tex 2010) Case No. SA:08-CV-00102

19. *Arendi v. Microsoft* (2010) (Civil Action No. 1:07-114)

20. *Touchcom v. Bereskin & Parr* (E.D. Va. 2010)

21. *PPC v. CMO*, (E.D.N.Y. 2010)

22. *Sanofi-Aventis v. Genentech and Biogen Idec* (N.D. Cal. 2010) Civil Action Nos. 08-cv-4909 SI(BZ) and 09-cv-1419 SI

23. *Alcatel-Lucent USA Inc. v. Fraunhofer Gesellschaft* (International Chamber of Commerce— International Court of Arbitration 2010) No. 16 457/VRO (C.16 65/VRO) no deposition; testimony at arbitration only

24. *Tecsec v. IBM* (E.D. Va. 2010) Case 1:10-cv-00115-LMB/TCB

25. *Medtronic et al. v. NuVasive, Inc*., (S.D. Cal. 2011) Case No. 3:08-cv—1512-MMA-AJB

26. *In the matter of Certain Personal Data and Mobile Communications Devices and Related Software,(Apple v. HTC)* (U.S. International Trade Commission 2011)  Investigation No. 337-TA-710

27. *Personalized Media Communications, L.L.C. v. Dish Network Corp.et al.* (E.D. Texas 2011), Case No. 2:08-CV-00070 [TJW]

28. *In the matter of Certain Semiconductor Chips and Products Containing Same (Rambus v. Broadcom)*, (ITC 2011) Investigation No. 337-TA-753

29. *In the matter of Certain Light-Emitting Diodes and Products Containing Same (Osram v. LG*) (ITC 2012) Investigation No. 337-TA-784

30. *Apple v. Samsung*, Case No. 11-cv-01846-LHK (N.D. Cal. 2012)

31. *In the Matter of Certain Devices For Improving Uniformity Used In A Backlight Module And Components Thereof And Products Containing Same* (*ITRI v. LG*) (ITC 2012) Investigation No. 337-TA-805

32. *In the matter of Certain Light-Emitting Diodes and Products Containing Same (Osram v. Samsung and LG*) (U.S. International Trade Commission 2012) Investigation No. 337-TA-775

33. *Intellect Wireless v. HTC*, (N.D. Ill. 2012)

34. *ABT Systems and University of Central Florida v. Emerson Electric Co.*, Civil Action No. 4:11-cv-00374-AGF (E.D. Mo. 2012)

35. *VirnetX v. Cisco Systems, Inc., Apple Inc., and NEC Corp.,* Civil Action No. 6:10-cv-000417 (LED) (E.D. Tex. 2012)

36. *Smartphone Tech. LLC v. Apple, Inc.*, Civil Action No. 6:10-cv-74-LED-JDL (E.D. Tex. 2013)

37. *Avanir Pharmaceuticals, Inc. et al. v. Actavis Inc., et al*, Civil Action No. 11-704(LPS) (D. Del. 2013)

38. *Wi-LAN v. HTC, Apple, Alcatel-Lucent, Hewlett-Packard, Sierra Wireless, and Novatel Wireless,* Case Nos. 2:11-cv-68-JRG and 2:12-cv-600-JRG (E.D. Tex. 2013)

39. *Lodsys, LLC, et al. v. Dell, Electronic Arts, Inc., Hoover's, Lenovo, Samsung, and Symantec* Case No. 2:11-cv-272-JRG (E.D. Tex. 2013)

40. *In the Matter of Certain Wireless Devices With 3G And/Or 4G Capabilities And Components Thereof, (Interdigital v. Nokia et al.)* 337-TA-868 (U.S. International Trade Commission 2013)

41. *Creative Integrated Systems, Inc., v. Nintendo and Macronix*, Case No. 10-CV-2735 PA (VBK) (C.D. Cal. 2013)

42. *GlaxoSmithKline v. Genentech*, Case No. C.A. No. 10-799-GMS (D. Del. 2013)

43. *Teva Branded Pharmaceutical Products R&D and Norton Healthcare Ltd et al. v. Perrigo Pharmaceuticals and Catalent Pharma Solutions et al.*, CA No. 12-1101-GMS (D.Del. 2014)

44. *Southern Research Institute, Genzyme Corporation, and Sanofi Aventis v. Abon Pharmaceuticals*, Civil Action No. 12-cv-4709 (JEI)(KMW) (D. N.J. 2014)

45. *In the Matter of Certain Antivenom Compositions and Products Containing the Same* (*BTG v. Bioclone et al.*) Investigation No. 337-TA-903 (U.S. International Trade Commission 2014)

46. *Honeywell Int'l Inc. and Intermec, Inc. v. Maltseff,* No. 2:14-cv-00283-JLR (W.D. Was. 2014)

47. *In the Matter of Certain Hemostatic Products and Components Thereof* (*Baxter v. Ferrosan and Ethicon*) Investigation No. 337'TA-913 (U.S. International Trade Commission 2014)

48. *Munchkin v. Luv N' Care et al., 2:13-CV-07228-ODW-AGR* (C.D. Cal. 2014)

49. *VirnetX Inc., et al. v. Apple Inc.* Civil Action No. 6:12-cv-855 (E.D. Tex. 2015)

50. *Oasis Research, LLC, v. Carbonite, Inc., et al*, Case no. 4:10-cv-00435 (E.D. Tex. 2015)

51. *Magna Electronics v. TRW*, 1:12-cv-006544 and 324 (W.D. Mich. 2015)

52. *Enzo Life Sciences, Inc. v. Illumina, Inc.*, C.A. No. 12-435-LPS (D. Del. 2016)

53. *Cipro Cases I and II,* JCCP Nos. 4154 & 4220 (California State Superior Court 2016)

54. *Barry v. Medtronic, Inc.*, C.A. No. 1:14-cv-00104 (E.D. Tex. 2016)

55. *Enzo Life Sciences, Inc. v. Roche et al.*, C.A. No. 12-106-LPS (D. Del. 2016)

56. *In the Matter of Certain Radio Frequency Identification ("RFID") Products and Components Thereof (Neology v. Kapsch),* Investigation No. 337-TA-979 (International Trade Commission 2016)

57. *Yodlee, Inc. v. Plaid Technologies, Inc.*, Case No. 14-1445-PLS-CJB (D. Del. 2016)

58. *Elbit Systems et al. v. Hughes Network Systems, LLC, et al.*, Civil Action No. 2:15-cv-00037 RWS-RSP (E.D. Tex 2017)

59. *Enzo Life Sciences, Inc. v. Abbott Laboratories et al.*, C.A. No. 12-274-LPS (D. Del 2017)

60. *Papst Licensing GMBH & Co. KG v. LG Electronics, Lenovo, Samsung, and ZTE*, C.A. Nos. 6:15-cv-01099, 01100, 01102, and 01111 (E.D. Tex. 2017)

61. *In the Matter of Certain X-Ray Breast Imaging Devices and Components Thereof* (*Hologic v. Fujifilm*), Investigation No. 337-TA-1063 (International Trade Commission 2018)

62. *Serta Simmons Bedding, LLC et al. v. Casper Sleep Inc.*, C.A. No. 17-cv-7468 (S.D. NY 2018)

63. *Egenera v. Cisco Systems*, Case No. 1:16-11613-RGS (D. Mass. 2018)

64. *Ball Seal Eng'g, Inc. v. Nelson Prods., Inc.* Case No. SACV13-01880 JLS (RNBx) (C.D. Cal. 2018)

65. *Sandbox Logistics, LLC et al v. Proppant Express Investments, LLC, et al.*, Civil Action No. 4:17-CV-00589 (S.D. Tex. 2018)

66. *Galas et al. v. Alere Inc.*, Case No. 37-2017-00016861-CU-BC-CTL (California Superior Court, County of San Diego 2018)

67. *Williams v. Citigroup et al.*, No. 650481/2010 et al. (New York state court, County of New York 2018)

68. *Whitewater West Indus. v. Pacific Surf Designs, Inc., et al.* 3:17-CV-01118-BEN-BLM (S.D. CA 2018)

69. *In the Matter of Certain Blow-Molded Bag-in-Container Devices etc. (Anheuser-Busch InBev S.A. v. Heineken N.V.),* Investigation No. 337-TA-1115 (International Trade Commission 2018)

70. *In the matter of Certain Beverage Dispensing Systems and Components Thereof (Heineken N.V. v. Anheuser-Busch InBev S.A.,* Investigation No. 337-TA-1130 (International Trade Commission 2019)

71. *In re: Copaxone 775 Patent Litigation*, (Teva v. Sandoz et al.) Civil Action No. 16-1267-GMS (D. Del. 2019)

72. *Manufacturing Resources Int'l, Inc. v. Civiq Smartscapes*, LLC et al, C.A. No. 17-269-RGA (D. Del. 2019)

73. *Power Integrations, Inc., v. ON Semiconductor Corp. et al.*, Case No. 16-cv-06371-BLF (N.D. Cal. 2019)

74. *Magna Mirrors of America, Inc. v. SMR Automotive Systems USA et al.* C.A. No. 1:17-cv-00077-RJJ-PJG (W.D. Mich. 2019)

11

75. *Edgewell Personal Care Brands, LLC, and International Refills Co. v. Munchkin, Inc.*, Case No. 2:18-cv-03005-PSG-JPR (C.D. Cal. 2019)

76. *Bioverativ v. CSL Behring*, C.A. No. 17-914-RGA (D. Del. 2019)

## EXPERT WITNESS TESTIMONY AT TRIAL

1. *ICU Medical v. B. Braun Inc.* (N.D. Cal. 2005)

2. *Lucent v. Microsoft, Gateway, et al* (S.D. Cal. 2007) (jury trial)

3. *Lucent v. Microsoft, Gateway, et al* (S.D. Cal. 2007) (bench trial)

4. *Kinetic Concepts, Inc. v. Smith & Nephew* (W.D. Tex 2010) Case No. SA:08-CV-00102

5. *Alcatel-Lucent USA Inc. v. Fraunhofer Gesellschaft* (International Chamber of Commerce— International Court of Arbitration 2010) No. 16 457/VRO (C.16 65/VRO) no deposition; testimony at arbitration only)

6. *In the matter of Certain Semiconductor Chips and Products Containing Same (Rambus v. Broadcom)*, (ITC 2011) Investigation No. 337-TA-753 (written testimony only)

7. *Medtronic et al. v. NuVasive, Inc.*, (S.D. Cal. 2011) Case No. 3:08-cv—1512-MMA-AJB

8. *Intellect Wireless v. HTC*, (N.D. Ill. 2012)

9. *Avanir Pharmaceuticals, Inc. et al. v. Actavis Inc., et al*, Civil Action No. 11-704(LPS) (D. Del. 2013)

10. *In the matter of certain Hemostatic Products (Ferrosan and Ethicon v. Baxter Healthcare Corp.)* (ITC 2015) Investigation No. 337-TA-913 (written testimony only)

11. *In the Matter of Certain X-Ray Breast Imaging Devices and Components Thereof* (*Hologic v. Fujifilm*), Investigation No. 337-TA-1063 (International Trade Commission 2018)

12. *Egenera v. Cisco Systems*, Case No. 1:16-11613-RGS (D. Mass. 2019)

13. *In the matter of Certain Beverage Dispensing Systems and Components Thereof (Heineken N.V. v. Anheuser-Busch InBev S.A.*, Investigation No. 337-TA-1130 (International Trade Commission 2019)

# EXHIBIT C

**1**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3                      - - -

 4   F. HOFFMAN-LA ROCHE, LTD.,    :    Civil Action

 5             Plaintiff,          :

 6         v.                      :

 7   IGEN INTERNATIONAL, INC.,     :
     ORGANON TEKNIKA CORPORATION, and :
 8   ORGANON TEKNIKA B.V.,         :

 9             Defendants.         :    No. 98-318-JJF

10                      - - -

11               Wilmington, Delaware
                 Tuesday, October 24, 2000
12                    9:30 a.m.

13                      - - -

14   BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.

15   APPEARANCES:

16       RICHARD K. HERRMANN, ESQ.
         Blank Rome Comisky & McCauley LLP
17          -and-
         DANIEL A. BOEHNEN, ESQ., and
18       GRANTLAND G. DRUTCHAS, ESQ.
         McDonnell Boehnen Hulbert & Berghoff
19       (Chicago, Illinois)

20              Counsel for Plaintiff

21       JACK B. BLUMENFELD, ESQ.,
         MARY B. GRAHAM, ESQ.,
22       MARYELLEN NOREIKA, ESQ.,
         KAREN JACOBS LOUDEN, ESQ., and
23       RICHARD W. ELLIS, ESQ.
         Morris, Nichols, Arsht & Tunnell
24
                Counsel for Defendants
25
```

**2**

**THE COURT:** Good morning.

**MR. HERRMANN:** Good morning, Your Honor. Your Honor has already been introduced to Dan Boehnen and Grant Drutchas.

**MR. BOEHNEN:** Good morning, Your Honor.

**THE COURT:** Mr. Blumenfeld.

**MR. BLUMENFELD:** Your Honor, on the defendants' side, you know Mary Graham, Karen Jacobs Louden, Rich Ellis, and Maryellen Noreika, all from our firm.

**THE COURT:** Good morning.

I have the October 20 letters from the parties, and the statements that are in the letter. As I understand it, we can't get over some of these discovery disputes.

**MR. HERRMANN:** That's correct, Your Honor.

**THE COURT:** As I read through the papers, the disputes -- who wants to tell me. I want to give you an opportunity to tell me, and I will give you what the results are.

**MR. BOEHNEN:** I am not sure about results, but we can start going through the issues.

I will be sharing comments with Mr. Drutchas, Your Honor.

I think the first and the overriding point that I would like to make for the Court is that it's become clear

**3**

to the plaintiffs, as a result of Igen's tactics over the past six months, that there is a strong desire on their part to try to delay the trial date. And they are pursuing this through at least two different lines of tactics. One is an effort to blame us for all delays, regardless of how hard we try to make things available for them, never, never enough, so that they can justify the delay as our fault. And second of all, to try to hinder our discovery in every way possible so that they can try to persuade us to join them in requesting the delay.

Let me just give you a few examples.

The letter that the defendants sent to you last Friday makes much ballyhoo of the fact that over the past six weeks they have produced many witnesses for deposition, whereas we have not, and that in fact they are still trying to get dates for Professor Hill and Leon Bushara. But that ignores the long history up to that, Your Honor.

Professor Hill is an academic in the U.K. Mr. Bushara is a businessman in Switzerland. As the Court knows, it is very common for the Europeans to take the month of August off for vacations.

Back in March, we began urging the defendants to schedule the depositions of European witnesses early in the summer, so that they could be scheduled and accomplished within the September 1st cutoff date. We urged this

**4**

repeatedly. Despite this, there was not any request for Professor Hill's deposition until late June. By that time, he was off campus. He was going to various conferences around the world. We weren't able to reach him until the end of August. When we did reach him, we provided dates to the defendants at the end of September. He needed to come back to school, have the fall term start, but said he could be available at the end of September.

The defendants rejected that date. We checked and got another date at the end of October. The defendants rejected that date. And we now have checked and I believe agreed with the defendants on a date at the end November for Professor Hill.

As to Mr. Bushara, his deposition wasn't even requested until towards the end of August, along with some flurry of new deposition notices that came in just prior to the close of discovery. He was on vacation. When he got back, he had a death in the family. Then, because of the vacation schedule, his calendar was filled through September and October.

We advised the defendants that he could make two days available if they would come to London and conduct his deposition at the same time they were going to be there anyway for Professor Hill. They refused, insisted that he had to come to the U.S. well, with travel days and

5

1  preparation dates, that means we are now talking about a
2  full week.
3        So we have just given them his date.  It again
4  is going to be in November.  But had they taken him early,
5  had they agreed to cooperate and do him in London when they
6  were doing Professor Hill, all of this would have been done.
7        By contrast, we served them with notices of
8  deposition in May.  We started asking for dates in April.
9  They didn't get them to us.  We just selected dates, served
10 notices in May.  One by one, they said, gee, that date isn't
11 available, let's reschedule it, we will get back to you.  We
12 agreed.  They never got back to us.
13       Finally, because they just flat-out ignored our
14 request in July, we renoticed all of the deposition dates,
15 told them that we would not agree to defer them unless we
16 had an agreed new date in advance.  Absent that, they were
17 obligated to go to the Court for protective order.  They did
18 neither.  They just ignored the dates once again.  They did
19 not come to this Court for any protection.  They refused our
20 requests for getting dates.
21       The point is, even as I sit here today, we have
22 people who were noticed for deposition back in May and a
23 second time in July and we still haven't had their
24 deposition.
25       The only reason they had so many produced in

6

1  September and October is because they didn't do any before
2  then.
3        Conduct during the depositions has also been
4  troubling.
5        They have repeatedly, or at least frequently,
6  given instructions not to answer on questions which they
7  deemed irrelevant, clearly improper under the current rules.
8        They waited until the very last day of the
9  discovery in order to tell us whether they were going to
10 rely upon opinions of counsel as part of their defense on
11 willful infringement.  They turned those documents over to
12 us on the last day.  And now, as we get into discovery on
13 those issues, they only allow witnesses to talk about
14 questions directed to the specific documents.  They refuse
15 to allow the witnesses to get into other communications that
16 are off the documents, even though they are on the same
17 subject, and to ask the attorneys about the work that they
18 have done elsewhere.  They have selectively chosen a few
19 documents which they intend to shield and refuse to let us
20 get into the subject matter of those same issues across the
21 board.
22       The damages documents, even today, they have not
23 produced, the most important damages information, even
24 though we are now a month and a half after the close of
25 discovery.  Mr. Migausky was recently deposed.  He

7

1  identified and confirmed that the only source of documents
2  that are available to determine sales and costs in the U.S.
3  are electronic form of sales journal and a cost journal.
4  They have not produced either of those, either electronic
5  form or in paper form.
6        Igen produced a very short summary of sales, but
7  their own witness, 30(b)(6) witness on the point of damages,
8  could not determine from this whether the sales were U.S. or
9  non-U.S.
10       Likewise, towards the end, they have now raised,
11 after the close of discovery, that not -- they believe that
12 not all of their sales were for specific binding assays,
13 although the documents they have produced don't support
14 that.  So we have proposed to them a stipulation that would
15 eliminate the need for more discovery on that issue.  They
16 have not accepted this stipulation and have not agreed to
17 any further discovery on the issue.
18       They produced no information whatsoever related
19 to development costs, no records to identify the nature of
20 the assay.  All of this with our expert reports due on
21 November 22.
22       THE COURT:  Most of what you are telling me is
23 in the papers.  My interest was, is there anything critical
24 that isn't in the papers that you want me to know about?
25       MR. BOEHNEN:  On the issue of Dr. Steven Weber,

8

1  who is one of our experts, technical expert, they have
2  objected to him --.
3        THE COURT:  That whole two-prong test idea, you
4  are going to be able to have Dr. Weber as an expert witness.
5        MR. BOEHNEN:  Okay.
6        THE COURT:  We are not going to have a problem
7  with that.  Obviously, I have been through the papers.  I
8  can cut through some of that for you.  If that is critical,
9  we will take care of that today.
10       MR. BOEHNEN:  Fine.  Those are all the points
11 that I had to make, Your Honor.  Let me ask Mr. Drutchas if
12 he had any points that are not already in the papers.
13       THE COURT:  All right.
14       MR. DRUTCHAS:  Your Honor, with respect to the
15 motion, or I guess I should say letter regarding the
16 withheld documents of Organon and Igen, Mr. Boehnen already
17 referred to some of the types of documents or some of the
18 testimony that we have been precluded from obtaining.  There
19 is one other area which has recently been identified, that
20 is, for instance, attorneys' bills regarding work that the
21 attorneys did with respect to opinions of counsel, something
22 that was clearly communicated to the client via the bills
23 themselves. And we again think that is one more category of
24 withheld document that we are entitled to.
25       Finally, I am not certain how well this was

9

1  covered in the papers, it was addressed in their reply on
2  the privileged issues, withheld issues. But the opinions of
3  counsel, the last two opinions of counsel received, Igen and
4  Organon Teknika, were clearly done by litigation counsel
5  during the course of the litigation and constitute both
6  attorney-client and work product information, clearly
7  conveying the thoughts, mental impressions, et cetera, of
8  litigation counsel.
9       And they have precluded us from getting any
10  further discovery regarding those, any underlying drafts,
11  any other communications that may have been conferred to the
12  client with respect to those and with respect to other
13  opinions that may have been received by litigation counsel.
14       THE COURT: All right.
15       MR. DRUTCHAS: There are a couple of other
16  issues that have come up, more or less corollaries to the
17  Steven Weber issue.
18       THE COURT: Hopefully, when you get that
19  decision, that will give you some guiding light. If it
20  doesn't, I will give you a spotlight on whatever the new
21  issue is.
22       MR. DRUTCHAS: Very good. Thank you.
23       THE COURT: Mr. Blumenfeld.
24       MR. BLUMENFELD: Good morning, Your Honor.
25  I was a little bit surprised by Mr. Boehnen's

10

1  opening remarks. I am not going to respond in kind. But
2  the fact is that here we are, the end of October, and we are
3  getting depositions in November. And these happened for
4  various reasons. With Dr. Hill, you know, they have now
5  offered him for November 22. We have been seeking him since
6  June. That date is okay with us, as we have told them. My
7  only concern about it is we have agreed that opening expert
8  reports, which means our reports on invalidity and
9  unenforceability, are due that way. So if we are going
10  to do Dr. Hill's deposition that day, I want to move the
11  expert reports. I have proposed to them just moving them a
12  week. We haven't gotten a response to that. But that seems
13  fair to me, that we at least ought to have his deposition.
14       MR. BOEHNEN: We sent them a letter yesterday
15  agreeing to that, Your Honor. And we do agree to that.
16       MR. DRUTCHAS: We just received their proposal
17  yesterday, Your Honor. We have not yet responded. But we
18  are agreeable to that.
19       THE COURT: It is not a discovery issue. It is
20  a communication issue.
21       MR. BOEHNEN: We received their suggestion on
22  that yesterday and we agree to it.
23       MR. BLUMENFELD: Okay. Mr. Bushara, we will get
24  back to them. We just got a letter yesterday proposing a
25  date. I am not going to address that.

11

1       There are a couple issues, and I will let Ms.
2  Graham address a couple issues. One is something that came
3  up in a letter just in the last couple days, it may have
4  been yesterday. This has to do with the lab notebooks we
5  raised back in July. We first got Serono's lab notebooks on
6  July 5. To put this in context, what we got were two
7  complete notebooks and two partial notebooks. One of the
8  notebooks is numbered 96, covers the period from March to
9  September of 1984. Another one, numbered 103, covers
10  September '84 to January of '85.
11       The next notebook we got -- I will be glad to
12  hand it up, if it helps -- is a notebook that begins at Page
13  101 of the notebook. And it covers the period starting in
14  July of '85, which is the month that the patent application
15  in the United States was filed. But the first hundred
16  pages, which presumably cover the period February of 1985 to
17  July 1985, haven't been produced. This is important to us
18  to know what work they were doing, particularly because we
19  don't have the data which underlies Figure 12 of the patent.
20       We have the data from the other notebooks that
21  underlies the other examples and the other figures in the
22  patent. Those are Figures 8, 9, 11 and some data in Column
23  7. In every one of those instances, the notebook in the
24  data is different than the notebook in the patent. Bad data
25  was deleted. Facts were misrepresented. We are very

12

1  concerned when we don't have the data underlying Figure 12.
2       We have been asking for this ever since we got
3  these notebooks in July. And what we have been told is, we
4  will take it under advisement. I don't believe we were ever
5  told until last Friday, We don't have these notebook pages
6  so we can't give them to you. It was always, We will check,
7  we will take it under advisement. Our firm has reviewed
8  these. We have elected not to produce things that aren't
9  relevant.
10       And it's hard to understand how -- this is a
11  microfiche copy, Your Honor. How they microfiche a notebook
12  started at Page 101 and didn't microfiche the first hundred
13  pages -- we think we are entitled to know what searches were
14  made, where the first half of the notebook went, what is
15  being withheld, what has been produced. And this is very
16  important data, particularly given --.
17       THE COURT: Where are the first hundred pages?
18  Give us an answer.
19       MR. DRUTCHAS: On this issue, you know, Your
20  Honor, first of all, let me say that roughly -- that the
21  three or four lab notebooks that have been produced in whole
22  or in part are not combined on microfiche in any simple
23  direct format. That is putting together roughly 12 to 15
24  separate pages of microfiche. The original laboratory
25  notebooks, as we informed defendants many, many months ago,

13

1  were transferred by Serono to a company called BioChem in
2  conjunction with the sale of this whole division.  Certain
3  lab notebooks were recorded on microfiche.
4        We have obtained, our client has obtained the
5  copies of the microfiche that were retained at the time, has
6  had somebody go through, look, determine what it is in those
7  microfiche pages that relate to the issues involved in this
8  litigation, that relate to the '610 patent.
9        We have produced everything that we have that
10 relates to the '610 patent.  To the extent that it hasn't
11 been produced, Serono does not have it.  We have withheld
12 certain pages from some of the laboratory notebooks that are
13 on projects that do not relate to this '610 patent, and
14 that's it.  And we have told Mr. Blumenfeld --.
15       THE COURT:  So the notebook that we are talking
16 about, which is provided, I think, in the papers, I think it
17 says July 5, had another hundred pages which aren't in your
18 possession, but they are on microfiche in a subsequent
19 party's hands.
20       MR. DRUTCHAS:  The original laboratory notebooks
21 are in a subsequent party's hands, BioChem.  Certain of
22 those notebooks were microfiched or certain portions of the
23 notebooks were microfiched.
24       THE COURT:  By whom?
25       MR. DRUTCHAS:  By Serono, just before

14

1  transferring them.
2        THE COURT:  Before they went.
3        MR. DRUTCHAS:  Correct.  And Serono retained the
4  microfiche of those notebooks that it had microfiched.
5        THE COURT:  Do you know why they chose not to do
6  the entire set of notebooks?
7        MR. DRUTCHAS:  No, I do not.  For that matter,
8  Serono may have had those at one time.  But those have
9  subsequently been lost or misplaced.  The fact is --.
10       THE COURT:  You told them they had to go to the
11 third party to get the first hundred pages?
12       MR. DRUTCHAS:  I am sorry?
13       THE COURT:  What did you tell them when they
14 asked for the first hundred pages?
15       MR. DRUTCHAS:  We told them the originals were
16 transferred to BioChem.  They have done Hague Convention
17 requests to our European parties in order to obtain those
18 documents.  They could have and we believe should have done
19 that here.
20       THE COURT:  But you don't have them.
21       MR. DRUTCHAS:  We don't have them.
22       MR. BOEHNEN:  We told them this months ago.
23       THE COURT:  Under your transactional agreements,
24 BioChem has no obligation to provide you with any
25 assistance.

15

1        MR. DRUTCHAS:  That's correct.
2        MR. BLUMENFELD:  Your Honor, if I can respond to
3  a couple points.  First, we did contact BioChem months ago.
4  They told us they don't have the notebooks.  So we have
5  tried that.  It is not that we have sat on our hands and
6  haven't looked for those.  But as for the first half of
7  this, I am a little concerned by what Mr. Drutchas -- about
8  the microfiche, because I think he said --.
9        THE COURT:  What did BioChem tell you?  They
10 don't have them?
11       MR. BLUMENFELD:  They told us they were unable
12 to locate them.
13       THE COURT:  Did they throw them out?
14       MR. BLUMENFELD:  They just couldn't locate them.
15 This transaction happened in 1994, I believe.
16 So it's been a number of years and they were unable to find
17 the notebooks.  They are not in the United States.  I
18 believe they are in Canada.
19       THE COURT:  So your remedy is to move for some
20 sort of preclusion.  If you have some document that says
21 BioChem can't find them and they say they don't have it,
22 then you got to do something.
23       MR. BLUMENFELD:  Well, I would like to talk --
24       THE COURT:  Otherwise, you are just in
25 conversation, which is interesting to both of you, I am

16

1  sure, but not resulting in anything.  That is why I don't
2  understand sometimes how these things degenerate into where
3  you are today on an issue like this, which is pretty
4  clear-cut to me.  You don't have them.  You sold them.  They
5  don't have them.  They want to sue on them.  If I was
6  litigating on your side, I would be in court saying, they
7  are the two facts I can establish and maybe they don't have
8  a lawsuit.  Maybe they don't have an issue.  I don't know.
9  That would be the more efficient way, rather than wrangling
10 back and forth.
11       You don't have the hundred pages of microfiche.
12 Right?
13       MR. DRUTCHAS:  To the extent there are any
14 additional pages from that lab notebook, they do not relate
15 to the '610 patent.  So we do not have the underlying
16 experimental data that they are requesting.
17       MR. BOEHNEN:  We have the hundred pages of
18 microfiche.  We have gone through them carefully and there
19 is nothing there that relates to what they are seeking.
20       THE COURT:  That is a little different.
21       MR. BOEHNEN:  That is why I wanted to clarify.
22       THE COURT:  That is a little different than
23 where we were originally.  All right.  I understand, you are
24 saying that they have nothing to do with the '610 patent.
25       MR. BOEHNEN:  Right.

**17**

1    MR. BLUMENFELD:  Your Honor, "We have the

2  hundred pages of microfiche" is, I thought, directly

3  contrary to what Mr. Drutchas just said and what he told me

4  last Friday.  But putting that aside, the record on this is

5  very clear.  These were Dr. Robinson's notebooks.  He is one

6  of the named inventors.  He was doing work on this invention

7  through February of 1985, when his last notebook leaves off.

8  He is doing work in July of 1985, July of 1985, where this

9  one picks up.  Figure 12 in that experiment was done in the

10  period in between, it must have been, because it's not in

11  the period and before or later.

12    When I took his deposition, I asked him what he

13  was doing during that period.  He said he couldn't remember

14  without seeing his notebook but that he was continuing to

15  work on electrochemical projects for Serono.  And, one, it's

16  hard to believe that he just took five months and didn't do

17  anything having to do with this, regardless of whether this

18  relates directly --.

19    THE COURT:  The answer is in the hundred pages.

20    MR. BLUMENFELD:.  Right.  I think we are

21  entitled to the hundred pages to see what it is.

22    MR. DRUTCHAS:  Let me correct something Mr.

23  Boehnen said.  I don't know standing here whether we do have

24  all hundred pages.  I have no doubt that we have some

25  portion of it.  I am the one who reviewed those.

**18**

1    THE COURT:  Here is the question I would ask

2  both sides.  How do you expect me to decide these things

3  when you don't know things like this?  Unless it's strategy,

4  which is in my view confusing, you got to nail down what the

5  facts are.

6    I have read the papers you gave me.  I have

7  thought carefully.  But the factual predicates of decisions

8  aren't really that clear.  And probably you have all been

9  writing letters rather than talking with each other and

10  isolating your issues.

11    Nobody has to rush away today, do they?

12    Here is what I am going to do:  I am going to

13  order that both sides have a conversation.  And the only

14  thing that can go on, that I am familiar with, is the agenda

15  that was attached to your latest letter.

16    MR. DRUTCHAS:  Yes.

17    THE COURT:  Plaintiff's latest letter.  You can

18  add to that agenda.  Although I think this issue is fairly

19  incorporated in your papers.  You all have a discussion, and

20  see how many of these issues, talking to each other, you can

21  work out between now and 1:30.  And then I will have you

22  back here at 1:30, using this agenda and any supplement that

23  the defendants put on it.  And I will give you the answers

24  to the remaining issues.

25    But when you come back, make sure you know where

**19**

1  the hundred pages are, and what your position is on the

2  hundred pages, either it has nothing in it or it has

3  protective information.  I am just using that as an example.

4  I am not thinking that is the realm of the dispute here, in

5  terms of conduct, believe me.  And then I will give you

6  answers to the issues that are presented on your papers.

7    That might be more productive.  Okay?

8    Let me say this:  If there is a hundred pages

9  out there -- I only use this as an example -- that has any

10  relationship at all to the patent issues in this case on the

11  '610 patent, you got to give over the hundred pages.  You

12  know that.

13    MR. DRUTCHAS:  Right.  Certainly true.

14    THE COURT:  Similarly, when they want to use an

15  expert or a witness, and there is some record of contact

16  previously, but no clear establishing of a confidential

17  exchange, you have to let them have the witness.

18    MR. BLUMENFELD:  Your Honor, this is really Ms.

19  Graham's issue.  But we did have a clear confidentiality

20  understanding with Dr. Weber.  In fact, we had two signed

21  agreements with Dr. Weber.

22    THE COURT:  But it has to relate -- if you

23  believe that, then you bring it to me.  But it's clear under

24  the case law what that two-part test is.  And the couple

25  times I have had this issue before, these witnesses,

**20**

1  particularly in competitive markets, have those agreements

2  with everybody.  Unless you have an employee, it's hard to

3  restrict someone who works at a university, unless you can

4  show that it pertains specifically to the issue that will be

5  tried in this case.  I think that is fairly what the cases

6  say.  If you think you have that, and you want to pursue

7  that position, we will take a look at it.  What I saw didn't

8  convince me at all.

9    All right.  Come back at 1:30, using your

10  agenda.

11    MR. BLUMENFELD:  I don't know what your day is

12  like.  I was talking to Mary.  She has a problem at 1:30.  I

13  have something from 12:30 to 1:30.  Would it be possible to

14  come back later this morning before lunch?

15    THE COURT:  I can tell you right away.  I have

16  some folks here for a short hearing, and then I have an

17  11:45, a 12:30 bankruptcy, which will be quick, at 1:00 I am

18  taking a plea.  I am available from 1:15 until 3:30.

19    MR. BLUMENFELD:  Would it be possible to do it

20  before your 11:45?  We can talk in the courtroom right now

21  and see whether we could pick this up.

22    THE COURT:  That would give you an hour and a

23  half.  That should be enough time.  These are not difficult

24  issues.  You ought to be able to work them out or know

25  exactly which ones you want me to tell you about.  Sure, why

**21**

1   don't you come back at, I will come back at 11:30 and I will
2   see you for 15 minutes.  Does that work for you?
3          MR. BOEHNEN:  I would say 11:15, Your Honor, so
4   we have a half-hour.
5          THE COURT:  I was trying to give you more time
6   to talk.
7          MR. BOEHNEN:  We will talk fast.
8          THE COURT:  See you at 11:15.
9          MR. HERRMANN:  Can we use the courtroom, Your
10  Honor?
11         THE COURT:  Absolutely.  I have to take these
12  folks behind you.  You know what?  This is a great
13  opportunity to use one of our two new facilities in the
14  courthouse, our Caleb M. Wright Lawyers Lounge, or our
15  lawyers conference room.
16         Can you call the clerk to see if you can get a
17  key?
18         We are setting up, close to setting up,
19  finishing those two rooms, one a work room for lawyers and
20  one a lounge for lawyers.  Only one has gotten a name, Caleb
21  M. Wright.
22         I think we are going to give you a nice room to
23  wait outside.  Hopefully, we have a key.
24         (Recess taken.)
25         THE COURT:  Good morning.

**22**

1          MS. GRAHAM:  Good morning.  Your Honor, we have
2   met for the last hour or so since we spoke, and there are a
3   number of issues that we have either resolved or essentially
4   think that we can resolve and would propose to come back
5   later if we in fact can't resolve those.  One of those is
6   with respect to the exchange of the privilege logs.  We have
7   now agreed to a procedure on that that moots that issue.
8          We have agreed that with respect to the issue of
9   redactions in defendants' opinions, that once we log what we
10  have redacted, that it is likely that they will not seek the
11  redacted portions of the opinions.  So we will confer on
12  that further.
13         With respect to the issue of the 30(b)(6)
14  depositions of Serono for which they have said that Ms.
15  Gebhard has already testified, we have agreed to put that
16  issue on hold because it may become moot after Mr. Bushara
17  testifies.
18         With respect to the lab notebooks, we have
19  agreed to set up a procedure whereby we can inspect those
20  pages, and then if there is a further issue on that, we
21  would come back to Your Honor later.
22         So I think that the lab notebook issue is off
23  the table for the present.
24         With respect to contentions on damages and
25  infringement, which were our issues, we have agreed to

**23**

1   either supplement, in the case of damages, in I think two
2   weeks, or that they will supplement in two weeks and give us
3   their damages contentions, or in the case of some other
4   issues, the claim construction issues, et cetera, we will
5   talk to them and agree to a mutual exchange on that.  And
6   that was one of our issues.
7          On an issue which I don't think they had briefed
8   but did mention when they spoke this morning having to do
9   with a stipulation relating to what customers are doing,
10  that is an issue that I think we can resolve with them and
11  we are going to discuss that further.
12         So that is what we have resolved.
13         What we haven't resolved, and I think we just
14  need Your Honor's, whatever your view is going to be in
15  connection with privilege, and specifically the two issues
16  that, as they are framed here are, one, whether or not
17  internal work product of the counsel who rendered the
18  opinions has to be produced, and it's our position that
19  under Thorn, if it wasn't communicated to the client, then
20  it's not relevant to the issue of willfulness.  And we have
21  --.
22         THE COURT:  If you read Thorn, it gives you the
23  answers.  We just talked about this yesterday.  We had a
24  meeting with lawyers.  The one issue I raised in discussing
25  discovery disputes was that I think this Court is -- I know

**24**

1   some of you folks were there.  I talked about privilege.
2   And I said to the four judges, aren't we all in the same
3   place on privilege?  And everybody nodded and all the
4   lawyers said yes.  That is one of the things, I don't
5   understand how we keep getting disputes.
6          MS. GRAHAM:  I think Mr. Boehnen would say and
7   my sense after our conference was just their concern was the
8   Judge Sleet case in Mosel-Micron.
9          THE COURT:  That is why I did it yesterday with
10  Judge Sleet sitting there, and I went right down the row, if
11  you were there.  Did anybody hear Judge Sleet speak up?  No.
12         MS. GRAHAM:  I was there.  Not for that part.
13         THE COURT:  It was a moment.  Because that's the
14  one thing where we have been a little inconsistent on
15  privilege.  And so I said to the other three judges, are we
16  all still consistent on that?  And everybody went
17  (indicating).  Were you there, Mr. Blumenfeld?
18         MR. BLUMENFELD:  I was not.
19         MS. GRAHAM:  I was there, but I didn't see his
20  response.
21         THE COURT:  Did I miss something?  Did Judge
22  Sleet jump up and say, no, I am off the reservation?
23         MR. HERRMANN:  I did not see Judge Sleet
24  standing up and doing that, Your Honor.
25         THE COURT:  Thank you.  Right after that, we

25

1 talked about predictability and consistency. So take Judge
2 Sleet and throw it out, for purposes of privilege. And I am
3 saying that with respect. That was a particular case.
4 We are trying to be predictable and consistent
5 as a Court. So you have to take that Judge Sleet case and
6 throw it out for now and follow Judge McKelvie's view, which
7 I think I have tried to follow, Judge Robinson has. We were
8 probably a little there before that came out.
9 I think you are correct, Ms. Graham, is the
10 bottom line. Does that help?
11 MS. GRAHAM: That certainly helps on that side
12 of it. I think there is a further issue with respect to the
13 reliance on advice of counsel. That has to do with the
14 date. And in this instance, we produced opinions from the
15 early nineties, which are not relevant for this current
16 issue. But then both defendants supplemented those opinions
17 shortly after the lawsuit was filed. And those opinions
18 came from counsel other than our firm. In the one case it
19 was Finnegan Henderson, who never took part in the
20 litigation. I think they briefly entered an appearance but
21 essentially they were litigation counsel.
22 In the case of Igen, a week after the complaint
23 was filed, a Mr. Evans rendered a supplemental opinion to
24 opinions that he had rendered previously. The approach that
25 we took was essentially -- it's often common to say, okay,

26

1 the start of the suit is the time when you cut off what you
2 provide. We took the position that essentially the time the
3 opinions were rendered, albeit they were shortly after the
4 lawsuit, essentially this was all supplementation, you know
5 you are in litigation, let's check, and then that was the
6 end of it. So we produced communications to the clients up
7 through the time of the opinion, or if there is something
8 that is immediately after because it discusses the opinion,
9 obviously, that either has or would be produced.
10 I am double-checking with the clients we have
11 got and everything that we thought we have.
12 But I think their position is that material,
13 whether from our firm or Mr. Evans, that in any way relates
14 to the issue of an infringement after that time should be
15 produced. And our position is that it shouldn't. At that
16 point you are now getting into things like we might be
17 talking about what the experts are going to say or what
18 responses are to contention interrogatories.
19 THE COURT: I don't mean to interrupt you. But
20 I want to understand. Let's assume that you appropriately
21 have made the cutoff. All of the other references you are
22 citing to me are on your log?
23 MS. GRAHAM: We would not be logging after the
24 time that suit was filed. Certainly with respect to the
25 opinions, we would log up to the time of the opinions. But

27

1 the agreement was --.
2 THE COURT: I am talking about the opinions.
3 MS. GRAHAM: Well, the agreement was to log, for
4 Igen and Organon Teknika, to log up to the time of the
5 lawsuit. But we have produced anything that goes up to the
6 time of the opinions that the clients would have on
7 infringement. So I am not sure if I understood your
8 question.
9 THE COURT: I am not sure if I understand what
10 you did. If you have a date, and you are telling me, Judge,
11 we logged everything up to that date, am I understanding
12 that correctly?
13 MS. GRAHAM: The logging issue is out because we
14 have produced it.
15 THE COURT: And you produced it.
16 MS. GRAHAM: Right.
17 THE COURT: You didn't assert anything against
18 it. After that date there is this little tail of things
19 that you are saying, when we determined that they were
20 relevant to what we have produced, we produced that, too.
21 MS. GRAHAM: Right.
22 THE COURT: But there is other stuff, Judge,
23 that we haven't produced.
24 MS. GRAHAM: What would be other stuff would be
25 not relating to the opinions, but would be, like, talking to

28

1 the client about how we answer contention interrogatories on
2 infringement. I think that is the kind of thing they are
3 seeking, because it was a communication with the client to
4 work out our position in the litigation. They claim that
5 that should be produced. They have gotten the material that
6 relates to the opinions.
7 THE COURT: And they know about that material
8 existing because...
9 MS. GRAHAM: The opinions in the lawsuits?
10 THE COURT: The stuff that you gave advice to
11 the client on, for instance, how do they know it exists,
12 that causes them to seek it?
13 MS. GRAHAM: They don't know and I don't know
14 what, for sure, exists relating to infringement. Only that
15 obviously when you are in a lawsuit --
16 THE COURT: Because you never logged it.
17 MS. GRAHAM: Because we were not going to be
18 logging -- the agreement was not to have to log after the
19 lawsuit was filed. If we were to log information relating
20 to infringement after the lawsuit, we would essentially be
21 logging, you know, the exchange of work product with the
22 client, or in the case of both our clients, there is
23 internal lawyers that you are working with.
24 THE COURT: I understand.
25 MS. GRAHAM: They don't know specific documents

**29**

1 on that. They would just assume that there exists drafts,
2 for example, of contentions.
3      THE COURT: You are saying because they gave you
4 stuff after the date, and they are telling you there is some
5 universe of stuff out there, you need to see it all.
6      MR. BOEHNEN: I think that is fair to say, Your
7 Honor. After the lawsuit was filed, they have a lawyer who
8 goes and creates a letter to send to the client for the
9 purpose of --.
10      THE COURT: That they give you.
11      MR. BOEHNEN: -- of creating a defense against
12 willfulness and they give that to us. When they do that,
13 this is now a post-litigation document. We are entitled to
14 the discovery behind that document so that we can show, this
15 is something that was created post-litigation solely for the
16 purpose of supporting this defense.
17      MS. GRAHAM: Now he is talking about discovery
18 behind it, which gets into the work product not exchanged.
19      THE COURT: First he is talking about you went
20 beyond the date to give them something favorable that he
21 would allege was created. That is where I was having the
22 misunderstanding, I didn't have a clear understanding. Was
23 that something you logged and after a request gave up? And
24 the answer is, no, you gave it up real easily even though it
25 was after the date because in your judgment you thought it

**30**

1 pertained.
2      And he is saying, if you gave us something that
3 was after the date, we want everything you have that
4 supports that, or give us a log, I think that is what he is
5 saying, of things that might be in the closed universe of
6 that issue.
7      MR. BOEHNEN: Well, they have now waived it. So
8 logging isn't sufficient.
9      THE COURT: Don't go too far.
10      MR. BOEHNEN: We want all the documents that
11 relate to that issue. As to documents that relate to other
12 issues --.
13      THE COURT: If they want to hold them back, the
14 only way to get to decide it for me is if they logged them,
15 you move for them and I take a look at them. That is what I
16 am trying to get to, a process. I understand what you are
17 saying, you didn't log them. I am saying, that's where I
18 can't get into a process.
19      MS. GRAHAM: Are we talking about communications
20 with the client relating to infringement? Is that the log
21 that you are asking about?
22      THE COURT: I would log them, let them see the
23 log, under the way we operate logs in this district, which
24 will have a little description. If they want to challenge
25 the log, then I will have to take a quick look at the

**31**

1 documents. What I will do is bring you over, carry the
2 documents, I will tell them which ones they get and which
3 not. That solves it. Then they have some satisfaction that
4 you are not arbitrarily providing things after the date that
5 you all agree on is a good date.
6      MS. GRAHAM: We can do that.
7      The next issue relates to Dr. Weber. I
8 understand Your Honor's concerns about him. I recognize the
9 concern about sort of knocking out an expert because they
10 happen to have some communications ten years ago. And I
11 think what is important here is -- and I gather Your Honor
12 has read the papers and knows there was a confidentiality
13 agreement and you are aware of the communications. But I
14 think your question earlier or your point earlier was to
15 what do they relate.
16      THE COURT: I even allowed it in a case where
17 they not only signed the agreement but it was about the
18 case. And then the expert, there was a lack of consummation
19 of the written documents. And I let the expert go to the
20 other side and come in.
21      MS. GRAHAM: Addressing the concern that you had
22 raised earlier, or trying to address that concern, what I
23 would suggest is that the issue for the client and where Dr.
24 Weber really was partaking of the client's knowledge,
25 getting confidential information and giving advice, and I

**32**

1 would say that happened over a two-year period, with six
2 days of visits and followup in each instance, really relates
3 to the issue of assay performance and sensitivity of the
4 assays.
5      The assays are performed on the instrumentation
6 that they were developing. That process of the development
7 that went on while he was engaging in communications with
8 the client is an issue for discovery that they have pursued,
9 and in particular they have focused on what happened to our
10 assays before the magnet was introduced in 1989 and what
11 happened after, how would you compare the performance of the
12 assays that were run and the sensitivity.
13      And that, with that particular area, he did
14 specifically advise on issues as to what extent you could
15 improve sensitivity without the magnet, and we don't have
16 his subsequent advice after the magnet was introduced. But
17 certainly, he gave advice on how to improve the sensitivity
18 of the assay when there wasn't a magnet but when there were
19 magnetic particles being used.
20      I would suggest that he should be foreclosed
21 from testifying in those particular areas of assay
22 performance and sensitivity in which he had intimate
23 discussions with the client and gained confidential
24 information and advised them, for which he paid him to come
25 up to speed and think about these issues. And that would be

33

1  in particular with respect to the client's ECL instrument,
2  not with respect to somebody else's instrument.
3        THE COURT:  You should bring that up as a motion
4  in limine, in the context of a pretrial, and if you prevail,
5  it will be on the discrete issue on a full record or report
6  and deposition.  And if you are successful, you will keep it
7  out.  If you fail, it will be great cross-examination.  That
8  is the way to handle it.  But I don't know enough -- I
9  wouldn't on the basis of what you have been able to present
10 in the papers at this point knock that witness out for good.
11       MS. GRAHAM:  I think Mr. Blumenfeld will address
12 another expert issue, which has to do with Goolcasian.  They
13 have also asked for another expert, Dr. Kissinger, and there
14 were some early discussions between us as to him back in
15 early October.  They raised the issue again recently.  They
16 just gave us some more information about Dr. Kissinger
17 yesterday.  It appears that he may be a competitor.  But I
18 talked to Mr. Drutchas.  I think we need to talk about
19 exactly what Dr. Kissinger does.  I would propose if we
20 can't resolve that issue, we bring that one back to Your
21 Honor after today.
22       THE COURT:  This is Peter Kissinger.  I think
23 you ought to be able to resolve it.  If you can't, I can
24 with a little more information give you an answer.
25       MS. GRAHAM:  Okay.  I think we don't have enough

34

1  information at this point.  They have said he sells
2  products, sells instruments for analytical purposes, as I
3  understand it, assays into the drug development area, and
4  that is precisely an area of competition with at least Igen.
5  We need more information from them and we need to talk to
6  our client to see if we can resolve it.
7        THE COURT:  That is the kind of information I
8  will need, then I will know what it is that creates the
9  problem or doesn't.
10       MS. GRAHAM:  Another issue is with respect to
11 the depositions of Humer and Meier.  Bertarelli is out
12 there, but we have agreed the rulings on Humer and Meier
13 will apply to Bertarelli.  It is our position that these
14 individuals should have to be produced for deposition.
15 These are not -- they are not cumulative and they are not
16 without knowledge.
17       THE COURT:  You are going to get to depose them.
18       MS. GRAHAM:  Okay.
19       THE COURT:  I have read the papers.  Don't think
20 I am deciding on one side.  I am anxious to get to the
21 issues you want resolved.  That was the point of letting you
22 go talk and come back.  I already came in with some
23 decisions on the basis of the letters.  A lot of these
24 overlap even on things that you kind of subliminally have
25 talked about in the papers.  Once you get the idea what you

35

1  are going to be able to do, you should be able to go off and
2  do it by extension to other witnesses and issues.  If you
3  can't, come back and we will get specific.
4        MS. GRAHAM:  With that, Your Honor, we will also
5  produce Mr. Wohlstadter to them for deposition.
6        I think the rest of the issues are Mr.
7  Blumenfeld's.
8        I did neglect to say, there is one other issue
9  that I am hopeful we can resolve with plaintiff, which is
10 documents of Roche Diagnostics on certain narrow topics
11 relating specifically to the Gear quit claim and the patent
12 purchase.  We are going to talk some more about that
13 shortly.
14       Thank you.
15       THE COURT:  On depositions, I can only add one
16 item, which is, we have a February trial date that we are
17 not going to lose.  This is for both sides.  So whatever the
18 scheduling is, you have to make it work so that we can do
19 all the things to keep the trial date.
20       MS. GRAHAM:  Your Honor, I did note, we have
21 noted in the past that it starts on a Friday.  I assume that
22 was intentional.
23       THE COURT:  No, that wasn't.  In preparation for
24 this conference, I noticed that.  We can adjust that a
25 little bit.  I don't know how that happened.  That must have

36

1  been a misread when we did it.  Did somebody remember me
2  saying let's start on a Friday?
3        MS. GRAHAM:  The scheduling order got sent out.
4        MR. BLUMENFELD:  I have a trial starting Friday
5  this week with Judge McKelvie.
6        THE COURT:  I like to start them on Tuesday,
7  actually.  I saw that.  We will get it corrected to a
8  date -- we are in February.
9        MS. GRAHAM:  Thank you, Your Honor.
10       THE COURT:  Is it a typical ten-day trial that
11 starts on Friday?
12       MR. BLUMENFELD:  No.  The reason we are starting
13 on Friday is because we only needed six days.  So we are
14 starting on Friday.
15       There were a couple other issues, but I think
16 Mr. Boehnen was anxious to say some things first.
17       MR. BOEHNEN:  Your Honor, I have been biting my
18 tongue for 20 minutes.  I even asked my counsel, Mr.
19 Herrmann, how I could interrupt, and he thought I shouldn't.
20       I must say, I have a lot of disagreement with
21 what Igen counsel just represented.  She presented all of
22 this as if we had agreement on all of these points and that
23 she was the designated spokesperson to explain them to the
24 Court.  I just don't believe that's true.
25       I had the impression that we were going to come

37

1  back in and, taking our agenda, which the Court said we were
2  going to follow, we were going to go down these things and
3  give a clear, simple statement where we are. I think if we
4  try to do that, we are going to find that there remains much
5  disagreement and much need for the Court to issue your
6  ruling on these things.
7       THE COURT: I thought you had --
8       MR. BOEHNEN: When we came in here --.
9       THE COURT: I thought you worked it out and I
10  thought Ms. Graham was speaking for all of you.
11      MR. BOEHNEN: Not at all. I was shocked to hear
12  her present that as if she were the designated spokesperson.
13  When I came in, I turned to Mr. Herrmann, and said, Richard,
14  did we agree on anything? And he said, no, not a thing.
15      So I would like to start over with the agenda of
16  the Court. And if the parties -- if they can state a clear
17  and simple point of agreement, we will agree to it and have
18  that on the record. But, you know, she was jumping all
19  around to different issues and extended discussion and
20  qualification. I don't think there is any clear agreement
21  on these points.
22      I am fully prepared to have the Court rule and
23  we go forward on it. So I suggest we start one by one and
24  state what is the supposed agreement or what the outcome is.
25      MR. BLUMENFELD: Your Honor, I thought the whole

38

1  purpose of taking an hour off and talking was to see whether
2  we could eliminate some of these issues. And when we sat in
3  the room for an hour, there were some issues which I think
4  we did reach agreement on. For example, that we would
5  supplement contentions. We didn't reach an agreement on
6  specifically what the date would be. But we would do that.
7  And other things, we agreed that we would talk a little more
8  and we thought we could reach agreement. I don't understand
9  why it is that Mr. Boehnen now wants the Court to rule on
10  these things anyway. I thought the whole point was to
11  eliminate these. The lab notebooks, if he wants a ruling,
12  he can ask Your Honor for a ruling.
13      MR. BOEHNEN: Let's take that issue, on the
14  contentions. Just before we started talking, you asked if
15  we had agreed on the contentions, and I said, No, Jack. I
16  don't know. I will agree on anything you want to do on them
17  as long as it is mutual. But what you have proposed so far
18  is a one-sided burden for us to supplement our contentions.
19  I said I don't agree to that. I will agree to any procedure
20  you want as long as it is mutual. That is where it was
21  left.
22      THE COURT: Here is what we are going to do. I
23  apologize to you. I am so slow, I thought that you had all
24  talked and I was getting your summary, and I was prepared
25  to, as I was doing, make rulings in the context of that.

39

1       MR. BOEHNEN: And I didn't want to interrupt
2  counsel, so --.
3       THE COURT: Here is what we are going to do:
4  The way I left it, we will start at the beginning, which is
5  the end of our last session, I said there is this agenda
6  that I was going to recognize, attached to the latest letter
7  I got, and that I offered that defendants could add any
8  issue they wanted to this agenda, and I was prepared to have
9  you go down it and address it, either to agree to a
10  resolution, and if not, to get my ruling or direction on it.
11      What I am going to do, I have some folks that I
12  don't want to keep beyond the 45 minutes to an hour that I
13  promised them I would keep them here, at 11:45. But what I
14  will do is go talk to them. I will ask both sides to go
15  down this agenda, and if you have agreement, tell me. When
16  I come back -- I will recognize you first, so we don't have
17  that problem again, that you have an agreement. If you
18  don't have an agreement, just say, Judge, there is no
19  agreement, you have to decide it.
20      And I am prepared to decide -- then, Mr.
21  Blumenfeld, add on any issue that you would like to have
22  decided today that isn't on this document so that it's a
23  composite document in a real sense. Okay? I will ask your
24  indulgence. It will take ten minutes to go down there, so
25  you can answer me directly and I can give you direct rulings

40

1  on the items you don't address. I apologize to you.
2       MS. GRAHAM: Your Honor, in my defense, I
3  thought we had agreement on all these things. Plus, I was
4  indicating where we didn't have a specific agreement now but
5  where we had agreed to discuss further.
6       THE COURT: Further conversation.
7       MS. GRAHAM: Right. To me, that is an agreement
8  to proceed. It is not a resolution.
9       THE COURT: I wasn't there. I thought that's
10  what was going on. But, you know, we have had a little
11  misunderstanding. I know you have to go somewhere. But
12  maybe Mr. Blumenfeld or Ms. Louden can finish up here. Just
13  so I can get you the rulings on the things you can't resolve
14  before you leave today. That is what I am trying to do. I
15  have some time today, until 3:30 I can be available.
16      MS. GRAHAM: Are we going to be revisiting the
17  rulings you made --.
18      THE COURT: They are not going to change,
19  because they are based on what I thought.
20      MR. BOEHNEN: Your Honor, if it is fastest,
21  perhaps you can go down the rulings, and if we want to talk
22  and reach a stipulation to modify a ruling afterwards, we
23  can do that.
24      THE COURT: It is faster. But you know what I
25  am trying to do. Let me bare my soul to you. We just had a

41

1  Third Circuit conference. You know what they told us at the
2  Third Circuit conference? And we just talked to some
3  lawyers yesterday. You know, the rules are changing and
4  there is going to now be claim discovery as opposed to
5  subject matter, all this stuff. Now there is all these --
6  we used to have Rule 11 meetings. We don't have those
7  anymore. Now we are having discovery meetings. The one
8  thing they tried to drive home is, you know what? We got
9  the Federal Rules because the idea was that you are all
10  officers of the Court. We are not supposed to be involved
11  in discovery except when there is a break, then you are
12  supposed to come in under Rule 37. You are supposed to, as
13  officers of the Court, get this all done. That doesn't
14  happen, and that is fine. But I am a believer that the
15  process should occur with the officers of the Court to the
16  point where there is a breakdown.
17       Now, yesterday's meeting, adding on to our
18  Hershey conference, brought this to light. When we have
19  breakdowns in this district, the way we can keep patent
20  cases moving is if we get a sense of the parties, and if we
21  can't stay on top of it, maybe we should appoint special
22  masters and send you to them. And I am going to become, as
23  I represented yesterday, an advocate in a strong way of that
24  procedure.
25       So my view is, first instance, you do it. I am

42

1  trying to see if you can do it. If you can't, I have got to
2  do it. Then this case has to go forward and I have to
3  decide whether you are going to be so irreconcilable in your
4  differences that you have to go to a master and I will take
5  appeals.
6       So that is what is going on here. I am trying
7  to provide all this new continuing legal education I have
8  gotten over the last two weeks -- you are the first case
9  that came in front of me with all this new information.
10  Isn't that great?
11       MR. BOEHNEN: We are happy to be the guinea
12  pigs.
13       THE COURT: That is why I am asking you to go
14  back, because you should do it in the first instance. If
15  you can't, I have to get a flavor of that, give you
16  decisions, and bring you back here with me and send you to a
17  master and keep you moving. That is all that is going on.
18       All right. I will talk to some folks and I will
19  be back in about a half-hour to 40 minutes.
20       (Recess taken.)
21       MR. BOEHNEN: Your Honor, we have tried to use
22  the time productively, and we have made some progress.
23  Again, I propose to basically go down our agenda one by one.
24  I will try to state clear and simply on the record where I
25  think it stands. If there is an agreement, terrific. We

43

1  will move on. If not, then I will leave it for you to rule,
2  Your Honor.
3       First, on the fully briefed motions, the first
4  one is the qualification of Dr. Weber under the protective
5  order. Basically, you have already ruled.
6       Do you accept that the Court has ruled and
7  granted that Professor Weber is going to be allowed?
8       MS. GRAHAM: I understand Judge Farnan's ruling.
9       THE COURT: You don't agree with that, but you
10  have the ruling. That can be taken off the agenda.
11       MR. BOEHNEN: That one is done.
12       Under the second motion, to compel the withheld
13  document logs from Igen and Organon, we understand that
14  Organon and Igen are going to be providing logs of all
15  withheld documents up to the date of the suit. And we
16  understand that, in terms of actually producing those
17  documents -- I guess that's the first point -- that they
18  will be producing all documents up to the date of the suit.
19  And there is an issue that we will get to later about
20  documents dated after the filing of the suit.
21       MS. GRAHAM: Your Honor, Igen has already logged
22  documents up to the date of the suit. To the extent there
23  is supplementation, as there always is in discovery when you
24  have additional documents, Organon Teknika will log up to
25  the date of the suit. The issue there was what Hoffman-La

44

1  Roche was going to do. The agreement is they are going to
2  log their documents up to the time that they became a
3  plaintiff. So that was the resolution.
4       In exchange for that resolution, we gave up on
5  some other things we were pressing for, as far as privileged
6  documents.
7       MR. BOEHNEN: Your Honor, there are two issues.
8  Organon had not produced a log, Igen, although it has, has
9  descriptions of the documents which are wholly inadequate
10  for us to be able to challenge the basis for withholding it.
11       MS. GRAHAM: That is an issue I am not aware of.
12  And I would need to know which descriptions that they are
13  talking about are wholly inadequate. I guess we could have
14  a discussion as to their log when we get it and ours. But
15  that is news to me.
16       MR. BOEHNEN: We pointed out in our motion, Your
17  Honor, that only a single description of a single document
18  even references the '610 patent. None of the others give
19  any description of any relationship to the '610 patent.
20       MS. GRAHAM: This was not raised in either of
21  the discussions we had today on this score. We are going to
22  be supplementing Igen's log.
23       THE COURT: You don't agree, is my conclusion.
24  I am going to grant the motion, because I think the premises of
25  is something you probably have agreed to, the premises of

45

1  the motion, as I understand it.  But if I am wrong, you can
2  come back.  But we will mark that up as being granted.
3      MS. GRAHAM:  If I could have clarification, I am
4  not sure exactly what it is we are being ordered to do.
5      THE COURT:  Give up the log.  I don't think the
6  premise of the motion requires a further specification of
7  any document.  But if that is something you can work out
8  just by providing amplified descriptions, you should
9  probably do that.  The premises of the motion are granted on
10  the production issue.
11      MS. GRAHAM:  Except we had agreed to that.
12      THE COURT:  I know.  I am working through this
13  as best I can to get answers for you.  So that motion is
14  granted.
15      MR. BOEHNEN:  The next point is the work product
16  related to infringement.  The Court has made clear that the
17  Thorn decision will apply.  But I think there is a couple of
18  issues here that are not really illuminated by the Thorn
19  decision.
20      And that is, first, that there are other --
21  there may well be other internal documents that are just
22  within the attorney, that he may not necessarily have sent
23  as a document to his counsel, but which is a memo to the
24  file or in some other way references the communications he
25  has had with his attorney.

46

1      I submit it would be a shambles if an attorney
2  was allowed to prepare a letter that he sent to the client
3  and then they take notes of other conversations they have
4  had with clients or they have memos of conversations with
5  clients relating to the same issue and they don't have to
6  produce any of those.
7      THE COURT:  But you are discovering on the
8  willfulness issue.
9      MR. BOEHNEN:  That's right.
10      THE COURT:  On the extent that you are
11  discovering on attorney opinions, you are discovering on the
12  reliance issue, as I understand it.
13      MR. BOEHNEN:  That is true, Your Honor.  But
14  what I am saying is, the reliance -- we are entitled to have
15  discovery of any documents that relate to the communications
16  that the attorney has had with the client.  Now, they have
17  given to us the written opinions that the attorney has given
18  to the client.  But there may well be lots of verbal
19  communications that the attorney has had with the client and
20  on which the client is relying or knows about.
21      THE COURT:  If the client is relying on it, you
22  would know about it.
23      MR. BOEHNEN:  Not necessarily, Your Honor.
24      THE COURT:  How are they going to rely on it?
25  The way it ultimately works is, you got to get to the jury.

47

1  So reliance is what they are going to tell the jury they
2  relied on to show that they weren't willful infringers.
3      MR. BOEHNEN:  So they can easily then put forth
4  the stuff that they want the jury to know about.
5      THE COURT:  That they relied upon.
6      MR. BOEHNEN:  I am interested in the stuff the
7  lawyer told them that may have contradicted that.  So that,
8  for example, let's say --.
9      THE COURT:  I understand that.  This isn't my
10  first trial or case.  But you have to take it in stages.
11  Now, we are first focused on the question of willfulness,
12  and then we are focused on their effort to get out from
13  under your charge of willfulness by reliance on the opinion
14  of counsel.  Now, there is no question in your mind that --
15  and this is what they are going to put in front of the jury
16  to show that they relied on, that they had a reasonable
17  belief to rely upon the opinion of counsel.
18      Are you satisfied that you have gotten all the
19  opinions that they intend to tell the jury they relied upon?
20      MR. BOEHNEN:  I will take their word for that.
21      THE COURT:  Now, have you produced everything
22  you are going to tell the jury that you relied upon?
23      MS. GRAHAM:  Yes, Your Honor.
24      THE COURT:  Okay.  Now, the next issue has
25  nothing to do with reliance.

48

1      MR. BOEHNEN:  I don't agree with that, Your
2  Honor.
3      THE COURT:  Really?
4      MR. BOEHNEN:  Because if at the same time they
5  gave to the client --.
6      THE COURT:  No, no.  You have to go through the
7  whole logic of conducting a trial.  Now what we are talking
8  about is impeachment.
9      MR. BOEHNEN:  Okay.
10      THE COURT:  That is what you are really looking
11  for.  They have given you reliance.  Now, you think they are
12  liars.  So what you want to do is impeach the reliance issue
13  evidence.
14      MR. BOEHNEN:  Fair enough.
15      THE COURT:  It's a different category of
16  document.
17      Now, on impeachment of their reliance issue
18  opinion, what is it that you think they have that you
19  haven't gotten?
20      MR. BOEHNEN:  We think we are entitled to any
21  documents they have, or any information, whether it is
22  documentary or otherwise they have, that relates to any
23  communication between the attorneys and the client on the
24  issue of infringement.
25      THE COURT:  Ms. Graham, what is your view about

49

1   it?

2         MS. GRAHAM:  Well, I think essentially, Your

3   Honor, what you indicated earlier will probably moot this.

4   I might have to expand slightly what was the exchange

5   between Your Honor and myself there.  But we left it that,

6   it is my understanding was we would be logging the

7   communications with the clients on infringement.  I had

8   considered, but it seems to me to be something we could do,

9   in fact, I doubt there is anything, but to log on that not

10  only the documents that were the communications but the

11  documents that would reflect a communication if there was

12  notes of communication about infringement, we could log

13  that.  Then they could determine if in fact they have an

14  issue to be pursued.

15        THE COURT:  You are going to log the universe of

16  documents that fall within the category described by the

17  plaintiff of infringement, and we will have that log by

18  when?

19        MS. GRAHAM:  I would say two weeks from Friday.

20        THE COURT:  Okay.

21        MS. GRAHAM:  That would be November 10th.

22        MR. BOEHNEN:  Your Honor, even under Thorn, I

23  don't understand their basis for not producing those.

24        THE COURT:  I don't know, either, because I

25  don't know what the documents are.  I don't think they know

50

1   yet.  They are going to log them.  When you get that log on

2   November 10th, your obligation is to move against any

3   suspect listing in the category that I have described, which

4   would be the impeachment issue category.  And once you give

5   me the list of the things you think you ought to be able to

6   have, I will take a look at those documents.

7         MR. BOEHNEN:  Your Honor, we are not talking

8   just about documents.  There is also deposition questioning,

9   where, when they produce a witness was involved in these

10  discussions on infringement, if we try to ask any question

11  about communications with the attorney other than the

12  opinion that they have set forth and they relied upon --.

13        THE COURT:  If it falls within the impeachment

14  category, you are going to be able to ask the witness, did

15  you tell him anything that would indicate to them that they

16  did infringe?  That is a permissible question.  They are not

17  going to object to that.  Are you?

18        MS. GRAHAM:  The only issue I think that might

19  come up is where it is a discussion with counsel.

20        THE COURT:  The question I asked, you wouldn't

21  object to that question, would you?

22        MS. GRAHAM:  I wouldn't object to a question of

23  the client who received the advice as to -- and haven't as

24  to whether or not they discussed with counsel infringement,

25  if that was your question.

51

1         THE COURT:  That is essentially the question.

2   And what were you told?

3         MS. GRAHAM:  Right.  And what you said back and

4   what you thought of it.

5         THE COURT:  You can ask that question, and they

6   are not going to object.

7         MR. BOEHNEN:  Maybe what we need is a motion

8   now, because we believe they have objected and have

9   instructed the witness not to answer.

10        THE COURT:  I can't get into the past.  I am

11  with Al Gore.  I am looking toward the future here.  I am

12  not living in that past.  I am trying to go through these

13  very clearly so everybody has a roadmap.  We are going to

14  look at the documents.  We are working on impeachment now.

15  You have gotten reliance.  You can ask the questions at a

16  deposition in that category of impeachment.  Ms. Graham

17  agrees you can ask about infringement and what were you

18  told.

19        MS. GRAHAM:  Your Honor, I would like to go back

20  to one thing, so there is no question about it.

21        As far as notes of counsel, for example, if it

22  was reflecting a conversation with the client, we just sent

23  you the opinion and we have now just talked about it, and

24  here is what I told the client and here is what the client

25  said, I don't think there are any of those documents, but if

52

1   there are, we will either log them or produce them if we

2   conclude that --.

3         THE COURT:  It is up to you to decide whether to

4   produce or log them.  But I am assuming that they probably

5   don't exist or there is something that you want to protect about

6   them, because otherwise, you would give them over, like you

7   are agreeing you would.

8         MS. GRAHAM:  Right.

9         THE COURT:  I don't find this that difficult.

10        MS. GRAHAM:  I don't think it is, really, Your

11  Honor.

12        MR. BOEHNEN:  The third point here on the list

13  is the production of unredacted opinions.  I believe on this

14  point it is clear --

15        THE COURT:  Unredacted opinions it is agreed you

16  are going to get.

17        MR. BOEHNEN:  Yes.  And/or, they will

18  produce any things that have been redacted that relate

19  either to infringement of the '610 patent or claim

20  construction issues.  This is my understanding, Your Honor.

21  I will leave it to them to clarify.  And if they continue to

22  redact portions other than those, they will be logged.

23        THE COURT:  You jumped up real quickly.  I got a

24  little nervous.

25        MS. GRAHAM:  I always have this feeling that we

53

1   are being accused of these things.

2         THE COURT:  Yes, you are.

3         MS. GRAHAM:  I have told them several times, we

4   have produced the portions of the opinion that relate to

5   infringement broadly construed, including on claim

6   construction.  It just disturbs me when my adversary, I

7   feel, they continue to accuse me of things which I haven't

8   done.  Now, I told them that's what we have done.  The rest

9   of the redactions, I have told them, and I thought we had

10  agreed, I thought when I stood up before that I made that

11  clear, that we will log the redactions.  And we will do it

12  in a way that if they have something else that they think

13  they need to raise about it, then they can do that.

14        MR. BOEHNEN:  Your Honor, I am trying to avoid

15  getting into the finger-pointing.  But now I must defend

16  myself.

17        I told counsel when you sent us out before, I

18  told counsel in at least one instance they produced two

19  versions of a privileged document.  One had some things

20  redacted.  The other disclosed it.  The one that disclosed

21  it showed they should have never been redacted on the first

22  version.  That raises a question in my mind as to what else

23  they have redacted.

24        THE COURT:  I am trying to look to the future.

25  So we are working through this pretty well.  You know, I

54

1   have a boat, and I only go down on weekends.  When I get to

2   the boat on Saturday morning, it is not clean, I don't

3   really care what happened or who drove it last or which kid,

4   I just want it cleaned up.  That is what we are trying to do

5   here.  We are trying to get cleaned up.

6         I don't think there is any bad faith on either

7   part.  I think communication has broken down.  I can explain

8   the first one coming redacted because an associate saw it,

9   it got reviewed and pushed out.  Anything can happen.

10        MR. BOEHNEN:  Absolutely.

11        THE COURT:  But don't suspect each other.  Let's

12  just try to get you what you need on both sides.  That way,

13  you can avoid all the recrimination, because it has

14  absolutely no effect on me until I get to the point where I

15  think someone is not telling the truth.

16        MR. BOEHNEN:  Let's move on.

17        THE COURT:  I was telling you both that.  You

18  don't have to respond.

19        MR. BOEHNEN:  Thank you.

20        The next point here are the motions for

21  protective orders of the CEOs.  And I think you had made

22  some indications on that earlier.  This is the motion for

23  protective order that we have filed with respect to Mr.

24  Humer, Mr. Meier, the CEO of Roche.  I don't think we have

25  an agreement with the other side on this issue.

55

1         MS. GRAHAM:  I had understood Your Honor to have

2   ruled on this.  They will be producing Humer and Meier.  In

3   view of that, we will be producing Mr. Wohlstadter.

4         THE COURT:  And the application will be denied.

5   I am trying to think of the context, that is how it would

6   work out.  Bottom line, the applications as presented would

7   be denied.

8         MS. GRAHAM:  Your Honor, I think this also

9   applies to Mr. Bertarelli.  The parties agreed the ruling

10  would apply to him.

11        THE COURT:  You had said once you got guidance

12  on the first two you would go with him in the same context.

13  Yes.  It does.

14        MS. GRAHAM:  Just so it is clear, are they

15  required to produce them in the United States, since they

16  are the plaintiff?  Your Honor had said earlier that that

17  was the rule that would apply when we were discussing

18  Serono's witnesses.  Humer and Meier are --.

19        THE COURT:  They like to come to the United

20  States.  Give them a free trip.

21        MR. BOEHNEN:  Your Honor, I have to interpose

22  here.  I have got to do one of the things lawyers always

23  hate to do, which is to advise the Court that my client is

24  going to have a very strong disagreement with this.  We

25  believe the record is crystal-clear that these people had no

56

1   direct involvement.  Indeed, the people who were hands-on

2   have been deposed and they testified that the CEOs had no

3   direct involvement.

4         A company like Roche, which is involved in I

5   don't know how many suits all the time, cannot allow its CEO

6   to be deposed in a situation like this, because it would

7   have a chilling effect on his ability to conduct business

8   and talk with other CEOs.

9         So I am willing to provide an affidavit from the

10  CEO confirming that he has no direct information and did not

11  have any direct activity in this and ask for

12  reconsideration.

13        THE COURT:  Does he think he is busier than I

14  am?  You tell him to show up.  Let them take his deposition,

15  and it will work out fine.  And tell him I am unreasonable.

16        MR. BOEHNEN:  I guess then, Your Honor, my other

17  question would be to seek guidance from the Court on how we

18  could best get this issue on appeal.  I certainly don't want

19  to anger the Court.

20        THE COURT:  I don't get angry.  You are the

21  litigant.  You tell me how to get it on appeal.  I just make

22  the decision here.  Sometimes these folks, because their

23  company is large, they want to be plaintiffs but they don't

24  want to be exposed.  I don't know what they want to ask.

25  But there is a premise for it, based on the record they have

57

1 made.

2        Tell him to show up.  His company brought a
3 piece of litigation and he has got to appear.

4        MR. BOEHNEN:  Okay.

5        THE COURT:  I don't know how you get it on
6 appeal, though.  I would help you if I could.

7        MR. BOEHNEN:  We will be taking steps to do
8 that.

9        THE COURT:  A writ of mandamus might do it.  I
10 won't be offended.

11       MR. BOEHNEN:  We might have to seek a contempt
12 citation in advance.

13       THE COURT:  Then a writ of mandamus.

14       MR. BOEHNEN:  On HLR's motion to compel, this
15 was obtaining copies of samples of instruments.

16       THE COURT:  I want to make sure you file it
17 before I execute on the contempt.

18       MR. BOEHNEN:  We will be responsible for that,
19 so we will try to make sure it gets done.  The reason I
20 raise it, Your Honor --.

21       THE COURT:  I understand.  I used to have
22 clients.

23       MR. BOEHNEN:  I am not saying that is a foregone
24 conclusion.  But I was instructed to reserve that.

25       THE COURT:  Tell him it is reserved.  Tell his

58

1 general counsel it has been reserved.  Tell them I am
2 unreasonable and you fought hard.

3        I honestly don't get where they can't spend some
4 time.

5        I had that with Hercules, and somebody couldn't
6 find Giacco.  They laid a lot of people off.  I don't know
7 if you remember this.  He didn't want to be deposed.  They
8 said he is out of the town.  Every Saturday morning, I see
9 him at Graylyn Crest Elementary School.  His grandson plays
10 soccer with my son.  He never misses a game.  Just go there.
11 I think the next game is like 8:30.

12       MR. BOEHNEN:  I am not saying I can't find the
13 guy.  I suspect that person was actually involved in the
14 decision.

15       THE COURT:  No.  Giacco said he didn't know
16 anything about laying these people off.  They were suing on,
17 what was it, age discrimination or something.  And I don't
18 know if he did or not.  But his company got sued.  He is the
19 head of it.  You know, they probably don't have anything to
20 do with most of the decisions they make.  But they go to
21 stockholders' meetings.

22       Tell him I don't see the problem.  It's not that
23 bad coming over.  But, you know, I want you to understand
24 something, that I am not upset with the lawyers when you
25 represent your client.  I used to represent people that

59

1 killed and raped, and I hope nobody took offense to me
2 personally because I was defending somebody.  Not that these
3 folks kill and rape.

4        MR. BOEHNEN:  Thank you.

5        The next item here is our motion to try to get
6 samples of their instruments and reagents, of the
7 defendants' products.  We have offered to pay them cost.

8        MR. BLUMENFELD:  Your Honor, I have never
9 understood this.  I didn't understand this in July and I
10 don't understand it now.  I wrote them a letter in July,
11 telling them that we would sell them these items at certain
12 prices.  The instruments are expensive instruments.  And we
13 offered to sell them at half of list price, which I am told
14 by people at Igen is a very favorable price, you know, among
15 the most favorable prices that clients get.

16       If they want them, we will sell them to them,
17 and they can have them.

18       THE COURT:  Here is my view of this.  This isn't
19 uncommon in this case.  There is a product that has an
20 actual cost to it.  Then there is a handling fee.  And some
21 folks think that is all they ought to have to pay.  But
22 there is, in the context of this kind of work, a little
23 something extra that has to be paid because while they are
24 producing this for you, they are not producing it for the
25 huge profit they usually make.

60

1        Now, those three categories of add-ons I can set
2 arbitrarily, or you can reasonably discuss them.  But my
3 view is, you got to pay the actual cost, you got to pay the
4 handling, and then you got to pay not a full kicker, but you
5 got to pay them a kicker, because you are taking their time
6 that is diverted from doing it for someone else.  And why
7 should they lose all of that just because you sue them and
8 we don't even know if they are liable yet?

9        I don't know what those numbers are.  You can
10 probably work that out, though.  But that is the principle I
11 give you to resolve this.  You got to sell it and you got to
12 pay for it.  And you got to pay cost, handling, and a little
13 bit of a kicker for the distraction.

14       MR. BOEHNEN:  Five percent above cost and
15 handling?

16       THE COURT:  Typically, you have to give me some
17 numbers.  When I sell real estate, if it is $10,000, it is a
18 bigger commission than if it's a lot more money.  Sliding
19 scale.  What are we talking about here in actual cost?

20       MR. DRUTCHAS:  If I could give you some numbers.
21 They have offered to sell us one piece of equipment for
22 $35,000, Igen has.  And Igen --

23       THE COURT:  What is the actual cost of the
24 $35,000?

25       MR. DRUTCHAS:  Igen on demand can obtain these

61

1  systems from Organon Teknika for less than $16,000,
2  according to their supply agreement. Whereas we are not
3  adverse to making some small premium above that $16,000,
4  paying nearly double that seems to me highway robbery.
5         THE COURT: It is a lot of money. Let me help
6  you out.
7         MR. BLUMENFELD: I don't know what the cost
8  information is.
9         THE COURT: Here is what I would say. If it is
10  $5,000, and there is some handling, and that is somewhat
11  concrete, soft concrete, then I don't think you ought to be
12  able to make a hundred-percent profit. But if you got a
13  20-percent kicker, that would be fair.
14         MR. BLUMENFELD: Your Honor, I am sure we can,
15  with those guidelines, we can work this out. There is more
16  than one device, and the other device I think is more
17  expensive. We will work that out.
18         THE COURT: Give me that number roughly. What
19  would that number be roughly?
20         MR. BLUMENFELD: I don't know the answer to
21  that. I don't know what the cost number is. I know what
22  the list price is. We can go back and get that information.
23  I think we can work this out.
24         THE COURT: You have the three categories. If
25  you can't agree, give me the hard numbers on the first two

62

1  and I will tell you what the kicker is going to be.
2         MR. BOEHNEN: We have been asked for the cost of
3  goods and haven't been able to get it.
4         THE COURT: You are going to get it sold. So
5  the application is granted on the principles discussed.
6         MR. BOEHNEN: Would you direct the defendants to
7  give us their information on the cost of goods sold? We
8  should be getting that for damages anyway.
9         THE COURT: Yes. He said he is going to do that
10  and I have ordered that.
11         MR. BLUMENFELD: That information has been
12  provided.
13         THE COURT: You should be able to get that.
14         MR. BOEHNEN: Okay, Your Honor. I believe that
15  brings us up to (e) on the next page. The protective order,
16  this is the generic kind of protective order that is
17  normally entered at the outset of a case, both sides have
18  presented them, and the essential issue I will turn over to
19  Mr. Drutchas. Or maybe you know what your ruling is, have
20  had a chance to read it.
21         MR. DRUTCHAS: You may be fully aware. Two
22  protective orders, HLR has proposed one that has the same
23  terms for all the parties. The defendants have proposed one
24  that has two tiers for Igen documents, or Igen or HLR
25  documents, and two separate tiers for Organon Teknika

63

1  documents as to who has access, basically requiring us to be
2  under a protective order that we think isn't equally applied
3  across the board.
4         THE COURT: It should be a two-tier order. As I
5  understand the presentations, that would work. I don't know
6  what else to tell you.
7         MR. BOEHNEN: Two tiers equally across the
8  board.
9         THE COURT: Yes. If you want to have a carveout
10  for something unusual, call me.
11         MR. BOEHNEN: The next issue, Your Honor, gets
12  into some other expert witnesses. The first one is a patent
13  attorney named John Goolcasian. We submitted his curriculum
14  vitae and they have refused to agree to let him have access
15  under the protective order.
16         MR. BLUMENFELD: Your Honor, this is a very
17  narrow issue. Mr. Goolcasian is a patent lawyer down in
18  Virginia. And when we got the undertaking, my
19  presumption -- this, by the way, is a Bench trial. This
20  isn't a jury trial. My presumption was that they wanted
21  him --
22         THE COURT: Patent law expert.
23         MR. BLUMENFELD: We are the defendant. It is
24  their patent. I said why does he need access to our
25  confidential information? The response I got was, oh, no,

64

1  he is also going to testify on willfulness. And my
2  understanding of the law on willfulness is that it's the
3  client's state of mind. I don't think Mr. Goolcasian is
4  going to have much to add about the client's state of mind.
5  If Your Honor wants to hear from him, then I guess we can
6  let him see it. When I asked Mr. Boehnen this morning, what
7  is it you want him to see, and he said I want to have him
8  have the ability to see any of the 175,000 pages of
9  documents --.
10         THE COURT: He didn't really say that. You
11  misunderstood him.
12         MR. BLUMENFELD: It's close enough.
13         MR. DRUTCHAS: If I can respond, Your Honor. As
14  far as Mr. Goolcasian's testimony goes, there is really two
15  aspects. One, getting to the ultimate trial issue, and
16  whether you want to have his testimony or not is something
17  that we should really be resolving in a motion in limine,
18  not at this stage. We are certainly entitled to have the
19  assistance of an expert such as Mr. Goolcasian assist us
20  with preparing the case and potentially be an expert,
21  assuming that this Court ultimately --.
22         THE COURT: Not really. If you want assistance
23  in preparing the case, hire him as special litigation
24  counsel. If you want him to come under the rules of an
25  expert witness, you are in a different ballgame. And in

65

1  this district, when you get into that patent law/expert/et
2  cetera area, we have a very consistent view.  And the view
3  is that they are not helpful.  And not only do we mostly
4  exclude them on Bench trials, but in jury trials they are so
5  severely limited, I can't figure out why anybody continues
6  to propose them.  It's been called the anti-Manbeck,
7  whatever that guy's name is, employment decision, the former
8  Commissioner.  But at any given period of time, it started
9  with Chisum, we put him out of here and we have gone through
10  different -- I am trying to be helpful to you in a way that
11  makes you understand -- he didn't really get to see all the
12  information they have because we don't have a place for him
13  in the expert column.
14          MR. BOEHNEN:  Can I ask, what would the Court's
15  view be of an expert witness on the competency of opinion of
16  counsel?  Their defense to willfulness is reliance on
17  opinion of counsel.  One of the things they have to show is
18  that it is a competent opinion.
19          MR. DRUTCHAS:  Let me add to that, Your Honor.
20  The Federal Circuit, in a case, In Re Hayes, and
21  Microcomputer Products, relied on that specific type of
22  testimony in order to determine that the conduct of the
23  defendant in that case was in fact fully justified as being
24  a willful infringement.  So again, the fact that the Federal
25  Circuit explicitly identified that testimony --.

66

1          THE COURT:  How about this:  Who was the panel?
2          MR. DRUTCHAS:  I don't have that in front of me.
3          THE COURT:  You know, I understand what --
4  because you want to cover every base when you are
5  litigators.  But the helpfulness of that on the opinion is
6  minimal.  What is helpful is the expert witness on the
7  technology read into the legal opinion, then the
8  cross-examination or impeachment attack on the expert that
9  offered the opinion.  And so you have that two-prong attack
10  from your technical expert, which is really helpful.
11          And that is what is most helpful to juries when
12  we talk to them afterwards.  It is not two lawyers, Give me
13  the patent and let me go get a couple opinions for you.  We
14  are getting worse than accountants, who tell you what a
15  company is worth.  It is not very helpful.
16          MR. DRUTCHAS:  I understand that it is not
17  necessarily very helpful, Your Honor.  But the question is
18  whether someone is competent to serve as an expert or not in
19  this instance.  And in this particular case, it's clear that
20  the Federal Circuit has relied on this type of testimony to
21  find that there was willfulness.
22          THE COURT:  No.  What the Federal Circuit had to
23  do was they had to accept the reliance placed on it by a
24  trial court, unless they become a de novo court.  You do
25  want to say that in this record.

67

1          MR. DRUTCHAS:  I accept that.
2          THE COURT:  So, I am giving you what we would --
3          MR. BOEHNEN:  Your Honor, granted you have
4  expressed it may not be helpful and granted that is going to
5  cause us to re-think how and if at all we use him at trial.
6  I guess the fact remains in our view we should be entitled
7  to proceed with him and get his views on this, even as a
8  potential expert witness.
9          THE COURT:  But, see, you have to have a place
10  to put him, so that I can make a ruling on what you want him
11  to have access to.  On the two places you have tried to put
12  him, I have rejected that as a basis to get access to their
13  information.
14          MR. BOEHNEN:  Okay.
15          The next one, Your Honor, is Dr. Kissinger.  He
16  has got a small business that's got a website that makes it
17  very clear that he sells a variety of reagents and does work
18  in relation to diagnostics.  We think it is very, very clear
19  that he is not a competitor of Igen.  Igen has asked for a
20  little more time to consider some recent information we have
21  given to them.
22          Beyond that, I think, you know, if you have
23  comments, everybody is interested to hear them.  But I
24  think --
25          THE COURT:  I think there would have to be some

68

1  strong reason to not permit him to be an expert and have
2  access in this case.
3          MR. BOEHNEN:  The next point relates to damages.
4  We have had a disagreement with Igen on whether their sales
5  and their customers use their products in electrochemical
6  specific binding assays.  And this is an issue that has come
7  up fairly recently because of recent depositions.  We are in
8  a position where absent an ability to reach a stipulation
9  with them on that, or perhaps in parallel with our efforts
10  to reach a stipulation, we are going to have to start
11  pursuing depositions and discovery from their customers
12  because that is the only ultimate source of the information.
13          We have proposed to them a stipulation that may
14  avoid the need for discovery from their customers.  The
15  parties are working on that stipulation.  But given the
16  timing, we are going to have to begin pursuing third-party
17  discovery in the meantime.
18          THE COURT:  Why don't we say, if you can't work
19  it out by November 3rd, you tell me in a brief letter
20  presentation what the disagreement is and call to get a
21  five- or ten-minute phone conversation and decision.  So you
22  will get a chance to work it out.  If you don't work it out,
23  call me.
24          MR. BOEHNEN:  Thank you.
25          MS. GRAHAM:  Your Honor, if I might just

69

1  interrupt. I understand that by that then that Mr. Boehnen
2  will not be proceeding with subpoenaing our --.
3      THE COURT: There should be no third -- no
4  customer discovery at this point.
5      MR. BOEHNEN: Not between now and November 3rd.
6      THE COURT: Yes. Is that the correct term,
7  customer discovery?
8      MR. BOEHNEN: I guess. Third-party customer
9  discovery.
10      Point (c) I think has been covered up above.
11      The last thing is on some documents. And this
12  gets back to these microfiche lab notebooks. And I do think
13  we have an agreement on how we are proceeding here. By at
14  least Friday of this week, we will make available in Mr.
15  Herrmann's office whatever copies of documents we have that
16  are in this Page 1 to 100. I am not sure we have all of
17  them. Whatever we have that is within that range will be
18  available for Igen's inspection. And at least that way we
19  can more sharply narrow whether there are one, two, five or
20  however many pages we are talking about. And hopefully we
21  will be able to resolve the whole thing. At least we will
22  make it more clear.
23      THE COURT: These will be in Mr. Herrmann's
24  office. And they are where now?
25      MR. BOEHNEN: Chicago.

70

1      MR. DRUTCHAS: In our offices.
2      MR. BOEHNEN: We believe the documents don't
3  relate to the '610 patent. We will give them a chance to
4  look at them and we can talk about them and see if we can at
5  least better crystallize the issue.
6      THE COURT: Okay.
7      MR. BOEHNEN: That was everything on our agenda,
8  Your Honor.
9      THE COURT: Ms. Graham.
10      MS. GRAHAM: Some of this may be repetitious of
11  what I mentioned earlier, Your Honor, but just so the record
12  is complete.
13      At this point, with respect to contentions, as I
14  understand it, on damages, we have been seeking the damages
15  contentions from plaintiff. They will give us damages
16  contentions in two weeks time.
17      With respect to the other contentions --.
18      THE COURT: Can I ask a question?
19      MS. GRAHAM: Yes.
20      THE COURT: As of today, under what theories are
21  plaintiffs seeking damages other than --
22      MR. BOEHNEN: We have told them that we are
23  pursuing reasonable royalty.
24      THE COURT: Reasonable royalty, okay. That just
25  helps me understand in case something comes up from this

71

1  point on what we understood today. So it is reasonable
2  royalty.
3      MS. GRAHAM: We have been told reasonable
4  royalty and we were given a range. That is the extent of
5  what we were told. But they will supplement that in two
6  weeks time.
7      Also, we have tied to that, have asked that they
8  go back and talk to Mr. Bushara so we can see about getting
9  that supplementation prior to his deposition. He is a
10  damages witness on behalf of Serono. And they will check
11  with him on his schedule. He is currently scheduled to give
12  his deposition or they have asked him to give his deposition
13  next week. He apparently has time then. I guess they are
14  going to revisit times with him.
15      With respect to other contentions --
16      MR. BLUMENFELD: Your Honor, there is one other
17  point that relates to that and the damages contentions we
18  discussed during the break. That is, we have had a dispute
19  for several months as to whether we are entitled to Serono
20  financial documents. Presumably, Serono would be the
21  hypothetical licensor in the hypothetical negotiation. They
22  have taken the position that it is not relevant.
23      I am not sure where we are on that. We did
24  raise this. I think Mr. Drutchas at least agreed that they
25  would go back and talk to Serono and take one more shot at

72

1  this. I hope I am right about that. If I am not, we
2  probably ought to get it resolved.
3      MR. DRUTCHAS: I think, actually, the suggestion
4  was we might be able to provide financial statements or
5  annual reports. But that generally, given that Serono was
6  not a --
7      MR. BOEHNEN: The company that was the patentee
8  does not make or sell any products. So in any normal sense
9  it doesn't have -- Serono Laboitoires S.A. didn't make or
10  sell products. Certainly, it didn't make or sell the
11  accused products.
12      THE COURT: Revolving around Serono S.A. is
13  there any commercialization of the product, that there would
14  be even a dotted line drawn to them?
15      MR. BOEHNEN: No. The entire parent
16  organization did not at any point in time ever make or sell
17  the product that falls within the scope of the patent. That
18  is why they sold the division in 1995.
19      MR. BLUMENFELD: Your Honor, but whether or not
20  they made a product that falls within the scope of the
21  claims, they had a diagnostic division. That is what was
22  sold in, I thought it was '94. '94, '95, whatever it was.
23  They had an ongoing business in this diagnostic area back in
24  the eighties and in the early nineties which was a Serono
25  company. It was Serono something. I don't know what the

73

1  name of it was.
2         It seems to me that in a hypothetical
3  negotiation, they are out there trying to get as many
4  documents as they can from Igen and from Organon Teknika
5  about what was your financial situation, how were you
6  looking at this. I think we are entitled to things on the
7  other side.
8         What was Serono's financial situation? What was
9  it doing in the diagnostics business? And, you know, the
10  fact that they say they didn't make, and I accept this, the
11  patented invention, that doesn't mean that their financial
12  information wouldn't have been relevant in a hypothetical
13  negotiation. They were in this business.
14        THE COURT: Well, I think they are going to try
15  to get you some financial information, from what I
16  understand of the representation. And we will see what they
17  come up with. And then we will take a look at it. This is
18  the whole move to get out of Georgia-Pacific and into
19  something meaningful. Luckily, this will be a Bench trial,
20  if we have to take it up. But let's see what they give you
21  first.
22        MR. BLUMENFELD: Thank you.
23        MS. GRAHAM: To complete what I was saying
24  before --
25        THE COURT: Before you were interrupted by

74

1  Blumenfeld. Let's make that clear.
2         MS. GRAHAM: That's right. I have to remember
3  where I was.
4         With respect to contentions, we had been seeking
5  further contentions from plaintiff on claim construction.
6  And we have told them specifically what we are primarily
7  interested in, which is their contentions on specific
8  binding assays and whether or not their contention with
9  respect to the meaning of electrochemical assay is something
10  that they contend was well known at the time or was
11  something that the inventors came up with, because this
12  makes a difference, to try to collect art and rebut their
13  argument if they are going to say that their meaning was
14  well-understood in the art at the time.
15        And what we have agreed is that there will be
16  some kind of mutual supplementation, and we are leaving it
17  up to them to come back to us. If they want to limit it to
18  infringement, we can mutually supplement on that. If they
19  want to involve the validity issues, fine, we will mutually
20  supplement on all of that. But they are going to get back
21  to us on that. My understanding is, we will reach
22  resolution on that.
23        As I think I had mentioned earlier, with respect
24  to our concerns about their designation of Gebhard to
25  testify as a 30(b)(6) witness after the fact, in other

75

1  words, she had given her deposition in a personal capacity
2  and they have now suggested that she could -- we should
3  accept her testimony as though it was taken in a 30(b)(6)
4  capacity. We have discussed that we may be able to moot
5  that issue.
6         We will proceed to take Mr. Bushara, they are
7  going to consider whether they could prepare him on
8  information that Ms. Gebhard might have, and hopefully that
9  will all be mooted. If it is not, we would come back to
10  Your Honor if we still have an issue.
11        MR. DRUTCHAS: Your Honor, to that extent -- let
12  me just clarify. I think Ms. Graham may have misstated. I
13  don't think we agreed to have Mr. Bushara educated into
14  areas that Ms. Gebhard had already testified on. But
15  clearly, the problem is that, for instance, there are
16  several topics here, such as the infringement investigation
17  that was done by Serono that they deposed Ms. Gebhard at
18  length on. The only people who had responsibility at Serono
19  during this period of time for this was Ms. Gebhard and the
20  other witness that we are now offering up. In that type of
21  a situation, the defendants have presented witnesses saying,
22  well, we are presenting this witness as a 30(b)(6) witness
23  within the scope of his personal knowledge or her personal
24  knowledge. And we are really basically -- are just simply
25  doing the same thing with respect to this.

76

1         They will now have had the two people with
2  personal knowledge of this event, series of events, at
3  Serono. So I guess I am not sure whether we have any issue
4  or not. I think they are going to take Bushara's
5  deposition, see whether that is adequate, and come back to
6  the Court.
7         MS. GRAHAM: Right.
8         The final thing was with respect to Roche
9  Diagnostics documents, from the depositions of Mr.
10  Montandon, who was a Roche witness, an F. Hoffman-LaRoche
11  witness, and Peter Homberg, who was a witness on behalf of
12  the Roche -- who was employed by the Roche Diagnostic
13  entities, is employed by those entities, we believe that
14  it's well established, the interaction, collaboration and
15  joint effort of F. Hoffman-La Roche and the two Roche
16  Diagnostic entities formerly, called Boehringer in
17  connection with the entire patent purchase efforts. And we
18  have asked them to consider producing the Roche Diagnostics
19  documents to us that relate to the patent purchase as well
20  as to the related issue of the Gear quit claim. And they
21  are going to go back and consider doing that. They will
22  take that up. If it is still an issue, we would come back
23  to Your Honor.
24        THE COURT: All right. What I am going to do
25  is, I think we have resolved what was pending from a dispute

77

1    point of view on the discovery issues.

2            Just so that we are clear, though, I am going to

3    ask that the plaintiff prepare an order that sets out item

4    by item what occurred here today, with reference to a docket

5    item number, probably most generally 266.  I meant to say

6    263, I think.  So we can track it.  And then a reference, a

7    recital at the opening of the order to this hearing and that

8    there is a transcript, and essentially present that with

9    notice.  And I will sign it.  That way we can track where we

10   go from today forward on the these issues.

11           And I know you have a lot to do.  But if I get

12   that in the next ten days or so, that would be helpful.

13           Okay.  Anything else?

14           MS. GRAHAM:  So we are clear, when you say

15   present with notice, you are asking that they talk to us

16   about it and see if we can come up with something that is

17   agreed.

18           THE COURT:  I don't think you could agree.  I am

19   saying that --

20           MR. BOEHNEN:  We will try.

21           THE COURT:  On notice, in my view, meant that

22   when they mail it to me they make sure you get a copy of it.

23   And simultaneously, then, if you want to comment on anything

24   you think is outrageous, you get a chance to write me a

25   letter telling me that.  I don't want it from them and I am

78

1    going to enter it.  I want them to send it to you at the

2    same time they submit it to the Court.  It is really kind of

3    like something for me to work out, but I will take your

4    thoughts on it because you will have notice of what they are

5    giving to me.  If we can get your submission to me in the --

6    basically I am asking you to do my work.

7            MR. BOEHNEN:  We are happy to narrow it down for

8    you a little bit.

9            THE COURT:  On this transcript.  And if I get

10   that in about ten days, we will have it tracking going

11   forward.  In case we are back on the same issue, we will

12   have a transcript and the order that I enter.

13           MR. BOEHNEN:  Thank you.

14           THE COURT:  Okay.  Thank you.

15           (Conference concluded at 2:52 p.m.)

16                    - - -

17   Reporter:  Kevin Maurer

18

19

20

21

22

23

24

25

| $ |
|---|
| **$10,000** [1] - 60:17 |
| **$16,000** [2] - 61:1, 61:3 |
| **$35,000** [2] - 60:22, 60:24 |
| **$5,000** [1] - 61:10 |

**'**

**'610** [10] - 13:8, 13:10, 13:13, 16:15, 16:24, 19:11, 44:18, 44:19, 52:19, 70:3
**'84** [1] - 11:10
**'85** [2] - 11:10, 11:14
**'94** [1] - 72:22
**'95** [1] - 72:22

**1**

**1** [1] - 69:16
**100** [1] - 69:16
**101** [2] - 11:13, 12:12
**103** [1] - 11:9
**10th** [2] - 49:21, 50:2
**11** [2] - 11:22, 41:6
**11:15** [2] - 21:3, 21:8
**11:30** [1] - 21:1
**11:45** [3] - 20:17, 20:20, 39:13
**12** [4] - 11:19, 12:1, 12:23, 17:9
**12:30** [2] - 20:13, 20:17
**15** [2] - 12:23, 21:2
**175,000** [1] - 64:8
**1984** [1] - 11:9
**1985** [5] - 11:16, 11:17, 17:7, 17:8
**1989** [1] - 32:10
**1994** [1] - 15:15
**1995** [2] - 72:18
**1:00** [1] - 20:17
**1:15** [1] - 20:18
**1:30** [5] - 18:21, 18:22, 20:9, 20:12, 20:13
**1st** [1] - 3:25

**2**

**20** [2] - 2:12, 36:18
**20-percent** [1] - 61:13
**2000** [1] - 1:11
**22** [2] - 7:21, 10:5
**24** [1] - 1:11

**263** [1] - 77:6
**266** [1] - 77:5
**2:52** [1] - 78:15

**3**

**30(b)(6** [5] - 7:7, 22:13, 74:25, 75:3, 75:22
**37** [1] - 41:12
**3:30** [2] - 20:18, 40:15
**3rd** [2] - 68:19, 69:5

**4**

**40** [1] - 42:19
**45** [1] - 39:12

**5**

**5** [2] - 11:6, 13:17

**7**

**7** [1] - 11:23

**8**

**8** [1] - 11:22
**8:30** [1] - 58:11

**9**

**9** [1] - 11:22
**96** [1] - 11:8
**98-318-JJF** [1] - 1:9
**9:30** [1] - 1:12

**A**

**a.m** [1] - 1:12
**ability** [3] - 56:7, 64:8, 68:8
**able** [16] - 4:4, 8:4, 20:24, 33:9, 33:23, 35:1, 44:10, 50:5, 50:14, 61:12, 62:3, 62:13, 69:21, 72:4, 75:4
**absent** [1] - 68:8
**Absent** [1] - 5:16
**absolutely** [1] - 54:14
**Absolutely** [2] - 21:11, 54:10
**academic** [1] - 3:18

**accept** [5] - 43:6, 66:23, 67:1, 73:10, 75:3
**accepted** [1] - 7:16
**access** [6] - 63:1, 63:14, 63:24, 67:11, 67:12, 68:2
**accomplished** [1] - 3:24
**according** [1] - 61:2
**accountants** [1] - 66:14
**accuse** [1] - 53:7
**accused** [2] - 53:1, 72:11
**Action** [1] - 1:4
**activity** [1] - 56:11
**actual** [4] - 59:20, 60:3, 60:19, 60:23
**add** [7] - 18:18, 35:15, 39:7, 39:21, 60:1, 64:4, 65:19
**add-ons** [1] - 60:1
**adding** [1] - 41:17
**additional** [2] - 16:14, 43:24
**address** [6] - 10:25, 11:2, 31:22, 33:11, 39:9, 40:1
**addressed** [1] - 9:1
**Addressing** [1] - 31:21
**adequate** [1] - 76:5
**adjust** [1] - 35:24
**advance** [2] - 5:16, 57:12
**adversary** [1] - 53:6
**adverse** [1] - 61:3
**advice** [6] - 25:13, 28:10, 31:25, 32:16, 32:17, 50:23
**advise** [2] - 32:14, 55:23
**advised** [2] - 4:21, 32:24
**advisement** [2] - 12:4, 12:7
**advocate** [1] - 41:23
**affidavit** [1] - 56:9
**afterwards** [2] - 40:22, 66:12
**age** [1] - 58:17
**agenda** [12] - 18:14, 18:18, 18:22, 20:10, 37:1, 37:15, 39:5, 39:8, 39:15, 42:23, 43:10, 70:7
**ago** [4] - 12:25, 14:22, 15:3, 31:10
**agree** [17] - 5:15,

10:15, 10:22, 23:5, 31:5, 37:14, 37:17, 38:16, 38:19, 39:9, 43:9, 44:23, 48:1, 61:25, 63:14, 77:18
**agreeable** [1] - 10:18
**agreed** [24] - 4:12, 5:5, 5:12, 5:16, 7:16, 10:7, 22:7, 22:8, 22:15, 22:19, 22:25, 34:12, 38:7, 38:15, 40:5, 44:25, 45:11, 52:15, 53:10, 55:9, 71:24, 74:15, 75:13, 77:17
**agreeing** [2] - 10:15, 52:7
**agreement** [24] - 27:1, 27:3, 28:18, 31:13, 31:17, 36:22, 37:17, 37:20, 37:24, 38:4, 38:5, 38:8, 39:15, 39:17, 39:18, 39:19, 40:3, 40:4, 40:7, 42:25, 44:1, 54:25, 61:2, 69:13
**agreements** [3] - 14:23, 19:21, 20:1
**agrees** [1] - 51:17
**AI** [1] - 51:11
**albeit** [1] - 26:3
**allege** [1] - 29:21
**allow** [3] - 6:13, 6:15, 56:5
**allowed** [3] - 31:16, 43:7, 46:2
**amplified** [1] - 45:8
**analytical** [1] - 34:2
**AND** [1] - 1:2
**anger** [1] - 56:19
**angry** [1] - 56:20
**annual** [1] - 72:5
**answer** [9] - 6:6, 12:18, 17:19, 28:1, 29:24, 33:24, 39:25, 51:9, 61:20
**answers** [4] - 18:23, 19:6, 23:23, 45:13
**anti** [1] - 65:6
**anti-Manbeck** [1] - 65:6
**anxious** [2] - 34:20, 36:16
**anyway** [3] - 4:24, 38:10, 62:8
**apologize** [2] - 38:23, 40:1
**appeal** [3] - 56:18, 56:21, 57:6
**appeals** [1] - 42:5

**appear** [1] - 57:3
**appearance** [1] - 25:20
**APPEARANCES** [1] - 1:15
**application** [3] - 11:14, 55:4, 62:5
**applications** [1] - 55:6
**applied** [1] - 63:2
**applies** [1] - 55:9
**apply** [4] - 34:13, 45:17, 55:10, 55:17
**appoint** [1] - 41:21
**approach** [1] - 25:24
**appropriately** [1] - 26:20
**April** [1] - 5:8
**arbitrarily** [2] - 31:4, 60:2
**area** [6] - 8:19, 32:13, 34:3, 34:4, 65:2, 72:23
**areas** [2] - 32:21, 75:14
**argument** [1] - 74:13
**Arsht** [1] - 1:23
**art** [2] - 74:12, 74:14
**aside** [1] - 17:4
**aspects** [1] - 64:15
**assay** [5] - 7:20, 32:3, 32:18, 32:21, 74:9
**assays** [8] - 7:12, 32:4, 32:5, 32:10, 32:12, 34:3, 68:6, 74:8
**assert** [1] - 27:17
**assist** [1] - 64:19
**assistance** [3] - 14:25, 64:19, 64:22
**associate** [1] - 54:8
**assume** [3] - 26:20, 29:1, 35:21
**assuming** [2] - 52:4, 64:21
**attached** [2] - 18:15, 39:6
**attack** [2] - 66:8, 66:9
**attorney** [10] - 9:6, 45:22, 45:25, 46:1, 46:11, 46:16, 46:17, 46:19, 50:11, 63:13
**attorney-client** [1] - 9:6
**attorneys** [3] - 6:17, 8:21, 48:23
**attorneys'** [1] - 8:20
**August** [3] - 3:21, 4:5, 4:15
**available** [9] - 3:6, 4:8, 4:22, 5:11, 7:2,

20:18, 40:15, 69:14,
69:18
**avoid** [3] - 53:14,
54:13, 68:14
**aware** [3] - 31:13,
44:11, 62:21

## B

**B.V** [1] - 1:8
**Bad** [1] - 11:24
**bad** [2] - 54:6, 58:23
**ballgame** [1] - 64:25
**ballyhoo** [1] - 3:13
**bankruptcy** [1] - 20:17
**bare** [1] - 40:25
**base** [1] - 66:4
**based** [2] - 40:19,
56:25
**basis** [5] - 33:9, 34:23,
44:10, 49:23, 67:12
**became** [1] - 44:2
**because..** [1] - 28:8
**become** [4] - 2:25,
22:16, 41:22, 66:24
**BEFORE** [1] - 1:14
**began** [1] - 3:22
**begin** [1] - 68:16
**beginning** [1] - 39:4
**begins** [1] - 11:12
**behalf** [2] - 71:10,
76:11
**behind** [3] - 21:12,
29:14, 29:18
**belief** [1] - 47:17
**believer** [1] - 41:14
**Bench** [3] - 63:19,
65:4, 73:19
**Berghoff** [1] - 1:18
**Bertarelli** [3] - 34:11,
34:13, 55:9
**best** [2] - 45:13, 56:18
**better** [1] - 70:5
**between** [6] - 17:10,
18:21, 33:14, 48:23,
49:5, 69:5
**Beyond** [1] - 67:22
**beyond** [2] - 29:20,
39:12
**bigger** [1] - 60:18
**bills** [2] - 8:20, 8:22
**binding** [3] - 7:12,
68:6, 74:8
**BioChem** [7] - 13:1,
13:21, 14:16, 14:24,
15:3, 15:9, 15:21
**bit** [4] - 9:25, 35:25,
60:13, 78:8
**biting** [1] - 36:17

**blame** [1] - 3:5
**Blank** [1] - 1:16
**Blumenfeld** [8] - 2:7,
9:23, 13:14, 24:17,
33:11, 39:21, 40:12,
74:1
**BLUMENFELD** [27] -
1:21, 2:8, 9:24,
10:23, 15:2, 15:11,
15:14, 15:23, 17:1,
19:18, 20:11, 20:19,
24:18, 36:4, 36:12,
37:25, 59:8, 61:7,
61:14, 61:20, 62:11,
63:16, 63:23, 64:12,
71:16, 72:19, 73:22
**Blumenfeld's** [1] -
35:7
**BLUMENFELD:** [1] -
17:20
**board** [3] - 6:21, 63:3,
63:8
**boat** [2] - 54:1, 54:2
**BOEHNEN** [82] - 1:17,
2:6, 2:20, 7:25, 8:5,
8:10, 10:14, 10:21,
14:22, 16:17, 16:21,
16:25, 21:3, 21:7,
29:6, 29:11, 30:7,
30:10, 36:17, 37:8,
37:11, 38:13, 39:1,
40:20, 42:11, 42:21,
43:11, 44:7, 44:16,
45:15, 46:9, 46:13,
46:23, 47:3, 47:6,
47:20, 48:1, 48:4,
48:9, 48:14, 48:20,
49:22, 50:7, 51:7,
52:12, 52:17, 53:14,
54:10, 54:16, 54:19,
55:21, 56:16, 57:4,
57:7, 57:11, 57:14,
57:18, 57:23, 58:12,
59:4, 60:14, 62:2,
62:6, 62:14, 63:7,
63:11, 65:14, 67:3,
67:14, 68:3, 68:24,
69:5, 69:8, 69:25,
70:2, 70:7, 70:22,
72:7, 72:15, 77:20,
78:7, 78:13
**Boehnen** [9] - 1:18,
2:4, 8:16, 17:23,
24:6, 36:16, 38:9,
64:6, 69:1
**Boehnen's** [1] - 9:25
**Boehringer** [1] - 76:16
**Bottom** [1] - 55:6
**bottom** [1] - 25:10
**break** [2] - 41:11,

71:18
**breakdown** [1] - 41:16
**breakdowns** [1] -
41:19
**brief** [1] - 68:19
**briefed** [2] - 23:7, 43:3
**briefly** [1] - 25:20
**bring** [5] - 19:23, 31:1,
33:3, 33:20, 42:16
**brings** [1] - 62:15
**broadly** [1] - 53:5
**broken** [1] - 54:7
**brought** [2] - 41:18,
57:2
**burden** [1] - 38:18
**Bushara** [8] - 3:16,
3:19, 4:14, 10:23,
22:16, 71:8, 75:6,
75:13
**Bushara's** [1] - 76:4
**busier** [1] - 56:13
**business** [5] - 56:7,
67:16, 72:23, 73:9,
73:13
**businessman** [1] -
3:19

## C

**Caleb** [2] - 21:14,
21:20
**calendar** [1] - 4:19
**campus** [1] - 4:3
**Canada** [1] - 15:18
**cannot** [1] - 56:5
**capacity** [2] - 75:1,
75:4
**care** [2] - 8:9, 54:3
**carefully** [2] - 16:18,
18:7
**carry** [1] - 31:1
**carveout** [1] - 63:9
**case** [26] - 19:10,
19:24, 20:5, 23:1,
23:3, 24:8, 25:3,
25:5, 25:18, 25:22,
28:22, 31:16, 31:18,
42:2, 42:8, 47:10,
59:19, 62:17, 64:20,
64:23, 65:20, 65:23,
66:19, 68:2, 70:25,
78:11
**cases** [2] - 20:5, 41:20
**categories** [2] - 60:1,
61:24
**category** [7] - 8:23,
48:15, 49:16, 50:3,
50:4, 50:14, 51:16
**causes** [1] - 28:12

**CEO** [3] - 54:24, 56:5,
56:10
**CEOs** [3] - 54:21,
56:2, 56:8
**Certain** [2] - 13:2,
13:21
**certain** [5] - 8:25,
13:12, 13:22, 35:10,
59:11
**Certainly** [3] - 19:13,
26:24, 72:10
**certainly** [4] - 25:11,
32:17, 56:18, 64:18
**cetera** [3] - 9:7, 23:4,
65:2
**challenge** [2] - 30:24,
44:10
**chance** [4] - 62:20,
68:22, 70:3, 77:24
**change** [1] - 40:18
**changing** [1] - 41:3
**charge** [1] - 47:13
**check** [3] - 12:6, 26:5,
71:10
**checked** [2] - 4:9, 4:11
**checking** [1] - 26:10
**Chicago** [2] - 1:19,
69:25
**chilling** [1] - 56:7
**Chisum** [1] - 65:9
**chose** [1] - 14:5
**chosen** [1] - 6:18
**Circuit** [6] - 41:1, 41:2,
65:20, 65:25, 66:20,
66:22
**citation** [1] - 57:12
**citing** [1] - 26:22
**Civil** [1] - 1:4
**claim** [8] - 23:4, 28:4,
35:11, 41:4, 52:19,
53:5, 74:5, 76:20
**claims** [1] - 72:21
**clarification** [1] - 45:3
**clarify** [3] - 16:21,
52:21, 75:12
**clean** [1] - 54:2
**cleaned** [2] - 54:4,
54:5
**clear** [24] - 2:25, 16:4,
17:5, 18:8, 19:16,
19:19, 19:23, 29:22,
37:3, 37:16, 37:20,
42:24, 45:16, 52:14,
53:11, 55:14, 55:25,
66:19, 67:17, 67:18,
69:22, 74:1, 77:2,
77:14
**clear-cut** [1] - 16:4
**clearly** [6] - 6:7, 8:22,
9:4, 9:6, 51:13,

75:15
**clerk** [1] - 21:16
**client** [29] - 8:22, 9:6,
9:12, 13:4, 23:19,
28:1, 28:3, 28:11,
28:22, 29:8, 30:20,
31:23, 32:8, 32:23,
34:6, 46:2, 46:16,
46:18, 46:19, 46:20,
46:21, 48:5, 48:23,
50:23, 51:22, 51:24,
55:23, 58:25
**client's** [4] - 31:24,
33:1, 64:3, 64:4
**clients** [9] - 26:6,
26:10, 27:6, 28:22,
46:4, 46:5, 49:7,
57:22, 59:15
**close** [5] - 4:17, 6:24,
7:11, 21:18, 64:12
**closed** [1] - 30:5
**collaboration** [1] -
76:14
**collect** [1] - 74:12
**Column** [1] - 11:22
**column** [1] - 65:13
**combined** [1] - 12:22
**coming** [2] - 54:8,
58:23
**Comisky** [1] - 1:16
**comment** [1] - 77:23
**comments** [2] - 2:22,
67:23
**commercialization** [1]
- 72:13
**commission** [1] -
60:18
**Commissioner** [1] -
65:8
**common** [2] - 3:20,
25:25
**communicated** [2] -
8:22, 23:19
**communication** [6] -
10:20, 28:3, 48:23,
49:11, 49:12, 54:7
**communications** [13]
- 6:15, 9:11, 26:6,
30:19, 31:10, 31:13,
32:7, 45:24, 46:15,
46:19, 49:7, 49:10,
50:11
**company** [8] - 13:1,
56:4, 56:23, 57:2,
58:18, 66:15, 72:7,
72:25
**compare** [1] - 32:11
**compel** [2] - 43:12,
57:14
**competency** [1] -

65:15
**competent** [2] - 65:18, 66:18
**competition** [1] - 34:4
**competitive** [1] - 20:1
**competitor** [2] - 33:17, 67:19
**complaint** [1] - 25:22
**complete** [3] - 11:7, 70:12, 73:23
**composite** [1] - 39:23
**concern** [5] - 10:7, 24:7, 31:9, 31:21, 31:22
**concerned** [2] - 12:1, 15:7
**concerns** [2] - 31:8, 74:24
**conclude** [1] - 52:2
**concluded** [1] - 78:15
**conclusion** [2] - 44:23, 57:24
**concrete** [2] - 61:11
**conduct** [4] - 4:22, 19:5, 56:7, 65:22
**Conduct** [1] - 6:3
**conducting** [1] - 48:7
**confer** [1] - 22:11
**Conference** [1] - 78:15
**conference** [6] - 21:15, 24:7, 35:24, 41:1, 41:2, 41:18
**conferences** [1] - 4:3
**conferred** [1] - 9:11
**confidential** [4] - 19:16, 31:25, 32:23, 63:25
**confidentiality** [2] - 19:19, 31:12
**confirmed** [1] - 7:1
**confirming** [1] - 56:10
**confusing** [1] - 18:4
**conjunction** [1] - 13:2
**connection** [2] - 23:15, 76:17
**consider** [4] - 67:20, 75:7, 76:18, 76:21
**considered** [1] - 49:8
**consistency** [1] - 25:1
**consistent** [3] - 24:16, 25:4, 65:2
**constitute** [1] - 9:5
**construction** [4] - 23:4, 52:20, 53:6, 74:5
**construed** [1] - 53:5
**consummation** [1] - 31:18
**contact** [2] - 15:3,

19:15
**contempt** [2] - 57:11, 57:17
**contend** [1] - 74:10
**contention** [3] - 26:18, 28:1, 74:8
**contentions** [16] - 22:24, 23:3, 29:2, 38:5, 38:14, 38:15, 38:18, 70:13, 70:15, 70:16, 70:17, 71:15, 71:17, 74:4, 74:5, 74:7
**context** [6] - 11:6, 33:4, 38:25, 55:5, 55:12, 59:22
**continue** [2] - 52:21, 53:7
**continues** [1] - 65:5
**continuing** [2] - 17:14, 42:7
**contradicted** [1] - 47:7
**contrary** [1] - 17:3
**contrast** [1] - 5:7
**Convention** [1] - 14:16
**conversation** [5] - 15:25, 18:13, 40:6, 51:22, 68:21
**conversations** [2] - 46:3, 46:4
**conveying** [1] - 9:7
**convince** [1] - 20:8
**cooperate** [1] - 5:5
**copies** [2] - 13:5, 57:15, 69:15
**copy** [2] - 12:11, 77:22
**corollaries** [1] - 9:16
**CORPORATION** [1] - 1:7
**Correct** [1] - 14:3
**correct** [5] - 2:15, 15:1, 17:22, 25:9, 69:6
**corrected** [1] - 36:7
**correctly** [1] - 27:12
**cost** [12] - 7:3, 59:7, 59:20, 60:3, 60:12, 60:14, 60:19, 60:23, 61:7, 61:21, 62:2, 62:7
**costs** [2] - 7:2, 7:19
**Counsel** [2] - 1:20, 1:24
**counsel** [26] - 6:10, 8:21, 9:3, 9:4, 9:8, 9:13, 23:17, 25:13, 25:18, 25:21, 36:18, 36:21, 39:2, 45:23,

47:14, 47:17, 50:19, 50:24, 51:21, 53:17, 53:18, 58:1, 64:24, 65:16, 65:17
**couple** [9] - 9:15, 11:1, 11:2, 11:3, 15:3, 19:24, 36:15, 45:17, 66:13
**course** [1] - 9:5
**court** [3] - 16:6, 66:24
**Court** [23] - 2:25, 3:19, 5:17, 5:19, 23:25, 25:5, 36:24, 37:1, 37:5, 37:16, 37:22, 38:9, 41:10, 41:13, 41:15, 43:6, 45:16, 55:23, 56:17, 56:19, 64:21, 76:6, 78:2
**Court's** [1] - 65:14
**courthouse** [1] - 21:14
**courtroom** [2] - 20:20, 21:9
**cover** [2] - 11:16, 66:4
**covered** [2] - 9:1, 69:10
**covers** [3] - 11:8, 11:9, 11:13
**created** [2] - 29:15, 29:21
**creates** [2] - 29:8, 34:8
**creating** [1] - 29:11
**Crest** [1] - 58:9
**critical** [2] - 7:23, 8:8
**cross** [2] - 33:7, 66:8
**cross-examination** [2] - 33:7, 66:8
**crystal** [1] - 55:25
**crystal-clear** [1] - 55:25
**crystallize** [1] - 70:5
**cumulative** [1] - 34:15
**current** [2] - 6:7, 25:15
**curriculum** [1] - 63:13
**customer** [2] - 69:4, 69:7, 69:8
**customers** [4] - 23:9, 68:5, 68:11, 68:14
**cut** [3] - 8:8, 16:4, 26:1
**cutoff** [2] - 3:25, 26:21

60:23, 61:5, 61:9, 61:18, 61:24, 62:4, 62:9, 62:13, 63:4, 63:9, 63:22, 64:10, 64:22, 66:1, 66:3, 66:22, 67:2, 67:9, 67:25, 68:18, 69:3, 69:6, 69:23, 70:6, 70:9, 70:18, 70:20, 70:24, 72:12, 73:14, 73:25, 76:24, 77:18, 77:21, 78:9, 78:14
**Court's** [1] - 65:14
**courthouse** [1] - 21:14
**courtroom** [2] - 20:20, 21:9
**cover** [2] - 11:16, 66:4
**covered** [2] - 9:1, 69:10
**covers** [3] - 11:8, 11:9, 11:13
**created** [2] - 29:15, 29:21
**creates** [2] - 29:8, 34:8
**creating** [1] - 29:11
**Crest** [1] - 58:9
**critical** [2] - 7:23, 8:8
**cross** [2] - 33:7, 66:8
**cross-examination** [2] - 33:7, 66:8
**crystal** [1] - 55:25
**crystal-clear** [1] - 55:25
**crystallize** [1] - 70:5
**cumulative** [1] - 34:15
**current** [2] - 6:7, 25:15
**curriculum** [1] - 63:13
**customer** [2] - 69:4, 69:7, 69:8
**customers** [4] - 23:9, 68:5, 68:11, 68:14
**cut** [3] - 8:8, 16:4, 26:1
**cutoff** [2] - 3:25, 26:21

## D

**damages** [14] - 6:22, 6:23, 7:7, 22:24, 23:1, 23:3, 62:8, 68:3, 70:14, 70:15, 70:21, 71:10, 71:17
**Dan** [1] - 2:4
**DANIEL** [1] - 1:17
**data** [8] - 11:19, 11:20, 11:22, 11:24, 12:1, 12:16, 16:16
**date** [29] - 3:3, 3:25, 4:9, 4:10, 4:11, 4:12,

5:3, 5:10, 5:16, 10:6, 10:25, 25:14, 27:10, 27:11, 27:18, 29:4, 29:20, 29:25, 30:3, 31:4, 31:5, 35:16, 35:19, 36:8, 38:6, 43:15, 43:18, 43:22, 43:25
**dated** [1] - 43:20
**dates** [8] - 3:16, 4:5, 5:1, 5:8, 5:9, 5:14, 5:18, 5:20
**days** [7] - 4:22, 4:25, 11:3, 32:2, 36:13, 77:12, 78:10
**de** [1] - 66:24
**death** [1] - 4:18
**decide** [6] - 18:2, 30:14, 39:19, 39:20, 42:3, 52:3
**decided** [1] - 39:22
**deciding** [1] - 34:20
**decision** [7] - 9:19, 45:17, 45:19, 56:22, 58:14, 65:7, 68:21
**decisions** [4] - 18:7, 34:23, 42:16, 58:20
**deemed** [1] - 6:7
**defend** [1] - 53:15
**defendant** [2] - 63:23, 65:23
**Defendants** [2] - 1:9, 1:24
**defendants** [14] - 3:12, 3:22, 4:6, 4:9, 4:10, 4:12, 4:21, 12:25, 18:23, 25:16, 39:7, 62:6, 62:23, 75:21
**defendants'** [3] - 2:8, 22:9, 59:7
**defending** [1] - 59:2
**defense** [5] - 6:10, 29:11, 29:16, 40:2, 65:16
**defer** [1] - 5:15
**degenerate** [1] - 16:2
**DELAWARE** [1] - 1:2
**Delaware** [1] - 1:11
**delay** [3] - 3:3, 3:7, 3:10
**delays** [1] - 3:5
**deleted** [1] - 11:25
**demand** [1] - 60:25
**denied** [2] - 55:4, 55:7
**depose** [1] - 34:17
**deposed** [5] - 6:25, 56:2, 56:6, 58:7, 75:17
**deposition** [23] - 3:14,

4:2, 4:14, 4:16, 4:23, 5:8, 5:14, 5:22, 5:24, 10:10, 10:13, 17:12, 33:6, 34:14, 35:5, 50:8, 51:16, 56:14, 71:9, 71:12, 75:1, 76:5

**depositions** [9] - 3:23, 6:3, 10:3, 22:14, 34:11, 35:15, 68:7, 68:11, 76:9

**described** [2] - 49:16, 50:3

**description** [3] - 30:24, 44:17, 44:19

**descriptions** [3] - 44:9, 44:12, 45:8

**designated** [2] - 36:23, 37:12

**designation** [1] - 74:24

**desire** [1] - 3:2

**Despite** [1] - 4:1

**determine** [5] - 7:2, 7:8, 13:6, 49:13, 65:22

**determined** [1] - 27:19

**developing** [1] - 32:6

**development** [3] - 7:19, 32:6, 34:3

**device** [2] - 61:16

**diagnostic** [2] - 72:21, 72:23

**Diagnostic** [2] - 76:12, 76:16

**diagnostics** [2] - 67:18, 73:9

**Diagnostics** [3] - 35:10, 76:9, 76:18

**difference** [1] - 74:12

**differences** [1] - 42:4

**different** [8] - 3:4, 11:24, 16:20, 16:22, 37:19, 48:15, 64:25, 65:10

**difficult** [2] - 20:23, 52:9

**direct** [7] - 12:23, 39:25, 56:1, 56:3, 56:10, 56:11, 62:6

**directed** [1] - 6:14

**direction** [1] - 39:10

**directly** [3] - 17:2, 17:18, 39:25

**disagreement** [5] - 36:20, 37:5, 55:24, 68:4, 68:20

**disclosed** [2] - 53:20

**discovering** [3] - 46:7, 46:11

**discovery** [27] - 2:14, 3:8, 4:17, 6:9, 6:12, 6:25, 7:11, 7:15, 7:17, 9:10, 10:19, 23:25, 29:14, 29:17, 32:8, 41:4, 41:7, 41:11, 43:23, 46:15, 68:11, 68:14, 68:17, 69:4, 69:7, 69:9, 77:1

**discrete** [1] - 33:5

**discrimination** [1] - 58:17

**discuss** [2] - 23:11, 40:5, 60:2

**discussed** [4] - 50:24, 62:5, 71:18, 75:4

**discusses** [1] - 26:8

**discussing** [2] - 23:24, 55:17

**discussion** [4] - 18:19, 37:19, 44:14, 50:19

**discussions** [4] - 32:23, 33:14, 44:21, 50:10

**dispute** [2] - 19:4, 71:18, 76:25

**disputes** [4] - 2:14, 2:17, 23:25, 24:5

**distraction** [1] - 60:13

**DISTRICT** [2] - 1:1, 1:2

**district** [3] - 30:23, 41:19, 65:1

**disturbs** [1] - 53:6

**diverted** [1] - 60:6

**division** [2] - 13:2, 72:18, 72:21

**docket** [1] - 77:4

**document** [12] - 8:24, 15:20, 29:13, 29:14, 39:22, 39:23, 43:13, 44:17, 45:7, 45:23, 48:16, 53:19

**documentary** [1] - 48:22

**documents** [48] - 6:11, 6:14, 6:16, 6:19, 6:22, 7:1, 7:13, 8:16, 8:17, 14:18, 28:25, 30:10, 30:11, 31:1, 31:2, 31:19, 35:10, 43:15, 43:17, 43:18, 43:20, 43:22, 43:24, 44:2, 44:6, 44:9, 45:21, 46:15, 48:21, 49:10, 49:11, 49:16, 49:25, 50:6, 50:8, 51:14, 51:25, 62:24, 62:25, 63:1,

64:9, 69:11, 69:15, 70:2, 71:20, 73:4, 76:9, 76:19

**done** [12] - 5:6, 6:18, 9:4, 14:16, 14:18, 17:9, 41:13, 43:11, 53:8, 57:19, 75:17

**dotted** [1] - 72:14

**double** [2] - 26:10, 61:4

**double-checking** [1] - 26:10

**doubt** [2] - 17:24, 49:9

**down** [12] - 18:4, 24:10, 37:2, 39:9, 39:15, 39:24, 40:21, 42:23, 54:1, 54:7, 63:17, 78:7

**Dr** [14] - 7:25, 8:4, 10:4, 10:10, 17:5, 19:20, 19:21, 31:7, 31:23, 33:13, 33:16, 33:19, 43:4, 67:15

**drafts** [2] - 9:10, 29:1

**drawn** [1] - 72:14

**drive** [1] - 41:8

**drove** [1] - 54:3

**drug** [1] - 34:3

**Drutchas** [8] - 2:5, 2:22, 8:11, 15:7, 17:3, 33:18, 62:19, 71:24

**DISTRICT** [2] - 1:1, 1:2

**DRUTCHAS** [29] - 1:18, 8:14, 9:15, 9:22, 10:16, 12:19, 13:20, 13:25, 14:3, 14:7, 14:12, 14:15, 14:21, 15:1, 16:13, 17:22, 18:16, 19:13, 60:20, 60:25, 62:21, 64:13, 65:19, 66:2, 66:16, 67:1, 70:1, 72:3, 75:11

**due** [2] - 7:20, 10:9

**during** [5] - 6:3, 9:5, 17:13, 71:18, 75:19

**E**

**early** [6] - 3:23, 5:4, 25:15, 33:14, 33:15, 72:24

**easily** [2] - 29:24, 47:3

**ECL** [1] - 33:1

**educated** [1] - 75:13

**education** [1] - 42:7

**effect** [2] - 54:14, 56:7

**efficient** [1] - 16:9

**effort** [3] - 3:5, 47:12,

76:15

**efforts** [2] - 68:9, 76:17

**eighties** [1] - 72:24

**either** [12] - 7:4, 19:2, 22:3, 23:1, 26:9, 39:9, 44:20, 49:24, 52:1, 52:19, 54:6

**elected** [1] - 12:8

**electrochemical** [3] - 17:15, 68:5, 74:9

**electronic** [2] - 7:3, 7:4

**Elementary** [1] - 58:9

**eliminate** [3] - 7:15, 38:2, 38:11

**ELLIS** [1] - 1:23

**Ellis** [1] - 2:9

**elsewhere** [1] - 6:18

**employed** [2] - 76:12, 76:13

**employee** [1] - 20:2

**employment** [1] - 65:7

**end** [10] - 4:5, 4:6, 4:8, 4:10, 4:12, 4:15, 7:10, 10:2, 26:6, 39:5

**engaging** [1] - 32:7

**enter** [2] - 78:1, 78:12

**entered** [2] - 25:20, 62:17

**entire** [3] - 14:6, 72:15, 76:17

**entities** [3] - 76:13, 76:16

**entitled** [10] - 8:24, 12:13, 17:21, 29:13, 46:14, 48:20, 64:18, 67:6, 71:19, 73:6

**equally** [2] - 63:2, 63:7

**equipment** [1] - 60:21

**ESQ** [8] - 1:16, 1:17, 1:18, 1:21, 1:21, 1:22, 1:22, 1:23

**essential** [1] - 62:18

**essentially** [9] - 22:3, 25:21, 25:25, 26:2, 26:4, 28:20, 49:2, 51:1, 77:8

**establish** [1] - 16:7

**established** [1] - 76:14

**establishing** [1] - 19:16

**estate** [1] - 60:17

**et** [2] - 9:7, 23:4

**European** [1] - 3:23, 14:17

**Europeans** [1] - 3:20

**Evans** [2] - 25:23,

26:13

**event** [1] - 76:2

**events** [1] - 76:2

**evidence** [1] - 48:13

**exactly** [3] - 20:25, 33:19, 45:4

**examination** [1] - 33:7, 66:8

**example** [6] - 19:3, 19:9, 29:2, 38:4, 47:8, 51:21

**examples** [2] - 3:11, 11:21

**except** [1] - 41:11

**Except** [1] - 45:11

**exchange** [6] - 19:17, 22:6, 23:5, 28:21, 44:4, 49:4

**exchanged** [1] - 29:18

**exclude** [1] - 65:4

**execute** [1] - 57:17

**exist** [1] - 52:5

**existing** [1] - 28:8

**exists** [3] - 28:11, 28:14, 29:1

**expand** [1] - 49:4

**expect** [1] - 18:2

**expensive** [2] - 59:12, 61:17

**experiment** [1] - 17:9

**experimental** [1] - 16:16

**expert** [24] - 7:20, 8:1, 8:4, 10:7, 10:11, 19:15, 31:9, 31:18, 31:19, 33:12, 33:13, 63:12, 63:22, 64:19, 64:20, 64:25, 65:13, 65:15, 66:6, 66:8, 66:10, 66:18, 67:8, 68:1

**experts** [2] - 8:1, 26:17

**explain** [2] - 36:23, 54:7

**explicitly** [1] - 65:25

**exposed** [1] - 56:24

**expressed** [1] - 67:4

**extended** [1] - 37:19

**extension** [1] - 35:2

**extent** [7] - 13:10, 16:13, 32:14, 43:22, 46:10, 71:4, 75:11

**extra** [1] - 59:23

**F**

**facilities** [1] - 21:13

**fact** [13] - 3:13, 3:15,

10:2, 14:9, 19:20, 22:5, 49:9, 49:13, 65:23, 65:24, 67:6, 73:10, 74:25
**facts** [2] - 16:7, 18:5
**Facts** [1] - 11:25
**factual** [1] - 18:7
**fail** [1] - 33:7
**Fair** [1] - 48:14
**fair** [3] - 10:13, 29:6, 61:13
**fairly** [3] - 18:18, 20:5, 68:7
**faith** [1] - 54:6
**fall** [2] - 4:7, 49:16
**falls** [3] - 50:13, 72:17, 72:20
**familiar** [1] - 18:14
**family** [1] - 4:18
**far** [5] - 30:9, 38:17, 44:5, 51:21, 64:14
**FARNAN** [1] - 1:14
**Farnan's** [1] - 43:8
**fast** [1] - 21:7
**faster** [1] - 40:24
**fastest** [1] - 40:20
**fault** [1] - 3:7
**favorable** [3] - 29:20, 59:14, 59:15
**February** [4] - 11:16, 17:7, 35:16, 36:8
**Federal** [5] - 41:9, 65:20, 65:24, 66:20, 66:22
**fee** [1] - 59:20
**few** [2] - 3:11, 6:18
**figure** [1] - 65:5
**Figure** [3] - 11:19, 12:1, 17:9
**figures** [1] - 11:21
**Figures** [1] - 11:22
**file** [2] - 45:24, 57:16
**filed** [7] - 11:15, 25:17, 25:23, 26:24, 28:19, 29:7, 54:23
**filing** [1] - 43:20
**filled** [1] - 4:19
**final** [1] - 76:8
**Finally** [2] - 5:13, 8:25
**financial** [6] - 71:20, 72:4, 73:5, 73:8, 73:11, 73:15
**Fine** [1] - 8:10
**fine** [3] - 41:14, 56:15, 74:19
**finger** [1] - 53:15
**finger-pointing** [1] - 53:15
**finish** [1] - 40:12

**finishing** [1] - 21:19
**Finnegan** [1] - 25:19
**firm** [4] - 2:10, 12:7, 25:18, 26:13
**First** [3] - 15:3, 29:19, 43:3
**first** [26] - 2:24, 11:5, 11:15, 12:12, 12:14, 12:17, 12:20, 14:11, 14:14, 15:6, 36:16, 39:16, 41:25, 42:8, 42:14, 43:3, 43:17, 45:20, 47:10, 47:11, 53:21, 54:8, 55:12, 61:25, 63:12, 73:21
**five** [3] - 17:16, 68:21, 69:19
**Five** [1] - 60:14
**flat** [1] - 5:13
**flat-out** [1] - 5:13
**flavor** [1] - 42:15
**flurry** [1] - 4:16
**focused** [3] - 32:9, 47:11, 47:12
**folks** [8] - 20:16, 21:12, 24:1, 39:11, 42:18, 56:22, 59:3, 59:21
**follow** [3] - 25:6, 25:7, 37:2
**followup** [1] - 32:2
**FOR** [1] - 1:2
**foreclosed** [1] - 32:20
**foregone** [1] - 57:23
**form** [3] - 7:3, 7:5
**format** [1] - 12:23
**former** [1] - 65:7
**formerly** [1] - 76:16
**forth** [3] - 16:10, 47:3, 50:12
**forward** [4] - 37:23, 42:2, 77:10, 78:11
**fought** [1] - 58:2
**four** [2] - 12:21, 24:2
**framed** [1] - 23:16
**free** [1] - 55:20
**frequently** [1] - 6:5
**Friday** [11] - 3:13, 12:5, 17:4, 35:21, 36:2, 36:4, 36:11, 36:13, 36:14, 49:19, 69:14
**front** [3] - 42:9, 47:15, 66:2
**full** [3] - 5:2, 33:5, 60:4
**fully** [4] - 37:22, 43:3, 62:21, 65:23
**future** [2] - 51:11, 53:24

**G**

**gained** [1] - 32:23
**game** [2] - 58:10, 58:11
**gather** [1] - 31:11
**Gear** [2] - 35:11, 76:20
**Gebhard** [6] - 22:15, 74:24, 75:8, 75:14, 75:17, 75:19
**gee** [1] - 5:10
**general** [1] - 58:1
**generally** [2] - 72:5, 77:5
**generic** [1] - 62:16
**Georgia** [1] - 73:18
**Georgia-Pacific** [1] - 73:18
**Giacco** [2] - 58:6, 58:15
**given** [12] - 5:3, 6:6, 12:16, 46:17, 48:11, 65:8, 67:21, 68:15, 71:4, 72:5, 75:1
**glad** [1] - 11:11
**goods** [2] - 62:3, 62:7
**Goolcasian** [5] - 33:12, 63:13, 63:17, 64:3, 64:19
**Goolcasian's** [1] - 64:14
**Gore** [1] - 51:11
**GRAHAM** [60] - 1:21, 22:1, 24:6, 24:12, 24:19, 25:11, 26:23, 27:3, 27:13, 27:16, 27:21, 27:24, 28:9, 28:13, 28:17, 28:25, 29:17, 30:19, 31:6, 31:21, 33:11, 33:25, 34:10, 34:18, 35:4, 35:20, 36:3, 36:9, 40:2, 40:7, 40:16, 43:8, 43:21, 44:11, 44:20, 45:3, 45:11, 47:23, 49:2, 49:19, 49:21, 50:18, 50:22, 51:3, 51:19, 52:8, 52:10, 52:25, 53:3, 55:1, 55:8, 55:14, 68:25, 70:10, 70:19, 71:3, 73:23, 74:2, 76:7, 77:14
**Graham** [8] - 2:9, 11:2, 25:9, 37:10, 48:25, 51:16, 70:9, 75:12
**Graham's** [1] - 19:19
**grandson** [1] - 58:9

**grant** [1] - 44:24
**Grant** [1] - 2:4
**granted** [7] - 43:7, 45:2, 45:9, 45:14, 62:5, 67:3, 67:4
**GRANTLAND** [1] - 1:18
**Graylyn** [1] - 58:9
**great** [3] - 21:12, 33:7, 42:10
**guess** [9] - 8:15, 43:17, 44:13, 56:16, 64:5, 67:6, 69:8, 71:13, 76:3
**guidance** [2] - 55:11, 56:17
**guidelines** [1] - 61:15
**guiding** [1] - 9:19
**guinea** [1] - 42:11
**guy** [1] - 58:13

**H**

**Hague** [1] - 14:16
**half** [7] - 6:24, 12:14, 15:6, 20:23, 21:4, 42:19, 59:13
**half-hour** [2] - 21:4, 42:19
**hand** [1] - 11:12
**handle** [1] - 33:8
**handling** [5] - 59:20, 60:4, 60:12, 60:15, 61:10
**hands** [4] - 13:19, 13:21, 15:5, 56:1
**hands-on** [1] - 56:1
**happy** [2] - 42:11, 78:7
**hard** [7] - 3:5, 12:10, 17:16, 20:2, 58:2, 61:25
**hate** [1] - 55:23
**Hayes** [1] - 65:20
**head** [1] - 58:19
**hear** [4] - 24:11, 37:11, 64:5, 67:23
**hearing** [2] - 20:16, 77:7
**help** [3] - 25:10, 57:6, 61:5
**helpful** [1] - 65:3, 65:10, 66:6, 66:10, 66:11, 66:15, 66:17, 67:4, 77:12
**helpfulness** [1] - 66:5
**helps** [3] - 11:12, 25:11, 70:25
**Henderson** [1] - 25:19
**Hercules** [1] - 58:5

**Herrmann** [2] - 36:19, 37:13
**HERRMANN** [5] - 1:16, 2:3, 2:15, 21:9, 24:23
**Herrmann's** [2] - 69:15, 69:23
**Hershey** [1] - 41:18
**highway** [1] - 61:4
**Hill** [6] - 3:16, 3:18, 4:13, 4:24, 5:6, 10:4
**Hill's** [2] - 4:2, 10:10
**hinder** [1] - 3:8
**hire** [1] - 64:23
**history** [1] - 3:17
**HLR** [2] - 62:22, 62:24
**HLR's** [1] - 57:14
**HOFFMAN** [1] - 1:4
**Hoffman** [3] - 43:25, 76:10, 76:15
**Hoffman-La** [2] - 43:25, 76:15
**HOFFMAN-LA** [1] - 1:4
**Hoffman-LaRoche** [1] - 76:10
**hold** [2] - 22:16, 30:13
**Homberg** [1] - 76:11
**home** [1] - 41:8
**honestly** [1] - 58:3
**Honor** [75] - 2:3, 2:4, 2:6, 2:8, 2:15, 2:23, 3:17, 8:11, 8:14, 9:24, 10:15, 10:17, 12:11, 12:20, 15:2, 17:1, 19:18, 21:3, 21:10, 22:1, 22:21, 24:24, 29:7, 31:11, 33:21, 35:4, 35:20, 36:9, 36:17, 37:25, 38:12, 40:2, 40:20, 42:21, 43:2, 43:21, 44:7, 44:17, 46:13, 46:23, 47:23, 48:2, 49:3, 49:5, 49:22, 50:7, 51:19, 52:11, 52:20, 53:14, 55:1, 55:8, 55:16, 55:21, 56:16, 57:20, 59:8, 61:14, 62:14, 63:11, 63:16, 64:5, 64:13, 65:19, 66:17, 67:3, 67:15, 68:25, 70:8, 70:11, 71:16, 72:19, 75:10, 75:11, 76:23
**Honor's** [2] - 23:14, 31:8
**HONORABLE** [1] - 1:14
**hope** [2] - 59:1, 72:1

hopeful [1] - 35:9
Hopefully [2] - 9:18, 21:23
hopefully [2] - 69:20, 75:8
hour [7] - 20:22, 21:4, 22:2, 38:1, 38:3, 39:12, 42:19
huge [1] - 59:25
Hulbert [1] - 1:18
Humer [5] - 34:11, 34:12, 54:24, 55:2, 55:18
hundred [17] - 11:15, 12:12, 12:17, 13:17, 14:11, 14:14, 16:11, 16:17, 17:2, 17:19, 17:21, 17:24, 19:1, 19:2, 19:8, 19:11, 61:12
hundred-percent [1] - 61:12
hypothetical [4] - 71:21, 73:2, 73:12

**I**

idea [3] - 8:3, 34:25, 41:9
identified [3] - 7:1, 8:19, 65:25
identify [1] - 7:19
IGEN [1] - 1:7
Igen [21] - 7:6, 8:16, 9:3, 25:22, 27:4, 34:4, 36:21, 43:13, 43:14, 43:21, 44:8, 59:14, 60:22, 60:25, 62:24, 67:19, 68:4, 73:4
Igen's [3] - 3:1, 44:22, 69:18
ignored [2] - 5:13, 5:18
ignores [1] - 3:17
Illinois [1] - 1:19
illuminated [1] - 45:18
immediately [1] - 26:8
impeach [1] - 48:12
impeachment [7] - 48:8, 48:17, 50:4, 50:13, 51:14, 51:16, 66:8
important [4] - 6:23, 11:17, 12:16, 31:11
impression [1] - 36:25
impressions [1] - 9:7
improper [1] - 6:7
improve [2] - 32:15,

32:17
IN [2] - 1:1, 1:2
inadequate [2] - 44:9, 44:13
INC [1] - 1:7
including [1] - 53:5
inconsistent [1] - 24:14
incorporated [1] - 18:19
Indeed [1] - 56:1
indicate [1] - 50:15
indicated [1] - 49:3
indicating [1] - 40:4
indicating) [1] - 24:17
indications [1] - 54:22
individuals [1] - 34:14
indulgence [1] - 39:24
information [27] - 6:23, 7:18, 9:6, 19:3, 28:19, 31:25, 32:24, 33:16, 33:24, 34:1, 34:5, 34:7, 42:9, 48:21, 56:10, 61:8, 61:22, 62:7, 62:11, 63:25, 65:12, 67:13, 67:20, 68:12, 73:12, 73:15, 75:8
informed [1] - 12:25
infringe [1] - 50:16
infringement [21] - 6:11, 22:25, 26:14, 27:7, 28:2, 28:14, 28:20, 30:20, 45:16, 48:24, 49:7, 49:12, 49:17, 50:10, 50:24, 51:17, 52:19, 53:5, 65:24, 74:18, 75:16
infringers [1] - 47:2
insisted [1] - 4:24
inspect [1] - 22:19
inspection [1] - 69:18
instance [9] - 8:20, 25:14, 28:11, 32:2, 41:25, 42:14, 53:18, 66:19, 75:15
instances [1] - 11:23
instructed [2] - 51:9, 57:24
instructions [1] - 6:6
instrument [2] - 33:1, 33:2
instrumentation [1] - 32:5
instruments [5] - 34:2, 57:15, 59:6, 59:12
intend [2] - 6:19, 47:19
intentional [1] - 35:22

interaction [1] - 76:14
interest [1] - 7:23
interested [3] - 47:6, 67:23, 74:7
interesting [1] - 15:25
internal [3] - 23:17, 28:23, 45:21
INTERNATIONAL [1] - 1:7
interpose [1] - 55:21
interrogatories [2] - 26:18, 28:1
interrupt [4] - 26:19, 36:19, 39:1, 69:1
interrupted [1] - 73:25
intimate [1] - 32:22
introduced [3] - 2:4, 32:10, 32:16
invalidity [1] - 10:8
invention [2] - 17:6, 73:11
inventors [2] - 17:6, 74:11
investigation [1] - 75:16
involve [1] - 74:19
involved [5] - 13:7, 41:10, 50:9, 56:4, 58:13
involvement [2] - 56:1, 56:3
irreconcilable [1] - 42:3
irrelevant [1] - 6:7
isolating [1] - 18:10
issue [72] - 7:15, 7:17, 7:25, 9:17, 9:21, 10:19, 10:20, 12:19, 16:3, 16:8, 18:18, 19:19, 19:25, 20:4, 22:7, 22:8, 22:13, 22:16, 22:20, 22:22, 23:7, 23:10, 23:20, 23:24, 25:12, 25:16, 26:14, 27:13, 30:6, 30:11, 31:7, 31:23, 32:3, 32:8, 33:5, 33:12, 33:15, 33:20, 34:10, 35:8, 37:5, 38:13, 39:8, 39:21, 43:19, 43:25, 44:11, 45:10, 46:5, 46:8, 46:12, 47:24, 48:12, 48:17, 48:24, 49:14, 50:4, 50:18, 54:25, 56:18, 62:18, 63:11, 63:17, 64:15, 68:6, 70:5, 75:5, 75:10, 76:3, 76:20, 76:22, 78:11

issues [37] - 2:21, 6:13, 6:20, 9:2, 9:16, 11:1, 11:2, 13:7, 18:10, 18:20, 18:24, 19:6, 19:10, 20:24, 22:3, 22:25, 23:4, 23:6, 23:15, 30:12, 32:14, 32:25, 34:21, 35:2, 35:6, 36:15, 37:19, 38:2, 38:3, 44:7, 45:18, 52:20, 74:19, 77:1, 77:10
item [5] - 35:16, 59:5, 77:3, 77:4, 77:5
items [2] - 40:1, 59:11

**J**

JACK [1] - 1:21
Jack [1] - 38:15
JACOBS [1] - 1:22
Jacobs [1] - 2:9
January [1] - 11:10
John [1] - 63:13
join [1] - 3:9
joint [1] - 76:15
JOSEPH [1] - 1:14
journal [1] - 7:3
JR [1] - 1:14
Judge [14] - 24:8, 24:10, 24:11, 24:21, 24:23, 25:1, 25:5, 25:6, 25:7, 27:10, 27:22, 36:5, 39:18, 43:8
judges [1] - 24:2, 24:15
judgment [1] - 29:25
July [12] - 5:14, 5:23, 11:5, 11:6, 11:14, 11:17, 12:3, 13:17, 17:8, 59:9, 59:10
jump [1] - 24:22
jumped [1] - 52:23
jumping [1] - 37:18
June [2] - 4:2, 10:6
juries [1] - 66:11
jury [8] - 46:25, 47:1, 47:4, 47:15, 47:19, 47:22, 63:20, 65:4
justified [1] - 65:23
justify [1] - 3:7

**K**

KAREN [1] - 1:22
Karen [1] - 2:9
keep [7] - 24:5, 33:6,

35:19, 39:12, 39:13, 41:19, 42:17
Kevin [1] - 78:17
key [2] - 21:17, 21:23
kicker [5] - 60:4, 60:5, 60:13, 61:13, 62:1
kid [1] - 54:3
kill [1] - 59:3
killed [1] - 59:1
kind [8] - 10:1, 28:2, 34:7, 34:24, 59:22, 62:16, 74:16, 78:2
Kissinger [5] - 33:13, 33:16, 33:19, 33:22, 67:15
knock [1] - 33:10
knocking [1] - 31:9
knowledge [5] - 31:24, 34:16, 75:23, 75:24, 76:2
known [1] - 74:10
knows [3] - 3:20, 31:12, 46:20

**L**

LA [1] - 1:4
lab [9] - 11:4, 11:5, 12:21, 13:3, 16:14, 22:18, 22:22, 38:11, 69:12
Laboratoires [1] - 72:9
laboratory [3] - 12:24, 13:12, 13:20
lack [1] - 31:18
laid [1] - 58:6
large [1] - 56:23
LaRoche [1] - 76:10
last [13] - 3:12, 6:8, 6:12, 9:3, 11:3, 12:5, 17:4, 17:7, 22:2, 39:5, 42:8, 54:3, 69:11
late [1] - 4:2
latest [3] - 18:15, 18:17, 39:6
law [3] - 19:24, 63:22, 64:2
law/expert/et [1] - 65:1
lawsuit [8] - 16:8, 25:17, 26:4, 27:5, 28:15, 28:19, 28:20, 29:7
lawsuits [1] - 28:9
lawyer [3] - 29:7, 47:7, 63:17
Lawyers [1] - 21:14

**lawyers** [10] - 21:15, 21:19, 21:20, 23:24, 24:4, 28:23, 41:3, 55:22, 58:24, 66:12
**laying** [1] - 58:16
**least** [10] - 3:4, 6:5, 10:13, 34:4, 53:18, 69:14, 69:18, 69:21, 70:5, 71:24
**leave** [3] - 40:14, 43:1, 52:21
**leaves** [1] - 17:7
**leaving** [1] - 74:16
**left** [3] - 38:21, 39:4, 49:5
**legal** [2] - 42:7, 66:7
**length** [1] - 75:18
**Leon** [1] - 3:16
**less** [2] - 9:16, 61:1
**letter** [14] - 2:13, 3:12, 8:15, 10:14, 10:24, 11:3, 18:15, 18:17, 29:8, 39:6, 46:2, 59:10, 68:19, 77:25
**letters** [3] - 2:12, 18:9, 34:23
**letting** [1] - 34:21
**liable** [1] - 60:8
**liars** [1] - 48:12
**licensor** [1] - 71:21
**light** [2] - 9:19, 41:18
**likely** [1] - 22:10
**Likewise** [1] - 7:10
**limine** [2] - 33:4, 64:17
**limit** [1] - 74:17
**limited** [1] - 65:5
**line** [3] - 25:10, 55:6, 72:14
**lines** [1] - 3:4
**list** [4] - 50:5, 52:12, 59:13, 61:22
**listing** [1] - 50:3
**litigant** [1] - 56:21
**litigating** [1] - 16:6
**litigation** [13] - 9:4, 9:5, 9:8, 9:13, 13:8, 25:20, 25:21, 26:5, 28:4, 29:13, 29:15, 57:3, 64:23
**litigators** [1] - 66:5
**living** [1] - 51:12
**LLP** [1] - 1:16
**locate** [2] - 15:12, 15:14
**log** [28] - 22:9, 26:22, 26:25, 27:3, 27:4, 28:18, 28:19, 30:4, 30:17, 30:20, 30:22, 30:23, 30:25, 43:24, 44:2, 44:8, 44:14,

44:22, 45:5, 49:9, 49:12, 49:15, 49:17, 50:1, 52:1, 52:4, 53:11
**logged** [6] - 27:11, 28:16, 29:23, 30:14, 43:21, 52:22
**logging** [6] - 26:23, 27:13, 28:18, 28:21, 30:8, 49:6
**logic** [1] - 48:7
**logs** [4] - 22:6, 30:23, 43:13, 43:14
**London** [2] - 4:22, 5:5
**look** [9] - 13:6, 20:7, 30:15, 30:25, 50:6, 51:14, 53:24, 70:4, 73:17
**looked** [1] - 15:6
**looking** [3] - 48:10, 51:11, 73:6
**lose** [2] - 35:17, 60:7
**lost** [1] - 14:9
**LOUDEN** [1] - 1:22
**Louden** [2] - 2:9, 40:12
**Lounge** [1] - 21:14
**lounge** [1] - 21:20
**LTD** [1] - 1:4
**Luckily** [1] - 73:19
**lunch** [1] - 20:14

**M**

**magnet** [4] - 32:10, 32:15, 32:16, 32:18
**magnetic** [1] - 32:19
**mail** [1] - 77:22
**Manbeck** [1] - 65:6
**mandamus** [2] - 57:9, 57:13
**March** [2] - 3:22, 11:8
**mark** [1] - 45:2
**markets** [1] - 20:1
**MARY** [1] - 1:21
**Mary** [2] - 2:9, 20:12
**MARYELLEN** [1] - 1:22
**Maryellen** [1] - 2:10
**master** [2] - 42:4, 42:17
**masters** [1] - 41:22
**material** [3] - 26:12, 28:5, 28:7
**matter** [3] - 6:20, 14:7, 41:5
**Maurer** [1] - 78:17
**McCauley** [1] - 1:16
**McDonnell** [1] - 1:18

**McKelvie** [1] - 36:5
**McKelvie's** [1] - 25:6
**mean** [2] - 26:19, 73:11
**meaning** [2] - 74:9, 74:13
**meaningful** [1] - 73:19
**means** [2] - 5:1, 10:8
**meant** [2] - 77:5, 77:21
**meantime** [1] - 68:17
**meeting** [2] - 23:24, 41:17
**meetings** [3] - 41:6, 41:7, 58:21
**Meier** [5] - 34:11, 34:12, 54:24, 55:2, 55:18
**memo** [1] - 45:23
**memos** [1] - 46:4
**mental** [1] - 9:7
**mention** [1] - 23:8
**mentioned** [2] - 70:11, 74:23
**met** [1] - 22:2
**Microcomputer** [1] - 65:21
**microfiche** [15] - 12:11, 12:12, 12:22, 12:24, 13:3, 13:5, 13:7, 13:18, 14:4, 15:8, 16:11, 16:18, 17:2, 69:12
**microfiched** [3] - 13:22, 13:23, 14:4
**Micron** [1] - 24:8
**Migausky** [1] - 6:25
**might** [10] - 19:7, 26:16, 30:5, 49:4, 50:18, 57:9, 57:11, 68:25, 72:4, 75:8
**mind** [4] - 47:14, 53:22, 64:3, 64:4
**minimal** [1] - 66:6
**minute** [1] - 68:21
**minutes** [5] - 21:2, 36:18, 39:12, 39:24, 42:19
**misplaced** [1] - 14:9
**misread** [1] - 36:1
**misrepresented** [1] - 11:25
**miss** [1] - 24:21
**misses** [1] - 58:10
**misstated** [1] - 75:12
**misunderstanding** [2] - 29:22, 40:11
**misunderstood** [1] - 64:11
**modify** [1] - 40:22

**moment** [1] - 24:13
**money** [2] - 60:18, 61:5
**Montandon** [1] - 76:10
**month** [3] - 3:20, 6:24, 11:14
**months** [6] - 3:2, 12:25, 14:22, 15:3, 17:16, 71:19
**moot** [3] - 22:16, 49:3, 75:4
**mooted** [1] - 75:9
**moots** [1] - 22:7
**morning** [12] - 2:2, 2:3, 2:6, 2:11, 9:24, 20:14, 21:25, 22:1, 23:8, 54:2, 58:8, 64:6
**Morris** [1] - 1:23
**Mosel** [1] - 24:8
**Mosel-Micron** [1] - 24:8
**Most** [1] - 7:22
**most** [5] - 6:23, 58:20, 59:15, 66:11, 77:5
**mostly** [1] - 65:3
**motion** [15] - 8:15, 33:3, 43:12, 44:16, 44:24, 45:1, 45:6, 45:9, 45:13, 51:7, 54:22, 57:14, 59:5, 64:17
**motions** [2] - 43:3, 54:20
**move** [7] - 10:10, 15:19, 30:15, 43:1, 50:2, 54:16, 73:18
**moving** [3] - 10:11, 41:20, 42:17
**MR** [140] - 2:3, 2:6, 2:8, 2:15, 2:20, 7:25, 8:5, 8:10, 8:14, 9:15, 9:22, 9:24, 10:14, 10:16, 10:21, 10:23, 12:19, 13:20, 13:25, 14:3, 14:7, 14:12, 14:15, 14:21, 14:22, 15:1, 15:2, 15:11, 15:14, 15:23, 16:13, 16:17, 16:21, 16:25, 17:1, 17:20, 17:22, 18:16, 19:13, 19:18, 20:11, 20:19, 21:3, 21:7, 21:9, 24:18, 24:23, 29:6, 29:11, 30:7, 30:10, 36:4, 36:12, 36:17, 37:8, 37:11, 37:25, 38:13, 39:1, 40:20, 42:11, 42:21, 43:11, 44:7,

44:16, 45:15, 46:9, 46:13, 46:23, 47:3, 47:6, 47:20, 48:1, 48:4, 48:9, 48:14, 48:20, 49:22, 50:7, 51:7, 52:12, 52:17, 53:14, 54:10, 54:16, 54:19, 55:21, 56:16, 57:4, 57:7, 57:11, 57:14, 57:18, 57:23, 58:12, 59:4, 59:8, 60:14, 60:20, 60:25, 61:7, 61:14, 61:20, 62:2, 62:6, 62:11, 62:14, 62:21, 63:7, 63:11, 63:16, 63:23, 64:12, 64:13, 65:14, 65:19, 66:2, 66:16, 67:1, 67:3, 67:14, 68:3, 68:24, 69:5, 69:8, 69:25, 70:1, 70:2, 70:7, 70:22, 71:16, 72:3, 72:7, 72:15, 72:19, 73:22, 75:11, 77:20, 78:7, 78:13
**MS** [59] - 22:1, 24:6, 24:12, 24:19, 25:11, 26:23, 27:3, 27:13, 27:16, 27:21, 27:24, 28:9, 28:13, 28:17, 28:25, 29:17, 30:19, 31:6, 31:21, 33:11, 33:25, 34:10, 34:18, 35:4, 35:20, 36:3, 36:9, 40:2, 40:7, 40:16, 43:8, 43:21, 44:11, 44:20, 45:3, 45:11, 47:23, 49:2, 49:19, 49:21, 50:18, 50:22, 51:3, 51:19, 52:8, 52:10, 52:25, 53:3, 55:1, 55:8, 55:14, 68:25, 70:10, 70:19, 71:3, 73:23, 74:2, 76:7, 77:14
**must** [4] - 17:10, 35:25, 36:20, 53:15
**mutual** [4] - 23:5, 38:17, 38:20, 74:16
**mutually** [2] - 74:18, 74:19

**N**

**nail** [1] - 18:4
**name** [3] - 21:20, 65:7, 73:1
**named** [2] - 17:6, 63:13

narrow [4] - 35:10, 63:17, 69:19, 78:7
nature [1] - 7:19
nearly [1] - 61:4
necessarily [3] - 45:22, 46:23, 66:17
need [14] - 7:15, 23:14, 29:5, 33:18, 34:5, 34:8, 37:5, 44:12, 51:7, 53:13, 54:12, 63:24, 68:14
needed [2] - 4:6, 36:13
neglect [1] - 35:8
negotiation [3] - 71:21, 73:3, 73:13
nervous [1] - 52:24
never [8] - 3:6, 5:12, 25:19, 28:16, 53:21, 58:10, 59:8
new [6] - 4:16, 5:16, 9:20, 21:13, 42:7, 42:9
news [1] - 44:15
next [13] - 11:11, 31:7, 45:15, 47:24, 54:20, 58:11, 59:5, 62:15, 63:11, 67:15, 68:3, 71:13, 77:12
nice [1] - 21:22
Nichols [1] - 1:23
nineties [2] - 25:15, 72:24
nobody [1] - 59:1
Nobody [1] - 18:11
non [1] - 7:9
non-U.S [1] - 7:9
None [1] - 44:18
NOREIKA [1] - 1:22
Noreika [1] - 2:10
normal [1] - 72:8
normally [1] - 62:17
note [1] - 35:20
notebook [13] - 11:11, 11:12, 11:13, 11:23, 11:24, 12:5, 12:11, 12:14, 13:15, 16:14, 17:7, 17:14, 22:22
notebooks [22] - 11:4, 11:5, 11:7, 11:8, 11:20, 12:3, 12:21, 12:25, 13:3, 13:12, 13:20, 13:22, 13:23, 14:4, 14:6, 15:4, 15:17, 17:5, 22:18, 38:11, 69:12
noted [1] - 35:21
notes [3] - 46:3, 49:12, 51:21
nothing [4] - 16:19,

16:24, 19:2, 47:25
notice [4] - 77:9, 77:15, 77:21, 78:4
noticed [2] - 5:22, 35:24
notices [3] - 4:16, 5:7, 5:10
November [9] - 4:12, 5:4, 7:21, 10:3, 10:5, 49:21, 50:2, 68:19, 69:5
novo [1] - 66:24
number [6] - 15:16, 22:3, 61:18, 61:19, 61:21, 77:5
numbered [2] - 11:8, 11:9
numbers [4] - 60:9, 60:17, 60:20, 61:25

## O

object [4] - 50:17, 50:21, 50:22, 51:6
objected [2] - 8:2, 51:8
obligated [1] - 5:17
obligation [2] - 14:24, 50:2
obtain [2] - 14:17, 60:25
obtained [2] - 13:4
obtaining [2] - 8:18, 57:15
obviously [2] - 26:9, 28:15
Obviously [1] - 8:7
occur [1] - 41:15
occurred [1] - 77:4
October [7] - 1:11, 2:12, 4:10, 4:20, 6:1, 10:2, 33:15
OF [1] - 1:2
offended [1] - 57:10
offense [1] - 59:1
offered [6] - 10:5, 39:7, 59:7, 59:13, 60:21, 66:9
offering [1] - 75:20
office [2] - 69:15, 69:24
officers [3] - 41:10, 41:13, 41:15
offices [1] - 70:1
often [1] - 25:25
Once [1] - 34:25
once [4] - 5:18, 22:9, 50:4, 55:11
one [47] - 5:10, 8:1,

8:19, 8:23, 11:9, 11:23, 14:8, 17:5, 17:9, 17:15, 17:25, 21:13, 21:19, 21:20, 23:6, 23:16, 23:24, 24:4, 24:14, 25:18, 33:20, 34:20, 35:8, 35:15, 37:23, 38:18, 41:7, 42:23, 43:4, 43:11, 51:20, 53:18, 53:20, 54:8, 55:22, 60:21, 61:16, 62:22, 62:23, 63:12, 67:15, 69:19, 71:16, 71:25
One [8] - 3:4, 5:10, 11:2, 11:7, 22:5, 53:19, 64:15, 65:17
one-sided [1] - 38:18
ones [2] - 20:25, 31:2
ongoing [1] - 72:23
ons [1] - 60:1
opening [3] - 10:1, 10:7, 77:7
operate [1] - 30:23
opinion [15] - 25:23, 26:7, 26:8, 47:13, 47:17, 48:18, 50:12, 51:23, 53:4, 65:15, 65:17, 65:18, 66:5, 66:7, 66:9
opinions [26] - 6:10, 8:21, 9:2, 9:3, 9:13, 22:9, 22:11, 23:18, 25:14, 25:16, 25:17, 25:24, 26:3, 26:25, 27:2, 27:6, 27:25, 28:6, 28:9, 46:11, 46:17, 47:19, 52:13, 52:15, 66:13
opportunity [2] - 2:18, 21:13
opposed [1] - 41:4
order [16] - 5:17, 6:9, 14:17, 18:13, 36:3, 43:5, 54:23, 62:15, 62:16, 63:2, 63:4, 63:15, 65:22, 77:3, 77:7, 78:12
ordered [2] - 45:4, 62:10
orders [1] - 54:21, 62:22
organization [1] - 72:16
Organon [10] - 8:16, 9:4, 27:4, 43:13, 43:14, 43:24, 44:8, 61:1, 62:25, 73:4
ORGANON [2] - 1:7, 1:8

original [2] - 12:24, 13:20
originally [1] - 16:23
originals [1] - 14:15
otherwise [2] - 48:22, 52:6
Otherwise [1] - 15:24
ought [7] - 10:13, 20:24, 33:23, 50:5, 59:21, 61:11, 72:2
outcome [1] - 37:24
outrageous [1] - 77:24
outset [1] - 62:17
outside [1] - 21:23
overlap [1] - 34:24
overriding [1] - 2:24
own [1] - 7:7

## P

p.m [1] - 78:15
Pacific [1] - 73:18
Page [11] - 11:12, 12:12, 69:16
page [1] - 62:15
pages [24] - 11:16, 12:5, 12:13, 12:17, 12:24, 13:7, 13:12, 13:17, 14:11, 14:14, 16:11, 16:14, 16:17, 17:2, 17:19, 17:21, 17:24, 19:1, 19:2, 19:8, 19:11, 22:20, 64:8, 69:20
paid [2] - 32:24, 59:23
panel [1] - 66:1
paper [1] - 7:5
papers [14] - 2:16, 7:23, 7:24, 8:7, 8:12, 9:1, 13:16, 18:6, 18:19, 19:6, 31:12, 33:10, 34:19, 34:25
parallel [1] - 68:9
parent [1] - 72:15
part [7] - 3:2, 6:10, 12:22, 19:24, 24:12, 25:19, 54:7
partaking [1] - 31:24
partial [1] - 11:7
particles [1] - 32:19
particular [6] - 25:3, 32:9, 32:13, 32:21, 33:1, 66:19
particularly [3] - 11:18, 12:16, 20:1
parties [7] - 2:12, 14:17, 37:16, 41:20, 55:9, 62:23, 68:15

party [3] - 14:11, 68:16, 69:8
party's [2] - 13:19, 13:21
past [5] - 3:2, 3:13, 35:21, 51:10, 51:12
patent [25] - 11:14, 11:19, 11:22, 11:24, 13:8, 13:10, 13:13, 16:15, 16:24, 19:10, 19:11, 35:11, 41:19, 44:18, 44:19, 52:19, 63:12, 63:17, 63:24, 65:1, 66:13, 70:3, 72:17, 76:17, 76:19
Patent [1] - 63:22
patented [1] - 73:11
patentee [1] - 72:7
pay [8] - 59:7, 59:21, 60:3, 60:4, 60:5, 60:12
paying [1] - 61:4
pending [1] - 76:25
people [9] - 5:22, 55:25, 56:1, 58:6, 58:16, 58:25, 59:14, 75:18, 76:1
percent [2] - 60:14, 61:12
performance [3] - 32:3, 32:11, 32:22
performed [1] - 32:5
perhaps [2] - 40:21, 68:9
period [9] - 11:8, 11:13, 11:16, 17:10, 17:11, 17:13, 32:1, 65:8, 75:19
permissible [1] - 50:16
permit [1] - 68:1
person [1] - 58:13
personal [4] - 75:1, 75:23, 76:2
personally [1] - 59:2
persuade [1] - 3:9
pertained [1] - 30:1
pertains [1] - 20:4
Peter [2] - 33:22, 76:11
phone [1] - 68:21
pick [1] - 20:21
picks [1] - 17:9
piece [2] - 57:3, 60:21
pigs [1] - 42:12
place [2] - 24:3, 65:12, 67:9
placed [1] - 66:23
places [1] - 67:11
Plaintiff [2] - 1:5, 1:20

**plaintiff** [7] - 35:9, 44:3, 49:17, 55:16, 70:15, 74:5, 77:3
**Plaintiff's** [1] - 18:17
**plaintiffs** [3] - 3:1, 56:23, 70:21
**plays** [1] - 58:9
**plea** [1] - 20:18
**Plus** [1] - 40:3
**point** [24] - 2:24, 5:21, 7:7, 26:16, 31:14, 33:10, 34:1, 34:21, 37:17, 38:10, 41:16, 43:17, 45:15, 52:12, 52:14, 54:14, 54:20, 68:3, 69:4, 70:13, 71:1, 71:17, 72:16, 77:1
**Point** [1] - 69:10
**pointed** [1] - 44:16
**pointing** [1] - 53:15
**points** [5] - 8:10, 8:12, 15:3, 36:22, 37:21
**portion** [1] - 17:25
**portions** [4] - 13:22, 22:11, 52:22, 53:4
**position** [10] - 19:1, 20:7, 23:18, 26:2, 26:12, 26:15, 28:4, 34:13, 68:8, 71:22
**possession** [1] - 13:18
**possible** [3] - 3:8, 20:13, 20:19
**post** [2] - 29:13, 29:15
**post-litigation** [2] - 29:13, 29:15
**potential** [1] - 67:8
**potentially** [1] - 64:20
**precisely** [1] - 34:4
**precluded** [2] - 8:18, 9:9
**preclusion** [1] - 15:20
**predicates** [1] - 18:7
**predictability** [1] - 25:1
**predictable** [1] - 25:4
**premise** [2] - 45:6, 56:25
**premises** [2] - 44:25, 45:9
**premium** [1] - 61:3
**preparation** [2] - 5:1, 35:23
**prepare** [3] - 46:2, 75:7, 77:3
**prepared** [4] - 37:22, 38:24, 39:8, 39:20
**preparing** [2] - 64:20, 64:23

**present** [5] - 22:23, 33:9, 37:12, 77:8, 77:15
**presentation** [1] - 68:20
**presentations** [1] - 63:5
**presented** [5] - 19:6, 36:21, 55:6, 62:18, 75:21
**presenting** [1] - 75:22
**pressing** [1] - 44:5
**presumably** [1] - 11:16
**Presumably** [1] - 71:20
**presumption** [2] - 63:19, 63:20
**pretrial** [1] - 33:4
**pretty** [2] - 16:3, 53:25
**prevail** [1] - 33:4
**previously** [2] - 19:16, 25:24
**price** [3] - 59:13, 59:14, 61:22
**prices** [2] - 59:12, 59:15
**primarily** [1] - 74:6
**principle** [1] - 60:10
**principles** [1] - 62:5
**privilege** [6] - 22:6, 23:15, 24:1, 24:3, 24:15, 25:2
**privileged** [3] - 9:2, 44:5, 53:19
**problem** [6] - 8:6, 20:12, 34:9, 39:17, 58:22, 75:15
**procedure** [4] - 22:7, 22:19, 38:19, 41:24
**proceed** [3] - 40:8, 67:7, 75:6
**proceeding** [2] - 69:2, 69:13
**process** [4] - 30:16, 30:18, 32:6, 41:15
**produce** [6] - 12:8, 35:5, 46:6, 50:9, 52:1, 52:4, 52:18, 55:15
**produced** [29] - 3:14, 5:25, 6:23, 7:4, 7:6, 7:13, 7:18, 11:17, 12:15, 12:21, 13:9, 13:11, 23:18, 25:14, 26:6, 26:9, 26:15, 27:5, 27:14, 27:15, 27:20, 27:23, 28:5, 34:14, 44:8, 47:21, 53:4, 53:18

**producing** [8] - 43:16, 43:18, 49:23, 55:2, 55:3, 59:24, 76:18
**product** [9] - 9:6, 23:17, 28:21, 29:18, 45:15, 59:19, 72:13, 72:17, 72:20
**production** [2] - 45:10, 52:13
**productive** [1] - 19:7
**productively** [1] - 42:22
**Products** [1] - 65:21
**products** [6] - 34:2, 59:7, 68:5, 72:8, 72:10, 72:11
**Professor** [7] - 3:16, 3:18, 4:2, 4:13, 4:24, 5:6, 4:37
**profit** [2] - 59:25, 61:12
**progress** [1] - 42:22
**projects** [2] - 13:13, 17:15
**promised** [1] - 39:13
**prong** [2] - 8:3, 66:9
**proposal** [1] - 10:16
**propose** [2] - 22:4, 33:19, 42:23, 65:6
**proposed** [6] - 7:14, 10:11, 38:17, 62:22, 62:23, 68:13
**proposing** [1] - 10:24
**protect** [1] - 52:5
**protection** [1] - 5:19
**protective** [10] - 5:17, 19:3, 43:4, 54:21, 54:23, 62:15, 62:16, 62:22, 63:2, 63:15
**provide** [5] - 14:24, 26:2, 42:7, 56:9, 72:4
**provided** [3] - 4:5, 13:16, 62:12
**providing** [3] - 31:4, 43:14, 45:8
**purchase** [3] - 35:12, 76:17, 76:19
**purpose** [3] - 29:9, 29:16, 38:1
**purposes** [2] - 25:2, 34:2
**pursue** [1] - 20:6
**pursued** [2] - 32:8, 49:14
**pursuing** [4] - 3:3, 68:11, 68:16, 70:23
**pushed** [1] - 54:9
**put** [8] - 11:6, 18:23, 22:15, 47:3, 47:15,

65:9, 67:10, 67:11
**putting** [2] - 12:23, 17:4

## Q

**qualification** [2] - 37:20, 43:4
**questioning** [1] - 50:8
**questions** [3] - 6:6, 6:14, 51:15
**quick** [2] - 20:17, 30:25
**quickly** [1] - 52:23
**quit** [2] - 35:11, 76:20

## R

**raise** [3] - 53:13, 57:20, 71:24
**raised** [6] - 7:10, 11:5, 23:24, 31:22, 33:15, 44:20
**raises** [1] - 53:22
**range** [2] - 69:17, 71:4
**rape** [1] - 59:3
**raped** [1] - 59:1
**rather** [2] - 16:9, 18:9
**Re** [1] - 65:20
**re** [1] - 67:5
**re-think** [1] - 67:5
**reach** [9] - 4:4, 4:5, 38:4, 38:5, 38:8, 40:22, 68:8, 68:10, 74:21
**read** [7] - 2:16, 18:6, 23:22, 31:12, 34:19, 62:20, 66:7
**reagents** [2] - 59:6, 67:17
**real** [4] - 29:24, 39:23, 52:23, 60:17
**Really** [1] - 48:3
**really** [16] - 18:8, 19:18, 31:24, 32:2, 45:18, 48:10, 52:10, 54:3, 64:10, 64:14, 64:17, 64:22, 65:11, 66:10, 75:24, 78:2
**realm** [1] - 19:4
**reason** [4] - 5:25, 36:12, 57:19, 68:1
**Reasonable** [1] - 70:24
**reasonable** [4] - 47:16, 70:23, 71:1, 71:3
**reasonably** [1] - 60:2

**reasons** [1] - 10:4
**rebut** [1] - 74:12
**received** [5] - 9:3, 9:13, 10:16, 10:21, 50:23
**recent** [2] - 67:20, 68:7
**recently** [4] - 6:25, 8:19, 33:15, 68:7
**Recess** [2] - 21:24, 42:20
**recital** [1] - 77:7
**recognize** [3] - 31:8, 39:6, 39:16
**reconsideration** [1] - 56:12
**record** [9] - 17:4, 19:15, 33:5, 37:18, 42:24, 55:25, 56:25, 66:25, 70:11
**recorded** [1] - 13:3
**records** [1] - 7:19
**recrimination** [1] - 54:13
**redact** [1] - 52:22
**redacted** [5] - 22:10, 22:11, 52:18, 53:20, 53:21, 53:23, 54:8
**redactions** [2] - 22:9, 53:9, 53:11
**reference** [2] - 77:4, 77:6
**references** [3] - 26:21, 44:18, 45:24
**referred** [1] - 8:17
**reflect** [1] - 49:11
**reflecting** [1] - 51:22
**refuse** [2] - 6:14, 6:19
**refused** [3] - 4:24, 5:19, 63:14
**regarding** [3] - 8:15, 8:20, 9:10
**regardless** [2] - 3:5, 17:17
**rejected** [3] - 4:9, 4:11, 67:12
**relate** [13] - 13:7, 13:8, 13:13, 16:14, 19:22, 30:11, 31:15, 46:15, 52:18, 53:4, 70:3, 76:19
**related** [3] - 7:18, 45:16, 76:20
**relates** [10] - 13:10, 16:19, 17:18, 26:13, 28:6, 31:7, 32:2, 48:22, 68:3, 71:17
**relating** [7] - 23:9, 27:25, 28:14, 28:19, 30:20, 35:11, 46:5

relation [1] - 67:18
relationship [2] - 19:10, 44:19
relevant [6] - 12:9, 23:20, 25:15, 27:20, 71:22, 73:12
reliance [12] - 25:13, 46:12, 46:14, 47:1, 47:13, 47:25, 48:11, 48:12, 48:17, 51:15, 65:16, 66:23
relied [8] - 47:2, 47:5, 47:16, 47:19, 47:22, 50:12, 65:21, 66:20
rely [3] - 6:10, 46:24, 47:17
relying [2] - 46:20, 46:21
remaining [1] - 18:24
remains [2] - 37:4, 67:6
remarks [1] - 10:1
remedy [1] - 15:19
remember [4] - 17:13, 36:1, 58:7, 74:2
rendered [4] - 23:17, 25:23, 25:24, 26:3
renoticed [1] - 5:14
repeatedly [2] - 4:1, 6:5
repetitious [1] - 70:10
reply [1] - 9:1
report [1] - 33:5
Reporter [1] - 78:17
reports [5] - 7:20, 10:8, 10:11, 72:5
represent [2] - 58:25
representation [1] - 73:16
represented [2] - 36:21, 41:23
request [3] - 4:1, 5:14, 29:23
requested [1] - 4:15
requesting [2] - 3:10, 16:16
requests [2] - 5:20, 14:17
required [1] - 55:15
requires [1] - 45:6
requiring [1] - 63:1
reschedule [1] - 5:11
reservation [1] - 24:22
reserve [1] - 57:24
reserved [2] - 57:25, 58:1
resolution [5] - 39:10, 40:8, 44:3, 44:4, 74:22
resolve [10] - 22:4,

22:5, 23:10, 33:20, 33:23, 34:6, 35:9, 40:13, 60:11, 69:21
resolved [6] - 22:3, 23:12, 23:13, 34:21, 72:2, 76:25
resolving [1] - 64:17
respect [24] - 8:14, 8:21, 9:12, 22:6, 22:8, 22:13, 22:18, 22:24, 25:3, 25:12, 26:24, 33:1, 33:2, 34:10, 54:23, 70:13, 70:17, 71:15, 74:4, 74:9, 74:23, 75:25, 76:8
respond [4] - 10:1, 15:2, 54:18, 64:13
responded [1] - 10:17
response [3] - 10:12, 24:20, 63:25
responses [1] - 26:18
responsibility [1] - 75:18
responsible [1] - 57:18
rest [2] - 35:6, 53:8
restrict [1] - 20:3
result [1] - 3:1
resulting [1] - 16:1
results [2] - 2:18, 2:20
retained [2] - 13:5, 14:3
reviewed [3] - 12:7, 17:25, 54:9
revisit [1] - 71:14
revisiting [1] - 40:16
Revolving [1] - 72:12
Rich [1] - 2:9
Richard [1] - 37:13
RICHARD [2] - 1:16, 1:23
roadmap [1] - 51:13
robbery [1] - 61:4
Robinson [1] - 25:7
Robinson's [1] - 17:5
ROCHE [1] - 1:14
Roche [1] - 35:10, 44:1, 54:24, 56:4, 76:8, 76:10, 76:12, 76:15, 76:18
Rome [1] - 1:16
room [4] - 21:15, 21:19, 21:22, 38:3
rooms [1] - 21:19
roughly [1] - 12:20, 12:23, 61:18, 61:19
row [1] - 24:10
royalty [4] - 70:23, 70:24, 71:2, 71:4

Rule [2] - 41:6, 41:12
rule [4] - 37:22, 38:9, 43:1, 55:17
ruled [3] - 43:5, 43:6, 55:2
rules [3] - 6:7, 41:3, 64:24
Rules [1] - 41:9
ruling [10] - 37:6, 38:11, 38:12, 39:10, 40:22, 43:8, 43:10, 55:9, 62:19, 67:10
rulings [6] - 34:12, 38:25, 39:25, 40:13, 40:17, 40:21
run [1] - 32:12
rush [1] - 18:11

## S

S.A [2] - 72:9, 72:12
sale [1] - 13:2
sales [6] - 7:2, 7:3, 7:6, 7:8, 7:12, 68:4
samples [2] - 57:15, 59:6
sat [2] - 15:5, 38:2
satisfaction [1] - 31:3
satisfied [1] - 47:18
Saturday [2] - 54:2, 58:8
saw [3] - 20:7, 36:7, 54:8
scale [1] - 60:19
schedule [3] - 3:23, 4:19, 71:11
scheduled [2] - 3:24, 71:11
scheduling [2] - 35:18, 36:3
School [1] - 58:9
school [1] - 4:7
scope [3] - 72:17, 72:20, 75:23
score [1] - 44:21
searches [1] - 12:13
second [3] - 3:7, 5:23, 43:12
See [1] - 21:8
see [25] - 17:21, 18:20, 20:21, 21:2, 21:16, 24:19, 24:23, 29:5, 30:22, 34:6, 38:1, 42:1, 58:8, 58:22, 64:6, 64:7, 64:8, 65:11, 67:9, 70:4, 71:8, 73:16, 73:20, 76:5, 77:16
seeing [1] - 17:14

seek [4] - 22:10, 28:12, 56:17, 57:11
seeking [6] - 10:5, 16:19, 28:3, 70:14, 70:21, 74:4
selected [1] - 5:9
selectively [1] - 6:18
sell [10] - 59:11, 59:13, 59:16, 60:11, 60:17, 60:21, 72:8, 72:10, 72:16
sells [3] - 34:1, 34:2, 67:17
send [4] - 29:8, 41:22, 42:16, 78:1
sense [4] - 24:7, 39:23, 41:20, 72:8
sensitivity [5] - 32:3, 32:12, 32:15, 32:17, 32:22
sent [7] - 3:12, 10:14, 36:3, 45:22, 46:2, 51:22, 53:17
separate [2] - 12:24, 62:25
September [7] - 3:25, 4:6, 4:8, 4:19, 6:1, 11:9, 11:10
series [1] - 76:2
Serono [19] - 13:1, 13:11, 13:25, 14:3, 14:8, 17:15, 22:14, 71:10, 71:19, 71:20, 71:25, 72:5, 72:9, 72:12, 72:24, 72:25, 75:17, 75:18, 76:3
Serono's [3] - 11:5, 55:18, 73:8
serve [1] - 66:18
served [2] - 5:7, 5:9
session [1] - 39:5
set [4] - 14:6, 22:19, 50:12, 60:1
sets [1] - 77:3
setting [2] - 21:18
several [3] - 53:3, 71:19, 75:16
severely [1] - 65:5
shambles [1] - 46:1
sharing [1] - 2:22
sharply [1] - 69:19
shield [1] - 6:19
shocked [1] - 37:11
short [2] - 7:6, 20:16
shortly [3] - 25:17, 26:3, 35:13
shot [1] - 71:25
show [7] - 20:4, 29:14, 47:2, 47:16, 56:14, 57:2, 65:17

showed [1] - 53:21
side [7] - 2:9, 16:6, 25:11, 31:20, 34:20, 54:25, 73:7
sided [1] - 38:18
sides [6] - 18:2, 18:13, 35:17, 39:14, 54:12, 62:17
sign [1] - 77:9
signed [2] - 19:20, 31:17
Similarly [1] - 19:14
simple [3] - 12:22, 37:3, 37:17
simply [2] - 42:24, 75:24
simultaneously [1] - 77:23
single [2] - 44:17
sit [1] - 5:21
sitting [1] - 24:10
situation [4] - 56:6, 73:5, 73:8, 75:21
six [4] - 3:2, 3:14, 32:1, 36:13
Sleet [7] - 24:8, 24:10, 24:11, 24:22, 24:23, 25:2, 25:5
Sliding [1] - 60:18
slightly [1] - 49:4
slow [1] - 38:23
small [2] - 61:3, 67:16
soccer [1] - 58:10
soft [1] - 61:11
sold [5] - 16:4, 62:4, 62:7, 72:18, 72:22
solely [1] - 29:15
solves [1] - 31:3
someone [4] - 20:3, 54:15, 60:6, 66:18
sometimes [1] - 16:2
Sometimes [1] - 56:22
somewhat [1] - 61:10
somewhere [1] - 40:11
son [1] - 58:10
sorry [1] - 14:12
sort [2] - 15:20, 31:9
soul [1] - 40:25
source [2] - 7:1, 68:12
speaking [1] - 37:10
special [2] - 41:21, 64:23
specific [6] - 6:14, 7:12, 28:25, 35:3, 40:4, 65:21, 68:6, 74:7
specifically [6] - 20:4, 23:15, 32:14, 35:11, 38:6, 74:6

specification [1] - 45:6
speed [1] - 32:25
spend [1] - 58:3
spokesperson [2] - 36:23, 37:12
spotlight [1] - 9:20
stage [1] - 64:18
stages [1] - 47:10
standing [2] - 17:23, 24:24
stands [1] - 42:25
start [9] - 2:21, 4:7, 26:1, 36:2, 36:6, 37:15, 37:23, 39:4, 68:10
started [4] - 5:8, 12:12, 38:14, 65:8
starting [4] - 11:13, 36:4, 36:12, 36:14
starts [2] - 35:21, 36:11
state [5] - 37:16, 37:24, 42:24, 64:3, 64:4
statement [1] - 37:3
statements [2] - 2:13, 72:4
STATES [1] - 1:1
States [4] - 11:15, 15:17, 55:15, 55:20
stay [1] - 41:21
steps [1] - 57:7
Steven [2] - 7:25, 9:17
still [5] - 3:15, 5:23, 24:16, 75:10, 76:22
stipulation [8] - 7:14, 7:16, 23:9, 40:22, 68:8, 68:10, 68:13, 68:15
stockholders' [1] - 58:21
stood [1] - 53:10
strategy [1] - 18:3
strong [4] - 3:2, 41:23, 55:24, 68:1
stuff [8] - 27:22, 27:24, 28:10, 29:4, 29:5, 41:5, 47:4, 47:6
subject [3] - 6:17, 6:20, 41:5
subliminally [1] - 34:24
submission [1] - 78:5
submit [2] - 46:1, 78:2
submitted [1] - 63:13
subpoenaing [1] - 69:2
subsequent [3] -

13:18, 13:21, 32:16
subsequently [1] - 14:9
successful [1] - 33:6
sue [2] - 16:5, 60:7
sued [1] - 58:18
sufficient [1] - 30:8
suggest [3] - 31:23, 32:20, 37:23
suggested [1] - 75:2
suggestion [2] - 10:21, 72:3
suing [1] - 58:16
suit [7] - 26:1, 26:24, 43:15, 43:18, 43:20, 43:22, 43:25
suits [1] - 56:5
summary [2] - 7:6, 38:24
summer [1] - 3:24
supplement [8] - 18:22, 23:1, 23:2, 38:5, 38:18, 71:5, 74:18, 74:20
supplemental [1] - 25:23
supplementation [4] - 26:4, 43:23, 71:9, 74:16
supplemented [1] - 25:16
supplementing [1] - 44:22
supply [1] - 61:2
support [1] - 7:13
supporting [1] - 29:16
supports [1] - 30:4
supposed [4] - 37:24, 41:10, 41:12
surprised [1] - 9:25
suspect [3] - 50:3, 54:11, 58:13
Switzerland [1] - 3:19
systems [1] - 61:1

T

table [1] - 22:23
tactics [2] - 3:1, 3:4
tail [1] - 27:18
technical [2] - 8:1, 66:10
technology [1] - 66:7
TEKNIKA [2] - 1:7, 1:8
Teknika [8] - 9:4, 27:4, 43:24, 61:1, 62:25, 72:6
ten [6] - 31:10, 36:10, 39:24, 68:21, 77:12,

78:10
ten-day [1] - 36:10
ten-minute [1] - 68:21
term [2] - 4:7, 69:6
terms [3] - 19:5, 43:16, 62:23
terrific [1] - 42:25
test [2] - 8:3, 19:24
testified [3] - 22:15, 56:2, 75:14
testifies [1] - 22:17
testify [2] - 64:1, 74:25
testifying [1] - 32:21
testimony [7] - 8:18, 64:14, 64:16, 65:22, 65:25, 66:20, 75:3
THE [163] - 1:1, 1:2, 2:2, 2:7, 2:11, 2:16, 7:22, 8:3, 8:6, 8:13, 9:14, 9:18, 9:23, 10:19, 12:17, 13:15, 13:24, 14:2, 14:5, 14:10, 14:13, 14:20, 14:23, 15:9, 15:13, 15:19, 15:24, 16:20, 16:22, 17:19, 18:1, 18:17, 19:14, 19:22, 20:15, 20:22, 21:5, 21:8, 21:11, 21:25, 23:22, 24:9, 24:13, 24:21, 24:25, 26:19, 27:2, 27:9, 27:15, 27:17, 27:22, 28:7, 28:10, 28:16, 28:24, 29:3, 29:10, 29:19, 30:9, 30:13, 30:22, 31:16, 33:3, 33:22, 34:7, 34:17, 34:19, 35:15, 35:23, 36:6, 36:10, 37:7, 37:9, 38:22, 39:3, 40:6, 40:9, 40:18, 40:24, 42:13, 43:9, 44:23, 45:5, 45:12, 46:7, 46:10, 46:21, 46:24, 47:5, 47:9, 47:21, 47:24, 48:3, 48:6, 48:10, 48:15, 48:25, 49:15, 49:20, 49:24, 50:13, 50:20, 51:1, 51:5, 51:10, 52:3, 52:9, 52:15, 52:23, 53:2, 53:24, 54:11, 54:17, 55:4, 55:11, 55:19, 56:13, 56:20, 57:5, 57:9, 57:13, 57:16, 57:21, 57:25, 58:15, 59:18, 60:16, 60:23, 61:5, 61:9, 61:18, 61:24, 62:4,

62:9, 62:13, 63:4, 63:9, 63:22, 64:10, 64:22, 66:1, 66:3, 66:22, 67:2, 67:9, 67:25, 68:18, 69:3, 69:6, 69:23, 70:6, 70:9, 70:18, 70:20, 70:24, 72:12, 73:14, 73:25, 76:24, 77:18, 77:21, 78:9, 78:14
themselves [1] - 8:23
theories [1] - 70:20
thinking [1] - 19:4
third [4] - 14:11, 52:12, 68:16, 69:3
Third [3] - 41:1, 41:2, 69:8
third-party [1] - 68:16
Third-party [1] - 69:8
Thorn [5] - 23:19, 23:22, 45:17, 45:18, 49:22
thoughts [2] - 9:7, 78:4
three [4] - 12:21, 24:15, 60:1, 61:24
throw [3] - 15:13, 25:2, 25:6
tied [1] - 71:7
tier [1] - 63:4
tiers [3] - 62:24, 62:25, 63:7
timing [1] - 68:16
today [14] - 5:21, 6:22, 8:9, 16:3, 18:11, 33:21, 39:22, 40:14, 40:15, 44:21, 70:20, 71:1, 77:4, 77:10
together [1] - 12:23
tongue [1] - 36:18
took [6] - 17:12, 17:16, 25:19, 25:25, 26:2, 59:1
top [1] - 41:21
topics [2] - 35:10, 75:16
toward [1] - 51:11
towards [2] - 4:15, 7:10
town [1] - 58:8
track [2] - 77:6, 77:9
tracking [1] - 78:10
transaction [1] - 15:15
transactional [1] - 14:23
transcript [3] - 77:8, 78:9, 78:12
transferred [2] - 13:1, 14:16
transferring [1] - 14:1

travel [1] - 4:25
trial [13] - 3:3, 35:16, 35:19, 36:4, 36:10, 47:10, 48:7, 63:19, 63:20, 64:15, 66:24, 67:5, 73:19
trials [2] - 65:4
tried [6] - 15:5, 20:5, 25:7, 41:8, 42:21, 67:11
trip [1] - 55:20
troubling [1] - 6:4
true [3] - 19:13, 36:24, 46:13
truth [1] - 54:15
try [13] - 3:3, 3:6, 3:8, 3:9, 37:4, 42:24, 50:10, 54:12, 57:19, 59:5, 73:14, 74:12, 77:20
trying [17] - 3:15, 21:5, 25:4, 30:16, 31:22, 40:14, 40:25, 42:1, 42:6, 51:12, 53:14, 53:24, 54:4, 54:5, 55:5, 65:10, 73:3
Tuesday [2] - 1:11, 36:6
Tunnell [1] - 1:23
turn [1] - 62:18
turned [2] - 6:11, 37:13
Two [2] - 62:21, 63:7
two [33] - 3:4, 4:21, 8:3, 9:3, 11:6, 11:7, 16:7, 19:20, 19:24, 21:13, 21:19, 23:1, 23:2, 23:15, 32:1, 42:8, 44:7, 49:19, 53:18, 55:12, 61:25, 62:24, 62:25, 63:4, 64:14, 66:9, 66:12, 67:11, 69:19, 70:16, 71:5, 76:1, 76:15
two-part [1] - 19:24
two-prong [2] - 8:3, 66:9
two-tier [1] - 63:4
two-year [1] - 32:1
type [3] - 65:21, 66:20, 75:20
types [1] - 8:17
typical [1] - 36:10
Typically [1] - 60:16

U

U.K [1] - 3:18
U.S [4] - 4:25, 7:2, 7:8,

7:9
U.S.D.C.J [1] - 1:14
ultimate [2] - 64:15, 68:12
ultimately [2] - 46:25, 64:21
unable [2] - 15:11, 15:16
uncommon [1] - 59:19
under [14] - 6:7, 12:4, 12:7, 19:23, 23:19, 30:23, 41:12, 43:4, 47:13, 49:22, 63:2, 63:15, 64:24, 70:20
Under [2] - 14:23, 43:12
underlies [2] - 11:19, 11:21
underlying [3] - 9:10, 12:1, 16:15
understood [5] - 27:7, 55:1, 59:9, 71:1, 74:14
undertaking [1] - 63:18
unenforceability [1] - 10:9
UNITED [1] - 1:1
United [4] - 11:15, 15:17, 55:15, 55:19
universe [3] - 29:5, 30:5, 49:15
university [1] - 20:3
unless [3] - 5:15, 20:3, 66:24
Unless [2] - 18:3, 20:2
unreasonable [2] - 56:15, 58:2
unredacted [1] - 52:13
Unredacted [1] - 52:15
unusual [1] - 63:10
up [49] - 3:17, 9:16, 11:3, 11:12, 17:9, 20:21, 21:18, 22:19, 24:11, 24:22, 24:24, 26:6, 26:25, 27:4, 27:5, 27:11, 29:23, 29:24, 32:25, 33:3, 40:12, 43:15, 43:18, 43:22, 43:24, 44:2, 44:4, 45:2, 45:5, 50:19, 52:3, 52:23, 53:10, 54:4, 54:5, 56:14, 57:2, 62:15, 68:7, 69:10, 70:25, 73:17, 73:20, 74:11, 74:17, 75:20, 76:22, 77:16
upset [1] - 58:24

urged [1] - 3:25
urging [1] - 3:22

## V

vacation [2] - 4:17, 4:19
vacations [1] - 3:21
validity [1] - 74:19
variety [1] - 67:17
various [2] - 4:3, 10:4
verbal [1] - 46:18
version [1] - 53:22
versions [1] - 53:19
via [1] - 8:22
view [14] - 18:4, 23:14, 25:6, 41:25, 48:25, 55:3, 59:18, 60:3, 65:2, 65:15, 67:6, 77:1, 77:21
views [1] - 67:7
Virginia [1] - 63:18
visits [1] - 32:2
vitae [1] - 63:14

## W

wait [1] - 21:23
waited [1] - 6:8
waived [1] - 30:7
wants [4] - 2:17, 38:9, 38:11, 64:5
Weber [9] - 7:25, 8:4, 9:17, 19:20, 19:21, 31:7, 31:24, 43:4, 43:7
website [1] - 67:16
week [6] - 5:2, 10:12, 25:22, 36:5, 69:14, 71:13
weekends [1] - 54:1
weeks [7] - 3:14, 23:2, 42:8, 49:19, 70:16, 71:6
well-understood [1] - 74:14
whatsoever [1] - 7:18
Whereas [1] - 61:2
whereas [1] - 3:15
whereby [1] - 22:19
whole [8] - 8:3, 12:21, 13:2, 37:25, 38:10, 48:7, 69:21, 73:18
wholly [2] - 44:9, 44:13
willful [3] - 6:11, 47:2, 65:24
willfulness [9] - 23:20,

29:12, 46:8, 47:11, 47:13, 64:1, 64:2, 65:16, 66:21
willing [1] - 56:9
Wilmington [1] - 1:11
withheld [7] - 8:16, 8:24, 9:2, 12:15, 13:11, 43:12, 43:15
withholding [1] - 44:10
witness [21] - 7:7, 8:4, 19:15, 19:17, 33:10, 50:9, 50:14, 51:9, 64:25, 65:15, 66:6, 67:8, 71:10, 74:25, 75:20, 75:22, 76:10, 76:11
witnesses [9] - 3:14, 3:23, 6:13, 6:15, 19:25, 35:2, 55:18, 63:12, 75:21
Wohlstadter [2] - 35:5, 55:3
word [1] - 47:20
words [1] - 75:1
works [2] - 20:3, 46:25
world [1] - 4:4
worse [1] - 66:14
worth [1] - 66:15
wrangling [1] - 16:9
Wright [2] - 21:14, 21:21
writ [2] - 57:9, 57:13
write [1] - 77:24
writing [1] - 18:9
written [2] - 31:19, 46:17
wrote [1] - 59:10

## Y

year [1] - 32:1
years [2] - 15:16, 31:10
yesterday [10] - 10:14, 10:17, 10:22, 10:24, 11:4, 23:23, 24:9, 33:17, 41:3, 41:23
yesterday's [1] - 41:17

# EXHIBIT D

## Additional Civil Trial Guidelines for Patent Cases
(Formerly, "Guidelines: Legal Expert Testimony
in Patent Cases;" Revised December 21, 2010)

**Joint Pretrial Order**.  Parties shall submit **two** courtesy copies of their joint proposed pretrial order.  Should the issues remaining for trial be narrowed or otherwise change following summary judgment, the parties may submit a revised proposed pretrial order prior to the pretrial conference, if time permits.

**Status letter**.  Following the pretrial conference, the parties shall file on the case docket a joint status letter appraising the court of the issues remaining for trial, **specific to asserted claims**.

**Patent DVD**.  In all patent jury trials, the court will show "An Introduction to the Patent System" to the jurors in connection with its preliminary jury instructions.  This video, distributed by the Federal Judicial Center, is approximately 18 minutes long and provides jurors with an overview of patent rights in the United States, patent office procedure and the contents of a patent.  **It is the parties' responsibility to provide and play the DVD as a jury demonstrative.**[1]

**Expert testimony**.  In view of the fact that the jury is shown "An Introduction to the Patent System," expert testimony from attorneys regarding patent practice and procedure is not required and will not be permitted except for extraordinary circumstances.  "Expert" legal testimony (as opposed to technical testimony) on such substantive issues as invalidity (by anticipation, obviousness, on-sale bar, prior conception, etc.) and claim construction and infringement, generally is not admitted, as descriptions of the law and instructions on the law are matters for the court.

**Jury instructions**.  The court has now published on its website standard jury instructions to be utilized in patent cases.  The parties shall tailor these instructions to their case and provide the court, along with their paper courtesy copy, a CD or DVD containing their joint proposed jury instructions in **WordPerfect** format.

---

[1]Any difficulty in this regard must be addressed with the court at the pretrial conference.

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2004 SEP 16  AM 11: 26

```
ST. CLAIR INTELLECTUAL PROPERTY     :
CONSULTANTS, INC.,                  :
                                    :
             Plaintiff,             :
                                    :
      v.                            :     Civil Action No.
                                    :     03-241 JJF
CANON, INC., CANON U.S.A., INC.,    :
FUJI PHOTO FILM CO., LTD,           :
FUJI PHOTO FILM U.S.A., INC.,       :
and FUJIFILM AMERICA, INC.,         :
                                    :
             Defendants.            :
```

**O R D E R**

WHEREAS, the Canon defendants filed a Motion To Strike The Expert Report Of Joseph V. Colaianni (D.I. 549);

WHEREAS, the Court finds that Mr. Colaianni's Expert Report largely consists of testimony on substantive issues of patent law;

WHEREAS, expert testimony on substantive issues of patent law generally is not admitted, as description of the law and instructions on the law are matters for the Court;

NOW THEREFORE, IT IS HEREBY ORDERED that the Canon defendants' Motion To Strike The Expert Report Of Joseph V. Colaianni (D.I. 549) is **GRANTED**.

September 16, 2004
DATE

_____
UNITED STATES DISTRICT JUDGE