**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **VIIV HEALTHCARE COMPANY, SHIONOGI & CO., LTD., and VIIV HEALTHCARE UK (NO. 3) LIMITED,** | **C.A. No. 1:18-cv-00224-CFC-CJB** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | ▇▇▇▇▇▇▇▇▇▇▇▇ |
| **GILEAD SCIENCES, INC.,** | ▇▇▇▇▇▇▇▇ |
| **Defendant.** | PUBLIC VERSION |

**LETTER DATED JUNE 11, 2020 FROM DANIEL M. SILVER, ESQ.**
**TO MAGISTRATE JUDGE BURKE**

OF COUNSEL:

John M. Desmarais
Justin P.D. Wilcox
Laurie N. Stempler
Todd L. Krause
Alyssa B. Monsen
Lindsey E. Miller
Kyle G. Petrie
Thomas J. Derbish
Julianne M. Thomsen
DESMARAIS LLP
230 Park Avenue
New York, New York 10169
(212) 351-3400
jdesmarais@desmaraisllp.com
jwilcox@desmaraisllp.com
lstempler@desmaraisllp.com
tkrause@desmaraisllp.com
amonsen@desmaraisllp.com
lmiller@desmaraisllp.com
kpetrie@desmaraisllp.com
tderbish@desmaraisllp.com
jthomsen@desmaraisllp.com

MCCARTER & ENGLISH, LLP

Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE  19801
(302) 984-6300
mkelly@mccarter.com
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiffs,*
*ViiV Healthcare Company, Shionogi & Co.,*
*Ltd., and ViiV Healthcare UK (No. 3) Limited*

Dear Magistrate Judge Burke:

The two issues Gilead raises lack any basis in the record and should be denied. *First*, ViiV and its expert witness, Dr. Alan Engelman, complied with all the Rule 26 requirements and Gilead cannot identify any material that Dr. Engelman considered but did not disclose or any legitimate prejudice it suffered. *Second*, Dr. Engelman did not raise a new opinion during his deposition.

## I.A  Rule 26 Violations Require Undisclosed Facts Or Data; Gilead Identifies None.

Gilead incorrectly argues that Rule 26(a)(2)(B)(ii) required Dr. Engelman to reveal to Gilead ███████████████████████████████████████████████████████████████████████ ████████████████████████ (Gilead Br. 1.) That rule requires no such thing. Instead, it states that "[t]he [expert's] report must contain . . . the facts or data considered by the witness in forming [all opinions the witness will express]." The term "facts and data" refers to ***factual materials***[1] that an expert witness considered in forming his or her opinions. *Dyson Tech. Ltd. v. Maytag Corp.*, 241 F.R.D. 247, 251 (D. Del. 2007) ("Courts have defined the term 'considered' broadly to include ***materials*** that an expert reviews, reflects upon, reads, and/or uses."); FED. R. CIV. P. 26 Advisory Committee's Notes – 2010 Amendment ("the intention is that 'facts or data' be interpreted broadly to require disclosure of ***any material*** considered by the expert, from whatever source, that contains ***factual*** ingredients."). In fact, Gilead fails to identify any case that has interpreted Rule 26 to include a *per se* requirement to disclose ████████████████████.

Gilead does not—and cannot—point to any material that Dr. Engelman considered in forming his opinions but did not identify in his reports. Instead, Gilead attempts to manufacture a Rule 26 disclosure violation, arguing that Dr. Engelman's reports are "misleading" because ████ ████████████████████████████████. No Rule 26 violation occurred. Dr. Engelman disclosed all of the materials he relied on in forming his opinions █████████████. Those materials included confidential internal documents from Gilead's production, ████████████████████████████████████████████—documents that Dr. Engelman did not have access to ████████████████████. Those materials did ***not*** include, as Gilead suggests, ████ ████████████████████████ (Gilead Br. at 2.)

Contrary to its sweeping allegations, Dr. Engelman did not seek to mislead Gilead. This is Dr. Engelman's first engagement as an expert witness. Given his lack of litigation experience ████ ████████████████████████████████████████, he did not think ████████ ████████████████ was relevant to his opinions in this case. When Plaintiffs' counsel learned a few days before his deposition that ████████████████████████, it did not disclose that fact because Dr. Engelman confirmed he had not relied upon ████████████████ in forming his opinions here, and therefore, Rule 26 did not require any further disclosure.

Dr. Engelman's analysis ████████ is consistent with the materials he considered where, having examined Gilead's internal documents, he found additional flaws that he was unaware of ████████████████. Those additional flaws are not inconsistent ████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Thus, Gilead knew that Dr. Engelman was likely one of the peer-reviewers. ████████████████████████████████████████ ████████████████████

---

[1] Emphasis has been added unless otherwise noted.

### I.B   Gilead Was Not Prejudiced By Dr. Engelman's Omission And Its Requested Relief Is Disproportionate And Unrelated To The Alleged Violation.

Even assuming that Rule 26 imposes a duty on experts to disclose ███████ ████████ (which it does not), Gilead has failed to identify any legitimate prejudice it has suffered. Gilead's claim of prejudice based on its supposed inability to prepare for the deposition lacks any basis. (Gilead Br. 2.) Gilead's assertions that it was merely "[b]y happenstance" that it asked Dr. Engelman ██████████████████████ and that it was "surprise[d]" by his answer (*id.* at 1-2), are belied by the fact that ████████████████████████████████



Critically, Gilead has failed to identify *any* additional information it requires to test Dr. Engelman's opinions. And, as it notes, Gilead is free to cross-examine Dr. Engelman on these issues at trial. *See W.L. Gore & Assocs. v. C.R. Bard, Inc.*, No. 11-515-LPS-CJB, 2015 WL 12806484, at *5–6 (D. Del. Sept. 25, 2015) (concluding that prejudice was cured by deposing and cross-examining expert); *Gicla v. United States*, 572 F.3d 407, 412 (7th Cir. 2009) (concluding that disclosure of additional materials was "correct[ed]" by "cross-examin[ing] [the expert] on [those materials]"); *Logan v. Harrah's Atl. City Operating Co., LLC*, No. 1:16-cv-03380-NLH-KMW, 2018 WL 4489671, at *1 n.3 (D.N.J. Sept. 19, 2018) (concluding that a "discrepancy" between an expert's testimony and the materials considered "seems more fodder for cross-examination . . . than it does an uncurable and prejudicial violation of Rule 26."). Because Gilead suffered no prejudice, its requested relief finds no basis in the record and should be denied.

Moreover, the sanctions that Gilead seeks are both inappropriate and disproportionate to the alleged harm. Adverse jury instructions are typically ordered as a result of spoliation or failure to produce requested discovery. *See e.g.*, *Samsung Elecs. Co. v. Nvidia Corp.*, 314 F.R.D. 190, 203 (E.D. Va. 2016) (explaining adverse inferences are "typically given in spoliation cases" so that "the jury may infer that *absent evidence* is favorable to a party"); *Staley v. U.S. Bank Nat'l Ass'n*, No. 1:10–cv–00591–BLW, 2013 WL 331271, at *5 (D. Idaho Jan. 29, 2013) (instructing jury on negative inference from the failure to produce certain documents). There is no such allegation here, and ███████████████████████████████ and was free to cross-examine him on them—but chose not to—Gilead's request is unwarranted.

### II.   Dr. Engelman Did Not Raise Any New Opinions In His Deposition.

Dr. Engelman did not, as Gilead suggests, provide "new opinions" on the Smith 2018 article during his deposition. (Gilead Br. 2.) Dr. Engelman has consistently opined that Smith 2018 is not reliable because the article is riddled with errors and misconceptions. (Ex. D ¶¶412-443; Ex. E ¶¶79-81.) When asked about those opinions, Dr. Engelman offered reasons why he believed the publication was flawed, including that some of the data cited in the paper was nearly a decade old. (Ex. C, 77:17-82:5.) Dr. Engelman's statements were not new opinions but "consistent and appropriate elaborations of [his] prior opinions and statements." *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, No. 05–737–JJF, 2010 WL 2044931, at *2 (D. Del. May 20, 2010). Gilead chose not to ask any follow-up questions despite having over 2 hours left on the deposition clock, negating any claim of prejudice. (Ex. C, 82:6-9; 117:22-118:1; 188:10-13; 236:21-25.) Striking these statements would be an "extreme sanction" not warranted in this case. *B. Braun Melsungen AG v. Terumo Med. Corp.*, 749 F. Supp. 2d 210, 221 (D. Del. 2010); *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977).

Respectfully submitted,

*/s/ Daniel M. Silver*

Daniel M. Silver (#4758)


cc:      All Counsel of Record (via CM/ECF and electronic mail)

ME1 33592168v.1

# EXHIBIT A

# EXHIBIT B

1     IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF DELAWARE
3                 -  -  -
4

VIIV HEALTHCARE          :   CIVIL ACTION
5  COMPANY, SHIONOGI &      :
   CO., LTD., and VIIV      :   NO.
6  HEALTHCARE UK (NO. 3)    :   1:18-cv-00224
   LIMITED,                 :   -CFC
7                           :
        Plaintiffs,         :
8                           :
        v.                  :
9                           :
   GILEAD SCIENCES, INC.,   :
10                          :
        Defendant.          :
11

                 -  ███████████  -
12              ██████████████████
13                 -  -  -
14            June 2, 2020
15                 -  -  -
16            Videotaped deposition of
   DOUGLAS D. RICHMAN, M.D., taken pursuant
17 to notice, was held via Zoom
   videoconferencing, beginning at 8:28 a.m.
18 PST, on the above date, before Michelle
   L. Gray, a Registered Professional
19 Reporter, Certified Shorthand Reporter,
   Certified Realtime Reporter, and Notary
20 Public.
21                 -  -  -
22        GOLKOW LITIGATION SERVICES
      877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24
25

Page 2

1  ZOOM VIDEOCONFERENCE APPEARANCES:
2
3  DESMARAIS, LLP
   BY: JUSTIN P.D. WILCOX, ESQ.
4  BY: LINDSEY E. MILLER, ESQ.
   BY: ALYSSA B. MONSEN, ESQ.
5  230 Park Avenue
   New York, New York 10169
6  (212) 351-4905
   jwilcox@desmaraisllp.com
7  lmiller@desmaraisllp.com
   amonsen@desmaraisllp.com
8  Representing the Plaintiffs
9
10 BARTLIT BECK, LLP
   BY: REBECCA T. HORWITZ, ESQ.
   BY: J. SCOTT MCBRIDE, ESQ.
11 BY: MADELINE LANSKY, ESQ.
   BY: MATTHEW R. FORD, ESQ.
12 Courthouse Place
   54 West Hubbard Street, Suite 300
13 Chicago, Illinois 60654
   (312) 494-4400
14 rebecca.horwitz@bartlitbeck.com
   scott.mcbride@bartlitbeck.com
15 madeline.lansky@bartlitbeck.com
   matt.ford@bartlitbeck.com
16 Representing the Defendant
17
18
19
20
21
22
23
24
25

Page 3

1  ZOOM VIDEOCONFERENCE APPEARANCES:
   (Cont'd.)
2
3  ALSO PRESENT:
4
   Mark Rachlin, Esq.
5  Tom Smith, Esq.
   (GSK)
6
7  Andrew Zoltan, Esq.
   (Shionogi, Inc.)
8
9  Andrea Hutchison, Esq.
   Andrew Kessel, Esq.
10 (Gilead)
11
12 VIDEOTAPE TECHNICIAN:
   TJ (Thadd) Loebbaka
13
14 LITIGATION TECHNICIAN:
   Jamey Johnson, FTI
15 Steve Schwartz, FTI
16
17
18
19
20
21
22
23
24
25

Page 4

- - -
1
2        I N D E X
3        - - -
4
Testimony of:
5
6        DOUGLAS D. RICHMAN, M.D.

   By Mr. Wilcox          9
7
8
9
10
11       - - -
12       E X H I B I T S
13       - - -
14
15 NO.         DESCRIPTION          PAGE
16 Richman-1    Notice of Deposition    31
17 Richman-2    Expert Report of        31
               Douglas D. Richman, M.D.
18             1/9/20
19 Richman-3    Materials Considered    31
               1/9/20
20
   Richman-4    Supplemental Rebuttal   31
21             Expert Report of
               Douglas D. Richman, M.D.
22             3/25/20
23 Richman-5    Errata to 1/9/20        31
               Expert Report
24
25

Page 5

- - -
1
2        E X H I B I T S  (Cont'd.)
3        - - -
4
5 NO.         DESCRIPTION          PAGE
6 Richman-6    Exhibit A              166
               Acknowledgement and
7              Agreement to be Bound
8 Richman-7    Letter, 5/21/20        167
               From Horwitz to Miller
9
10 Richman-9   E-mail Thread          262
               3/20/20
11             Subject, HIV/AIDS 2019
               Abstract
12 Richman-10   2019 Update of the     289
               Drug Resistance
13             Mutations in HIV-1
               (Wensing)
14
15 Richman-11   2017 Update of the     282
               Drug Resistance
16             Mutations in HIV-1
17 Richman-12   Project: HIV           127
               Integrase Stand
18             Transfer Inhibitor
               (INSTI)
19             9/16/13
20 Richman-17   E-mail Thread          192
               1/30/19,
21             No Subject
               From Engelman to
22             Richman
23 Richman-18   Interim Week 48        155
               Clinical Study Report
24             GS-US-380-1489
25             BICVIIVUS0031157-35

Page 6

1
2    E X H I B I T S (Cont'd.)
3      - - -
4
5  NO.      DESCRIPTION      PAGE
6  Richman-19  Interim Week 48      161
       Clinical Study Report
7      GS-US-380-1490
       BICVIIVUS1492734-39
8
   Richman-20  Bictegravir Confers   47
9      Long-term Viral
       Suppression Against
10     Drug-Resistant Viruses
       In Cell Culture
11     (Cuadra-Foy)
12 Richman-22  Efficacies of      300
       Cabotegravir and Bictegravir
13     Against Drug-Resistant
       HIV-1 Integrase Mutants
14     (Smith)
15 Richman-30  Bictegravir      246
       Emtricitabine and
16     Tenofovir
       (Gallant)
17
   Richman-32  Section 2.7      240
18     Clinical Summary
       Summary of Clinical
19     Efficacy
       6/2/17
20     BICVIIVUS0001176-64
21
22
23
24
25

Page 7

1      - - -
2    DEPOSITION SUPPORT INDEX
3      - - -
4
5  Direction to Witness Not to Answer
6  PAGE   LINE
   None.
7
8  Request for Production of Documents
9  PAGE   LINE
   None.
10
11 Stipulations
12 PAGE   LINE
   None.
13
14 Questions Marked
15 PAGE   LINE
   None.
16
17
18
19
20
21
22
23
24
25

Page 8

1      - - -
2      THE VIDEOGRAPHER:  We are
3  now on the record.  My name is TJ
4  Loebbaka, I'm a videographer and
5  certified remote deposition
6  operator for FTI Consulting.
7      Today's date is June 2,
8  2020.  And the time is 8:28 a.m.
9  Pacific Daylight Time.
10     This deposition is taking
11 place via Cloud Video Services,
12 and the witness resides in La
13 Jolla, California.
14     This matter is in re Viiv
15 Healthcare V Gilead in and for the
16 U.S. District Court for the
17 District of Delaware.
18     Our deponent today is Doug
19 Richman.
20     Counsel will be noted on the
21 stenographic record.
22     Our court reporter today is
23 Michelle Gray.
24     And counsel has agreed that
25 the witness can be sworn in via

Page 9

1  remote video.
2      Madam court reporter will
3  now swear in the witness.
4      - - -
5  ... DOUGLAS D. RICHMAN, M.D.,
6  having been first duly sworn, was
7  examined and testified as follows:
8      - - -
9      EXAMINATION
10     - - -
11 BY MR. WILCOX:
12     Q.   Good morning, Dr. -- Dr.
13 Richman.  My name is Justin Wilcox, and
14 I'm with the law firm of Desmarais, LLP.
15 I represent the plaintiffs in this matter
16 that are ViiV Healthcare Company, ViiV
17 Healthcare UK (No. 3) Limited, and
18 Shionogi.
19     Do you understand that
20 you're testifying here today in the
21 matter between -- and I'll call the
22 plaintiffs altogether ViiV.  Do you
23 understand you're testifying in the
24 matter of ViiV versus Gilead Sciences?
25     A.   I do.  Mm-hmm.

Page 182

1    MS. HORWITZ:  Objection.
2    Vague.
3    THE WITNESS:  Not original
4    lab research.  I am part of the
5    IAS-USA mutations group guidelines
6    panel, and as a result of that,
7    those papers include information
8    about INSTI drug resistance.
9    BY MR. WILCOX:
10    Q.   So you have not published a
11    single paper related to original research
12    on dolutegravir or bictegravir, correct?
13    A.   That's correct.
14    Q.   And you haven't published a
15    scientific paper on original research
16    that you've conducted for other INSTIs,
17    correct?
18    MS. HORWITZ:  Objection.
19    Mischaracterizes prior testimony.
20    I -- Justin, can you hear
21    me?
22    MR. WILCOX:  I think we're
23    frozen up --
24    MS. HORWITZ:  I think we may
25    have -- I think we lost Doug.

Page 183

1    MR. WILCOX:  Can we go off
2    the record?
3    MS. HORWITZ:  TJ?  Can we go
4    off the record?
5    THE VIDEOGRAPHER:  We are
6    currently off the video record.
7    The time is 12:52.
8    (Short break.)
9    THE VIDEOGRAPHER:  We are
10    back on the video record.  The
11    time is 12:59 p.m. Pacific
12    Daylight Time.
13    BY MR. WILCOX:
14    Q.   Dr. Richman, before you
15    left, we were talking about scientific
16    publications so I'd just like to follow
17    up on that.
18    Have you published any
19    papers regarding original research on
20    raltegravir?
21    A.   No, I have just used it as a
22    reagent in some original research.
23    Q.   And have you ever published
24    any papers involving original research on
25    elvitegravir?

Page 184

1    A.   No.
2    Q.   When you're publishing a --
3    strike that.
4    When you're performing an
5    analysis that's going to go into a
6    scientific publication at some point,
7    have you ever relied on an e-mail as a
8    primary source for that analysis?
9    MS. HORWITZ:  Objection.
10    Vague.
11    THE WITNESS:  I communicate
12    all the time with colleagues and
13    collaborators by e-mail.  But when
14    we publish a paper, we use
15    mutually agreed upon completed
16    data.
17    But often my e-mail
18    exchanges with other people are
19    important for me to confirm or
20    solidify my thoughts.
21    BY MR. WILCOX:
22    Q.   In any peer reviewed article
23    that you published, have you ever cited
24    to an e-mail?
25    A.   So most journals won't let

Page 185

1    you cite something that isn't publicly
2    available.  But infrequently people will
3    make a statement and say personal
4    communication.  But that is in
5    parentheses in the text, and not a
6    scientific --
7    Q.   All right.  So you typically
8    don't cite to e-mails in a peer-reviewed
9    publications that you author, correct?
10    A.   You can't.  The journals
11    wouldn't admit it.  You can only cite
12    publicly available material.
13    Q.   Are you familiar with ViiV's
14    expert in this case, Dr. Engelman?
15    A.   Yes, I am, mm-hmm.
16    Q.   How are you familiar with
17    Dr. Engelman outside of your work on this
18    case?
19    A.   Well, I've known of his work
20    for quite a few years.  And I got to
21    interact with him over the last maybe
22    three years as being on the scientific
23    advisory board of this project run out of
24    Scripps in which he's a participant.
25    Q.   Do you consider Dr. Engelman

Page 186

1 to be honest?
2 　　A.　Yes.　He's an excellent
3 scientist.
4 　　Q.　Do you have any questions
5 about Dr. Engelman's ethics?
6 　　A.　No.　Why would I?
7 　　Q.　Do you consider Dr. Engelman
8 to be one of the world's leading experts
9 in HIV virology?
10 　　A.　Well, in integrase.　I mean
11 HIV virology is a big area.　And so
12 his -- we all have expertise in our own
13 areas, either viruses or areas of
14 viruses.　He's one of the top experts in
15 retroviral integrases.
16 　　Q.　So you'd agree that he's --
17 strike that.
18 　　　　You'd agree that
19 Dr. Engelman is one of the world's
20 leading experts in HIV integrase,
21 correct?
22 　　A.　Yes.
23 　　Q.　Now, have you reviewed any
24 of Dr. Engelman's published research on
25 HIV integrase outside of the context of

Page 187

1 this case?
2 　　A.　I haven't been a reviewer of
3 his papers, if that's what you mean.
4 　　　　But I definitely read
5 several of his papers.
6 　　Q.　Yeah.　I'm sorry.　I'll be
7 more clear.
8 　　　　So outside of your work on
9 this case, have you ever read of
10 Dr. Engelman's papers on HIV integrase?
11 　　A.　Yes.
12 　　Q.　Did you find his research to
13 be thorough?
14 　　A.　Yes.
15 　　Q.　Did you find it to be
16 accurate?
17 　　A.　Yes.
18 　　Q.　Just a quick question about
19 peer reviewing.　Have you ever served as
20 a peer reviewer?
21 　　A.　Yes, I have.
22 　　Q.　Did you run across any
23 articles in your work on this case that
24 you peer reviewed previously?
25 　　A.　No.　I have not peer

Page 188

1 reviewed any of the -- any of the
2 articles that are involved in the case.
3 　　Q.　Have you ever contacted
4 Dr. Engelman -- strike that.
5 　　　　So previously you talked
6 about your work on this committee, and
7 perhaps that you interacted with
8 Dr. Engelman, correct?
9 　　A.　Correct.
10 　　Q.　Outside of that interaction,
11 have you ever reached out to Dr. Engelman
12 about his expertise in HIV integrase?
13 　　A.　No.
14 　　Q.　So you never contacted him
15 before by e-mail or anything prior to
16 this past January?
17 　　A.　I think we've exchanged a
18 couple e-mails about asking him for
19 recommendations of people who might
20 review things for a journal I edit.　But
21 I have not communicated with him about
22 his basic science.
23 　　　　Basically, his area of
24 research is more basic than the
25 translational and clinical research that

Page 189

1 I do.
2 　　　　So although I've contributed
3 to integrase, our expertise are -- there
4 is a lot -- there's some significant
5 amount of overlap of our areas of
6 expertise.
7 　　Q.　Where would you say the
8 overlap in your expertise lies if we're
9 thinking of it in a diagram?
10 　　A.　We're both interested in how
11 integrase works and how drugs can inhibit
12 it.
13 　　Q.　When you said that his area
14 of research is more basic than the
15 translational clinical research that you
16 do, what do you mean by that?
17 　　A.　His research involves basic
18 biochemistry and structural biology.　And
19 those are not -- those are the areas that
20 do not overlap with what I do.
21 　　Q.　So what are more of the
22 areas that you do?
23 　　A.　I do things like virus
24 replication, pathogenesis, drug
25 resistance in the laboratory.

# EXHIBIT C

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3                    -  -  -
 4

 5   VIIV HEALTHCARE            :   CIVIL ACTION
     COMPANY, SHIONOGI &        :
     CO., LTD., and VIIV        :   NO.
 6   HEALTHCARE UK (NO. 3)      :   1:18-cv-00224
     LIMITED,                   :   (CFC) (CJB)
 7                              :
          Plaintiffs,           :
 8                              :
          v.                    :
 9                              :
     GILEAD SCIENCES, INC.,     :
10                              :
          Defendant.           :
11

                    -          -
12
13                    -  -  -
14            May 14, 2020
15                    -  -  -
16            Videotaped deposition of
     ALAN ENGELMAN, PH.D., taken pursuant to
17   notice, was held via Zoom
     videoconferencing, beginning at 9:56 a.m.
18   EST, on the above date, before Michelle
     L. Gray, a Registered Professional
19   Reporter, Certified Shorthand Reporter,
     Certified Realtime Reporter, and Notary
20   Public.
21                    -  -  -
22         GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
25
```

Page 2

1  ZOOM VIDEOCONFERENCE APPEARANCES:
2
3  DESMARAIS, LLP
   BY: JUSTIN P.D. WILCOX, ESQ.
4  BY: JOHN M. DESMARAIS, ESQ.
   BY: LINDSEY E. MILLER, ESQ.
5  BY: JULIANNE M. THOMSEN, Ph.D., ESQ.
   230 Park Avenue
6  New York, New York 10169
   (212) 351-4905
7  jwilcox@desmaraisllp.com
   jdesmarais@desmaraisllp.com
8  lmiller@desmaraisllp.com
   jthomsen@desmaraisllp.com
9  Representing the Plaintiffs
10
11 BARTLIT BECK, LLP
   BY: ADAM K. MORTARA, ESQ.
12 BY: REBECCA T. HORWITZ, ESQ.
   BY: MADELINE LANSKY, ESQ.
13 Courthouse Place
   54 West Hubbard Street, Suite 300
14 Chicago, Illinois 60654
   (312) 494-4400
15 adam.mortara@bartlitbeck.com
   rebecca.horwitz@bartlitbeck.com
16 madeline.lansky@bartlitbeck.com
17   - and -
18 BARTLIT BECK, LLP
   BY: MEG E. FASULO, ESQ.
19 BY: JOHN M. HUGHES, ESQ.
   1801 Wewatta Street
20 Suite 1200
   Denver, Colorado 80202
21 (303) 592-3100
   meg.fasulo@bartlitbeck.com
22 john.hughes@bartlitbeck.com
   Representing the Defendant
23
24
25

Page 3

1  ZOOM VIDEOCONFERENCE APPEARANCES:
   (Cont'd.)
2
3  ALSO PRESENT:
4
   Mark Rachlin, Esq.
5  Tom Smith, Esq.
   (GSK)
6
7  Andrew Zoltan, Esq.
   (Shionogi, Inc.)
8
9  Andrea Hutchison, Esq.
   Andrew Kessel, Esq.
10 (Gilead)
11
12 VIDEOTAPE TECHNICIAN:
   TJ (Thadd) Loebbaka
13
14 LITIGATION TECHNICIAN:
   Jamey Johnson, FTI
15 Steve Schwartz, FTI
16
17
18
19
20
21
22
23
24
25

Page 4

1      - - -
2    I N D E X
3      - - -
4
   Testimony of:
5
       ALAN ENGELMAN, PH.D.
6
   By Mr. Mortara          9
7
   By Mr. Wilcox          291
8
9
10
11
12      - - -
   E X H I B I T S
13
14      - - -
15 NO.      DESCRIPTION          PAGE
16 Engelman-6  E-mail Thread      237
   12/13/19
17 Subject, HIV/HIV AIDS
18 Engelman-7  E-mail Thread      225
   3/20/20
19 Subject, HIV/AIDS 2019
   Abstract
20
   Engelman-9  Structural Basis      88
21 Of Second Generation
   HIV Integrase
22 (Cook)
23
24
25

Page 5

1      - - -
2  E X H I B I T S  (Cont'd.)
3      - - -
4
5  NO.      DESCRIPTION          PAGE
6  Engelman-11  Bictegravir Confers  211
   Long-Term Viral
7  Suppression Against
   Drug Resistant
8  Viruses in Cell Culture
   (Brenner)
9
   Engelman-13  Multifaceted HIV      69
10 Integrase Functionalities
   And Therapeutic Strategies
11 For their Inhibition
   (Engelman)
12
   Engelman-15  Dolutegravir Exhibits 244
13 Significantly Slower
   Dissociation
14 (Hightower)
15 Engelman-19  HIV-1 Integrase      104
   Tetramers are the
16 Antiviral Target of
   Pyridine Based
17 Allosteric Integrase
   Inhibitors
18 (Koneru)
19 Engelman-24  Structural Basis for  111
   Strand Transfer Inhibitor
20 Binding to HIV Intasomes
   (Passos)
21
   Engelman-25  Efficacies of        57
22 Cabotegravir and Bictegravir
   Against Drug Resistant
23 HIV-1 Integrase Mutants
   (Smith)
24
25

Page 6

1
2          - - -
      E X H I B I T S  (Cont'd.)
3          - - -
4
5  NO.      DESCRIPTION      PAGE
6  Engelman-27  Bictegravir     244
               Dissociation
7              Half-Life from HIV-1
               (White)
8
   Engelman-36  Retrovirology   127
9              About, Affiliations
10 Engelman-37  Retrovirology   130
               Editorial Board
11
   Engelman-40  Exhibit A        19
12             Curriculum Vitae
               4/7/20
13
   Engelman-44  E-mail Thread   287
14             11/1/10
               Subject, Paper
15
   Engelman-45  Curriculum Vitae  19
16             9/10/18
17
18
19
20
21
22
23
24
25

Page 7

1          - - -
2    DEPOSITION SUPPORT INDEX
3          - - -
4
5  Direction to Witness Not to Answer
6  PAGE  LINE
      134   9
7     167   2
      272   18
8
9  Request for Production of Documents
10 PAGE  LINE
   None.
11
12 Stipulations
13 PAGE  LINE
   None.
14
15 Questions Marked
16 PAGE  LINE
   None.
17
18
19
20
21
22
23
24
25

Page 8

1          - - -
2          THE VIDEOGRAPHER:  We are
3  now on the record.  My name is
4  Tadd Loebbaka, videographer and
5  remote deposition operator for FTI
6  Consulting.  Today's date is
7  May 14, and the time is 9:56 a.m.
8          This deposition is taking
9  place via cloud services and the
10 witness resides in Hopkinton,
11 Massachusetts.
12         And this deposition is
13 taking place In Re:  ViiV
14 Healthcare Company versus Gilead
15 Sciences.
16         Our deponent today is Dr.
17 Alan Engelman.
18         Counsel will be noted on the
19 stenographic record.
20         Our court reporter today is
21 Michelle Gray and she will swear
22 in the witness, and through an
23 agreement of counsel, it has been
24 agreed that the witness can be
25 sworn in remotely.

Page 9

1          - - -
2          ... ALAN ENGELMAN, PH.D.,
3  having been first duly sworn, was
4  examined and testified as follows:
5          - - -
6          EXAMINATION
7          - - -
8  BY MR. MORTARA:
9     Q.   Great.  Good morning,
10 Dr. Engelman.  How are you?
11    A.   Good.  Good morning.
12    Q.   Where are you today exactly?
13    A.   I'm in my home in Hopkinton,
14 Massachusetts.
15    Q.   Do you understand that you
16 are under oath, sir?
17    A.   I do.
18    Q.   What did you do to get ready
19 for today's deposition?
20    A.   Well, I reviewed the reports
21 that I had previously written and
22 submitted.  And I had some preparatory
23 sessions with counsel from Desmarais,
24 LLP.
25    Q.   How many preparatory

Page 10

1  sessions did you have?
2      A.   I think over the last month
3  or two, we met approximately five or six
4  times.
5      Q.   For how many --
6          MS. MILLER:  Adam, can I --
7  Adam, I hate to interrupt you
8  there, but apparently you need to
9  let Justin, the defending attorney
10  back in --
11          MR. MORTARA:  We'll stop
12  right now and we'll let him back
13  in.  Just, let's take time.  And
14  John Hughes is trying to get in as
15  well.
16          (Whereupon, a discussion was
17  held off the record.)
18  BY MR. MORTARA:
19      Q.   Sorry for the technical
20  difficulties, Dr. Engelman.  It's the
21  first time for everybody, including you.
22          MS. MILLER:  And Steve,
23  could you unmute Justin, please?
24  Thank you.
25          MR. MORTARA:  Are we ready

Page 11

1      to proceed?
2          THE VIDEOGRAPHER:  You're
3  ready.
4          MR. MORTARA:  Great.
5  BY MR. MORTARA:
6      Q.   Sorry, Dr. Engelman, for the
7  delay.  There may be a couple like that
8  during the day.
9          Is anyone with you in the
10  room right now?
11      A.   No.  I'm here by myself.
12      Q.   What devices do you have in
13  front of you?
14      A.   I have the three devices
15  that FTI Consulting had shipped to me.
16  And they are properly set up as verified
17  by that company.
18      Q.   And where is your mobile
19  phone right now?
20      A.   My mobile phone is in my
21  kitchen.
22      Q.   Do you have an iPad near
23  you?
24      A.   The only computer or
25  electronics that I have in this room with

Page 12

1  me are those three devices provided by
2  FTI Consulting.
3      Q.   Do you have any documents in
4  front of you?
5      A.   I do.  What I have with me
6  is the three reports that I've penned.
7  Those are referred to as my opening
8  expert report dated November 15, 2019.
9          Second is the reply expert
10  report dated February 5, 2020.
11          Third is the supplemental
12  expert report dated April 9, 2020.
13          These are the only documents
14  related to this case and the only
15  materials related to this case.  And I'll
16  confirm these are printed documents that
17  I have in my office.
18      Q.   When was the last time you
19  received an electronic message from
20  anyone on ViiV's legal team?
21      A.   Electronic message?  It
22  would have been around 9:30 this morning.
23  I would have received an e-mail.  I
24  couldn't read that e-mail now, because I
25  don't have access to the worldwide web

Page 13

1  right now in this office.
2      Q.   Just the question was when.
3  That's fine, Dr. Engelman.
4          You talked about maybe five
5  meetings with the ViiV legal team.  About
6  how long did each of those meetings last?
7          MR. WILCOX:  Counsel, has
8  the deposition started?
9          MR. MORTARA:  It did.  Yes,
10  Mr. Wilcox.  The deposition has
11  started.
12          MR. WILCOX:  Okay.  Well, I
13  was outside of the room when
14  people were sworn in and
15  appearances were made.  So I'm
16  just checking.  Thank you.
17          MR. MORTARA:  The one person
18  was sworn in.  And Madam Court
19  Reporter confirmed that
20  appearances will be appearing on
21  her stenographic record, and they
22  were unnecessary.
23          May I proceed, Mr. Wilcox?
24          MR. WILCOX:  You may
25  proceed, Mr. Mortara.

Page 14

1  BY MR. MORTARA:
2      Q.   About how long did you meet
3  with ViiV's lawyers to prepare for
4  today's deposition?
5      A.   So we had, as I mentioned,
6  about a half dozen meetings.  They varied
7  in length between approximately one hour
8  and as many as approximately seven hours.
9  I can testify that these prior two days
10 we spent near full days, I think perhaps
11 seven hours.  It was on Tuesday, two days
12 ago, and about six hours yesterday.  But
13 prior meetings, as mentioned, were one to
14 two hours.
15     Q.   Do you generally consider a
16 full day of work to be about seven hours?
17     A.   That's close.  I think I
18 would say full day of work is about eight
19 hours.
20     Q.   During the deposition, as I
21 think FTI will have instructed you, I
22 will be showing you documents on the
23 screen that is next to you.
24          You can see hopefully right
25 now what I've marked as Engelman

Page 15

1  Deposition Exhibit 1.  And we'll be
2  placing it in the exhibit -- digital
3  exhibit file later.  But since you have
4  your own hard copy you can always look at
5  it the old fashion way.  But I'm just
6  confirming you can see on the screen the
7  front cover of your November 2019 expert
8  report.
9      A.   I can confirm that I can see
10 that.
11          And my understanding,
12 perhaps not for this demonstration, as I
13 then will be able to drag that to a
14 separate monitor and have the ability to
15 view the exhibit in full.
16     Q.   That's exactly correct, if
17 all goes well and according to plan.
18          And as to this document I'm
19 happy to do it now since you have it in
20 paper in front of you.  I am responsible
21 for the dragging.  So if you don't have a
22 document, please ask me.  FTI is here to
23 help if we need help with the technology.
24          Dr. Engelman, have you ever
25 been deposed before?

Page 16

1      A.   I have not.
2      Q.   As part of your scientific
3  research, do you ever read transcripts of
4  trials where other scientists have
5  testified?
6      A.   Not as part of my scientific
7  research.  I have done that for this
8  case.
9      Q.   Have you ever read a trial
10 transcript where one of your peers has
11 given testimony?
12     A.   Not to the best of my
13 knowledge.
14     Q.   I'm going to go ahead and
15 put your CV into the shared folder.  Of
16 course, it's attached to the expert
17 reports.  And there's various versions of
18 your CV.  The one that I am going to be
19 referring to is the one I believe you
20 attached to your most recent report,
21 dated April 2020.  I'm moving that into
22 the shared folder now.  I have it up on
23 the screen.  It's a copy of your CV.
24          Do you see that, sir?
25     A.   I do.

Page 17

1      Q.   This version of your CV is
2  dated April 2020, correct?
3      A.   Correct.
4      Q.   Do you have any updates to
5  your CV since then?
6      A.   I am sure I have minor
7  updates, yes, I do.
8      Q.   Tell me what they are.
9      A.   I have served on thesis
10 defense exams.  I have been recruited to
11 serve on qualifying exams for students.
12 I do not believe I have had a publication
13 added to my CV since this date.  So they
14 would be committee service, in particular
15 to Harvard Medical School.
16     Q.   If you think of anything
17 during today's deposition that's an
18 update that you haven't mentioned, please
19 let me know.  Okay?
20     A.   Okay.
21     Q.   If you would turn now to the
22 Page 2 of the CV, other professional
23 positions.
24          Do you see that?
25     A.   I do.

Page 18

1      Q.   And down there you've got
2  some listings there.  And here it says
3  that you've been a consultant for
4  Desmarais, LLP since 2016.
5          Do you see that?
6      A.   That's right.
7      Q.   You started working with
8  ViiV's legal team in 2016, correct?
9      A.   That's correct.
10     Q.   You have never done any
11 actual consulting for ViiV itself, have
12 you?
13         MR. WILCOX:  Objection.
14     Ambiguous.
15         THE WITNESS:  I've worked
16     directly with Desmarais, LLP, as
17     they represent ViiV Healthcare
18     Company.
19 BY MR. MORTARA:
20     Q.   You've never done any actual
21 scientific consulting for ViiV in a
22 research and development capacity,
23 correct?
24     A.   Correct.
25     Q.   Dr. Engelman, I am now going

Page 19

1  to place into the shared folder another
2  version of your CV from earlier in time.
3  And this one you may not have in front of
4  you.  It has been marked Engelman
5  Exhibit 45.
6          Is that in your shared
7  folder that you can see, the admitted
8  exhibits?
9      A.   I see it.
10     Q.   And you see that this is
11 your CV dated September 10th, 2018,
12 correct?
13     A.   Correct.
14         (Document marked for
15     identification as Exhibit
16     Engelman-45.)
17 BY MR. MORTARA:
18     Q.   I'd like to refer you to the
19 "Other professional positions" entry on
20 this CV.
21         And Dr. Engelman, I'll
22 represent, this is the CV that you
23 provided us when you became -- when you
24 went on the protective order in this
25 case, and it says here, from 2016 you've

Page 20

1  been a consultant for ViiV Healthcare.
2          Do you see that?
3      A.   I do.
4      Q.   Why did you tell us in 2018
5  you were a consultant for ViiV, but then
6  change it to be a consultant to ViiV's
7  lawyers -- ViiV's lawyers later?
8      A.   Thank you for the question.
9  One of the main interfaces I have with my
10 outside activity is the way in which I
11 report it to my employer, which is the
12 Dana-Farber Cancer Institute.

Page 21

18 There's no set guidelines from my
19 employer about this, beyond the fact I
20 have to report my outside activities.



1 lawyers in connection with litigation
2 against Gilead, just this time in Canada,
3 correct?
4     A.   I believe that's correct.
5     Q.   And how much did you charge
6 the Bereskin & Parr ViiV legal team for
7 your work on that case?
8     A.   I believe my hourly rate
9 there was 650 U.S. an hour.  Unless it
10 was a travel day, I requested 750 U.S. an
11 hour.
12     Q.   Why did you charge a
13 different rate for consulting services to
14 ViiV's lawyers north of the border,
15 versus consulting services on your
16 retention by the Desmarais firm?
17     A.   Well, you can see two years
18 have passed between when I was retained
19 by these different law firms.  As you are
20 well aware, cost of living increases go
21 up from year to year.
22     Q.   And that's also been true
23 since 2007 through to 2016 or 2020,
24 correct?
25     A.   That's correct.

1     Q.   You are charging $500 an
2 hour for your work plus expenses,
3 correct?
4     A.   That's correct.
5     Q.   Has your hourly rate changed
6 at any point since you started working
7 for ViiV's lawyers or ViiV in 2016?
8     A.   It has not.
9     Q.   Name everyone else you have
10 ever charged $500 an hour for consulting
11 work.
12     A.   Well, I think on the prior
13 version of the CV there was a -- there
14 were two other companies listed.  Here on
15 this version is Ambrilia Biopharma.
16 That's over ten years ago.  I do not
17 recall the hourly rate that I had charged
18 back then.  For the one you are about to
19 pull up, Bereskin & Parr, LLP, I do
20 not -- I did not charge them, I do not
21 charge them $500 an hour.  Do you want to
22 know how much I charge them?
23     Q.   Well, first let's establish
24 the Bereskin & Parr LLP consulting that
25 you did was also for a set of ViiV's

1     Q.   So it stands to reason that
2 you charged Ambrilia Biopharma less than
3 $500 an hour.  Would that be fair to say?
4     A.   I do not recall, as -- as
5 testified what I charged Ambrilia
6 Biopharma Incorporated.  And I don't have
7 access to that paperwork right now.
8     Q.   About how much consulting
9 did you do for Ambrilia Biopharma?
10     A.   As noted on the document
11 that we're looking at, it was a couple
12 days per year.
13     Q.   Have you ever worked for
14 ViiV's lawyers, the Desmarais firm, on
15 any cases other than this one?
16     A.   No, I have not.
17     Q.   How much money have ViiV's
18 lawyers paid you for your work to date in
19 this case?
20     A.   Well, I've worked quite
21 extensively on this case.  You might be
22 able to guess that based on the extent of
23 the three reports I referred to.
24         I think, my recollection to
25 date is I've billed, over four years, or

Page 26

1  close to four years, roughly 200 hours of
2  work.
3      Q.    That's approximately 100 --
4  wait, hold on.  200 hours times $500 is
5  $100,000.  Is that about right, that's
6  your recollection?
7      A.    That's my recollection,
8  since I began first working with them in
9  the fall of 2016.
10      Q.    Let's talk about the
11  Canadian lawyers for ViiV, how much have
12  they paid you?
13      A.    I billed significantly less
14  hours to the Canadian lawyers.  I don't
15  think I've billed them since 2018.  I
16  don't recall the extent of hours that
17  were billed.  It would be significantly
18  less or much less.  Maybe -- whatever --
19  whatever we said on the screen was two
20  days a year.  That seems about right.  So
21  we established that a workday is about
22  eight hours.  I would say it would be
23  approximately 10 to 16 hours that they
24  were billed since I started consulting
25  with them.

Page 27

1      Q.    Dr. Engelman, of the
2  approximately 200 hours you remember
3  billing to the Desmarais firm on this
4  case, how many of those were in 2019?
5      A.    I don't have that number in
6  front of me.  I would say out of the
7  200 hours I've billed, most of that has
8  been encompassed since I started to
9  generate my opinion via writing my
10  opening report.  It's not 100 percent of
11  the hours that I've billed.  But I
12  would -- I could -- I could fairly
13  accurately guess that it would be more
14  than half of all the 200 hours that I
15  billed.
16      Q.    And when did you start
17  drafting your opening report, sir?
18      A.    I started to draft my
19  opening report at the end of summer 2019,
20  beginning of fall 2019.
21      Q.    It's fair to say the
22  majority of the money that you have
23  billed in this case began to be billed --
24  the majority of the money has been billed
25  since the summer of 2019; is that right?

Page 28

1      A.    I have to testify that I
2  don't have the precise numbers in front
3  of me.  But I would tend to agree with
4  that assessment.
5      Q.    So Dr. Engelman, I want to
6  ask you a little bit about some of the
7  numbers here.
8          You told me earlier that you
9  considered a full day of work to be seven
10  or eight hours.  Do you remember that?
11      A.    Yep.
12      Q.    And seven or eight hours a
13  year for 2016, 2017, and 2018, four days
14  a year, which is what your CV says you
15  were doing.  That's over 100 hours right
16  there, isn't it?
17      A.    32 plus 32 plus 32, sounds
18  about like 96 to me.
19      Q.    Well, 2016, 2017, 2018, you
20  get 96 hours, right?  And you're telling
21  me you spent 96 hours right up to 2019
22  and then since then 104; is that right?
23      A.    What's the date on the CV
24  again?
25      Q.    This is your April 2020 CV

Page 29

1  that you gave us last month where you
2  told me you were spending four days a
3  year working for Desmarais LLP.
4      A.    So 2016 to 2020 encompasses
5  five years.  Five years times four days
6  equals 20 days.  That seems to be
7  approximately correct to me.
8      Q.    Dr. Engelman, is it your
9  testimony you didn't spend four days in
10  2016 working for ViiV, you didn't spend
11  four days in 2017, you spent the bulk of
12  those 20 days in 2019?  And just for --
13  I'll withdraw the question.
14          You said you spent two full
15  days preparing for this deposition.  Plus
16  the odd and end other hour, two-hour
17  meetings, right?
18      A.    The CV in front of me is
19  dated in April.  It's not dated today.
20      Q.    My question is, you've spent
21  a lot more than 20 days working for
22  ViiV's lawyers on this case, isn't that
23  right?
24      A.    This is my CV, it's a
25  professional document.  I am advised by

Page 30

1  my university, where this CV is related
2  to, it's called Harvard Medical School,
3  to have an estimate of my time spent for
4  outside working practices.
5      It's not my understanding
6  that this part of my CV has to be
7  technically accurate based on any given
8  day or year.  It's an approximate of the
9  amount of time I've spent over the years
10  working on this outside activity.
11      As mentioned, the way I do
12  the math, I started in 2016.  Today is
13  2020.  And I approximated over that time
14  span, which is what the CV represents,
15  and I think the recording is accurate.
16      Q.   You've already spent more
17  than four days working for ViiV in 2020,
18  isn't that right?
19      A.   That sounds accurate.
20      Q.   And my question was not
21  about the CV.
22      Is it accurate to say you've
23  worked significantly more than 20 days
24  since you started working for ViiV's
25  lawyers in this case?

Page 31

1      A.   Well, you gave me a
2  calculator.  I have to do 200 divided by
3  24.
4      Q.   I can do that for you.  200
5  divided by 24 is 8.3.
6      A.   So I worked about 8.3 days.
7  Oh, sorry.  It's supposed to be 200
8  divided by 8?  I apologize.
9      Q.   200 divided by 8 is 25, sir.
10      A.   So 25 days is my testimony
11  over four years of approximately the
12  amount of time I have put into this case.
13      Q.   It is your sworn testimony
14  that you have spent only approximately
15  200 hours working for ViiV in this case;
16  is that right?
17      A.   That's, approximately -- I
18  think what I did in preparation for
19  today's depositions I reviewed the amount
20  of hours that I received reimbursement.
21  And it's something less than 200.  Since
22  I've been reimbursed for the last invoice
23  I provided, I have put more hours in.
24  But I didn't memorize those hours.
25      So my testimony is I have

Page 32

1  received payment for something close to
2  about 200 hours of billed services to
3  date.
4      Q.   And you got some additional
5  amount, would you say maybe 20 to 30 more
6  that you haven't billed for yet?
7      A.   I think that sounds about
8  right, correct.
9      Q.   Have you ever received any
10  compensation that was not your hourly
11  rate or expenses for your work on this
12  case?
13      A.   I have not.
14      Q.   Have you ever traveled with
15  ViiV's lawyers anywhere at their expense?
16      A.   I have not.
17      Q.   Have you applied for any
18  research grants from ViiV?
19      A.   To the best of my
20  recollection, I have not.
21      Q.   Have you applied for any
22  research grants from GSK?
23      A.   To the best of my
24  recollection, I have not.
25      Q.   Have you applied to any

Page 33

1  research grants from Shionogi?
2      A.   To the best of my
3  recollection, I have not.
4      Q.   Have you been provided any
5  research materials or other in kind
6  assistance by ViiV, GSK or Shionogi?
7      A.   The research assistance, no,
8  I have not.
9      Q.   Your testimony is that you
10  have not been provided any research
11  materials or other kind of assistance by
12  ViiV, GSK or Shionogi, correct?
13      A.   My testimony here is I have
14  received research materials from
15  Desmarais LLP.
16      Q.   What research materials did
17  you receive from Desmarais, LLP?
18      A.   I received documents that
19  are tabulated in the Exhibit Bs of my
20  first two reports.
21      Some of those documents, as
22  far as I understand, represent internal
23  documents obtained from Gilead as a
24  course of this case.  And I received
25  those from lawyers at Desmarais, LLP.

Page 34

1    Q.   How much money did you make
2  in 2019 from sources other than ViiV's
3  lawyers?
4    A.   So you're asking for my
5  salary?
6    Q.   I'm asking for your total
7  income from 2019, other than the portion
8  you received from ViiV's lawyers?

19    Q.   Thank you, Dr. Engelman.  I
20  want to talk about your experience now.
21  You are not a medical doctor, are you?
22    A.   That's correct.  My advanced
23  degree is a Ph.D.
24    Q.   You have never treated
25  patients, have you?

Page 35

1    A.   That's correct.
2    Q.   You have never prescribed
3  medicine, correct?
4    A.   That's correct.
5    Q.   And that means that you have
6  never once prescribed an antiviral
7  medication to a patient suffering from
8  HIV, correct?
9    A.   That's correct.
10    Q.   You have never made a
11  decision about whether a patient will or
12  will not respond to a particular HIV
13  antiviral medication, have you?
14    A.   That's correct.
15    Q.   You are not an expert in
16  treating patients with drug-resistant
17  HIV, are you?
18    A.   I am not an expert in
19  treating patients, correct.
20    Q.   Nor are you an expert in
21  treating patients with drug resistant
22  HIV, correct?
23    A.   That's correct.
24    Q.   In fact, it would be illegal
25  for you to treat patients, wouldn't it?

Page 36

1    A.   I believe it would be.
2    Q.   You are not an expert in
3  evaluating clinical studies, are you?
4      MR. WILCOX:  Object to form.
5      THE WITNESS:  I am an expert
6  in HIV replication, HIV integrase
7  and HIV integration.  I surely can
8  read and understand published
9  clinical studies on the use of
10  integrase inhibitors in the
11  clinic.
12  BY MR. MORTARA:
13    Q.   Has anyone ever asked you,
14  outside of the context of this case, to
15  evaluate a clinical trial?
16    A.   No.
17    Q.   You've never done that as
18  part of your regular work, have you?
19    A.   That's correct.
20    Q.   You're not an expert in
21  designing clinical studies either, are
22  you?
23    A.   I would agree with you.
24    Q.   You are not a medicinal
25  chemist, correct?

Page 37

1    A.   I have a working knowledge
2  in medicinal chemistry as it applies to
3  inhibitors of HIV integrase.  But I agree
4  my expertise is not broadly in medicinal
5  chemistry.
6    Q.   You agree that your
7  expertise is not broadly in medicinal
8  chemistry, correct?
9    A.   That's correct.
10    Q.   You have never worked in a
11  pharmaceutical company engaged in drug
12  discovery or drug development, have you?
13    A.   That's correct.
14    Q.   You are not an expert in
15  pharmacokinetics, correct?
16    A.   I have a working knowledge
17  of pharmacokinetics, especially as it
18  applies to the opinions I was asked to
19  make in this -- in my reports as they
20  apply to experiments with in vitro
21  infection and replication of HIV.  But I
22  am not an expert in clinical
23  pharmacokinetics.
24    Q.   You are not an expert in
25  clinical pharmacokinetics, correct?

1    A.   I have a working knowledge
2  of pharmacokinetics.
3    Q.   Would you agree that you are
4  not an expert in clinical
5  pharmacokinetics?
6    A.   I would agree that my
7  expertise lies outside of clinical
8  pharmacokinetics, but I have a working
9  knowledge of it.
10    Q.   Have you ever been asked to
11  render any opinions about
12  pharmacokinetics outside of your work for
13  the ViiV lawyers in this case?
14    A.   Could you clarify the
15  question?  Asked by whom?
16    Q.   Earlier I asked you whether
17  anybody ever asked you to comment on a
18  clinical trial outside of your work on
19  this case.  You said no.  Have you ever
20  been asked in your regular job to comment
21  about clinical pharmacokinetics outside
22  of your work on this case?
23    A.   I would -- I would probably
24  have to say no there.
25    Q.   You've never performed a

1  pharmacokinetics research study, correct?
2    A.   Well, we have published in
3  the area of pharmacokinetics as it
4  applies to in vitro assays of HIV
5  infection.
6    Q.   You've never performed a
7  clinical pharmacokinetics research study,
8  correct?
9    A.   That's correct.  We've never
10  performed a clinical pharmacokinetics
11  research study.
12    Q.   You are not an expert in
13  molecular modeling, correct?
14    A.   Well, I surely have a
15  working knowledge of molecular modeling.
16    Q.   When was the last time you
17  prepared any molecular modeling?
18    A.   It would have been about two
19  weeks ago.
20    Q.   How many times have you
21  prepared molecular modeling outside of
22  your work on this case, sir?
23    A.   Well, I think molecular
24  modeling is a broad term.  Should I
25  describe to you in detail what I did two

1  weeks ago?
2    Q.   Was your work two weeks ago
3  on this case?
4    A.   It was not.
5    Q.   Go ahead.





Page 42

Page 44

2    Q.   We'll come back to
3  Dr. Cherepanov in a little bit.
4        Who is Dr. Stephen Hughes?
5    A.   Dr. Hughes is an
6  investigator at the National Cancer
7  Institute who I know fairly well.  I
8  first met him in the 1980s when I was a
9  training graduate student and he was
10  already a -- probably a staff scientist
11  or an investigator at the National Cancer
12  Institute.
13    Q.   And the National Cancer
14  Institute, that's part of the United
15  States National Institutes of Health,
16  correct?
17    A.   That's correct.
18    Q.   That's the health research
19  arm of the United States government,
20  correct?
21    A.   I think it's one of the
22  health research arms of the United States
23  government.  There's also the CDC; the
24  United States Army has a strong research
25  arm as well.

Page 43

2    Q.   Have you ever spoken to
3  Dr. Cherepanov about this litigation?
4    A.   I have not spoken to
5  Dr. Cherepanov about any details of this
6  litigation.

Page 45

1    Q.   Dr. Tony Fauci works at the
2  National Institute of Health, right?
3    A.   Even I worked at the
4  National Institutes of Health between
5  1990 and 1995.
6    Q.   And you don't work there
7  today, do you, sir?
8    A.   That's correct.
9    Q.   Dr. Tony Fauci works there
10  today, doesn't he?
11    A.   He does and I know him as
12  well.
13    Q.   You've published six
14  articles together with Dr. Stephen Hughes
15  of the NIH, correct?
16    A.   That's correct.
17    Q.   Is Dr. Hughes of the
18  National Institutes of Health a great
19  scientist?
20    A.   I think he's a well known
21  scientist.  I would probably refer from a
22  term -- it's a very qualitative term.  I
23  think it's difficult to know who the
24  greatest scientists are.  Sometimes we
25  reserve that for people like Nobel

1  laureates and even those -- even in some
2  of those cases, some of the assignments
3  of awards are questionable.
4      Q.    Would you call yourself a
5  great scientist?
6      A.   I think I am a well known
7  scientist, especially in the field of HIV
8  integrase and HIV integration.
9      Q.   Do you consider Dr. Hughes
10 to be one of the leaders in HIV research?
11     A.   I think Dr. Hughes is a well
12 respected research scientist in HIV
13 research.
14     Q.   Do you respect him?
15     A.   Well, my respect has waned a
16 little through my involvement in this
17 case, I would say.
18     Q.   You have invited Stephen
19 Hughes to speak at meetings and
20 conferences, correct?
21     A.   I would say that sounds
22 accurate to the best of my recollection.
23     Q.   Do you know how many times
24 you invited Stephen Hughes to speak at
25 Dana-Farber or Harvard?

1      A.   If I have done it, my
2  recollection would be once.
3      Q.   You are aware that
4  scientists at the National Institutes of
5  Health are not permitted to consult with
6  legal teams for money the way you are
7  with ViiV's legal team, right?
8      A.   I -- that's the best of my
9  understanding, that scientists who work
10 directly for the government have more
11 restrictions than those of us on the
12 outside of the government.
13     Q.   And, therefore, scientists
14 who work directly for the government are
15 not permitted to be paid by legal teams
16 to give expert opinions in litigation,
17 the way you are being paid by ViiV's
18 legal team, correct?
19         MR. WILCOX:  Objection.
20     Calls for speculation.
21         THE WITNESS:  That's my
22     understanding, but it's also my
23     understanding I'm not the only
24     expert witness on this case.
25 BY MR. MORTARA:

1      Q.    Scientists at the National
2  Institutes of Health work only for the
3  government, only for the U.S. taxpayer,
4  correct?
5          MR. WILCOX:  Objection.
6      Calls for speculation.
7          THE WITNESS:  Yeah, I can't
8      address that.  I don't today work
9      for the U.S. government so I
10     don't -- I am unaware of the
11     details that might be spelled out
12     in contracts between individual
13     scientists and the U.S.
14     government.
15 BY MR. MORTARA:
16     Q.   You, in fact, receive a lot
17 of money from the NIH to do your
18 research, correct?
19         MR. WILCOX:  Objection,
20     form.
21         THE WITNESS:  My
22     understanding is the Dana-Farber
23     Cancer Institute, my employers,
24     receives those funds.
25 BY MR. MORTARA:

1      Q.   Well, you are listed as the
2  principal investigator on a number of NIH
3  grants in your CV, correct?
4      A.   That's correct.
5      Q.   And that's money that you
6  applied for from the NIH and the U.S.
7  taxpayer gives you to do research, right,
8  you are allowed?
9      A.   The grants that I write for
10 the NIH are submitted to a specific arm
11 of the NIH, and then are reviewed by
12 expert scientists, a panel of expert
13 scientists who generate a priority score.
14         In general, these grants
15 that are scored in the system are funded
16 at the rate of approximately 15 to
17 20 percent.  It is my understanding that
18 although those expert scientists may pay
19 U.S. taxes, I think it's unjust to
20 characterize it's the U.S. taxpayers that
21 fund my grants.
22     Q.   Where does the NIH get its
23 money from, sir?
24         MR. WILCOX:  Objection.
25     Calls for speculation.

1    THE WITNESS:  Yes, I'm
2 not -- I don't work for Congress.
3 I'm not sure how -- how money that
4 might be in the U.S. Treasury is
5 decided to go to one branch of
6 government versus another.  I am
7 not an expert in that.
8 BY MR. MORTARA:
9    Q.   As a fellow citizen of the
10 United States, do you know where the U.S.
11 Treasury gets its money from?
12    A.   I would imagine the --
13 actually I don't know.  I do know that I
14 pay taxes every year.  I think that makes
15 part of it.  I'm not sure if they invest
16 those monies and make money off of
17 investments.  I don't know about things
18 like that.  I apologize.
19    Q.   You would agree in common
20 parlance, the National Institutes of
21 Health is a taxpayer-funded government
22 agency, correct?
23    MR. WILCOX:  Objection.
24 Ambiguous.
25    THE WITNESS:  I have agreed

1 that the National Institutes of
2 Health is part of the United
3 States government.
4 BY MR. MORTARA:
5    Q.   And the United States
6 government spends taxpayer money on
7 things the United States government
8 decides are a priority, one of which is
9 your research, correct?
10    MR. WILCOX:  Objection.
11 Calls for speculation.
12    THE WITNESS:  Yeah, I think
13 I've already answered that
14 question.  I don't know exactly
15 where the monies that the U.S.
16 government uses to run the U.S.
17 government comes from.  I don't
18 know where 100 percent of those
19 monies come from.  I do -- I did
20 agree some of those monies came
21 from people like me and I
22 hopefully everybody else on the
23 call who pays their annual tax
24 fees.
25 BY MR. MORTARA:

1    Q.   You take seriously the fact
2 that you're -- some of your research is
3 funded by the public, correct?
4    A.   I take my -- my career very
5 seriously.  I have been writing and
6 reviewing grants for the United States
7 National Institute of Health -- I
8 first -- I wrote my first grant or I got
9 my first grant funded in, I believe,
10 1996.  And I have reviewed to date
11 hundreds of grants for the United States
12 Institutes of Health since the year 2001.
13    Q.   Have you ever asked a
14 pharmaceutical company to assist you with
15 money, materials, or other support for
16 your research?
17    A.   Are you asking whether or
18 not I've ever applied for research
19 funding from a pharmaceutical company?
20    Q.   That would be included.  But
21 to be clear, I'm asking in any way, have
22 you sought from a pharmaceutical company
23 assistance with money, materials, or
24 other support for your research?
25    A.   I -- to the best of my

1 recollection, I once submitted a grant
2 application to Merck Chemical Company,
3 which to the best of my recollection was
4 awarded funding for a two-year period.  I
5 imagine those details are in my CV.
6    Q.   Is that the only time that
7 you've ever asked a pharmaceutical
8 company for any kind of assistance with
9 money, materials, or other support for
10 your research?
11    A.   For my research, correct.
12    Q.   Have you ever asked a
13 pharmaceutical company for any kind of
14 assistance with money, materials, or
15 other support for something other than
16 your research?
17    A.   I have done something that
18 many other scientists in my field have
19 done, and that's to organize national and
20 international meetings.  When we -- when
21 we take on the job of meeting
22 organization, almost in all
23 circumstances, we need to seek outside
24 funding to help support the conference to
25 be able to take place.

Page 54

1    And when I have done it in
2  the past -- I haven't done that recently
3  to the best of my knowledge.  When I've
4  done that in the past, I've approached
5  that through granting organizations like
6  the United States National Institutes of
7  Health, where, to the best of my
8  recollection, I once submitted an R15
9  grant application, which is a format
10 specifically for seeking assistance to
11 run a scientific conference.
12    And on the flip side, I've
13 also approached pharmaceutical companies
14 in the past to seek support, outside
15 support, to run international and
16 national conferences.
17    Q.   Since 2016, have you
18 approached ViiV, GSK, or Shionogi to seek
19 support, outside support, to run
20 international or national conferences?
21    A.   To the best of my knowledge,
22 no.
23    Q.   Have you ever asked Gilead
24 to support your research with money,
25 materials, or other support?

Page 55

1    A.   To the best of my
2  recollection, I have not submitted a
3  grant application to Gilead Sciences.  I
4  have given a seminar there, though it's
5  been a number of years.  I would
6  speculate it's more than ten years ago.
7  I'm sure that was a paid -- I'm sure I
8  received an honorarium from Gilead for
9  providing that lecture in the early
10 2000s.
11    And I could -- to the best
12 of my recollection, I assume I would have
13 approached Gilead as described when I --
14 in the past when I ran national and
15 international conferences to ask them for
16 potential support to run those meetings.
17    Q.   Dr. Engelman, I want to be
18 clear.  I said have you ever asked Gilead
19 to support your research with money,
20 materials, or other support.  You said,
21 to the best of my recollection I have not
22 submitted a grant application and went on
23 from there.
24    Have you ever asked Gilead
25 in any way to provide you money, or

Page 56

1  research materials, or any other kind of
2  support for your proposed research?
3    A.   For my proposed research, to
4  the best of my knowledge, no.
5    I apologize for not being
6  accurate.
7    Q.   It's okay, Dr. Engelman.
8  That's why we're here, for me to ask
9  follow-up questions.
10    Is it fair to say that
11 Dr. Stephen Hughes of the NIH has
12 published and written several things
13 about the comparison between bictegravir
14 and dolutegravir that you do not agree
15 with?
16    A.   I don't agree with certain
17 conclusions in those papers.  That's
18 correct.
19    Q.   And Dr. Hughes has said
20 those things that you don't agree with,
21 those conclusions that you don't agree
22 with, publicly in a peer-reviewed
23 journal, correct?
24    A.   In a peer-reviewed journal,
25 that's correct.

Page 57

1    Q.   Dr. Hughes has made those
2  statements publicly in a peer-reviewed
3  journal that any fellow scientist could
4  look at, right?
5    A.   I would agree with that.
6    Q.   And Dr. Hughes made those
7  conclusions that you disagree with in a
8  peer-reviewed journal where other
9  scientists got to read the manuscript
10 before it was even published, right?
11    A.   That's correct.
12    Q.   Just like many of your
13 articles are both public, where other
14 people can look at them, and
15 peer-reviewed where other scientists
16 already have, correct?
17    A.   That's correct.
18    Q.   All right.  I'm going to put
19 Smith 2018, which is the Stephen Hughes
20 article into the admitted folder as
21 Deposition Exhibit 25.
22    (Document marked for
23    identification as Exhibit
24    Engelman-25.)
25 BY MR. MORTARA:

1    Q.   There we go.  Do you see
2  that on the screen, sir?
3    A.   It's loading on the screen.
4       MR. WILCOX:  Dr. Engelman,
5    please make sure that you have
6    access to a complete copy there on
7    one of your screens.
8       THE WITNESS:  Okay.
9  BY MR. MORTARA:
10   Q.   You got it, sir?
11   A.   Yes, I see it.  And I have
12  access to the full document on my
13  leftward monitor.
14   Q.   Excellent.  And if you ever
15  don't have access to the document, please
16  let us know and we'll engage our
17  colleagues for technical support.
18      Engelman Exhibit 25, the
19  Stephen Hughes NIH article is the public
20  peer-reviewed article with some of the
21  conclusions that disagree with, last
22  named article, Stephen Hughes, correct?
23   A.   That's correct.
24   Q.   You can see, I think, that
25  Stephen Hughes is listed as the

1  corresponding author, correct?
2    A.   That's correct.
3    Q.   What does it mean that
4  Stephen Hughes is the last listed author?
5    A.   It means in a list of
6  authors, he's the last one.
7    Q.   Does that have significance
8  in your field, sir?
9    A.   Sometimes it does.
10  Sometimes it carries more significance or
11  not.
12      If you want my professional
13  opinion, significance of the list of
14  authorships generally applies to the
15  first author, where we infer that that
16  person either carried out the scientific
17  experimentation or provided the
18  brainchild for the study or wrote --
19  wrote the manuscript at hand, as well as
20  the corresponding author, who usually is
21  a more senior author who takes on many of
22  the responsibilities I described for the
23  first author, though, because of the
24  senior position, in general, tends to do
25  less of the actual experiment.

1    Q.   What is the significance of
2  being a corresponding author?
3    A.   As a corresponding author,
4  which I am on many of the manuscripts for
5  my laboratory, you take on the
6  responsibility for interacting with the
7  publication -- you know, this is a paper
8  that's been submitted to publication.  So
9  you take on the responsibility of
10  interact -- interactions with the journal
11  to oversee the peer review process.  And
12  you also take the senior author
13  responsibility of the accuracy of the
14  work that's being presented.
15   Q.   And that corresponding
16  author for the Hughes NIH article here,
17  Exhibit 25, is Stephen Hughes, correct?
18   A.   Correct.
19   Q.   Another role of the
20  corresponding author is to interact with
21  readers who may have questions about the
22  article, correct?
23   A.   That's correct.
24   Q.   And that's why for example,
25  Stephen Hughes' e-mail address is

1  provided here for everyone to see in the
2  journal if they want to contact him and
3  they have questions, correct?
4    A.   Correct.
5    Q.   In fact, your e-mail address
6  is on dozens of articles where you are
7  the corresponding author.  So anyone can
8  e-mail you with questions about articles
9  on which you are the corresponding
10  author.
11   A.   That's correct.
12   Q.   And do you occasionally get
13  e-mails from readers asking you questions
14  about things that you've published?
15   A.   I'd say on rare occasions.
16   Q.   So it has happened?
17   A.   Most usually to request
18  for -- to make a request for a reagent
19  that we described in that paper.
20   Q.   Have you ever engaged with
21  another scientist about one of their
22  articles, one of your articles, they've
23  had a question or they -- criticism
24  maybe?
25   A.   Do you mean by e-mail?

1    Q.    Yes.
2    A.    By e-mail it's quite a rare
3  occasion.
4    Q.    Has it ever happened?
5    A.    I've received tens of
6  thousands, if not hundreds of thousands
7  of e-mails since I have been employed at
8  the Dana-Farber Cancer Institute.  So I
9  can't recall.
10    Q.    You agree that most of your
11  interactions about articles that you've
12  written with other scientists are oral in
13  nature?
14    A.    I would have to agree with
15  that.  We tend to discuss each other's
16  research face-to-face when we see each
17  other.  For example, at the kinds of
18  conferences I referred to earlier.
19    Q.    Or on the telephone, right,
20  sir?
21    A.    These days, I think people
22  personally use telephones less and less
23  to communicate with others.
24    Q.    Or on Zoom or Skype or
25  Microsoft Teams?

1    A.    I think -- I think today
2  that's the way that things have evolved.
3  But I have not attended a scientific
4  conference virtually beyond the first
5  week when we all went into shutdown in
6  early March.
7      So in that virtual
8  conference there was no live back and
9  forth.
10    Q.    The other authors listed
11  here on the Hughes NIH article, they all
12  work at the National Institutes of Health
13  as well, correct?
14    A.    Well, we can scroll down and
15  look at what superscript 1, and
16  superscript 2 refer to.  I would assume
17  those are probably different departments
18  or divisions of the National Cancer
19  Institute.
20    Q.    In fact, you've published
21  with Steven J. Smith before, correct?
22    A.    To the -- I don't recall
23  that.  I am sure you have that
24  information.  Again, it's possible that
25  he was a co-author of one of the six

1  papers we've already established that I
2  published with Stephen Hughes.
3    Q.    In articles like these,
4  there's usually a section where authors'
5  contributions are discussed, correct?
6    A.    That varies from journal to
7  journal.  Some of the -- but over time
8  and in recent times, some journals
9  have -- do request that information be
10  provided as part of the publication
11  process.
12    Q.    And -- and this one does
13  over on Page 16.  Do you see that?
14    A.    I do see that.
15    Q.    And it says SS performed the
16  experiments, SS and SH, that's Stephen
17  Hughes, designed the experiments.  It
18  goes on and says, "SS and SH drafted the
19  manuscript."
20      Do you see that?
21    A.    Yep.
22    Q.    That's Stephen Hughes.  And,
23  "All authors read and approved the final
24  manuscript."
25      Do you see that?

1    A.    I do.
2    Q.    That's pretty common too,
3  comments to the effect that all authors
4  read and approved the final manuscript,
5  correct?
6    A.    I think that's -- that's
7  written to indicate that, that's correct.
8    Q.    That's on a lot of your
9  articles too, right?
10    A.    Again, I think -- I think
11  without specific knowledge at hand, I
12  hate to testify, but as mentioned, more
13  journals -- more and more journals these
14  days are requesting said information.  So
15  I would tend to agree that such
16  information is probably provided in a
17  number of manuscripts that I'm a
18  co-author on.
19    Q.    And then right down below
20  there it says, "The authors declare they
21  have no competing interests."
22      What is that?
23    A.    I can't speak to any
24  interest that Dr. Hughes or Dr. Smith or
25  Dr. Zhao or Dr. Burke might have in terms

Page 66

1 of competing interests.
2       This is also somewhat of a
3 moving target in my field.  I don't know
4 if you want me to pontificate here or
5 not.
6       Q.   I'm just asking what it
7 means when authors declare they have no
8 competing interests to you.
9       A.   It means very little to me.
10      Q.   It does not mean that none
11 of them are being paid money by
12 pharmaceutical companies?
13      A.   I think if someone is
14 receiving fees for outside activities, I
15 personally feel that that's an obligation
16 to report that in this section of papers.
17 But I do not believe everyone who
18 receives monies for outside activities
19 does that.  And I don't know what the
20 hard and fast rules are for this.
21      Q.   As far as you're concerned,
22 in the competing interests section, an
23 author should declare if they are
24 receiving outside monies from a
25 pharmaceutical company whose drugs, for

Page 67

1 instance, are mentioned in the article?
2       A.   I -- it is my understanding
3 that that's what the journal would expect
4 out of the authors, yes.
5       Q.   And is -- do you believe
6 that your understanding is widely shared?
7       MR. WILCOX:  Objection.
8       Calls for speculation.
9       THE WITNESS:  I can only
10      testify to what I understand.
11      It's impossible for me to
12      testify to what other people might
13      understand.
14 BY MR. MORTARA:
15      Q.   Well, you are familiar with
16 the rules for various journals that the
17 articles that are at issue in this case
18 are published in, correct, like in
19 Science for example; is that right?
20      A.   I would have read the
21 instructions to authors as I got ready
22 to -- to write my paper.  I haven't
23 reviewed the instructions to authors in
24 preparation for today.
25      Q.   For example, in the Science

Page 68

1 article that you earlier mentioned, you
2 disclosed that you were receiving fees
3 from ViiV?
4       A.   Right, I did do that because
5 I thought that was an accurate
6 representation.  It's not time to get
7 advice, but I went -- I go back and forth
8 whether or not I should have declared

19      Q.   You have cited this article
20 by Dr. Stephen Hughes and others from the
21 NIH in your other peer reviewed research,
22 correct?
23      A.   That sounds accurate.
24      Q.   Well, let's take a look.
25 I'm going to put into the shared folder

Page 69

1 what will be Engelman Exhibit 13.
2       (Document marked for
3       identification as Exhibit
4       Engelman-13.)
5 BY MR. MORTARA:
6       Q.   Do you have that, sir?
7       A.   I have that on my left
8 screen.  I'm opening it.  It's
9 downloading right now.  It indicates it's
10 22 pages which sounds accurate.  And I
11 can see your copy on my right screen.
12      Q.   Engelman Exhibit 13 is what
13 I'll refer to as Engelman 2019, which is
14 a review article you published in JBC
15 Reviews, correct?
16      A.   That's correct.
17      Q.   And in fact, you used money
18 that you got from the NIH to support
19 yourself in writing this article, right?
20      A.   Yeah, my association with
21 the Dana-Farber Cancer Institute in
22 colloquialism is called a soft money job.
23 If I did not have grant money, I would
24 not have a job.
25      Q.   I'm trying to understand.

Page 70

1  This article says, "This work was
2  supported by the National Institutes of
3  Health grants."  And it lists some
4  numbers.
5          Do you see that?
6      A.   I do see that.
7      Q.    Who decided that the NIH
8  grant money would be used to support this
9  work?
10     A.    Well, I work with people.  I
11 work with local accountants in my
12 department at the Dana-Farber Cancer
13 Institute.  We go through great efforts
14 to account for percent efforts of myself
15 and my six -- six people that I
16 supervise, in terms of how those efforts
17 are split out to the different grants
18 that I'm affiliated with, either as a PI
19 or through other affiliation to receive
20 money into the laboratory setting.
21        It's a -- it's a
22 collaboration with me and those
23 accountants that work.  But this is a
24 representation of how my percent effort
25 was divided onto the grants and how I saw

Page 71

1  those percent efforts apply to the
2  writing of this manuscript.
19     Q.    All right.  And now, the
20 second sentence down here that I've got
21 up on the screen says, "The author has
22 received fees from ViiV Healthcare
23 Company within the last 12 months."
24        Do you see that?
25     A.   That's correct.

Page 72

1      Q.
                                  In this one you
6  decided to put "I receive fees from ViiV
7  Healthcare," correct?
8      A.    That's what I used as
9  standard declaration of potential for
10 conflict of interest.
18     Q.    There's a -- the next
19 sentence says, "The content is solely the
20 responsibility of the author.  It does
21 not necessarily represent the official
22 views of the National Institutes of
23 Health."
24        Do you see that?
25     A.   I do.

Page 73

1      Q.   Why is that there?
2      A.   I don't know fully.  Seems
3  to be a clause that the journal would
4  include as part of normal publications of
5  manuscripts that may have been supported
6  in part by one or -- one or another
7  funding agency.
8      Q.   And Dr. Engelman, just
9  returning to Exhibit 25, which is the
10 Hughes article, is there a similar
11 disclaimer in the Hughes article?
12     A.   I don't know.  I have to
13 read the Hughes article.
14     Q.   Do you recall seeing it,
15 sir?
16     A.   Could you -- well, let me --
17 let me go back and I can look at it.
18        This one is 25; is that
19 correct?
20     Q.   That's correct.
21     A.   Well, I can state upfront in
22 my limited experience, or my professional
23 experience, different journals will treat
24 aspects of this differently.
25        My recollection in

Page 74

1 particular is that the BMC Corporation,
2 which, off the tip of my tongue I don't
3 know what it refers to, but it's the
4 company that publishes the Journal of
5 Retrovirology.
6        Science copyright to the
7 authors. So when one is getting
8 copyright assignment, what clauses might
9 pertain in terms of this specific clause
10 to -- is a little outside of my area of
11 expertise, besides the fact that I am an
12 author.
13    Q.   Did you write the disclaimer
14 about your work not being the views of
15 the National Institutes of Health or not?
16    A.   I actually don't recall.
17    Q.   Dr. Engelman, is it your
18 practice to cite articles that you have
19 decided are riddled with meaningful
20 errors and misconceptions?
21    A.   I think when I -- when I
22 write a review article, I tend to, or I
23 try to comprehensively review the
24 literature.
25    Q.   And you cited the Hughes

Page 75

1 article in this Engelman 2019 reference,
2 didn't you? It's reference 119 here.
3    A.   That's correct. And I
4 penned this paper in the first half of
5 2019 before I really dug into the
6 materials as opined in my opening report
7 in great detail to begin to formulate my
8 opinions in this case.
9    Q.   Well, Dr. Engelman, this
10 paper was published in August of 2019.
11        Do you see that?
12    A.   It was published in
13 August 2019, months after I initially
14 started the first draft.
15    Q.   At any time prior to its
16 publication, you could have pulled the
17 citation to the NIH Hughes article; isn't
18 that right, sir?
19    A.   At any time prior to
20 publication, I could have pulled the
21 citation to any one of the 273 papers
22 that I've included in the reference list.
23    Q.   You could actually submit an
24 errata pulling the citation to the Hughes
25 NIH article today, couldn't you?

Page 76

1    A.   Why don't we go back to the
2 detail of how I cited the Hughes article
3 please.
4    Q.   I believe it's Number 119.
5        MS. MILLER: Actually, just
6        to be clear, I don't think that is
7        the right Hughes article.
8 BY MR. MORTARA:
9    Q.   Oh, it's another Hughes
10 article.
11        Did you cite the Hughes
12 article, Exhibit 25, in this reference or
13 not?
14    A.   Excuse me. I've lost my
15 left screen. Okay. It's coming back.
16        My review article, 25,
17 that's correct.
18    Q.   I think you'll find it at
19 160. And I'm sorry, sir. I said it was
20 119. That was another Stephen Hughes
21 article you were citing. Here we've got
22 Reference 160. It will be up on your
23 screen.
24        That's Exhibit 25.
25    A.   What -- I'm particularly

Page 77

1 interested in what context I cited
2 Reference 160, so I'd be looking for that
3 text.
4        On my left -- I've lost it
5 again.
6        (Brief white noise.)
7 BY MR. MORTARA:
8    Q.   Right here, Number 160. You
9 see it says, "CAB in cell culture is
10 marginally less effective at inhibiting
11 infection by certain INSTI-resistant
12 viruses than is either DTG or BIC?"
13        Do you see that?
14    A.   Yes, and I think that's an
15 accurate portrayal of what I feel is
16 represented in Article 160.
17    Q.   That is the Hughes NIH
18 article that you have said is riddled
19 with meaningful errors and
20 misconceptions, correct?
21    A.   Well, surely as I already
22 espoused, I've gotten into this article
23 more deeply since I started to opine my
24 opinions in this case.
25        And --

Page 78

1    (Brief white noise.)
2    THE COURT REPORTER:  The
3  witness is cutting out.  The
4  witness is cutting out.  Can
5  anybody hear me?  This is the
6  court reporter.
7    THE WITNESS:  -- very
8  troubling.
9    You all froze.  Can you hear
10 me?
11 BY MR. MORTARA:
12    Q.   Yes, you're back,
13 Dr. Engelman.  You cut out for a bit.
14    And the question is, this is
15 the Hughes NIH article, Reference 160,
16 that you have said is riddled with
17 meaningful errors and misconceptions,
18 correct?
19    A.   That's correct.  As I
20 already testified, I did not -- it did
21 not come aware to my attention the extent
22 of typographical errors and
23 misconceptions until I delved deeply into
24 this article as part of my preparation
25 for my opening report.

Page 79

1    You guys freeze up again or
2  are you there?
3    Q.   We're here.
4    A.   Okay.
5    Q.   Doctor --
6    A.   What I've done very --
7    Q.   Go ahead.
8    A.   And even more recently, I've
9  uncovered new information which leads me
10 to highly question the materials that are
11 in some of the conclusions that are made
12 in the Number 160, Smith, et al., 2018
13 Retrovirology report --
14    Q.   Dr. Engelman.  Dr. Engelman.
15 Dr. Engelman, you're breaking up on me.
16 I can't hear you.
17    Dr. Engelman, you're
18 breaking up on me.
19    Let me -- let me follow up.
20 Just -- I'll ask the question again.
21 Dr. Engelman, I want to just
22 focus on Exhibit 13, your 2019 article.
23 And ask, did you share a draft of this
24 article with ViiV's legal team before you
25 submitted it for publication.

Page 80

1    Can you hear me?
2    A.   Yeah, I can hear you.  I
3  prefer to answer the previous question.
4    Q.   Dr. Engelman, the question
5  was -- I'll read it to you.
6    This is the Hughes NIH
7  Article 160 that you have said is riddled
8  with meaningful errors and
9  misconceptions, correct?
10    MR. WILCOX:  And, Counsel,
11 you didn't let him finish his
12 answer.
13    MR. MORTARA:  Well, Counsel,
14 I couldn't hear him.
15    THE WITNESS:  Let me try
16 again --
17    MR. WILCOX:  Let him finish
18 his answer.  So why don't we get a
19 clear record.  Why don't you ask
20 him the question again and then we
21 can get Dr. Engelman's full answer
22 to that question.
23 BY MR. MORTARA:
24    Q.   Go ahead, Dr. Engelman.
25    A.   Right.  So again, the extent

Page 81

1  of errors, typographical errors and
2  misconceptions that I've opined on in my
3  reports, I did not begin to get into that
4  level of detail with this article until
5  late fall -- late summer 2019, early fall
6  2019 when I started working on my opening
7  report.
8    Since then, new information
9  has come to my attention by reviewing the
10 literature of Dr. Hughes that even brings
11 much more troubling information into this
12 article.  I have uncovered that
13 Dr. Hughes repeatedly uses the same EC50
14 values over multiple years, going back as
15 many as nine years and recycles those
16 values into his publications.  Sometimes
17 he cites that the values are old, in
18 some -- in some of his publications he
19 doesn't cite that some of the values are
20 old.
21    I have clearly identified
22 that much of the data that's present in
23 Smith 2018 could not have been run in
24 conjunction with some of the assays,
25 because this data is historical and

Page 82

1 clearly identified in the literature in
2 papers published in 2011, as well as 2014
3 and 2016.
4         I find this extremely
5 troubling.
6         MR. MORTARA:  Move to strike
7 the answer as nonresponsive.  Move
8 to strike the opinions as
9 undisclosed in the expert report.
10 BY MR. MORTARA:
11     Q.    And we will proceed,
12 Dr. Engelman.
13         MR. WILCOX:  And we -- just
14 to put on the record, we disagree
15 with that objection and we
16 disagree that it should be
17 stricken.
18 BY MR. MORTARA:
19     Q.    Dr. Engelman, you have just
20 talked a little while ago about a review
21 article that you and Dr. Cherepanov
22 are -- have submitted, correct?
23     A.    That's correct.
24     Q.    How many Stephen Hughes
25 articles are cited in that one?

Page 83

1     A.    I don't have access to my
2 computer.  I've been advised not to keep
3 any electronics.  So I don't -- I would
4 come to expect that we cited some work
5 from a Stephen Hughes article.  I have
6 not discussed with Dr. Cherepanov the
7 very troubling information that has
8 recently come to light, that Dr. Hughes
9 is repeatedly recycling data in his
10 laboratory.

25     Q.    In fact, you haven't told

Page 84

1 anybody outside of this case that the
2 Hughes 2018 NIH article is "riddled with
3 meaningful errors and misconceptions,"
4 have you?
5     A.    Well, I think I uncovered
6 those meaningful errors and
7 misconceptions working with counsel.
8 And -- and I'm not a lawyer, but it
9 sounds like that could then be
10 protected by privilege.
11     Q.    Those are meaningful errors
12 and misconceptions that you have
13 uncovered by reading the article, that's
14 what you tell us in your reports, right?
15     A.    That's right.
16     Q.    The article is public,
17 correct?
18     A.    Correct.
19     Q.    Anyone can read it, right?
20     A.    That's correct.
21     Q.    You are allowed to tell
22 anybody what you have detected as an
23 error in a public article based on what
24 it says, right?
25     A.    That's correct.

Page 85

1     Q.    And you haven't told anyone
2 outside of this case, in the scientific
3 community whatsoever, that the Hughes
4 2018 NIH article is "riddled with
5 meaningful errors and misconceptions,"
6 have you, sir?
7     A.    Not to date.
8         MR. WILCOX:  Counsel --
9 BY MR. MORTARA:

15     Q.    I'd like to move on now
16 to --
17         MR. WILCOX:  Counsel, can --
18 we've been going about an hour and
19 15 minutes.  Can we go ahead and
20 take a break here?
21 BY MR. MORTARA:
22     Q.    Would you like a break,
23 Dr. Engelman?
24     A.    Yeah, I think we could take
25 a ten-minute break.

Page 86

1    Q.   Ten-minute break would be
2  great.  We'll resume in ten minutes.
3         Dr. Engelman, feel free to
4  turn off your video so you can do
5  whatever it is you want to do.  I'm going
6  to turn off mine, as well as mute myself.
7         THE WITNESS:  Thank you.
8         THE VIDEOGRAPHER:  The time
9  is 11:15 a.m. Eastern time.  And
10  we are off the video record.
11        (Short break.)
12        THE VIDEOGRAPHER:  The time
13  is 11:27 a.m.  And we are back on
14  the video record.
15  BY MR. MORTARA:
16    Q.   Hello again, Dr. Engelman.
17        I had a question earlier
18  about Engelman Exhibit 13, the 2019
19  review article in JBC.
20    A.   Yes.
21    Q.   Did you provide a draft of
22  this publication to ViiV's legal team
23  before it was published?
24    A.   Not to the best of my
25  recollection.

Page 87

1    Q.   Did you provide the
2  submitted and accepted manuscript to
3  ViiV's legal team before it was available
4  online?
5    A.   Not to the best of my
6  recollection.
7    Q.   Is it possible you did?
8    A.   I think anything is
9  possible.
10    Q.   You are not sure whether you
11  gave a version of this paper before it
12  was available to the public to ViiV's
13  legal team; is that right?
14    A.   To the best of my
15  recollection, I did not share this
16  manuscript with ViiV's legal team before
17  it was published.
18    Q.   Dr. Engelman, I've placed in
19  the shared folder what is Engelman
20  Exhibit 9, which is the Science article,
21  the last author is Cherepanov that we've
22  referred to a few times today.
23        Do you have that in the
24  shared folder?
25    A.   I see it on the right.  And

Page 88

1  I don't want to make a mistake again on
2  the left.
3         Do I have the exhibit on my
4  leftward screen?
5    Q.   It should be, yes.
6    A.   Exhibit Number 9.  I don't
7  have it.
8    Q.   It's not in the shared
9  folder?
10    A.   Not in the leftward screen.
11  No.  Now it is.
12    Q.   It's quite large.  I think
13  that's why.
14        (Document marked for
15  identification as Exhibit
16  Engelman-9.)
17        THE WITNESS:  Okay.  I'm
18  opening it on my end.  It's
19  uploading.
20        You're correct, all 49 pages
21  are there.
22  BY MR. MORTARA:
23    Q.   This -- this is an original
24  research article that was published just
25  a few months ago, correct?

Page 89

1    A.   That's correct.
2    Q.   In the journal of Science,
3  correct?
4    A.   Correct.
5    Q.   And in fact, you are one of
6  the two corresponding authors on this
7  article, "Structural Basis of
8  Second-Generation HIV Integrase Inhibitor
9  Action and Viral Resistance," correct?
10    A.   That's correct.
11    Q.   The other corresponding
12  author is Peter Cherepanov, correct?
13    A.   That's correct.
14    Q.   This article was published
15  in February; is that right?
16    A.   You know, if you had a gun
17  to my head, I would say it was posted
18  online January 30th, 2019.
19    Q.   That's actually available at
20  the end of the article, I think.
21        Yes.  It says, "Accepted
22  January 15th, published 30th, 2020."  Is
23  that right?
24    A.   Yeah.  So I got it right.
25  January 30, 2020.

1    Q.    And to be clear,
2  January 30th, 2020 is after you had
3  already decided that the Hughes 2018 NIH
4  article, according to your expert
5  reports, is riddled with meaningful
6  errors and misconceptions, right?
7    A.    Certain aspects -- I
8  definitely have issues with certain
9  conclusions in the Hughes article.
10  That's correct.
11    Q.    Dr. Engelman, first question
12  is, did you ever provide any version,
13  draft or submitted draft or accepted
14  draft, to ViiV's lawyers prior to
15  January 30th, 2020?
16    A.    To the best of my
17  recollection, I did not.
18    Q.    Why not?
19    A.    So this was a collaborative
20  study involving multiple laboratories and
21  senior authors.  In addition to myself,
22  as you already noted, the other
23  corresponding author was Dr. Cherepanov.
24  And another senior author was Dr. Rosta.
25        The article, upwards till

1  very close to January 30, 2020, was still
2  in the peer review process.  Many times
3  that means the informational contact will
4  change as it does in response to editors'
5  and reviewers' comments as part of the
6  peer review process.
7        I made the decision not to
8  share it until it was a finished product
9  and also available through the public
10  record.
11    Q.    You could have shared it,
12  should you have chosen to do so, correct?
13    A.    I would have only done that
14  if I would have engaged my colleagues and
15  told them I was doing that, because I
16  would not take it upon myself to share
17  information that another laboratory had
18  generated prior to acceptance and
19  publication of that final paper without
20  engaging them in the discussion.  I
21  personally would have felt ethical issue
22  with that.
23        And I made the decision not
24  to bring Dr. Cherepanov and Dr. Rosta
25  into the conversation with respect to

1  sharing this article with legal counsel.
2    Q.    Is that the same reason that
3  you didn't mention this research in your
4  opening expert report in November 2019,
5  sir?
6    A.    I would think that's
7  correct.  That's basically the reason.
8    Q.    Is your opening expert
9  report from 2019 public?
10    A.    It is not.
11    Q.    What stopped you from
12  discussing research from other labs in
13  your opening expert report in 2019?
14    A.    I'll restate my answer to
15  the question.  Especially in 2019, the
16  paper had just been initially submitted
17  for consideration for publication to the
18  journal of Science.  It had not undergone
19  the peer review process.  In a sense it
20  was still a draft manuscript at that
21  point in time.
22        We had not even received the
23  initial reviewers' reviews from the
24  scientific experts who eventually
25  reviewed the article.

1        At that point in time it was
2  a work in progress, and I -- and
3  personally, again, I would have felt it
4  ethically imperative if I decided to
5  share it with Desmarais LLP, to discuss
6  that with my colleagues.
7        Perhaps you're trying to
8  clarify with me, gee, you shouldn't have
9  had a conscience.  You should have just
10  shared it with your lawyers.  It's not a
11  public record.  But that's -- you know, I
12  took a different stance.  Hopefully you
13  understand that.
14    Q.    Your decision was, because
15  the research had not been made public and
16  was not peer reviewed, you would not
17  discuss it in your opening expert report?
18    A.    As it pertains to this
19  article, that's correct.
20    Q.    You understand that
21  Dr. Cherepanov had no trouble sharing the
22  data from this research when he was
23  asked, correct?
24        MR. WILCOX:  Objection.
25        Calls for speculation.

1  THE WITNESS:  Yes, I have
2  evidence provided to me through my
3  legal counsel that Dr. Cherepanov
4  had responded to a request from
5  expert witness from the defendant.
6  BY MR. MORTARA:
7  Q.  And did you ask
8  Dr. Cherepanov for his permission to
9  share the underlying data from this
10  article so you could use it in your
11  opening expert report?
12  A.  I did not.
13  Q.  If you had, do you think he
14  would have said yes?
15  A.  I can't --
16  MR. WILCOX:  Objection.
17  Calls for speculation.
18  THE WITNESS:  I can't
19  speculate to what he might have
20  answered to a question I didn't
21  ask him.
22  BY MR. MORTARA:
23  Q.  Why didn't you ask him?
24  A.  So when I drafted my opening
25  report, the paper in question had just

1  been submitted to the journal.  It had
2  not undergone the peer review process.
3  At that point it's a working draft.  And
4  the vast majority of the papers that I've
5  ever published, they can change rather
6  dramatically in terms of data content and
7  conclusions made in response to
8  reviewers' and editors' comments.
9  Personally felt it ethically
10  important that if I was going to share
11  data from other laboratories with an
12  outside source, in this case legal
13  counsel, Desmarais LLP, that I wouldn't
14  do that with first discussing the sharing
15  of those data with those colleagues, and
16  I made the decision not to have to then
17  explain to Dr. Cherepanov, to Dr. Rosta,
18  the reason why I wanted to share the
19  data.
20  THE VIDEOGRAPHER:  This is
21  TJ, the videographer.  Can we stop
22  for a second there.  I don't know
23  if I got the last answer.  I'm
24  having a blackout over here on my
25  recording device.

1  MR. MORTARA:  It's in the
2  transcript.  And candidly, the
3  video is of less of importance.
4  Do you need to stop to make it
5  work?
6  THE VIDEOGRAPHER:  If you
7  can give me about two minutes,
8  we'll be good to go.
9  MR. MORTARA:  Sure.  Why
10  don't we go off the record and let
11  the videographer reboot.
12  THE VIDEOGRAPHER:  Thank
13  you.
14  (Whereupon, a discussion was
15  held off the record.)
16  THE VIDEOGRAPHER:  The time
17  is 11:40 a.m. Eastern time, and we
18  are on the video record.
19  BY MR. MORTARA:
20  Q.  Dr. Engelman, the vast
21  majority of the papers that you ever
22  published can change rather dramatically
23  in terms of data content and conclusions
24  made in response to reviewers' and
25  editors' comments, correct?

1  A.  That's correct, as it
2  pertains to the period of time that
3  encompasses the peer review process.
4  Q.  And you made a decision that
5  you would not discuss the experiments
6  represented in Exhibit 9, the Cherepanov
7  Science article, without first asking
8  Dr. Cherepanov and Dr. Rosta, correct?
9  A.  That was my -- that's the
10  way I felt about it at the time.  That's
11  correct.
12  Q.  And the reason that you
13  decided not to ask them for permission to
14  use the data in your opening report is
15  that you did not want to have to explain
16  to them why you wanted to share the data;
17  is that correct?
18  A.  I think that's accurate.
19  That's correct.
20  Q.  Dr. Engelman, in Exhibit 9,
21  you again disclose that you receive fees
22  from ViiV Healthcare.  And I'm blowing it
23  up on the screen.  It's on the last page.
24  "ANE reports fees from ViiV Healthcare."
25  Do you see that?

Page 98

1    A.   That's correct.
2    Q.   And, "No authors declare
3  competing interests."
4       Do you see that?
5    A.   I do see that.
6    Q.   We talked about what that
7  means to you.  You're a corresponding
8  author on this publication, correct?
9    A.   That's correct.
10    Q.   And it's your responsibility
11  to ensure that the disclosures are
12  accurate to the best of your ability,
13  correct?
14    A.   That's correct.  Especially
15  as it pertains to the people in my
16  laboratory who I collaborate with on this
17  paper.
18    Q.   To the best of your
19  knowledge, none of the other authors were
20  receiving money from any competing
21  interests or pharmaceutical company,
22  correct?
23    A.   That's correct.

Page 99

15    Q.   Now, you cite several
16  references in this article, correct?
17    A.   Yes, we do.
18    Q.   Which was finally published
19  after an extensive review period on
20  January 30, 2020, correct?
21    A.   That's correct.
22    Q.   And the fourth article in
23  this publication went up in January 2020.
24  It's again Stephen Hughes NIH article,
25  correct?

Page 100

1    A.   That's correct.
2    Q.   Does your public and peer
3  reviewed February 2020 article in Science
4  say that the Stephen Hughes NIH article
5  is riddled with meaningful errors and
6  misconceptions?
7    A.   Well, I don't -- I don't
8  think it would.  I don't think it would
9  ever do that.  I think if I really felt
10  that work should be retracted from the
11  literature, that would be a very formal
12  proceeding, I wouldn't state it in a
13  paper.  I would have to contact journal
14  editors that published the paper.
15    Q.   Does your public and peer
16  reviewed February 2020 article in Science
17  say that the Stephen Hughes article is
18  riddled with meaningful errors and
19  misconception?
20    A.   No.
21    Q.   I asked you earlier if you
22  shared a draft of the data or manuscript
23  of this article with ViiV's counsel.  Did
24  you share it with anyone outside of the
25  listed authors before it was published?

Page 101

1    A.   To the best of my
2  recollection, I did not.
3    Q.   You didn't ask for anybody's
4  opinion about the manuscript?
5       I see you're looking at the
6  acknowledgment section, sir.  There's a
7  thing to A. Costa for critical reading of
8  the manuscript.  Do you see that?
9    A.   A. Costa for critical
10  reading of the manuscript.  That's
11  correct.
12    Q.   And the subject of that
13  sentence is, "We are grateful," correct?
14    A.   That's correct.
15    Q.   And that's we, that's all of
16  you, all the authors, correct?
17    A.   That seems to be the
18  interpretation of the word "we."
19    Q.   And it at least includes you
20  and Dr. Cherepanov, the corresponding
21  authors, who drafted the manuscript,
22  correct?
23    A.   I think that's the language
24  as written.  That's the meaning that
25  should be taken.  Perhaps it should have

Page 102

1 been restated, Dr. Cherepanov is grateful
2 for -- to A. Costa for critical reading
3 of the manuscript.
4         Because I assume, without
5 knowing that it was Dr. Cherepanov who
6 shared the manuscript with Dr. Costa, I
7 certainly did not.
8     Q.   So who is Dr. Costa?
9     A.   Dr. Costa, I believe, is a
10 colleague of Dr. Cherepanov's at the
11 Francis Crick Institute.
12    Q.   Is he on the paper, is he an
13 author?
14    A.   Not on this paper.  But
15 Dr. Cherepanov and I have published with
16 Dr. Costa previously.
17    Q.   Did you see Dr. Costa's
18 comments on -- after his critical reading
19 of the manuscript?
20    A.   I did not.
21    Q.   Did Dr. Cherepanov ask you
22 or Dr. Rosta for permission before he
23 shared the data with Dr. Costa?
24    A.   I don't know.  I'm not privy
25 to conversations between Dr. Cherepanov

Page 103

1 and Dr. Costa.  But I do not recall that
2 he asked my permission.
3     Q.   Does that concern you, that
4 he did not consult with you and Dr. Rosta
5 before he shared the data with Dr. Costa
6 for his comments on the manuscript?
7     A.   No, it does not.
8     Q.   And yet you were concerned
9 to the point that you didn't even ask
10 Dr. Rosta or Dr. Cherepanov for the
11 ability to cite this data in your opening
12 highly confidential expert report,
13 correct?
14    A.   That's correct.
15    Q.   And those two, Exhibit 13
16 and Exhibit 9, the Engelman 2019 article
17 and the Cherepanov 2020 Science article,
18 aren't the only two times you have cited
19 the NIH Stephen Hughes article, are they?
20    A.   It's possible it's not the
21 only times, that's correct.

Page 104

3     Q.   I'm going to put into the
4 shared folder Exhibit 19.
5         (Document marked for
6 identification as Exhibit
7 Engelman-19.)
8         (Document marked for
9 identification as Exhibit
10 Engelman-40.)
11        THE WITNESS:  Can I qualify
12 my answer to the last question?
13 BY MR. MORTARA:
14    Q.   You can say anything you'd
15 like, sir.
16    A.   Oh.  As we highlighted when
17 we looked at the nature under which I
18 cited the Smith 2018 retrovirology
19 article in my 2019 -- Engelman 2019, I
20 stand by that citation, that -- and if we
21 can bring that up.  I don't want to
22 misquote myself.
23    Q.   Well, you can return to that
24 material with your lawyer on your own
25 time if you wish to.  I'm asking about

Page 105

1 the opinions in your report and I've
2 gotten answers to my questions.  If you
3 want to come back when I'm done with
4 Mr. Wilcox and talk about that, you can.
5         I want to move on now to
6 another article of yours, the Koneru 2019
7 article, Exhibit 19 to the deposition.
8 That is in the shared article now.
9         You are an author on this
10 article, correct?
11    A.   That's correct.
12    Q.   And this article was
13 published in May of 2019, correct?
14    A.   That's correct, 23rd of May.
15    Q.   And it -- it is public and
16 peer reviewed, correct?
17    A.   That's correct.
18    Q.   And part of your role in
19 this article was reviewing and editing
20 it, correct?
21    A.   Writing, review and editing,
22 that's correct.
23    Q.   And who is Dmitry Lyumkis?
24    A.   Dmitry Lyumkis is an
25 assistant professor at the Salk Institute

Page 106

1  of Biological Sciences.
2      Q.   Respected scientist, Dmitry
3  Lyumkis?
4      A.   He is a young scientist,
5  he's still an assistant professor.  But I
6  think at the level that his career has
7  initiated, he is a respected individual.
8      Q.   You think enough of him to
9  have helped make him a subcontractor or
10  subgrantee on one of your NIH grants; is
11  that right?
12      A.   He is a subcontractor on one
13  of my NIH grants, that's correct.
14      Q.   Meaning you thought he was a
15  pretty good scientist, right?
16      A.   I agree.
17      Q.   Now, in this published and
18  peer reviewed article you cite the
19  Stephen Hughes NIH article as well,
20  correct?
21      A.   I don't recollect that.  But
22  it looks like we can look it up, because
23  we have the paper on the screen.
24      Q.   If you look at Page 27, I
25  think it's right there.  From

Page 107

1  Retrovirology, 2018?
2      A.   Could you remind me of the
3  exhibit number here?
4      Q.   For the Hughes NIH article
5  that's riddled with meaningful errors and
6  misconceptions, or this one?
7      A.   This one.
8      Q.   This is Exhibit 19 --
9      A.   Okay.
10      Q.   -- I believe.  Exhibit 19,
11  your article from 2019 which cites the
12  Hughes article from 2018.
13      A.   Yeah, I'm just calling it up
14  on my left screen.
15      Q.   Can you answer my question,
16  sir, which is just that, does the Koneru
17  article of which you are an author cite
18  the Stephen Hughes 2018 NIH article?
19      A.   It does.
20      Q.   Nowhere in this public and
21  peer reviewed article did you or the
22  other authors say that Stephen Hughes
23  2018 NIH article is riddled with
24  meaningful errors and misconceptions,
25  correct?

Page 108

1      A.   I believe I've already
2  testified that such information did not
3  come to my light until I -- until I
4  started working deeply on my opening
5  report in late summer of 2019, which was
6  several months after this article, or at
7  least a couple months after this article
8  was published.
9      Q.   And several months before
10  the publication of the Cherepanov Science
11  2020 article, Exhibit 9, correct?
12      A.   We had submitted the
13  Cherepanov 2020 Science article about a
14  month or two before I started diving
15  deeply into the literature to begin to
16  opine in my opening report.  I believe
17  that --
18      Q.   You could -- go ahead.
19      A.   I believe that was initially
20  submitted for publication in June 2019.

Page 109

1  when I cited it in Engelman 2019, I cited
2  it to make the point that cabotegravir is
3  slightly less effective at inhibiting
4  mutant viruses than is dolutegravir and
5  bictegravir.  Even though I've now
6  covered more errors in the Hughes 2019
7  article, which calls into question
8  whether or not the paper should perhaps
9  be retracted, I have not initiated that
10  business, nor have I decided when and
11  where I might initiate that business.
12          I stand by -- I would stand
13  by the interpretation.  Even with all the
14  riddled errors, the message that
15  dolutegravir as well as the message in
16  that paper that raltegravir and
17  elvitegravir are less efficient at
18  inhibiting the infection of certain
19  integrase mutant viruses, which is
20  representative in the Hughes -- the Smith
21  2018 paper, is generally accurate.
22          So not everything in the
23  Smith 2018 article as discussed in my
24  reports is inaccurate.  Some aspects, as
25  I opined in the reports, are inaccurate.

Page 110

1    Q.   Dr. Engelman, this article
2  that you were on in 2019 mentions
3  dolutegravir, correct?
4    A.   That's correct.
5    Q.   It also mentions, I think,
6  bictegravir, correct, at the bottom
7  there?
8    A.   Yes, it's mentioned there.
9    Q.   Why didn't you disclose to
10 this journal that you were receiving fees
11 from ViiV healthcare in an article that
12 mentions both drugs?
13   A.   I gave that information to
14 the corresponding author.
15   Q.   Is it your responsibility to
16 make sure that information appears in the
17 article or the corresponding author's?
18   A.   I recall supplying that
19 information to the corresponding author.
20   Q.   Have you taken any steps to
21 correct the fact that your competing
22 interest does not appear in this article?
23   A.   I was unaware it doesn't
24 appear, because I recall providing that
25 information.  But since I was unaware, I

Page 111

1  haven't taken any steps.
2    Q.   Dr. Engelman, I'm going to
3  now put into the shared exhibits folder
4  Exhibit 24, which is going to be the
5  Lyumkis Science article, with which I
6  understand that you are familiar,
7  correct?
8    A.   I am familiar with it.
9         (Document marked for
10        identification as Exhibit
11        Engelman-24.)
12 BY MR. MORTARA:
13   Q.   Let us know when you have
14 it, sir.
15   A.   I have it.
16   Q.   And this is again the Dmitry
17 Lyumkis we talked about that, the young
18 scientist for which you have such high
19 regard that you made him a subcontractor
20 on one of your NIH grants, correct?
21   A.   That's correct.
22   Q.   And who is Robert Craigie?
23   A.   He's another scientist at
24 the NIH.  I worked --
25   Q.   Friend of yours?

Page 112

1    A.   I worked with Robert
2  Craigie.  I trained with him between 1990
3  and 1995.  And we have stayed in touch.
4  And I would characterize him as a friend.
5    Q.   You used to work in Robert
6  Craigie's lab, right?
7    A.   That's correct.
8    Q.   You published about a dozen
9  articles with him.  Would you say that's
10 right?
11   A.   I don't have the precise
12 number at hand.  If you know that, I
13 would not disagree.
14   Q.   You collaborate with
15 Dr. Robert Craigie quite frequently,
16 correct?
17   A.   We have published a paper
18 recently together.  The extent of our
19 collaboration is not as extensive as some
20 of the other scientists we've discussed
21 today.
22   Q.   And of course Dr. Stephen
23 Hughes is on this article as well,
24 correct?
25   A.   That's correct.

Page 113

1    Q.   If you go to the back, which
2  is a four-page piece, so more lengthy to
3  yours.  Page 4, there is an author
4  contributions section.
5         Do you see that?
6    A.   Getting there.  Yes.
7    Q.   And it says that amongst
8  others, Dmitry Lyumkis wrote the
9  manuscript with help from all the
10 authors.
11        Do you see that?
12   A.   I see that Lyumkis, DOP, and
13 IKJ wrote the manuscript with help from
14 all authors.
15   Q.   So among others, Dmitry
16 Lyumkis wrote the manuscript with help
17 from all the -- all the authors, correct?
18   A.   That's correct.
19   Q.   And it says here in
20 competing interests, there's -- some of
21 the authors are inventors on a
22 provisional patent application.
23        Do you see that?
24   A.   It looks like the four
25 authors from the Smith 2018 paper.

Page 114

1    Q.   And no one disclosed there
2  that they're being paid by any
3  pharmaceutical companies, correct?
4    A.   That's what it looks like.
5    Q.   Reference 25 in the Lyumkis
6  Science article is again the Stephen
7  Hughes 2018 NIH article, correct?
8    A.   That's correct.
9    Q.   And this Reference 25, I
10  think you know, is cited for the
11  proposition that bictegravir is the most
12  broadly potent of all clinically approved
13  INSTIs.
14      Do you see that?
15    A.   I see it, but I don't agree
16  with it.
17    Q.   All these scientists on this
18  article are comfortable citing the Hughes
19  2018 NIH article for the proposition that
20  bictegravir was the most broadly potent
21  of all clinically approved INSTIs,
22  correct?
23    A.   That's correct.  But
24  throughout my professional career, I've
25  surely -- I've come into contact many

Page 115

1  times when individual scientists, even in
2  publications, make conclusions that I
3  don't agree with.
4    Q.   It's not just Stephen Hughes
5  on this article or the authors of the
6  Hughes 2018 NIH article that are authors
7  here.  It includes Dmitry Lyumkis and
8  Robert Craigie, correct?
9    A.   That's correct.
10    Q.   Did you tell Lyumkis or
11  Craigie that there are meaningful errors
12  and misconceptions in the 2018 NIH
13  article?
14    A.   To date I have not done
15  that.
16    Q.   Have you told the editors of
17  Science that no one should be citing the
18  2018 NIH Hughes article for this
19  proposition because there's meaningful
20  errors and misconceptions?
21    A.   So I already discussed, that
22  would be improper business practice.
23    Q.   Did you do it?
24    A.   I don't undertake improper
25  business practices as a normal course of

Page 116

1  business.
2    Q.   When was the last time you
3  communicated with Stephen Hughes?
4    A.   I probably would have seen
5  Dr. Hughes in person in May 2019 in Long
6  Island at a national meaning that we tend
7  to both regularly attend.  That meeting
8  was to be taking place next week.  But
9  it's been canceled.  It will be held
10  virtually, and I don't plan to attend it.
11      That's -- to the best of my
12  recollection, the last time I
13  communicated with him is when I saw him
14  in person at a conference.  I don't
15  recollect communicating with him since
16  May 2019.
17    Q.   You have his e-mail, right?
18    A.   I think his e-mail is public
19  record.
20    Q.   You have his phone number,
21  right?
22    A.   I don't have his phone in my
23  smartphone, but I'm sure with some effort
24  I could discover his phone.
25    Q.   You called him, in your

Page 117

1  expert reports in this case, a good
2  friend.  He's a good friend of yours,
3  right?
4    A.   He's a friend of mine.
5    Q.   Have you told your good
6  friend that you've uncovered -- that his
7  2018 article that's being cited
8  repeatedly by you and others, is riddled
9  with meaningful errors and
10  misconceptions?
11    A.   I haven't done that.  That's
12  a sensitive issue for me.  He is a
13  long-term colleague.  I've discovered or
14  uncovered some meaningful issues.  And
15  this publication and other publications
16  that are recycling data for up to a
17  decade, I have not -- and I will make a
18  decision at one point in time whether or
19  not I will contact journal editors with
20  that information or directly talk to
21  Dr. Hughes about that.
22      MR. MORTARA:  I also move
23  to strike that answer as
24  nonresponsive and also disclosing
25  opinions not in your expert

1    report.
2         And I'm sure Mr. Wilcox
3    will, of course, disagree.  We'll
4    take that up with the court later.
5    BY MR. MORTARA:
6         Q.   My question to you, sir --
7              MR. WILCOX:  Yeah, I'll put
8    that on the record, I do disagree
9    and we will take that up later.
10   BY MR. MORTARA:
11        Q.   My question to you, sir, is
12   just yes or no.
13        Have you called your good
14   friend and in a one-on-one conversation
15   told him that his 2018 article is riddled
16   with errors and misconceptions?
17        A.   I have not.
18        Q.   Dr. Engelman, your expert
19   report in this case is highly
20   confidential, isn't it?
21        A.   It is.
22        Q.   Dr. Engelman, your work for
23   ViiV's lawyers in this case, you are
24   being paid for that work, correct?
25        A.   I'm being paid for the time

1    spent.
2         Q.   And you are being paid for
3    the reports you generated, correct?
4         A.   Part of the time I spent
5    generating reports, that's correct.
6         Q.   So when you are being paid
7    by ViiV's lawyers to write non-public
8    expert reports, you are willing to say
9    that the NIH 2018 Hughes article is
10   riddled with errors and misconceptions,
11   but you are unwilling to call him up and
12   say that to date, correct?
13        A.   To date, I have not called
14   him up and said that.
15        Q.   Dr. Engelman, I want to
16   return to Exhibit 25 which is the Hughes
17   NIH 2018 article.  And I want to talk
18   about your history with this piece.
19        A.   I wish I knew how to quickly
20   keep that up for reference.
21        Q.   It's 20 -- it's 25.  Just
22   take your time, sir.
23        A.   My screen goes blank a lot.
24   Which -- which icon should I click to get
25   it back?

1              MR. MORTARA:  That's a
2    question for FTI.
3              THE VIDEOGRAPHER:  I'm
4    working on that now.  Let me go
5    ahead and fix that for you,
6    Doctor.
7              THE WITNESS:  Some
8    instruction on how to toggle
9    between PDFs without losing the
10   screen would be helpful.
11   BY MR. MORTARA:
12        Q.   We can take that up at the
13   next break or at lunch even, if you -- if
14   you wish to share some of your lunchtime
15   with technical assistance, Dr. Engelman.
16        Speaking of which, I'm in
17   Chicago and it's noon.  You are out east
18   where it's 1 o'clock.  Please tell me
19   when you need to have lunch.
20        A.   Actually it's noon time here
21   as well.
22        Q.   Oh great.  I thought you
23   were in -- where are you again?
24        A.   I'm in Massachusetts.
25        Q.   You know what, the time on

1    the realtime is your time, not my time.
2    No wonder I'm not hungry.
3         A.   Well, it's certainly noon at
4    sometime, right, somewhere.
5         Q.   You know, time flies when
6    you're having fun.
7         A.   I'm having fun.
8         Which -- which one are we
9    talking about now?
10        Q.   Who is asking that question?
11        A.   This is Dr. Engelman.
12        We're going back, Smith 2018
13   is?
14        Q.   Yeah, it's Exhibit 25.
15        A.   Thank you.  Okay.
16        Q.   All right.
17        A.   I have it on the screen.
18        Q.   You saw a draft of this
19   article before it was published, isn't
20   that right?
21        A.   If you're asking whether or
22   not I served as a reviewer for this
23   article, that's not my recollection.
24        Q.   You were not a reviewer of
25   this article?

Page 122

1    A.    To the best of my
2  recollection, I was not.
3    Q.    You might have been a
4  reviewer for this article?
5         MR. WILCOX:  Objection.
6  Asked and answered.
7         THE WITNESS:  I do not
8     recall reviewing this article.
9     I -- you know, to be able to
10    answer a question like that in
11    absolute certainty, I'd have to
12    review my notes.
13 BY MR. MORTARA:
14   Q.    But that's not actually my
15 question.  My question is, didn't you see
16 a draft of this article before it was
17 published in Retrovirology?
18   A.    That's not my recollection.
19   Q.    What journal was this
20 article published in, Dr. Engelman?
21   A.    Retrovirology.
22   Q.    Aren't you on the editorial
23 board of Retrovirology?
24   A.    I am.
25   Q.    You agree that Retrovirology

Page 123

1  is a prominent journal, correct?
2    A.    I would -- I would
3  characterize it as a mid tier journal.
4    Q.    No, you agree that it's a
5  prominent journal, don't you, sir?
6         MR. WILCOX:  Objection.
7  Asked and answered.
8         THE WITNESS:  I disagree
9     it's a prominent journal.
10    Prominent journals are journals
11    such as Cell, Science, and Nature.
12       We -- we have a tendency in
13    the field to think about journals
14    at different ranks, where we would
15    like our best work to be seen and
16    read, and surely no -- none of my
17    colleagues would agree that their
18    best work would be sent to
19    Retrovirology.
20 BY MR. MORTARA:
21   Q.    You don't agree that
22 Retrovirology is a prominent journal,
23 correct?
24   A.    I stick by my assertion that
25 I think of Retrovirology as a good mid

Page 124

1  tier journal.
2    Q.    You are familiar with
3  Retrovirology's peer review process, are
4  you not?
5    A.    I have reviewed for them in
6  the past.
7    Q.    Do you agree that
8  Retrovirology publishes stringently peer
9  reviewed articles?
10   A.    I agree that the articles
11 that are published in Retrovirology
12 undergo peer review, that's correct.
13   Q.    Do you agree that the review
14 is stringent?
15   A.    In my -- in my experience,
16 some reviewers are quite stringent in
17 their reading and their comments, while
18 other reviewers are significantly less
19 stringent.  So it's a -- I think it's a
20 term the journal would like to always be
21 able to apply, but in my experience, the
22 opinions of different reviewers, when
23 they read articles, can -- can vary
24 greatly.
25   Q.    You agree that the 2018 NIH

Page 125

1  Hughes article was peer reviewed by your
2  colleagues at Retrovirology, a journal on
3  which you serve on the editorial board,
4  correct?
5    A.    Well, to the best of my
6  knowledge.  I'm not privy to the
7  information of the process under which
8  this paper was received, reviewed by
9  editors, and then eventually published.
10       I might assume that that was
11 the case, but I'm -- I'm not privy to
12 that information.
13       And I'm 99.99 percent sure I
14 did not review this paper.  But I can't
15 be absolutely sure without reviewing
16 notes.
17   Q.    Dr. Engelman, you have your
18 opening expert report in front of you,
19 correct?
20   A.    That's correct.
21   Q.    Could you please turn to
22 Page 2.
23   A.    Page 2 --
24   Q.    Paragraph 10.  Do you see
25 that?

Page 126

1    A.   Yep.

2    Q.   Second sentence says, "I
3 currently serve on the editorial boards
4 of several prominent molecular biology,
5 virology, pharmacology journals,
6 including Nucleic Acids Research, Journal
7 of Virology, Retrovirology, and
8 Antimicrobial Agents and Chemotherapy."
9        Do you see that?

10   A.   I do.

11   Q.   In your own expert report in
12 this case, in November, you described the
13 Retrovirology journal as prominent,
14 correct?

15   A.   That's correct.

16   Q.   Yet you just told me a few
17 minutes ago, you don't think it's
18 prominent.  Which is it?

19   A.   Well, I would agree with the
20 statement in my opening report,
21 especially as -- as it applies to Nucleic
22 Acids Research, which I feel is a more
23 prominent journal than Retrovirology.
24 But in my opening report I didn't go into
25 such details.

Page 127

1    Q.   And you would agree that the
2 journal on which you are a contributing
3 editor describes its review process as
4 stringent, wouldn't you?

5    A.   Could you -- could you show
6 me that information from the journal
7 website before I comment?

8    Q.   Absolutely, sir.  I'm going
9 to move into the admitted exhibits,
10 Exhibit 36 which is, as you requested, a
11 printed version of the prominent journal
12 Retrovirology's website.

13       (Document marked for
14       identification as Exhibit
15       Engelman-36.)

16 BY MR. MORTARA:

17   Q.   Let me know when you have
18 it.

19   A.   I see it on the rightward
20 screen.  I don't see it on the leftward
21 screen, but I can see it on the rightward
22 screen.

23   Q.   Great.  Over here on the
24 third page, you can see a discussion of
25 the peer reviewed policy.

Page 128

1    A.   Okay.

2    Q.   Do you want to take a look
3 at that?

4        Do you agree with the
5 statements being made about the peer
6 reviewed process in Retrovirology?

7    A.   Yes, I agree with -- I agree
8 with the policy statement.

9    Q.   Do you agree that
10 Retrovirology operates a stringent peer
11 review system?

12   A.   I don't see that language.

13   Q.   I'm just asking if you agree
14 it's stringent or not.

15       MR. WILCOX:  I'm going to
16 object.  The question is
17 ambiguous.

18       THE WITNESS:  I've already
19 answered that, that in my vast
20 experience as a reader for journal
21 articles, that I see a critical
22 array of critical reviews provided
23 by individual scientists who serve
24 as reviewers.

25       Some of those reviews are

Page 129

1 stringent.  Many reviews are less
2 stringent.

3 BY MR. MORTARA:

4    Q.   Have you told the journal
5 editors of Retrovirology that you don't
6 agree with any portion of their website?

7    A.   I have not.

8    Q.   Would you please go to the
9 first page of the website where it talks
10 about Retrovirology.

11   A.   Do I have access to the web?

12   Q.   It's right here in
13 Exhibit 36, sir.

14   A.   Okay.

15   Q.   Retrovirology.  It's an open
16 access online journal that publishes
17 stringently peer-reviewed high-impact
18 articles.

19       Do you see that?

20   A.   I do see that.

21   Q.   You disagree with the
22 statement that your colleagues at
23 Retrovirology, a journal on which you
24 serve on the editorial board, are making
25 about their peer review process; is that

1 right?
2      A.   I think the person who wrote
3 this, which was not me -- I did not write
4 this.  I was not asked for my input on
5 this verbiage that you've shown on my
6 rightward screen.  I believe the people
7 that did write this -- it just
8 disappeared.
9      Q.   Go ahead and answer, sir.
10      A.   Well, I'd like to answer
11 with the verbiage in front of me.
12      Q.   Sure.  I'll put it up in a
13 second.
14      A.   Yes.  I believe that the
15 people who did write this -- again, it
16 was written without my input -- would
17 surely like to believe that they are
18 publishing high-impact articles.  But I
19 think that's a pipe dream on their -- on
20 their perspective.
21           I think my expert opinion is
22 that the high impact articles in my field
23 are targeted to journals such as Cell,
24 Science, and Nature.
25      Q.   Dr. Engelman I've placed

1 Exhibit 37 into the shared folder.
2           (Document marked for
3      identification as Exhibit
4      Engelman-37.)
5 BY MR. MORTARA:
6      Q.   And that's a listing of the
7 editorial board of the Retrovirology
8 journal.  You can see it on the screen,
9 your name appears on the second page.
10 You are a member of the editorial board,
11 correct?
12      A.   That's correct.
13      Q.   At any time, have you
14 communicated to any of your colleagues on
15 the Retrovirology editorial board that
16 the 2018 NIH Hughes article that they
17 published is riddled with meaningful
18 errors and misconceptions?
19      A.   I have not.
20      Q.   You do not feel that you
21 have a responsibility as a member of the
22 editorial board to communicate these
23 views to the journal that published the
24 article?
25           MS. HORWITZ:  Adam, you can

1 see on your screen.
2           THE WITNESS:  Excuse me?
3 BY MR. MORTARA:
4      Q.   You did not feel that you
5 have a responsibility to communicate your
6 conclusions about this article to the
7 editors of the journal on which you serve
8 on the editorial board?
9      A.   Some of the most blatant
10 misconceptions and data misuses that
11 appear in this article have come to light
12 only in the recent past one or two weeks.
13 I have not yet made a
14 decision whether or not I will contact
15 the editors of the journal about these
16 discoveries.
17      Q.   I am simply asking you,
18 whether you think it's your
19 responsibility to tell your fellow
20 editors at Retrovirology that the Stephen
21 Hughes 2018 article contains, as you put
22 it in your supplemental report, "It is
23 riddled with meaningful errors and
24 misconceptions."
25           Do you consider that to be

1 your responsibility or not?
2           MR. WILCOX:  Objection.
3      Asked and answered.
4           THE WITNESS:  I have not
5      come to a final conclusion whether
6      or not I will take that action.
7 BY MR. MORTARA:
8      Q.   And to be fair to you,
9 Dr. Engelman, you concluded that the
10 Stephen Hughes NIH 2018 article was
11 riddled with meaningful errors and
12 misconceptions while you were preparing
13 your expert reports in this case,
14 correct?
15      A.   That's correct.  That's --
16 that's during the time under which I
17 generated that opinion.
18      Q.   Have you called the National
19 Institutes of Health and told them that
20 Stephen Hughes' 2018 article is riddled
21 with meaningful errors and
22 misconceptions?
23      A.   I have not.
24      Q.   Have you discussed the
25 possibility of you taking action with

1 respect to the NIH 2018 article with any
2 of ViiV's lawyers?
3      A.   Outside --
4          MR. WILCOX:  Let me -- wait.
5      Wait, Doctor.  You know, I'm going
6      to object to this question.  You
7      know, it goes to Rule 26
8      protections.
9          And Dr. Engelman, you should
10     not answer it.
11         MR. MORTARA:  Mr. Wilcox,
12     his reports don't discuss taking
13     any such action.  So I don't know
14     how that could be a communication
15     about a draft report.  If you
16     would permit him to answer the
17     question, then we won't have to
18     seek relief from the court and
19     bring him back later like with
20     Kawasuji.
21         MR. WILCOX:  I'll take that
22     under advisement, but at this
23     point I'm going to instruct him
24     not to answer.
25 BY MR. MORTARA:

1      Q.   Dr. Engelman, is it fair to
2 say that to date, as in up to today, you
3 have been unwilling to put your
4 professional reputation on the line by
5 subjecting your own criticisms of the
6 Hughes NIH 2018 article to public
7 scrutiny, correct?
8          MR. WILCOX:  Objection.
9      Argumentative.
10         THE WITNESS:  If I was going
11     to pursue this matter, beyond to
12     which I have to date, my first
13     step in that approach would be to
14     contact the editors of the
15     journals where I think
16     publications are significantly
17     flawed.
18 BY MR. MORTARA:
19     Q.   And you haven't done that to
20 date, have you?
21     A.   That's correct.
22     Q.   I want to now move to
23 statements in the article and confirm
24 your disagreements with those statements.
25         The very first of those

1 appears in the abstract in the results
2 section.  "Overall, in terms of their
3 ability to inhibit a broad range of
4 INSTI-resistant mutants, BIC was superior
5 to dolutegravir, and dolutegravir was
6 superior to CAB."
7          Do you see that?
8      A.   I do see that.
9      Q.   If I understand you
10 correctly, you don't have any problem
11 with the idea that dolutegravir was
12 superior to CAB, right?
13     A.   So in forming my opinions
14 for this case, I did not just focus on a
15 single article.  As opined in my reports,
16 I reviewed over 400 documents and came to
17 a consensus conclusion about the work
18 related to this case from looking at
19 numerous peer-reviewed publications, one
20 of them being this article.
21         My assessment of the data
22 that's been freely available to me
23 through the published literature, or
24 through documents provided by counsel, is
25 that in general, dolutegravir is superior

1 to cabotegravir.  However, there are
2 instances in other papers that would tend
3 to indicate that that's not always the
4 case.
5      Q.   Dr. Engelman, you disagree
6 with the statement here, "BIC was
7 superior to dolutegravir," correct?
8      A.   My interpretation of the
9 data presented in this article, that
10 tested the activities of five different
11 integrase inhibitors against 57 different
12 integrase mutant viruses, and then
13 assessed the statistical and numerical
14 significance of activities via comparing
15 EC50 values in head-to-head analyses by,
16 I believe, the students' T test, was that
17 out of those 57 tested mutant viruses,
18 dolutegravir was superior to bictegravir
19 for 10 of the 57 mutant viruses, and
20 bictegravir was superior to dolutegravir
21 for 14 of the mutant viruses.
22     Q.   My question, Dr. Engelman,
23 is fairly simple.
24         Do you agree that
25 bictegravir is superior to dolutegravir

Page 138

1 in terms of its in vitro ability to
2 inhibit a broad range of INSTI resistant
3 mutants?
4     A.   Well, as opined in my
5 report, taking into account numerous
6 publications and other documents that
7 were provided to me, I disagree with that
8 statement.
9     Q.   Do you agree that based on
10 the data presented in this article,
11 bictegravir is superior to dolutegravir
12 in terms of its in vitro ability to
13 inhibit a broad range of INSTI resistant
14 mutants?
15     A.   Well, I disagree with that,
16 because when looking at the data
17 carefully, which I've done at numerous
18 times in my two different reports,
19 especially in my reply report, where I
20 broke down the different mutants that
21 were discussed at length in this article,
22 based on reported P-values.  And went
23 through those one by one in different
24 sets and came to the conclusion that
25 there was no substantial difference in

Page 139

1 the reported values of bictegravir versus
2 dolutegravir to inhibit the 57 integrase
3 mutant viruses that were the subject of
4 this paper.
5     Q.   Dr. Engelman, hold one
6 moment.  That means you disagree based on
7 the data presented in this article with
8 the statement in the abstract that
9 bictegravir is superior to dolutegravir
10 in terms of its ability -- its in vitro
11 ability to inhibit a broad range of INSTI
12 resistant mutants, correct?
13     A.   Yes.  That's my expert
14 opinion.
15     Q.   Would you admit that
16 bictegravir is better than dolutegravir
17 in terms of its ability to broadly
18 inhibit the known integrase mutants based
19 on the data in this article?
20     A.   My expert opinion took into
21 account numerous published articles.  And
22 I am only willing to comment on the
23 behavior of dolutegravir and bictegravir
24 when I take all the data at hand into
25 consideration.

Page 140

1     Q.   Did you take all the data
2 available to you in hand when rendering
3 your expert opinions in this case?
4     A.   I did.
5     Q.   You did not take into
6 consideration in your opening expert
7 report the data you had in hand from the
8 Science manuscript, did you?
9     A.   I did not include the data
10 from the Science manuscript in my opening
11 report for reasons discussed.
12         If I had taken that data at
13 hand, as I have now in my, I believe
14 reply and supplemental report, it does
15 not change my opinion.
16     Q.   Did you, otherwise, take
17 into account all the data available to
18 you?
19     A.   I took into account the
20 approximate 400 documents that are
21 enumerated, specifically under Exhibit B
22 in my opening report and reply report.
23     Q.   Sorry, sir, my realtime.  I
24 just need to check the transcript.  It's
25 not coming up.

Page 141

1         MR. MORTARA:  Madam court
2     reporter, I'm having a problem
3     with the realtime.  Oh, got it.
4 BY MR. MORTARA:
5     Q.   Did you attempt to take into
6 account all the data available to you
7 when rendering your expert opinions in
8 this case?
9         MR. WILCOX:  Objection.
10     Asked and answered.
11         THE WITNESS:  As I -- as I
12 recently said, I took into account
13 the approximate 400 documents that
14 are tabulated specifically in the
15 Exhibit B of my opening report and
16 my reply report.
17         Approximately 125 of those
18 documents, of the 400 that I
19 considered, discussed dolutegravir
20 or bictegravir.
21         I additionally took into
22 account in vitro antiviral potency
23 data from 14 separate reports,
24 either internal documents or
25 published papers, that encompassed

1   approximately 200 different
2   integrase mutant viruses.
3   BY MR. MORTARA:
4       Q.   Who decided what data you
5   would take into account in rendering your
6   expert opinions?
7       A.   I did.
8       Q.   Was there any data that you
9   asked for that you weren't given?
10      A.   No.
11      Q.   Do you think that there's
12  any data you could have considered but
13  chose not to?
14      A.   It's difficult for me to
15  speculate about things that I know
16  nothing about.
17      Q.   Are you aware of any data
18  you could have considered but chose not
19  to?
20      A.   I am unaware of things that
21  I am unaware of.
22      Q.   My question, sir, is, do you
23  know that there's additional data out
24  there that you could have considered for
25  purposes of your expert report, but you

1   chose not to do that, as you did in your
2   opening report with the draft materials
3   from the Science article?
4       A.   I do not know of any data
5   that I chose not to include.  I didn't
6   even choose not to include the data from
7   the Science paper in my opening report.
8   It was something I didn't even consider,
9   or barely considered.
10      Q.   Would you please turn to
11  page -- excuse me one second.  I'll try
12  to get to the page.  Page 8 of 18 of the
13  article.
14           I'm going to ask you about a
15  sentence that appears at the bottom of
16  the page.  It says -- when you're ready,
17  sir, just let me know -- "Thus, BIC was
18  superior to other INSTIs" -- the other
19  INSTIs in terms of its ability to retain
20  antiviral activity against this set of
21  triple mutants."
22           Do you see that?
23      A.   I see that on the screen.
24           I'm now going to turn to a
25  portion of my reply report that begins on

1   Page 47.
2           Could you remind me of the
3   exhibit of Smith 2018 please?
4       Q.   It's 25, sir.
5       A.   Okay.  Finally uploaded on
6   my left screen.  And what page number are
7   you on, please?
8       Q.   It is 8 of 18.
9       A.   Okay.  Sorry.
10      Q.   At the bottom.  The sentence
11  highlighted.
12           "Thus, BIC was superior to
13  the other INSTIs in terms of its ability
14  to retain antiviral activity against this
15  set of triple mutants."
16           Do you see that?
17      A.   I do.  And I am trying to
18  put that in context.
19           And now I believe I have the
20  context of the statement.
21      Q.   My question is, do you
22  agree, based on the data presented in the
23  Smith 2018 article, that bictegravir was
24  superior to cabotegravir and dolutegravir
25  in terms of its ability to retain

1   antiviral activity against this set of
2   triple mutants?
3       A.   Yeah, I have to apologize.
4   I don't want to answer until I fully know
5   what that statement refers to.  It's a
6   little awkward for me to be reading this
7   in realtime.  If I have the paper copy of
8   the paper in front of me, I would be more
9   familiar with that.  So I just have to
10  apologize.
11           I'm unwilling to answer the
12  question until I fully understand the
13  context of the statement.  So just give
14  me more time.
15           Now that I've had some time
16  to review the science, the sentence that
17  you have highlighted to, refers to, it
18  seems to me that from looking at
19  supplemental Table 7, at the back side of
20  this manuscript, is that applies -- that
21  statement, at best, could apply to half
22  of the viruses under experimentation.
23  The statistical analysis applied by the
24  authors indicates that bictegravir was
25  statistically numerically different from

Page 146

¹ dolutegravir to inhibit half of the
² viruses under study in this particular
³ experiment.
⁴         So it was superior to the
⁵ other INSTIs in terms of its ability to
⁶ retain antiviral activity against the set
⁷ of triple mutants.
⁸         I think that's misleading.
⁹     Q.   You believe it's misleading
¹⁰ to say that bictegravir was superior to
¹¹ the other INSTIs in terms of its ability
¹² to retain antiviral activity against this
¹³ set of triple mutants, while you
¹⁴ agree that bictegravir was superior for
¹⁵ half of them, for another half it was
¹⁶ not?
¹⁷     A.   That's -- that's one of the
¹⁸ issues with that statement, is that
¹⁹ dolutegravir and bictegravir were
²⁰ statistically insignificant in terms of
²¹ their ability to inhibit the infection of
²² the E138A/G140S/Q148H mutant virus.  They
²³ were statistically numerically
²⁴ insignificant in their ability to inhibit
²⁵ the infection of the G140S/Y143R/Q148H

Page 147

¹ virus.
²         They were statistically
³ insignificant in their abilities to
⁴ inhibit the infection of the
⁵ G140S/Q148H/N155R virus.
⁶         So that leaves three viruses
⁷ out of six, including T97A/G140S/Q148H.
⁸         I would direct your
⁹ attention to Page 48 in my reply report,
¹⁰ where I specifically discuss the in vitro
¹¹ activities of dolutegravir and
¹² bictegravir in their ability to inhibit
¹³ the infection of the T97A/G140S/Q148H
¹⁴ mutant virus.
¹⁵         My expert analysis indicates
¹⁶ that the fold change in activity of
¹⁷ dolutegravir to inhibit this triple
¹⁸ mutant virus is 34.9, and the fold change
¹⁹ of bictegravir to inhibit this mutant
²⁰ virus is 29.5.
²¹         Therefore, even though the
²² statistical analysis performed in Smith
²³ 2018 indicates that there is a P-value to
²⁴ indicate a statistical numerical
²⁵ difference in the in vitro activity of

Page 148

¹ bictegravir and dolutegravir to inhibit
² the infection of this one mutant virus,
³ my own analysis indicates that the fold
⁴ change values from 15.5 to 34.9 clearly
⁵ indicates that the in vitro activities of
⁶ these two drugs against that mutant virus
⁷ is rather meaningless, because neither
⁸ inhibitor can be considered to be active
⁹ against that virus.
¹⁰     Q.   Okay.  Dr. Engelman, you've
¹¹ just called the sentence that I've
¹² highlighted on Page 18 of Exhibit 25, the
¹³ 2018 NIH Hughes article, "Thus
¹⁴ bictegravir was superior to the other
¹⁵ INSTIs in terms of its ability to retain
¹⁶ antiviral activity against this set of
¹⁷ triple mutants," misleading, did you not?
¹⁸     A.   Well, I came to that
¹⁹ conclusion because, as we've discussed,
²⁰ three of the six mutant viruses it's
²¹ untrue.
²²     Q.   And could you please read
²³ the sentence that follows?
²⁴     A.   "BIC was the superior INSTI
²⁵ against this panel of triple mutants as

Page 149

¹ it had significantly better potencies
² against five triple mutant viruses in CAB
³ and three P-values less than 0.001, see
⁴ Figure 3, and additional file 1:S7B and
⁵ three triple mutants than DTG, P-values
⁶ less than .001.
⁷     Q.   That next sentence explains
⁸ what Dr. Hughes and his colleagues meant
⁹ by "superior performance against this set
¹⁰ of triple mutants," does it not?
¹¹     A.   I think it attempts to do
¹² that.  That's correct.
¹³     Q.   Is the highlighted sentence,
¹⁴ "Bictegravir was superior to the other
¹⁵ INSTIs in terms of its ability to retain
¹⁶ antiviral activity against this set of
¹⁷ triple mutants," misleading?
¹⁸     A.   Well, surely if I would have
¹⁹ been a peer reviewer of this article, I
²⁰ would have made that comment and asked
²¹ the authors to change their language.
²²     Q.   Is it misleading, sir?
²³     A.   Yes.
²⁴     Q.   Okay.  Dr. Engelman, if the
²⁵ Milwaukee Bucks had the best record in

Page 150

1  the NBA Eastern conference and have
2  played 60 games and lost 22, would it be
3  fair to say that they were superior to
4  the other teams at basketball?
5      MR. WILCOX:  Objection.
6      Incomplete hypothetical.
7      THE WITNESS:  I don't know
8      what the other records of the
9      other teams in basketball are.
10 BY MR. MORTARA:
11     Q.   I just told you they're the
12 best.  60 and 22.  They were better than
13 everybody else.  Would it be fair to say
14 they were superior to the other teams in
15 the eastern conference?
16     A.   I am not an expert in
17 basketball, sir.
18     Q.   We can't have a conversation
19 about what it means to be superior to a
20 set like a group of teams?
21     A.   I would like to restrict my
22 testimony to what I am -- what I am an
23 expert in.
24     Q.   Well, this is written in
25 English, correct?

Page 151

1      A.   This is in -- this paper is
2  published in English, that's correct.
3      Q.   You're a native reader and
4  speaker of English, correct?
5      A.   I am.
6      Q.   Do you think that this
7  sentence is incorrect as a matter of
8  English, in light of the data presented
9  in the article?
10     A.   I do.
11     Q.   Even in light of the
12 sentence that follows, correct?
13     A.   That's correct.
14     Q.   I'd like to show you now a
15 comment that you've discussed in your
16 expert reports that appears on Page 10 of
17 the article.
18     It's the sentence -- I'm
19 sure you are familiar with it --
20 "However, given the problems that arise
21 with drug resistance, it is likely that
22 among related compounds, those that are
23 more broadly effective against resistant
24 viruses will have an advantage in the
25 clinic."

Page 152

1      Do you see that?
2      A.   I do.
3      Q.   You actually at times quote
4  this sentence in your reports; isn't that
5  right?
6      A.   My reports are quite
7  extensive.  I don't recollect any
8  specific quote versus another.
9      Q.   This is not a conclusion
10 from the data presented in this article
11 that Dr. Hughes and his colleagues are
12 drawing.  This is just the general
13 scientific statement, correct?
14     MR. WILCOX:  Objection.
15     Ambiguous.
16     THE WITNESS:  It's a
17     statement made by the authors of
18     the paper.
19 BY MR. MORTARA:
20     Q.   And it's not saying, "We
21 analyzed the data and concluded this."
22 The data -- this paper is not a clinical
23 research paper, correct?
24     A.   This paper analyzes the
25 activity of the integrase inhibitor in in

Page 153

1  vitro infection assays.
2      Q.   It's not a clinical research
3  paper, correct?
4      A.   This paper does not describe
5  the results of the clinical trial.
6      Q.   And this statement, "Given
7  the problems that arise with drug
8  resistance, it is likely that among
9  related compounds, those that are more
10 broadly effective against resistant
11 viruses will have an advantage in the
12 clinic," is a general statement of
13 science, correct?
14     MR. WILCOX:  Objection.
15     Ambiguous.
16     THE WITNESS:  Pointing your
17     attention to the prior sentence.
18     "Given the complexities of
19     pharmacology, a significant
20     difference in the behavior of a
21     drug against a particular mutant
22     or mutants may or may not
23     translate directly into a
24     desirable clinical outcome."
25 BY MR. MORTARA:

Page 154

1    Q.   Okay.  Also a general
2  statement of science, correct?
3         MR. WILCOX:  Objection.
4    Ambiguous.
5         THE WITNESS:  What page are
6    we on, sir?
7  BY MR. MORTARA:
8    Q.   Ten, sir.
9    A.   This is -- this is part of
10 the discussion section of the paper
11 where -- where authors can discuss their
12 results and take the liberty to
13 speculate.  And then it's up to reviewers
14 and editors to see if they agree with
15 that language.  But this is in the
16 discussion section of the paper.
17   Q.   And my question to you is,
18 these are general statements of science
19 in the discussion section of the article,
20 correct?
21        MR. WILCOX:  Objection.
22   Ambiguous.
23        THE WITNESS: These are
24   statements that these authors
25   chose to make in the discussion

Page 155

1    section of this article.
2  BY MR. MORTARA:
3    Q.   And I -- I guess I asked, do
4  you disagree with the sentence
5  highlighted, "Given the problems that
6  arise with drug resistance, it is likely
7  that among related compounds, those that
8  are more broadly effective against
9  resistant viruses will have an advantage
10 in the clinic"?
11   A.   Very different -- difficult
12 for me to speculate about a statement
13 like this, unless I have the specific
14 data at hand.  As opined in my reports, I
15 looked at data generated from hundreds of
16 documents and came up with a consensus
17 opinion based on the data across
18 documents.
19        I'd like to be able to
20 restrict my analyses of data to what I've
21 already analyzed in great detail.
22   Q.   You can't say you agree or
23 disagree with the sentence that's in the
24 article; is that your testimony?
25   A.   That's my testimony.

Page 156

1    Q.   You would at least concede
2  that reasonable scientists could agree
3  that given the problems that arise with
4  drug resistance, it is likely that among
5  related compounds, those that are more
6  broadly effective against resistant
7  viruses will have an advantage in the
8  clinic, correct?
9    A.   Yes, and I do agree that --
10        MR. WILCOX:  Objection --
11        Sorry about that, Dr.
12   Engelman, just give me a chance to
13   make my objection.  I'm going to
14   object that that question.  Calls
15   for speculation.
16        MR. MORTARA:  For the
17   record, the witness began his
18   answer with the word "Yes."
19 BY MR. MORTARA:
20   Q.   Please continue,
21 Dr. Engelman.
22   A.   Well, you know,
23 reconsidering the question, I think it
24 has become clear and it is a consensus in
25 my field that dolutegravir has much

Page 157

1    superior resistance profiles than the
2  First-Generation inhibitors, raltegravir
3  and elvitegravir in in vitro assays, and
4  to date, it seems to have proven true
5  that dolutegravir has an advantage over
6  raltegravir and elvitegravir in the
7  clinical setting.
8    Q.   Dr. Engelman, could a
9  reasonable scientist agree with this
10 statement in the Hughes 2018 NIH article,
11 "Given the problems that arise with drug
12 resistance it is likely that among
13 related compounds, those that are more
14 broadly effective against resistant
15 viruses will have an advantage in the
16 clinic"?
17        MR. WILCOX:  I'm going to
18   object that this question calls
19   for speculation.
20        THE WITNESS:  Yeah, I think
21   this -- this statement is over
22   speculative.
23        Even the problems that arise
24   with drug resistance, it is likely
25   that, among related compounds,

1  that are more broadly effective
2  against resistant viruses may have
3  an advantage.  Definitely not will
4  have an advantage.
5  BY MR. MORTARA:
6      Q.   You agree with the statement
7  if it said may have an advantage in the
8  clinic?
9      A.   Definitely as it pertains to
10 the differences between dolutegravir and
11 raltegravir and elvitegravir.
12     Q.   Could a reasonable scientist
13 agree with Dr. Hughes and the conclusions
14 of his 2018 NIH article that bictegravir
15 has a superior in vitro resistance
16 profile than dolutegravir in the
17 experiments disclosed in the article, or
18 are Dr. Hughes' conclusions completely
19 unreasonable?
20     A.   In my expert opinion after
21 spending more than 20 hours of my time
22 reviewing the Smith article and related
23 publications, my opinion is that the
24 conclusion that bictegravir is superior
25 to dolutegravir is an overstatement from

1  this paper.
2          I'm not sure about other
3  scientists that you have in mind, whether
4  or not they've spent one hour, 20 hours
5  or perhaps more time reading this
6  article.
7      Q.   And for those 20 hours of
8  your time, you were paid $10,000 correct?
9      A.   For the time that I have put
10 into this case, reading manuscripts,
11 considering close to 400, if not 400
12 documents, I was paid -- I was billed --
13 I billed and was paid at the rate of $500
14 per hour, that's correct.
15     Q.   And if you spent 20 hours
16 reviewing the Smith manuscript, you were
17 paid $10,000 for that review, correct?
18     A.   That -- that would seem to
19 be correct.  That's correct.
20     Q.   Would you turn to the second
21 page of the article, in the picture in
22 the structures in Figure 1.
23     A.   Yep, I have those.
24     Q.   And you see that -- the
25 chemical structure of dolutegravir here

1  and the chemical structure of
2  bictegravir, correct?
3      A.   Correct.
4      Q.   And on the left is the
5  ring -- leftmost ring of dolutegravir and
6  then the leftmost bridged bicyclic ring
7  of bictegravir, correct?
8      A.   That's correct.
9      Q.   If you would, please refer
10 now to Page 11 of the article, which I'll
11 also put up on the screen.  There's a
12 discussion of the differences that
13 Dr. Hughes and his team are talking
14 about, which I'm sure you remember.
15         Can you see that on the
16 screen?
17     A.   Yeah, I'm reading it right
18 now.
19     Q.   Take your time.
20         And right at the top of that
21 page there is sentence that says, "It
22 appears that the structural differences
23 on the left side of these INSTIs, the
24 part of the pharmacophore away from the
25 3' end of the viral DNA are largely

1  responsible for their different
2  resistance profiles."
3          Do you see that part?
4      A.   I was reading Page 11.  I
5  didn't see it there.  Could you -- could
6  you tell me the page number again?
7      Q.   It's on Page 11.  The very
8  first thing, first full sentence.
9      A.   Okay.  I got it.
10     Q.   And you understand that to
11 be referring to what I've highlighted on
12 the left, the single ring of dolutegravir
13 and the bridged bicyclic ring of
14 bictegravir, and indeed the smaller ring
15 of cabotegravir, the left side as
16 Dr. Hughes puts it, correct?
17     A.   That's correct.
18     Q.   So Dr. Hughes is saying in
19 this article that it is this structural
20 feature that is responsible for the
21 different resistance profiles that he
22 found in his article of these three
23 compounds, correct?
24     A.   I don't think he's saying it
25 with utmost certainty.  He's done some

1 molecular modeling to paraphrase the
2 sentence he wrote. His wording is "it
3 appears that."
4    Q.   You agree that he concluded
5 that it appears that these structural
6 differences that I've highlighted in
7 yellow on the left side in the article,
8 left side of the INSTIs as Dr. Hughes has
9 drawn them, it appears that those
10 differences are responsible for their
11 different resistance profiles, correct?
12    A.   Yes. Just let me, for the
13 record, restate the actual language.
14    "It appears that the
15 structural differences on the left side
16 are largely responsible."
17    Q.   Otherwise you agree?
18    A.   I agree that's what he
19 wrote.
20    Q.   All right. Dr. Engelman, I
21 am going to move on and put up -- by the
22 way, do you want a break? We've been
23 going for quite some time.
24    MR. MORTARA:  Mr. Wilcox?
25    MR. WILCOX:  Dr. Engelman,

1    if you feel like you want to take
2    a break right now, if we could
3    stop for lunch --
4    MR. MORTARA:  I'm happy to
5    continue, but I'm also happy to
6    offer you a break, Dr. Engelman.
7    THE WITNESS:  Well, since
8    it's almost 1:00 p.m. where I
9    live, I think it's not a bad time
10    for a break. Should we reconvene
11    at 1:45 Eastern?
12    MR. MORTARA:  Whatever it is
13    you'd like, sir. I've got all
14    day.
15    1:45 Eastern?
16    MR. WILCOX:  Sounds like a
17    plan. Let's do it.
18    THE WITNESS:  Thank you.
19    MR. MORTARA:  Thank you,
20    Dr. Engelman.
21    THE VIDEOGRAPHER:  Going off
22    the video record at 12:55 p.m.
23       - - -
24    (Lunch break.)
25       - - -

1    A F T E R N O O N   S E S S I O N
2       - - -
3    THE VIDEOGRAPHER:  We are
4 back on the record. It's
5 1:45 p.m.
6       - - -
7    CONTINUED EXAMINATION
8       - - -
9 BY MR. MORTARA:
10    Q.   All right. Dr. Engelman,
11 back to the Hughes article.
12    MR. WILCOX:  Mr. Mortara,
13 could I just put something on the
14 record before you get started
15 there?
16    MR. MORTARA:  Sure.
17    MR. WILCOX:  So I'm going to
18 withdraw my instruction to
19 Dr. Engelman not to answer the
20 question about having discussed
21 the possibility of taking action
22 with respect to the NIH 2018
23 article.
24    MR. MORTARA:  Okay. I'll go
25 ahead and ask it.

1 BY MR. MORTARA:
2    Q.   Dr. Engelman, have you
3 discussed the possibility of taking any
4 action with respect to the errors and
5 misconceptions you believe are in the
6 Stephen Hughes 2018 NIH article with
7 ViiV's lawyers?
8    A.   I believe I have recently
9 brought up that idea with them.
10    Q.   And tell me what they said.
11    A.   I don't think they had any
12 specific reply to that. They are not --
13 they are not a physician -- a person of
14 ordinary skill in the art for HIV
15 integrase and integrase inhibitors. I
16 don't recall any specific reply from
17 them.
18    Q.   Did you tell them that you
19 were going to do it?
20    A.   No. Because I mentioned
21 earlier, I have not even decided if I'm
22 going to do it. I believe I mentioned,
23 given recent information, that is
24 something I should consider.
25    Q.   Dr. Engelman, did ViiV's

1 lawyers give you their opinion about
2 whether it would be good or bad for them
3 if you did so?
4     A.   No, they did not.
5     Q.   Dr. Engelman, did you have
6 any conversations with ViiV's lawyers
7 today since you started testifying,
8 electronic or otherwise?
9     A.   Yes, we have had
10 conversation.
11     Q.   You have been communicating
12 with ViiV's lawyers during today's
13 testimony?
14     A.   We have spoken to each other
15 when we're off the record, mostly about
16 the weather and the kinds of keyboards we
17 have.  That's what we just spoke about.
18     Q.   Why have you been getting on
19 the phone with ViiV's lawyers during your
20 testimony today, sir?
21     A.   Well, it's not -- it's when
22 we're off the record.
23     Q.   Why have you been getting on
24 the phone with ViiV's lawyers during your
25 testimony today, sir?

1     A.   During multiple meetings in
2 prep for today, the lawyers instructed
3 me, in many -- since we spent a couple
4 dozen hours -- couple dozen hours
5 preparing for today, they brought up many
6 different things that may occur during
7 the day.  They said one thing that we --
8     MR. WILCOX:  I'm sorry.
9   Dr. Engelman, I'm going to
10   instruct you not to answer what
11   was discussed during your sessions
12   with us.
13     THE WITNESS:  Okay.  Thank
14   you.
15 BY MR. MORTARA:
16     Q.   Dr. Engelman, have you
17 communicated in any way about the
18 substance of this case or the format or
19 the way in which you are testifying in
20 this deposition with ViiV's lawyers
21 today?
22     A.   I have not.
23     Q.   Dr. Engelman, why have you
24 been on the phone with ViiV's lawyers
25 while you are under oath?

1     A.   In preparing for today's --
2 well, I believe what's discussed between
3 myself and the attorneys during the
4 preparation for today is covered under
5 privilege.
6     Q.   Tell me everything the ViiV
7 lawyers have said to you during today's
8 deposition?
9     A.   They've asked me how is the
10 weather in Massachusetts.
11     I replied to them that the
12 weather here was sunny.
13     I asked them how is the
14 weather where they lived.  I think I got
15 a reply from Ms. Miller that it was nice.
16     Q.   Did you arrange -- go ahead.
17 Continue.  Tell me everything that was
18 said.
19     A.   Most recently we were
20 talking about the desks that we use to
21 work.  In particular, Lindsey Miller told
22 me that there are people that she works
23 with that use bicycle desks.  I found
24 that very interesting, because I'm not
25 all that familiar with bicycle desks.

1     Q.   Dr. Engelman, prior to
2 today's deposition, did you arrange in
3 advance to use seemingly innocuous
4 discussions about the weather and bicycle
5 desks as code for coaching during your
6 deposition?
7     A.   No, sir.  We did not.
8     Q.   Dr. Engelman, why did you
9 call the ViiV lawyers during the breaks?
10     A.   My understanding is what we
11 discussed in preparation for today's
12 meeting is covered by privilege.
13     Q.   Do you believe that you were
14 calling the ViiV lawyers because of
15 instructions -- withdrawn.
16     You were calling the ViiV's
17 lawyers because of something that they
18 had prepared you about for today's
19 deposition, correct?
20     A.   I think, my understanding,
21 is the discussions that we had in
22 preparation for today's deposition is
23 covered by privilege.
24     Q.   I'm asking you about the
25 discussions you had today and why you had

Page 170

1  them.
2      You had them because of
3  something you discussed in prep, correct?
4      A.   Well, I think you're back to
5  asking me what was discussed in prep.
6  And my understanding is that has been
7  covered by privilege.
8      MR. MORTARA:  Mr. Wilcox,
9  are you going to instruct him not
10 to answer my question about why
11 you were on the phone with him
12 during the deposition?  The
13 question is, "You had these
14 discussions with ViiV lawyers on
15 the phone today because of
16 something you discussed in prep,
17 correct?"
18     MR. WILCOX:  I think it's
19 different than the way you're
20 asking.  If you want to ask him
21 why he was on the phone with us, I
22 think that's fine.
23     But if you're going to delve
24 into the -- if you're going to
25 delve into the substance of our

Page 171

1  communications prior to him going
2  under oath, and with respect to
3  the prep, you know, I'm going to
4  draw the line there.
5      MR. MORTARA:  I'm not asking
6  for the substance, sir.
7  BY MR. MORTARA:
8      Q.   I'm saying, is the reason
9  that you were on the phone with ViiV's
10 lawyers while you were under oath today,
11 the prep that you received?
12     A.   My understanding is that we
13 agreed to meet with each other during the
14 day today, just an informal fashion, to
15 see each other.
16     Q.   Have you been engaged in
17 videoconferencing with ViiV's lawyers
18 during today's deposition?
19     A.   We have met each other
20 through video app on a computer at my
21 house that's outside of this room.
22     Q.   Have you been shown
23 documents during today's testimony?
24     A.   No.
25     Q.   Have you told me everything

Page 172

1  that you discussed with ViiV's lawyers?
2  The weather, bicycle desks.  Anything
3  else?
4      A.   We briefly discussed how
5  difficult it is for our children to deal
6  with learning in today's virtual
7  environment.  I have children.
8      Sir, do you have children?
9      Q.   Dr. Engelman, did the word
10 "bictegravir" or the word "dolutegravir"
11 get used today between you and the ViiV
12 lawyers?
13     A.   No, they did not.
14     Q.   Are the discussions that you
15 had today with ViiV's lawyers part of
16 what you're including in preparation for
17 the deposition?
18     A.   In preparation for today's
19 deposition, it was mentioned that --
20     MR. WILCOX:  Dr. Engelman,
21 he's asking you a question of
22 where you are drawing the line
23 about where did preparation end
24 and today's deposition begin.
25     THE WITNESS:  Preparation

Page 173

1  for today's deposition ended
2  approximately 9:30 this morning.
3  BY MR. MORTARA:
4      Q.   Dr. Engelman, do you believe
5  that the conversations that you've had
6  with ViiV's lawyers today during your
7  sworn testimony have been in fact about
8  your testimony, whether or not words
9  about your testimony have been used?
10     A.   I absolutely believe the
11 conversations that I've had with ViiV
12 lawyers during today off the record have
13 nothing to do with my testimony today.
14     Q.   Do you know why it was
15 arranged that you would have calls with
16 ViiV lawyers while I was questioning you?
17     A.   I do not know why it was
18 arranged.
19     Q.   Dr. Engelman let's turn to
20 the Hughes 2018 article.
21     And I'm now referring to
22 Page 3, which you can see on your screen.
23 Do you have it yet?
24     A.   I'm scrolling up on my
25 screen to Page 3.  That's correct.

1    Q.   And there's a sentence that
2 you have spent much time discussing in
3 your expert reports, and so I know you're
4 very familiar with it.  It's this one I
5 am highlighting on the screen.
6    A.   I see it there.
7    Q.   "However, only bictegravir
8 potently inhibited the well known
9 RAL-resistant IN double mutant
10 G140S/Q148H and the DTG-resistant IN
11 mutants G118R/R263K and H51Y/R263K with
12 EC50 values less than or equal to 5
13 nanomolar."
14       You've discussed that
15 sentence at length in your expert
16 reports, right?
17    A.   That's because I believe
18 that sentence is incorrect.
19    Q.   Dr. Engelman, if you would,
20 I'm going to refer you to your expert
21 report, Paragraph 417 of your opening
22 report.
23    A.   Did you say -- oh, 417, I
24 got it.
25    Q.   Yep.  Just go ahead and take

1 your time.
2    A.   Okay.  417.
3    Q.   And I have some of your
4 discussion of this sentence.  It says --
5 it purports to be quoting the sentence.
6 It says, "However, only BIC potently
7 inhibited the well-known RAL resistant IN
8 double mutant," goes on and ends after
9 G118R.  Do you see that?
10    A.   Yep.
11    Q.   You did not include the
12 whole sentence here.  And you cut it off
13 in your expert report, correct?
14    A.   What I meant to say, the
15 type of typing that I used is after the
16 IN mutant I have a double bracket which
17 is not in the primary research
18 publication you have highlighted on my
19 rightward screen.  The double bracket
20 that I used is there to indicate there
21 are -- is other text from the original
22 quotation that I omitted.  And then after
23 the first double bracket I then state
24 G118R, and then I go to a second double
25 bracket which includes the period or the

1 final punctuation in said sentence.
2    Q.   You did not include the
3 whole sentence here.  You cut it off in
4 your expert report, correct?
5    A.   But in my mind, I used
6 indications in the typing to indicate
7 that very fact.
8    Q.   You cut it off, correct?
9    A.   I -- I amended the original
10 sentence to indicate it was not the full
11 sentence, that's correct.
12    Q.   It is your position that the
13 highlighted sentence in the 2018 Hughes
14 article, Dr. Hughes and his co-authors,
15 are communicating that only bictegravir
16 potently inhibited G140S/Q148H and that
17 dolutegravir and cabotegravir did not.
18 That is your reading of this sentence,
19 correct?
20    A.   My reading of this sentence
21 is that, "However, only bictegravir
22 potently inhibited the well-known RAL
23 resistant IN double mutant G140S/Q148H
24 and the DTG-resistant IN mutants G118R,
25 R263K, and H51Y/R263K with effective

1 concentration 50 percent values less than
2 or equal to 5 nanomolar."
3       That's my reading of the
4 sentence.
5    Q.   And you think this sentence
6 means bictegravir was the only compound
7 to potently inhibit G140S/Q148H.
8 Bictegravir was the only compound to
9 inhibit G118R.  Bictegravir was the only
10 compound to potently inhibit G -- R263K.
11 And bictegravir was the only compound to
12 inhibit H51Y/R263K.  That is what you
13 think this means?
14       MR. WILCOX:  Objection.
15    Compound.
16       THE WITNESS:  I think what
17    this sentence means is that only
18    bictegravir potently inhibited the
19    five integrase mutant viruses that
20    are further subjects of this
21    sentence.  That's correct.  That's
22    my reading of this sentence.
23 BY MR. MORTARA:
24    Q.   Meaning that only
25 bictegravir inhibited each of them, and

1  the other two INSTIs did not, correct?
2      A.   The -- the implication from
3  the sentence is that only bictegravir
4  potently inhibited the five viruses that
5  are the subject of this sentence.
6      Q.   One of those implications is
7  that only bictegravir inhibited
8  G140S/Q148H, correct?
9      A.   An implication from the
10 sentence or the way I read the sentence
11 is that only bictegravir potently
12 inhibited the well-known RAL resistant IN
13 double mutant G140S/Q148H.  That's what
14 I'm reading directly and I agree with
15 that language.
16     Q.   And your interpretation of
17 this also is that only bictegravir
18 inhibited G118R, correct?
19     A.   That's my interpretation of
20 what these authors are intending to mean
21 with this sentence.
22     Q.   I want to see whether the
23 jury will agree with your reading.  On
24 the screen you will see a sentence:
25          Only the Philadelphia Eagles

1  defeated the Redskins, Raiders, Patriots
2  and Cowboys.  Do you see that?
3      A.   Okay.
4      Q.   Is this statement false in
5  your view, if the Panthers beat the
6  Redskins 27 to zero in Week 1?
7      A.   No, they are unrelated.
8      Q.   I'm asking you a question of
9  whether this sentence that I've written,
10 in ordinary English that the ladies and
11 gentlemen of the jury speak and you and I
12 speak, only the Philadelphia Eagles
13 defeated the Redskins, Raiders, Patriots
14 and Cowboys, means that only the Eagles
15 defeated the Redskins, only the Eagles
16 defeated the Raiders, only the Eagles
17 defeated the Patriots, and only the
18 Eagles defeated the Cowboys.
19          Is that how you read this?
20          MR. WILCOX:  Objection.
21 Argumentive.
22          THE WITNESS:  I would agree
23 with your assessment of that
24 sentence, that only the
25 Philadelphia Eagles defeated the

1      Washington Redskins, which
2      means -- does that mean the
3      Redskins beat all the other teams?
4  BY MR. MORTARA:
5      Q.   I'm asking you if you think
6  the English language meaning of this
7  sentence requires that only the Eagles
8  beat the Redskins, only the Eagles beat
9  the Raiders, only the Eagles beat the
10 Patriots, and only the Eagles beat the
11 Cowboys.  Is that what this means to you?
12     A.   Yeah I'm trying to
13 understand it.  I'm really not an expert
14 in the National Football League.  You
15 know, I'm an expert in integrase strand
16 transfer inhibitor.  It's going to take
17 me some time to figure this out.  Please.
18     Q.   Go ahead, sir.
19     A.   My understanding of this is
20 that only the Philadelphia Eagles
21 defeated the Washington Redskins.  Only
22 the Philadelphia Eagles defeated the
23 Washington Redskins.  I think that means
24 Washington Redskins beat all the other
25 teams they must have played.  I think

1  that's what that means in ordinary
2  English.  Let's see.  I can now move on
3  to the next point.
4          Only the Philadelphia Eagles
5  defeated the Oakland Raiders.  Are they
6  in -- they are in Las Vegas now.  Only
7  the Philadelphia Eagles defeated the Las
8  Vegas Raiders.  That must mean that the
9  Las Vegas Raiders beat all the other
10 teams that they played.  Okay.  I think
11 I'm beginning to understand the first
12 sentence.
13          Is this false if the
14 Panthers beat the Redskins.  I think it
15 must still be true, the Panthers beat the
16 Redskins.
17     Q.   Why?  You just told me only
18 the Philadelphia Eagles defeated the
19 Redskins.
20     A.   Oh.  Yeah, then it's false.
21     Q.   Dr. Engelman, you don't
22 read --
23     A.   I'm not an expert in the
24 NFL.  This really tripped me up.
25     Q.   You are an expert in the

Page 182

1  English language at least insofar as we
2  are both native speakers and so are the
3  ladies and gentlemen of the jury.  Yes?
4       A.   That's right.
5       Q.   You don't read this
6  sentence --
7       A.   If the Panthers beat the
8  Redskins in Week 1, then the statement is
9  false.  I apologize.
10      Q.   Dr. Engelman, you don't read
11  this sentence to mean alone amongst
12  football teams, the Philadelphia Eagles
13  defeated the Redskins, Raiders, Patriots,
14  and Cowboys, and they are the only ones
15  that defeated those four teams.  That's
16  not the way you read this?
17      A.   So again, I'll qualify that
18  I -- it's a hypothetical about football
19  teams.
20      Q.   I'm just asking you how you
21  read English, sir.
22      A.   Yeah, I'm trying.  If the
23  Panthers beat the Redskins in Week 1,
24  then it -- the statement does not address
25  whether or not the Eagles are undefeated

Page 183

1  which is where I got tripped up.
2       So if Panthers beat the
3  Redskins in Week 1, it can still be true
4  that the Eagles was the -- were the only
5  team that beat four other teams.
6       Q.   That's my question.  Isn't
7  the ordinary English language way to read
8  this sentence that only the Eagles
9  defeated all four of these teams?
10      MR. WILCOX:  I'm going to
11      object.  There's no context to
12      this in terms of what teams you
13      are talking about.
14      MR. MORTARA:  You can take
15      that up at trial.  I'm crossing
16      Dr. Engelman.
17  BY MR. MORTARA:
18      Q.   Dr. Engelman, isn't the
19  ordinary English language reading of this
20  sentence that only the Philadelphia
21  Eagles defeated all four of the Redskins,
22  Raiders, Patriots, and Cowboys?
23      MR. WILCOX:  Objection.
24      Ambiguous.
25      THE WITNESS:  I'll read the

Page 184

1       English sentence:  Only the
2       Philadelphia Eagles defeated the
3       Redskins, Raiders, Patriots, and
4       Cowboys.
5  BY MR. MORTARA:
6       Q.   Doctor, my question is
7  wouldn't an ordinary reader of English
8  understand this to mean the Philadelphia
9  Eagles alone defeated that set of four
10  teams?
11      A.   I can't comment to what an
12  ordinary reader of English may or may not
13  say.  I read the sentence as only the
14  Philadelphia Eagles defeated the
15  Redskins, Raiders, Patriots, and Cowboys.
16      Q.   Meaning as you read it, the
17  Eagles were the only team to beat the
18  Redskins, the only team to beat the
19  Raiders, the only team to beat the
20  Patriots, and the only team to beat the
21  Cowboys.  That's the way you read
22  English?
23      A.   The sentence is a little
24  ambiguous.  It's unclear whether or not
25  the Eagles were the only team to beat all

Page 185

1  four teams or it was the only team to
2  beat any of those four teams.
3       Q.   Well, let me ask you whether
4  you think now the sentence in the Hughes
5  article that we were just talking about
6  is ambiguous.  He uses the same
7  formulation, after all.
8       A.   So here, I am an expert.
9  I'm very much an expert in understanding
10  the activities of integrase inhibitors
11  and how they behave with integrase mutant
12  viruses.  It's 100 percent clear to me as
13  a person of ordinary skill in the art
14  that this sentence means that only
15  bictegravir potently inhibited the well
16  known RAL-resistant integrase double
17  mutant G140S/Q148H, and the DTG-resistant
18  IN mutants G118R, R263K, and H51Y.  R263K
19  has the highest EC50 value less than or
20  equal to 5 nanomolar.
21      Q.   Do you think a reasonable
22  writer or reader of the English language
23  could look at it as Dr. Hughes is saying
24  only bictegravir did all of these things,
25  the set of all of these things?

Page 186

1    A.   I can't -- so I myself, a
2  single individual who has opined opinions
3  based on my ordinary skill in the art --
4  and that's surely not how I interpreted
5  this sentence.
6        And surely, that's -- if
7  that's your interpretation, it's
8  completely -- completely misleading.  If
9  I had reviewed this paper, I surely would
10 have corrected this as a peer reviewer.
11   Q.   Can you name a single other
12 human being who understands this sentence
13 in this article the way you do?
14   A.   I have not discussed this
15 sentence in this article outside --
16 outside of counsel with anybody else, no
17 other human being, definitely no other
18 research scientist.
19   Q.   Do you think it's more
20 likely that Stephen Hughes was making a
21 false statement or that he meant it the
22 way that I do when I read it, which is
23 that only bictegravir collectively did
24 all of these things?
25        Which of those two is more

Page 187

1  likely in your view?
2    A.   I don't understand your --
3        MR. WILCOX:  Objection.
4  Calls for speculation.
5        THE WITNESS:  I apologize,
6  but I don't understand your
7  interpretation.
8        It's clearly incorrect to
9  say that only BIC only inhibited
10 G140S/Q148H and G118R based on
11 evidence that's provided in this
12 manuscript.
13 BY MR. MORTARA:
14   Q.   But it is clearly correct,
15 based on the evidence in the manuscript
16 that only bictegravir did all four of
17 those things, correct?
18   A.   So it's just my
19 interpretation of the English language.
20   Q.   Yes.  And because you
21 adopted your interpretation of the
22 English language, you have accused, in
23 your highly confidential expert report,
24 Dr. Stephen Hughes of the National
25 Institutes of Health, of speaking in

Page 188

1  error in this article; is that correct?
2    A.   I will furthermore point out
3  that the activities of dolutegravir
4  against wild type virus, G118R/R263K,
5  H51Y, and R263K were not generated during
6  the course of this paper.  They are
7  historical data that the author put into
8  this paper and did not cite that that
9  data is several years old.
10       MR. MORTARA:  Well, again,
11 move to strike your undisclosed
12 and totally nonresponsive opinion.
13 And I will read my question again.
14 BY MR. MORTARA:
15   Q.   Because you adopted your
16 interpretation of the English language,
17 you have accused, in your highly
18 confidential expert report, Dr. Stephen
19 Hughes of the National Institutes of
20 Health of speaking of error in this --
21 speaking in error in this article; is
22 that correct?
23       MR. WILCOX:  First, I'm
24 going to say that I disagree with
25 your move to strike.

Page 189

1        Then I'm going to object as
2  asked and answered.
3  BY MR. MORTARA:
4    Q.   You may answer my question,
5  Dr. Engelman.
6    A.   Well, as my attorney
7  indicated, I've already answered it.
8  Could you ask it again, please.
9    Q.   Because you adopted your
10 interpretation of the English language
11 you have accused, in your highly
12 confidential expert report, Dr. Stephen
13 Hughes of the National Institutes of
14 Health of speaking in error in this
15 sentence in this article; is that
16 correct?
17   A.   So what I enumerated in my
18 expert report -- and I'm the only one who
19 can enumerate myself, is that I
20 identified 32 typographical errors in
21 this paper, and this is one of 32 that I
22 highlighted.
23   Q.   Because of your
24 interpretation of the English language in
25 this sentence beginning, "However, only

1 BIC," correct?
2     A.   This is one out of 32
3 typographical errors that I have
4 characterized from my reading of this
5 paper.  And I believe this is a
6 typographical error, that's correct.
7     Q.   And you believe that this is
8 a typographical error because of the way
9 you read this English language sentence,
10 correct?
11     A.   I believe it's a
12 typographical error because it's a
13 statement in error.
14     If I was a peer reviewer of
15 this article, I would have corrected this
16 statement as well as the other 31
17 typographical errors that I identified.
18     Q.   And that is because of how
19 you read the grammar and usage of this
20 sentence, correct?
21     A.   As I've indicated to you, I
22 have been asked to review hundreds of
23 grant applications for the National
24 Institutes of Health.
25     I serve on the editorial

1 boards for four, as you said, prominent
2 journals.  And I've reviewed hundreds if
3 not thousands of papers.  In each one of
4 those cases, reviewing hundreds of grants
5 for the National Institutes of Health,
6 reviewing hundreds of papers for
7 prominent journals, some of which I serve
8 on the editorial board, I am asked to do
9 that repeatedly over and over and over
10 again, because of the way I read the
11 English language.
12     Q.   And you think this is an
13 error, the "only bictegravir" sentence
14 that we've been talking about, because of
15 the way you read the English language,
16 correct?
17     A.   My interpretation of this
18 sentence in my summary report, I
19 concluded -- I included it as one out of
20 32 typographical errors.  That's correct.
21     Q.   Dr. Engelman, I want to now
22 continue to make sure that we understand
23 the words the same way.
24     Would you please turn to
25 your opening expert report, Paragraph

1 386.
2     A.   Okay.  I'm there.
3     Q.   At the bottom you have a
4 sentence I want to focus you on.  It says
5 instead -- excuse the highlighting.  I'll
6 blow it up for you.  It says,
7 "Instead" -- you see that sentence? --
8 "some publications have reported that
9 bictegravir more effectively inhibits the
10 G140S/G148H mutant than dolutegravir,"
11 and cite two publications, "and others
12 have reported that dolutegravir more
13 effectively inhibits the G140S/Q148H
14 mutant virus than bictegravir."
15     Do you see that?
16     A.   Yes, I've seen that.  And I
17 have since recognized that there's a
18 slight misuse -- I think there's slight
19 misuse of language here.  Others have
20 reported that dolutegravir and
21 bictegravir inhibit this mutant virus in
22 a statistically numerical and significant
23 manner.
24     Q.   That's not what your report
25 says, is it?

1     A.   That's not what it says.
2 And I would have -- add that I have
3 identified more than one typographical
4 error across my three reports.
5     Q.   Have you submitted -- have
6 you submitted an errata to your reports
7 to us, sir?
8     A.   I was unaware that I should
9 have.  And I will after this.
10     Q.   Well, this, you're saying
11 that these two articles support the
12 proposition that dolutegravir more
13 effectively inhibits the G140S/Q148H
14 mutant virus than BIC.
15     And by the way, that Smith
16 2018 article, that's the Stephen Hughes
17 NIH article, correct?
18     A.   That's correct.
19     Q.   The Stephen Hughes NIH
20 article in no way supports the
21 proposition that dolutegravir more
22 effectively inhibits the G140S/Q148H
23 mutant virus than bictegravir, correct?
24     A.   And I've already admitted
25 that that's a typographical error.  What

Page 194

1 it should say is that, while others have
2 indicated that the ability for
3 dolutegravir versus bictegravir to
4 inhibit the infection of the G140S/Q148H
5 mutant virus is statistically -- -- is
6 numerically statistically insignificant.
7       And it should also cite
8 Hassounah 2017 because, as you recall,
9 Hassounah 2017 reported on two
10 experiments, the activity of bictegravir
11 versus dolutegravir to inhibit the
12 G140S/Q148H mutant virus.  In one set of
13 experiments they were able to assign a
14 P-value that indicated statistically
15 numerical significance.  And in the
16 second set of experiments, they assigned
17 a P-value that indicated there was no
18 statistically numerical significance
19 between the activity of the two drugs.
20       I admit to the typographical
21 error in the second half of this
22 sentence.
23    Q.   So when I pointed it out to
24 you, you admitted the error, neither the
25 Smith-Hughes 2018 article, nor the Zhang

Page 195

1 2018 article support this clause of this
2 sentence, correct?
3    A.   That's my understanding.  I
4 believe in those two articles there was
5 no difference in the potency between the
6 two inhibitors against this mutant virus.
7    Q.   When were you going to tell
8 Gilead, me, that you made these mistakes
9 in your report?  Were you going to wait
10 until I asked you?
11    A.   Well, you know, over the
12 course of generating the reports, counsel
13 and I have discussed a small handful of
14 typographical errors that are present in
15 the three reports.
16       I think I caught this one so
17 I knew about this one.  I caught it only
18 a day or two ago.  I apologize.  But I --
19 with everything else going on in
20 preparation for today, I hadn't pointed
21 out that typographical error.
22       If I'm instructed to by the
23 court or by my counsel to go ahead after
24 this deposition in the ensuing days to
25 come up with a detailed list of all the

Page 196

1 typographical errors that I have
2 identified in my report, I surely would
3 be happy to do that.
4       I apologize for not having
5 alerted you to this single typographical
6 error before today.
7    Q.   And you just were given the
8 opportunity to take a look at your work
9 again and decide whether it was in error,
10 and, in fact, you already knew it was an
11 error, you just hadn't told me yet, you
12 were given the opportunity to explain
13 yourself just now, haven't you, you've
14 just done that?
15    A.   This single typographical
16 error, I just, over the last I'd say
17 about two days, two to three days
18 identified it.
19    Q.   Have you given Stephen
20 Hughes any opportunity to address the
21 alleged errors that you have found in his
22 2018 article?
23    A.   I think we discussed that
24 before lunch.  I have not contacted
25 Dr. Hughes about the numerous

Page 197

1 typographical errors that I identified in
2 the Smith 2018 article.
3    Q.   In this, what you're calling
4 a typographical error, Page 186 of your
5 expert report, you say that two peer
6 reviewed pieces of literature support the
7 idea that dolutegravir more effectively
8 inhibits the G140S/Q148H mutant
9 bictegravir, when, in fact, neither of
10 those two say that, correct?
11    A.   What those two papers say is
12 there's no difference in the ability for
13 dolutegravir or bictegravir to inhibit
14 that mutant virus.  And that does
15 contrast the first half of the sentences
16 that says BIC more effectively inhibits
17 the virus.
18       So what I meant to say in
19 the paper, in the sentence, is basically,
20 to boil it down, half the literature
21 indicates that bictegravir is more
22 effective whereas half of the literature
23 indicates no difference.
24    Q.   And so what you -- what you
25 actually said in your report is that half

1 the literature says BIC is better and
2 half the literature says dolutegravir is
3 better. That's what you actually said in
4 your report, right, sir?
5    A.   And I have admitted that
6 that is a typographical error.
7    Q.   So, in fact, half the
8 literature says bictegravir is more
9 effective than dolutegravir and the other
10 half of the literature doesn't find any
11 statistical significant difference.
12 That's fair to say, right?
13    A.   For this one mutant virus,
14 that's correct.
15    Q.   And zero percent of the
16 literature says dolutegravir is better
17 than bictegravir for G140S/Q148H,
18 correct?
19    A.   Yeah, that is correct. This
20 is the opening report. I would also
21 indicate that in Cook 2020, we measured
22 the activity of bictegravir versus
23 dolutegravir to inhibit this very mutant
24 virus and we did not find a statistically
25 significant difference in -- in activity.

1    So a little more than half
2 of the literature would indicate there's
3 no difference.
4    Q.   By the way, you didn't find
5 a statistically significant difference,
6 but that doesn't mean there is no
7 difference, correct, that's the way
8 statistics works?
9    A.   So, my understanding of
10 statistics is that -- is a measure or not
11 of whether or not the null hypothesis is
12 supported. So the null hypothesis here,
13 as far as I understand, would be there is
14 no difference between bictegravir and
15 dolutegravir.
16    But my understanding of this
17 case is it's not a literal infringement
18 case. It's a doctrine -- doctrine of
19 equivalence case.
20    And because it's doctrine of
21 equivalence, I believe that the
22 plaintiffs say that there are numerical
23 differences between bictegravir and
24 dolutegravir.
25    So P-values that are

1 statistically numerically significant do
2 not have -- in any way address whether or
3 not the overall behavior of the two
4 compounds is insubstantial or
5 substantial. To be able to come up with
6 an analysis of insubstantial or
7 substantial differences, one has to take
8 into a large body of literature and
9 that's the approach I've taken in my
10 report, to reach the conclusion that the
11 activities of bictegravir and
12 dolutegravir in in vitro assays are
13 insubstantial.
14    Q.   Dr. Engelman, the way you
15 were originally putting it in your
16 report, just focusing on what you
17 actually said in your first report.
18    You said there were two
19 publications reporting that BIC more
20 effectively inhibits the G140S/Q148H
21 mutant than dolutegravir.
22    So two statistically
23 significant differences in favor of BIC
24 and two statistically significant
25 differences on the other side in favor of

1 dolutegravir?
2    Those results would be
3 inconsistent with each other, right? You
4 shouldn't find that BIC is statistically
5 significantly better than dolutegravir on
6 one hand -- one study and then find it
7 the other way around in another, correct?
8    A.   Well, I disagree with that,
9 because in different studies people take
10 approaches that are consistent with their
11 own laboratory. And as I discussed in my
12 opening report, there's many different
13 factors that come into establishing these
14 types of experiments. Whether or not one
15 test indicates in the end that there
16 might be a statistically numerical
17 significance in one direction and a
18 similar test in a completely different
19 setting comes up with a conclusion of a
20 statistically numerically difference in
21 the opposite direction, that wouldn't
22 surprise me at all.
23    Q.   Dr. Engelman, my question is
24 a little bit different.
25    It's, now that we know what

Page 202

1 the Hughes 2018 article and Zhang article
2 actually say, which is there's no finding
3 of a statistically significant
4 difference, the data in those articles
5 is, in fact, consistent with reality
6 there being a difference between
7 bictegravir and dolutegravir, correct?
8         MR. WILCOX:  Objection.
9     Ambiguous.
10        THE WITNESS:  My
11    understanding, even though I'm not
12    a lawyer of the doctrine of
13    equivalence, is that we should
14    expect numerical differences.
15 BY MR. MORTARA:
16    Q.   That's not my question.
17    Is the actual finding, the
18 actual data in Hughes 2018 and Zhang
19 2018, consistent with there, in fact,
20 being a statistically significant
21 difference between bictegravir and
22 dolutegravir for the G140S/Q148H mutant?
23    A.   If I understood the question
24 correctly, the data presented in Smith
25 2018 and Zhang 2018, as well as some of

Page 203

1 the data in Hassounah 2017 and data in
2 Cook 2020, indicates there is no
3 statistically numerical significant
4 difference in the activity of bictegravir
5 versus dolutegravir to inhibit the
6 infection of the G140S/Q148H mutant
7 virus.
8    Q.   The data in the articles you
9 just cited does not rule out that there
10 is, in fact, a real and statistically
11 significant difference between
12 bictegravir and dolutegravir as to this
13 mutant, correct?
14    A.   That's a -- that's a
15 hypothetical.  As a scientist, I must
16 interpret the data at hand.  I can just
17 tell you that what the papers report,
18 they clearly report a difference in the
19 activities of these two mutant viruses
20 that is statistically numerically
21 insignificant.
22    Q.   That is not a finding of a
23 quality, that is merely a nonfinding of
24 statistical difference, correct?
25    A.   That is correct.

Page 204

1    Q.   Dr. Engelman, I want to just
2 make sure I heard you correctly when you
3 said something a little bit earlier.
4        You said, "In different
5 studies people take approaches that are
6 consistent with their own laboratory.
7 There's many different factors that come
8 into establishing these types of
9 experiments."
10        Whether or not one test
11 indicates in the end that there might be
12 a statistical numerical significance and
13 similar task in another setting comes up
14 with a conclusion of a statistical
15 difference in the opposite direction,
16 that wouldn't surprise you at all.
17        That's what you said,
18 correct?
19    A.   That wouldn't surprise me.
20 That's correct.
21    Q.   Dr. Engelman, without
22 spending all the time to discuss all the
23 typos that you found in your report so
24 far, can you tell me how many typos you
25 found?

Page 205

1    A.   I haven't tabulated the
2 list, because I haven't been given that
3 task.  I would say about five or six
4 across the three reports.
5    Q.   Five or six.  How long have
6 you spent looking?
7    A.   I wrote the reports.  And I
8 re-read each of them approximately two or
9 three times.
10    Q.   I know you characterize
11 what's going on here in the highlighted
12 clause of the sentence in Paragraph 386
13 as a typo.  Would you characterize this
14 as an error or a misconception?
15        MR. WILCOX:  Objection.
16    Ambiguous.
17        THE WITNESS:  It's a
18    typographical error, as I
19    explained.
20 BY MR. MORTARA:
21    Q.   Dr. Engelman, your report
22 uses the phrase first-generation INSTI --
23 excuse me -- to describe raltegravir and
24 elvitegravir, correct?
25    A.   I use that language.  My

Page 206

1  interpretation is that's field-standard
2  language here.
3      Q.    And you have relied on data
4  comparing both bictegravir and
5  dolutegravir to those first-generation
6  INSTIs to conclude that bictegravir and
7  dolutegravir are similar, correct?
8      A.    My conclusions are the
9  behaviors of bictegravir and dolutegravir
10 in in vitro assays together are much
11 different than the behaviors of
12 raltegravir and elvitegravir in
13 side-by-side tests.
14     Q.    And you have relied on data
15 comparing bictegravir and dolutegravir to
16 raltegravir and elvitegravir to conclude
17 that bictegravir and dolutegravir are
18 similar, correct?
19     A.    To conclude that bictegravir
20 and dolutegravir are insubstantially
21 different.
22     Q.    Dr. Engelman, you understand
23 that the first-generation INSTIs
24 raltegravir and elvitegravir are part of
25 the prior art in this case, right?

Page 207

1      A.    I understand that
2  raltegravir and elvitegravir are
3  classified as first-generation strand
4  transfer inhibitors.
5      Q.    And you understand that they
6  are part of what's called the prior art
7  in this case, correct?
8      A.    I don't recollect if I have
9  used that language in my report.
10     Q.    Well, paragraph 43 of your
11 opening report.  You received an
12 instruction from your friends, the ViiV
13 lawyers, who used the phrase prior art.
14 What did you think that meant?
15     A.    Well, my interpretation, if
16 it's a whole body of literature on the
17 research of HIV integrase, HIV
18 integration, as well as the INSTIs that
19 might have been licensed for patient use
20 before dolutegravir.
21     Q.    So you understand that the
22 first-generation INSTIs raltegravir and
23 elvitegravir are part of the prior art in
24 this case, correct?
25     A.    That sounds accurate.

Page 208

1      Q.    You were instructed as part
2  of your analysis of insubstantial
3  differences, you should compare
4  bictegravir and dolutegravir to those
5  prior art compounds, correct?
6      A.    I wasn't instructed by
7  anyone about what to do.  The reports you
8  see in front of you are fully penned by
9  my hand.
10     Q.    You understood that as part
11 of your analysis of insubstantial
12 differences, you could compare
13 bictegravir and dolutegravir to those
14 prior art compounds, correct?
15     A.    I could compare them to
16 elvitegravir and raltegravir, in the
17 broad literature, that's correct.
18     Q.    I'd like to go back now to
19 Exhibit 9, which is the Cherepanov
20 Science article from 2020.  If you want
21 to get that out, sir.
22         Do you have it there?
23     A.    It's loading on my screen.
24     Q.    Take your time, sir.  Let me
25 know when you've got it.

Page 209

1      A.    It's loading.  Okay.  Seems
2  to be fully loaded.
3      Q.    We talked a little bit
4  earlier about the section at the back,
5  the author contributions.  Do you
6  remember that?
7      A.    Well, I can turn to that and
8  read it.  Yeah, I can see it.
9      Q.    What were your contributions
10 to this work?
11     A.    So it stated in the article
12 is that Wen Li, who is my trainee, and
13 myself designed the simian
14 immunodeficiency virus in red-capped
15 mangabey vector and carried out HIV-1 and
16 SIVrcm infectivity assays.
17         Further down, "Dr.
18 Cherepanov and Dr. Engelman wrote the
19 manuscript with contributions from all
20 authors."
21     Q.    So turning here to Figure 3,
22 which represents some of the results of
23 the experiment your contribution in your
24 lab, you did what I'm about to highlight
25 on the screen, these assays, correct?

Page 210

1    A.   These are some of the assays
2  that are reported in the papers that were
3  performed in my laboratory.
4    Q.   And I'm referring to figure
5  3B.  And I highlighted that on the
6  screen.  Your lab and you did not perform
7  in any way the experiments shown in
8  Figure 3A, correct?
9    A.   That's correct.  3A, the
10  experiments that came out in publication
11  as Figure 3A were performed in
12  Dr. Cherepanov's laboratory.
13    Q.   Similarly, going back to
14  Figure 2 on the previous page which takes
15  up approximately 75 percent of Page 3 of
16  4 of the article -- I'll blow up bigger
17  too, but frankly it's 75 percent of the
18  page.
19       So you and your lab were
20  responsible for the segment I'm
21  highlighting in Figure 2A, these cellular
22  assays and curves disclosed there,
23  correct?
24    A.   That's correct.
25    Q.   And you and your lab were

Page 211

1  not responsible for the generation of the
2  data, the experimental work, or what
3  appears in B, C, D, E, or F, of Figure 2,
4  correct?
5    A.   We did not generate the
6  data, but as stated, the final
7  presentation of the paper was a very
8  close collaboration between
9  Dr. Cherepanov and myself.
10    Q.   You did not generate -- go
11  ahead.
12    A.   In particular, Panels E and
13  F there were only generated in response
14  to reviewers' comments.  So it came in
15  much later in the paper.
16    Q.   Well, let's focus on panel
17  C.  You and your lab had nothing to do
18  with the generation of this figure, did
19  you?
20    A.   I did not generate that
21  figure.
22    Q.   And you did not perform the
23  experiments that led to the generation of
24  Figure 2C, either?
25    A.   We did not solve the

Page 212

1  structure of the reported -- we did not
2  solve the structures of the reported
3  structures in this paper, that's correct.
4    Q.   And you were not responsible
5  for the insertion of the highlighted
6  yellow lines that appear here next to
7  G118 in Figure 2C were you?
8    A.   Well, I was involved with
9  that.  I can recall one of the reviewers
10  of the paper questioned the use of those
11  yellow lines.  And I was involved with
12  the response to that request.  So I was
13  involved in the peer review process, and
14  the yellow lines came up in the peer
15  review process.
16    Q.   And the yellow lines
17  remained in the paper, correct?
18    A.   The yellow lines remained in
19  the paper.  They're there to highlight
20  the approach of the A rings of both
21  dolutegravir and bictegravir to the
22  beta4-alpha2 connector, which is
23  understood as G118 in this figure.
24    Q.   Is that what the paper says,
25  sir?

Page 213

1    A.   I believe it is.  It does
2  say that the A rings of both compounds
3  approach and make close contact with the
4  beta4-alpha2 connector.
5    Q.   Let's talk about those
6  contacts.  Referring to Page 2 of the
7  article, there is a sentence -- two
8  sentences I know that you're highly
9  familiar with.
10       "Dolutegravir and
11  bictegravir intimately contact the
12  backbone atoms of those from the
13  integrase beta4-alpha2 connector making
14  eight and 12 contacts respectively with
15  interatomic distances less than or equal
16  to five angstroms.  Moreover, bictegravir
17  makes three contacts with interatomic
18  distances of 3.9 to 4 angstroms,"
19  correct?
20    A.   That's correct, and that's
21  what I said earlier, the paper says that
22  the -- or implies from this sentence that
23  the A-rings of both drugs make intimate
24  contacts with the backbone atoms of the
25  integrase beta 4-alpha 2 connector.

Page 214

1    Q.    Who wrote these two
2  sentences?
3      A.    So Dr. Cherepanov penned the
4  original draft and then it was an
5  iterative process of back and forth
6  between us to come up with the final
7  draft that was shared with other authors.
8  This language in large part, I think,
9  reflects what was there in the original
10  draft but I haven't compared the language
11  in the final published paper to the
12  various drafts.
13      Q.    And these sentences refer to
14  experimental work and analysis done in
15  Dr. Cherepanov's lab, correct?
16      A.    That's correct.
17      Q.    You are close friends with
18  Peter Cherepanov, correct?
19      A.    He's a longtime colleague of
20  mine and we stay in touch mainly through
21  our correspondence with Science.  I would
22  consider him a friend.
23      Q.    You've co-authored over 30
24  articles with Dr. Cherepanov, correct?
25      A.    That sounds correct.

Page 215

1      Q.    You consider him to be
2  honest?
3      A.    I consider him to be a
4  scientist of great integrity.
5      Q.    And you at least agree that
6  these two sentences identify two
7  differences between bictegravir and
8  dolutegravir.  One being that bictegravir
9  makes numerically more contacts with the
10  beta 4-alpha 2 connector, and the second
11  being that bictegravir's contacts are
12  closer, correct?
13      A.    I agree with the statement
14  in the paper and I think that's
15  consistent with doctrine of equivalence
16  where we expect differences.
17      Q.    You understand that a number
18  of scientists have interpreted this
19  sentence to be consistent with an
20  explanation for bictegravir's superiority
21  over dolutegravir, don't you?
22      A.    My interpretation of the
23  literature as a whole is there is no
24  superiority of bictegravir over
25  dolutegravir.  The numerical differences

Page 216

1  that we've been talking about, in my
2  expert opinion, are insubstantial based
3  on the assays I've evaluated and the data
4  I've evaluated.
5      Q.    But you understand that some
6  other scientists have interpreted your
7  article, and the findings of
8  Dr. Cherepanov here, to be consistent and
9  a possible explanation for what they
10  believe is bictegravir's superior
11  resistance profile, correct?
12      A.    I think it's possible that
13  other scientists have made that leap.
14      Q.    I'm going put Exhibit 11
15  into the mix here.  Should be coming up.
16        (Document marked for
17        identification as Exhibit
18        Engelman-11.)
19  BY MR. MORTARA:
20      Q.    Do you see it, sir?
21      A.    Is this Exhibit 11?  Yeah, I
22  see it.
23      Q.    Exhibit 11 is a poster
24  presented by Bluma Brenner and others at
25  the CROI research conference in 2020.

Page 217

1  You are familiar with it, correct?
2      A.    That's correct.
3      Q.    You know that this poster
4  cites Dr. Cherepanov's research and the
5  article you co-authored with him for the
6  proposition that the enhanced resistance
7  profile of bictegravir might be due to
8  van der Waal's interactions of the larger
9  oxazepine ring with the alpha 2-beta 4
10  loop integrase that may act as an
11  additional anchor Q148H/G140S.  You know
12  that this poster presented at CROI says,
13  correct?
14      A.    I agree that that's what
15  this poster, which is not a peer reviewed
16  publication, has stated.
17      Q.    Your expert reports are not
18  peer reviewed, are they, sir?
19      A.    They certainly are not.
20      Q.    Dr. Engelman, bictegravir
21  has an oxazepine ring, right?
22      A.    So I'm not -- my expertise
23  is not chemistry.  I'm not 100 percent
24  sure if that's the correct chemical
25  characterization of the ring.  I do

Page 218

1  admit, based on the structures you showed
2  me previously, that those were the three
3  drugs.
4      Q.   Dolutegravir does not have
5  an oxazepine ring, correct?
6      A.   Dolutegravir has a different
7  A-ring configuration, that's correct.
8      Q.   And Bluma Brenner and her
9  colleagues are familiar with results of
10 Dr. Cherepanov's work from the Science
11 2020 article and the article you
12 co-authored with him.  They looked at
13 that and concluded that bictegravir's
14 enhanced resistance profile could be
15 because it had this larger ring that made
16 contact in the alpha 2-beta 4 loop,
17 correct?
18     A.   That's what is stated in --
19 at the end of this poster, that's
20 correct.
21     Q.   And going back to
22 Figure 9.2 C of your Science 2020 article
23 with Dr. Cherepanov, that larger ring is
24 what's shown here in purple next to the
25 yellow lines.  That's bictegravir,

Page 219

1  correct?
2      A.   That's correct.
3  Dolutegravir is modeled in yellow and
4  bictegravir is modeled in purple, in
5  terms of the backbone end.
6      Q.   And that's bictegravir's
7  bigger ring, correct?
8      A.   I haven't done a volume
9  calculation to know in this
10 three-dimensional space which ring is
11 bigger or not.  But I would confirm that
12 the purple is definitely the bictegravir
13 ring.
14     Q.   Now, Dr. Brenner and her
15 colleagues presented this poster at CROI,
16 correct?
17     A.   That's my understanding,
18 correct.
19     Q.   And you've been a frequent
20 attendee at CROI in the past, correct?
21     A.   I have attended CROI in the
22 past, that's correct.
23     Q.   And you understand because
24 of COVID-19 CROI 2020 was held online,
25 correct?

Page 220

1      A.   That's correct.
2      Q.   In fact, it was held in
3  Boston, correct, or was supposed to be
4  held in Boston?
5      A.   That is correct.
6      Q.   Were you going to go?
7      A.   I was registered to go.  I
8  was traveling the week before and I was
9  actually sitting at the gate in the
10 Houston International Airport on my way
11 to a separate conference when I got the
12 no travel order starting on Monday from
13 my employer.  So I was traveling right
14 beforehand.  I was asked to lead a
15 discussion session at the CROI 2020
16 conference, and I ended up doing that
17 virtually from my home.
18     Q.   Now -- oh, so you
19 participated in CROI from -- virtually
20 from your house?
21     A.   That's correct.
22     Q.   Anyone can go online now and
23 get the abstract and this -- and this
24 associated poster that Bluma Brenner
25 presented at CROI 2020, correct?

Page 221

1      A.   That's my understanding.  I
2  haven't taken the time to do that myself.
3      Q.   And down here you see it
4  says contact, and Bluma Brenner has
5  provided her e-mail address.  You see
6  that?
7      A.   Yeah.
8      Q.   So anyone could go online,
9  get the abstract, and they can contact
10 Bluma Brenner and engage her on whether
11 she is reading the Science 2020
12 Cherepanov article and data correctly or
13 her conclusions are correct, right?
14     A.   It's a hypothetical, but I
15 suppose so.
16     Q.   And well, it's true, because
17 Bluma Brenner decided to present her work
18 in a public forum and subject it to
19 viewing by scientific colleagues,
20 correct?
21     A.   That seems like an accurate
22 characterization, correct.
23     Q.   But you disagree with Bluma
24 Brenner's conclusions in this poster,
25 correct?

1    A.   Well, my interpretation of
2  the data of the poster, as I put in my
3  supplemental report, indicates there
4  seems to be a phenotypic difference
5  between dolutegravir and bictegravir in
6  one of the four sets of experiments that
7  are presented in the middle column.
8  So...
9    Q.   My question is a little
10  narrower, which is, you disagree with the
11  sentence I highlighted earlier that cites
12  the Cherepanov work in the Science 2020
13  article right here, correct?
14    A.   That's because my reading of
15  the literature is very inconclusive in
16  terms of the enhanced resistance profile
17  of BIC versus dolutegravir, even to
18  inhibit the Q148H/G140S virus.
19    Q.   And have you -- have you
20  told Bluma Brenner and her colleagues
21  that you disagree with the statement in
22  her presentation at CROI?
23    A.   I have not.
24    Q.   Have you told Bluma Brenner
25  and her colleagues that you disagree with

1  how she is reading the article that you
2  are a co-author of and that
3  Dr. Cherepanov's work contained therein?
4    A.   I have not done it in this
5  case, nor do I do it in any case unless
6  I'm asked to review a paper through peer
7  review.
8    Q.   Have you publicly presented
9  anywhere in your criticisms of
10  Dr. Brenner's poster?
11    A.   I have not.  That's also in
12  my mind unprofessional.
13    Q.   Have you publicly said
14  anywhere that no one should read the
15  Science article with your name on it the
16  way Bluma Brenner is reading it?
17    A.   Again, to put that out in
18  the public, I would consider that highly
19  unprofessional.
20    Q.   Who is Bluma Brenner?
21    A.   I do not recall ever meeting
22  Dr. Brenner in person.  I believe --
23  let's see.  She's a scientist at the Lady
24  Davis Institute.
25    Q.   She is a virologist,

1  correct?
2    A.   I have not spent an
3  extensive time overviewing Dr. Brenner's
4  CV or literature.
5    I can say, based on this
6  paper and I think -- I believe following
7  reading this poster, I did go back and
8  read Article Number 6 and the references
9  and acknowledgments section, which, if I
10  recall correctly is an AIDS article from
11  2018 where Dr. Brenner served as
12  corresponding author, I'm under the
13  impression.
14    So based on my reading of
15  those -- this poster and that paper, I
16  think she could be characterized as
17  virologist, yes.
18    Q.   I understand that you
19  mentioned one of them already.  You had
20  some criticisms of this work.  One of
21  those criticisms is that this work has
22  not been peer reviewed, correct?
23    A.   Well, I think it's just a
24  statement that the work has not been peer
25  reviewed.

1    And as we've talked about
2  today, the data -- papers can -- it can
3  change rather dramatically during the
4  peer review process, based on the
5  comments provided by editors and
6  reviewers.
7    Q.   Dr. Engelman, you are aware
8  that Dr. Cherepanov has stated in
9  correspondence that he believes his data
10  shows why bictegravir has an improved
11  resistance profile over dolutegravir,
12  correct?
13    A.   I have seen copies of
14  e-mails shared between, I think it was,
15  Dr. Reynolds and Dr. Cherepanov.
16    Q.   I'm going to put Exhibit 7,
17  which is that correspondence, into the
18  shared folder for you.
19    (Document marked for
20    identification as Exhibit
21    Engelman-7.)
22  BY MR. MORTARA:
23    Q.   And I've got it on the
24  screen.  Going down to the first e-mail,
25  of the chain.  In the first e-mail,

1 Dr. Reynolds asked Dr. Cherepanov for the
2 data underlying an abstract that you and
3 Dr. Cherepanov had published, correct?
4     A.   Yeah, an abstract of a
5 presentation of a meeting.  I usually
6 reserve publication for something that's
7 come out in a journal.
8     Q.   Did you present that
9 material at the meeting?
10    A.   I was present at the
11 meeting.  The presentation I believe was
12 given by Dr. Cherapanov.
13    Q.   And at the meeting where the
14 presentation was made by Dr. Cherepanov
15 of the data underlying the science
16 article, how many people were there?
17    A.   I would have to give you a
18 ballpark estimate of 2- to 300.  I have
19 no idea what the absolute number is.
20    Q.   So you showed the data
21 underlying what came out in Science to 2-
22 to 300 people.  When was that?
23    A.   If we are talking about the
24 same meeting, I believe it would have
25 been June 2019.  I think that's

1 referenced in my report.
2     Q.   Take your time to confirm it
3 if you wish.
4         MR. WILCOX:  Adam, do you
5 have a better copy of Exhibit 7?
6         On the first page it's
7 cutting off the last line of the
8 e-mail.  And on the second page,
9 it's cutting off the top line of
10 the e-mail with the exhibit
11 sticker.
12        MR. MORTARA:  We'll have to
13 live with it.
14        THE WITNESS:  Okay.  Sir,
15 I've identified Page 15 of my
16 reply report.  I can confirm that
17 this meeting took place on
18 June 27th and June 28th, 2019.
19 BY MR. MORTARA:
20    Q.   So in June of 2019, you
21 and -- you were there and Dr. Cherepanov
22 presented the data underlaying the 2020
23 publication that went into Science to 2-
24 to 300 people, correct?
25    A.   That's -- that's accurate.

1     Q.   It was a fairly public
2 presentation, 2- to 300 people, isn't it?
3     A.   That's correct.
4     Q.   Yet, you felt uncomfortable
5 putting that same data into your highly
6 confidential expert report in this case
7 after Dr. Cherepanov has shown it to 200
8 to 300 people.  Can you explain that to
9 me, sir?
10    A.   Again, my feeling is that --
11 the thought pattern that I heard, is what
12 I explained to you early, and I will
13 enumerate once again as follows.
14        I personally wouldn't have
15 been able to do that with a clear
16 conscious about sharing data unless I
17 would have contacted my colleagues in
18 this study, Dr. Cherepanov and minimally
19 Dr. Rosta, who, like myself, are senior
20 investigators who run research
21 laboratories.
22        And I made the decision on
23 my own not to involve them because of the
24 confidential -- confidential nature of
25 this case.

1     Q.   Even though it had already
2 been shown to 2- to 300 people publicly
3 the past June?
4     A.   The results have been
5 discussed at meetings.  At this point in
6 time, it was just about when we submitted
7 the first draft of the manuscript.  But
8 it was not the final paper that would
9 have come out.  And now the paper has
10 come out, and in my supplemental report,
11 I do discuss the paper.
12    Q.   When you were writing your
13 first report, you knew that this data
14 that Dr. Cherepanov had generated, was
15 pretty important to the case, didn't you?
16    A.   I would say it was likely to
17 become pertinent.
18    Q.   Even though the data had
19 been shown to 200 to 300 people, you
20 didn't feel comfortable putting it in
21 your confidential expert report for the
22 reasons that you've given, correct?
23    A.   That's correct.
24    Q.   Now, in the first e-mail on
25 the screen, Dr. Reynolds asked

1 Dr. Cherepanov for the data, correct?
2      MR. WILCOX: I'm going to
3 object to this line of questioning
4 on this document because, like I
5 pointed out to counsel before,
6 there are lines that are cut off.
7      So we don't have the full
8 e-mail. It's a standing objection
9 to these questions on Exhibit 7.
10      Dr. Engelman, you can go
11 ahead.
12 BY MR. MORTARA:
13   Q.   In the first e-mail,
14 Dr. Reynolds asks Dr. Cherepanov for the
15 data that underlay the presentation and
16 abstract, correct?
17   A.   I'm reading it now.   Yes.
18 He e-mailed Peter explaining who he was.
19 It seems like he gave a brief explanation
20 in relation to this case as well.
21   Q.   And in response Dr.
22 Cherepanov wrote quite a long e-mail
23 back, which I want to ask you about one
24 paragraph that you reviewed and commented
25 on in your expert reports already. And

1 it's right here.
2      "We suspected already for
3 some time that contacts with that" --
4 same thing I couldn't pronounce before --
5 "we call as beta4-alpha2 connector might
6 be the critical feature of the
7 second-generation property INSTIs.
8 Interestingly, BIC makes more intimate
9 contacts via its extended structure,
10 which I believe explains a better
11 performance of the compound reported by
12 Steve Hughes' lab."
13      Do you see that?
14   A.   I do see that.
15   Q.    And that -- is it fair to
16 say that's a paraphrase of the language
17 from Exhibit 9, the Science 2020 article
18 that we were just discussing, eight and
19 12 contacts, bictegravir makes 12,
20 dolutegravir makes eight. Bictegravir's
21 contacts are closer. This is a
22 paraphrase of that same language,
23 correct?
24      MR. WILCOX: Object to form.
25      THE WITNESS: I think it's

1 related to that. But nowhere in
2 the paper that I recall, the
3 published 2020 paper, do we
4 pontificate that the difference in
5 contacts that are made may explain
6 a better performances of the
7 compound as reported by Steve
8 Hughes' lab.
9      And, moreover, I believe
10 Peter has made this statement
11 without having read the Hughes lab
12 paper at the same level of detail
13 that I have.
14 BY MR. MORTARA:
15   Q.   Do you know that? Other
16 times today you've been -- you've been
17 discouraged by your counsel from
18 speculating. Are you speculating right
19 now, sir?
20      MR. WILCOX: Objection.
21      Argumentative.
22 BY MR. MORTARA:
23   Q.   You have no idea how closely
24 Dr. Cherepanov has read that 2018 Hughes
25 article, do you?

1   A.   I do not.
2   Q.   Dr. Engelman, here
3 Dr. Cherepanov says, "Interestingly BIC
4 makes more intimate contacts via its
5 extended structure," and cites the Hughes
6 work.
7      You see that, right?
8   A.   Yes, sir.
9   Q.   And when you first read that
10 e-mail, you decided to write in your
11 reply report that you weren't sure what
12 your close friend and colleague meant,
13 correct?
14   A.   Well, because the statement
15 in Dr. Cherepanov's e-mail was ambiguous.
16 He believes and explains a better
17 performance of the compound, but it's
18 unclear -- or actually he makes no
19 comparison of the compound to what. It's
20 completely ambiguous in the statement
21 that you've highlighted.
22   Q.   Yeah, I think you wrote in
23 your reply report, it wasn't clear to you
24 what he meant, right?
25   A.   That's correct.

Page 234

1    Q.   Did you call him and ask him
2  or send him an e-mail saying, Peter,
3  what's your thoughts on whether there's a
4  difference between bictegravir and
5  dolutegravir based on the experiments you
6  did and wrote up in our article that
7  appeared in Science, do you think there's
8  a difference?
9         Did you -- did you ask your
10  close friend that question?
11    A.   So again, I would have
12  considered that completely, you know,
13  unprofessional.  The thoughts and the
14  opinions I've opined in these -- in these
15  expert reports, I approach them as work
16  produced under the confidentiality --
17  confidentiality between myself and legal
18  counsel.  And I did not want to engage in
19  direct conversation with things like
20  that, with -- with other scientists.
21    Q.   You didn't want to check
22  whether you're reading other scientists'
23  words correctly and talk to them, and you
24  thought you couldn't because this work is
25  confidential?

Page 235

1    A.   This is surely a
2  confidential e-mail.  It's not meant for
3  me.
4    Q.   You didn't have to mention
5  the e-mail to ask Dr. Cherepanov what his
6  views are about what his experiments
7  showed, did you?
8    A.   Sir, I'm a very busy person.
9  I run a research laboratory with seven
10  different grant applications funding my
11  work.  I have better things to do with my
12  time than follow up on a confidential
13  e-mail to ask for an opinion of a
14  colleague.
15    Q.   Well, instead of following
16  up on the scientific view that one of
17  your colleagues had about experiments he
18  did and he wrote up, you decided to write
19  in your reply report that you didn't know
20  what he meant and proceed to analyze what
21  he might have meant, correct?
22    A.   In my reply report, I
23  highlighted the ambiguity of this e-mail
24  that was shared with me through a highly
25  confidential route with -- by counsel.

Page 236

1  And I -- I addressed what I thought it
2  meant in my report.  That's right.
3    Q.   And how long did that take
4  you?  Did it take you longer or shorter
5  than it would have taken you just to ask
6  Dr. Cherepanov what his views are about
7  the research he had done and written up
8  in an article you were a co-author of?
9    A.   At this point in time, I
10  almost feel obliged that I need to reach
11  out to Dr. Cherepanov to mention to him
12  that he is a co-author on papers with
13  Dr. Hughes which has recycled data over
14  numerous years.  I'm not sure he's aware
15  of that.
16    Q.   Have you -- Dr. Engelman,
17  have you said anything to Dr. Cherepanov
18  about your views about Dr. Stephen
19  Hughes' article?
20    A.   I have not.
21         MR. MORTARA:  And again, I
22  move to strike the newly disclosed
23  opinion that keeps popping up in
24  response to questions.  It's
25  completely nonresponsive.

Page 237

1         Mr. Wilcox, go ahead.
2         MR. WILCOX:  Yeah, I would
3  oppose that motion.
4  BY MR. MORTARA:
5    Q.   Dr. Engelman, you ultimately
6  found out, in fact, what Dr. Cherepanov
7  meant in his e-mail to Dr. Reynolds,
8  correct?
9    A.   I believe that was clarified
10  by a subsequent e-mail, that's correct.
11    Q.   And I'm moving into the
12  folder Exhibit 6.
13         (Document marked for
14  identification as Exhibit
15  Engelman-6.)
16  BY MR. MORTARA:
17    Q.   Exhibit 6 is an e-mail --
18  excuse me.  Exhibit 6 is a full copy of
19  the e-mail that Mr. Wilcox was objecting
20  to before.  We'll go back to Exhibit 7
21  which has the response.
22         At the top you see the
23  response.  "Hi Chuck, apologies if my
24  e-mail was not clear.  Yes, I was
25  discussing the differences between

Page 238

1  dolutegravir and bictegravir.
2          And indeed, I believe that
3  the more intimate contacts with integrase
4  backbone explain improved resistance
5  profile of BIC versus dolutegravir which
6  was shown by Hughes' lab?"
7          Do you see that?
8      A.  I do see that.
9      Q.  It is Dr. Cherepanov's view
10 of the research he did, and he wrote up,
11 in a paper with you as a co-author, that
12 bictegravir makes more intimate contacts
13 with the integrase backbone than
14 dolutegravir, correct?
15     A.  Yes.  I agree with the
16 statement in the paper, whereas
17 bictegravir makes 12 contacts,
18 dolutegravir makes 8 contacts.
19     Q.  And bictegravir makes closer
20 contacts too, right, Doctor?  That's what
21 it says in the sentence right afterwards.
22     A.  That's right.  Bictegravir
23 has four contacts within the interatomic
24 distance of 3.9 to 4 angstroms.

Page 239

4      Q.  And you are being paid by
5  ViiV's lawyers, correct?
6      A.  I'm compensated for the time
7  that I've put into this case.
8          And let me clarify, the
9  approach that I have taken in generating
10 my expert reports is the exact same
11 approach I have taken over my career to
12 closely analyze data that's shown before
13 me in terms of grants, reviewing grant
14 applications or reviewing manuscripts and
15 the peer review process.  It's the exact
16 same approach as I've taken in my expert
17 reports, or when I work pro bono as a
18 reviewer for grants.  I am paid $200 each
19 time I serve on an NIH study section.



Page 242



10    MR. MORTARA:  Let's take a
11  break.  About ten minutes?  Is
12  that all right?  15?  What do you
13  want?
14    Dr. Engelman, up to you, 10
15  or 15?
16    THE WITNESS: Let's reconvene
17  at 3:25.
18    MR. MORTARA:  3:25.
19  Perfect.  Thank you.
20    THE VIDEOGRAPHER:  Going off
21  the video record at 3:12 Eastern
22  time.
23    (Short break.)
24    THE VIDEOGRAPHER:  We are
25  now back on the video record.

Page 243

1    It's 3:26 p.m., Eastern time.
2  BY MR. MORTARA:
3    Q.   Hello again, Dr. Engelman.
4    A.   Good afternoon.
5    Q.   Talking again about the data
6  from the Exhibit 9, the Science 2020
7  article with Dr. Cherepanov as the last
8  listed author.
9      You would agree that you
10  considered and rejected the idea of
11  talking about the Cherepanov experiments
12  that had been disclosed at that
13  presentation in June and that material
14  that underlay the science manuscript in
15  your first expert report, correct?
16    A.   That's correct.
17    Q.   Why did you not place the
18  draft manuscript or the data on the list
19  of materials you considered in your
20  expert report then?
21    A.   Well, it's because I didn't
22  consider them.
23    Q.   I just asked you if you
24  considered and rejected the idea, talking
25  about the experiments, and you said you

Page 244

1  did.
2      In your mind that didn't
3  constitute considering them?
4    A.   I did not consider the data
5  that was part of the draft manuscript
6  that we had been working on as part of
7  the information I considered in
8  formulating my opinion in the opening
9  report.
10    Q.   Did you talk to the ViiV
11  lawyers during the break?
12    A.   I did not.
13    Q.   You spend a fair amount of
14  space in your expert reports talking
15  about something called dissociation
16  kinetics, correct?
17    A.   That's one of the metrics
18  that I analyzed in my report, that's
19  correct.
20    Q.   And you reviewed a poster by
21  Kirsten White at Gilead, correct?
22    A.   Poster from Kirsten White,
23  publication from Hightower, et al.
24    Q.   Right.  I'm going to put
25  both of those into your folder.  I have

Page 245

1  prefatory questions first.  Those will be
2  Exhibit 15 and 27.
3      (Document marked for
4    identification as Exhibit
5    Engelman-15 .)
6      (Document marked for
7    identification as Exhibit
8    Engelman-27.)
9  BY MR. MORTARA:
10    Q.   You don't need to look at
11  them yet.  I'm just getting them over
12  there:
13    MR. MORTARA:  Hightower
14  would be 15.  And that poster will
15  be 27.
16  BY MR. MORTARA:
17    Q.   Both of those articles use a
18  technique called SPA or scintillation
19  proximity assay, correct?
20    A.   That's correct.
21    Q.   Prior to your first expert
22  report in this case, you had never, not
23  once, published research where you
24  reported on SPA experiments; is that
25  right?

Page 246

1  A. That's correct. My
2  laboratory has not performed that
3  particular SPA assay.
4  Q. Now, the Cherepanov Science
5  2020 article has some SPA experiments in
6  it, doesn't it?
7  A. That's correct.
8  Q. And we earlier looked at
9  some of the results generated by those
10  experiments in Figure 3A. Do you
11  remember that?
12  A. I can recall that, yes.
13  Q. You and your lab had nothing
14  to do with the performance of the SPA
15  experiments in the Cherepanov Science
16  2020 article, correct?
17  A. As prior stated on the
18  record, these experiments were performed
19  in Dr. Cherepanov's laboratory.
20  Q. And you have never done SPA
21  experiments yourself, correct?
22  A. We have not done this SPA
23  experiment ourselves, correct.
24  Q. And thus, you have zero
25  performance in performing SPA

Page 247

1  experiments, correct?
2  A. We have not run SPA
3  experiments within my laboratory, that's
4  correct.
5  Q. Do you know whether
6  Dr. Cherepanov asked anyone for help in
7  designing or performing the SPA
8  experiments in the Cherepanov Science
9  2020 article?
10  A. It's very difficult for me
11  to comment on what Dr. Cherepanov might
12  have done.
13  Q. I'm just asking if you know
14  whether Dr. Cherepanov asked anyone for
15  help in designing or performing the SPA
16  experiments in the Cherepanov Science
17  2020 article?
18  A. I am -- I am not privy to
19  that information.
20  Q. Dr. Engelman -- do you have
21  something to add?
22  A. No. Sorry. Please go
23  ahead.
24  Q. The results that
25  Dr. Cherepanov got in his SPA experiments

Page 248

1  for the half-life of dolutegravir -- I'm
2  speaking specifically about the mutant
3  Q148H/G140S of a 14-hour half-life, are
4  they in agreement with the Hightower
5  paper?
6  And that is Exhibit 15, sir.
7  Let's do it this way. Go ahead and take
8  a look at Exhibit 15, which you now have
9  in your folder. But I'll put it up on
10  the screen. Table 2, from Exhibit 15.
11  You have reviewed the Hightower paper for
12  your report, correct?
13  A. That's correct.
14  Q. And of course, at some point
15  you reviewed the paper that you're a
16  corresponding author on with
17  Dr. Cherepanov and his experiments,
18  correct?
19  A. That's correct.
20  Q. What explains the different
21  results here, 14 hours in an experiment
22  Dr. Cherepanov did and 3.3 hours in an
23  experiment Dr. Hightower did?
24  A. Well, it's of course
25  difficult to come up with a concrete

Page 249

1  answer, because no control experiment has
2  been tested side by side to address this.
3  My expert opinion, though,
4  is this likely is to be in part explained
5  by the temperature at which the
6  experiment was conducted.
7  The experiment in Hightower,
8  et al., was conducted at 37 degrees
9  celsius; whereas, the experiment in Cook,
10  et al., was conducted at room
11  temperature, approximately 22 to
12  25 degrees celsius.
13  I am aware of reports at
14  meetings and in the literature that have
15  conducted this experiment both at
16  37 degrees celsius and at 25 degrees
17  celsius.
18  Q. So here, the different
19  experimental methods yielded different
20  absolute results, correct, 14 hours in
21  the Cook, et al., paper and 3.3 hours in
22  Hightower, correct?
23  A. Again, my opinion is it's
24  difficult to come up with a concrete
25  explanation because the proper control

Page 250

1 experiments have not been conducted, but
2 the feeling is that the longer value on
3 the left panel that you've highlighted at
4 14 hours, is likely in part, at least in
5 part, due to the different temperature
6 under which the experiment was conducted.
7         To paraphrase, the warmer
8 things are cooked, the faster the
9 molecules will move, hence leading to the
10 apparent faster dissociation in this
11 example under the higher temperature in
12 Table 2.
13     Q.   And you can't come up with a
14 concrete explanation comparing these two
15 experiments because of the absence of a
16 control between them; is that right?
17     A.   The absence of a carefully
18 controlled experiment to address the
19 differences that you've brought up,
20 that's correct.  So for example, a
21 carefully controlled experiment would be
22 for one investigator to repeat the
23 experiment, if they had the wherewithal
24 to do it, with this mutant and this
25 compound at the two temperatures side by

Page 251

1 side directly.
2     Q.   And you can't come up with a
3 concrete explanation comparing these two
4 experiments in part because of that
5 difference in temperature in the two
6 methods, correct?
7     A.   I think the difference in
8 temperature is one of the -- one of the
9 differences between the two experiments
10 that I would highlight in this discussion
11 as I have, correct.
12     Q.   And that's a difference in
13 the way the experiments are performed,
14 correct?
15     A.   The temperature under which
16 the dissociation phase of the experiments
17 were performed.  That's correct.
18     Q.   I'd like to refer you now to
19 Exhibit 27, which is the White poster.
20 You are familiar with the Kirsten White,
21 et al., poster from Gilead, correct?
22     A.   That's correct.  I have
23 reviewed it.
24     Q.   And I want to talk about the
25 dissociation half-life data shown on

Page 252

1 Table 3.  I'll blow that up on the
2 screen.
3         And you understand that
4 there's two different models that were
5 used to calculate the half-lives.  One is
6 the exponential decay model, and one is
7 the equilibrium binding model.  You
8 understand that, right?
9     A.   Yes.  I believe the two
10 examples that you had on the screen from
11 Cook 2020 and Hightower 2011, they had
12 approached data analysis by the
13 exponential decay model.
14     Q.   And that's the one I want to
15 ask you about.
16         The difference between the
17 observed half-lives between bictegravir
18 and dolutegravir is 56 hours, correct?
19     A.   That looks -- that looks to
20 be accurate, that's correct.
21     Q.   Would you agree that
22 bictegravir dissociates from HIV
23 wild-type integrase much more slowly than
24 dolutegravir because its half-life in
25 these experiments is 56 hours longer?

Page 253

1     A.   Well, that's by the
2 exponential decay model.  The difference
3 in the equilibrium binding model is -- is
4 a smaller number.  That seems to be about
5 22 hours.
6     Q.   Just focusing on the
7 exponential decay model, would you agree
8 that bictegravir dissociates from HIV
9 integrase much more slowly than
10 dolutegravir in these experiments?
11     A.   I would agree with
12 language --
13         MR. WILCOX:  Object to form.
14         THE WITNESS:  -- that it --
15     that it seems to dissociate more
16     slowly.
17 BY MR. MORTARA:
18     Q.   You don't agree that the
19 56-hour increase in half-life represents
20 much slower disassociation?
21         MR. WILCOX:  Object to form.
22         THE WITNESS:  Yes, I
23     disagree with that.  I have to do
24     a more complete analysis.  The
25     analysis that I provided is that

Page 254

1     the dissociation rate of
2     bictegravir versus dolutegravir
3     from HIV integration complexes is
4     insubstantially different.
5 BY MR. MORTARA:
6     Q. I want to talk to you about
7 Monogram Biosciences PhenoSense integrase
8 assay.
9        You have never once written
10 an article where the Monogram assay was
11 used or cited in any way, correct?
12     A. We have not used the
13 services at Monogram Biosciences.
14     Q. Monogram Biosciences has
15 never asked you to consult with them in
16 any way, shape or form, correct?
17     A. That's correct.
18     Q. Do you know even anyone who
19 works at Monogram Biosciences?
20     A. I do not know of anybody who
21 works at Monogram Biosciences.
22     Q. In fact, prior to this case,
23 you had zero experience with Monogram
24 Biosciences or using or interpreting
25 their assay, correct?

Page 255

1     A. Prior to this case, I was
2 aware of Monogram Biosciences, but I had
3 not used them or interpreted their data
4 prior to this case.
5     Q. So the only time you've done
6 anything having anything to do with
7 Monogram Biosciences PhenoSense integrase
8 assay is when you were being paid by ViiV
9 lawyers in this case, correct?
10     A. Monogram Biosciences data is
11 one of 400 different data sources I
12 considered in forming my expert opinion
13 in this case.
14     Q. So the only time you've had
15 anything to do with Monogram Biosciences
16 assays is when you were being paid by
17 ViiV's lawyers in this case, correct?
18     A. I've read numerous papers on
19 HIV integrase and integrase strand
20 transfer inhibitors. So I've read about
21 Monogram Biosciences and their results
22 prior to this case.

Page 256

1           So I was surely
2 aware of the use of Monogram Biosciences
3 and the type of data they provided
4 because it's my impression, as I opined
5 in my reports, that much of the data
6              was
7 generated by Monogram Biosciences.

14     Q. Dr. Engelman, did you tell
15 us in your expert reports that

18     A. I did not --

23     Q. Dr. Engelman, did you
24 disclose in your expert reports that

Page 257

25        MR. WILCOX: Counsel, I'm





Page 258

1  going to object as argumentative.
2  You need to calm down and not be
3  yelling into the screen at
4  Dr. Engelman.
5  BY MR. MORTARA:

19       MR. MORTARA:  We're going to
20  take a break for 20 minutes.  And
21  we're going to come back on the
22  record.
23  BY MR. MORTARA:
24       Q.   Dr. Engelman, I'm asking you
25  not to talk to the ViiV lawyers during

Page 259

1  this break.
2       MR. MORTARA:  And counsel,
3  I'd like you to confirm that you
4  will not talk to the witness
5  during the break, or I will seek
6  emergency relief from the court.
7       MR. WILCOX:  Counsel, I
8  think this is totally
9  inappropriate.  You know, if we
10  were in person at an office, that
11  if there was a breakout, we would
12  go back in a conference room.  So
13  you've got no basis --
14       MR. MORTARA:  Absolutely
15  not --
16       MR. WILCOX:  -- to tell
17  me --
18       MR. MORTARA:  We're going to
19  stay -- we're going to stay on
20  the -- we're going to stay on the
21  record.  You are not talking to
22  your witness about this frankly
23  shocking and blockbuster
24  disclosure.  We are staying on the
25  record.

Page 260

1       Dr. Engelman, we're going to
2  let the tape roll, we're going to
3  take up my time while I decide
4  what to do on this on my own time.
5  Thank you.
6       We'll stay on the...
7       (Pause in the proceedings.)
8       MR. WILCOX:  Just to be
9  clear, we've been on the record
10  the whole time now.
11       MR. MORTARA:  Oh, yeah,
12  that's exactly right, because I
13  didn't want you to talk to your
14  witness.  Thanks, Mr. Wilcox.
15  BY MR. MORTARA:
16       Q.   Dr. Engelman,
                                  , you had
18  already been retained by ViiV Healthcare,
19  correct?
20       A.   That's incorrect.  That was
21  before they first contacted me.

Page 261

20       Q.   What date exactly were you
21  retained by ViiV Healthcare?
22       A.   I don't have the exact date
23  in front of me.  I don't have access to
24  the retention agreement.  It was some
25  time in August 2016.



Page 262

1   Q.   When were you first
2  contacted by ViiV healthcare in
3  connection with this case?  Exact date,
4  please.
5     A.   I apologize, sir, but I
6  don't have the exact date at hand.  It
7  would have been sometime around early
8  August 2016.
9     Q.   You can find out the exact
10 date, can't you?
11    A.   My colleague, Lindsey Miller
12 might know.
13    Q.   We'll ask her at a different
14 time.
15       Dr. Engelman, did you reach
16 out to ViiV Healthcare or did ViiV
17 Healthcare reach out to you?
18    A.   My recollection is that I
19 was contacted by Michael Stadnick, a name
20 that I brought up earlier, by telephone.
21    Q.   Did you tell the ViiV
22 lawyers at any point that ██████████
23 ████████████████████████████████
25    A.   I believe a question like

Page 263

1  that is covered by attorney/client
2  privilege.
3     Q.   They're not your lawyers,
4  sir.
5       MR. MORTARA:  Mr. Wilcox,
6     are you going to let him ask the
7     question?
8       MR. WILCOX:  Restate your
9     question, Mr. Mortara.
10 BY MR. MORTARA:
11    Q.   Did you tell the ViiV
12 lawyers at any point that ██████████
13 ████████████████████████████████
15       MR. WILCOX:  You can answer
16    that yes or no, Dr. Engelman.
17       THE WITNESS:  Yes.
18 BY MR. MORTARA:
19    Q.   When did you tell the ViiV
20 lawyers that ██████████████████████
21 ████████████████████████████████
23       MR. WILCOX:  You can answer
24    that with a date, Dr. Engelman.
25       THE WITNESS:  I don't have

Page 264

1  the precise date.  But that sounds
2  like a conversation that we had
3  quite recently, within the last
4  one to two weeks.
5  BY MR. MORTARA:
6     Q.   That would be the first time
7  you told the ViiV lawyers that ████████
8  ████████████████████████████████████
10    A.   That's the best of my
11 recollection, yes.
12 ████████████████████████████████████
13 ████████████████████████████████████
17    A.   That's right.  We
18 highlight -- excuse me, I misspoke. █
19 ████████████████████████████████████
21    Q.   When you said "we," who did
22 you mean?
23    A.   I meant myself only.
24 ████████████████████████████████████
25 ████████████████████████████████████

Page 265

1  ████████████████████████████████████
2  ████████████████████████████████████
3  ███████████
4          Do you see that?
5     A.   I do.
6     Q.   You did not disclose that
7  ████████████████████████████████████
9     A.   I did not.
10    Q.   And in fact, you didn't
11 disclose it until I asked you under oath
12 that question, correct?
13    A.   That's correct.
14    Q.   You weren't going to
15 disclose it unless someone asked you
16 under oath whether that was true, were
17 you?
18       MR. WILCOX:  Objection.
19       Argumentative.
20 ████████████████████████████████████
21 ████████████████████████████████████
23 BY MR. MORTARA:
24    Q.   Your report is highly
25 confidential, isn't it, sir?  It says

Page 266

1  that on the front.
2      A.   That's right.  And that's
3  why I answered your question under oath,
4  because this is also highly confidential.
5      Q.   Dr. Engelman, none of your
6  reports disclose that

9      A.   No.

22     Q.   And you nowhere told us
23  about that in your expert reports,
24  correct?
25     A.   That's correct.

Page 267

18     Q.   And then you say, noting --

23        Do you see that?
24     A.   Yes, I do see that.

Page 268

Page 269



Page 270

[text redacted]

Page 272

Q. Did you think -- did it
occur to you that [redacted]
[redacted] that
someone might be misled in reading your
expert reports from the truth which is
[redacted]
MR. WILCOX: Objection.
Argumentative.
THE WITNESS: No, I didn't.
What I was doing was [redacted]
[redacted]
BY MR. MORTARA:
Q. You don't think that your
expert report is misleading for not
[redacted]
A. That's correct.
Q. When you told the ViiV
lawyers that [redacted]
[redacted] did you discuss with the
ViiV lawyers whether that should be
disclosed to Gilead?
MR. WILCOX: I'm going to

Page 271

MR. WILCOX: Objection.
Argumentative.
[redacted]
BY MR. MORTARA:
[redacted]
A. Excuse me?
[redacted]

Page 273

instruct you not to answer that
question, Dr. Engelman, that falls
under Rule 26, protections.
MR. MORTARA: Again,
Mr. Wilcox, we're going to take
this one up with the court. And
if you want to give him the
opportunity to answer the question
yes or no right now, that will
save him from coming back and
having a potentially quite lengthy
redeposition on this subject.
MR. WILCOX: Yeah, I'll take
it under advisement, Counsel.
MR. MORTARA: Go ahead and
let me know if you're going to --
willing to let him answer that
question.
BY MR. MORTARA:
Q. In any event, Dr. Engelman,
you did not disclose to me or to anyone
from Gilead or to the court prior to
today that [redacted]
[redacted] did you?
A. I did not disclose.



Page 274

Page 276

1 portion of the report, I didn't -- I
2 suppose I felt like it wasn't pertinent.

Page 275

Page 277

9     Q.   Dr. Engelman, you are on the
10 editorial board of Retrovirology, we
11 discussed that earlier, right?
12     A.   That's correct.
13     Q.   Were you one of the peer
14 reviews of the Hughes NIH 2018 article?
15     A.   I already stated that I'm
16 99.99 percent sure I was not.  So I was
17 not.

21     Q.   Why did you choose not to
22 reveal

25     A.   When I -- when I wrote this

Page 278



Page 279

8    Q.   In hindsight, do you think
9  you made a mistake in not disclosing in
10  your expert report that
, would you admit that
13  you made a mistake?
14    A.   I think I could have been
15  more accurate if
18    Q.   Dr. Engelman, you had
19  referred a couple times to 32
20  typographical errors, that you cited the
21  number in your expert report, in the
22  Hughes 2018 NIH article, correct?
23    A.   That's correct.
24    Q.   I'm asking you only about
25  the 32 typographical errors that you

Page 280

1  didn't identify, but you gave the number,
2  in your expert report.
3        You agree you did not, in
4  fact, identify all those 32 typographical
5  errors, correct?
6    A.   I did not.  I think in my
7  report, I believe in my report I
8  highlighted some more of the egregious
9  ones which we've already talked about
10  one, the misinterpretation of the data.
11    Q.   That was the sentence where
12  you and I can't agree about the meaning
13  of the Philadelphia Eagles sentence that
14  I showed on the screen, right?  That was
15  one.
16        That's one, correct?
17    A.   That's one, that's correct.
18    Q.   Another is the numbers in
19  the figure here that I'm showing on the
20  screen are off by one, correct?
21    A.   Yes.  This figure is very
22  difficult to follow, because the numbers
23  in the first column, most of those are
24  incorrect.
25    Q.   And then a third appears in

Page 281

1  Supplemental Table 1, which I will get to
2  momentarily, which is where for G118R,
3  there's a greater than sign but also an
4  "NS" designation, correct?
5    A.   Yeah, this table is very
6  confusing and riddled with errors.
7    Q.   Those are three, though,
8  right, three that I just identified?
9    A.   Those are three.
10    Q.   Would you please now, go
11  through and identify the other 29
12  typographical errors that you found in
13  the Hughes 2018 article?
14    A.   I can do that.  It will take
15  up the rest of our time.
16    Q.   Well, I don't know if it's
17  going to take up the rest of our time.  I
18  have very little left other than that.
19  So I'm willing to use my time to have you
20  tell me what those errors are.
21    A.   Okay.  Which -- I'll go to
22  my left screen.  I apologize.  Once
23  again, remind me of the exhibit number.
24    Q.   It is 25.  And please, we
25  can go through the article in order.  And

1 you can tell me the page, and we'll
2 highlight it on the screen as we go.
3     A.   The first one would be on
4 Page 3.  "Only bictegravir potently
5 inhibited the well known
6 raltegravir-resistant integrase double
7 mutant virus" --
8     Q.   That's one of the three that
9 we already counted.  But if you want to
10 just count 32.
11     A.   I want to -- I want to
12 highlight when I think it's an error,
13 because -- because the authors are
14 pointing out that the value is less than
15 or equal to five.  But if we go to the
16 table --
17        Oh, boy.  Okay.  The mouse
18 is kind of working.  We're now going to
19 Supplemental Table S1.
20        And we're in the fourth
21 column from the left.  The value for
22 dolutegravir is 5.8.  The value for
23 bictegravir is 5.5.  I don't see how 5.5
24 is less than or equal to five.
25        The value for G118R for

1 dolutegravir is 13.0, for bictegravir
2 it's 5.4.
3        My interpretation is that
4 5.4 is not less than five.  But that's
5 really one of those typographical errors.
6     Q.   How many of those -- how
7 many typographical errors do you
8 believe -- how many did that account for,
9 this sentence, you don't like the way
10 it's written compared to the data, 5.4
11 rounded to five is confusing to you, 5.5
12 for the other one, you don't think that's
13 five.  How many is that?  Is that three?
14     A.   I think it was one or two.
15 You know, to be -- I have a tabulated
16 value on my own laptop that highlights
17 all the typographical errors.  This will
18 go much faster if you want me to go get
19 my laptop.
20     Q.   Why didn't you submit with
21 your expert report, the tabulated
22 typographical errors, the 32 that you
23 were talking about, in your reports?
24     A.   Well, I did highlight the
25 most egregious errors.  So some of the

1 other ones we can look at right on this
2 table.  This is a table that has a lot of
3 them.
4     Q.   Dr. Engelman, I want to
5 continue asking you about the tabulation
6 that you have that you didn't give us.
7        You have a tabulation of the
8 so-called 32 typographical errors on your
9 laptop; is that correct?
10     A.   Well, I went through and I
11 counted them.  I came up with a number of
12 32.  And I think that's correct.  I have
13 a PDF version where I believe all of
14 those are highlighted.
15        MR. MORTARA:  Mr. Wilcox,
16 could we get the PDF version and
17 save Dr. Engelman the time of
18 going through and identifying all
19 32 of them?  I am willing to
20 accept the PDF that only has the
21 32 that he was talking about in
22 his reports.
23        MR. WILCOX:  Let me take
24 that under -- let me take that
25 under advisement.  I'll get back

1 to you after the next break or if
2 you want to take a break now.
3 BY MR. MORTARA:
4     Q.   Well, Dr. Engelman, let me
5 ask you what you would prefer.
6     A.   I want to defer to my
7 counsel here.
8        MR. MORTARA:  Okay.  Why
9 don't we take that break.
10        Mr. Wilcox, I would request
11 that, consistent with the rules of
12 the court, you not discuss the
13 substance of the witness's
14 testimony.  I'm not finished with
15 my exam.
16        And that you also consider
17 whether you're going to let him
18 answer whether he discussed with
19 you and your co-counsel whether or
20 not to disclose to us that ███
███████████████████████████████████
███████████████████████████████████
23        But please do not discuss
24 the substance of the witness's
25 testimony with him.  Thank you.

Page 286

1  MR. WILCOX:  Yeah, and I
2  don't need a reminder on that,
3  Mr. Mortara.  I'm well aware of
4  the rules of the court and I
5  follow them at all times.
6  So let's go ahead and take a
7  break.  We can go off the record.
8  THE VIDEOGRAPHER:  Going off
9  the record.  The time is 4:14 p.m.
10  Eastern time.
11  (Short break.)
12  THE VIDEOGRAPHER:  Going
13  back on the record.  The time is
14  4:21 p.m. Eastern time.
15  MR. MORTARA:  Mr. Wilcox,
16  can I have the PDF?
17  MR. WILCOX:  Mr. Mortara, we
18  will -- we will provide the PDF to
19  you.  Would you like us to e-mail
20  it to you now?
21  MR. MORTARA:  No, that's
22  fine.  Actually, yeah, sure.  Send
23  it now so I can check it before I
24  conclude my examination.  That
25  would be really great.

Page 287

1  MR. WILCOX:  Yeah, because I
2  want to make sure that you're
3  going to have this thing now.
4  And I don't want this to be
5  something that's going to hold the
6  record up.
7  MR. MORTARA:  I would not --
8  I would not hold the record open
9  for that, but I will hold it open
10  for plenty of other things.
11  MR. WILCOX:  Yeah, and
12  we'll -- I'm sure we'll disagree
13  about that.
14  So we will send that over to
15  you.
16  MR. MORTARA:  Great.
17  MR. WILCOX:  And then -- and
18  then I will withdraw my
19  instruction on that question that
20  you previously asked.
21  MR. MORTARA:  I understand.
22  BY MR. MORTARA:

Page 288

7  Q.  Dr. Engelman, I'm moving
8  into the admitted exhibits folder what
9  will be Deposition Exhibit 44.
10  (Document marked for
11  identification as Exhibit
12  Engelman-44.)
13  BY MR. MORTARA:
14  Q.  Deposition Exhibit 44 begins
15  with a November 1st, 2010, e-mail from
16  you to Damian McColl, Manuel Tsiang, and
17  Hans Reiser.  It says, "Dear Damian and
18  Manuel."
19  You can read it to yourself.
20  "We have studied residual
21  INSTI function after cell pretreatment."
22  It goes on.
23  It talks about the results.
24  It says, "This would seem to differ from
25  what you presented at the 49th ICAAC in

Page 289

1  2009, though I'm guessing relative degree
2  likely accounts for the differences
3  between the study.  Our paper is
4  attached."
5  You go on to say, "It would
6  be interesting to follow-up with
7  additional drugs (GS9160, others) in
8  these established assays and/or further
9  characterize EVG persistence and
10  virucidal function.  Labeled EVG would
11  work well for these later studies.
12  "Please let me know if you
13  have interest in these research areas."
14  Do you see that?
15  A.  I do see it.
16  Q.  All right.  In this e-mail
17  you were asking Gilead for its support,
18  in particular providing materials, for
19  your research, correct?
20  A.  It doesn't look like I'm
21  directing requesting materials.  It looks
22  like I'm discussing -- I had completely
23  forgotten about this e-mail.  It's now
24  approximately ten years old.  I have
25  obviously hundreds of thousands of

Page 290

1  e-mails since then.
2       It looks like I'm discussing
3  the results of the paper that we had
4  published.  And discussing the
5  possibility of further work in that
6  arena, which never materialized.
7       Q.   And you were suggesting that
8  Gilead might supply to you some materials
9  for you to do research with.  Isn't that
10  what this means?
11       A.   In discussing the results of
12  a published paper, discussing possible
13  follow-up experiments.  I don't recall
14  the original e-mail honestly.  And I
15  don't remember any follow-up after this
16  e-mail.
17       Q.   And you asked Gilead if they
18  had interest in your proposed research
19  areas, correct?
20       A.   "Please let me know in case
21  you have interest in these research
22  areas." That's correct.
23       Q.   And Gilead never expressed
24  any interest in your research, did they?
25       A.   I apologize, sir, I don't

Page 291

1  recall this original e-mail.  And I don't
2  recall whether or not there was a reply
3  e-mail.  I apologize.
4       MR. MORTARA:  I have no
5  further questions.
6       MR. WILCOX:  Why don't we go
7  ahead and take a ten-minute break.
8       MR. MORTARA:  Sure.
9       THE WITNESS:  Thank you.
10       THE VIDEOGRAPHER:  Going off
11  the video record.  The time is
12  4:26 p.m.
13       (Short break.)
14       THE VIDEOGRAPHER:  Back on
15  the video record.  The time is
16  4:35 p.m. Eastern time.
17       - - -
18       EXAMINATION
19       - - -
20  BY MR. WILCOX:
21       Q.   Dr. Engelman, I have some
22  questions for you.
23       MR. WILCOX:  So -- so could
24  somebody please pull up
25  Exhibit 25.

Page 292

1       TJ, can you pull up
2  Exhibit 25 for me, please.
3       THE VIDEOGRAPHER:  Sure can.
4       Okay.  Adam, could you stop
5  this feature for me?  Thank you.
6       MR. WILCOX:  Oh, and Adam,
7  you know, your -- your firm asked
8  that all the counsel who are
9  taking and defending be on the
10  camera.  So could you please come
11  back on the camera?
12       MR. MORTARA:  Sure.  I
13  thought it would be less
14  distracting.
15       MR. WILCOX:  TJ, could you
16  go to Page 3 of Exhibit 25.
17       And then could you go down
18  to the area, "however."  Could you
19  highlight that sentence?
20  "However, only BIC."  Right down
21  here where my cursor is.
22       THE VIDEOGRAPHER:  I can't
23  see your cursor.  However...
24       MR. WILCOX:  "However only
25  BIC."  Yeah, that's --

Page 293

1       THE VIDEOGRAPHER:  Is that
2  in the left-hand column?
3  Left-hand column.
4       MR. WILCOX:  Yeah, left-hand
5  column, you're right there.
6       THE VIDEOGRAPHER:  All
7  right.
8  BY MR. WILCOX:
9       Q.   Actually Dr. Engelman, can
10  you see on Page 3 of Exhibit 25,
11  left-hand column, starting with,
12  "However."  Do you see that sentence?
13       "However, only BIC."  Do you
14  see that sentence?
15       A.   I do.
16       Q.   Okay.  Now, Mr. Mortara
17  asked you some questions about this
18  particular sentence today.  And I want to
19  know if you agree with the statement that
20  only bictegravir inhibited G140/Q148H.
21  Do you agree with that?
22       A.   I do not agree with that.
23  Only BIC totally inhibited.  That's a
24  misstatement.  It's clear that the
25  potency of bictegravir and dolutegravir

1 can inhibit that mutant virus with a
2 statistically numerically insignificant
3 result.
4    Q.   Now, as part of your
5 analysis in this case, approximately how
6 many mutant viruses did you consider?
7    A.   Throughout my total analysis
8 in this case I've analyzed data for
9 upwards of 200 different integrase mutant
10 viruses.
11    Q.   And based on all the data
12 that you considered, what would a person
13 of ordinary skill in the art conclude
14 about the differences between the in
15 vitro activity of dolutegravir and
16 bictegravir to inhibit the infection of
17 site-directed mutations?
18    A.   With all the evidence I've
19 considered, a person of ordinary skill in
20 the art would conclude that the potency
21 for bictegravir versus dolutegravir to
22 inhibit the infection of site-directed
23 mutant viruses to be insubstantially
24 different.
25    Q.   Based on all the data that

1 you considered, what would a person of
2 ordinary skill in the art conclude about
3 the differences between the in vitro
4 dissociation half-lives of dolutegravir
5 and bictegravir?
6    A.   Based on all the data that
7 I've considered, a person of ordinary
8 skill in the art will conclude that the
9 in vitro dissociation half-lives of
10 bictegravir versus dolutegravir are
11 insubstantially different.
12    Q.   So based on all the data
13 that you considered, what would a person
14 of ordinary skill in the art conclude
15 about any differences in the overall
16 performance in vitro of dolutegravir and
17 bictegravir?
18    A.   Based on all the information
19 and all the data that I've considered, a
20 person of ordinary skill in the art
21 would -- would conclude that the
22 differences between dolutegravir and
23 bictegravir to inhibit HIV integrase
24 activity, the infection of wild-type
25 HIV-1 strains, the infection of

1 site-directed mutant viruses and patient
2 strains would be an insubstantial
3 difference.
4       MR. WILCOX:  I pass the
5 witness.
6       MR. MORTARA:  Thank you,
7 Mr. Wilcox.
8       At this time Gilead has no
9 further questions.  However,
10 Mr. Wilcox, I'll advise you that
11 we will hold the deposition open,
12 pending a possible motion
13 regarding the nondisclosure of ███
14 ██████████████████████████ as
15 well as a couple other objections
16 that came up, although I think,
17 I'm not 100 percent sure, those
18 were for the most part resolved.
19       We'll meet and confer with
20 you about any such motion.  And
21 I'm sure you will disagree with
22 our assessment.
23       MR. WILCOX:  And I'd like to
24 note -- confirm that you received
25 the PDF that we sent you with

1 the -- with the upwards of 30
2 errors.
3       MR. MORTARA:  Thank you very
4 much.  I did receive the PDF, and
5 at this time Gilead has no
6 questions about it.
7       MR. WILCOX:  And are any of
8 your reasons for holding open the
9 deposition, do those pertain to
10 that PDF because if you --
11       MR. MORTARA:  No.  As I
12 earlier confirmed to you,
13 Mr. Wilcox, no, they do not.
14       My reasons for holding open
15 the deposition is Gilead's
16 potential motion for litigation
17 sanctions against ViiV for its
18 nondisclosure of ████████████
19 ████████████████████████████████
20
21       MR. WILCOX:  We obviously
22 disagree with that contention,
23 but, you know, we can meet and
24 confer after this.
25       MR. MORTARA:  Yes, I've

Page 298

1  rarely met the adversary that
2  agrees with a sanctions motion.
3       This deposition is concluded
4  from Gilead's perspective.
5  Mr. Wilcox?
6       MR. WILCOX:  It is
7  concluded.
8       MR. MORTARA:  Madame court
9  reporter, may I place on the
10 record Gilead's sincere thanks for
11 your hard work in this, our first
12 ever, this case's and my first
13 ever, online deposition.
14      I'd also like to thank my
15 colleagues from FTI, as well as
16 our videographer.  Thank you very
17 much.  This has been a tough day.
18 I really appreciate it, all of
19 you.  Thank you.  And everybody
20 have a good and safe day.
21      THE VIDEOGRAPHER:  This
22 concludes the deposition for
23 today.  And we're going off the
24 video record.  The official time
25 is 4:42 p.m. Eastern time.

Page 299

1       (Excused.)
2       (Deposition concluded
3  approximately 4:42 p.m. Eastern
4  standard time.)

Page 300

1
2        CERTIFICATE
3
4
5       I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
        It was requested before
8  completion of the deposition that the
   witness, ALAN ENGELMAN, PH.D., have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12
         _____
13       MICHELLE L. GRAY,
         A Registered Professional
         Reporter, Certified Shorthand
14       Reporter, Certified Realtime
         Reporter and Notary Public
15       Dated:  May 18, 2020
16
17
         (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24
25

Page 301

1        INSTRUCTIONS TO WITNESS
2
3       Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8       After doing so, please sign
9  the errata sheet and date it.
10      You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14      It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24
25

Page 302

```
 1        - - - - - -
        E R R A T A
 2        - - - - - -
 3
 4  PAGE  LINE  CHANGE
 5  ____ ____ _____
 6    REASON: _____
 7  ____ ____ _____
 8    REASON: _____
 9  ____ ____ _____
10    REASON: _____
11  ____ ____ _____
12    REASON: _____
13  ____ ____ _____
14    REASON: _____
15  ____ ____ _____
16    REASON: _____
17  ____ ____ _____
18    REASON: _____
19  ____ ____ _____
20    REASON: _____
21  ____ ____ _____
22    REASON: _____
23  ____ ____ _____
24    REASON: _____
25
```

Page 304

```
 1        LAWYER'S NOTES
 2  PAGE  LINE
 3  ____ ____ _____
 4  ____ ____ _____
 5  ____ ____ _____
 6  ____ ____ _____
 7  ____ ____ _____
 8  ____ ____ _____
 9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____
25
```

Page 303

```
 1
 2      ACKNOWLEDGMENT OF DEPONENT
 3
 4        I,_____, do
 5  hereby certify that I have read the
 6  foregoing pages, 1 - 304, and that the
 7  same is a correct transcription of the
 8  answers given by me to the questions
 9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  ALAN ENGELMAN, PH.D.        DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____
22
    _____
23  Notary Public
24
25
```

**WORD INDEX**

< $ >
**$10,000** 159:8, 17
**$100,000** 26:5 268:17
**$200** 239:18
██████
██████
██████
**$500** 23:1, 10, 21 25:3 26:4 159:13

< 0 >
**0.001** 149:3
**001** 149:6

< 1 >
**1** 6:14 15:1 63:15 120:18 159:22 179:6 182:8, 23 183:3 281:1 303:6
**1:00** 163:8
**1:18-cv-00224** 1:6
**1:45** 163:11, 15 164:5
**1:S7B** 149:4
**10** 6:14, 16 26:23 125:24 137:19 151:16 242:14
**100** 26:3 27:10 28:15 51:18 185:12 217:23 296:17
**10169** 2:6
**104** 5:15 28:22
**10th** 19:11
**11** 6:14 160:10 161:4, 7 216:14, 21, 23

**11:15** 86:9
**11:27** 86:13
**11:40** 96:17
**111** 5:19 269:20
**119** 75:2 76:4, 20
**12** 4:16 71:23 213:14 231:19, 19 238:17
**12:55** 163:22
**1200** 2:19
**125** 141:17
**127** 6:7
**13** 4:16 69:1, 12 79:22 86:18 103:15
**13.0** 283:1
**130** 6:10
**134** 7:6
**14** 1:14 8:7 137:21 141:23 248:21 249:20 250:4
**14-hour** 248:3
**15** 12:8 49:16 85:19 227:15 242:12, 15 245:2, 14 248:6, 8, 10
**15.5** 148:4
**15th** 89:22
**16** 26:23 64:13
**160** 76:19, 22 77:2, 8, 16 78:15 79:12 80:7
**167** 7:7
**18** 6:16 7:7 143:12 144:8 148:12 300:15
**1801** 2:19
**186** 197:4
**19** 4:16 6:10, 14 104:4 105:7 107:8, 10
**1980s** 44:8
**1990** 45:5 112:2

**1995** 45:5 112:3
**1996** 52:10
**1st** 288:15

< 2 >
**2** 7:7 17:22 63:16 125:22, 23 210:14 211:3 213:6, 25 215:10 226:18, 21 227:23 228:2 229:2 248:10 250:12
**20** 4:18, 18 6:12 29:6, 12, 21 30:23 32:5 49:17 119:21 158:21 159:4, 7, 15 258:20 303:20
**200** 26:1, 4 27:2, 7, 14 31:2, 4, 7, 9, 15, 21 32:2 142:1 228:7 229:19 268:15 294:9
**2000s** 55:10
**2001** 52:12
**2007** 24:23
**2009** 289:1
**2010** 288:15
**2011** 82:2 252:11 277:22 278:9
**2014** 82:2
**2016** 18:4, 8 19:25 22:7 23:7 24:23 26:9 28:13, 19 29:4, 10 30:12 54:17 82:3 239:22, 24 255:24, 24 256:6, 9, 11, 17 257:1, 15, 21 258:14, 16 260:17, 23 261:14, 18, 19, 25 262:8, 24

**263:**14, 21
**264:**9, 15
**266:**8, 17
**268:**5, 9, 20, 25 269:11 270:15, 22 271:8, 12, 14, 24 272:22 275:23 279:12 285:22 288:2 296:14 297:20
**2017** 22:9, 14 28:13, 19 29:11 194:8, 9 203:1
**2018** 19:11 20:4, 17 26:15 28:13, 19 57:19 79:12 81:23 83:15, 20 84:2 85:4 90:3 104:18 107:1, 12, 18, 23 109:21, 23 113:25 114:7, 19 115:6, 12, 18 117:7 118:15 119:9, 17 121:12 124:25 131:16 132:21 133:10, 20 134:1 135:6 144:3, 23 147:23 148:13 157:10 158:14 164:22 165:6 173:20 176:13 193:16 194:25 195:1 196:22 197:2 202:1, 18, 19, 25, 25 224:11 232:24 277:14 279:22 281:13
**2019** 4:19 12:8 15:7 27:4, 19, 20, 25 28:21 29:12 34:2, 7 69:13 75:1, 5, 10, 13 79:22 81:5, 6 86:18 89:18

**92:**4, 9, 13, 15 103:16 104:19, 19 105:6, 13 107:11 108:5, 20 109:1, 6 110:2 116:5, 16 226:25 227:18, 20 257:12 261:17
**2020** 1:14 12:10, 12 16:21 17:2 20:17 24:23 28:25 29:4 30:13, 17 89:22, 25 90:2, 15 91:1 99:20, 23 100:3, 16 103:17 108:11, 13 198:21 203:2 208:20 216:25 218:11, 22 219:24 220:15, 25 221:11 222:12 227:22 231:17 232:3 243:6 246:5, 16 247:9, 17 252:11 300:15
**211** 5:6
**212** 2:6
**22** 69:10 150:2, 12 249:11 253:5
**225** 4:18
**230** 2:5
**237** 4:16
**23rd** 105:14
**24** 31:3, 5 111:4
**244** 5:11 6:6
**246** 264:14, 24
**247** 264:12, 14 267:7 269:19
**25** 31:9, 10 57:21 58:18 60:17 73:9, 18 76:12, 16, 24 83:14 114:5, 9 119:16, 21

121:*14*  144:*4*
148:*12*  249:*12,
16*  281:*24*
291:*25*  292:*2,
16*  293:*10*
**26**  134:*7*
273:*3*
**27**  106:*24*
179:*6*  245:*2,
15*  251:*19*
**272**  7:*7*
**273**  75:*21*
**27th**  227:*18*
**287**  6:*12*
**28th**  227:*18*
**29**  281:*11*
**29.5**  147:*20*
**291**  4:*3*
**2A**  210:*21*
**2-beta**  217:*9*
218:*16*
**2C**  211:*24*
212:*7*

**< 3 >**
**3**  1:*6*  4:*18*
149:*4*  160:*25*
173:*22, 25*
209:*21*  210:*15*
252:*1*  282:*4*
292:*16*  293:*10*
**3.3**  248:*22*
249:*21*
**3.9**  213:*18*
238:*24*
**3:12**  242:*21*
**3:25**  242:*17, 18*
**3:26**  243:*1*
**30**  32:*5*  89:*25*
91:*1*  99:*20*
214:*23*  240:*16*
297:*1*  301:*16*
**300**  2:*13*
226:*18, 22*
227:*24*  228:*2,
8*  229:*2, 19*
**303**  2:*20*
**304**  303:*6*
**30th**  89:*18, 22*
90:*2, 15*

**31**  190:*16*
**312**  2:*14*
**32**  28:*17, 17,
17*  189:*20, 21*
190:*2*  191:*20*
279:*19, 25*
280:*4*  282:*10*
283:*22*  284:*8,
12, 19, 21*
**34.9**  147:*18*
148:*4*
**351-4905**  2:*6*
**36**  127:*10*
129:*13*
**37**  131:*1*
249:*8, 16*
**386**  192:*1*
205:*12*
**3A**  210:*8, 9,
11*  246:*10*
**3B**  210:*5*

**< 4 >**
**4**  6:*12*  113:*3*
210:*16*  213:*18*
217:*9*  218:*16*
238:*24*
**4:14**  286:*9*
**4:21**  286:*14*
**4:26**  291:*12*
**4:35**  291:*16*
**4:42**  298:*25*
299:*3*
**400**  136:*16*
140:*20*  141:*13,
18*  159:*11, 11*
255:*11*
**417**  174:*21, 23*
175:*2*
**43**  207:*10*
**44**  288:*9, 14*
**45**  19:*5*
**47**  144:*1*
**48**  147:*9*
**49**  88:*20*
**494-4400**  2:*14*
**49th**  288:*25*
**4-alpha**
213:*25*  215:*10*

**< 5 >**

**5**  12:*10*
174:*12*  177:*2*
185:*20*
**5.4**  283:*2, 4, 10*
**5.5**  282:*23, 23*
283:*11*
**5.8**  282:*22*
**50**  177:*1*
**54**  2:*13*
**56**  252:*18, 25*
**56-hour**
253:*19*
**57**  5:*20*
137:*11, 17, 19*
139:*2*
**592-3100**  2:*20*

**< 6 >**
**6**  224:*8*
237:*12, 17, 18*
**60**  150:*2, 12*
**60654**  2:*13*
**650**  24:*9*
**69**  5:*8*

**< 7 >**
**7**  6:*12*  145:*19*
225:*16*  227:*5*
230:*9*  237:*20*
**72**  261:*7*
**75**  210:*15, 17*
**750**  24:*10*
**76**  261:*7*

**< 8 >**
**8**  31:*8, 9*
143:*12*  144:*8*
238:*18*
**8.3**  31:*5, 6*
**80202**  2:*20*
**877.370.3377**
1:*22*
**88**  4:*19*

**< 9 >**
**9**  4:*3*  6:*16*
7:*6*  12:*12*
87:*20*  88:*6*
97:*6, 20*
103:*16*  108:*11*

208:*19*  231:*17*
243:*6*
**9.2**  218:*22*
**9:30**  12:*22*
173:*2*
**9:56**  1:*17*  8:*7*
**917.591.5672**
1:*22*
**96**  28:*18, 20,
21*
**99.99**  125:*13*
277:*16*

**< A >**
**a.m**  1:*17*  8:*7*
86:*9, 13*  96:*17*
**abilities**  147:*3*
**ability**  15:*14*
98:*12*  103:*11*
136:*3*  138:*1,
12*  139:*10, 11,
17*  143:*19*
144:*13, 25*
146:*5, 11, 21,
24*  147:*12*
148:*15*  149:*15*
194:*2*  197:*12*
**able**  15:*13*
25:*22*  53:*25*
122:*9*  124:*21*
155:*19*  194:*13*
200:*5*  228:*15*
278:*1, 16*
**absence**
250:*15, 17*
**absolute**
122:*11*  226:*19*
249:*20*
**absolutely**
125:*15*  127:*8*
173:*10*  259:*14*
**Abstract**  4:*19*
136:*1*  139:*8*
220:*23*  221:*9*
226:*2, 4*
230:*16*
**academic**
34:*14*
**accept**  269:*8*
284:*20*

**acceptance**
91:*18*
**accepted**  87:*2*
89:*21*  90:*13*
264:*25*  277:*8*
**access**  12:*25*
25:*7*  58:*6, 12,
15*  83:*1*
129:*11, 16*
261:*23*
**account**  70:*14*
138:*5*  139:*21*
140:*17, 19*
141:*6, 12, 22*
142:*5*  283:*8*
**accountants**
70:*11, 23*
**accounts**  289:*2*
**accuracy**  60:*13*
**accurate**
20:*20, 25*  21:*7,
14, 16, 22*  30:*7,
15, 19, 22*
46:*22*  56:*6*
68:*5, 23*  69:*10*
72:*3*  77:*15*
97:*18*  98:*12*
109:*21*  207:*25*
221:*21*  227:*25*
252:*20*  279:*15*
301:*20*
**accurately**
27:*13*
**accused**
187:*22*  188:*17*
189:*11*
**acid**  41:*6, 17*
**Acids**  126:*6,
22*
**acknowledge**
275:*19*
**acknowledging**
272:*16*
**acknowledgmen
t**  101:*6*  303:*2*
**acknowledgmen
ts**  224:*9*
**act**  217:*10*
**ACTION**  1:*3*
89:*9*  133:*6, 25*

134:*13*  164:*21*
165:*4*
active  40:*17*
41:*4*  148:*8*
activities
20:*14*  21:2, *20*
66:*14, 18*
137:*10, 14*
147:*11*  148:*5*
185:*10*  188:*3*
200:*11*  203:*19*
activity  20:*10*
30:*10*  143:*20*
144:*14*  145:*1*
146:6, *12*
147:*16, 25*
148:*16*  149:*16*
152:*25*  194:*10,
19*  198:22, *25*
203:*4*  294:*15*
295:*24*
actual  18:*11,
20*  21:*4*  59:*25*
162:*13*  202:*17,
18*
ADAM  2:*11*
10:6, *7*  131:*25*
227:*4*  292:*4, 6*
adam.mortara
@bartlitbeck.co
m  2:*14*
add  193:*2*
247:*21*
added  17:*13*
addition  90:*21*
additional
32:*4*  142:*23*
149:*4*  217:*11*
278:*7*  289:*7*
additionally
141:*21*
address  48:*8*
60:*25*  61:*5*
182:*24*  196:*20*
200:*2*  221:*5*
249:*2*  250:*18*
addressed
236:*1*  277:*6*
admit  139:*15*
194:*20*  218:*1*
279:*12*

admitted  19:*7*
57:*20*  127:*9*
193:*24*  194:*24*
198:*5*  275:*6*
288:*8*
adopted
187:*21*  188:*15*
189:*9*
advance  169:*3*
advanced
34:*22*
advantage
151:*24*  153:*11*
155:*9*  156:*7*
157:5, *15*
158:*3, 4, 7*
adversary
298:*1*
advice  68:*7*
240:*12*
advise  296:*10*
advised  29:*25*
83:*2*
advisement
134:*22*  273:*14*
284:*25*
affiliated  70:*18*
affiliation
70:*19*
Affiliations  6:*9*
afternoon
243:*4*
agency  50:*22*
73:*7*
Agents  126:*8*
274:*19*
ago  14:*12*
23:*16*  39:*19*
40:*1, 2*  41:*20*
55:*6*  82:*20*
83:*13*  85:*11*
88:*25*  103:*24*
108:*22*  126:*17*
195:*18*
agree  28:*3*
36:*23*  37:*3, 6*
38:*3, 6*  50:*19*
51:*20*  56:*14,
16, 20, 21*  57:*5*
62:*10, 14*
65:*15*  106:*16*

114:*15*  115:*3*
122:*25*  123:*4,
17, 21*  124:*7,
10, 13, 25*
126:*19*  127:*1*
128:*4, 7, 7, 9,
13*  129:*6*
137:*24*  138:*9*
144:*22*  146:*14*
154:*14*  155:*22*
156:2, *9*  157:*9*
158:6, *13*
162:*4, 17, 18*
178:*14, 23*
179:*22*  215:*5,
13*  217:*14*
238:*15*  243:*9*
252:*21*  253:*7,
11, 18*  267:*16*
271:*7, 11, 17*
280:*3, 12*
293:*19, 21, 22*
agreed  8:*24*
43:*1*  50:*25*
171:*13*
agreement
8:*23*  20:*19*
21:*24*  22:2, *6,
14, 19*  68:*14*
240:*1*  248:*4*
261:*24*
agrees  298:*2*
ahead  16:*14*
40:*5*  79:*7*
80:*24*  85:*19*
108:*18*  120:*5*
130:*9*  164:*25*
168:*16*  174:*25*
180:*18*  195:*23*
211:*11*  230:*11*
237:*1*  247:*23*
248:*7*  273:*15*
286:*6*  291:*7*
AIDS  4:*17, 19*
224:*10*
Airport  220:*10*
al  79:*12*
244:*23*  249:*8,
10, 21*  251:*21*

ALAN  1:*16*
4:*3*  8:*17*  9:*2*
300:*8*  303:*16*
alerted  196:*5*
alleged  196:*21*
Allosteric  5:*17*
allowed  49:*8*
84:*21*
alpha  217:*9*
218:*16*
alternative
72:*11*
ambiguity
235:*23*
Ambiguous
18:*14*  50:*24*
128:*17*  152:*15*
153:*15*  154:*4,
22*  183:*24*
184:*24*  185:*6*
202:*9*  205:*16*
233:*15, 20*
Ambrilia
23:*15*  25:2, *5,
9*
amended
22:*10*  176:*9*
amino  41:6, *17*
amount  30:*9*
31:*12, 19*  32:*5*
244:*13*
analyses
137:*15*  155:*20*
analysis  41:*22*
145:*23*  147:*15,
22*  148:*3*
200:6  208:2,
11*  214:*14*
252:*12*  253:*24,
25*  276:*24*
294:*5, 7*
analyze
235:*20*  239:*12*
analyzed
152:*21*  155:*21*
244:*18*  294:*8*
analyzes
152:*24*
anchor  217:*11*
Andrea  3:*9*

Andrew  3:*7, 9*
ANE  97:*24*
angstroms
213:*16*  238:*24*
angstroms,
213:*18*
annual  21:*2*
51:*23*
anonymized
275:*8*
Answer  7:*5*
80:*3, 12, 18, 21*
82:*7*  92:*14*
95:*23*  104:*12*
107:*15*  108:*25*
117:*23*  122:*10*
130:*9, 10*
134:*10, 16, 24*
145:*4, 11*
156:*18*  164:*19*
167:*10*  170:*10*
189:*4*  249:*1*
263:*15, 23*
273:*1, 8, 17*
278:*8, 17*
285:*18*
answered
51:*13*  94:*20*
122:*6*  123:*7*
128:*19*  133:*3*
141:*10*  189:*2,
7*  266:*3*
answers  105:*2*
303:*8*
Antimicrobial
126:*8*  274:*19*
Antiviral  5:*16*
35:6, *13*
141:*22*  143:*20*
144:*14*  145:*1*
146:6, *12*
148:*16*  149:*16*
anybody
38:*17*  78:*5*
84:*1, 22*
186:*16*  254:*20*
anybody's
101:*3*
apologies
237:*23*

apologize 31:8
50:18 56:5
145:3, 10
182:9 187:5
195:18 196:4
261:19 262:5
281:22 290:25
291:3
app 171:20
apparent
250:10
apparently
10:8
appear 110:22,
24 132:11
212:6
APPEARANCE
S 2:1 3:1
13:15, 20
appeared
40:20 234:7
appearing
13:20
appears
110:16 131:9
136:1 143:15
151:16 160:22
162:3, 5, 9, 14
211:3 280:25
application
53:2 54:9
55:3, 22
113:22
applications
190:23 235:10
239:14
applied 32:17,
21, 25 49:6
52:18 145:23
applies 37:2,
18 39:4 59:14
126:21 145:20
apply 37:20
40:9 71:1
124:21 145:21
300:18
appreciate
298:18
approach
135:13 200:9
212:20 213:3

234:15 239:9,
11, 16
approached
43:10, 16 54:4,
13, 18 55:13
99:9 252:12
approaches
201:10 204:5
approaching
241:20
appropriate
301:6
approved
64:23 65:4
114:12, 21
approximate
30:8 140:20
141:13
approximated
30:13
approximately
10:3 14:7, 8
26:3, 23 27:2
29:7 31:11, 14,
17 34:16
49:16 141:17
142:1 173:2
205:8 210:15
249:11 268:15,
17 289:24
294:5 299:3
April 12:12
16:21 17:2
28:25 29:19
area 39:3
74:10 292:18
areas 289:13
290:19, 22
arena 290:6
Argumentative
135:9 265:19
271:2 272:8
Argumentive
179:21 232:21
258:1
A-ring 218:7
A-rings 213:23
arm 44:19, 25
49:10
arms 44:22
Army 44:24

arrange
168:16 169:2
arranged
173:15, 18
arrangement
240:10
array 128:22
art 165:14
185:13 186:3
206:25 207:6,
13, 23 208:5,
14 294:13, 20
295:2, 8, 14, 20
article 40:7,
15, 18, 23
41:24 42:4, 8,
11, 18 57:20
58:19, 20, 22
60:16, 22
63:11 67:1
68:1, 19 69:14,
19 70:1 73:10,
11, 13 74:22
75:1, 17, 25
76:2, 7, 10, 12,
16, 21 77:16,
18, 22 78:15,
24 79:22, 24
80:7 81:4, 12
82:21 83:5, 15,
19 84:2, 13, 16,
23 85:4, 10
86:19 87:20
88:24 89:7, 14,
20 90:4, 9, 25
92:1, 25 93:19
94:10 97:7
99:16, 22, 24
100:3, 4, 16, 17,
23 103:16, 17,
19 104:19
105:6, 7, 8, 10,
12, 19 106:18,
19 107:4, 11,
12, 17, 18, 21,
23 108:6, 7, 11,
13, 23 109:7,
23 110:1, 11,
17, 22 111:5
112:23 114:6,
7, 18, 19 115:5,

6, 13, 18 117:7
118:15 119:9,
17 121:19, 23,
25 122:4, 8, 16,
20 125:1
131:16, 24
132:6, 11, 21
133:10, 20
134:1 135:6,
23 136:15, 20
137:9 138:10,
21 139:7, 19
143:3, 13
144:23 148:13
149:19 151:9,
17 152:10
154:19 155:1,
24 157:10
158:14, 17, 22
159:6, 21
160:10 161:19,
22 162:7
164:11, 23
165:6 173:20
176:14 185:5
186:13, 15
188:1, 21
189:15 190:15
193:16, 17, 20
194:25 195:1
196:22 197:2
202:1, 1
208:20 209:11
210:16 213:7
216:7 217:5
218:11, 11, 22
221:12 222:13
223:1, 15
224:8, 10
226:16 231:17
232:25 234:6
236:8, 19
243:7 246:5,
16 247:9, 17
254:10 255:24
256:9, 11, 13,
17 257:1, 3, 7,
15, 21 258:13,
14 260:17, 23
262:24 263:14,
22 264:9

266:8, 15
267:13, 19
268:2, 5, 20, 25
269:6, 14
270:15 271:9,
13, 15 272:12,
22 274:16
275:23 277:14
279:12, 22
281:13, 25
285:22 288:3
297:20
articles 45:14
57:13 61:6, 8,
22, 22 62:11
64:3 65:9
67:17 74:18
82:25 112:9
124:9, 10, 23
128:21 129:18
130:18, 22
139:21 193:11
195:4 202:4
203:8 214:24
240:16 245:17
256:19 258:10
261:7 266:10
277:18 278:12
asked 36:13
37:18 38:10,
15, 16, 17, 20
52:13 53:7, 12
54:23 55:18,
24 93:23
99:10 100:21
103:2 122:6
123:7 130:4
133:3 141:10
142:9 149:20
155:3 168:9,
13 189:2
190:22 191:8
195:10 220:14
223:6 226:1
229:25 240:11,
19 243:23
247:6, 14
254:15 261:3
265:11, 15
275:15 287:20

290:*17*  292:7
293:*17*
**asking**  34:*4, 6*
52:*17, 21*
61:*13*  66:6
97:7  104:*25*
121:*10, 21*
128:*13*  132:*17*
169:*24*  170:*5,
20*  171:*5*
172:*21*  179:*8*
180:*5*  182:*20*
240:*24*  247:*13*
258:*24*  279:*24*
284:*5*  289:*17*
**asks**  230:*14*
261:*9*
**aspects**  73:*24*
90:7  109:*24*
**assay**  245:*19*
246:*3*  254:*8,
10, 25*  255:*8*
**assays**  39:*4*
81:*24*  153:*1*
157:*3*  200:*12*
206:*10*  209:*16,
25*  210:*1, 22*
216:*3*  255:*16*
289:*8*
**assertion**
123:*24*
**assessed**
137:*13*
**assessment**
28:*4*  136:*21*
179:*23*  270:*21*
296:*22*
**assign**  194:*13*
**assigned**
194:*16*
**assignment**
74:*8*
**assignments**
46:*2*
**assist**  52:*14*
**assistance**
33:*6, 7, 11*
52:*23*  53:*8, 14*
54:*10*  120:*15*
**assistant**
105:*25*  106:*5*

**associated**
220:*24*
**association**
69:*20*
**assume**  55:*12*
63:*16*  102:*4*
125:*10*  277:*5*
**atoms**  41:*16*
213:*12, 24*
**attached**
16:*16, 20*
289:*4*  301:*12*
303:*11*
**attempt**  141:*5*
**attempts**
149:*11*
**attend**  116:*7,
10*
**attended**  63:*3*
219:*21*  264:*15*
**attendee**
219:*20*
**attention**
78:*21*  81:9
147:9  153:*17*
**attest**  22:*8*
**attorney**  10:9
189:*6*  263:*1*
301:*16*
**ATTORNEYS**
1:*12*  168:*3*
**August**  22:7
75:*10, 13*
239:*24*  261:*25*
262:*8*
**author**  40:*23*
59:*1, 4, 15, 20,
21, 23*  60:*2, 3,
12, 16, 20*  61:*7,
10*  66:*23*
71:*21*  72:*20*
74:*12*  87:*21*
89:*12*  90:*23,
24*  98:*8*
102:*13*  105:9
107:*17*  110:*14,
19*  113:*3*
188:7  209:*5*
224:*12*  243:*8*
248:*16*  270:*23*
275:*17*

**authors**  59:*6*
63:*10*  64:*4, 23*
65:*3, 20*  66:7
67:*4, 21, 23*
74:7  89:*6*
90:*21*  98:*2, 19*
100:*25*  101:*16,
21*  107:*22*
113:*10, 14, 17,
21, 25*  115:*5, 6*
145:*24*  149:*21*
152:*17*  154:*11,
24*  178:*20*
209:*20*  214:7
277:*2*  282:*13*
**author's**
110:*17*
**authorships**
59:*14*
**available**  87:*3,
12*  89:*19*  91:9
136:*22*  140:*2,
17*  141:*6*
**Avenue**  2:*5*
**awarded**  53:*4*
**awards**  46:*3*
**aware**  24:*20*
43:*12*  47:*3*
78:*21*  142:*17*
225:7  236:*14*
249:*13*  255:*2*
256:*2*  257:*21*
261:*8*  286:*3*
**awkward**
145:*6*

**< B >**
**back**  10:*10, 12*
23:*18*  42:*24*
44:*2*  63:*8*
68:7  72:*2*
73:*17*  76:*1, 15*
78:*12*  81:*14*
86:*13*  105:*3*
113:*1*  119:*25*
121:*12*  134:*19*
145:*19*  164:*4,
11*  170:*4*
208:*18*  209:*4*
210:*13*  214:*5*
218:*21*  224:7

230:*23*  237:*20*
242:*25*  258:*21*
259:*12*  273:*10*
276:*23*  277:*24*
278:*2*  284:*25*
286:*13*  291:*14*
292:*11*
**backbone**
213:*12, 24*
219:*5*  238:*4,
13*
**bad**  163:9
166:*2*
**ballpark**
226:*18*
**barely**  143:9
**barrier**  270:*11*
**BARTLIT**  2:9,
15
**Based**  5:*16*
21:*23*  25:*22*
30:7  84:*23*
138:9, 22
139:*6, 18*
144:*22*  155:*17*
186:*3*  187:*10,
15*  216:*2*
218:*1*  224:*5,
14*  225:*4*
234:*5*  294:*11,
25*  295:*6, 12,
18*
**basically**  92:7
197:*19*
**Basis**  4:*19*
5:*19*  21:*3*
89:7  259:*13*
**basketball**
150:*4, 9, 17*
**beat**  179:*5*
180:*3, 8, 8, 9,
10, 24*  181:9,
14, 15*  182:*7,
23*  183:*2, 5*
184:*17, 18, 19,
20, 25*  185:*2*
**BECK**  2:9, 15
**began**  26:*8*
27:*23*  156:*17*
257:*10*

**beginning**
1:*17*  27:*20*
181:*11*  189:*25*
240:9
**begins**  143:*25*
288:*14*
**behave**  185:*11*
**behaving**
276:*21*
**behavior**
139:*23*  153:*20*
200:*3*  269:*21*
**behaviors**
206:*9, 11*
**Belgium**  274:*8*
**believe**  16:*19*
17:*12*  22:*25*
24:*4, 8*  36:*1*
52:9  66:*17*
67:*5*  76:*4*
102:9  107:*10*
108:*1, 16, 19*
130:*6, 14, 17*
137:*16*  140:*13*
144:*19*  146:9
165:*5, 8, 22*
168:*2*  169:*13*
173:*4, 10*
174:*17*  190:*5,
7, 11*  195:*4*
199:*21*  213:*1*
216:*10*  223:*22*
224:*6*  226:*11,
24*  231:*10*
232:9  237:9
238:*2*  242:*2, 4*
252:9  258:*16*
262:*25*  269:*22*
278:*11*  280:7
283:*8*  284:*13*
**believed**
274:*15*
**believes**  225:9
233:*16*
**Bereskin**
23:*19, 24*  24:*6*
**best**  16:*12*
32:*19, 23*  33:*2*
46:*22*  47:*8*
52:*25*  53:*3*
54:*3, 7, 21*

55:*1, 11, 21*
56:4  86:24
87:*5, 14*  90:*16*
98:*12, 18, 24*
99:*2, 3, 6*
101:*1*  104:*1*
116:*11*  122:*1*
123:*15, 18*
125:5  145:*21*
149:25  150:*12*
264:*10*  271:*7, 11*
**beta**  213:*25*
215:*10*
**beta4-alpha2**
212:22  213:*4, 13*  231:*5*
**Bethesda**
274:*11*
**better**  139:*16*
149:*1*  150:*12*
198:*1, 3, 16*
201:5  227:5
231:*10*  232:6
233:*16*  235:*11*
**beyond**  21:*19*
63:*4*  135:*11*
**bias**  268:*1, 21*
269:*17*  276:*8, 12*
**biased**  267:*20*
268:6
**BIC**  77:*12*
136:*4*  137:6
143:*17*  144:*12*
148:*24*  175:6
187:9  193:*14*
197:*16*  198:*1*
200:*19, 23*
201:4  222:*17*
231:8  233:*3*
238:5  292:*20, 25*  293:*13, 23*
**BIC,**  190:*1*
**Bictegravir**
5:*6, 22*  6:6
56:*13*  109:*5*
110:6  114:*11, 20*  137:*18, 20, 25*  138:*11*
139:*1, 9, 16, 23*

141:*20*  144:*23*
145:*24*  146:*10, 14, 19*  147:*12, 19*  148:*1, 14*
149:*14*  158:*14, 24*  160:*2, 7*
161:*14*  172:*10*
174:7  176:*15, 21*  177:*6, 8, 9, 11, 18, 25*
178:*3, 7, 11, 17*
185:*15, 24*
186:*23*  187:*16*
191:*13*  192:*9, 14, 21*  193:*23*
194:*3, 10*
197:*9, 13, 21*
198:*8, 17, 22*
199:*14, 23*
200:*11*  202:*7, 21*  203:*4, 12*
206:*4, 6, 9, 15, 17, 19*  208:*4, 13*  212:*21*
213:*11, 16*
215:*7, 8, 24*
217:*7, 20*
218:25  219:*4, 12*  222:*5*
225:*10*  231:*19*
234:*4*  238:*1, 12, 17, 19, 22*
252:*17, 22*
253:*8*  254:*2*
270:*10*  276:*20*
282:*4, 23*
283:*1*  293:*20, 25*  294:*16, 21*
295:*5, 10, 17, 23*
**bictegravir's**
215:*11, 20*
216:*10*  218:*13*
219:*6*  231:*20*
**bicycle**  168:*23, 25*  169:*4*
172:*2*
**bicyclic**  160:6
161:*13*
**bigger**  210:*16*
219:*7, 11*

**billed**  25:25
26:*13, 15, 17, 24*  27:*7, 11, 15, 23, 23, 24*  32:*2, 6*  159:*12, 13*
268:*15*
**billing**  27:*3*
**Binding**  5:*20*
252:7  253:*3*
**Biological**
106:*1*
**biology**  126:*4*
**Biopharma**
23:*15*  25:*2, 6, 9*
**Biosciences**
254:7, *13, 14, 19, 21, 24*
255:*2, 7, 10, 15, 21*  256:*1, 2, 7*
270:*17, 19*
**bit**  28:6  44:*3*
78:*13*  201:24
204:*3*  209:*3*
**blackout**  95:*24*
**blank**  119:*23*
**blatant**  132:*9*
**blind**  275:*8*
**blockbuster**
259:*23*
**blow**  192:6
210:*16*  252:*1*
**blowing**  97:*22*
**Bluma**  216:*24*
218:*8*  220:*24*
221:*4, 10, 17, 23*  222:*20, 24*
223:*16, 20*
**BMC**  74:*1*
**Board**  6:*10*
122:*23*  125:*3*
129:*24*  131:*7, 10, 15, 22*
132:8  191:*8*
274:*18*  277:*10*
**boards**  126:*3*
191:*1*
**body**  200:*8*
207:*16*
**boil**  197:*20*

**bono**  239:*17*
**border**  24:*14*
**Boston**  220:*3, 4*
**bottom**  110:6
143:*15*  144:*10*
192:*3*
**boy**  282:*17*
**bracket**
175:*16, 19, 23, 25*
**brainchild**
59:*18*
**branch**  50:5
**break**  85:*20, 22, 25*  86:*1, 11*
120:*13*  162:22
163:*2, 6, 10, 24*
242:*11, 23*
244:*11*  258:*20*
259:*1, 5*  285:*1, 2, 9*  286:*7, 11*
291:*7, 13*
**breaking**
79:*15, 18*
**breakout**
259:*11*
**breaks**  169:9
**Brenner**  5:*8*
216:*24*  218:*8*
219:*14*  220:*24*
221:*4, 10, 17*
222:*20, 24*
223:*16, 20, 22*
224:*11*
**Brenner's**
221:*24*  223:*10*
224:*3*
**bridged**  160:6
161:*13*
**Brief**  77:6
78:*1*  230:*19*
**briefly**  172:*4*
**bring**  91:*24*
104:*21*  134:*19*
271:*24*  276:5
**brings**  81:*10*
**broad**  39:*24*
136:*3*  138:*2, 13*  139:*11*
208:*17*

**broadly**  37:*4, 7*  114:*12, 20*
139:*17*  151:*23*
153:*10*  155:*8*
156:*6*  157:*14*
158:*1*
**broke**  138:*20*
**brought**  43:*15*
165:9  167:*5*
250:*19*  262:*20*
**Bs**  33:*19*
**Bucks**  149:*25*
**bulk**  29:*11*
**Burke**  65:*25*
**business**  21:*8, 17*  109:*10, 11*
115:*22, 25*
116:*1*
**busy**  235:*8*
**button**  269:*8*

**< C >**
**CAB**  77:*9*
136:*6, 12*
149:*2*
**Cabotegravir**
5:*22*  109:*2*
137:*1*  144:*24*
161:*15*  176:*17*
**calculate**  252:*5*
**calculation**
219:*9*
**calculator**  31:*2*
**call**  41:5  46:*4*
51:*23*  119:*11*
169:9  231:*5*
234:*1*  240:*19, 20*
**called**  30:*2*
40:*11*  69:*22*
116:*25*  118:*13*
119:*13*  133:*18*
148:*11*  207:*6*
244:*15*  245:*18*
**calling**  107:*13*
169:*14, 16*
197:*3*
**Calls**  47:*20*
48:6  49:*25*
51:*11*  67:*8*
93:*25*  94:*17*

109:7  156:*14*
157:*18*  173:*15*
187:*4*
**calm**  258:2
**camera**
292:*10, 11*
**Canada**  24:2
**Canadian**
26:*11, 14*
43:*18*
**canceled**  116:*9*
**Cancer**  20:*12,*
*15*  34:*17*  44:*6,*
*11, 13*  48:*23*
62:8  63:*18*
69:*21*  70:*12*
**candidly**  96:2
**capacity**  18:22
**capital**  42:*15*
**career**  52:*4*
106:*6*  114:*24*
239:*11*
**carefully**
138:*17*  250:*17,*
*21*  255:25
301:*4*
**carried**  59:*16*
209:*15*
**carries**  59:*10*
**case**  12:*14, 15*
16:*8*  19:25
22:*3, 22*  24:7
25:*19, 21*  27:*4,*
*23*  29:22
30:25  31:*12,*
*15*  32:12
33:24  36:*14*
38:*13, 19, 22*
39:22  40:*3*
43:*8, 12, 13, 17,*
*18*  46:*17*
47:*24*  67:*17*
75:8  77:*24*
84:*1*  85:2
95:*12*  99:*11*
117:*1*  118:*19,*
*23*  125:*11*
126:*12*  133:*13*
136:*14, 18*
137:*4*  140:*3*
141:*8*  159:*10*

167:*18*  199:*17,*
*18, 19*  206:25
207:*7, 24*
223:*5, 5*  228:*6,*
*25*  229:*15*
230:*20*  239:7
241:*11*  242:7
245:22  254:22
255:*1, 4, 9, 13,*
*17, 22*  262:*3*
278:*23*  279:7
290:*20*  294:*5,*
*8*
**cases**  25:*15*
46:2  191:*4*
**case's**  298:*12*
**casual**  43:*14*
44:*1*
**catch**  276:*14*
**caught**  195:*16,*
*17*
**CDC**  44:*23*
**Cell**  5:*8*  77:*9*
123:*11*  130:*23*
288:*21*
**cellular**  210:*21*
**celsius**  249:*9,*
*12, 16, 17*
**certain**  56:*16*
77:*11*  90:*7, 8*
109:*18*
**certainly**
102:*7*  121:*3*
217:*19*  278:*9*
**certainty**
122:*11*  161:*25*
278:*8, 17*
**CERTIFICAT**
**E**  300:*2*
**certification**
300:*15*
**Certified**  1:*19,*
*19*  300:*13, 14*
**CERTIFY**
300:*5*  303:*5*
**certifying**
300:*21*
**CFC**  1:*6*
**chain**  41:*13,*
*17*  225:25
**chance**  156:*12*

**change**  20:6
21:*3, 10*  91:*4*
95:*5*  96:22
140:*15*  147:*16,*
*18*  148:*4*
149:*21*  225:*3*
302:*4*
**changed**  20:*21*
23:*5*  268:*10,*
*12, 18, 23*
271:*21*
**changes**  278:*3*
301:*11*  303:*10*
**characterizatio**
**n**  217:*25*
221:22
**characterize**
49:*20*  112:*4*
123:*3*  205:*10,*
*13*  289:*9*
**characterized**
190:*4*  224:*16*
**charge**  23:*20,*
*21, 22*  24:*5, 12*
40:22
**charged**  23:*10,*
*17*  25:*2, 5*
**charging**  23:*1*
**check**  140:*24*
234:*21*  269:7
286:*23*
**checking**  13:*16*
**checks**  20:22
21:25
**Chemical**  53:2
159:*25*  160:*1*
217:*24*
**chemist**  36:*25*
**chemistry**
37:*2, 5, 8*
217:*23*
**Chemotherapy**
126:*8*  274:*20*
**Cherapanov**
226:*12*
**Cherepanov**
40:*14*  42:*19*
43:*3, 5, 8, 9*
44:*3*  82:*21*
83:6  87:*21*
89:*12*  90:*23*

91:*24*  93:*21*
94:*3, 8*  95:*17*
97:*6, 8*  98:*25*
99:*4, 10*
101:*20*  102:*1,*
*5, 15, 21, 25*
103:*10, 17*
108:*10, 13*
208:*19*  209:*18*
211:*9*  214:*3,*
*18, 24*  216:*8*
218:*23*  221:*12*
222:*12*  225:*8,*
*15*  226:*1, 3, 14*
227:*21*  228:*7,*
*18*  229:*14*
230:*1, 14, 22*
232:*24*  233:*3*
235:*5*  236:*6,*
*11, 17*  237:*6*
239:*1*  240:*6,*
*15, 20*  241:*3*
243:*7, 11*
246:*4, 15*
247:*6, 8, 11, 14,*
*16, 25*  248:*17,*
*22*
**Cherepanov's**
102:*10*  210:*12*
214:*15*  217:*4*
218:*10*  223:*3*
233:*15*  238:*9*
246:*19*
**Chicago**  2:*13*
120:*17*
**children**  172:*5,*
*7, 8*
**choose**  143:*6*
275:*21*
**chose**  142:*13,*
*18*  143:*1, 5*
154:25  267:*12*
**chosen**  91:*12*
**Chuck**  237:*23*
**circumstances**
53:*2*
**citation**  75:*17,*
*21, 24*  104:*20*
**cite**  74:*18*
76:*11*  81:*19*
83:*13*  99:*15*

103:*11*  106:*18*
107:*17*  188:8
192:*11*  194:7
**cited**  68:*19*
74:25  76:2
77:*1*  82:25
83:*4*  85:*10*
103:*18, 25*
104:*18*  109:*1,*
*1*  114:*10*
117:7  203:*9*
254:*11*  277:*19*
278:*12*  279:*20*
**cites**  81:*17*
107:*11*  108:22
217:*4*  222:*11*
233:*5*  255:25
**citing**  76:*21*
114:*18*  115:*17*
**citizen**  50:*9*
**CIVIL**  1:*3*
**CJB**  1:*6*
**clarified**  237:*9*
**clarify**  38:*14*
93:*8*  239:*8*
**classified**
207:*3*
**clause**  73:*3*
74:*9*  195:*1*
205:*12*
**clauses**  74:*8*
**clear**  52:*21*
55:*18*  71:*3*
76:*6*  80:*19*
90:*1*  156:*24*
185:*12*  228:*15*
233:*23*  237:*24*
260:*9*  293:*24*
**clearly**  81:*21*
82:*1*  148:*4*
187:*8, 14*
203:*18*
**click**  119:*24*
**client**  263:*1*
**clinic**  36:*11*
151:25  155:*10*
156:*8*  157:*16*
158:*8*
**clinic,**  153:*12*
**clinical**  36:*3, 9,*
*15, 21*  37:*22,*

25  38:4, 7, 18, 21  39:7, 10  152:22  153:2, 5, 24  157:7
clinically  114:12, 21
close  14:17  26:1  32:1  91:1  159:11  211:8  213:3  214:17  233:12  234:10
closely  232:23  239:12
closer  215:12  231:21  238:19
cloud  8:9
cluster  41:3, 18
coaching  169:5
co-author  63:25  65:18  223:2  236:8, 12  238:11
co-authored  214:23  217:5  218:12
co-authors  176:14
co-counsel  285:19
code  169:5
collaborate  98:16  112:14
collaboration  70:22  112:19  211:8
collaborative  90:19
colleague  102:10  117:13  214:19  233:12  235:14  262:11
colleagues  58:17  91:14  93:6  95:15  123:17  125:2  129:22  131:14  149:8  152:11  218:9  219:15  221:19  222:20,

25  228:17  235:17  298:15
collectively  186:23
colloquialism  69:22
Colorado  2:20
column  222:7  280:23  282:21  293:2, 3, 5, 11
come  21:25  44:2  51:19  71:9  78:21  81:9  83:4, 8  105:3  108:3  114:25  132:11  133:5  195:25  200:5  201:13  204:7  214:6  226:7  229:9, 10  248:25  249:24  250:13  251:2  258:21  271:21  275:4  292:10
comes  51:17  71:10, 14  201:19  204:13  269:23
comfortable  114:18  229:20
coming  76:15  140:25  216:15  273:10
comment  38:17, 20  127:7  139:22  149:20  151:15  184:11  247:11  269:20, 22  270:2, 18  276:18
commented  230:24
comments  65:3  91:5  95:8  96:25  102:18  103:6  124:17  211:14  225:5  261:13  264:20  266:15

268:19, 25  269:9, 10, 13  270:9, 24  276:22  277:2, 6  278:2, 5  279:16
commission  303:21
committee  17:14
common  43:22  50:19  65:2  274:21
communicate  62:23  131:22  132:5
communicated  116:3, 13  131:14  167:17
communicating  116:15  166:11  176:15
communication  134:14
communications  171:1
community  85:3
companies  23:14  54:13  66:12  114:3  241:5
COMPANY  1:5  8:14  11:17  18:18  20:17  21:4  37:11  52:14, 19, 22  53:2, 8, 13  66:25  68:12, 17  71:23  72:17  74:4  98:21
compare  208:3, 12, 15
compared  214:10  283:10
comparing  137:14  206:4, 15  250:14  251:3

comparison  56:13  233:19
compensated  239:6
compensation  32:10
competing  65:21  66:1, 8, 22  98:3, 20  110:21  113:20
competitive  71:17
complain  268:21  269:17  270:16
complained  268:1
complete  58:6  253:24
completely  20:20  158:18  186:8, 8  201:18  233:20  234:12  236:25  289:22
completion  300:8
complexes  254:3
complexities  153:18
complimentary  269:13
compound  177:6, 8, 10, 11, 15  231:11  232:7  233:17, 19  250:25
compounds  40:10  151:22  153:9  155:7  156:5  157:13, 25  161:23  200:4  208:5, 14  213:2
comprehensively  74:23
computer  11:24  41:8  83:2  171:20
concede  156:1

concentration  177:1
concern  103:3
concerned  66:21  103:8
conclude  206:6, 16, 19  286:24  294:13, 20  295:2, 8, 14, 21
concluded  133:9  152:21  162:4  191:19  218:13  298:3, 7  299:2
concludes  298:22
conclusion  133:5  136:17  138:24  148:19  152:9  158:24  200:10  201:19  204:14
conclusions  56:17, 21  57:7  58:21  79:11  90:9  95:7  96:23  115:2  132:6  158:13, 18  206:8  221:13, 24
concrete  248:25  249:24  250:14  251:3  278:17
conducted  249:6, 8, 10, 15  250:1, 6
confer  296:19  297:24
conference  53:24  54:11  63:4, 8  116:14  150:1, 15  216:25  220:11, 16  259:12
conferences  46:20  54:16, 20  55:15  62:18
Confers  5:6

CONFIDENTI
AL 1:*10*
103:*12* 118:*20*
187:*23* 188:*18*
189:*12* 228:6,
*24, 24* 229:*21*
234:*25* 235:2,
*12, 25* 265:22,
*25* 266:*4*
confidentiality
234:*16, 17*
configuration
218:*7*
configurations
41:*12*
confirm 12:*16*
15:*9* 135:*23*
219:*11* 227:2,
*16* 259:*3*
296:*24*
confirmed
13:*19* 297:*12*
confirming
15:*6*
conflict 72:*10*
261:*10*
conflicts 261:*4*
confusing
281:*6* 283:*11*
Congress 50:*2*
conjunction
81:*24*
connection
24:*1* 262:*3*
connector
212:*22* 213:4,
*13, 25* 215:*10*
231:*5*
conscience
93:*9*
conscious
228:*16*
consensus
136:*17* 155:*16*
156:*24*
consider 14:*15*
46:*9* 132:*25*
143:*8* 165:*24*
214:*22* 215:1,
*3* 223:*18*
241:*20* 243:*22*

244:*4* 285:*16*
294:*6*
consideration
92:*17* 139:*25*
140:*6*
considered
28:*9* 141:*19*
142:*12, 18, 24*
143:*9* 148:*8*
234:*12* 243:*10,
19, 24* 244:*7*
255:*12* 294:*12,
19* 295:*1, 7, 13,
19*
considering
159:*11* 244:*3*
consistent
201:*10* 202:5,
*19* 204:*6*
215:*15, 19*
216:*8* 285:*11*
constitute
244:*3*
consult 21:*13*
47:*5* 103:*4*
254:*15*
consultant
18:*3* 20:1, 5, 6,
*16*
Consulting
8:*6* 11:*15*
12:*2* 18:*11, 21*
20:*14* 23:*10,
24* 24:*13, 15*
25:*8* 26:*24*
240:*10*
contact 61:*2*
91:*3* 100:*13*
114:*25* 117:*19*
132:*14* 135:*14*
213:*3, 11*
218:*16* 221:4,
*9* 241:*3*
contacted
196:*24* 228:*17*
241:*1, 24*
260:*21* 262:2,
*19*
contacts 213:6,
*14, 17, 24*
215:*9, 11*

231:*3, 9, 19, 21*
232:*5* 233:*4*
238:*3, 12, 17,
18, 20, 23*
contained
223:*3*
contains
132:*21*
Cont'd 3:*1*
5:*2* 6:*2*
content 72:*19*
95:*6* 96:*23*
271:*16*
contention
297:*22*
context 36:*14*
77:*1* 144:*18,
20* 145:*13*
183:*11*
continue
156:*20* 163:*5*
168:*17* 191:*22*
284:*5*
CONTINUED
164:*7*
contracts
48:*12*
contrast
197:*15*
contributing
127:*2*
contribution
209:*23*
contributions
64:*5* 113:*4*
209:*5, 9, 19*
control 249:*1,
25* 250:*16*
300:*20*
controlled
250:*18, 21*
conversation
43:*14* 44:*1*
91:*25* 118:*14*
150:*18* 166:*10*
234:*19* 264:*2*
conversations
102:*25* 166:*6*
173:*5, 11*
Cook 4:*22*
198:*21* 203:*2*

249:*9, 21*
252:*11*
cooked 250:*8*
coordination
40:*16*
copies 225:*13*
copy 15:*4*
16:*23* 58:*6*
69:*11* 85:*14*
145:*7* 227:*5*
237:*18* 269:*2*
copyright 74:6,
*8*
Corporation
74:*1*
correct 15:*16*
17:2, *3* 18:8, 9,
*23, 24* 19:*12,
13* 22:4, *17, 24,
25* 23:*3, 4*
24:*3, 4, 24, 25*
29:*7* 32:*8*
33:*12* 34:*22*
35:*1, 3, 4, 8, 9,
14, 19, 22, 23*
36:*19, 25* 37:8,
*9, 13, 15, 25*
39:*1, 8, 9, 13*
42:*2, 20, 21*
44:*16, 17, 20*
45:8, *15, 16*
46:*20* 47:*18*
48:*4, 18* 49:*3,
4* 50:*22* 51:*9*
52:*3* 53:*11*
56:*18, 23, 25*
57:*11, 16, 17*
58:*22, 23* 59:*1,
2* 60:*17, 18, 22,
23* 61:*3, 4, 11*
63:*13, 21* 64:*5*
65:5, *7* 67:*18*
68:*22* 69:*15,
16* 71:*15, 18,
25* 72:*7, 14*
73:*19, 20* 75:*3*
76:*17* 77:*20*
78:*18, 19* 80:*9*
82:*22, 23*
84:*17, 18, 20,
25* 85:*12*

88:*20, 25* 89:*1,
3, 4, 9, 10, 12,
13* 90:*10*
91:*12* 92:*7*
93:*19, 23*
96:*25* 97:*1, 8,
11, 17, 19* 98:*1,
8, 9, 13, 14, 22,
23* 99:*1, 5, 13,
16, 20, 21, 25*
100:*1* 101:*11,
13, 14, 16, 22*
103:*13, 14, 21*
104:*2* 105:*10,
11, 13, 14, 16,
17, 20, 22*
106:*13, 20*
107:*25* 108:*11,
23* 110:*3, 4, 6,
21* 111:*7, 20,
21* 112:*7, 16,
24, 25* 113:*17,
18* 114:*3, 7, 8,
22, 23* 115:8, *9*
118:*24* 119:*3,
5, 12* 123:*1, 23*
124:*12* 125:4,
*19, 20* 126:*14,
15* 131:*11, 12*
133:*14, 15*
135:*7, 21*
137:*7* 139:*12*
149:*12* 150:*25*
151:*2, 4, 12, 13*
152:*13, 23*
153:*3, 13*
154:*2, 20*
156:*8* 159:*8,
14, 17, 19, 19*
160:*2, 3, 7, 8*
161:*16, 17, 23*
162:*11* 169:*19*
170:*3, 17*
173:*25* 175:*13*
176:*4, 8, 11, 19*
177:*21* 178:*1,
8, 18* 187:*14,
17* 188:*1, 22*
189:*16* 190:*1,
6, 10, 20*
191:*16, 20*

193:17, 18, 23
195:2  197:10
198:14, 18, 19
199:7  201:7
202:7  203:13,
24, 25  204:18,
20  205:24
206:7, 18
207:7, 24
208:5, 14, 17
209:25  210:8,
9, 23, 24  211:4
212:3, 17
213:19, 20
214:15, 16, 18,
24, 25  215:12
216:11  217:1,
2, 13, 24  218:5,
7, 17, 20  219:1,
2, 7, 16, 18, 20,
22, 25  220:1, 3,
5, 21, 25
221:13, 20, 22,
25  222:13
224:1, 22
225:12  226:3
227:24  228:3
229:22, 23
230:1, 16
231:23  233:13,
25  235:21
237:8, 10
238:14  239:2,
5, 22  240:6, 15
241:5, 12, 16
243:15, 16
244:16, 19, 21
245:19, 20
246:1, 7, 16, 21,
23  247:1, 4
248:12, 13, 18,
19  249:20, 22
250:20  251:6,
11, 14, 17, 21,
22  252:18, 20
254:11, 16, 17,
25  255:9, 17
260:19  265:12,
13  266:17, 18,
20, 21, 24, 25
267:3  268:7,

13, 21  269:1, 3,
17  270:5, 19
271:9  272:18
277:12  279:22,
23  280:5, 16,
17, 20  281:4
284:9, 12
289:19  290:19,
22  303:7
**corrected**
186:10  190:15
**corrections**
301:5, 7
303:10
**correctly**
136:10  202:24
204:2  221:12
224:10  234:23
**correspond**
42:19

**correspondence**
214:21  225:9,
17
**corresponding**
59:1, 20  60:2,
3, 15, 20  61:7,
9  89:6, 11
90:23  98:7
101:20  110:14,
17, 19  224:12
248:16
**cost**  24:20
**Costa**  101:7, 9
102:2, 6, 8, 9,
16, 23  103:1, 5
**Costa's**  102:17
**Counsel**  8:18,
23  9:23  13:7
43:16  80:10,
13  84:7  85:8,
17  92:1  94:3
95:13  100:23
136:24  186:16
195:12, 23
230:5  232:17
234:18  235:25
257:25  259:2,
7  273:14
285:7  287:24

288:1  292:8
**count**  282:10
**counted**  282:9
284:11
**couple**  11:7
25:11  83:13
85:11  108:7
167:3, 4
270:12  279:19
296:15
**course**  16:16
33:24  108:21
112:22  115:25
118:3  188:6
195:12  248:14,
24
**COURT**  1:1
8:20  13:18
78:2, 6  118:4
134:18  141:1
195:23  259:6
273:6, 22
285:12  286:4
298:8  301:20
**Courthouse**
2:12
**cover**  15:7
**covered**  109:6
168:4  169:12,
23  170:7
263:1
**COVID-19**
219:24
**Cowboys**
179:2, 14, 18
180:11  182:14
183:22  184:4,
15, 21
**Craigie**
111:22  112:2,
15  115:8, 11
**Craigie's**  112:6
**Crick**  102:11
**critical**  101:7,
9  102:2, 18
128:21, 22
231:6
**criticism**  61:23
**criticisms**
135:5  223:9

224:20, 21
276:6
**criticize**  257:6
**CROI**  216:25
217:12  219:15,
20, 21, 24
220:15, 19, 25
222:22
**crossing**
183:15
**Culture**  5:8
77:9
**currently**
126:3
**Curriculum**
6:12, 14
**cursor**  292:21,
23
**curves**  210:22
**cut**  78:13
175:12  176:3,
8  230:6
**cutoff**  270:19
**cutoffs**  270:17
**cutting**  78:3, 4
227:7, 9
**CV**  16:15, 18,
23  17:1, 5, 13,
22  19:2, 11, 20,
22  21:9, 12
23:13  28:14,
23, 25  29:18,
24  30:1, 6, 14,
21  49:3  53:5
224:4  261:8
**CVs**  20:18

**< D >**
**Damian**
288:16, 17
**Dana-Farber**
20:12, 15
34:17  46:25
48:22  62:8
69:21  70:12
71:14
**data**  81:22, 25
83:9  93:22
94:9  95:6, 11,
15, 19  96:23
97:14, 16

100:22  102:23
103:5, 11
117:16  132:10
136:21  137:9
138:10, 16
139:7, 19, 24
140:1, 7, 9, 12,
17  141:6, 23
142:4, 8, 12, 17,
23  143:4, 6
144:22  151:8
152:10, 21, 22
155:14, 15, 17,
20  188:7, 9
202:4, 18, 24
203:1, 1, 8, 16
206:3, 14
211:2, 6  216:3
221:12  222:2
225:2, 9  226:2,
15, 20  227:22
228:5, 16
229:13, 18
230:1, 15
236:13  239:12
243:5, 18
244:4  251:25
252:12  255:3,
10, 11  256:3, 5
270:7  271:21
276:8, 12
280:10  283:10
294:8, 11, 25
295:6, 12, 19
**date**  1:18  8:6
17:13  25:18,
25  28:23  32:3
52:10  72:16
85:7  115:14
119:12, 13
135:2, 12, 20
157:4  261:14,
20, 22  262:3, 6,
10  263:24
264:1  301:9
303:16
**dated**  12:8, 10,
12  16:21  17:2
19:11  29:19,
19  300:15

dates 261:*15*
Davis 223:*24*
day 11:*8*
14:*16, 18*
24:*10* 28:*9*
30:*8* 163:*14*
167:*7* 171:*14*
195:*18* 298:*17,*
*20* 303:*20*
days 14:*9, 10,*
*11* 25:*12*
26:*20* 28:*13*
29:*2, 5, 6, 9, 11,*
*12, 15, 21*
30:*17, 23* 31:*6,*
*10* 40:*19*
62:*21* 65:*14*
195:*24* 196:*17,*
*17* 275:*15*
301:*16*
deal 172:*5*
Dear 288:*17*
Debyser 274:*7,*
*14*
decade 117:*17*
decay 252:*6,*
*13* 253:*2, 7*
decide 196:*9*
260:*3*
decided 50:*5*
70:*7* 72:*6*
74:*19* 90:*3*
93:*4* 97:*13*
109:*10* 142:*4*
165:*21* 221:*17*
233:*10* 235:*18*
276:*3*
decides 51:*8*
decision 20:*24*
35:*11* 91:*7, 23*
93:*14* 95:*16*
97:*4* 117:*18*
132:*14* 228:*22*
declaration
72:*9* 261:*9*
declare 65:*20*
66:*7, 23* 98:*2*
declared 68:*8,*
*11*
declined 99:*13*

241:*10*
deemed 301:*19*
deeply 77:*23*
78:*23* 108:*4,*
*15*
defeated 179:*1,*
*13, 15, 16, 17,*
*18, 25* 180:*21,*
*22* 181:*5, 7, 18*
182:*13, 15*
183:*9, 21*
184:*2, 9, 14*
Defendant
1:*10* 2:*22*
94:*5*
defending
10:*9* 292:*9*
defense 17:*10*
defer 285:*6*
definitely 90:*8*
158:*3, 9*
186:*17* 219:*12*
269:*7*
degree 34:*23*
289:*1*
degrees 249:*8,*
*12, 16, 16*
DELAWARE
1:*2*
delay 11:*7*
delve 170:*23,*
*25*
delved 78:*23*
demonstration
15:*12*
Denver 2:*20*
department
70:*12*
departments
63:*17*
deponent 8:*16*
303:*2*
deposed 15:*25*
deposing
301:*16*
deposition
1:*16* 7:*2* 8:*5,*
*8, 12* 9:*19*
13:*8, 10* 14:*4,*
*20* 15:*1* 17:*17*
29:*15* 57:*21*

105:*7* 167:*20*
168:*8* 169:*2, 6,*
*19, 22* 170:*12*
171:*18* 172:*17,*
*19, 24* 173:*1*
195:*24* 288:*9,*
*14* 296:*11*
297:*9, 15*
298:*3, 13, 22*
299:*2* 300:*6, 8,*
*9* 301:*3, 13, 17,*
*19*
depositions
31:*19*
deps@golkow.c
om 1:*23*
der 217:*8*
describe 39:*25*
153:*4* 205:*23*
described
55:*13* 59:*22*
61:*19* 126:*12*
describes
127:*3*
DESCRIPTIO
N 4:*15* 5:*5*
6:*5*
designation
281:*4*
designed
64:*17* 209:*13*
designing
36:*21* 247:*7,*
*15*
desirable
153:*24*
desks 168:*20,*
*23, 25* 169:*5*
172:*2*
DESMARAIS
2:*3, 4* 9:*23*
18:*4, 16* 20:*23*
21:*13* 22:*3, 11,*
*16, 23* 24:*16*
25:*14* 27:*3*
29:*3* 33:*15, 17,*
*25* 68:*9, 15, 16*
72:*4, 15* 93:*5*
95:*13* 240:*2*
detail 39:*25*
40:*11* 75:*7*

76:*2* 81:*4*
155:*21* 232:*12*
257:*11, 14*
264:*13*
detailed
195:*25*
details 43:*5*
48:*11* 53:*5*
126:*25* 240:*7*
detected 84:*22*
development
18:*22* 37:*12*
device 95:*25*
devices 11:*12,*
*14* 12:*1*
differ 288:*24*
difference
138:*25* 147:*25*
153:*20* 195:*5*
197:*12, 23*
198:*11, 25*
199:*3, 5, 7, 14*
201:*20* 202:*4,*
*6, 21* 203:*4, 11,*
*18, 24* 204:*15*
222:*4* 232:*4*
234:*4, 8* 251:*5,*
*7, 12* 252:*16*
253:*2* 296:*3*
differences
158:*10* 160:*12,*
*22* 162:*6, 10,*
*15* 199:*23*
200:*7, 23, 25*
202:*14* 208:*3,*
*12* 215:*7, 16,*
*25* 237:*25*
250:*19* 251:*9*
289:*2* 294:*14*
295:*3, 15, 22*
different
24:*13, 19*
41:*12* 63:*17*
70:*17* 73:*23*
93:*12* 123:*14*
124:*22* 137:*10,*
*11* 138:*18, 20,*
*23* 142:*1*
145:*25* 155:*11*
161:*1, 21*
162:*11* 167:*6*

170:*19* 201:*9,*
*12, 18, 24*
204:*4, 7*
206:*11, 21*
218:*6* 235:*10*
248:*20* 249:*18,*
*19* 250:*5*
252:*4* 254:*4*
255:*11* 262:*13*
270:*4, 7* 294:*9,*
*24* 295:*11*
differently
73:*24* 270:*8*
difficult 45:*23*
142:*14* 155:*11*
172:*5* 247:*10*
248:*25* 249:*24*
280:*22*
difficulties
10:*20*
digital 15:*2*
direct 147:*8*
234:*19* 300:*20*
directing
289:*21*
Direction 7:*5*
201:*17, 21*
204:*15*
directly 18:*16*
47:*10, 14*
117:*20* 153:*23*
178:*14* 240:*8*
251:*1*
disagree 57:*7*
58:*21* 82:*14,*
*16* 112:*13*
118:*3, 8* 123:*8*
129:*21* 137:*5*
138:*7, 15*
139:*6* 155:*4,*
*23* 188:*24*
201:*8* 221:*23*
222:*10, 21, 25*
253:*23* 287:*12*
296:*21* 297:*22*
disagreements
135:*24*
disappeared
130:*8*
disassociation
253:*20*

**disclaimer**
73:*11*  74:*13*

**disclose** 97:*21*
110:*9*  256:*24*
265:6, *11, 15*
266:6  273:*21,*
*25*  285:*20*

**disclosed** 68:2
114:*1*  158:*17*
210:22  236:22
243:*12*  272:24

**disclosing**
117:*24*  279:9
287:*25*

**disclosure**
259:*24*

**disclosures**
98:*11*

**discouraged**
232:*17*

**discover**
116:*24*  276:22

**discovered**
117:*13*

**discoveries**
132:*16*

**discovery**
37:*12*

**discuss** 62:*15*
93:5, *17*  97:5
134:*12*  147:*10*
154:*11*  204:22
229:*11*  257:*14*
266:*14*  272:22
285:*12, 23*
287:*24*

**discussed** 64:5
83:6  109:*23*
112:*20*  115:*21*
133:*24*  138:*21*
140:*11*  141:*19*
148:*19*  151:*15*
164:20  165:*3*
167:*11*  168:2
169:*11*  170:*3,*
*5, 16*  172:*1, 4*
174:*14*  186:*14*
195:*13*  196:*23*
201:*11*  229:5
239:20  266:*11*
277:*11*  285:*18*

**discussing**
92:*12*  95:*14*
174:2  231:*18*
237:*25*  289:22
290:2, *4, 11, 12*

**discussion**
10:*16*  91:*20*
96:*14*  127:*24*
154:*10, 16, 19,*
*25*  160:*12*
175:4  220:*15*
251:*10*  288:6

**discussions**
169:*4, 21, 25*
170:*14*  172:*14*

**dissociate**
253:*15*

**dissociates**
252:22  253:8

**Dissociation**
5:*13*  6:6
244:*15*  250:*10*
251:*16, 25*
254:*1*  295:*4, 9*

**distance** 41:*16*
238:*24*

**distances**
41:*14*  213:*15,*
*18*

**distracting**
292:*14*

**DISTRICT**
1:*1, 2*

**divided** 31:*2,*
*5, 8, 9*  70:*25*

**diving** 108:*14*

**divisions** 63:*18*

**Dmitry** 105:*23,*
*24*  106:2
111:*16*  113:8,
*15*  115:7
241:*15, 22*
242:*1*

**DNA** 160:*25*

**doctor** 34:*21*
79:5  120:6
134:5  184:6
238:*20*

**doctrine**
199:*18, 18, 20*
202:*12*  215:*15*

**document**
15:*18, 22*
19:*14*  22:9
25:*10*  29:25
57:22  58:*12,*
*15*  69:2  88:*14*
104:5, 8  111:9
127:*13*  131:2
216:*16*  225:*19*
230:*4*  237:*13*
245:*3, 6*
288:*10*

**Documents**
7:9  12:*3, 13,*
*16*  14:22
33:*18, 21, 23*
136:*16, 24*
138:6  140:*20*
141:*13, 18, 24*
155:*16, 18*
159:*12*  171:*23*
257:*19*

**doing** 28:*15*
40:24  91:*15*
99:*11*  220:*16*
272:*10*  301:8

**Dolutegravir**
5:*11*  56:*14*
109:*4, 15*
110:*3*  136:5, *5,*
*11, 25*  137:*18,*
*20, 25*  138:*11*
139:*2, 9, 16, 23*
141:*19*  144:24
146:*1, 19*
147:*11, 17*
148:*1*  156:25
157:5  158:*10,*
*16, 25*  159:25
160:5  161:*12*
172:*10*  176:*17*
188:*3*  192:*12,*
*20*  193:*12, 21*
194:*3, 11*
197:*7, 13*
198:*2, 9, 16, 23*
199:*15, 24*
200:*12, 21*
201:*1, 5*  202:*7,*
*22*  203:*5, 12*
206:*5, 7, 9, 15,*

*17, 20*  207:*20*
208:*4, 13*
212:*21*  213:*10*
215:8, *21, 25*
218:*4, 6*  219:*3*
222:5, *17*
225:*11*  231:*20*
234:5  238:*1, 5,*
*14, 18*  248:*1*
252:*18, 24*
253:*10*  254:2
269:22  270:*11*
276:*20*  282:22
283:*1*  293:*25*
294:*15, 21*
295:*4, 10, 16,*
*22*

**dolutegravir,**
137:7  192:*10*

**DOP** 113:*12*

**double** 174:9
175:8, *16, 19,*
*23, 24*  176:*23*
178:*13*  185:*16*
282:6

**downloading**
69:9

**dozen** 14:6
112:8  167:*4, 4*

**dozens** 61:6

**Dr** 8:*16*  9:*10*
10:*20*  11:6
13:*3*  15:24
18:25  19:*21*
27:*1*  28:5
29:8  34:*19*
40:*14*  42:*19*
43:*3, 5, 8, 9*
44:*3, 4, 5*  45:*1,*
*9, 14, 17*  46:*9,*
*11*  55:17  56:*7,*
*11, 19*  57:*1, 6*
58:4  65:24, *24,*
*25, 25*  68:*20*
73:8  74:*17*
75:9  78:*13*
79:*14, 14, 15,*
*17, 21*  80:4, *21,*
*24*  81:*10, 13*
82:*12, 19, 21*
83:6, *8, 11*

85:*23*  86:*3, 16*
87:*18*  90:*11,*
*23, 24*  91:*24,*
*24*  93:*21*  94:*3,*
*8*  95:*17, 17*
96:*20*  97:8, *8,*
*20*  99:*10*
101:*20*  102:*1,*
*5, 6, 8, 9, 10, 15,*
*16, 17, 21, 22,*
*23, 25*  103:*1, 4,*
*5, 10, 10*  110:*1*
111:2  112:*15,*
*22*  116:5
117:*21*  118:*18,*
*22*  119:*15*
120:*15*  121:*11*
122:*20*  125:*17*
130:*25*  133:9
134:*9*  135:*1*
137:5, *22*
139:5  148:*10*
149:8, *24*
152:*11*  156:*11,*
*21*  157:8
158:*13, 18*
160:*13*  161:*16,*
*18*  162:8, *20,*
*25*  163:6, *20*
164:*10, 19*
165:2, *25*
166:5  167:9,
*16, 23*  169:*1, 8*
172:9, *20*
173:4, *19*
174:*19*  176:*14*
181:*21*  182:*10*
183:*16, 18*
185:*23*  187:*24*
188:*18*  189:5,
*12*  191:*21*
196:*25*  200:*14*
201:*23*  204:*1,*
*21*  205:*21*
206:*22*  209:*17,*
*18*  210:*12*
211:9  214:*3,*
*15, 24*  216:8
217:4, *20*
218:*10, 23*
219:*14*  223:*3,*

10, 22  224:3,
11  225:7, 8, 15,
15  226:1, 1, 3,
12, 14  227:21
228:7, 18, 19
229:14, 25
230:1, 10, 14,
14, 21  232:24
233:2, 3, 15
235:5  236:6,
11, 13, 16, 17,
18  237:5, 6, 7
238:9  239:1
240:6, 15, 20
241:3  242:3, 5,
6, 14  243:3, 7
246:19  247:6,
11, 14, 20, 25
248:17, 22, 23
256:14, 23
257:5, 13
258:4, 24
260:1, 16
261:12  262:15
263:16, 24
265:1  266:5,
13  267:15
269:12  273:2,
20  274:1, 2, 8,
14, 15  275:7
277:9  279:18
284:4, 17
285:4  287:23
288:7  291:21
293:9  297:18
**draft**  27:18
42:3, 22, 23, 24
75:14  79:23
86:21  90:13,
13, 14  92:20
95:3  100:22
121:18  122:16
134:15  143:2
214:4, 7, 10
229:7  243:18
244:5
**drafted**  22:7
64:18  94:24
101:21
**drafting**  27:17

**drafts**  214:12
257:6
**drag**  15:13
**dragging**  15:21
**dramatically**
95:6  96:22
225:3
**draw**  171:4
**drawing**
152:12  172:22
**drawn**  162:9
**dream**  130:19
**Drug**  5:7, 22
35:21  37:11,
12  151:21
153:7, 21
155:6  156:4
157:11, 24
**drug-resistant**
35:16
**drugs**  66:25
110:12  148:6
194:19  213:23
218:3  289:7
**DTG**  77:12
149:5
**DTG-resistant**
174:10  176:24
185:17
**due**  217:7
250:5
**dug**  75:5
**duly**  9:3
300:5
**duties**  40:25

< E >
**E138A**  146:22
**Eagles**  178:25
179:12, 14, 15,
16, 18, 25
180:7, 8, 9, 10,
20, 22  181:4, 7,
18  182:12, 25
183:4, 8, 21
184:2, 9, 14, 17,
25  280:13
**earlier**  19:2
28:8  38:16
62:18  68:1, 11
71:6  86:17

99:8  100:21
165:21  204:3
209:4  213:21
222:11  239:20
246:8  262:20
277:11  297:12
**early**  40:21
55:9  63:6
81:5  228:12
240:3  261:16
262:7
**east**  120:17
**Eastern**  86:9
96:17  150:1,
15  163:11, 15
242:21  243:1
286:10, 14
291:16  298:25
299:3
**EC50**  81:13
137:15  174:12
185:19
**editing**  105:19,
21  267:20
**editor**  42:10
127:3
**Editorial**  6:10
122:22  125:3
126:3  129:24
131:7, 10, 15,
22  132:8
190:25  191:8
274:18  277:10
**editors**  91:4
95:8  96:25
100:14  115:16
117:19  125:9
129:5  132:7,
15, 20  135:14
154:14  225:5
**effect**  65:3
**effective**  77:10
109:3  151:23
153:10  155:8
156:6  157:14
158:1  176:25
197:22  198:9
**effectively**
192:9, 13
193:13, 22

197:7, 16
200:20
**Efficacies**  5:20
**efficient**
109:17
**effort**  70:24
116:23
**efforts**  70:13,
14, 16  71:1
**egregious**
280:8  283:25
**eight**  14:18
26:22  28:10,
12  213:14
231:18, 20
**either**  36:21
59:16  70:18
77:12  141:24
211:24
**electronic**
12:19, 21
166:8
**electronics**
11:25  83:3
**elvitegravir**
109:17  157:3,
6  158:11
205:24  206:12,
16, 24  207:2,
23  208:16
**E-mail**  4:16,
18  6:12  12:23,
24  60:25  61:5,
8, 25  62:2
116:17, 18
221:5  225:24,
25  227:8, 10
229:24  230:8,
13, 22  233:10,
15  234:2
235:2, 5, 13, 23
237:7, 10, 17,
19, 24  286:19
288:15  289:16,
23  290:14, 16
291:1, 3
**e-mailed**
230:18
**e-mails**  61:13
62:7  225:14
290:1

**emergency**
259:6
**employed**  62:7
**employee**
34:17
**employer**
20:11, 20  21:1,
19  34:15
220:13
**employers**
48:23
**encompassed**
27:8  141:25
**encompasses**
29:4  97:3
**ended**  173:1
220:16
**ends**  175:8
**engage**  58:16
221:10  234:18
241:21
**engaged**  37:11
61:20  91:14
171:16
**engaging**  91:20
**ENGELMAN**
1:16  4:3  5:11
8:17  9:2, 10
10:20  11:6
13:3  14:25
15:24  18:25
19:4, 21  27:1
28:5  29:8
34:19  55:17
56:7  58:4, 18
69:1, 12, 13
73:8  74:17
75:1, 9  78:13
79:14, 14, 15,
17, 21  80:4, 24
82:12, 19
83:11  85:23
86:3, 16, 18
87:18, 19
90:11  96:20
97:20  103:16
104:19  109:1
110:1  111:2
118:18, 22
119:15  120:15
121:11  122:20

125:17  130:25
133:9  134:9
135:1  137:5,
22  139:5
148:10  149:24
156:12, 21
157:8  162:20,
25  163:6, 20
164:10, 19
165:2, 25
166:5  167:9,
16, 23  169:1, 8
172:9, 20
173:4, 19
174:19  181:21
182:10  183:16,
18  189:5
191:21  200:14
201:23  204:1,
21  205:21
206:22  209:18
217:20  225:7
230:10  233:2
236:16  237:5
242:14  243:3
247:20  256:14,
23  257:5, 13
258:4, 24
260:1, 16
261:12  262:15
263:16, 24
266:5, 13
267:15  269:12
273:2, 20
275:7  277:9
279:18  284:4,
17  285:4
287:23  288:7
291:21  293:9
300:8  303:16
**Engelman-11**
5:6  216:18
**Engelman-13**
5:8  69:4
**Engelman-15**
5:11  245:5
**Engelman-19**
5:15  104:7
**Engelman-24**
5:19  111:11

**Engelman-25**
5:20  57:24
**Engelman-27**
6:6  245:8
**Engelman-36**
6:7  127:15
**Engelman-37**
6:10  131:4
**Engelman-40**
6:10  104:10
**Engelman-44**
6:12  288:12
**Engelman-45**
6:14  19:16
**Engelman-6**
4:16  237:15
**Engelman-7**
4:18  225:21
**Engelman-9**
4:19  88:16
**Engelman's**
80:21  297:18
**English**
150:25  151:2,
4, 8  179:10
180:6  181:2
182:1, 21
183:7, 19
184:1, 7, 12, 22
185:22  187:19,
22  188:16
189:10, 24
190:9  191:11,
15
**enhanced**
217:6  218:14
222:16
**ensuing**  195:24
**ensure**  98:11
**entry**  19:19
**enumerate**
189:19  228:13
**enumerated**
140:21  189:17
**environment**
43:21  172:7
**enzyme**  40:17
41:7
**equal**  174:12
177:2  185:20

213:15  282:15,
24
**equals**  29:6
**equilibrium**
252:7  253:3
**equivalence**
199:19, 21
202:13  215:15
**errata**  75:24
193:6  301:6, 9,
12, 15  303:12
**error**  84:23
188:1, 20, 21
189:14  190:6,
8, 12, 13
191:13  193:4,
25  194:21, 24
195:21  196:6,
9, 11, 16  197:4
198:6  205:14,
18  282:12
**errors**  74:20
77:19  78:17,
22  80:8  81:1,
1  83:21  84:3,
6, 11  85:5
90:6  100:5, 18
107:5, 24
109:6, 14
115:11, 20
117:9  118:16
119:10  131:18
132:23  133:11,
21  165:4
189:20  190:3,
17  191:20
195:14  196:1,
21  197:1
279:20, 25
280:5  281:6,
12, 20  283:5, 7,
17, 22, 25
284:8  297:2
**especially**
37:17  46:7
92:15  98:14
126:21  138:19
**espoused**  77:22
**ESQ**  2:3, 4, 4,
5, 11, 11, 12, 18,

18  3:3, 5, 7, 9,
9
**EST**  1:18
**establish**  23:23
**established**
26:21  64:1
289:8
**establishing**
201:13  204:8
**estimate**  30:3
71:7  226:18
**et**  79:12
244:23  249:8,
10, 21  251:21
**ethical**  91:21
**ethically**  93:4
95:9
**evaluate**  36:15
**evaluated**
216:3, 4
**evaluating**
36:3
**event**  273:20
**eventually**
92:24  125:9
277:7
**everybody**
10:21  51:22
150:13  298:19
**EVG**  289:9, 10
**evidence**  94:2
187:11, 15
294:18
**evolved**  63:2
**exact**  239:10,
15  261:22
262:3, 6, 9
**exactly**  9:12
15:16  51:14
260:12  261:20
**exam**  285:15
**EXAMINATIO
N**  9:6  164:7
286:24  291:18
**examined**  9:4
**example**  60:24
62:17  67:19,
25  250:11, 20
276:25
**examples**
252:10

**exams**  17:10,
11
**Excellent**
58:14
**excerpts**
264:19
**Excuse**  76:14
132:2  143:11
192:5  205:23
237:18  264:18
271:10
**Excused**  299:1
**Exhibit**  6:10
15:1, 2, 3, 15
19:5, 15  33:19
57:21, 23
58:18  60:17
69:1, 3, 12
73:9  76:12, 24
79:22  83:14
86:18  87:20
88:3, 6, 15
97:6, 20
103:15, 16
104:4, 6, 9
105:7  107:3, 8,
10  108:11
111:4, 10
119:16  121:14
127:10, 14
129:13  131:1,
3  140:21
141:15  144:3
148:12  208:19
216:14, 17, 21,
23  225:16, 20
227:5, 10
230:9  231:17
237:12, 14, 17,
18, 20  243:6
245:2, 4, 7
248:6, 8, 10
251:19  281:23
288:9, 11, 14
291:25  292:2,
16  293:10
**Exhibits**  5:11
19:8  111:3
127:9  288:8

expect 67:3
83:4 202:14
215:16
expense 32:15
expenses 23:2
32:11
experience
34:20 73:22,
23 124:15, 21
128:20 254:23
experiment
59:25 146:3
209:23 246:23
248:21, 23
249:1, 6, 7, 9,
15 250:6, 18,
21, 23
experimental
211:2 214:14
249:19
experimentatio
n 59:17
145:22
experiments
37:20 64:16,
17 97:5
158:17 194:10,
13, 16 201:14
204:9 210:7,
10 211:23
222:6 234:5
235:6, 17
243:11, 25
245:24 246:5,
10, 15, 18, 21
247:1, 3, 8, 16,
25 248:10
250:1, 15
251:4, 9, 13, 16
252:25 253:10
290:13
expert 12:8, 9,
12 15:7 16:16
35:15, 18, 20
36:2, 5, 20
37:14, 22, 24
38:4 39:12
47:16, 24
49:12, 12, 18
50:7 82:9
90:4 92:4, 8,

13 93:17 94:5,
11 99:12
103:12 117:1,
25 118:18
119:8 125:18
126:11 130:21
133:13 139:13,
20 140:3, 6
141:7 142:6,
25 147:15
150:16, 23
151:16 158:20
174:3, 15, 20
175:13 176:4
180:13, 15
181:23, 25
185:8, 9
187:23 188:18
189:12, 18
191:25 197:5
216:2 217:17
228:6 229:21
230:25 234:15
239:10, 16
242:6 243:15,
20 244:14
245:21 249:3
255:12 256:15,
24 257:20
258:11, 15
264:13 266:23
267:16 272:5,
15 275:24
277:19 278:13,
21, 23 279:10,
21 280:2
283:21 288:4
expertise 37:4,
7 38:7 74:11
217:22 265:2
278:24
experts 92:24
267:12
expires: 303:21
explain 95:17
97:15 196:12
228:8 232:5
238:4 268:22
explained
205:19 228:12
249:4

explaining
230:18
explains 149:7
231:10 233:16
248:20
explanation
215:20 216:9
230:19 249:25
250:14 251:3
exponential
252:6, 13
253:2, 7
expressed
290:23
extended
231:9 233:5
extensive
99:19 112:19
152:7 224:3
278:18
extensively
25:21 276:10
extent 25:22
26:16 43:25
78:21 80:25
112:18
extremely 82:4
EYES 1:12

< F >
face-to-face
62:16
fact 21:19
35:24 48:16
52:1 61:5
63:20 69:17
71:13 74:11
83:25 89:5
99:7 110:21
173:7 176:7
196:10 197:9
198:7 202:5,
19 203:10
220:2 237:6
241:21 242:5
254:22 256:25
257:13 260:24
262:23 263:13,
20 264:8
265:10 270:20

272:20 280:4
288:1, 3
factors 201:13
204:7
fail 301:18
fair 25:3
27:21 56:10
133:8 135:1
150:3, 13
198:12 231:15
244:13
fairly 27:12
44:7 137:23
228:1
fall 26:9
27:20 81:5, 5
falls 273:2
false 179:4
181:13, 20
182:9 186:21
familiar 67:15
111:6, 8 124:2
145:9 151:19
168:25 174:4
213:9 217:1
218:9 251:20
far 33:22
66:21 199:13
204:24 238:25
239:3 241:22,
23 242:7, 9
fashion 15:5
42:25 171:14
fast 66:20
faster 250:8,
10 283:18
FASULO 2:18
Fauci 45:1, 9
favor 200:23,
25
fax 1:22
feature 161:20
231:6 292:5
February
12:10 22:9, 14
40:22 89:15
100:3, 16
FEBS 42:12
F-E-B-S 42:15

feedback
267:2, 9
271:15, 18
feel 21:14, 16
66:15 77:15
86:3 126:22
131:20 132:4
163:1 229:20
236:10
feeling 228:10
250:2
fees 51:24
66:14 68:2, 9,
12 71:22 72:3,
4, 6 97:21, 24
110:10
fellow 50:9
57:3 132:19
felt 21:6, 21
91:21 93:3
95:9 97:10
100:9 228:4
276:2
field 46:7
53:18 59:8
66:3 123:13
130:22 156:25
265:3 267:12,
17
field-standard
206:1
Figure 149:4
159:22 180:17
209:21 210:4,
8, 11, 14, 21
211:3, 18, 21,
24 212:7, 23
218:22 246:10
270:20 280:19,
21
file 15:3 34:9
149:4
final 43:1
64:23 65:4
91:19 133:5
176:1 211:6
214:6, 11
229:8
finally 99:18
144:5

**find** 76:*18*
82:*4* 198:*10,*
*24* 199:*4*
201:*4, 6* 262:9
268:6 275:*18*
**finding** 202:2,
*17* 203:22
**findings** 216:7
**fine** 13:*3*
170:22 286:22
**finish** 80:*11,*
*17*
**finished** 91:*8*
285:*14*
**firm** 24:*16*
25:*14* 27:3
292:7
**firmly** 274:*15*
**firms** 21:5
24:*19*
**first** 9:*3*
10:*21* 23:*23*
26:8 33:20
40:22 42:*11,*
*23* 44:8 52:8,
*8, 9* 59:*15, 23*
63:*4* 75:*4, 14*
90:*11* 95:*14*
97:7 129:9
135:*12, 25*
161:8, *8*
175:*23* 181:*11*
188:*23* 197:*15*
200:*17* 225:*24,*
*25* 227:6
229:7, *13, 24*
230:*13* 233:9
243:*15* 245:*1,*
*21* 256:8
260:*21* 262:*1*
264:6 280:*23*
282:*3* 298:*11,*
*12*
**First-Generatio
n** 157:2
205:22 206:*5,*
*23* 207:*3, 22*
**five** 10:*3* 13:*4*
29:*5, 5* 137:*10*
149:2 177:*19*
178:*4* 205:*3, 5*

**213:***16* 282:*15,*
*24* 283:*4, 11,*
*13*
**fix** 120:5
**flawed** 135:*17*
**flaws** 270:*3*
**flies** 121:*5*
**flip** 54:*12*
**focus** 40:*15*
79:22 136:*14*
192:*4* 211:*16*
**focuses** 278:*25*
**focusing**
200:*16* 253:6
**fold** 147:*16,*
*18* 148:*3*
**folder** 16:*15,*
*22* 19:*1, 7*
57:*20* 68:*25*
87:*19, 24* 88:9
104:*4* 111:*3*
131:*1* 225:*18*
237:*12* 244:*25*
248:9 288:*8*
**follow** 79:*19*
235:*12* 280:22
286:5
**following**
224:6 235:*15*
274:5
**follows** 9:*4*
148:*23* 151:*12*
228:*13*
**follow-up** 56:9
289:6 290:*13,*
*15*
**Football**
180:*14* 182:*12,*
*18*
**foregoing**
300:*15* 303:6
**forgotten**
289:*23*
**form** 36:*4*
48:*20* 231:*24*
253:*13, 21*
254:*16* 303:*10*
**formal** 100:*11*
**format** 54:9
167:*18*

**forming**
136:*13* 255:*12*
**formulate** 75:7
**formulating**
244:*8*
**formulation**
185:7
**forth** 42:*24*
63:9 68:7
72:2 214:5
**forum** 221:*18*
**found** 161:22
168:*23* 196:*21*
204:*23, 25*
237:6 281:*12*
**four** 25:*25*
26:*1* 28:*13*
29:*2, 5, 9, 11*
30:*17* 31:*11*
113:*24* 182:*15*
183:5, *9, 21*
184:*9* 185:*1, 2*
187:*16* 191:*1*
222:6 238:*23*
**four-page**
113:2
**fourth** 99:22
282:*20*
**Francis** 102:*11*
**frankly**
210:*17* 259:22
**Frederick**
274:*11*
**free** 86:*3*
**freely** 136:22
**freeze** 79:*1*
**frequent**
219:*19*
**frequently**
112:*15*
**Friend** 111:*25*
112:*4* 117:2, *2,*
*4, 6* 118:*14*
214:22 233:*12*
234:*10*
**friends** 207:*12*
214:*17* 240:*17*
**front** 11:*13*
12:*4* 15:*7, 20*
19:*3* 27:6
28:2 29:*18*

**125:***18* 130:*11*
145:8 208:8
261:*23* 266:*1*
**froze** 78:9
**FTI** 3:*14, 15*
8:5 11:*15*
12:2 14:*21*
15:22 120:2
298:*15*
**full** 14:*10, 16,*
*18* 15:*15* 28:9
29:*14* 58:*12*
80:*21* 161:8
176:*10* 230:7
237:*18*
**fully** 73:2
145:*4, 12*
208:8 209:2
274:22
**fun** 121:*6, 7*
**function**
288:*21* 289:*10*
**Functionalities**
5:*10*
**functions** 41:*4,*
*9, 11*
**fund** 49:*21*
**funded** 49:*15*
52:*3, 9*
**funding** 52:*19*
53:*4, 24* 73:7
235:*10*
**funds** 48:*24*
**further** 41:*1*
177:*20* 209:*17*
267:*20* 289:8
290:5 291:*5*
296:9
**furthermore**
188:2

**< G >**
**G118** 212:*7, 23*
**G118R** 174:*11*
175:9, *24*
176:*24* 177:9
178:*18* 185:*18*
187:*10* 188:*4*
281:2 282:*25*
**G140** 293:*20*

**G140S** 146:22,
*25* 147:*5, 7, 13*
174:*10* 176:*16,*
*23* 177:7
178:8, *13*
185:*17* 187:*10*
192:*10, 13*
193:*13, 22*
194:*4, 12*
197:8 198:*17*
200:*20* 202:22
203:6 217:*11*
222:*18* 248:*3*
**G148H** 192:*10*
**games** 150:2
**gate** 220:9
**gee** 93:*8*
**general** 49:*14*
59:*24* 136:*25*
152:*12* 153:*12*
154:*1, 18*
275:*10*
**generally**
14:*15* 59:*14*
109:*21* 271:*18*
**generate** 27:9
49:*13* 211:*5,*
*10, 20* 257:8
**generated**
91:*18* 119:*3*
133:*17* 155:*15*
188:5 211:*13*
229:*14* 246:9
256:7
**generating**
119:5 195:*12*
239:9
**Generation**
4:*21* 211:*1, 18,*
*23*
**gentlemen**
179:*11* 182:*3*
**getting** 74:7
113:*6* 166:*18,*
*23* 245:*11*
**GILEAD** 1:9
3:*10* 8:*14*
24:2 33:*23*
54:*23* 55:*3, 8,*
*13, 18, 24* 99:*5,*
*9* 195:8 239:2

241:*11*  244:*21*
251:*21*  257:*19*
272:*24*  273:*22*
274:*4*  287:*25*
289:*17*  290:*8,*
*17, 23*  296:*8*
297:*5*
**Gilead's**
297:*15*  298:*4,*
*10*
**give**  47:*16*
96:*7*  145:*13*
156:*12*  166:*1*
226:*17*  273:*7*
278:*16*  284:*6*
**given**  16:*11*
21:*11*  30:*7*
55:*4*  142:*9*
151:*20*  153:*6,*
*18*  155:*5*
156:*3*  157:*11*
165:*23*  196:*7,*
*12, 19*  205:*2*
226:*12*  229:*22*
300:*6*  303:*8*
**gives**  49:*7*
**go**  16:*14*
24:*20*  40:*5*
50:*5*  58:*1*
68:*7*  70:*13*
73:*17*  76:*1*
79:*7*  80:*24*
85:*19*  96:*8, 10*
108:*18*  113:*1*
120:*4*  126:*24*
129:*8*  130:*9*
164:*24*  168:*16*
174:*25*  175:*24*
180:*18*  195:*23*
208:*18*  211:*10*
220:*6, 7, 22*
221:*8*  224:*7*
230:*10*  237:*1,*
*20*  247:*22*
248:*7*  259:*12*
264:*13*  269:*15*
273:*15*  276:*23*
277:*24*  278:*1*
281:*10, 21, 25*
282:*2, 15*
283:*18, 18*

286:*6, 7*  289:*5*
291:*6*  292:*16,*
*17*
**goes**  15:*17*
64:*18*  119:*23*
134:*7*  175:*8*
288:*22*
**going**  16:*14,*
*18*  18:*25*
57:*18*  68:*25*
81:*14*  85:*18*
86:*5*  95:*10*
103:*22*  104:*3*
111:*2, 4*
121:*12*  127:*8*
128:*15*  134:*5,*
*23*  135:*10*
143:*14, 24*
156:*13*  157:*17*
162:*21, 23*
163:*21*  164:*17*
165:*19, 22*
167:*9*  170:*9,*
*23, 24*  171:*1, 3*
174:*20*  180:*16*
183:*10*  188:*24*
189:*1*  195:*7, 9,*
*19*  205:*11*
210:*13*  216:*14*
218:*21*  220:*6*
225:*16, 24*
230:*2*  242:*20*
244:*24*  258:*1,*
*19, 21*  259:*18,*
*19, 20*  260:*1, 2*
263:*6*  265:*14*
272:*25*  273:*5,*
*16*  281:*17*
282:*18*  284:*18*
285:*17*  286:*8,*
*12*  287:*3, 5*
291:*10*  298:*23*
**GOLKOW**
1:*22*
**Good**  9:*9, 11,*
*11*  96:*8*
106:*15*  117:*1,*
*2, 5*  118:*13*
123:*25*  166:*2*
243:*4*  298:*20*

**gotten**  77:*22*
105:*2*
**government**
44:*19, 23*
47:*10, 12, 14*
48:*3, 9, 14*
50:*6, 21*  51:*3,*
*6, 7, 16, 17*
**graduate**  44:*9*
**grammar**
190:*19*
**grant**  52:*8, 9*
53:*1*  54:*9*
55:*3, 22*  69:*23*
70:*8*  190:*23*
235:*10*  239:*13*
**granting**  54:*5*
**grants**  32:*18,*
*22*  33:*1*  49:*3,*
*9, 14, 21*  52:*6,*
*11*  70:*3, 17, 25*
71:*4, 9, 11, 16*
106:*10, 13*
111:*20*  191:*4*
239:*13, 18*
**grateful**  102:*1*
**grateful,**
101:*13*
**Gray**  1:*18*
8:*21*  300:*12*
**Great**  9:*9*
11:*4*  45:*18*
46:*5*  70:*13*
75:*7*  86:*2*
120:*22*  127:*23*
155:*21*  215:*4*
257:*14*  286:*25*
287:*16*
**greater**  281:*3*
**greatest**  45:*24*
**greatly**  124:*24*
**group**  40:*9*
150:*20*
**GS9160**  289:*7*
**GSK**  3:*5*
32:*22*  33:*6, 12*
54:*18*
**guess**  25:*22*
27:*13*  155:*3*
275:*1*

**guessed**  274:*23*
**guessing**  289:*1*
**guidelines**
21:*18*
**gun**  89:*16*
**guy**  269:*24*
**guys**  79:*1*

**< H >**
**H51Y**  174:*11*
176:*25*  177:*12*
185:*18*  188:*5*
**half**  14:*6*
27:*14*  75:*4*
145:*21*  146:*1,*
*15, 15*  194:*21*
197:*15, 20, 22,*
*25*  198:*2, 7, 10*
199:*1*
**Half-Life**  6:*7*
248:*1, 3*
251:*25*  252:*24*
253:*19*
**half-lives**
252:*5, 17*
295:*4, 9*
**hand**  59:*19*
65:*11*  112:*12*
139:*24*  140:*2,*
*7, 13*  155:*14*
201:*6*  203:*16*
208:*9*  262:*6*
**handful**  195:*13*
**Hans**  288:*17*
**happened**
61:*16*  62:*4*
**happy**  15:*19*
163:*4, 5*  196:*3*
269:*10*
**hard**  15:*4*
66:*20*  298:*11*
**Harvard**
17:*15*  30:*2*
46:*25*
**Hassounah**
194:*8, 9*  203:*1*
**hate**  10:*7*
65:*12*  241:*7*
**head**  89:*17*
**head-to-head**
137:*15*

**Health**  44:*15,*
*18, 22*  45:*2, 4,*
*18*  47:*5*  48:*2*
50:*21*  51:*2*
52:*7, 12*  54:*7*
63:*12*  70:*3*
71:*15*  72:*23*
74:*15*  133:*19*
187:*25*  188:*20*
189:*14*  190:*24*
191:*5*
**HEALTHCAR**
**E**  1:*3, 6*  8:*14*
18:*17*  20:*1, 16*
21:*4*  22:*13*
68:*12, 17*
71:*22*  72:*5, 14,*
*16*  97:*22, 24*
110:*11*  260:*18,*
*25*  261:*21*
262:*2, 16, 17*
**Healthcare,**
72:*7*
**hear**  78:*5, 9*
79:*16*  80:*1, 2,*
*14*
**heard**  204:*2*
228:*11*
**heavily**  257:*5*
**held**  1:*17*
10:*17*  96:*15*
116:*9*  219:*24*
220:*2, 4*
**Hello**  86:*16*
243:*3*
**help**  15:*23, 23*
53:*24*  113:*9,*
*13, 16*  247:*6,*
*15*
**helped**  106:*9*
**helpful**  120:*10*
**Hi**  237:*23*
**high**  111:*18*
130:*22*
**higher**  250:*11*
**highest**  185:*19*
**high-impact**
129:*17*  130:*18*
**highlight**
209:*24*  212:*19*
251:*10*  264:*18,*

19 282:2, 12
283:24 292:19
highlighted
104:16 144:11
145:17 148:12
149:13 155:5
161:11 162:6
175:18 176:13
189:22 205:11
210:5 212:5
222:11 233:21
235:23 250:3
258:18 276:19
280:8 284:14
highlighting
174:5 192:5
210:21 272:10
highlights
283:16
HIGHLY 1:10
79:10 103:12
118:19 187:23
188:17 189:11
213:8 223:18
228:5 235:24
265:22, 24
266:4 279:5
Hightower
5:14 244:23
245:13 248:4,
11, 23 249:7,
22 252:11
277:21 278:9
hindsight
279:8
hire 241:15
historical
81:25 188:7
history 119:18
HIV 4:17, 17,
19, 21 5:8, 20
35:8, 12, 17, 22
36:6, 6, 7 37:3,
21 39:4 46:7,
8, 10, 12 89:8
165:14 207:17,
17 252:22
253:8 254:3
255:19 278:25,
25 279:2, 3
295:23

HIV-1 5:15,
23 6:7 209:15
295:25
hold 26:4
139:5 287:5, 8,
9 296:11
holding 297:8,
14
home 9:13
34:10 220:17
honest 215:2
269:25 270:21
271:15, 17
honestly
290:14
honorarium
55:8
hopefully
14:24 51:22
93:12
Hopkinton
8:10 9:13
HORWITZ
2:11 131:25
hour 14:7
23:2, 10, 21
24:9, 11 25:3
29:16 85:18
159:4, 14
hourly 23:5,
17 24:8 32:10
hours 14:8, 11,
12, 14, 16, 19
26:1, 4, 14, 16,
22, 23 27:2, 7,
11, 14 28:10,
12, 15, 20, 21
31:15, 20, 23,
24 32:2
158:21 159:4,
7, 15 167:4, 4
248:21, 22
249:20, 21
250:4 252:18,
25 253:5
268:15
house 171:21
220:20
Houston
220:10
Hubbard 2:13

HUGHES
2:18 10:14
44:4, 5 45:14,
17 46:9, 11, 19,
24 56:11, 19
57:1, 6, 19
58:19, 22, 25
59:4 60:16, 17,
25 63:11 64:2,
17, 22 65:24
68:20 73:10,
11, 13 74:25
75:17, 24 76:2,
7, 9, 11, 20
77:17 78:15
80:6 81:10, 13
82:24 83:5, 8,
14, 20 84:2
85:3 90:3, 9
99:24 100:4,
17 103:19
106:19 107:4,
12, 18, 22
108:23 109:6,
20 112:23
114:7, 18
115:4, 6, 18
116:3, 5
117:21 119:9,
16 125:1
131:16 132:21
133:10, 20
135:6 148:13
149:8 152:11
157:10 158:13,
18 160:13
161:16, 18
162:8 164:11
165:6 173:20
176:13, 14
185:4, 23
186:20 187:24
188:19 189:13
193:16, 19
196:20, 25
202:1, 18
231:12 232:8,
11, 24 233:5
236:13, 19
238:6 277:14
279:22 281:13

human 186:12,
17
hundreds
52:11 62:6
155:15 190:22
191:2, 4, 6
256:19 289:25
hungry 121:2
Hutchison 3:9
hypothesis
199:11, 12
hypothetical
150:6 182:18
203:15 221:14

< I >
I, 303:4
ICAAC 288:25
icon 119:24
idea 136:11
165:9 197:7
226:19 232:23
241:6 243:10,
24
identification
19:15 57:23
69:3 88:15
104:6, 9
111:10 127:14
131:3 216:17
225:20 237:14
245:4, 7
288:11
identified
81:21 82:1
189:20 190:17
193:3 196:2,
18 197:1
227:15 279:15
281:8
identify 215:6
276:12 280:1,
4 281:11
identifying
284:18
identity
275:12, 16
276:17
IKJ 113:13
illegal 35:24
Illinois 2:13

imagine 50:12
53:5 267:11
278:6
immunodeficen
cy 209:14
impact 130:22
imperative
93:4 301:14
implication
178:2, 9
implications
178:6
implies 213:22
importance
96:3
important
95:10 229:15
impossible
67:11
impression
224:13 256:4
improper
115:22, 24
improved
225:10 238:4
inaccurate
109:24, 25
inappropriate
259:9
inclination
278:22
include 73:4
140:9 143:5, 6
175:11 176:2
included
41:20 52:20
75:22 191:19
256:6, 20
257:3 273:23
includes
101:19 115:7
175:25
including
10:21 126:6
147:7 172:16
income 34:7,
11
Incomplete
150:6 276:24
inconclusive
222:15

inconsistent
201:3
Incorporated
25:6
incorrect
151:7  174:18
187:8  260:20
280:24
increase
253:19
increases 24:20
INDEX 7:2
indicate 65:7
137:3  147:24
175:20  176:6,
10  198:21
199:2
indicated
189:7  190:21
194:2, 14, 17
indicates 69:9
145:24  147:15,
23  148:3, 5
197:21, 23
201:15  203:2
204:11  222:3
indications
176:6
individual
48:12  106:7
115:1  128:23
186:2
infection
37:21  39:5
77:11  109:18
146:21, 25
147:4, 13
148:2  153:1
194:4  203:6
294:16, 22
295:24, 25
infectivity
209:16
infer 59:15
influenced
267:21
informal
171:14
information
63:24  64:9
65:14, 16  79:9

81:8, 11  83:7
91:17  108:2
110:13, 16, 19,
25  117:20
125:7, 12
127:6  165:23
244:7  247:19
256:22  257:4
295:18
informational
91:3
infringement
199:17
inhibit 136:3
138:2, 13
139:2, 11, 18
146:1, 21, 24
147:4, 12, 17,
19  148:1
177:7, 9, 10, 12
192:21  194:4,
11  197:13
198:23  203:5
222:18  294:1,
16, 22  295:23
inhibited
174:8  175:7
176:16, 22
177:18, 25
178:4, 7, 12, 18
185:15  187:9
282:5  293:20,
23
inhibiting
77:10  109:3,
18
Inhibition 5:11
Inhibitor 5:19
89:8  148:8
152:25  180:16
Inhibitors
5:17  36:10
37:3  40:12
137:11  157:2
165:15  185:10
195:6  207:4
255:20  279:3
inhibits 192:9,
13  193:13, 22
197:8, 16

200:20
initial 92:23
initially 20:13
75:13  92:16
108:19  239:24
initiate 109:11
initiated 106:7
109:9
innocuous
169:3
input 130:4, 16
insertion 212:5
insignificant
146:20, 24
147:3  194:6
203:21  294:2
insofar 182:1
instance 67:1
instances
137:2
INSTI 138:2,
13  139:11
148:24  205:22
288:21

INSTI-resistant
77:11  136:4
INSTIs 114:13,
21  143:18, 19
144:13  146:5,
11  148:15
149:15  160:23
162:8  178:1
206:6, 23
207:18, 22
231:7
Institute 20:12,
15  34:18  44:7,
12, 14  45:2
48:23  52:7
62:8  63:19
69:21  70:13
71:14  102:11
105:25  223:24
Institutes
44:15  45:4, 18
47:4  48:2
50:20  51:1
52:12  54:6
63:12  70:2
71:15  72:22

74:15  133:19
187:25  188:19
189:13  190:24
191:5
instruct
134:23  167:10
170:9  273:1
instructed
14:21  167:2
195:22  208:1,
6
instruction
120:8  164:18
207:12  287:19
instructions
67:21, 23
169:15  301:1
insubstantial
200:4, 6, 13
208:2, 11
216:2  296:2
insubstantially
206:20  254:4
294:23  295:11
Intasomes 5:20
Integrase 4:21
5:10, 15, 17, 23
36:6, 10  37:3
40:12, 17  41:4,
7  46:8  89:8
109:19  137:11,
12  139:2, 18
142:2  152:25
165:15, 15
177:19  180:15
185:10, 11, 16
207:17  213:13,
25  217:10
238:3, 13
252:23  253:9
254:7  255:7,
19, 19  278:25
279:2, 3  282:6
294:9  295:23
integration
36:7  46:8
207:18  254:3
279:1
integrity 215:4
intending
178:20

interact 60:10,
20
interacting
60:6  274:3
interactions
60:10  62:11
217:8
interatomic
213:15, 17
238:23
interest 65:24
72:10  110:22
261:5, 10
289:13  290:18,
21, 24
interested 77:1
interesting
168:24  289:6
Interestingly
231:8  233:3
interests 65:21
66:1, 8, 22
98:3, 21
113:20
interfaces 20:9
internal 33:22
141:24
international
53:20  54:15,
20  55:15
220:10
interpret
203:16
interpretation
101:18  109:13
137:8  178:16,
19  186:7
187:7, 19, 21
188:16  189:10,
24  191:17
206:1  207:15
215:22  222:1
276:13  283:3
interpreted
186:4  215:18
216:6  255:3
270:7
interpreting
254:24  276:8
interrupt 10:7

**intimate**
213:*23* 231:*8*
233:*4* 238:*3,*
*12*
**intimately**
213:*11*
**introduce** 41:*5*
**introduced**
41:*15*
**intuitively**
275:*5*
**inventors**
113:*21*
**invest** 50:*15*
**investigating**
41:*2*
**investigator**
44:*6, 11* 49:*2*
250:*22*
**investigators**
228:*20*
**investments**
50:*17*
**invitation**
40:*21*
**invited** 40:*18*
42:*10* 46:*18,*
*24*
**invoice** 31:*22*
**involve** 228:*23*
**involved** 212:*8,*
*11, 13*
**involvement**
46:*16*
**involving**
90:*20*
**ion** 41:*3, 18*
**ions** 40:*16*
41:*18*
**iPad** 11:*22*
**Island** 116:*6*
**issue** 67:*17*
91:*21* 117:*12*
296:*14*
**issues** 90:*8*
117:*14* 146:*18*
**iterative** 42:*25*
214:*5*
**its** 49:*22*
50:*11* 75:*15*
99:*5* 127:*3*

138:*1, 12*
139:*10, 10, 17*
143:*19* 144:*13,*
*25* 146:*5, 11*
148:*15* 149:*15*
231:*9* 233:*4*
252:*24* 288:*1*
289:*17* 297:*17*

**< J >**
**Jamey** 3:*14*
**January** 89:*18,*
*22, 25* 90:*2, 15*
91:*1* 99:*20, 23*
**JBC** 69:*14*
86:*19*
**jdesmarais@de**
**smaraisllp.com**
2:*7*
**job** 38:*20*
53:*21* 69:*22,*
*24* 71:*5, 8*
**jobs** 276:*11*
**JOHN** 2:*4, 18*
10:*14*
**john.hughes@b**
**artlitbeck.com**
2:*21*
**Johnson** 3:*14*
**journal** 40:*19,*
*20* 42:*12, 16*
56:*23, 24* 57:*3,*
*8* 60:*10* 61:*2*
64:*6, 7* 67:*3*
73:*3* 74:*4*
83:*18, 24* 89:*2*
92:*18* 95:*1*
100:*13* 110:*10*
117:*19* 122:*19*
123:*1, 3, 5, 9,*
*22* 124:*1, 20*
125:*2* 126:*6,*
*13, 23* 127:*2, 6,*
*11* 128:*20*
129:*4, 16, 23*
131:*8, 23*
132:*7, 15*
226:*7* 260:*22*
261:*5, 8*
267:*11* 274:*3,*
*19* 277:*8*

**J-O-U-R-N-A-L**
42:*16*
**journals** 64:*8*
65:*13, 13*
67:*16* 73:*23*
123:*10, 10, 13*
126:*5* 130:*23*
135:*15* 191:*2,*
*7* 261:*2, 8*
265:*21* 275:*11*
**jthomsen@des**
**maraisllp.com**
2:*8*
**JULIANNE**
2:*5*
**July** 261:*17*
**June** 108:*20*
226:*25* 227:*18,*
*18, 20* 229:*3*
243:*13*
**jury** 178:*23*
179:*11* 182:*3*
**JUSTIN** 2:*3*
10:*9, 23*
**jwilcox@desma**
**raisllp.com** 2:*7*

**< K >**
**Kawasuji**
134:*20*
**keep** 83:*2*
119:*20*
**keeps** 236:*23*
**Kessel** 3:*9*
**keyboards**
166:*16*
**kind** 33:*5, 11*
53:*8, 13* 56:*1*
282:*18*
**kinds** 62:*17*
166:*16*
**kinetics** 244:*16*
**Kirsten**
244:*21, 22*
251:*20*
**kitchen** 11:*21*
**knew** 119:*19*
195:*17* 196:*10*
229:*13*

**know** 17:*19*
23:*22* 34:*10*
44:*7* 45:*11, 23*
46:*23* 50:*10,*
*13, 13, 17*
51:*14, 18*
58:*16* 60:*7*
66:*3, 19* 73:*2,*
*12* 74:*3* 89:*16*
93:*11* 95:*22*
102:*24* 111:*13*
112:*12* 114:*10*
120:*25* 121:*5*
122:*9* 127:*17*
134:*5, 7, 13*
142:*15, 23*
143:*4, 17*
145:*4* 150:*7*
156:*22* 171:*3*
173:*14, 17*
174:*3* 180:*15*
195:*11* 201:*25*
205:*10* 208:*25*
213:*8* 217:*3,*
*11* 219:*9*
232:*15* 234:*12*
235:*19* 238:*25*
239:*3* 241:*2,*
*10, 22, 23, 25*
242:*7, 9* 247:*5,*
*13* 254:*18, 20*
259:*9* 261:*1*
262:*12* 270:*22*
273:*16* 278:*10*
281:*16* 283:*15*
289:*12* 290:*20*
292:*7* 293:*19*
297:*23*
**knowing** 102:*5*
**knowledge**
16:*13* 37:*1, 16*
38:*1, 9* 39:*15*
43:*22* 54:*3, 21*
56:*4* 65:*11*
98:*19, 25* 99:*2,*
*4, 6* 125:*6*
**known** 45:*20*
46:*6* 139:*18*
174:*8* 185:*16*
282:*5*

**Koneru** 5:*18*
105:*6* 107:*16*
**KU** 274:*8*

**< L >**
**lab** 112:*6*
209:*24* 210:*6,*
*19, 25* 211:*17*
214:*15* 231:*12*
232:*8, 11*
238:*6* 246:*13*
**labeled** 267:*6*
289:*10*
**laboratories**
90:*20* 95:*11*
228:*21*
**laboratory**
60:*5* 70:*20*
83:*10* 91:*17*
98:*16* 201:*11*
204:*6* 210:*3,*
*12* 235:*9*
246:*2, 19*
247:*3*
**labs** 92:*12*
**ladies** 179:*10*
182:*3*
**Lady** 223:*23*
**language**
21:*23* 22:*1, 5,*
*18* 72:*11*
101:*23* 128:*12*
149:*21* 154:*15*
162:*13* 178:*15*
180:*6* 182:*1*
183:*7, 19*
185:*22* 187:*19,*
*22* 188:*16*
189:*10, 24*
190:*9* 191:*11,*
*15* 192:*19*
205:*25* 206:*2*
207:*9* 214:*8,*
*10* 231:*16, 22*
239:*25* 241:*17*
253:*12*
**LANSKY** 2:*12*
**laptop** 283:*16,*
*19* 284:*9*

large 88:12
200:8 214:8
269:21
largely 160:25
162:16
larger 217:8
218:15, 23
Las 181:6, 7, 9
late 81:5, 5
108:5 257:11,
12
laureates 46:1
law 21:4
24:19
lawyer 84:8
104:24 202:12
lawyers 14:3
20:7, 7 22:24
23:7 24:1, 14
25:14, 18
26:11, 14
29:22 30:25
32:15 33:25
34:3, 8 38:13
43:24 90:14
93:10 99:1, 5
118:23 119:7
134:2 165:7
166:1, 6, 12, 19,
24 167:2, 20,
24 168:7
169:9, 14, 17
170:14 171:10,
17 172:1, 12,
15 173:6, 12,
16 207:13
239:2, 5
240:18 244:11
255:9, 17
258:25 262:22
263:3, 12, 20
264:7 272:20,
23
LAWYER'S
304:1
lead 220:14
leaders 46:10
leading 250:9
leads 79:9
League 180:14

leap 216:13
learned 40:8
learning 172:6
leaves 147:6
leaving 274:25
lecture 55:9
led 211:23
left 69:7
76:15 77:4
88:2 107:14
144:6 160:4,
23 161:12, 15
162:7, 8, 15
250:3 281:18,
22 282:21
left-hand
293:2, 3, 4, 11
leftmost 160:5,
6
leftward 58:13
88:4, 10
127:20
legal 12:20
13:5 18:8
24:6 42:4
43:10, 16 47:6,
7, 15, 18 79:24
86:22 87:3, 13,
16 92:1 94:3
95:12 234:17
239:21 240:4
241:15
length 14:7
138:21 174:15
267:2
lengthy 113:2
273:11
letter 261:16
274:1
Leuven 274:8
level 81:4
106:6 232:12
Li 209:12
liberty 154:12
licensed
207:19
lies 38:7
light 83:8
108:3 132:11
151:8, 11
271:22

LIMITED 1:6
73:22
LINDSEY 2:4
168:21 262:11
LINE 7:6, 10,
13, 16 135:4
171:4 172:22
227:7, 9 230:3
302:4 304:2
lines 212:6, 11,
14, 16, 18
218:25 230:6
list 59:5, 13
75:22 195:25
205:2 243:18
listed 23:14
49:1 58:25
59:4 63:10
100:25 243:8
listing 131:6
listings 18:2
lists 70:3
literal 199:17
literature
74:24 81:10
82:1 100:11
108:15 136:23
197:6, 20, 22
198:1, 2, 8, 10,
16 199:2
200:8 207:16
208:17 215:23
222:15 224:4
249:14 257:11
LITIGATION
1:22 3:14
24:1 43:3, 6
47:16 297:16
little 28:6
44:3 46:16
66:9 74:10
82:20 145:6
184:23 199:1
201:24 204:3
209:3 222:9
281:18
live 63:8
163:9 227:13
lived 168:14
living 24:20

LLP 2:3, 9, 15
9:24 18:4, 16
20:23 21:13
22:3, 11, 16, 23
23:19, 24 29:3
33:15, 17, 25
68:9, 15, 16
72:15 93:5
95:13 240:2
lmiller@desma
raisllp.com 2:8
loaded 209:2
loading 58:3
208:23 209:1
local 70:11
Loebbaka
3:12 8:4
long 13:6
14:2 116:5
205:5 230:22
236:3 240:18
longer 236:4
250:2 252:25
Long-Term
5:6 117:13
longtime
214:19
look 15:4
41:11 57:4, 14
63:15 68:24
73:17 106:22,
24 128:2
185:23 196:8
245:10 248:8
257:10 270:25
271:23 278:2
284:1 289:20
looked 104:17
155:15 218:12
246:8
looking 25:11
77:2 101:5
136:18 138:16
145:18 205:6
looks 106:22
113:24 114:4
252:19, 19
289:21 290:2
loop 217:10
218:16
losing 120:9

lost 76:14
77:4 150:2
lot 29:21
48:16 65:8
119:23 271:4
279:2 284:2
lunch 120:13,
19 163:3, 24
196:24
lunchtime
120:14
Lyumkis
105:23, 24
106:3 111:5,
17 113:8, 12,
16 114:5
115:7, 10
241:16, 22
242:1, 3, 5, 6

< M >
Madam 13:18
141:1
Madame 298:8
MADELINE
2:12
madeline.lansk
y@bartlitbeck.c
om 2:15
magnesium
40:16 41:3, 18
main 20:9
majority
27:22, 24 95:4
96:21
making
129:24 186:20
213:13
mangabey
209:15
manner 192:23
Manuel
288:16, 18
manuscript
57:9 59:19
64:19, 24 65:4
71:2 83:12
85:11, 14 87:2,
16 92:20
100:22 101:4,
8, 10, 21 102:3,

*6, 19* 103:6, *23*
113:*9, 13, 16*
140:*8, 10*
145:*20* 159:*16*
187:*12, 15*
209:*19* 229:7
243:*14, 18*
244:5 265:*1*
268:6 270:22
271:*25*
**manuscripts**
60:*4* 65:*17*
73:5 159:*10*
239:*14*
**March** 63:6
**marginally**
77:*10*
**Mark** 3:*3*
**Marked** 7:*15*
14:*25* 19:*4, 14*
57:22 69:2
88:*14* 104:5, *8*
111:9 127:*13*
131:2 216:*16*
225:*19* 237:*13*
245:*3, 6*
288:*10*
**marketing**
267:*21* 276:*14*
**Maryland**
274:*11, 12*
**Massachusetts**
8:*11* 9:*14*
120:*24* 168:*10*
**material**
104:*24* 226:9
243:*13*
**materialized**
290:6
**materials**
12:*15* 33:5, *11,*
*14, 16* 52:*15,*
*23* 53:9, *14*
54:*25* 55:*20*
56:*1* 75:6
79:*10* 143:2
243:*19* 289:*18,*
*21* 290:8
**math** 30:*12*
**matter** 135:*11*

151:7 274:22
**McColl** 288:*16*
**mean** 59:*3*
61:*25* 66:*10*
178:*20* 180:2
181:8 182:*11*
184:8 199:6
261:*18* 264:22
267:5
**meaning**
101:*24* 106:*14*
116:6 177:*24*
180:6 184:*16*
280:*12*
**meaningful**
74:*19* 77:*19*
78:*17* 80:8
83:*21* 84:*3, 6,*
*11* 85:5 90:5
100:5, *18*
107:5, *24*
115:*11, 19*
117:9, *14*
131:*17* 132:*23*
133:*11, 21*
**meaningless**
148:7
**means** 35:5
59:5 66:7, 9
91:*3* 98:7
139:6 150:*19*
177:6, *13, 17*
179:*14* 180:2,
*11, 23* 181:*1*
185:*14* 290:*10*
300:*19*
**meant** 149:8
175:*14* 186:*21*
197:*18* 207:*14*
233:*12, 24*
235:2, *20, 21*
236:2 237:7
264:*23*
**measure** 41:*14*
199:*10*
**measured**
198:*21*
**mechanism**
40:*13*
**Medical** 17:*15*
30:2 34:*21*

**medication**
35:*7, 13*
**medicinal**
36:*24* 37:2, *4,*
*7*
**medicine** 35:*3*
**meet** 14:2
171:*13* 296:*19*
297:*23*
**meeting** 53:*21*
116:7 169:*12*
223:*21* 226:5,
*9, 11, 13, 24*
227:*17*
**meetings** 13:5,
*6* 14:6, *13*
29:*17* 46:*19*
53:*20* 55:*16*
167:*1* 229:5
249:*14*
**MEG** 2:*18*
**meg.fasulo@ba**
**rtlitbeck.com**
2:*21*
**member**
131:*10, 21*
274:*18*
**memorize**
31:*24*
**memorized**
34:*15*
**mention** 92:*3*
235:*4* 236:*11*
**mentioned**
14:5, *13* 17:*18*
30:*11* 65:*12*
67:*1* 68:*1*
71:5 110:*8*
165:*20, 22*
172:*19* 224:*19*
240:22
**mentions**
110:2, *5, 12*
**Merck** 53:2
**merely** 203:*23*
**message** 12:*19,*
*21* 109:*14, 15*
**met** 10:*3* 44:8
171:*19* 298:*1*
**metal** 41:*18*

**methods**
249:*19* 251:6
**metrics** 244:*17*
**Michael**
262:*19*
**Michelle** 1:*18*
8:*21* 300:*12*
**Microsoft**
62:*25*
**mid** 123:*3, 25*
**middle** 222:7
**MILLER** 2:*4*
10:6, *22* 76:5
168:*15, 21*
262:*11*
**Milwaukee**
149:*25*
**mind** 159:*3*
176:5 223:*12*
244:2
**mine** 34:*11*
86:6 117:*4*
214:*20*
**minimally**
228:*18*
**minor** 17:*6*
**minutes** 85:*19*
86:2 96:7
126:*17* 242:*11*
258:*20*
**minutia** 68:*10*
**misconception**
100:*19* 205:*14*
**misconceptions**
74:*20* 77:*20*
78:*17, 23* 80:9
81:2 84:*7, 12*
90:6 100:6
107:6, *24*
115:*12, 20*
117:*10* 118:*16*
119:*10* 131:*18*
132:*10, 24*
133:*12, 22*
165:5

**misconceptions,**
83:22 84:*3*
85:5
**misinterpretati**
**on** 280:*10*

**misleading**
146:*8, 9*
148:*17* 149:*17,*
*22* 186:8
272:*15*
**misled** 272:*4*
**misquote**
104:22
**misspoke**
264:*18*
**misstatement**
293:*24*
**mistake** 88:*1*
279:*9, 13*
**mistakes** 195:*8*
**misuse** 192:*18,*
*19*
**misuses** 132:*10*
**mix** 216:*15*
**mobile** 11:*18,*
*20*
**model** 252:6, *7,*
*13* 253:2, *3, 7*
**modeled** 219:*3,*
*4*
**modeling**
39:*13, 15, 17,*
*21, 24* 41:6, *21*
162:*1*
**models** 252:*4*
**modified** 277:*3*
**molecular**
39:*13, 15, 17,*
*21, 23* 41:6, *21*
126:*4* 162:*1*
**molecules**
250:9
**moment** 139:*6*
**momentarily**
281:2
**Monday**
220:*12*
**money** 25:*17*
27:22, *24* 34:*1*
47:6 48:*17*
49:*5, 23* 50:*3,*
*11, 16* 51:6
52:*15, 23* 53:9,
*14* 54:24
55:*19, 25*
66:*11* 69:*17,*

22, 23  70:8, 20
71:9, 10  98:20
241:4
**monies**  50:16
51:15, 19, 20
66:18, 24
**monitor**  15:14
58:13
**Monogram**
254:7, 10, 13,
14, 19, 21, 23
255:2, 7, 10, 15,
21  256:1, 2, 7
270:16, 18
**month**  10:2
29:1  108:14
**months**  71:23
75:13  88:25
108:6, 7, 9
**morning**  9:9,
11  12:22
173:2
**MORTARA**
2:11  4:3  9:8
10:11, 18, 25
11:4, 5  13:9,
17, 25  14:1
18:19  19:17
36:12  47:25
48:15, 25  50:8
51:4, 25  57:25
58:9  67:14
69:5  76:8
77:7  78:11
80:13, 23  82:6,
10, 18  85:9, 21
86:15  88:22
94:6, 22  96:1,
9, 19  104:13
111:12  117:22
118:5, 10
120:1, 11
122:13  123:20
127:16  129:3
131:5  132:3
133:7  134:11,
25  135:18
141:1, 4  142:3
150:10  152:19
153:25  154:7
155:2  156:16,

19  158:5
162:24  163:4,
12, 19  164:9,
12, 16, 24
165:1  167:15
170:8  171:5, 7
173:3  177:23
180:4  183:14,
17  184:5
187:13  188:10,
14  189:3
202:15  205:20
216:19  225:22
227:12, 19
230:12  232:14,
22  236:21
237:4, 16
242:10, 18
243:2  245:9,
13, 16  253:17
254:5  258:5,
19, 23  259:2,
14, 18  260:11,
15  263:5, 9, 10,
18  264:5
265:23  271:6
272:13  273:4,
15, 19  284:15
285:3, 8  286:3,
15, 17, 21
287:7, 16, 21,
22  288:13
291:4, 8
292:12  293:16
296:6  297:3,
11, 25  298:8
**motion**  237:3
296:12, 20
297:16  298:2
**mouse**  282:17
**Move**  82:6, 7
85:15  105:5
117:22  127:9
135:22  162:21
181:2  188:11,
25  236:22
250:9
**moving**  16:21
66:3  237:11
275:11  288:7

**Multifaceted**
5:8
**multiple**  81:14
90:20  167:1
266:10
**mutant**  41:13
109:4, 19
137:12, 17, 19,
21  139:3
142:2  146:22
147:14, 18, 19
148:2, 6, 20
149:2  153:21
174:9  175:16
176:23  177:19
178:13  185:11,
17  192:10, 14,
21  193:14, 23
194:5, 12
195:6  197:8,
14  198:13, 23
200:21  202:22
203:6, 13, 19
248:2  250:24
282:7  294:1, 6,
9, 23  296:1
**mutant,**  175:8
**Mutants**  5:23
136:4  138:3,
14, 20  139:12,
18  143:21
144:15  145:2
146:7, 13
148:25  149:5
153:22  174:11
176:24  185:18
**mutants,**
148:17  149:10,
17
**mutations**
40:9  41:2
294:17
**mute**  86:6

**< N >**
**N155R**  147:5
**name**  8:3
23:9  131:9
186:11  223:15
262:19  275:18

**named**  58:22
**names**  240:22
**nanomolar**
174:13  177:2
185:20
**narrower**
222:10
**National**  44:6,
11, 13, 15  45:2,
4, 18  47:4
48:1  50:20
51:1  52:7
53:19  54:6, 16,
20  55:14
63:12, 18  70:2
71:15  72:22
74:15  116:6
133:18  180:14
187:24  188:19
189:13  190:23
191:5
**native**  151:3
182:2
**nature**  62:13
104:17  123:11
130:24  228:24
**NBA**  150:1
**NCI**  274:9
**near**  11:22
14:10
**necessarily**
72:21
**necessary**
301:4
**need**  10:8
15:23  53:23
96:4  120:19
140:24  236:10
245:10  258:2
269:14  286:2
**needed**  42:18
**neither**  148:7
194:24  197:9
**never**  18:10,
20  34:24  35:2,
6, 10  36:17
37:10  38:25
39:6, 9  72:10
245:22  246:20
254:9, 15
290:6, 23

**New**  2:6, 6
79:9  81:8
**newly**  236:22
**NFL**  181:24
**nice**  168:15
**NIH**  45:15
48:17  49:2, 6,
10, 11, 22
56:11  58:19
60:16  63:11
68:21  69:18
70:7  71:9, 11,
18  75:17, 25
77:17  78:15
80:6  83:14
84:2  85:4
90:3  99:24
100:4  103:19
106:10, 13, 19
107:4, 18, 23
108:23  111:20,
24  114:7, 19
115:6, 12, 18
119:9, 17
124:25  131:16
133:10  134:1
135:6  148:13
157:10  158:14
164:22  165:6
193:17, 19
239:19  274:12
277:14  279:22
**nine**  81:15
**Nobel**  45:25
**noise**  77:6
78:1
**nondisclosure**
296:13  297:18
**nonfinding**
203:23
**non-public**
119:7
**nonresponsive**
82:7  117:24
188:12  236:25
**noon**  120:17,
20  121:3
**normal**  73:4
115:25
**north**  24:14

**Notary** 1:*19*
300:*14* 303:*23*
**note** 296:*24*
**noted** 8:*18*
25:*10* 90:*22*
267:*19* 301:*11*
303:*11*
**notes** 122:*12*
125:*16* 278:*18*
304:*1*
**notice** 1:*17*
**noting** 267:*18*
**November**
12:*8* 15:*7*
92:*4* 126:*12*
288:*15*
**NS** 281:*4*
**Nucleic** 126:*6,
21*
**null** 199:*11, 12*
**number** 27:*5*
49:*2* 55:*5*
65:*17* 76:*4*
77:*8* 79:*12*
88:*6* 107:*3*
112:*12* 116:*20*
144:*6* 161:*6*
215:*17* 224:*8*
226:*19* 253:*4*
269:*8* 279:*21*
280:*1* 281:*23*
284:*11*
**numbers** 28:*2,
7* 70:*4* 280:*18,
22*
**numerical**
137:*13* 147:*24*
192:*22* 194:*15,
18* 199:*22*
201:*16* 202:*14*
203:*3* 204:*12*
215:*25*
**numerically**
145:*25* 146:*23*
194:*6* 200:*1*
201:*20* 203:*20*
215:*9* 294:*2*
**numerous**
136:*19* 138:*5,
17* 139:*21*

196:*25* 236:*14*
255:*18*

< O >
**Oakland** 181:*5*
**oath** 9:*16*
167:*25* 171:*2,
10* 265:*11, 16*
266:*3*
**Object** 36:*4*
128:*16* 134:*6*
156:*14* 157:*18*
183:*11* 189:*1*
230:*3* 231:*24*
253:*13, 21*
258:*1*
**objecting**
237:*19*
**Objection**
18:*13* 47:*19*
48:*5, 19* 49:*24*
50:*23* 51:*10*
67:*7* 82:*15*
93:*24* 94:*16*
122:*5* 123:*6*
133:*2* 135:*8*
141:*9* 150:*5*
152:*14* 153:*14*
154:*3, 21*
156:*10, 13*
177:*14* 179:*20*
183:*23* 187:*3*
202:*8* 205:*15*
230:*8* 232:*20*
265:*18* 271:*1*
272:*7*
**objections**
296:*15*
**objective**
268:*19*
**obligation**
66:*15*
**obliged** 236:*10*
**observed**
252:*17*
**obtained** 33:*23*
**obvious** 275:*5*
**obviously**
270:*3* 289:*25*
297:*21*

**occasion** 62:*3*
275:*18*
**occasionally**
61:*12*
**occasions**
61:*15*
**occur** 167:*6*
272:*2*
**o'clock** 120:*18*
**odd** 29:*16*
**offer** 163:*6*
**office** 12:*17*
13:*1* 259:*10*
**official** 72:*21*
298:*24*
**Oh** 31:*7* 76:*9*
104:*16* 120:*22*
141:*3* 174:*23*
181:*20* 220:*18*
260:*11* 269:*12*
282:*17* 292:*6*
**Okay** 13:*12*
17:*19, 20* 56:*7*
58:*8* 76:*15*
79:*4* 88:*17*
107:*9* 121:*15*
128:*1* 129:*14*
144:*5, 9*
148:*10* 149:*24*
154:*1* 161:*9*
164:*24* 167:*13*
175:*2* 179:*3*
181:*10* 192:*2*
209:*1* 227:*14*
281:*21* 282:*17*
285:*8* 292:*4*
293:*16*
**old** 15:*5*
81:*17, 20*
188:*9* 289:*24*
**omitted** 175:*22*
**once** 35:*6*
41:*23* 47:*2*
53:*1* 54:*8*
228:*13* 245:*23*
254:*9* 281:*22*
**one-on-one**
118:*14*
**ones** 182:*14*
280:*9* 284:*1*
**ongoing** 43:*13*

**online** 87:*4*
89:*18* 129:*16*
219:*24* 220:*22*
221:*8* 298:*13*
**open** 129:*15*
287:*8, 9*
296:*11* 297:*8,
14*
**opening** 12:*7*
27:*10, 17, 19*
69:*8* 75:*6*
78:*25* 81:*6*
88:*18* 92:*4, 8,
13* 93:*17*
94:*11, 24*
97:*14* 103:*11*
108:*4, 16*
125:*18* 126:*20,
24* 140:*6, 10,
22* 141:*15*
143:*2, 7*
174:*21* 191:*25*
198:*20* 201:*12*
207:*11* 244:*8*
**operates**
128:*10*
**operator** 8:*5*
**opine** 77:*23*
108:*16*
**opined** 72:*12*
75:*6* 81:*2*
109:*25* 136:*15*
138:*4* 155:*14*
186:*2* 234:*14*
256:*4*
**opinion** 27:*9*
59:*13* 101:*4*
130:*21* 133:*17*
139:*14, 20*
140:*15* 155:*17*
158:*20, 23*
166:*1* 188:*12*
216:*2* 235:*13*
236:*23* 244:*8*
249:*3, 23*
255:*12* 268:*9,
23*
**opinions** 37:*18*
38:*11* 47:*16*
75:*8* 77:*24*
82:*8* 105:*1*

117:*25* 124:*22*
136:*13* 140:*3*
141:*7* 142:*6*
186:*2* 234:*14*
257:*9, 20*
271:*20* 272:*11*
278:*21*
**opportunity**
196:*8, 12, 20*
273:*8* 300:*9*
**oppose** 237:*3*
**opposite**
201:*21* 204:*15*
**opt** 275:*16*
**oral** 62:*12*
**order** 19:*24*
220:*12* 281:*25*
**ordinary**
165:*14* 179:*10*
181:*1* 183:*7,
19* 184:*7, 12*
185:*13* 186:*3*
294:*13, 19*
295:*2, 7, 14, 20*
**organization**
53:*22*
**organizations**
54:*5*
**organize** 53:*19*
**original** 88:*23*
175:*21* 176:*9*
214:*4, 9* 268:*5*
290:*14* 291:*1*
301:*15*
**originally** 22:*6,
12* 200:*15*
**other's** 62:*15*
**outcome**
153:*24*
**outside** 13:*13*
20:*10* 21:*2, 7,
20* 30:*4, 10*
36:*14* 38:*7, 12,
18, 21* 39:*21*
47:*12* 53:*23*
54:*14, 19*
66:*14, 18, 24*
74:*10* 84:*1*
85:*2* 95:*12*
100:*24* 134:*3*

171:*21* 186:*15*, *16*
**Overall** 136:2 200:*3* 295:*15*
**oversee** 21:*1* 60:*11*
**overstatement** 158:*25*
**overviewing** 224:*3*
**oxazepine** 217:*9, 21* 218:5

**< P >**
**P.D** 2:*3*
**p.m** 163:*8, 22* 164:5 243:*1* 286:9, *14* 291:*12, 16* 298:25 299:*3*
**PAGE** 4:*15* 5:5 6:5 7:6, *10, 13, 16* 17:22 64:*13* 97:23 106:24 113:3 125:22, *23* 127:24 129:9 131:9 143:*11, 12, 12, 16* 144:*1, 6* 147:9 148:*12* 151:*16* 154:5 159:*21* 160:*10, 21* 161:4, 6, 7 173:22, *25* 197:4 210:*14, 15, 18* 213:6 227:6, 8, *15* 269:20 282:*1, 4* 292:16 293:*10* 302:4 304:2
**pages** 69:*10* 88:20 303:6
**paid** 21:5, *13* 25:18 26:*12* 47:*15, 17* 55:7 66:*11* 71:7 99:*1, 5* 114:2 118:*24, 25*

119:2, *6* 159:*8, 12, 13, 17* 239:*1, 4, 18* 255:8, *16* 268:*12, 16*
**panel** 49:*12* 148:25 211:*16* 250:*3*
**Panels** 211:*12*
**Panthers** 179:5 181:*14, 15* 182:*7, 23* 183:2
**Paper** 6:*14* 15:*20* 41:*1* 42:22 60:7 61:*19* 67:22 75:*4, 10* 87:*11* 91:*19* 92:16 94:25 98:*17* 100:*13, 14* 102:*12, 14* 106:23 109:8, *16, 21* 112:*17* 113:25 125:8, *14* 139:*4* 143:7 145:*7, 8* 151:*1* 152:*18, 22, 23, 24* 153:*3, 4* 154:*10, 16* 159:*1* 186:9 188:*6, 8* 189:*21* 190:5 197:*19* 211:*7, 15* 212:*3, 10, 17, 19, 24* 213:21 214:*11* 215:*14* 223:6 224:6, *15* 229:8, *9, 11* 232:*2, 3, 12* 238:*11, 16* 248:5, *11, 15* 249:21 274:6 276:6 277:*3, 5, 7* 278:*4* 289:*3* 290:*3, 12*
**papers** 40:*20* 56:*17* 64:*1* 66:*16* 75:*21*

82:2 95:*4* 96:*21* 137:2 141:25 191:*3, 6* 197:*11* 203:*17* 210:2 225:2 236:*12* 255:*18* 275:*19* 278:*7, 20* 279:*1, 6*
**paperwork** 25:*7*
**Paragraph** 125:*24* 174:*21* 191:25 205:*12* 207:*10* 230:24 264:*12* 269:*19*
**paraphrase** 162:*1* 231:*16, 22* 240:8 241:*7* 250:7
**Park** 2:*5*
**parlance** 50:*20*
**Parr** 23:*19, 24* 24:*6*
**part** 16:*2, 6* 30:*6* 36:*18* 40:25 42:*17* 44:*14* 50:*15* 51:2 64:*10* 71:*12* 73:*4, 6* 78:24 91:5 105:*18* 119:*4* 154:9 160:24 161:*3* 172:*15* 206:24 207:*6, 23* 208:*1, 10* 214:8 244:*5, 6* 249:4 250:*4, 5* 251:4 269:*21, 23* 274:*12* 294:4 296:*18*
**participated** 220:*19*
**particular** 17:*14* 35:*12* 74:*1* 146:2 153:*21* 168:*21* 211:*12* 246:*3* 255:*23* 271:*23* 289:*18* 293:*18*

**particularly** 76:*25*
**pass** 296:*4*
**passed** 24:*18*
**Passos** 5:*20*
**patent** 113:22
**patient** 35:*7, 11* 207:*19* 296:*1*
**patients** 34:*25* 35:*16, 19, 21, 25*
**Patriots** 179:*1, 13, 17* 180:*10* 182:*13* 183:22 184:*3, 15, 20*
**pattern** 228:*11*
**Pause** 260:7
**pay** 49:*18* 50:*14*
**payment** 32:*1*
**payments** 68:*16, 18*
**pays** 51:*23*
**PDF** 284:*13, 16, 20* 286:*16, 18* 296:25 297:*4, 10*
**PDFs** 120:*9*

**peer-reviewed** 56:22, *24* 57:2, *8, 15* 58:*20* 129:*17* 136:*19*
**peers** 16:*10*
**pending** 296:*12*
**penned** 12:*6* 75:*4* 208:*8* 214:*3* 274:2
**people** 13:*14* 43:20 45:25 51:*21* 57:*14* 62:*21* 67:*12* 70:*10, 15* 98:*15* 130:*6, 15* 168:22 201:*9* 204:5 226:*16, 22* 227:*24* 228:*2, 8* 229:*2, 19*
**percent** 27:*10* 49:*17* 51:*18* 70:*14, 24* 71:*1* 125:*13* 177:*1* 185:*12* 198:*15* 210:*15, 17* 217:*23* 277:*16* 296:*17*
**Perfect** 242:*19*
**perform** 210:6 211:22
**performance** 149:9 231:*11* 233:*17* 246:*14, 25* 295:*16*

performances 232:6

performed 38:25  39:6, 10  64:15  147:22  210:3, 11  246:2, 18  251:13, 17  275:15

performing 246:25  247:7, 15

period 53:4  97:2  99:19  175:25

permission 94:8  97:13  102:22  103:2

permit 134:16

permitted 47:5, 15

persistence 289:9

person 13:17  59:16  116:5, 14  130:2  165:13  185:13  223:22  235:8  259:10  272:3  294:12, 19  295:1, 7, 13, 20

personally 21:21  62:22  66:15  91:21  93:3  95:9  228:14

perspective 130:20  298:4

pertain 74:9  297:9

pertains 93:18  97:2  98:15  158:9

pertinent 229:17  276:2  279:6

Peter 42:19  89:12  98:25  99:4  214:18  230:18  232:10

234:2

ph 1:22

PH.D 1:16  2:5  4:3  9:2  34:23  300:8  303:16

pharmaceutical 37:11  52:14, 19, 22  53:7, 13  54:13  66:12, 25  98:21  114:3  241:5

pharmacokineti cs 37:15, 17, 23, 25  38:2, 5, 8, 12, 21  39:1, 3, 7, 10

pharmacology 126:5  153:19

pharmacophore 160:24

phase 251:16

PhenoSense 254:7  255:7

phenotypic 222:4

Philadelphia 178:25  179:12, 25  180:20, 22  181:4, 7, 18  182:12  183:20  184:2, 8, 14  280:13

phone 11:19, 20  116:20, 22, 24  166:19, 24  167:24  170:11, 15, 21  171:9

phrase 205:22  207:13

physician 165:13

PI 70:18

picture 159:21

piece 83:20  113:2  119:18

pieces 197:6

pipe 130:19

pique 276:15, 16

Place 2:12  8:9, 13  19:1  42:11  53:25  116:8  227:17  243:17  298:9

placed 87:18  130:25

placing 15:2

Plaintiffs 1:7  2:9  199:22

plan 15:17  116:10  163:17

played 150:2  180:25  181:10

please 10:23  15:22  17:18  42:13  58:5, 15  76:3  120:18  125:21  129:8  143:10  144:3, 7  148:22  156:20  160:9  180:17  189:8  191:24  247:22  262:4  281:10, 24  285:23  289:12  290:20  291:24  292:2, 10  301:3, 8

plenty 287:10

plus 23:2  28:17, 17  29:15

point 20:24  23:6  43:22  92:21  93:1  95:3  103:9  109:2  117:18  134:23  181:3  188:2  229:5  236:9  241:2  248:14  261:6  262:22  263:12

pointed 194:23  195:20  230:5

Pointing 153:16  282:14

policy 127:25  128:8

Pommier 274:9, 15

pontificate 66:4  232:4

popping 236:23

portion 34:7  129:6  143:25  276:1, 4

portrayal 77:15

position 59:24  176:12

positions 17:23  19:19

positive 271:18

possibility 133:25  164:21  165:3  287:25  290:5

possible 63:24  87:7, 9  103:20  216:9, 12  240:25  290:12  296:12

posted 89:17

poster 216:23  217:3, 12, 15  218:19  219:15  220:24  221:24  222:2  223:10  224:7, 15  244:20, 22  245:14  251:19, 21

potencies 149:1

potency 141:22  195:5  293:25  294:20

potent 114:12, 20

potential 55:16  72:9  261:4  274:6  297:16

potentially 273:11

potently 174:8  175:6  176:16, 22  177:7, 10,

18  178:4, 11  185:15  282:4

practice 21:17  74:18  115:22

practices 21:8  30:4  115:25

precise 28:2  112:11  264:1

prefatory 245:1

prefer 80:3  285:5

prep 167:2  170:3, 5, 16  171:3, 11

preparation 31:18  67:24  78:24  168:4  169:11, 22  172:16, 18, 23, 25  195:20  278:1

preparatory 9:22, 25

prepare 14:3

prepared 39:17, 21  169:18  278:13

preparing 29:15  42:17  133:12  167:5  168:1

prescribed 35:2, 6

PRESENT 3:3  81:22  195:14  221:17  226:8, 10

presentation 211:7  222:22  226:5, 11, 14  228:2  230:15  243:13

presented 60:14  137:9  138:10  139:7  144:22  151:8  152:10  202:24  216:24  217:12  219:15  220:25

222:7 223:8
227:22 288:25
**pretreatment**
288:21
**pretty** 65:2
106:15 229:15
**previous** 80:3
210:14
**previously**
9:21 102:16
108:25 218:2
287:20
**primary**
175:17
**principal** 49:2
**printed** 12:16
127:11
**prior** 14:9, 13
23:12 75:15,
19 90:14
91:18 153:17
169:1 171:1
206:25 207:6,
13, 23 208:5,
14 245:21
246:17 254:22
255:1, 4, 22
264:24 273:22
**priority** 49:13
51:8
**privilege**
84:10 168:5
169:12, 23
170:7 263:2
**privy** 102:24
125:6, 11
247:18
**pro** 239:17
**probably**
38:23 44:10
45:21 63:17
65:16 83:17
116:4 267:21
**problem**
136:10 141:2
269:5
**problems**
151:20 153:7
155:5 156:3
157:11, 23

**proceed** 11:1
13:23, 25
82:11 235:20
**proceeding**
100:12
**proceedings**
260:7
**process** 60:11
64:11 71:18
91:2, 6 92:19
95:2 97:3
124:3 125:7
127:3 128:6
129:25 212:13,
15 214:5
225:4 239:15
257:15 258:13,
17 264:14
265:22 266:14
275:8
**produced**
234:16
**product** 43:1
91:8
**Production** 7:9
**Professional**
1:18 17:22
19:19 29:25
59:12 73:22
114:24 135:4
300:13
**professor**
34:14 105:25
106:5 274:7
**profile** 158:16
216:11 217:7
218:14 222:16
225:11 238:5
**profiles** 157:1
161:2, 21
162:11
**program** 40:25
**progress** 93:2
**prominent**
123:1, 5, 9, 10,
22 126:4, 13,
18, 23 127:11
191:1, 7
**pronounce**
231:4

**proper** 249:25
**properly** 11:16
**property** 231:7
**proposed** 56:2,
3 290:18
**proposition**
114:11, 19
115:19 193:12,
21 217:6
**propounded**
303:9
**protected**
84:10
**protections**
134:8 273:3
**protective**
19:24
**proven** 157:4
**provide** 55:25
86:21 87:1
90:12 99:12
278:20 286:18
**provided** 12:1
19:23 31:23
33:4, 10 41:9
59:17 61:1
64:10 65:16
94:2 128:22
136:24 138:7
187:11 221:5
225:5 253:25
256:3 257:18
267:3, 8
**providing**
55:9 110:24
289:18
**provisional**
113:22
**proximity**
245:19
**Public** 1:20
52:3 57:13
58:19 84:16,
23 87:12 91:9
92:9 93:11, 15
100:2, 15
105:15 107:20
116:18 135:6
221:18 223:18
228:1 300:14
303:23

**publication**
17:12 41:22
42:1, 8 60:7, 8
64:10 75:16,
20 79:25
86:22 91:19
92:17 98:8
99:23 108:10,
20, 22 117:15
175:18 210:10
217:16 226:6
227:23 244:23
264:25 277:5
**publications**
73:4 81:16, 18
115:2 117:15
135:16 136:19
138:6 158:23
192:8, 11
200:19
**publicly** 56:22
57:2 223:8, 13
229:2
**published**
36:8 39:2
45:13 56:12
57:10 61:14
63:20 64:2
67:18 69:14
75:10, 12 82:2
86:23 87:17
88:24 89:14,
22 95:5 96:22
99:18 100:14,
25 102:15
105:13 106:17
108:8 112:8,
17 121:19
122:17, 20
124:11 125:9
131:17, 23
136:23 139:21
141:25 151:2
214:11 226:3
232:3 245:23
260:24 275:19
290:4, 12
**publishes** 74:4
124:8 129:16
**publishing**
130:18

**pull** 23:19
291:24 292:1
**pulled** 75:16,
20
**pulling** 75:24
**punctuation**
176:1
**purple** 218:24
219:4, 12
**purports** 175:5
**purposes**
22:21 142:25
**pursuant** 1:16
**pursue** 135:11
**put** 16:15
31:12, 23
57:18 68:25
72:6 82:14
103:22 104:3
111:3 118:7
130:12 132:21
135:3 144:18
159:9 160:11
162:21 164:13
188:7 216:14
222:2 223:17
225:16 239:7
244:24 248:9
269:9
**puts** 161:16
**putting** 200:15
228:5 229:20
**P-value**
147:23 194:14,
17
**P-values**
138:22 149:3,
5 199:25
**PyMOL** 40:25
41:5, 8, 9, 11,
13
**Pyridine** 5:16

**< Q >**
**Q148H** 146:22,
25 147:5, 7, 13
174:10 176:16,
23 177:7
178:8, 13
185:17 187:10
192:13 193:13,

22  194:4, 12
197:8  198:17
200:20  202:22
203:6  217:11
222:18  248:3
293:20
**qualify**  104:11
182:17
**qualifying**
17:11
**qualitative**
45:22
**quality**  203:23
**question**  13:2
20:8  29:13, 20
30:20  38:15
51:14  61:23
78:14  79:10,
20  80:3, 4, 20,
22  86:17
90:11  92:15
94:20, 25
104:12  107:15
109:7  118:6,
11  120:2
121:10  122:10,
15, 15  128:16
134:6, 17
137:22  142:22
144:21  145:12
154:17  156:14,
23  157:18
164:20  170:10,
13  172:21
179:8  183:6
184:6  188:13
189:4  201:23
202:16, 23
222:9  234:10
262:25  263:7,
9  265:12
266:3  273:2, 8,
18  287:19
**questionable**
46:3
**questioned**
212:10
**questioning**
173:16  230:3
**Questions**
7:15  56:9

60:21  61:3, 8,
13  105:2
230:9  236:24
245:1  291:5,
22  293:17
296:9  297:6
303:8
**quickly**  119:19
**quite**  25:20
62:2  88:12
112:15  124:16
152:6  162:23
230:22  264:3
271:18  273:11
276:21
**quotation**
175:22
**quote**  152:3, 8
**quoting**  175:5

**< R >**
**R15**  54:8
**R263K**  174:11,
11  176:25, 25
177:10, 12
185:18, 18
188:4, 5
**Rachlin**  3:3
**Raiders**  179:1,
13, 16  180:9
181:5, 8, 9
182:13  183:22
184:3, 15, 19
**RAL**  175:7
176:22  178:12
**RAL-resistant**
174:9  185:16
**raltegravir**
109:16  157:2,
6  158:11
205:23  206:12,
16, 24  207:2,
22  208:16
**raltegravir-resi
stant**  282:6
**ran**  55:14
**range**  136:3
138:2, 13
139:11
**ranks**  123:14

**rare**  61:15
62:2
**rarely**  298:1
**rate**  23:5, 17
24:8, 13  32:11
49:16  159:13
254:1
**reach**  200:10
236:10  240:13,
14  262:15, 17
**read**  12:24
16:3, 9  36:8
57:9  64:23
65:4  67:20
73:13  80:5
84:19  123:16
124:23  148:22
178:10  179:19
181:22  182:5,
10, 16, 21
183:7, 25
184:13, 16, 21
186:22  188:13
190:9, 19
191:10, 15
209:8  223:14
224:8  232:11,
24  233:9
255:18, 20, 24
256:8  269:10
271:14  288:19
300:9  301:3
303:5
**reader**  128:20
151:3  184:7,
12  185:22
**readers**  60:21
61:13
**reading**  84:13
101:7, 10
102:2, 18
124:17  145:6
159:5, 10
160:17  161:4
176:18, 20
177:3, 22
178:14, 23
183:19  190:4
221:11  222:14
223:1, 16
224:7, 14

230:17  234:22
271:4, 4  272:4
**ready**  9:18
10:25  11:3
67:21  143:16
**reagent**  61:18
**real**  203:10
**reality**  202:5
**realized**  278:3
**really**  75:5
100:9  180:13
181:24  278:24
283:5  286:25
298:18
**Realtime**  1:19
121:1  140:23
141:3  145:7
300:14
**reason**  25:1
92:2, 7  95:18
97:12  171:8
275:9  301:5
302:6, 8, 10, 12,
14, 16, 18, 20,
22, 24
**reasonable**
156:2  157:9
158:12  185:21
**reasons**
140:11  229:22
297:8, 14
**REBECCA**
2:11
rebecca.horwitz
@bartlitbeck.co
m  2:15
**reboot**  96:11
**recall**  23:17
25:4  26:16
62:9  63:22
73:14  74:16
103:1  110:18,
24  122:8
165:16  194:8
212:9  223:21
224:10  232:2
240:7, 23
246:12  274:1,
4  277:3, 21
288:5  290:13

291:1, 2
**receipt**  301:17
**receive**  20:22
33:17  48:16
68:15  70:19
72:6  97:21
297:4
**received**  12:19,
23  31:20  32:1,
9  33:14, 18, 24
34:8  55:8
62:5  68:9, 11
71:22  72:3, 4
92:22  125:8
171:11  207:11
296:24
**receives**  48:24
66:18
**receiving**
66:14, 24  68:2
98:20  110:10
**recognized**
192:17
**recollect**
106:21  116:15
152:7  207:8
**recollection**
25:24  26:6, 7
32:20, 24  33:3
46:22  47:2
53:1, 3  54:8
55:2, 12, 21
73:25  85:13
86:25  87:6, 15
90:17  101:2
104:2  116:12
121:23  122:2,
18  257:17
262:18  264:11
**recommended**
240:4  241:14
**reconsidering**
156:23
**reconvene**
163:10  242:16
**record**  8:3, 19
10:17  13:21
80:19  82:14
86:10, 14
91:10  93:11
96:10, 15, 18

116:*19*  118:*8*
149:*25*  156:*17*
162:*13*  163:*22*
164:*4, 14*
166:*15, 22*
173:*12*  242:*21,
25*  246:*18*
258:*22*  259:*21,
25*  260:*9*
286:*7, 9, 13*
287:*6, 8*
291:*11, 15*
298:*10, 24*
300:*6*
**recorded**  20:*15*
**recording**
30:*15*  95:*25*
241:*9*
**records**  150:*8*
**recourse**  261:*1*
**Recovered**
71:*16*
**recruited**
17:*10*
**recycled**
236:*13*
**recycles**  81:*15*
**recycling**  83:*9*
117:*16*
**red-capped**
209:*14*
**redeposition**
273:*12*
**Redskins**
179:*1, 6, 13, 15*
180:*1, 3, 8, 21,
23, 24*  181:*14,
16, 19*  182:*8,
13, 23*  183:*3,
21*  184:*3, 15,
18*
**refer**  19:*18*
45:*21*  63:*16*
69:*13*  160:*9*
174:*20*  214:*13*
251:*18*
**reference**  75:*1,
2, 22*  76:*12, 22*
77:*2*  78:*15*
114:*5, 9*
119:*20*  264:*15*

**referenced**
227:*1*
**references**
99:*16*  224:*8*
**referred**  12:*7*
25:*23*  62:*18*
87:*22*  279:*19*
**referring**
16:*19*  41:*25*
108:*25*  161:*11*
173:*21*  210:*4*
213:*6*  272:*2*
**refers**  74:*3*
145:*5, 17*
**reflect**  21:*9*
**reflects**  21:*12*
22:*2*  214:*9*
**regard**  111:*19*
**regarding**
296:*13*
**Registered**
1:*18*  220:*7*
300:*13*
**regular**  36:*18*
38:*20*  71:*8*
**regularly**
116:*7*
**reimbursed**
31:*22*
**reimbursement**
31:*20*
**Reiser**  288:*17*
**rejected**
243:*10, 24*
**related**  12:*14,
15*  30:*1*
136:*18*  151:*22*
153:*9*  155:*7*
156:*5*  157:*13,
25*  158:*22*
232:*1*
**relation**  230:*20*
**relationship**
20:*25*  240:*9*
**relationships**
21:*23*
**relative**  289:*1*
**relied**  206:*3,
14*
**relief**  134:*18*
259:*6*

**remained**
212:*17, 18*
**remember**
27:*2*  28:*10*
160:*14*  209:*6*
246:*11*  270:*8*
290:*15*
**remind**  107:*2*
144:*2*  281:*23*
**reminder**
286:*2*
**remote**  8:*5*
**remotely**  8:*25*
**render**  38:*11*
**rendering**
140:*2*  141:*7*
142:*5*
**repeat**  250:*22*
**repeatedly**
81:*13*  83:*9*
117:*8*  191:*9*
**replication**
36:*6*  37:*21*
**replied**  168:*11*
**reply**  12:*9*
138:*19*  140:*14,
22*  141:*16*
143:*25*  147:*9*
165:*12, 16*
168:*15*  227:*16*
233:*11, 23*
235:*19, 22*
291:*2*
**report**  12:*8,
10, 12*  15:*8*
16:*20*  20:*11*
21:*20*  27:*10,
17, 19*  66:*16*
75:*6*  78:*25*
79:*13*  81:*7*
82:*9*  92:*4, 9,
13*  93:*17*
94:*11, 25*
97:*14*  103:*12*
105:*1*  108:*5,
16*  118:*1, 19*
125:*18*  126:*11,
20, 24*  132:*22*
134:*15*  138:*5,
19*  140:*7, 11,
14, 22, 22*

141:*15, 16*
142:*25*  143:*2,
7, 25*  147:*9*
174:*21, 22*
175:*13*  176:*4*
187:*23*  188:*18*
189:*12, 18*
191:*18, 25*
192:*24*  195:*9*
196:*2*  197:*5,
25*  198:*4, 20*
200:*10, 16, 17*
201:*12*  203:*17,
18*  204:*23*
205:*21*  207:*9,
11*  222:*3*
227:*1, 16*
228:*6*  229:*10,
13, 21*  233:*11,
23*  235:*19, 22*
236:*2*  242:*7*
243:*15, 20*
244:*9, 18*
245:*22*  248:*12*
264:*13*  265:*8,
24*  266:*11*
267:*7*  269:*3,
19*  272:*15*
275:*24*  276:*1,
5, 19*  279:*10,
21*  280:*2, 7, 7*
283:*21*
**reported**
20:*13*  138:*22*
139:*1*  192:*8,
12, 20*  194:*9*
210:*2*  212:*1, 2*
231:*11*  232:*7*
245:*24*
**Reporter**  1:*19,
19, 19*  8:*20*
13:*19*  78:*2, 6*
141:*2*  298:*9*
300:*13, 14, 14,
21*
**reporting**  21:*3*
200:*19*
**reports**  9:*20*
12:*6*  16:*17*
25:*23*  33:*20*
37:*19*  81:*3*

84:*14*  90:*5*
97:*24*  109:*24,
25*  117:*1*
119:*3, 5, 8*
133:*13*  134:*12*
136:*15*  138:*18*
141:*23*  151:*16*
152:*4, 6*
155:*14*  174:*3,
16*  193:*4, 6*
195:*12, 15*
205:*4, 7*  208:*7*
217:*17*  230:*25*
234:*15*  239:*10,
17*  244:*14*
249:*13*  256:*5,
15, 21, 24*
257:*3, 7, 9, 16*
258:*11, 15*
266:*6, 16, 23*
272:*5*  277:*19*
278:*13*  283:*23*
284:*22*  288:*4*
**represent**
18:*17*  19:*22*
33:*22*  72:*21*
**representation**
21:*7, 17, 22*
68:*6*  70:*24*
**representative**
109:*20*
**representatives**
43:*11*
**represented**
77:*16*  97:*6*
**Representing**
2:*9, 22*
**represents**
30:*14*  209:*22*
253:*19*
**reproduction**
300:*19*
**reputation**
135:*4*
**Request**  7:*9*
61:*17, 18*  64:*9*
94:*4*  212:*12*
285:*10*
**requested**
24:*10*  127:*10*
300:*6*

requesting
65:14 289:21
required
267:19
requires 180:7
re-read 20:18
205:8
research 16:3,
7 18:22 32:18,
22 33:1, 5, 7,
10, 14, 16 39:1,
7, 11 43:20
44:18, 22, 24
46:10, 12, 13
48:18 49:7
51:9 52:2, 16,
18, 24 53:10,
11, 16 54:24
55:19 56:1, 2,
3 62:16 68:21
88:24 92:3, 12
93:15, 22
126:6, 22
152:23 153:2
175:17 186:18
207:17 216:25
217:4 228:20
235:9 236:7
238:10 245:23
289:13, 19
290:9, 18, 21,
24
reserve 45:25
226:6
resides 8:10
residual
288:20
resistance
40:8 151:21
153:8 155:6
156:4 157:1,
12, 24 158:15
161:2, 21
162:11 216:11
217:6 218:14
222:16 225:11
238:4 270:11
Resistance,
89:9
Resistant 5:7,
22 35:21

138:2, 13
139:12 151:23
153:10 155:9
156:6 157:14
158:2 175:7
176:23 178:12
resolved
296:18
respect 46:14,
15 91:25
134:1 164:22
165:4 171:2
respected
46:12 106:2, 7
respectively
213:14
respond 35:12
responded
94:4
response 91:4
95:7 96:24
211:13 212:12
230:21 236:24
237:21, 23
241:8 278:4
responsibilities
59:22
responsibility
60:6, 9, 13
72:20 98:10
110:15 131:21
132:5, 19
133:1
responsible
15:20 68:18
161:1, 20
162:10, 16
210:20 211:1
212:4
rest 281:15, 17
restate 92:14
162:13 263:8
266:9
restated 102:1
restrict 150:21
155:20
restrictions
47:11
resubmitted
277:4
result 294:3

results 41:21
136:1 153:5
154:12 201:2
209:22 218:9
229:4 246:9
247:24 248:21
249:20 255:21
269:20 288:23
290:3, 11
resume 86:2
retain 143:19
144:14, 25
146:6, 12
148:15 149:15
240:5
retained 22:11,
13, 20, 23
24:18 68:14
239:23 241:25
242:3, 5
260:18, 25
261:21
retaining 22:8
retainment
43:23
retention
20:19 21:24
22:2, 6, 14, 19
24:16 68:13
240:1 261:24
retracted
100:10 109:9
Retrovirology
6:7, 10 74:5
79:13 104:18
107:1 122:17,
21, 23, 25
123:19, 22, 25
124:8, 11
125:2 126:7,
13, 23 128:6,
10 129:5, 10,
15, 23 131:7,
15 132:20
261:11 277:10
Retrovirology's
124:3 127:12
return 104:23
119:16 301:15
returning 73:9

reveal 257:4
275:22
revealed 288:3
revealing
275:16
review 40:6,
18 41:24 42:4,
7, 10, 18 60:11
69:14 71:17
74:22, 23
76:16 82:20
83:19 86:19
91:2, 6 92:19
95:2 97:3
99:19 105:21
122:12 124:3,
12, 13 125:14
127:3 128:11
129:25 145:16
159:17 190:22
212:13, 15
223:6, 7 225:4
239:15 257:14
258:13, 17
261:4 264:14
266:14 267:12
268:19 269:3,
10 270:24
271:8 275:7,
14 276:23
277:25 278:18,
20 296:14
reviewed 9:20
31:19 49:11
52:10 67:23
68:21 92:25
93:16 100:3,
16 105:16
106:18 107:21
124:5, 9 125:1,
8 127:25
128:6 136:16
186:9 191:2
197:6 217:15,
18 224:22, 25
230:24 244:20
248:11, 15
251:23 256:19
257:2 260:17
261:7 265:1
268:8 270:14

272:12 279:5,
11 285:22
reviewing
52:6 81:9
105:19 122:8
125:15 158:22
159:16 191:4,
6 239:13, 14
271:12 277:21
279:1 297:19
Reviews 69:15
92:23 128:22,
25 129:1
275:14 277:14
Reynolds
225:15 226:1
229:25 230:14
237:7
riddled 74:19
77:18 78:16

80:7  83:21
84:2  85:4
90:5  100:5, 18
107:5, 23
109:14  117:8
118:15  119:10
131:17  132:23
133:11, 20
281:6

**right**  10:12
11:10, 19  13:1
14:24  18:6
22:22  25:7
26:5, 20  27:25
28:15, 20, 21,
22  29:17, 23
30:18  31:16
32:8  45:2
47:7  49:7
57:4, 10, 18
62:19  65:9, 19
67:19  68:4
69:9, 11, 19
71:19  75:18
76:7  77:8
80:25  84:14,
15, 19, 24
87:13, 25
89:15, 23, 24
90:6  103:25
106:11, 15, 25
108:24  112:6,
10  116:17, 21
117:3  121:4,
16, 20  129:12
130:1  136:12
152:5  160:17,
20  162:20
163:2  164:10
174:16  182:4
198:4, 12
201:3  206:25
217:21  220:13
221:13  222:13
231:1  232:18
233:7, 24
236:2  238:20,
21, 22  240:20
242:8, 12
244:24  245:25
250:16  252:8

260:12  264:17
266:2  269:15
273:9  277:11
280:14  281:8
284:1  289:16
292:20  293:5,
7

**rightward**
127:19, 21
130:6  175:19
**ring**  160:5, 5,
6  161:12, 13,
14  217:9, 21,
25  218:5, 15,
23  219:7, 10,
13
**rings**  212:20
213:2
**Robert**  111:22
112:1, 5, 15
115:8
**role**  41:2
60:19  105:18
297:19
**roll**  260:2
**room**  11:10,
25  13:13
171:21  249:10
259:12
**Rosta**  90:24
91:24  95:17
97:8  102:22
103:4, 10
228:19
**rotameric**
41:12
**rough**  71:6
**roughly**  26:1
**rounded**
283:11
**route**  235:25
**Rule**  134:7
203:9  273:3
**rules**  66:20
67:16  285:11
286:4
**run**  51:16
54:11, 15, 19
55:16  81:23
228:20  235:9

247:2

**< S >**
**S1**  282:19
**safe**  298:20
**salary**  34:5, 15
71:12, 13
**Salk**  105:25
**sanctions**
297:17  298:2
273:10  284:17
**saw**  70:25
116:13  121:18
270:3
**saying**  152:20
161:18, 24
171:8  185:23
193:10  234:2
275:3
**says**  18:2
19:25  28:14
64:15, 18
65:20  70:1
71:21  72:19
77:9  84:24
89:21  113:7,
19  126:2
143:16  160:21
175:4, 6  192:4,
6, 25  193:1
197:16  198:1,
2, 8, 16  212:24
213:21  217:12
221:4  233:3
238:21  265:25
288:17, 24
**School**  17:15
30:2
**Schwartz**  3:15
**Science**  40:20
67:19, 25  74:6
87:20  89:2
92:18  97:7
100:3, 16
103:17  108:10,
13  111:5
114:6  115:17
123:11  130:24
140:8, 10
143:3, 7

145:16  153:13
154:2, 18
208:20  214:21
218:10, 22
221:11  222:12
223:15  226:15,
21  227:23
231:17  234:7
243:6, 14
246:4, 15
247:8, 16
**SCIENCES**
1:9  8:15  55:3
106:1
**scientific**  16:2,
6  18:21  54:11
59:16  63:3
85:2  92:24
152:13  221:19
235:16  271:16
**scientist**  44:10
45:19, 21  46:5,
7, 12  57:3
61:21  106:2, 4,
15  111:18, 23
157:9  158:12
186:18  203:15
215:4  223:23
241:19  276:7
**scientists**  16:4
45:24  47:4, 9,
13  48:1, 13
49:12, 13, 18
53:18  57:9, 15
62:12  112:20
114:17  115:1
128:23  156:2
159:3  215:18
216:6, 13
234:20, 22
240:12  265:2,
7  267:3, 5, 7, 8
272:3, 6, 11, 17
273:23  274:14
279:11  285:21
**scintillation**
245:18
**score**  49:13
**scored**  49:15
**screen**  14:23
15:6  16:23

26:19  58:2, 3
69:8, 11  71:21
76:15, 23  88:4,
10  97:23
106:23  107:14
119:23  120:10
121:17  127:20,
21, 22  130:6
131:8  132:1
143:23  144:6
160:11, 16
173:22, 25
174:5  175:19
178:24  208:23
209:25  210:6
225:24  229:25
248:10  252:2,
10  258:3
280:14, 20
281:22  282:2
**screens**  58:7
**scroll**  63:14
**scrolling**
173:24
**scrutiny**  135:7
**Second**  4:21
12:9  71:20
95:22  126:2
130:13  131:9
143:11  159:20
175:24  194:16,
21  215:10
227:8
**Second-Generat
ion**  89:8  231:7
**section**  64:4
66:16, 22
101:6  113:4
136:2  154:10,
16, 19  155:1
209:4  224:9
239:19
**see**  14:24
15:6, 9  16:24
17:24  18:5
19:7, 9, 10
20:2  24:17
34:13  58:1, 11,
24  61:1  62:16
64:13, 14, 20,
25  69:11  70:5,

*6* 71:*24* 72:*24*
75:*11* 77:*9*, *13*
87:*25* 97:*25*
98:*4*, *5* 101:*5*,
*8* 102:*17*
113:*5*, *11*, *12*,
*23* 114:*14*, *15*
122:*15* 125:*24*
126:*9* 127:*19*,
*20*, *21*, *24*
128:*12*, *21*
129:*19*, *20*
131:*8* 132:*1*
136:*7*, *8*
143:*22*, *23*
144:*16* 149:*3*
152:*1* 154:*14*
159:*24* 160:*15*
161:*3*, *5*
171:*15* 173:*22*
174:*6* 175:*9*
178:*22*, *24*
179:*2* 181:*2*
192:*7*, *15*
208:*8* 209:*8*
216:*20*, *22*
221:*3*, *5*
223:*23* 231:*13*,
*14* 233:*7*
237:*22* 238:*7*,
*8* 265:*4*
267:*10*, *23*, *24*
275:*13* 282:*23*
289:*14*, *15*
292:*23* 293:*10*,
*12*, *14*
**seeing** 73:*14*
277:*4*
**seek** 43:*23*
53:*23* 54:*14*,
*18* 134:*18*
259:*5*
**seeking** 54:*10*
**seemingly**
169:*3*
**seen** 116:*4*
123:*15* 192:*16*
225:*13*
**segment**
210:*20*
**seminar** 55:*4*

**send** 234:*2*
286:*22* 287:*14*
**sending** 83:*19*
**senior** 59:*21*,
*24* 60:*12*
90:*21*, *24*
228:*19*
**sense** 92:*19*
274:*22*
**sensitive**
117:*12*
**sent** 42:*24*
123:*18* 296:*25*
**sentence** 71:*20*
72:*19* 101:*13*
126:*2* 143:*15*
144:*10* 145:*16*
148:*11*, *23*
149:*7*, *13*
151:*7*, *12*, *18*
152:*4* 153:*17*
155:*4*, *23*
160:*21* 161:*8*
162:*2* 174:*1*,
*15*, *18* 175:*4*, *5*,
*12* 176:*1*, *3*, *10*,
*11*, *13*, *18*, *20*
177:*4*, *5*, *17*, *21*,
*22* 178:*3*, *5*, *10*,
*10*, *21*, *24*
179:*9*, *24*
180:*7* 181:*12*
182:*6*, *11*
183:*8*, *20*
184:*1*, *13*, *23*
185:*4*, *14*
186:*5*, *12*, *15*
189:*15*, *25*
190:*9*, *20*
191:*13*, *18*
192:*4*, *7*
194:*22* 195:*2*
197:*19* 205:*12*
213:*7*, *22*
215:*19* 222:*11*
238:*21* 280:*11*,
*13* 283:*9*
292:*19* 293:*12*,
*14*, *18*
**sentences**
197:*15* 213:*8*

214:*2*, *13*
215:*6*
**separate** 15:*14*
141:*23* 220:*11*
**September**
19:*11*
**seriously** 52:*1*,
*5*
**serve** 17:*11*
125:*3* 126:*3*
128:*23* 129:*24*
132:*7* 190:*25*
191:*7* 239:*19*
256:*12*
**served** 17:*9*
121:*22* 224:*11*
258:*9*
**service** 17:*14*
**SERVICES**
1:*22* 8:*9* 22:*8*
24:*13*, *15* 32:*2*
254:*13*
**session** 220:*15*
**sessions** 9:*23*
10:*1* 167:*11*
**set** 11:*16*
21:*18* 23:*25*
143:*20* 144:*15*
145:*1* 146:*6*,
*13* 148:*16*
149:*9*, *16*
150:*20* 184:*9*
185:*25* 194:*12*,
*16*
**sets** 138:*24*
222:*6* 270:*24*
**setting** 70:*20*
157:*7* 201:*19*
204:*13*
**seven** 14:*8*, *11*,
*16* 28:*9*, *12*
235:*9*
**SH** 64:*16*, *18*
**shape** 254:*16*
**share** 79:*23*
87:*15* 91:*8*, *16*
93:*5* 94:*9*
95:*10*, *18*
97:*16* 100:*24*
120:*14*

**shared** 16:*15*,
*22* 19:*1*, *6*
42:*3* 67:*6*
68:*25* 87:*19*,
*24* 88:*8* 91:*11*
93:*10* 100:*22*
102:*6*, *23*
103:*5* 104:*4*
105:*8* 111:*3*
131:*1* 214:*7*
225:*14*, *18*
235:*24*
**sharing** 92:*1*
93:*21* 95:*14*
228:*16*
**sheet** 301:*7*, *9*,
*12*, *15* 303:*12*
**SHIONOGI**
1:*5* 3:*7* 33:*1*,
*6*, *12* 54:*18*
**shipped** 11:*15*
**shocking**
259:*23*
**Short** 86:*11*
242:*23* 286:*11*
291:*13*
**shorter** 236:*4*
**Shorthand**
1:*19* 300:*13*
**show** 127:*5*
151:*14* 269:*21*
**showed** 218:*1*
226:*20* 235:*7*
280:*14*
**showing** 14:*22*
280:*19*
**shown** 20:*18*
130:*5* 171:*22*
210:*7* 218:*24*
228:*7* 229:*2*,
*19* 238:*6*
239:*12* 251:*25*
**shows** 225:*10*
**shutdown** 63:*5*
**side** 41:*13*, *17*
54:*12* 145:*19*
160:*23* 161:*15*
162:*7*, *8*, *15*
200:*25* 249:*2*,
*2* 250:*25*
251:*1*

**side-by-side**
206:*13*
**sides** 43:*11*, *16*,
*19*
**sign** 281:*3*
300:*9* 301:*8*
**significance**
59:*7*, *10*, *13*
60:*1* 137:*14*
194:*15*, *18*
201:*17* 204:*12*
**significant**
153:*19* 192:*22*
198:*11*, *25*
199:*5* 200:*1*,
*23*, *24* 202:*3*,
*20* 203:*3*, *11*
**Significantly**
5:*13* 26:*13*, *17*
30:*23* 124:*18*
135:*16* 149:*1*
201:*5*
**signing** 301:*10*
**silico** 41:*10*, *15*
**simian** 209:*13*
**similar** 73:*10*
201:*18* 204:*13*
206:*7*, *18*
269:*21*
**Similarly**
210:*13* 276:*21*
**simple** 137:*23*
**simply** 132:*17*
**sincere** 298:*10*
**single** 136:*15*
161:*12* 186:*2*,
*11* 196:*5*, *15*
**sir** 9:*16*
16:*24* 27:*17*
31:*9* 34:*12*
39:*22* 42:*14*
45:*7* 49:*23*
58:*2*, *10* 59:*8*
62:*20* 69:*6*
73:*15* 75:*18*
76:*19* 85:*6*
92:*5* 101:*6*
104:*15* 107:*16*
111:*14* 118:*6*,
*11* 119:*22*
123:*5* 127:*8*

129:*13*  130:*9*
140:*23*  142:22
143:*17*  144:*4*
149:22  150:*17*
154:6, *8*
163:*13*  166:2*0*,
*25*  169:*7*
171:*6*  172:8
180:*18*  182:2*1*
193:7  198:*4*
208:2*1, 24*
212:25  216:2*0*
217:*18*  227:*14*
228:9  232:*19*
233:8  235:8
248:6  258:*7,
15*  261:*18*
262:5  263:*4*
265:8, *25*
271:5  275:2
290:*25*
**site**  40:*17*
41:*4*
**site-directed**
294:*17, 22*
296:*1*
**sitting**  220:*9*
**SIVrcm**  209:*16*
**six**  10:*3*
14:*12*  45:*13*
63:25  70:*15,
15*  147:*7*
148:2*0*  205:*3,
5*
**skill**  165:*14*
185:*13*  186:*3*
294:*13, 19*
295:2, *8, 14, 20*
**Skype**  62:*24*
**slight**  192:*18,
18*
**slightly**  109:*3*
**Slower**  5:*13*
253:2*0*
**slowly**  252:*23*
253:9, *16*
**small**  195:*13*
**smaller**
161:*14*  253:*4*
**smartphone**
116:*23*

**Smith**  3:*5*
5:*23*  57:*19*
63:2*1*  65:2*4*
79:*12*  81:*23*
104:*18*  109:2*0,
23*  113:25
121:*12*  144:*3,
23*  147:22
158:22  159:*16*
193:*15*  197:2
202:24
**Smith-Hughes**
194:*25*
**so-called**
267:2, *5*  284:8
**soft**  69:22
**solely**  72:*19*
**solve**  211:*25*
212:2
**somebody**
291:*24*
**somewhat**  66:2
**Sorry**  10:*19*
11:*6*  31:*7*
76:*19*  140:2*3*
144:9  156:*11*
167:8  247:22
261:*19*
**sought**  52:22
**sounds**  28:*17*
30:*19*  32:*7*
46:2*1*  68:*23*
69:*10*  84:*9*
163:*16*  207:25
214:25  264:*1*
**source**  95:*12*
**sources**  34:2
255:*11*
**SPA**  245:*18,
24*  246:*3, 5, 14,
20, 22, 25*
247:2, *7, 15, 25*
**space**  219:*10*
244:*14*  301:*6*
**span**  30:*14*
**speak**  46:*19,
24*  65:2*3*
179:*11, 12*
**speaker**  151:*4*
**speakers**  182:2

**Speaking**
120:*16*  187:25
188:2*0, 21*
189:*14*  248:2
**specific**  41:6,
*16*  49:*10*
65:*11*  74:*9*
152:8  155:*13*
165:*12, 16*
**specifically**
54:*10*  140:2*1*
141:*14*  147:*10*
248:2  274:*4*
**specifics**
240:*23*
**speculate**  55:*6*
94:*19*  142:*15*
154:*13*  155:*12*
**speculating**
232:*18, 18*
**speculation**
47:2*0*  48:*6*
49:25  51:*11*
67:8  93:25
94:*17*  156:*15*
157:*19*  187:*4*
**speculative**
157:22
**spell**  42:*13*
**spelled**  48:*11*
**spend**  29:9, *10*
244:*13*
**spending**  29:2
158:2*1*  204:22
**spends**  51:*6*
**spent**  14:*10*
28:2*1*  29:*11,
14, 20*  30:*3, 9,
16*  31:*14*
119:*1, 4*  159:*4,
15*  167:*3*
174:2  205:*6*
224:2
**split**  70:*17*
**spoke**  166:*17*
**spoken**  43:2, *4*
166:*14*
**SS**  64:*15, 16,
18*
**Stadnick**

262:*19*
**staff**  44:*10*
**stance**  93:*12*
**stand**  104:2*0*
109:*12, 12*
**standard**  72:*9*
299:*4*
**standing**  230:8
**stands**  25:*1*
**start**  27:*16*
**started**  13:8,
*11*  18:7  23:6
26:2*4*  27:8, *18*
30:*12, 24*
75:*14*  77:2*3*
81:6  108:*4, 14*
164:*14*  166:*7*
257:8
**starting**
220:*12*  257:*11*
293:*11*
**state**  22:*10*
73:2*1*  100:*12*
175:2*3*  301:*5*
**stated**  209:*11*
211:6  217:*16*
218:*18*  225:8
246:*17*  277:*15*
279:*16*
**statement**
126:2*0*  128:8
129:22  137:6
138:8  139:8
144:2*0*  145:*5,
13, 21*  146:*18*
152:*13, 17*
153:*6, 12*
154:2  155:*12*
157:*10, 21*
158:6  179:*4*
182:8, *24*
186:2*1*  190:*13,
16*  215:*13*
222:2*1*  224:2*4*
232:*10*  233:*14,
20*  238:*16*
293:*19*
**statements**
57:2  72:*15*
128:*5*  135:2*3,
24*  154:*18, 24*

**STATES**  1:*1*
22:*15*  44:*15*,
*19, 22, 24*
50:*10*  51:*3, 5,
7*  52:*6, 11*
54:6
**statistical**
137:*13*  145:2*3*
147:22, *24*
198:*11*  203:2*4*
204:*12, 14*
276:2*4*
**statistically**
145:25  146:2*0,
23*  147:2
192:22  194:*5,
6, 14, 18*
198:2*4*  199:*5*
200:*1, 22, 24*
201:*4, 16, 20*
202:*3, 20*
203:*3, 10, 20*
294:2
**statistics**
199:8, *10*
**stay**  214:2*0*
259:*19, 19, 20*
260:*6*
**stayed**  112:*3*
**staying**  259:*24*
**stenographic**
8:*19*  13:2*1*
**step**  135:*13*
**Stephen**  44:*4*
45:*14*  46:*18,
24*  56:*11*
57:*19*  58:*19,
22, 25*  59:*4*
60:*17, 25*  64:2,
*16, 22*  68:2*0*
76:2*0*  82:2*4*
83:*5, 14, 20*
99:2*4*  100:*4,
17*  103:*19*
106:*19*  107:*18,
22*  112:22
114:6  115:*4*
116:*3*  132:2*0*
133:*10, 20*
165:*6*  186:2*0*
187:2*4*  188:*18*

189:*12* 193:*16,
19* 196:*19*
236:*18*
**steps** 110:*20*
111:*1*
**Steve** 3:*15*
10:*22* 231:*12*
232:*7*
**Steven** 63:*21*
**stick** 123:*24*
**sticker** 227:*11*
**Stipulations**
7:*12*
**stop** 10:*11*
95:*21* 96:*4*
163:*3* 292:*4*
**stopped** 92:*11*
**strains** 295:*25*
296:*2*
**Strand** 5:*19*
40:*12* 180:*15*
207:*3* 255:*19*
**Strategies**
5:*10* 267:*22*
**Street** 2:*13, 19*
**stricken** 82:*17*
**strike** 82:*6, 8*
117:*23* 188:*11,
25* 236:*22*
**stringent**
124:*14, 16, 19*
127:*4* 128:*10,
14* 129:*1, 2*
**stringently**
124:*8* 129:*17*
**strong** 44:*24*
**Structural**
4:*19* 5:*19*
89:*7* 160:*22*
161:*19* 162:*5,
15*
**structure**
159:*25* 160:*1*
212:*1* 231:*9*
**structure,**
233:*5*
**structures**
159:*22* 212:*2,
3* 218:*1*
**student** 44:*9*

**students** 17:*11*
137:*16*
**studied** 288:*20*
**studies** 36:*3, 9,
21* 201:*9*
204:*5* 289:*11*
**study** 39:*1, 7,
11* 59:*18*
90:*20* 146:*2*
201:*6* 228:*18*
239:*19* 289:*3*
**subcontractor**
106:*9, 12*
111:*19*
**subgrantee**
106:*10*
**Subject** 4:*17,
19* 6:*14*
101:*12* 139:*3*
178:*5* 221:*18*
273:*12* 301:*10*
**subjecting**
135:*5*
**subjects**
177:*20*
**submit** 75:*23*
261:*13* 283:*20*
**submitted**
9:*22* 41:*22, 25*
42:*8, 9* 49:*10*
53:*1* 54:*8*
55:*2, 22* 60:*8*
79:*25* 82:*22*
83:*12, 13, 24*
85:*12* 87:*2*
90:*13* 92:*16*
95:*1* 103:*24*
108:*12, 20, 21*
193:*5, 6* 229:*6*
242:*6* 274:*16*
**Subscribed**
303:*19*
**subsequent**
237:*10*
**substance**
167:*18* 170:*25*
171:*6* 285:*13,
24* 303:*11*
**substantial**
138:*25* 200:*5,
7*

**substitutions**
41:*7, 10, 15*
**suffering** 35:*7*
**suggested**
274:*4*
**suggesting**
290:*7*
**Suite** 2:*13, 19*
**summarize**
257:*19*
**summary**
191:*18*
**summer** 27:*19,
25* 81:*5* 108:*5*
257:*12*
**sunny** 168:*12*
**superior** 136:*4,
6, 12, 25* 137:*7,
18, 20, 25*
138:*11* 139:*9*
143:*18* 144:*12,
24* 146:*4, 10,
14* 148:*14, 24*
149:*9, 14*
150:*3, 14, 19*
157:*1* 158:*15,
24* 216:*10*
**superiority**
215:*20, 24*
**superscript**
63:*15, 16*
**supervise**
70:*16*
**supervision**
300:*21*
**supplemental**
12:*11* 132:*22*
140:*14* 145:*19*
222:*3* 229:*10*
281:*1* 282:*19*
**supply** 290:*8*
**supplying**
110:*18*
**SUPPORT**
7:*2* 52:*15, 24*
53:*9, 15, 24*
54:*14, 15, 19,
19, 24, 25*
55:*16, 19, 20*
56:*2* 58:*17*
69:*18* 70:*8*

193:*11* 195:*1*
197:*6* 289:*17*
**supported**
70:*2* 73:*5*
199:*12*
**supports**
193:*20*
**suppose** 40:*10*
221:*15* 276:*2*
**supposed** 31:*7*
220:*3*
**Suppression**
5:*7*
**sure** 17:*6*
50:*3, 15* 55:*7,
7* 58:*5* 63:*23*
87:*10* 96:*9*
110:*16* 116:*23*
118:*2* 125:*13,
15* 130:*12*
151:*19* 159:*2*
160:*14* 164:*16*
191:*22* 204:*2*
217:*24* 233:*11*
236:*14* 269:*16*
271:*3* 277:*16*
286:*22* 287:*2,
12* 291:*8*
292:*3, 12*
296:*17, 21*
**surely** 36:*7*
39:*14* 77:*21*
114:*25* 123:*16*
130:*17* 149:*18*
186:*4, 6, 9*
196:*2* 235:*1*
256:*1* 268:*22*
**surprise**
201:*22* 204:*16,
19* 275:*4*
**surprising**
278:*19* 279:*5*
**suspect** 83:*16*
**suspected**
231:*2*
**swear** 8:*21*
**sworn** 8:*25*
9:*3* 13:*14, 18*
31:*13* 173:*7*
300:*5* 303:*19*

**system** 49:*15*
128:*11*

**< T >**
**T97A** 147:*7,
13*
**Table** 145:*19*
248:*10* 250:*12*
252:*1* 281:*1, 5*
282:*16, 19*
284:*2, 2*
**tabulate**
256:*21*
**tabulated**
33:*19* 141:*14*
205:*1* 283:*15,
21*
**tabulation**
284:*5, 7*
**Tadd** 8:*4*
**take** 10:*13*
21:*11* 52:*1, 4*
53:*21, 25* 60:*5,
9, 12* 68:*24*
85:*20, 24*
91:*16* 118:*4, 9*
119:*22* 120:*12*
128:*2* 133:*6*
134:*21* 139:*24*
140:*1, 5, 16*
141:*5* 142:*5*
154:*12* 160:*19*
163:*1* 174:*25*
180:*16* 183:*14*
196:*8* 200:*7*
201:*9* 204:*5*
208:*24* 227:*2*
236:*3, 4* 241:*4*
242:*10* 248:*7*
258:*20* 260:*3*
273:*5, 13*
281:*14, 17*
284:*23, 24*
285:*2, 9* 286:*6*
291:*7*
**taken** 1:*16*
101:*25* 110:*20*
111:*1* 140:*12*
200:*9* 221:*2*
236:*5* 239:*9,
11, 16*

**takes** 59:*21*
210:*14*
**talk** 26:*10*
34:20 40:*10*
105:*4* 117:*20*
119:*17* 213:5
234:23 244:*10*
251:24 254:6
258:*12, 25*
259:4 260:*13*
271:25
**talked** 13:*4*
43:*20, 25*
68:*10* 82:20
98:6 103:*23*
111:*17* 209:*3*
225:*1* 239:25
258:*10* 274:9
276:*10* 280:9
**talking** 121:9
160:*13* 168:20
183:*13* 185:5
191:*14* 216:*1*
226:23 243:5,
*11, 24* 244:*14*
259:*21* 283:23
284:*21*
**talks** 129:9
288:*23*
**tape** 260:2
**Target** 5:*16*
66:*3*
**targeted**
130:*23*
**task** 204:*13*
205:*3*
**tax** 51:*23*
**taxes** 34:9
49:*19* 50:*14*
**taxpayer** 48:*3*
49:7 51:6
**taxpayer-funde**
**d** 50:*21*
**taxpayers**
49:*20*
**team** 12:*20*
13:5 18:8
24:6 42:5
47:7, *18* 79:24
86:22 87:*3, 13,*
*16* 160:*13*

183:5 184:*17,*
*18, 19, 20, 25*
185:*1* 239:*21*
240:*4* 241:*15*
**teams** 47:6, *15*
62:25 150:*4, 9,*
*14, 20* 180:*3,*
*25* 181:*10*
182:*12, 15, 19*
183:5, 9, *12*
184:*10* 185:*1,*
*2*
**technical**
10:*19* 58:*17*
120:*15*
**technically**
30:*7*
**TECHNICIAN**
3:*12, 14*
**technique**
245:*18*
**technology**
15:*23*
**telephone**
62:*19* 262:*20*
**telephones**
62:22
**Tell** 17:8
20:*4* 83:*18*
84:*14, 21*
115:*10* 120:*18*
132:*19* 161:6
165:*10, 18*
168:6, *17*
195:7 203:*17*
204:24 256:*14*
259:*16* 260:22
262:*21* 263:*11,*
*19* 276:9
278:*14* 281:20
282:*1*
**telling** 28:*20*
**temperature**
249:5, *11*
250:5, *11*
251:5, 8, *15*
**temperatures**
250:25
**ten** 23:*16*
55:6 86:2

154:8 242:*11*
289:24
**tend** 28:*3*
42:23 62:*15*
65:*15* 74:22
116:6 137:2
**tendency**
123:*12*
**tends** 59:24
**ten-minute**
85:25 86:*1*
291:7
**tens** 62:5
**term** 39:*24*
45:22, 22
124:*20*
**terms** 40:7
65:25 70:*16*
74:9 95:6
96:23 136:2
138:*1, 12*
139:*10, 17*
143:*19* 144:*13,*
*25* 146:5, *11,*
*20* 148:*15*
149:*15* 183:*12*
219:5 222:*16*
239:*13* 274:2
**test** 137:*16*
201:*15, 18*
204:*10*
**tested** 137:*10,*
*17* 249:2
**testified** 9:*4*
16:5 25:5
78:20 99:7
108:2 258:8
**testify** 14:9
28:*1* 65:*12*
67:*10, 12*
**testifying**
166:7 167:*19*
**Testimony** 4:*3*
16:*11* 29:9
31:*10, 13, 25*
33:9, *13* 99:*12*
150:22 155:*24,*
*25* 166:*13, 20,*
*25* 171:*23*
173:7, 8, 9, *13*
256:8 275:2

285:*14, 25*
300:6
**tests** 206:*13*
**Tetramers**
5:*15*
**text** 77:*3*
175:*21* 258:*18*
**Thadd** 3:*12*
**Thank** 10:24
13:*16* 20:8
34:*19* 86:7
96:*12* 121:*15*
163:*18, 19*
167:*13* 242:*19*
260:5 285:25
291:9 292:5
296:6 297:*3*
298:*14, 16, 19*
**Thanks**
260:*14* 298:*10*
**T-H-E** 42:*15*
**Therapeutic**
5:*10*
**thesis** 17:9
**thing** 101:7
161:8 167:7
231:*4* 268:*11,*
*18* 287:*3*
**things** 43:*25*
50:*17* 51:7
56:*12, 20*
61:*14* 63:2
142:*15, 20*
167:6 185:*24,*
*25* 186:24
187:*17* 234:*19*
235:*11* 250:8
287:*10*
**think** 10:2
14:*10, 17, 21*
17:*16* 22:5, *18*
23:*12* 25:*24*
26:*15* 30:*15*
31:*18* 32:7
39:23 43:9, *12,*
*13, 15, 19, 21,*
*24* 44:*21*
45:*20, 23* 46:6,
*11* 49:*19*
50:*14* 51:*12*
58:24 62:*21*

63:*1, 1* 65:6,
*10, 10* 66:*13*
74:*21* 76:6, *18*
77:*14* 84:5
85:24 87:8
88:*12* 89:*20*
92:6 94:*13*
97:*18* 100:8, *8,*
*9* 101:*23*
106:6, *8, 25*
110:5 114:*10*
116:*18* 123:*13,*
*25* 124:*19*
126:*17* 130:2,
*19, 21* 132:*18*
135:*15* 142:*11*
146:8 149:*11*
151:6 156:*23*
157:*20* 161:*24*
163:9 165:*11*
168:*14* 169:*20*
170:*4, 18, 22*
177:5, *13, 16*
180:5, *23, 25*
181:*10, 14*
185:*4, 21*
186:*19* 191:*12*
192:*18* 195:*16*
196:23 207:*14*
214:8 215:*14*
216:*12* 224:6,
*16, 23* 225:*14*
226:25 231:25
233:22 234:7
251:7 259:8
261:6, *15*
269:2, *18*
272:*1, 14*
274:*1* 277:*1*
278:*18* 279:*4,*
*8, 14* 280:6
282:*12* 283:*12,*
*14* 284:*12*
296:*16*
**Third** 12:*11*
127:*24* 272:*3*
280:*25*
**thirty** 301:*16*
**THOMSEN**
2:5

thought 68:*5*
71:*6* 72:*12*
106:*14* 120:22
228:*11* 234:24
236:*1* 276:7
292:*13*
thoughts
234:*3, 13*
thousands
62:*6, 6* 191:*3*
289:25
Thread 4:*16,*
*18* 6:*12*
three 11:*14*
12:*1, 6* 25:*23*
40:*19* 147:*6*
148:*20* 149:*3,*
*5* 161:22
193:*4* 195:*15*
196:*17* 205:*4,*
*9* 213:*17*
218:*2* 274:*5, 8,*
*13, 17, 23*
281:*7, 8, 9*
282:*8* 283:*13*
three-dimensio
nal 219:*10*
tier 123:*3*
124:*1*
till 90:25
time 8:*7*
10:*13, 21*
12:*18* 19:*2*
20:*21, 24* 21:*8*
24:*2* 30:*3, 9,*
*13* 31:*12*
39:*16* 53:*6*
64:*7* 68:*6*
75:*15, 19* 86:*8,*
*9, 12* 92:*21*
93:*1* 96:*16, 17*
97:*2, 10*
104:25 116:*2,*
*12* 117:*18*
118:25 119:*4,*
*22* 120:*20, 25*
121:*1, 1, 5*
131:*13* 133:*16*
145:*14, 15*
158:*21* 159:*5,*
*8, 9* 160:*19*

162:*23* 163:*9*
174:*2* 175:*1*
180:*17* 204:22
208:24 221:*2*
224:*3* 227:*2*
229:*6* 231:*3*
235:*12* 236:*9*
239:*6, 19*
240:*11, 18*
242:22 243:*1*
255:*5, 14*
260:*3, 4, 10*
261:25 262:*14*
264:*6* 270:25
271:*5* 274:*16*
281:*15, 17, 19*
284:*17* 286:*9,*
*10, 13, 14*
291:*11, 15, 16*
296:*8* 297:*5*
298:*24, 25*
299:*4*
timeline
240:*24*
times 10:*4*
26:*4* 29:*5*
39:*20* 42:25
46:*23* 64:*8*
87:22 91:*2*
103:*18, 21*
115:*1* 138:*18*
152:*3* 205:*9*
232:*16* 270:*12*
279:*19* 286:*5*
tip 74:*2*
TJ 3:*12*
95:*21* 292:*1,*
*15*
today 8:*16, 20*
9:*12* 21:*14*
29:*19* 30:*12*
40:*11* 45:*7, 10*
48:*8* 63:*1*
67:*24* 75:25
87:22 112:*21*
135:*2* 166:*7,*
*20, 25* 167:*2, 5,*
*21* 168:*4*
169:25 170:*15*
171:*10, 14*
172:*11, 15*

173:*6, 12, 13*
195:*20* 196:*6*
225:*2* 232:*16*
273:*23* 274:*10*
276:*10* 278:*1,*
*9, 15* 293:*18*
298:*23*
Today's 8:*6*
9:*19* 14:*4*
17:*17* 31:*19*
166:*12* 168:*1,*
*7* 169:*2, 11, 18,*
*22* 171:*18, 23*
172:*6, 18, 24*
173:*1*
toggle 120:*8*
told 28:*8*
29:*2* 83:*23, 25*
85:*1* 91:*15*
115:*16* 117:*5*
118:*15* 126:*16*
129:*4* 133:*19*
150:*11* 168:*21*
171:25 181:*17*
196:*11* 222:*20,*
*24* 240:*14, 20*
264:*7* 266:22
272:*19*
Tom 3:*5*
tongue 74:*2*
Tony 45:*1, 9*
top 160:*20*
227:*9* 237:22
total 34:*6, 10*
294:*7*
totally 188:*12*
259:*8* 293:*23*
touch 112:*3*
214:*20*
tough 298:*17*
trained 112:*2*
trainee 209:*12*
training 44:*9*
transcript
16:*10* 96:*2*
140:*24* 300:*9,*
*18* 301:*17, 19*
transcription
303:*7*
transcripts
16:*3*

Transfer 5:*19*
40:*12* 180:*16*
207:*4* 255:*20*
translate
153:*23*
travel 24:*10*
220:*12*
traveled 32:*14*
traveling
220:*8, 13*
Treasury 50:*4,*
*11*
treat 35:25
73:*23*
treated 34:*24*
treating 35:*16,*
*19, 21*
trial 16:*9*
36:*15* 38:*18*
153:*5* 183:*15*
269:*14*
trials 16:*4*
triple 143:*21*
144:*15* 145:*2*
146:*7, 13*
147:*17* 148:*17,*
*25* 149:*2, 5, 10,*
*17*
tripped
181:*24* 183:*1*
trouble 93:*21*
troubling 78:*8*
81:*11* 82:*5*
83:*7*
true 24:22
157:*4* 181:*15*
183:*3* 221:*16*
265:*16* 300:*6*
truth 272:*5*
try 74:*23*
80:*15* 143:*11*
trying 10:*14*
69:25 93:*7*
144:*17* 180:*12*
182:22



Tsiang's 265:*1*
Tuesday 14:*11*
turn 17:*21*
86:*4, 6* 125:*21*
143:*10, 24*
159:*20* 173:*19*
191:*24* 209:*7*
turning 209:*21*
two 10:*3* 14:*9,*
*11, 14* 20:*18*
23:*14* 24:*17*
26:*19* 29:*14*
33:*20* 39:*18,*
*25* 40:*2, 19*
41:*20* 89:*6*
96:*7* 103:*15,*
*18, 24* 108:*14,*
*22* 132:*12*
138:*18* 148:*6*
178:*1* 186:*25*
192:*11* 193:*11*
194:*9, 19*
195:*4, 6, 18*
196:*17, 17*
197:*5, 10, 11*
200:*3, 18, 22,*
*24* 203:*19*
205:*8* 213:*7*
214:*1* 215:*6, 6*
250:*14, 25*
251:*3, 5, 9*
252:*4, 9*
256:25 257:*18,*
*20, 23* 264:*4, 8*
265:*2, 7* 266:*7,*
*19* 267:*3, 5, 6,*
*8* 270:*24*
272:*3, 6, 11, 17,*
*21* 273:*23*
274:*7* 275:*6*

279:*11*  283:*14*
285:*21*
**two-hour**
29:*16*
**two-year**  53:*4*
**type**  175:*15*
188:*4*  256:*3*
**types**  201:*14*
204:*8*
**typical**  34:*13*
**typing**  175:*15*
176:*6*
**typo**  205:*13*
**typographical**
78:*22*  81:*1*
189:*20*  190:*3*,
*6, 8, 12, 17*
191:*20*  193:*3*,
*25*  194:*20*
195:*14, 21*
196:*1, 5, 15*
197:*1, 4*  198:*6*
205:*18*  279:*20*,
*25*  280:*4*
281:*12*  283:*5*,
*7, 17, 22*  284:*8*
**typos**  204:*23*,
*24*

**< U >**
**U.S**  24:*9, 10*
48:*3, 9, 13*
49:*6, 19, 20*
50:*4, 10*  51:*15*,
*16*
**UK**  1:*6*
**ultimate**  257:*6*
**ultimately**
237:*5*
**unaware**
48:*10*  110:*23*,
*25*  142:*20, 21*
193:*8*  276:*17*
**unclear**
184:*24*  233:*18*
**uncomfortable**
228:*4*
**uncovered**
40:*14*  79:*9*
81:*12*  84:*5, 13*
117:*6, 14*

**undefeated**
182:*25*
**undergo**
124:*12*
**undergone**
92:*18*  95:*2*
**underlay**
230:*15*  243:*14*
**underlaying**
227:*22*
**underlying**
94:*9*  226:*2, 15*,
*21*
**understand**
9:*15*  33:*22*
36:*8*  67:*10, 13*
69:*25*  93:*13*,
*20*  111:*6*
136:*9*  145:*12*
161:*10*  180:*13*
181:*11*  184:*8*
187:*2, 6*
191:*22*  199:*13*
206:*22*  207:*1*,
*5, 21*  215:*17*
216:*5*  219:*23*
224:*18*  252:*3*,
*8*  267:*4*
287:*21*
**understanding**
15:*11*  30:*5*
47:*9, 22, 23*
48:*22*  49:*17*
67:*2, 6*  99:*8*,
*14*  169:*10, 20*
170:*6*  171:*12*
180:*19*  185:*9*
195:*3*  199:*9*,
*16*  202:*11*
219:*17*  221:*1*
241:*13*
**understands**
186:*12*
**understood**
202:*23*  208:*10*
212:*23*
**undertake**
115:*24*
**undisclosed**
82:*9*  188:*11*
**unique**  278:*23*

**UNITED**  1:*1*
44:*14, 19, 22,
24*  50:*10*  51:*2,
5, 7*  52:*6, 11*
54:*6*
**university**  30:*1*
**unjust**  49:*19*
**unmute**  10:*23*
**unnecessary**
13:*22*
**unprofessional**
223:*12, 19*
234:*13*
**unreasonable**
158:*19*
**unrelated**
179:*7*
**untrue**  148:*21*
**unveiling**
275:*12*
**unwilling**
119:*11*  135:*3*
145:*11*
**update**  17:*18*
**updated**  21:*9*
240:*1*
**updates**  17:*4, 7*
**upfront**  73:*21*
261:*10*
**uploaded**
144:*5*
**uploading**
88:*19*
**upwards**
90:*25*  294:*9*
297:*1*
**usage**  190:*19*
**use**  36:*9*
62:*22*  72:*14*
94:*10*  97:*14*
168:*20, 23*
169:*3*  205:*25*
207:*19*  212:*10*
245:*17*  256:*2*
276:*24*  281:*19*
**uses**  51:*16*
81:*13*  185:*6*
205:*22*
**usually**  59:*20*
61:*17*  64:*4*

226:*5*
**utmost**  161:*25*

**< V >**
**value**  185:*19*
250:*2*  282:*14*,
*21, 22, 25*
283:*16*
**values**  81:*14*,
*16, 17, 19*
137:*15*  139:*1*
148:*4*  174:*12*
177:*1*
**van**  217:*8*
**varied**  14:*6*
**varies**  64:*6*
**various**  16:*17*
67:*16*  214:*12*
**vary**  124:*23*
**vast**  95:*4*
96:*20*  128:*19*
**vector**  209:*15*
**Vegas**  181:*6, 8,
9*
**verbiage**
130:*5, 11*
**verified**  11:*16*
**version**  17:*1*
19:*2*  23:*13, 15*
87:*11*  90:*12*
127:*11*  277:*4*
284:*13, 16*
**versions**  16:*17*
**versus**  8:*14*
24:*15*  50:*6*
139:*1*  152:*8*
194:*3, 11*
198:*22*  203:*5*
222:*17*  238:*5*
254:*2*  294:*21*
295:*10*
**video**  86:*4, 10,
14*  96:*3, 18*
163:*22*  171:*20*
242:*21, 25*
291:*11, 15*
298:*24*
**VIDEOCONFE**
**RENCE**  2:*1*
3:*1*

**videoconferenci**
**ng**  1:*17*
171:*17*
**VIDEOGRAPH**
**ER**  8:*2, 4*
11:*2*  86:*8, 12*
95:*20, 21*  96:*6,
11, 12, 16*
120:*3*  163:*21*
164:*3*  242:*20,
24*  286:*8, 12*
291:*10, 14*
292:*3, 22*
293:*1, 6*
298:*16, 21*
**VIDEOTAPE**
3:*12*
**Videotaped**
1:*16*
**view**  15:*15*
179:*5*  187:*1*
235:*16*  238:*9*
270:*4*
**viewing**  221:*19*
**views**  72:*22*
74:*14*  131:*23*
235:*6*  236:*6,
18*
**VIIV**  1:*3, 5*
8:*13*  13:*5*
18:*11, 17, 21*
20:*1, 5, 16*
21:*3*  22:*7, 13*
23:*7*  24:*6*
26:*11*  29:*10*
30:*17*  31:*15*
32:*18*  33:*6, 12*
38:*13*  42:*4*
54:*18*  68:*3, 12,
16*  71:*22*  72:*5,
6, 14, 16*  97:*22,
24*  99:*9*
110:*11*  168:*6*
169:*9, 14*
170:*14*  172:*11*
173:*11, 16*
207:*12*  239:*1,
21, 24*  240:*4,
18*  241:*11, 15,
21*  244:*10*
255:*8*  258:*25*

260:*18, 25*
261:*21*  262:*2,*
*16, 16, 21*
263:*11, 19*
264:*7*  268:*13,*
*17*  272:*19, 23*
297:*17*
**ViiV's**  12:*20*
14:*3*  18:*8*
20:6, *7*  22:*23*
23:7, *25*  24:*14*
25:*14, 17*
29:22  30:*24*
32:*15*  34:2, *8*
47:7, *17*  79:*24*
86:*22*  87:*3, 12,*
*16*  90:*14*  99:*1*
100:*23*  118:*23*
119:7  134:2
165:7, *25*
166:6, *12, 19,*
*24*  167:*20, 24*
169:*16*  171:9,
*17*  172:*1, 15*
173:6  239:5
255:*17*  287:*24*
**Viral**  5:*6*
89:*9*  160:*25*
**virologist**
223:*25*  224:*17*
**virology**  126:5,
7
**virtual**  63:*7*
172:*6*
**virtually**  63:*4*
116:*10*  220:*17,*
*19*
**virucidal**
289:*10*
**virus**  146:*22*
147:*1, 5, 14, 18,*
*20*  148:2, *6, 9*
188:*4*  192:*14,*
*21*  193:*14, 23*
194:*5, 12*
195:6  197:*14,*
*17*  198:*13, 24*
203:7  209:*14*
222:*18*  276:*15*
282:7  294:*1*

**Viruses**  5:*8*
77:*12*  109:*4,*
*19*  137:*12, 17,*
*19, 21*  139:*3*
142:2  145:*22*
146:2  147:*6*
148:*20*  149:*2*
151:*24*  153:*11*
155:9  156:*7*
157:*15*  158:2
177:*19*  178:*4*
185:*12*  203:*19*
294:*6, 10, 23*
296:*1*
**vis-à-vis**  41:*15*
**Vitae**  6:*12, 14*
**vitro**  37:*20*
39:*4*  138:*1, 12*
139:*10*  141:*22*
147:*10, 25*
148:5  153:*1*
157:*3*  158:*15*
200:*12*  206:*10*
294:*15*  295:*3,*
*9, 16*
**volume**  219:*8*

**< W >**
**Waal's**  217:*8*
**wait**  26:*4*
134:*4, 5*  195:*9*
**waned**  46:*15*
**want**  23:*21*
28:5  34:*10, 20*
55:*17*  59:*12*
61:2  66:*4*
71:*3*  79:*21*
86:5  88:*1*
97:*15*  104:*21*
105:*3, 5*
119:*15, 17*
128:2  135:*22*
145:*4*  162:*22*
163:*1*  170:*20*
178:*22*  191:*21*
192:*4*  204:*1*
208:*20*  230:*23*
234:*18, 21*
242:*13*  251:*24*
252:*14*  254:*6*
260:*13*  269:*9*

271:*24*  273:*7*
282:*9, 11, 11*
283:*18*  284:*4*
285:2, *6*  287:*2,*
*4*  293:*18*
**wanted**  20:*19*
95:*18*  97:*16*
269:*15*  276:*9*
**warmer**  250:*7*
**Washington**
180:*1, 21, 23,*
*24*
**way**  15:*5*
20:*10*  30:*11*
47:6, *17*  52:*21*
55:*25*  63:*2*
97:*10*  162:*22*
167:*17, 19*
170:*19*  178:*10*
182:*16*  183:*7*
184:*21*  186:*13,*
*22*  190:*8*
191:*10, 15, 23*
193:*15, 20*
199:*4, 7*  200:*2,*
*14*  201:*7*
210:*7*  220:*10*
223:*16*  248:*7*
251:*13*  254:*11,*
*16*  283:*9*
**we,**  264:*21*
**weaker**  270:*10,*
*10*
**weather**
166:*16*  168:*10,*
*12, 14*  169:*4*
172:*2*
**web**  12:*25*
129:*11*
**website**  127:*7,*
*12*  129:6, *9*
**week**  63:*5*
116:*8*  179:*6*
182:8, *23*
183:*3*  220:*8*
**weeks**  39:*19*
40:*1, 2*  41:*20*
83:*13*  85:*11*
103:*24*  108:*22*
132:*12*  264:*4*

**Well**  9:*20*
10:*15*  13:*12*
15:*17*  21:*15*
23:*12, 23*
24:*17, 20*
25:*20*  28:*19*
31:*1*  39:2, *14,*
*23*  42:*9*  43:*7*
44:7, *25*  45:*12,*
*20*  46:*6, 11, 15*
49:*1*  59:*19*
63:*13, 14*
67:*15*  68:*24*
70:*10*  73:*16,*
*21*  75:*9*  77:*21*
80:*13*  82:*2*
84:5  86:*6*
100:7  104:*23*
106:*19*  109:*15*
112:*23*  120:*21*
121:*3*  125:*5*
126:*19*  130:*10*
138:*4, 15*
148:*18*  149:*18*
150:*24*  156:*22*
163:*7*  166:*21*
168:2  170:*4*
174:*8*  185:*3,*
*15*  188:*10*
189:*6*  190:*16*
193:*10*  195:*11*
201:8  202:*25*
207:*10, 15, 18*
209:*7*  211:*16*
212:*8*  221:*16*
222:*1*  224:*23*
230:*20*  233:*14*
235:*15*  243:*21*
248:*24*  253:*1*
267:*6*  268:*16,*
*22*  281:*16*
282:5  283:*24*
284:*10*  285:*4*
286:*3*  289:*11*
296:*15*  298:*15*
**well-known**
175:*7*  176:*22*
178:*12*
**Wen**  209:*12*
**went**  19:*24*
55:*22*  63:*5*

68:7  71:*17*
99:*23*  138:*22*
227:*23*  267:*1*
277:5  284:*10*
**we're**  25:*11*
56:8  79:*3*
121:*12*  166:*15,*
*22*  258:*19, 21*
259:*18, 19, 20*
260:*1, 2*  273:*5*
279:*1*  282:*18,*
*20*  298:*23*
**West**  2:*13*
**We've**  39:*9*
40:7  64:*1*
76:*21*  85:*18*
87:*21*  112:*20*
148:*19*  162:*22*
191:*14*  216:*1*
225:*1*  260:*9*
274:9  276:*9*
280:*9*
**Wewatta**  2:*19*
**whatsoever**
85:*3*
**wherewithal**
250:*23*
**White**  6:*7*
77:6  78:*1*
244:*21, 22*
251:*19, 20*
274:*1, 2*
**widely**  67:*6*
**wife**  34:*10*
**WILCOX**  2:*3*
4:*3*  13:7, *10,*
*12, 23, 24*
18:*13*  36:*4*
47:*19*  48:5, *19*
49:*24*  50:*23*
51:*10*  58:*4*
67:7  80:*10, 17*
82:*13*  85:8, *17*
93:*24*  94:*16*
105:*4*  118:2, *7*
122:5  123:*6*
128:*15*  133:*2*
134:*4, 11, 21*
135:8  141:*9*
150:5  152:*14*
153:*14*  154:*3,*

21 156:10
157:17 162:24,
25 163:16
164:12, 17
167:8 170:8,
18 172:20
177:14 179:20
183:10, 23
187:3 188:23
202:8 205:15
227:4 230:2
231:24 232:20
237:1, 2, 19
253:13, 21
257:25 259:7,
16 260:8, 14
263:5, 8, 15, 23
265:18 271:1
272:7, 25
273:5, 13
284:15, 23
285:10 286:1,
15, 17 287:1,
11, 17 291:6,
20, 23 292:6,
15, 24 293:4, 8
296:4, 7, 10, 23
297:7, 13, 21
298:5, 6
**wild** 188:4
**wild-type**
252:23 295:24
**willing** 119:8
139:22 273:17
281:19 284:19
**wish** 104:25
119:19 120:14
227:3 268:14
**withdraw**
29:13 164:18
287:18
**withdrawn**
169:15
**Witness** 7:5
8:10, 22, 24
18:15 36:5
47:21, 24 48:7,
21 50:1, 25
51:12 58:8
67:9 78:3, 4, 7
80:15 86:7

88:17 94:1, 5,
18 104:11
120:7 122:7
123:8 128:18
132:2 133:4
135:10 141:11
150:7 152:16
153:16 154:5,
23 156:17
157:20 163:7,
18 167:13
172:25 177:16
179:22 183:25
187:5 202:10
205:17 227:14
231:25 242:16
253:14, 22
259:4, 22
260:14 263:17,
25 265:20
271:3 272:9
278:23 291:9
296:5 300:5, 6,
8 301:1
**witness's**
285:13, 24
**wonder** 121:2
**word** 101:18
156:18 172:9,
10
**wording** 162:2
**words** 173:8
191:23 234:23
**work** 14:16,
18 22:3 23:2,
11 24:7 25:18
26:2 28:9
32:11 36:18
38:12, 18, 22
39:22 40:2
45:6 47:9, 14
48:2, 8 50:2
60:14 63:12
70:1, 9, 10, 11,
23 74:14 83:4
93:2 96:5
100:10 112:5
118:22, 24
123:15, 18
136:17 168:21
196:8 209:10

211:2 214:14
218:10 221:17
222:12 223:3
224:20, 21, 24
233:6 234:15,
24 235:11
239:17 240:3
241:11 265:20
289:11 290:5
298:11
**workday** 26:21
**worked** 18:15
25:13, 20
30:23 31:6
37:10 45:3
111:24 112:1
261:3, 6
**working** 18:7
22:15, 16 23:6
26:8 29:3, 10,
21 30:4, 10, 17,
24 31:15 37:1,
16 38:1, 8
39:15 81:6
84:7 95:3
108:4 120:4
244:6 282:18
**works** 45:1, 9
168:22 199:8
254:19, 21
**worldwide**
12:25
**write** 40:18,
23 42:10 49:9
67:22 74:13,
22 119:7
130:3, 7, 15
233:10 235:18
**writer** 185:22
**writing** 27:9
40:6 41:1
52:5 69:19
71:2 105:21
229:12
**written** 9:21
56:12 62:12
65:7 68:13
101:24 130:16
150:24 179:9
236:7 240:16
254:9 283:10

**wrote** 42:21,
22 52:8 59:18,
19 113:8, 13,
16 130:2
162:2, 19
205:7 209:18
214:1 230:22
233:22 234:6
235:18 238:10
275:25 276:4

**< Y >**
**Y143R** 146:25
**Yeah** 48:7
51:12 69:20
80:2 85:24
89:24 107:13
118:7 121:14
145:3 157:20
160:17 180:12
181:20 182:22
198:19 209:8
216:21 221:7
226:4 233:22
237:2 258:12
260:11 273:13
281:5 286:1,
22 287:1, 11
292:25 293:4
**year** 24:21, 21
25:12 26:20
28:13, 14 29:3
30:8 34:16
50:14 52:12
71:8 268:9
**years** 23:16
24:17 25:25
26:1 29:5, 5
30:9 31:11
43:14 55:5, 6
81:14, 15
188:9 236:14
240:9 289:24
**yelling** 258:3
**yellow** 162:7
212:6, 11, 14,
16, 18 218:25
219:3
**Yep** 28:11
64:21 126:1

159:23 174:25
175:10
**yesterday**
14:12
**yielded** 249:19
**York** 2:6, 6
**young** 106:4
111:17
**Yves** 274:8

**< Z >**
**Zeger** 274:7
**zero** 179:6
198:15 246:24
254:23
**Zhang** 194:25
202:1, 18, 25
**Zhao** 65:25
**Zoltan** 3:7
**Zoom** 1:17
2:1 3:1 62:24

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**VIIV HEALTHCARE COMPANY, SHIONOGI & CO., LTD., and VIIV HEALTHCARE UK (NO. 3) LIMITED,**

    **Plaintiffs,**

    **v.**

**GILEAD SCIENCES, INC.,**

    **Defendant.**

**C.A. No. 1:18-cv-00224-CFC-CJB**

**JURY TRIAL DEMANDED**

▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉

## OPENING EXPERT REPORT OF ALAN ENGELMAN, PH.D. CONCERNING INSUBSTANTIAL DIFFERENCES BETWEEN DOLUTEGRAVIR AND BICTEGRAVIR

Dated: November 15, 2019

_____
Dr. Alan N. Engelman

Hassounah 2017 at -536-37, Figures 1 and 2.

406.    Although the 7.4 fold change in $EC_{50}$ value noted in Table 3 for DTG to inhibit HIV-1 integrase mutant virus G140S/Q148H was numerically significantly different from the 4.8 fold change value noted for BIC with this virus, other investigators have reported $EC_{50}$ and fold change values for BIC and DTG to inhibit the G140S/Q148H mutant virus that do not significantly differ from one another.  *See* Smith 2018; Zhang 2018.  In light of all of those other instances, any differences in DTG and BIC's $EC_{50}$ and fold change values reported in Hassounah 2017 do not change my opinion that any differences in DTG and BIC's activity against site-directed mutant viruses are insubstantial.

407.    Both DTG and BIC performed similarly in TZM-bl cells and CBMC cultures, demonstrating comparable resistance profiles and inhibition activity. This further suggests that DTG and BIC have similar resistance profiles and further supports my opinion that the *in vitro* data of DTG and BIC are insubstantially different from one another.

**b.    Smith 2018**

408.    Retrovirology published an article by Dr. Steven Smith, among others, entitled *Efficacies of Cabotegravir and Bictegravir Against Drug-resistant HIV-1 Integrase Mutant*s. Steven J. Smith et al., *Efficacies of Cabotegravir and Bictegravir Against Drug-resistant HIV-1 Integrase Mutant*s, 15 RETROVIROLOGY 1 1–18 (2018) (accessed through Open Access, https://retrovirology.biomedcentral.com/track/pdf/10.1186/s12977-018-0420-7)    (supplemental materials "Smith 2018 Supplement"[8] ) (collectively "Smith 2018").

---

[8] The supplemental materials are available at
https://static-content.springer.com/esm/art%3A10.1186%2Fs12977-018-0420-7/MediaObjects/12977_2018_420_MOESM1_ESM.pdf

409.   Smith 2018 illustrates $EC_{50}$ values "in single round infection assays" (n=4), discussed above, "using vectors that carry the INSTI-resistant mutations in INSTI-resistant IN mutants."   VIIVUS00001366-383 at -368.   As discussed in further detail in the following paragraphs, Smith 2018 demonstrates that DTG's and BIC's respective resistance profiles against site-directed mutant viruses are very similar.   Although a handful of mutant viruses sometimes led to greater resistance to BIC and sometimes led to greater resistance to DTG, overall, both BIC and DTG have resistance profiles that are drastically different from those of first-generation INSTIs.

410.   Smith 2018 reports the differences between, on the one hand, DTG, BIC, and CAB and, on the other hand, RAL and EVG.  For example, Smith 2018 acknowledges that "[g]enerally speaking, the second generation INSTIs (DTG, BIC, and CAB) are much more proficient at inhibiting these INSTI-resistant mutants than RAL and EVG.  Based on the data from our panel of mutants, DTG and BIC are more broadly effective against the mutants than CAB (Fig. 3)." *Id.* at -376.  Smith 2018 also acknowledges that "DTG, BIC, and CAB are similar chemically and structurally" and "given the problems that arise with drug resistance, it is likely that, among related compounds [such as DTG and BIC], those that are more broadly effective against resistant viruses [such as DTG and BIC] will have an advantage in the clinic."  *Id.* at -375 Smith 2018 concludes that, based on their ability to inhibit the 57 INSTI-resistant mutants selected and tested, BIC performed better than DTG against 14 mutants and DTG performed better than BIC against 10 mutants. *See id.* at -374; ███████████████████████████

411.   Smith 2018 also notes that "[g]iven the complexities of pharmacology, a significant difference in the behavior of a drug against a particular mutant (or mutants) may or may not translate directly into a desirable clinical outcome."  *Id.* at -375; ███████████████

███████████████

████████████████████

197

412.    However, putting aside that the assay results may not translate into the clinic, there are issues with Smith 2018 that raise questions about its analysis and results.

413.    First, Smith 2018 obtained $EC_{50}$ values for DTG against site-directed mutant virus ███████████████████████████████████████████████████████████ Margot 2019; Tsiang Dep. Ex. 1; Tables 1.1-1.3.  While it is not uncommon for scientists to run an assay only 3 or 4 times, ████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████  This suggests to me that the Smith 2018 assay methodology, the limited number of times the assay was run (n=4), or experimental error may be the cause.  *Id.* at -376, Figure 9. ███████████████████████████████████████ ████████████████████████████████████████████████████. ████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████  This indicates to me that if Smith 2018 had used Gilead's assays, instead of his own, or run its assays more times, Smith 2018 may have reached a different conclusion.

|  | Mutant Virus | | Smith 2018 |
|---|---|---|---|
| DTG | WT | ███ | 0.7 – 2.5 nM (n=4) |
| DTG | G140S/Q148R | ███ | 19.4 – 33 nM (n=4) |
| DTG | N155H/Q148R | ███ | 5.1 – 9.1 nM (n=4) |
| DTG | R263K | ███ | 7.9 – 14.7 nM (n=4) |

---

[9] Tables 1.1 and 2.1 include Gilead's *in vitro* data from Tsiang Dep. Ex. 1, including BICVIIVUS0068588.

████████████████████████████████████████████

414.    Second, Smith 2018 attributes the differences in DTG, BIC, and CAB's resistance profiles to the structural differences on the "left side," or ring A, of these INSTIs.  *Id.* at -366, -374, -376.  This directly contradicts Gilead's presentation to the public at ASM Microbe 2016, which attributes the differences to the "right side," or ring D, of these INSTIs. BICVIIVUS0251877-891 at -886-877; ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████

415.    In addition to my opinion that the above issues call the data and conclusions in Smith 2018 into question, I disagree with some of the conclusions that Smith 2018 draws from its individual assay panels.  Instead, as discussed in further detail below, those panel results further support my opinion that any *in vitro* differences between DTG and BIC are insubstantial.  Smith 2018 ran 7 assay panels 4 times each: (Panel 1) primary INSTI-resistant mutants; (Panel 2) other common INSTI-resistant single mutants; (Panel 3) double-mutants with primary mutation at Q148; (Panel 4) double-mutants with primary mutations at T66I and N155H; (Panel 5) triple-mutants with primary mutation Q148H/K/R; (Panel 6) triple-mutants with primary mutation at T66I and N155H; and (Panel 7) triple-mutants with primary mutation G140S/Q148H.

416. **Panel 1, Primary INSTI-Resistant Mutants – Figure 2, Table S1.** In the first panel, Smith 2018 tested WT and primary INSTI-resistant mutants, including: Y143R, N155H, G140S/Q148H, T66I, E92Q, H51Y, G118R, R263K, H51Y/R263K, and E138K/E263K. VIIVUS00001366-383 at -367-368, Figure 2; Smith 2018 Supplement at Table S1A. DTG and BIC both inhibited at least WT, Y143R, N155H, T66I, E92Q, H51Y, G118R, and E138K/R263K. Smith 2018 Supplement at Table S1A.



**Fig. 2** Antiviral activities of BIC and CAB against primary INSTI-resistant mutants. The $EC_{50}$ values were determined, in single round infection assays, using vectors that carry the INSTI-resistant IN mutants. Error bars represent the standard deviations in the data from independent experiments (n = 4). The $EC_{50}$ values shown in the figure have a maximum of 100 nM. The $EC_{50}$ values of RAL against Y143R, N155H, and G140S/Q148H, EVG versus G140S/Q148H, and E92Q primary INSTI-resistant mutants were all > 100 nM



Smith 2018 at 3, Figure 2.

417.     Smith 2018 claims that only BIC potently inhibited G140S/Q148H and G118R. VIIVUS00001366-383 at -368 ("However, only BIC potently inhibited the well-known RAL-resistant IN double mutant G140S/Q148H and the DTG-resistant IN mutant[] G118R[.]").   I disagree.   Regarding G140S/Q148H, the Smith 2018 supplemental materials indicate that both DTG and BIC had $EC_{50}$ values > 5 nM, and these values were insubstantially different from one another (DTG: 5.8 ± 0.5 nM; BIC: 5.5 ± 0.7 nM).   Smith 2018 Supplement, Table S1A; Smith 2018 Supplement at Table S1B ("G140S/Q148H DTG-BIC NS [not significant]").   Therefore, I believe these two compounds performed similarly against the G140S/Q148H mutant.   Regarding G118R, the Smith 2018 supplemental materials indicate that both DTG and BIC had $EC_{50}$ values > 5 nM, and these values were not statistically significant  (DTG: 13.0 ± 5.0 nM; BIC: 5.4 ± 0.6 nM).   Smith 2018 Supplement at Table S1A; Smith 2018 Supplement at Table S1B ("G118R BIC > DTG NS [not significant]").[10]

| A | WT | Y143R (RAL) | N155H (RAL) | G140S/Q148H (RAL) | T66I (EVG) | E92Q (EVG) | H51Y (DTG) | G118R (DTG) | R263K (DTG) | H51Y/R263K (DTG) | E138K/R263K (DTG) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RAL | 4.0 ± 2.0 | 162.4 ± 16.2 | 153.6 ± 32.8 | 1900.0 ± 300.0 | 2.8 ± 0.4 | 29.8 ± 10.2 | 3.4 ± 0.2 | 35.5 ± 5.0 | 5.7 ± 2.3 | 6.0 ± 2.3 | 8.0 ± 1.6 |
| EVG | 6.4 ± 0.8 | 7.9 ± 2.3 | 90.0 ± 17.8 | 5700.0 ± 1100.0 | 66.2 ± 0.7 | 153.7 ± 34.0 | 4.5 ± 2.1 | 21.0 ± 9.5 | 5.4 ± 0.1 | 52.6 ± 18.2 | 11.4 ± 0.2 |
| DTG | 1.6 ± 0.9 | 4.3 ± 1.2 | 3.6 ± 1.3 | 5.8 ± 0.5 | 0.9 ± 0.8 | 2.3 ± 0.4 | 3.2 ± 0.2 | 13.0 ± 5.0 | 11.3 ± 3.4 | 16.0 ± 1.9 | 3.2 ± 0.5 |
| CAB | 2.4 ± 0.2 | 2.7 ± 0.6 | 2.2 ± 0.3 | 36.3 ± 6.5 | 0.9 ± 0.3 | 4.2 ± 0.1 | 9.8 ± 1.8 | 12.1 ± 1.9 | 13.4 ± 1.3 | 10.4 ± 1.5 | 4.2 ± 0.8 |
| BIC | 1.9 ± 0.3 | 2.6 ± 0.1 | 2.7 ± 0.8 | 5.5 ± 0.7 | 0.2 ± 0.1 | 2.0 ± 0.1 | 2.2 ± 0.4 | 5.4 ± 0.6 | 4.1 ± 1.1 | 3.5 ± 1.0 | 3.5 ± 0.6 |

Smith 2018 Supplement, Table  S1A.

418.     Less concentration of BIC was required to inhibit H51Y (DTG: 3.2 ± 0.2 nM; BIC: 2.2 ± 0.1 nM), R263K (DTG: 11.3 ± 3.4 nM; BIC: 4.1 ± 1.1 nM) and H51Y/R263K (DTG: 16.0 ± 1.9 nM; BIC: 3.5 ± 1.0 nM) than DTG.   However, as illustrated below, Smith 2018 obtained $EC_{50}$ values for DTG against site-directed mutants ████████████████████████████████

████████████████████████████████       *See* Margot 2019; Tsiang Dep. Ex. 1. ██

---

[10] This "G118R BIC > DTG NS [not significant]" may be a typographical error.

████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████  *Compare* Smith 2018, Table S1 *with* Margot 2019 at 2191-2192 and

Tsiang Dep. Ex. 1.  While it is not uncommon for scientists to run an assay only 3 or 4 times, the

great data disparity here suggests to me that the Smith 2018 assay methodology and/or the limited

number of times the assay was run (n=4) may be the cause.  For example, if Smith 2018 had

conducted more runs or used Gilead's assays, instead of his own, Smith 2018 may have reached a

different conclusion.

419.  ██████████████████ ██ ████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████  According to Smith 2018's *in vitro* data, Smith 2018 ran assay

panels on DTG against site-directed mutant R263K only 4 times and produced $EC_{50}$ values ranging

from 7.9 – 14.7 nM, ████████████████████████████████████  *See*

VIIVUS00001366-383 at -368, Figure 2; Smith 2018 Supplement, Table S1A.  ████████████

██████████████████████████████████████████████████████████

████████████████████████

| $EC_{50}$ (nM) | R263K | |
|---|---|---|
| | ████████████ | **Smith 2018** |
| **DTG** | ██████████ | 7.9 – 14.7 nM (n=4) |
| **BIC** | ████████████ | 3.0 – 5.2 nM (n=4) |

420.  ██████████████████████████████████████████████████

████████  In Smith 2018, DTG and BIC exhibited similar efficacy against site-directed mutant

---

[11] Tables 1.1 and 2.1 include Gilead's *in vitro* data from Tsiang Dep. Ex. 1, including BICVIIVUS0068588.

██████████████████████████████████

viruses as a whole, suggesting that DTG and BIC have similar resistance profiles and markedly better resistance profiles than first-generation INSTIs. This further supports my opinion that the *in vitro* data of DTG and BIC are insubstantially different from one another.

421.   **Panel 2, Other Common INSTI-Resistant Single Mutants – Figure 4, Table S2.** In the second panel, Smith 2018 tested other common INSTI-resistant mutants, including: M50I, L74M, T97A, S119R, E138K, G140S, Q146L, Q146P, Q148H, Q148K, Q148R, and S153Y. VIIVUS00001366-383 at -371, Figure 4; Smith 2018 Supplement, Table S2A. DTG and BIC both inhibited M50I, L74M, T97A, S119R, E138K, G140S, Q146P, Q148H, Q148K, Q148R, and S153Y.



**Fig. 4** Antiviral activities of BIC and CAB against common INSTI-resistant single mutants. The $EC_{50}$ values were determined using vectors that carry the INSTI-resistant IN double mutants in single round infection assays. Error bars represent the standard deviations in the data from independent experiments (n = 4). The $EC_{50}$ values shown in the figure have a maximum of 100 nM. The $EC_{50}$ values of RAL against Q148H, Q148K, and Q148R and EVG versus Q148K and Q148R INSTI-resistant mutants were all > 100 nM



Smith 2018 at 6.

| A | M50I | L74M | T97A | S119R | E138K | G140S | Q146L | Q146P | Q148H | Q148K | Q148R | S153Y |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RAL | 30.7 ± 6.9 | 7.4 ± 2.1 | 2.9 ± 0.2 | 25.9 ± 0.1 | 6.5 ± 0.9 | 10.0 ± 3.7 | 24.1 ± 2.3 | 6.0 ± 0.8 | 142.2 ± 4.1 | 1450.0 ± 242.5 | 272.7 ± 7.0 | 18.0 ± 2.4 |
| EVG | 2.8 ± 0.4 | 6.0 ± 0.4 | 5.3 ± 0.4 | 7.6 ± 0.2 | 2.7 ± 0.4 | 12.6 ± 2.6 | 43.2 ± 5.4 | 4.7 ± 0.6 | 23.7 ± 4.2 | 309.8 ± 12.4 | 296.1 ± 24.2 | 4.2 ± 0.9 |
| DTG | 2.1 ± 0.9 | 2.2 ± 0.4 | 1.1 ± 0.5 | 2.3 ± 0.6 | 1.8 ± 0.4 | 2.7 ± 0.7 | 2.1 ± 0.8 | 0.5 ± 0.04 | 0.6 ± 0.1 | 1.0 ± 0.01 | 1.3 ± 0.2 | 2.0 ± 0.7 |
| CAB | 0.8 ± 0.1 | 0.9 ± 0.2 | 2.7 ± 0.7 | 2.3 ± 1.0 | 12.9 ± 1.0 | 5.1 ± 1.5 | 3.4 ± 0.6 | 10.3 ± 2.1 | 6.8 ± 1.5 | 2.9 ± 0.6 | 4.5 ± 1.3 | 3.2 ± 0.6 |
| BIC | 2.5 ± 0.3 | 1.4 ± 0.4 | 1.5 ± 0.3 | 3.3 ± 0.1 | 4.0 ± 0.2 | 3.5 ± 0.4 | 5.2 ± 1.3 | 0.8 ± 0.01 | 0.9 ± 0.1 | 1.2 ± 0.3 | 1.2 ± 0.3 | 2.8 ± 0.4 |

Smith 2018 Supplement,  Table S2A.

422.    Smith 2018 reported that "BIC potently inhibited this entire panel of INSTI-resistant mutants with $EC_{50}$ values below 5 nM, which was comparable to DTG. … Most of the INST-resistant single mutants in this panel caused significant drops in susceptibility to the first generation INSTIs, RAL and EVG[.]"  VIIVUS00001366-383 at -369.  DTG performed slightly better than BIC for a handful of mutants.  *Id.* ("Based on the data obtained with the mutants in this panel, DTG was better than CAB and BIC … DTG was significantly better than CAB against six of the mutants and better than BIC against four mutants.").  However, as a whole, DTG and BIC demonstrated similar efficacy against the site-directed mutants tested in Panel 2.

423.    BIC had an $EC_{50}$ against the Q146L mutant virus that was slightly higher than 5 nM (5.2 ± 1.3 nM), and slightly higher than that of DTG (2.1 ± 0.8 nM).  Smith 2018 Supplement, Table S2A.  In my opinion, these differences are insubstantial.

424.    DTG and BIC performed similarly in Panel 2 and markedly better than RAL and EVG.  In Smith 2018, DTG and BIC exhibited similar efficacy against site-directed mutant viruses as a whole, suggesting that DTG and BIC have similar resistance profiles and markedly better

resistance profiles than first-generation INSTIs.  This further supports my opinion that the *in vitro* data of DTG and BIC are insubstantially different from one another.

425.  **Panel 3, Double-Mutants with Primary Mutation at Q148 – Figure 5, Table S3.**  In the third panel, Smith 2018 tested double-mutants with a primary mutation at Q148 (H/K/R), or Y143R or N155H and a secondary mutation at E138 (A/K) or G140 (A/C/S).  VIIVUS00001366-383 at -372, Figure 5; Smith 2018 Supplement, Table S3A.  DTG and BIC both inhibited  G140A/Q148H,  Y143R/Q148H,  Q148H/N155H,  G140S/Q148K,  E138A/Q148R,  E138K/Q148R, and G140C/Q148R.



**Fig. 5**  Antiviral activities of BIC and CAB against a panel of INSTI-resistant double mutants that have a primary mutation at position Q148. The $EC_{50}$ values were determined using vectors that carry the INSTI-resistant double mutants in single round infection assays. Error bars represent the standard deviations in the data from independent experiments (n = 4). The $EC_{50}$ values shown in the figure have a maximum of 100 nM. The $EC_{50}$ values of RAL and EVG against this entire panel (except for EVG versus Y143R/Q148H) were all > 100 nM. The $EC_{50}$ values of DTG against G140A/Q148K, CAB versus E138K/Q148K, G140A/Q148K, G140S/Q148K, and BIC against G140A/Q148K were all > 100 nM



Smith 2018 at 7 Figure 5.

| A | G140A/ Q148H | Y143R/ Q148H | Q148H/ N155H | E138K/ Q148K | G140A/ Q148K | G140S/ Q148K | E138A/ Q148R | E138K/ Q148R | G140A/ Q148R | G140C/ Q148R | G140S/ Q148R | Q148R/ N155H |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RAL | 476.3 ± 22.0 | 2040.0 ± 99.0 | 337.5 ± 69.0 | 2885.0 ± 49.5 | >5000 | 113.3 ± 1.4 | 3150.0 ± 210.0 | 3240.0 ± 876.8 | >5000 | >5000 | >5000 | >5000 |
| EVG | 250.8 ± 4.9 | 23.2 ± 5.7 | 620.9 ± 90.6 | 1890.0 ± 42.4 | 2053.3 ± 45.1 | 543.1 ± 89.2 | 293.2 ± 35.6 | 801.6 ± 67.7 | 575.0 ± 19.8 | >5000 | 1326.3 ± 32.7 | 285.8 ± 18.2 |
| DTG | 3.9 ± 0.7 | 0.8 ± 0.2 | 4.0 ± 0.6 | 25.0 ± 2.1 | 450.7 ± 58.8 | 2.3 ± 0.2 | 4.4 ± 0.8 | 3.9 ± 0.1 | 4.1 ± 0.3 | 2.9 ± 0.6 | 26.2 ± 6.8 | 7.1 ± 2.0 |
| CAB | 3.9 ± 0.8 | 6.0 ± 0.4 | 13.3 ± 2.9 | 772.1 ± 72.2 | 393.1 ± 51.1 | 87.3 ± 7.6 | 25.6 ± 0.8 | 24.1 ± 0.1 | 13.7 ± 2.7 | 66.6 ± 8.1 | 414.6 ± 14.5 | 50.5 ± 6.5 |
| BIC | 1.1 ± 0.3 | 0.4 ± 0.1 | 4.0 ± 0.7 | 59.3 ± 4.9 | 137.1 ± 5.0 | 4.5 ± 0.4 | 4.1 ± 0.6 | 3.5 ± 0.4 | 10.0 ± 2.5 | 6.4 ± 1.4 | 6.1 ± 1.3 | 2.0 ± 0.4 |

Smith 2018 Supplement,  Table S3A.

426.    According to Smith 2018, DTG and BIC had $EC_{50}$ values against the G140S/Q148R mutant virus that were numerically statistically different from one another, with an associated p value of 0.008 reported.  Smith 2018 Supplement, Table S3A (reporting $EC_{50}$ values for BIC and DTG against G140S/Q148R) and Table S3B (reporting BIC > DTG and a p value of 0.008 for G140S/Q148R). ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*Compare* Smith 2018, Table S3 *with* Margot 2019 at 2191-2192 ███████████████████ While it is not uncommon for scientists to run an assay only 3 or 4 times, the great data disparity here suggests to me that the Smith 2018 assay methodology and/or the limited number of times the assay was run (n=4) may be the cause.  For example, if Smith 2018 had conducted more runs or used Gilead's assays, instead of his own, Smith 2018 may have reached a different conclusion.

████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████.  Smith 2018

also ran assay panels on DTG against site-directed double-mutant G140S/Q148R, but Smith 2018

ran the panels only 4 times, and Smith 2018 produced $EC_{50}$ values ranging from 19.4 – 33 nM, █

█████████████████████████████████ *See* VIIVUS00001366-383 at -372, Figure

5; Smith Supplement, Table S3A.

| $EC_{50}$ (nM) | G140S/Q148R | | | |
|---|---|---|---|---|
| | | ████████████ | | Smith 2018 |
| DTG | | ████████████ | | 19.4 – 33 nM (n=4) |
| BIC | | ████████████ | | 4.8 – 7.4 nM (n=4) |

427.    Less concentration of DTG was required to inhibit G140A/Q148R than BIC (DTG:

4.1 ± 0.3 nM; BIC: 10.0 ± 2.5 nM), while less concentration of BIC was required to inhibit

Q148R/N155H than DTG (DTG: 7.1 ± 2.0 nM; BIC: 2.0 ± 0.4 nM).  VIIVUS00001366-383 at -

372, Figure 5; Smith 2018 Supplement, Table S3A.  In my opinion, the fact that sometimes less

concentration of DTG is required to inhibit one mutant virus while sometimes less concentration

of BIC is required to inhibit a different mutant virus does not create a substantial difference

between the *in vitro* data of BIC and DTG.

428.    Indeed, both DTG and BIC had instances where they were more effective than the

other in this panel.  VIIVUS00001366-383 at -369 ("BIC was significantly better than DTG against

five of these double mutants. … [H]owever, DTG was better than BIC for four of the mutants[.]").

429.    The key point is that, overall, both DTG and BIC performed similarly in Panel 3

and markedly better than RAL and EVG.  In Smith 2018, DTG and BIC exhibited similar efficacy

---

12  ████████████████████████████████████████████████████████████
████████████████████

████████████████████████████████████

against site-directed mutant viruses as a whole, suggesting that DTG and BIC have similar resistance profiles and markedly better resistance profiles than first-generation INSTIs. This further supports my opinion that the *in vitro* data of DTG and BIC are insubstantially different from one another.

430.    **Panel 4, Double-Mutants with Primary Mutations at T66I and N155H – Figure 6, Table S4.**  In the fourth panel, Smith 2018 tested the EVG-resistant double-mutant T66I/E157Q and INSTI-resistant double-mutants with a primary mutation at N155H and one of the following secondary mutations identified in the figure and table below. DTG and BIC both inhibited all Panel 4 strains:  T66I/E157Q, E92Q/N155H, G140S/N155H, Y143H/N155H, Y143R/N155H, and N155H/G163R.  Smith 2018 Supplement at Table S6A.



**Fig. 6** Antiviral activities of BIC and CAB against a panel of INSTI-resistant double mutants that included the primary mutations T66I and N155H with additional mutations at other positions. The $EC_{50}$ values were determined using vectors that carry the INSTI-resistant double mutants in single round infection assays. Error bars represent the standard deviations in the data from independent experiments (n = 4). The $EC_{50}$ values shown in the figure have a maximum of 100 nM. The $EC_{50}$ values of RAL against this entire panel of INSTI-resistant double mutants were all > 100 nM. The $EC_{50}$ values of EVG against E92Q/N155H and Y143R/N155H were all > 100 nM



Smith 2018 at 8 Figure 6.

**A**

| | T66I/E157Q | E92Q/N155H | G140S/N155H | Y143H/N155H | Y143R/N155H | N155H/G163R |
|---|---|---|---|---|---|---|
| **RAL** | 98.7 ± 20.2 | >5000 | 477.8 ± 66.6 | 1205.0 ± 77.8 | >5000 | 245.5 ± 43.8 |
| **EVG** | 67.5 ± 10.6 | 1601.0 ± 77.8 | 51.9 ± 10.8 | 70.0 ± 13.3 | 170.1 ± 34.0 | 72.6 ± 6.8 |
| **DTG** | 0.5 ± 0.1 | 1.8 ± 0.2 | 2.0 ± 1.0 | 1.7 ± 0.7 | 2.5 ± 0.8 | 1.6 ± 0.4 |
| **CAB** | 0.3 ± 0.1 | 4.6 ± 1.7 | 4.4 ± 0.6 | 1.2 ± 0.1 | 3.7 ± 0.2 | 2.2 ± 0.4 |
| **BIC** | 1.1 ± 0.2 | 3.3 ± 0.9 | 2.2 ± 0.5 | 2.7 ± 0.6 | 4.0 ± 0.8 | 2.1 ± 0.1 |

Smith 2018 Supplement, Table S4A.

431.    As illustrated in Figure 6 and Table S4, DTG and BIC performed similarly against these six mutant viruses, and markedly better than first-generation INSTIs.  Indeed, Smith 2018 reported a clear distinction in Panel 4 between first and second generation INSTIs:  "The first generation INSTIs, RAL and EVG, failed to potently inhibit any of these double mutants.  Based on this panel of mutants, the antiviral profiles of the three second generation INSTIs were similar to each other."  VIIVUS00001366-383 at -369.

432.    In sum, both DTG and BIC performed similarly in Panel 4 and markedly better than RAL and EVG.  In Smith 2018, DTG and BIC exhibited similar efficacy against site-directed mutant viruses as a whole, suggesting that DTG and BIC have similar resistance profiles and markedly better resistance profiles than first-generation INSTIs.  This further supports my opinion that the *in vitro* data of DTG and BIC are insubstantially different from one another.

433.    **Panel 5, Triple-Mutants with Primary Mutation Q148H/K/R – Figure 8, Table S5.**  In the fifth panel, Smith 2018 tested triple-mutants that included a primary mutation at Q148 (H/K/R) with two additional mutations at primary or secondary positions, including: T97A/Y143R/Q148H, T97A/Q148H/N155H, E138K/G140A/Q148K, L74M/G140A/Q148R, L74M/G140C/Q148R, E138K/G140C/Q148R, and E138A/S147G/Q148R.  VIIVUS00001366-383 at -375, Figure 8; Smith 2018 Supplement, Table S5A.  DTG and BIC both inhibited at least T97A/Y143R/Q148H and T97A/Q148H/N155H.  Smith 2018 Supplement at Table S6A.



**Fig. 8** Antiviral activities of BIC and CAB against a panel INSTI-resistant triple mutants that included a primary mutation (Q148H/K/R) and two additional mutations. The EC$_{50}$ values were determined using vectors that carry the INSTI-resistant triple mutants in single round infection assays. Error bars represent the standard deviations in the data from independent experiments (n = 4). The EC$_{50}$ values shown in the figure have a maximum of 100 nM. The EC$_{50}$ values of RAL and EVG versus this entire panel of INSTI-resistant triple mutants were all > 100 nM. The EC$_{50}$ values of DTG against E138K/G140A/Q148K, CAB versus E138K/G140A/Q148K, L74M/G140C/Q148R, and E138K/G140C/Q148R, and BIC against E138K/G140A/ Q148K were all > 100 nM



Smith 2018 at 10, Figure 8.

| A | T97A/Y143R/Q148H | T97A/Q148H/N155H | E138K/G140A/Q148K | L74M/G140A/Q148R | L74M/G140C/Q148R | E138K/G140C/Q148R | E138A/S147G/Q148R |
|---|---|---|---|---|---|---|---|
| RAL | >5000 | 4455.0 ± 388.9 | >5000 | >5000 | >5000 | >5000 | 1410.0 ± 183.8 |
| EVG | 41.6 ± 3.0 | 224.5 ± 24.8 | 4090.0 ± 641.0 | 747.4 ± 78.5 | >5000 | 945.3 ± 176.4 | 774.9 ± 17.2 |
| DTG | 1.5 ± 0.1 | 2.4 ± 0.7 | 212.1 ± 46.0 | 12.0 ± 2.1 | 10.2 ± 1.3 | 5.3 ± 1.0 | 5.5 ± 1.3 |
| CAB | 5.3 ± 0.7 | 1.8 ± 0.6 | 610.3 ± 8.6 | 53.2 ± 14.8 | 220.3 ± 41.2 | 134.2 ± 0.3 | 4.0 ± 0.2 |
| BIC | 1.2 ± 0.7 | 1.8 ± 0.3 | 223.0 ± 30.7 | 11.7 ± 1.3 | 6.1 ± 0.9 | 8.2 ± 1.1 | 2.3 ± 0.0 |

Smith 2018 Supplement, Table SA5.

434.    As illustrated in Figure 8 and Table S5, DTG and BIC performed similarly against these seven mutant viruses, and markedly better than first-generation INSTIs.  Indeed, Smith 2018 reported that "[o]verall, DTG and BIC showed similar antiviral profiles against these triple mutants."  VIIVUS00001366-383 at -371.  They were both more effective than CAB.  *Id.*  Both DTG and BIC exhibited a slight loss in potency in the presence of the E138K/G140C/Q148R mutant.  *Id.*  Both DTG and BIC were also less potent against the L74M/G140A/Q148R triple mutant.  *Id.*  Neither DTG nor BIC performed well against E138K/G140A/Q148K (DTG: 212.1 ± 46.0 nM; BIC: 223.0 ± 30.7 nM).  *Id.*

435.    In sum, both DTG and BIC performed similarly in Panel 5 and markedly better than RAL and EVG.  In Smith 2018, DTG and BIC exhibited similar efficacy against site-directed mutant viruses as a whole, suggesting that DTG and BIC have similar resistance profiles and

markedly better resistance profiles than first-generation INSTIs.  This further supports my opinion that the *in vitro* data of DTG and BIC are insubstantially different from one another.

436.    **Panel 6, Triple-Mutants with Primary Mutation at T66I and N155H – Figure 9, Table S6.**  In the sixth panel, Smith 2018 tested triple-mutants that included T66I/T97A/E157Q, T97A/Y143R/N155H, G140S/Y143R/N155H, and E92Q/N155H/G163R.  VIIVUS00001366-383 at -376, Figure 9; Smith 2018 Supplement, Table S6A.  DTG and BIC both inhibited at least T66I/T97A/E157Q, G140S/Y143R/N155H, and E92Q/N155H/G163R.  Smith 2018 Supplement at Table S6A.



**Fig. 9**  Antiviral activities of BIC and CAB versus a panel of INSTI-resistant triple mutants that consists of a primary mutation at T66I and N155H with additional secondary mutations. The $EC_{50}$ values were determined using vectors that carry the INSTI-resistant triple mutants in single round infection assays. Error bars represent the standard deviations of the data from independent experiments (n = 4). The $EC_{50}$ value shown in the figure have a maximum of 100 nM. The $EC_{50}$ values of RAL against T97A/Y143R/N155H, G140S/Y143R/N155H, and E92Q/N155H/G163R were all > 100 nM. The $EC_{50}$ values of EVG versus T97A/Y143R/N155H and E92Q/N155H/G163R and CAB against T97A/Y143R/N155H were all > 100 nM



Smith 2018 at 11, Figure 9.

| A | T66I/T97A/E157Q | T97A/Y143R/N155H | G140S/Y143R/N155H | E92Q/N155H/G163R |
|---|---|---|---|---|
| **RAL** | 33.5 ± 8.7 | >5000 | >5000 | >5000 |
| **EVG** | 69.4 ± 11.8 | 642.7 ± 16.5 | 93.1 ± 16.1 | 677.9 ± 45.8 |
| **DTG** | 0.5 ± 0.1 | 8.5 ± 1.5 | 2.6 ± 0.3 | 3.8 ± 0.7 |
| **CAB** | 0.8 ± 0.1 | 142.2 ± 8.3 | 20.0 ± 3.5 | 4.2 ± 1.5 |
| **BIC** | 0.4 ± 0.2 | 8.2 ± 1.7 | 2.1 ± 0.1 | 2.0 ± 0.4 |

Smith 2018 Supplement, Table S6A

437.    As illustrated in Figure 9 and Table S6, DTG and BIC performed nearly identically against these four mutant viruses and markedly better than first-generation INSTIs.  Indeed, Smith 2018 found that "DTG (0.5 ± 0.1 nM), BIC (0.4 ± 0.2 nM), and CAB (0.8 ± 0.1 nM) retained full potency against [T66I/T97A/E157Q]."  VIIVUS00001366-383 at -372, -376, Figure 9; Smith 2018 Supplement, Table S6.  Smith 2018 further reported that "DTG, BIC, and CAB retained high antiviral potencies against the E92Q/N155H/G163R INSTI-resistant triple mutant (EC$_{50}$ < 5 nM)" and that "[t]he G140S/Y143R/N155H triple mutant was susceptible to both DTG (2.6 ± 0.3 nM) and BIC (2.1 ± 0.1 nM), but it caused a moderate loss in potency to CAB (20.0 ± 3.5 nM)."  *Id.* DTG and BIC were also more effective against the T97A/Y143R/N155H triple mutant than CAB. *Id.* ("Both DTG and BIC retained significant potency against the T97A/Y143R/N155H triple mutant, 8.5 ± 1.5 nM and 8.2 ± 1.7 nM, respectively, whereas CAB lost substantial potency (142.2 ± 8.3 nM).").

438.    In sum, both DTG and BIC performed similarly in Panel 6 and markedly better than RAL and EVG.  In Smith 2018, DTG and BIC exhibited similar efficacy against site-directed mutant viruses as a whole, suggesting that DTG and BIC have similar resistance profiles and

markedly better resistance profiles than first-generation INSTIs.  This further supports my opinion that the *in vitro* data of DTG and BIC are insubstantially different from one another.

439.     **Panel 7, Triple-Mutants with Primary Mutation G140S/Q148H – Figure 10, Table S7.**  In the seventh panel, Smith 2018 tested triple-mutants that included the RAL-resistant G140S/Q148H double mutations with an additional mutation: T97A, E138A/K, Y143R, N155H, or G163K.  VIIVUS00001366-383 at -377, Figure 10; Smith 2018 Supplement, Table S7A.  As was the case throughout the Smith 2018 panels, first generation INSTIs, RAL and EVG, were ineffective against this panel.  VIIVUS00001366-383 at -372.



**Fig. 10**  Antiviral activities of CAB and BIC against a panel of INSTI-resistant triple mutants that include the well-characterized RAL-resistant double mutant G140S/Q148H plus an additional secondary mutation. The EC$_{50}$ values were determined using vectors that carry the INSTI-resistant triple mutants in single round infection assays. Error bars represent the standard deviations in the data from independent experiments (n=4). The EC$_{50}$ values shown in the figure have a maximum of 100 nM. The EC$_{50}$ values of RAL and EVG against this entire panel of INSTI-resistant triple mutants were all > 100 nM. The EC$_{50}$ values of CAB against G140S/Y143R/Q148H and G140S/Q148H/N155H were all > 100 nM



Smith 2018 at 12, Figure 10.

| | T97A/G140S/Q148H | E138A/G140S/Q148H | E138K/G140S/Q148H | G140S/Y143R/Q148H | G140S/Q148H/N155H | G140S/Q148H/G163K |
|---|---|---|---|---|---|---|
| **A** | | | | | | |
| RAL | >5000 | >5000 | >5000 | >5000 | >5000 | >5000 |
| EVG | >5000 | >5000 | >5000 | >5000 | >5000 | >5000 |
| DTG | 55.9 ± 3.0 | 13.8 ± 4.8 | 68.2 ± 2.0 | 7.7 ± 2.0 | 77.9 ± 15.9 | 24.3 ± 1.1 |
| CAB | 43.7 ± 4.2 | 70.2 ± 9.0 | 93.0 ± 6.1 | 113.8 ± 23.1 | 2423.3 ± 453.9 | 32.4 ± 3.1 |
| BIC | 29.5 ± 4.4 | 5.1 ± 0.5 | 4.9 ± 0.3 | 9.4 ± 0.3 | 57.5 ± 5.0 | 8.8 ± 1.9 |

Smith 2018 Supplement, Table S7A.

440.    Neither DTG nor BIC were effective against T97A/G140S/Q148H.  Smith 2018 Supplement, Table S7; VIIVUS00001366-383 at -373.  There was also a significant reduction in potency for both DTG and BIC against G140S/Q148H/N155H.  Smith 2018 Supplement, Table S7.

441.    Although Smith 2018 reported that "for this panel of mutants, BIC was more effective than DTG in retaining potency," VIIVUS00001366-383 at -373, I believe that that conclusion contradicts other peer-reviewed literature and is not supported by the data presented, especially given the disparity in results between the Gilead and Smith 2018 data for the same site-directed mutations.  Therefore, that finding does not alter my opinion that  the *in vitro* data of DTG and BIC are insubstantially different from one another.

442.    In sum, both DTG and BIC performed similarly in Panel 7 and markedly better than RAL and EVG.  In Smith 2018, DTG and BIC exhibited similar efficacy against site-directed

mutant viruses as a whole, suggesting that DTG and BIC have similar resistance profiles and markedly better resistance profiles than first-generation INSTIs.  This further supports my opinion that the *in vitro* data of DTG and BIC are insubstantially different from one another.

443.    In conclusion, the data from Smith 2018 demonstrate that both DTG and BIC performed similarly in these 7 panels of site-directed mutant viruses, and markedly better than first-generation INSTIs.  Thus, the data support my opinion that the *in vitro* data of DTG and BIC are insubstantially different from one another.

### iv.    ACTIVITY AGAINST PATIENT-DERIVED ISOLATES

444.    Third parties conducted *in vitro* testing to measure the activity of DTG and BIC against integrase in patient-derived isolates.  The data appear in third party publications and supplemental materials, including:  Neogi 2018, Zhang 2018, and Saladini 2019.

445.    This data supports my opinion that DTG and BIC similarly inhibit integrase strand-transfer, resulting in reduced HIV-1 replication.  Moreover, this data supports my opinion that DTG and BIC perform similarly against patient-derived isolates and markedly better than first-generation INSTIs.  Finally, this data supports my opinion that the *in vitro* data of DTG and BIC are insubstantially different from one another.

### a.    Neogi 2018

446.    Neogi 2018, also discussed *infra*, illustrates $EC_{50}$ values in a drug sensitivity assay performed using recombinant HIV-1 subtype B ("HIV-1B") (n=6), HIV-1C (n=14) and A-like (A1, 01_AE and 02_AG; n=4) viruses that were derived from INSTI naïve patients.  *See* Neogi 2018, VIIVUS00917200-207 at -200.  It also provides an analysis of the integrase sequences from a patient cohort.  Neogi 2018 at -203.

447.    **Drug Sensitivity Assay.**  According to the Neogi 2018 data, the median $EC_{50}$ and $EC_{50}$ interquartile ranges for RAL (5.31 (1.56-6.7)) and EVG (2.82 (1.69-5.39)) "were

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **VIIV HEALTHCARE COMPANY, SHIONOGI & CO., LTD., and VIIV HEALTHCARE UK (NO. 3) LIMITED,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**GILEAD SCIENCES, INC.,**<br><br>    **Defendant.** | **C.A. No. 1:18-cv-00224-CFC-CJB**<br><br>**JURY TRIAL DEMANDED**<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮ |

**REPLY EXPERT REPORT OF ALAN ENGELMAN, PH.D.
CONCERNING INSUBSTANTIAL DIFFERENCES BETWEEN
DOLUTEGRAVIR AND BICTEGRAVIR**

Dated: February 5, 2020

_____
Dr. Alan N. Engelman

74.     The lack of substantive discussion or analysis by Drs. Richman, Cullen, MacMillan, Taft, and Reynolds further supports my opinions. For example, Drs. Richman and Cullen hastily address each of the studies that I analyzed in my Opening Report without explaining why any of the alleged differences that they identied are substantial. The lack of substantive discussion in these reports further supports my opinion that there are no significant differences between the *in vitro* data of DTG and BIC.

### 1.     SMITH 2018

75.     Of the *in vitro* data that they considered, Dr. Richman and Dr. Cullen spend a substantial portion of their reports discussing Smith 2018. Smith 2018 is a peer-reviewed publication from Retrovirology that came out of the laboratory of Dr. Stephen Hughes.

76.     Dr. Stephen Hughes is a Senior Investigator at the NIH in the HIV Dynamics and Replication Program. Stephen H. Hughes, Ph.D., NATIONAL INSTITUTES OF HEALTH, https://irp.nih.gov/pi/stephen-hughes (last visited February 1, 2020). Dr. Hughes is a good friend of mine, and I overall have great respect for his work. We have collaborated together many times over the years, yielding a total of 6 joint publications. *See, e.g.*, Vasudevan Achuthan et al., *Capsid-CPSF6 Interaction Licenses Nuclear HIV-1 Trafficking to Sites of Viral DNA Integration*, 24 CELL HOST MICROBE 392 (2018); Yasuhiro Koh et al., *Differential Effects of Human Immunodeficiency Virus Type 1 Capsid and Cellular Factors Nucleoporin 153 and LEDGF/p75 on the Efficiency and Specificity of Viral DNA Integration*, 87 J. VIROLOGY 648 (2013); Hao Wang et al., *HRP2 Determines the Efficacy and Specificity of HIV-1 Integration in LEDGF/p75 Knockout Cells but does not Contribute to the Antiviral Activity of a Potent LEDGF/p75-Binding Site Integrase Inhibitor* 40 NUCLEIC ACIDS RESEARCH 11518 (2012); Zandrea Ambrose et al., *Human Immunodeficiency Virus Type 1 Capsid Mutation N74D Alters Cyclophiliin A Dependence and Impairs Macrophage Infection*, 86 J. VIROLOGY 4708 (2012); Kyeong Eun Lee et al., *Flexible Use*

34

*of Nuclear Import Pathways by HIV-1*, 7 CELL HOST MICROBE 221 (2010); Andrea L. Ferris, et al., *Lens Epithelium-Derived Growth Factor Fusion Proteins Redirect HIV-1 DNA Integration*, 107 PROC. NATL. ACAD. SCI. USA 3135 (2010).

77.     I addressed Smith 2018 in my Opening Report.   Engelman Rpt. ¶¶ 184-185 (discussing Smith 2018 assay methodology), ¶¶ 408-443 (discussing Smith 2018 and Smith 2018 Supplement).

78.     Dr. Richman and Dr. Cullen accuse me of "criticizing" Dr. Hughes's work in my Opening Report, which is simply untrue.  I merely conducted a rigorous analysis of the Smith 2018 publication and underlying data, as I systematically do when reviewing articles.  I believe that it is important to acknowledge inaccuracies and possible errors, as well as place the data in the appropriate context by considering other information that is available to me through the published literature.  Through a close reading of the Smith 2018 article, I have identified 32 typographical errors, which in some cases precludes the interpretation of the data (as discussed below).  Although one or 2 typographical errors is not uncommon in a published study such as Smith 2018, 32 seems exceptionally high to me.  I am of the opinion that Dr. Hughes and colleagues neglected to carefully read the paper as it went through the publication process at the journal Retrovirology, which precludes the interpretation of some of the data and may call into question the accuracy of other data that is not necessarily linked to obvious typographical error.

          a.      **There Are Meaningful Errors In Smith 2018 That Would Cause A Person Of Skill To Doubt Its Accuracy.**

79.     In Dr. Cullen's opinion, "there is nothing that would cause a person of skill to doubt the accuracy or reliability of Smith 2018's results █████████."  Cullen Rpt. ¶ 77.  However, with respect to the Smith 2018 manuscript, I disagree.  I have identified a number of errors that

call the data and conclusions in Smith 2018 into question and suggest that the authors did not consider these errors in formulating their conclusions.

80.     For example, Smith 2018 states that the bridged A-ring of "BIC is more flexible, which would allow it to be more conformationally adaptable."  Smith 2018, VIIVUS00001366-383 at -376.  Smith 2018 further explains that "[t]he greater flexibility of the extended ring system of BIC may help it adapt to changes in the geometry in the IN active site, allowing BIC to overcome many of the known IN resistance mutations."  Smith 2018, VIIVUS00001366-383 at -376.  Dr. Reynolds adopts the "greater flexibility" argument in Smith 2018.  Reynolds Rpt. ¶ 63 ("I hypothesize that the spherical shape [of BIC] may be responsible for the 'greater flexibility' of the BIC A-ring described in the Smith et al. paper.").  Similarly, Dr. Richman reviewed Dr. Reynolds's report and concluded that Dr. Reynolds's report and comments from Dr. Cherepanov supported his opinion.  Richman Rpt. ¶ 156.  I disagree.  In my opinion, Dr. Cherepanov's email does not support the conclusions that Dr. Reynolds is drawing regarding flexibility.  Moreover, as I discuss above, it is my understanding that the addition of a bridge to the A-ring, as in BIC, makes the ring structures less flexible, not more flexible.  Wipf Opening Rpt. ¶¶ 423-424.  As discussed above, our data from the $SIV_{rcm}$ system further supports this point, as analog 1 lacking the A-ring maintained full second-generation INSTI potency against wild type HIV-1 but was 80-fold less potent in its ability to inhibit infection of the HIV-1 Q148H/G140S INSTI resistant virus.  *See supra* Section VI.A.  Dr. Cherepanov agrees.  Cherepanov Email ¶ 9, BICVIIVUS3029295-296 at -295 ("The contacts with Gly118-Asn117 make the compound[s] more still in the active site."); Cook 2020 at 2, 3 ("***DTG and BIC intimately contact the backbone atoms of Asn 117 and Gly118 from the IN β4-α2 connector***, making respectively 8 and 12 contacts with interatomic distances ≤ 5 Å." "We note that although ***DTG and BIC maximally extend to the β4-α2 connector***, they leave

substantial free space in the IN active site, which is occupied by solute molecules in our structures (movie S1)." (emphasis added)).

81.     As another example, Smith 2018 concludes in part that "only BIC potently inhibited the well-known RAL-resistant IN double mutant G140S/Q148H and the DTG-resistant IN mutants G118R…with $EC_{50}$ values $\leq 5$ nM."  Smith 2018 at 3; Richman Rpt. ¶ 146.  I disagree.  Regarding **G140S/Q148H**, the Smith 2018 supplemental materials reveal that both DTG and BIC had $EC_{50}$ values > 5 nM, and, contrary to the main text statement, the difference between these values was not statistically significant (<u>DTG</u>: 5.8 ± 0.5 nM; <u>BIC</u>: 5.5 ± 0.7 nM); indeed, these values indicate that both compounds have similar potency against this mutant virus.  Supplement to Steven J. Smith et al., *Efficacies of Cabotegravir and Bictegravir Against Drug Resistant HIV-1 Integrase Mutants*, 15 Retrovirology 1, 1 (2018), accessible at https://staticcontent.springer.com/esm/art%3A10.1186% 2Fs12977-01804207/MediaObjects/12977_2018_420_MOESM1_ESM.pdf), VIIVUS15547175-181 at -175 ("Smith 2018 Supplement").  Similarly, regarding **G118R**, the Smith 2018 supplemental materials indicate that both DTG and BIC had $EC_{50}$ values > 5 nM, and the difference between these values was not statistically significant (<u>DTG</u>: 13.0 ± 5.0, 8.1 FC[3]; <u>BIC</u>: 5.4 ± 0.6, 2.8 FC).  Smith 2018 Supplement, VIIVUS15547175-181 at -175.  However, the lack of precision in presentation style makes it entirely unclear whether DTG and BIC potencies differed in a statistically meaningful manner for the **G118R** mutant.  In addition to the Supplemental Tables provided with the article, Smith 2018 compiled results of statistical analyses in Figures 3 and 7 of the main paper.  ==Figure 3 itself harbors numerous errors, as the notations to actual Figures 4, 5, 6, 8, 9, and 10 are erroneously==

---

[3] I calculated the fold change values by dividing the $EC_{50}$ value for the mutant by the $EC_{50}$ value for wild-type.  *See* Smith 2018 Supplement, VIIVUS15547175-181.

tabulated as Figures 3, 4, 5, 6, 7, and 8, respectively.  Nevertheless, with respect to the Figure 3 data, DTG and BIC are not listed as having significantly different potencies against the **G118R** mutant virus. Consistent with this interpretation, Smith 2018 Supplement at Table S1B lists: "G118R BIC > DTG NS [not significant]."  However, elsewhere in the Supplemental Tables, " > " is meant to indicate that there is a statistically relevant difference.  One therefore is forced to read between the lines as to whether there is or is not a statistically significant difference in DTG and BIC potencies with respect to inhibition of the **G118R** mutant virus in the Smith 2018 paper.  In my opinion, based on the preponderance of evidence reported in Figure 3 and Supplemental Table 1B of the Smith 2018 article, the potencies of DTG and BIC against **G118R** do not differ from one another in a meaningful way.  The **G118R** mutation conferred partial resistance to both DTG and BIC, and both BIC and DTG inhibited **G118R** mutant viral infection at similar potencies.  *See* Engelman Rpt. ¶ 417 (citing Smith 2018 Supplement at Table S1A;); *see* Richman Rpt. ¶ 148.  The inconsistent reporting of DTG and BIC potencies and significance values against the important **Q148H/G140S** and **G118R** mutant viruses are some of the more troubling issues identified within Smith 2018.  Especially with regards to **Q148H/G140S**, Smith 2018's own data does not support its ultimate conclusion.  These and other errors surely call into question underlying aspects of the statistical analysis and conclusions reached in Smith 2018.

> **b.**    **Despite These Errors, Dr. Richman And Dr. Cullen Fully Adopt The Statistical Analysis And Conclusions In Smith 2018 And Criticize My Common Sense Approach To The Analysis.**

82.    Dr. Richman and Dr. Cullen fully adopt the statistical analysis in Smith 2018, highlighting that "[t]he p value cut-offs used in Smith 2018 are rigorous" and concluding that "Dr. Hughes identified a large number of statistically significant differences between bictegravir and dolutegravir's *in vitro* assay profiles, even at very high levels of statistical rigor."  Richman Rpt.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on June 11, 2020 on the following counsel in the manner indicated:

### <u>VIA EMAIL</u>

Jack B. Blumenfeld
Jeremy A. Tigan
MORRIS, NICHOLS, ARSHT & TUNNEL LLP
1201 North Market Street
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

Adam K. Mortara
J. Scott McBride
Mark S. Ouweleen
Matthew R. Ford
Nevin M. Gewertz
Tulsi E. Gaonkar
Rebecca T. Horwitz
Madeline W. Lansky
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
(312) 494-4400
adam.mortara@bartlit-beck.com
scott.mcbride@bartlit-beck.com
mark.ouweleen@bartlit-beck.com
matthew.ford@bartlit-beck.com
nevin.gewertz@bartlitbeck.com
tulsi.gaonkar@bartlit-beck.com
rebecca.horwitz@bartlit-beck.com
madeline.lansky@bartlitbeck.com

Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
(303) 592-3100
meg.fasulo@bartlitbeck.com

Nao Takada
TAKADA LEGAL, P.C.
112-01 Queens Blvd.
Forest Hills, NY 11375
(212) 380-7804
naotakada@takadalegal.com

*Attorneys for Defendant Gilead Sciences, Inc.*

Dated: June 11, 2020                    */s/ Daniel M. Silver*
                                        Daniel M. Silver (#4758)

2