## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **VIIV HEALTHCARE COMPANY, SHIONOGI & CO., LTD., and VIIV HEALTHCARE UK (NO. 3) LIMITED,** | **C.A. No. 1:18-cv-00224-CFC-CJB** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **GILEAD SCIENCES, INC.,** | |
| **Defendant.** | |

## JOINT PROPOSED FINAL JURY INSTRUCTIONS[1]

---

[1] The parties reserve the right to amend their proposed jury instructions based on the Court's forthcoming rulings and the evidence that is presented and admitted at trial.

## Table of Contents

1.    GENERAL INSTRUCTIONS ................................................................1

      1.1.    INTRODUCTION .................................................................1

      1.2.    JURORS' DUTIES ................................................................2

      1.3.    THE PARTIES .....................................................................3

      1.4.    SUMMARY OF CONTENTIONS ........................................4

      1.5.    BURDENS OF PROOF .........................................................6

      1.6.    EVIDENCE DEFINED .........................................................8

      1.7.    DIRECT AND CIRCUMSTANTIAL EVIDENCE ...........10

      1.8.    CONSIDERATION OF EVIDENCE ..................................11

      1.9.    STATEMENTS OF COUNSEL ..........................................12

      1.10.   CREDIBILITY OF WITNESSES......................................13

      1.11.   NUMBER OF WITNESSES................................................15

      1.12.   EXPERT WITNESSES ........................................................16

      1.13.   DEPOSITION TESTIMONY ...............................................17

      1.14.   DEMONSTRATIVE EXHIBITS.........................................18

      1.15.   USE OF NOTES ...................................................................19

      1.16.   CONFIDENTIAL LABELS AND REDACTIONS ...........20

      1.17.   STIPULATIONS or ADMISSIONS....................................21

2.    ISSUES PRESENTED ........................................................................22

3.    PATENT CLAIMS................................................................................24

      3.1.    THE ROLE OF THE CLAIMS IN A PATENT .................24

i

3.2.   MEANING OF CLAIM TERMS ...................................................... 25

4.   INFRINGEMENT ............................................................................. 26

4.1.   INFRINGEMENT GENERALLY .......................................... 26

4.2.   INFRINGEMENT ..................................................................... 27

4.3.   KNOWLEDGE OF THE PATENT AND INTENT TO INFRINGE ARE IMMATERIAL .......................................... 36

4.4.   [GILEAD'S PROPOSAL:   LIMITATIONS   ON   THE DOCTRINE OF EQUIVALENTS ..................................... 38

4.4.1.  [GILEAD'S PROPOSAL: PRESERVING LIMITATIONS ............. 40

4.4.2.  [GILEAD'S PROPOSAL: "CONSISTING OF" CLAIMS ............... 41

4.5.   [GILEAD'S PROPOSAL: SAFE HARBOR ...................................... 42

4.6.   WILLFUL INFRINGEMENT ............................................... 43

5.   DAMAGES ......................................................................................... 50

5.1.   DAMAGES GENERALLY ................................................... 50

5.2.   LOST PROFITS—"BUT FOR" TEST ................................. 52

5.3.   LOST PROFITS—DEMAND ............................................... 55

5.4.   LOST PROFITS—NONINFRINGING SUBSTITUTES ................. 56

5.5.   LOST PROFITS—CAPACITY ............................................ 60

5.6.   LOST PROFITS—AMOUNT OF PROFIT ........................ 61

5.7.   LOST PROFITS—MARKET SHARE ................................. 62

5.8.   LOST PROFITS – PRICE EROSION ................................. 63

5.9.   REASONABLE ROYALTY—ENTITLEMENT ................. 64

5.10.  REASONABLE ROYALTY AS A MEASURE OF DAMAGES .............................................................................. 65

5.11.   FACTORS   FOR   DETERMINING   A   REASONABLE ROYALTY ...........................................................................66

5.12.   USE OF COMPARABLE LICENSE AGREEMENTS ....................71

5.13.   [GILEAD'S   PROPOSAL:   USE   OF   MULTI-COMPONENT LICENSE AGREEMENTS.................................................................73

5.14.   REASONABLE   ROYALTY   -   AVAILABILITY   OF   NON-INFRINGING ALTERNATIVES .......................................................74

5.15.   REASONABLE ROYALTY – APPORTIONMENT .......................75

6.   DELIBERATIONS AND VERDICT...........................................................78

6.1.   INTRODUCTION................................................................................78

6.2.   UNANIMOUS VERDICT ...................................................................79

6.3.   DUTY TO DELIBERATE....................................................................81

6.4.   SOCIAL MEDIA ................................................................................82

6.5.   COURT HAS NO OPINION ..............................................................83

# 1.    GENERAL INSTRUCTIONS

## 1.1.    INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case.

And last I will explain the rules that you must follow during your deliberations in the jury room and the possible verdicts that you may return.

Please listen very carefully to everything I say.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## 1.2.    JURORS' DUTIES

You have two main duties as jurors. The first is to decide what the facts are from the evidence that you saw and heard in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on each of the issues presented. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way. Also, do not let anything that I said during the course of the trial influence you. Nothing that I said or did was intended to indicate, or should be taken by you as indicating, what your verdict should be.

## 1.3.   THE PARTIES

I will now review for you the parties in this action and the positions of the parties that you will have to consider in reaching your verdict. This is a civil case concerning allegations of patent infringement.

The plaintiffs in this case are ViiV Healthcare Company, Shionogi & Co, Ltd., and ViiV Healthcare UK (No. 3) Limited. I will refer to ViiV Healthcare Company, Shionogi & Co., Ltd., and ViiV Healthcare UK (No. 3) Limited together as "Plaintiffs" or "ViiV." The defendant in this case is Gilead Sciences, Inc. I will refer to Gilead Sciences, Inc. as "Defendant" or "Gilead."

## 1.4.    SUMMARY OF CONTENTIONS

There is one patent for your consideration in this case: U.S. Patent No. 8,129,385. I will refer to this patent as the "'385 patent" or the "Asserted Patent."

ViiV alleges that Gilead infringes claim 6 of the '385 patent in this case by selling, offering for sale, or importing in the United States, Biktarvy®, an HIV treatment that includes the active chemical compound bictegravir. Biktarvy® will be referred to as the Accused Product. **[ViiV's Proposal:** ViiV further alleges that Gilead's infringement is willful.][2]

Defendant denies that Biktarvy® infringes claim 6 of the '385 patent. **[ViiV's Proposal:** Defendant further denies that any infringement is willful.][3]

---

[2] **Gilead's Position**: Gilead does not believe ViiV will adduce sufficient evidence to submit its willfulness claim to the jury. In addition, Gilead does not believe enhancement could ever be warranted in this case. Therefore Gilead believes it is inappropriate to instruct the jury on willfulness or submit a willfulness question on the verdict form. *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 WL 2190055, at *1–3 (E.D. Tex. May 18, 2017) (Bryson, J.); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1311 (Fed. Cir. 2019). Gilead conditionally agrees to this proposed language in the event the Court permits willfulness to go to the jury.

**ViiV's Position:** Gilead's willful infringement is a factual issue for the jury to decide.  ViiV will adduce sufficient evidence to submit its willfulness claim to the jury and to warrant enhancement in this case.  Therefore, willfulness is appropriate to include in the jury instructions and the verdict form.

[3] **Gilead's Position**: For the reasons explained above, n.2, *supra*, Gilead believes it is inappropriate to instruct the jury on willfulness.

4

The '385 patent and all other issued patents are presumed to be valid and Gilead has not challenged the validity of claim 6 of the'385 patent.

---

**ViiV's Position:** For the reasons explained above, n.2, *supra*, ViiV believes it is appropriate to instruct the jury on willfulness.

## 1.5.      BURDENS OF PROOF

In any legal action, facts must be proven by a required amount of evidence, known as the "burden of proof." The party who bears the burden of proof on an issue bears the burden of persuading you to find in their favor. In this patent case, there is a single burden of proof called "preponderance of the evidence."  ViiV has the burden of proving infringement by a preponderance of the evidence. That means ViiV has to produce evidence which, when considered in light of all of the facts, leads you to believe that its claim of patent infringement is more likely true than not. To put it differently, if you were to put ViiV's and Gilead's evidence on the opposite sides of a scale, the evidence supporting ViiV's claims would have to make the scales tip slightly on its side.  That is, if the scale tips slightly in favor of ViiV, you must find for ViiV. If the scale should remain equal or tip in favor of Defendant, you must find for Defendant. ViiV must also prove **[ViiV's Proposal:** willful infringement and]⁴ its damages by a preponderance of the evidence.

In determining whether any fact has been proved by a preponderance of evidence in the case, you may, unless otherwise instructed, consider the testimony

---

⁴ **Gilead's Position**: For the reasons explained above, n.2, *supra*, Gilead believes it is inappropriate to instruct the jury on willfulness.

**ViiV's Position:** For the reasons explained above, n.2, *supra*, ViiV believes it is appropriate to instruct the jury on willfulness.

of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

Some of you may have heard the phrase "proof beyond a reasonable doubt." That burden of proof applies only in criminal cases and has nothing to do with a civil case like this one. You should therefore not consider it in this case.

### 1.6.     EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath (including deposition testimony that has been presented to you), the exhibits that I allowed into evidence, and the stipulations that the parties agreed to.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. None of my comments or questions are evidence.

During the trial, I may not have let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And, sometimes I may have ordered you to disregard things that you saw or heard, or I struck things from the record. You must completely ignore all of these things.

Do not speculate about what a witness might have said or what an exhibit might have shown. Speculation is not evidence, and you are bound by your oath not to let speculation influence your decision in any way.

8

You must not conduct any independent research, investigation, or experiments about the case or its subject matter on your own. Make your decision based only on the evidence, as I have defined it here, and nothing else.

### 1.7.   DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are two kinds of evidence that you may use in reaching your verdict. One type of evidence is called "direct evidence." Direct evidence is direct proof of a fact, such as testimony of an eyewitness. For example, if a witness testified that she saw it raining outside, that would be direct evidence that it was raining.

The other type of evidence is "circumstantial evidence." Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. For example, if someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

The law makes no distinction between the weight that you should give to either direct or circumstantial evidence, but simply requires that you find facts from all the evidence in the case, both direct and circumstantial, and give it whatever weight you believe it deserves.

### 1.8.      CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider the evidence in light of your everyday experience with people and events and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

## 1.9.    STATEMENTS OF COUNSEL

The attorneys' statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented. If you remember the evidence differently from the attorneys, you should rely on your own recollection.

## 1.10.   CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. For all witnesses, including expert witnesses and witnesses who provided testimony by deposition, you should consider: the source of each witness's knowledge; each witness's strength of memory and opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or whether there was evidence that at some other time (including in other testimony read to you or played by video for you at trial) the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave at the trial. You have the right to distrust such a witness's testimony in other particulars and you may reject some or all of the testimony of that witness or give it such weight and credit as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may forget some things or

remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

## 1.11.   NUMBER OF WITNESSES

Sometimes jurors wonder if the number of witnesses who testified makes any difference. Do not make any decisions based on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the number of witnesses for either side.

## 1.12.   EXPERT WITNESSES

During the trial, you heard testimony from expert witnesses. Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

You are not required to accept an expert's opinion. As with any other witness, it is up to you to judge the credibility of the expert witness and decide whether to rely upon his or her testimony.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

## 1.13.    DEPOSITION TESTIMONY

During the trial, certain testimony was presented to you through excerpts of a deposition. A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath and swears to tell the truth, and lawyers for each party may ask questions. You should not attribute any significance to the fact that the testimony is not live at trial. The deposition testimony may have been edited or cut to exclude irrelevant testimony. You should not attribute any significance to the fact that the deposition excerpts may appear to have been edited. Deposition testimony is entitled to the same consideration you would give if the witness had appeared personally in court.

**1.14.     DEMONSTRATIVE EXHIBITS**

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room for your deliberations. The other exhibits (including charts and animations presented by attorneys and witnesses) were offered to help illustrate the testimony of the various witnesses but were not admitted into evidence. These illustrations are called "demonstrative exhibits" and are not evidence and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits and the underlying documents that have been summarized and illustrated in the demonstrative exhibits that are the evidence in this case.

## 1.15.     USE OF NOTES

You may use the notes you took during the trial to assist your memory. However, you should use caution in consulting your notes. There is a tendency to attach undue importance to matters that you have written down. Some testimony that you may have considered unimportant at the time presented, and thus not written down, may have taken on greater importance later on in the trial in light of all the evidence presented. Therefore, you are instructed that your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

## 1.16.    CONFIDENTIAL LABELS AND REDACTIONS

In the course of this case, the parties entered into an agreement that would protect each respective party's confidential and sensitive business information from disclosure to the public or third parties. Under that agreement, the parties have added confidentiality labels to their documents, and have redacted, which means that they have covered or removed information, from documents to protect the confidential nature of the information. You may have seen documents with confidentiality labels or redactions during the course of the trial. The use of confidentiality labels and redactions has no bearing on the evidence, and should not be construed in any way against any party.

## 1.17.  STIPULATIONS OR ADMISSIONS

The parties have stipulated that certain facts are true. The parties have also admitted that certain facts are true. To the extent that stipulated facts or admitted facts have been read to you during this trial, you must treat these facts as having been proven for the purposes of this case.

## 2.    ISSUES PRESENTED

I will now summarize the issues that you must decide and for which I will provide instructions to guide your deliberations. (The specific questions you must answer are listed on the verdict sheet you will be given.) You must decide the following issues:

1.    Whether ViiV has proven by a preponderance of the evidence that Gilead infringes claim 6 of the '385 patent;

2.    If you find that claim 6 of the '385 patent is infringed, what amount of damages ViiV has proven by a preponderance of the evidence it should be awarded as compensation for the infringement; and

3.    **[ViiV's Proposal:** If you find that claim 6 of the '385 patent is infringed, whether ViiV has proven by a preponderance of the evidence that Gilead's infringement is willful.][5]

---

[5] **Gilead's Position:** For the reasons explained above, n.2, *supra*, Gilead believes it is inappropriate to instruct the jury on willfulness.

**ViiV's Position:** For the reasons explained above, n.2, *supra*, ViiV believes it is appropriate to instruct the jury on willfulness.

[**Gilead's Proposal**: If you do decide that there was willful infringement, that decision should not affect any damages award you give in this case.]⁶

---

⁶ **Gilead's Position**: For the reasons explained above, n.2, *supra*, Gilead believes it is inappropriate to instruct the jury on willfulness. If the Court does decide to submit willfulness to the jury, Gilead's proposed language will prevent juror confusion about the effect of a finding of willfulness on damages and thus is necessary to prevent prejudice to Gilead. Delaware courts have included Gilead's proposed language when instructing the jury on the issues. *Liqwd, Inc. v. L'oreal USA, Inc.*, No. 17-CV-14, D.I. 1049 at 20 (D. Del. Aug. 6, 2019); *Avid Tech., Inc. v. Harmonic, Inc.*, No. 1-11-cv-01040-GMS, No. 153 at 13 (D. Del. Jan. 31, 2014). Inclusion of such language here is appropriate if the Court includes the willfulness instruction. This instruction addresses all three issues the jury must resolve, and Gilead's proposal explains the relationship between two of those issues – willfulness and damages.

**ViiV's Position:** For the reasons explained above, n.2, *supra*, ViiV believes it is appropriate to instruct the jury on willfulness.  Regardless, Gilead's proposal is duplicative of language included in the "Willful Infringement" section of these instructions.  Since this issue relates to willful infringement, it is ViiV's position that this instruction is more appropriately included in that section of the instructions and should not be repeated here, similar to what this Court has done in previous cases. *See f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, No. 1:16-cv-00041-CFC, Trial Transcript at 1172:25–1173:2 (D. Del. May 2, 2019).  In both cases cited by Gilead, the Court did not instruct the jury twice on the effect of a finding of willfulness on damages as Gilead proposes the Court do here.  *See Liqwd, Inc. v. L'Oreal USA, Inc.*, No. 17-cv-00014, D.I. 1049 (D. Del. Aug. 6, 2019); *Avid Tech., Inc. v. Harmonic, Inc.*, No. 1:11-cv-01040-GMS, No. 153 (D. Del. Jan. 31, 2014).

### 3. PATENT CLAIMS

At the beginning of the trial, I gave you some general information about patents and the patent system and played you a video with a brief overview of the patent laws relevant to this case. I will now give you more detailed instructions about the patent laws that specifically relate to this case.

### 3.1. THE ROLE OF THE CLAIMS IN A PATENT

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims." The patent claims are the numbered sentences at the end of each patent. The claims are important because it is the words of the claims that define what a patent covers. Only the claims of a patent can be infringed. Neither the text preceding the claims, nor the figures in a patent can be infringed. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but the claims define the extent of the patent's coverage. Each claim may cover more or less than another claim. Only the claims define the extent of the patent's coverage; therefore, what a patent covers depends, in turn, on what its claims cover, and each of the claims must be considered individually.

### 3.2.    MEANING OF CLAIM TERMS

It is my job as the judge to provide to you the meaning of any claim language that must be interpreted. I have already defined the meaning of some of the words of the Asserted Claim in this case. These definitions have been provided to you on a chart in your juror notebooks.

You must accept the definitions I give you and use them when you decide whether any claim has been infringed. You must ignore any different definitions used by the witnesses or the attorneys. You should not take any definition of the language of the patent claims as an indication that I have a view regarding how you should decide the infringement issues you are being asked to decide. These issues are yours to decide.

For any other claim term that I have not provided a definition, you should use its ordinary meaning within the context of the patent in which the claim term is used.

## 4.    INFRINGEMENT

### 4.1.    INFRINGEMENT GENERALLY

Patent law gives the owner of a valid patent the right to exclude others from making, using, offering to sell, selling, or importing the patented invention within the United States during the term of the patent. Any person or business entity that has engaged in any of those acts without the patent owner's permission infringes the patent.

In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations." When a product meets each and every requirement of a claim, the claim is said to "cover" that product, and that product is said to "fall within the scope" of that claim.

The ownership or existence of another patent that claims the Accused Product does not automatically negate infringement of the Asserted Patent. As I will explain later in these instructions, such a patent is relevant but not dispositive to whether or not the Accused Product infringes under the doctrine of equivalents, and you may consider such a patent and the circumstances around its issuance when assessing whether the Accused Product infringes the Asserted Patent under the doctrine of equivalents.

## 4.2.   INFRINGEMENT

ViiV alleges that Gilead infringes claim 6 of the '385 patent under the doctrine

of equivalents by selling, offering to sell, and importing into the United States the

Accused Product, Biktarvy®.[7]

---

[7] **Gilead's Position:** Gilead maintains that ViiV cannot assert, and the jury should not be instructed on, infringement under the doctrine of equivalents.  That doctrine may be available where claims do not "describe" the invention "with complete precision," *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002), and so place the patent holder "at the mercy of verbalism," *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 607 (1950).  But it has no application to ViiV's claim, which perfectly defines the boundaries of the purported invention by, for example, combining closed "consisting of" language, exact chemical nomenclature, and coverage of stereoisomers.  Extending the doctrine of equivalents to such precisely drawn language would impermissibly leave the doctrine "unbounded by the patent claims."  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28-29 (1997).  For similar reasons, Gilead maintains that the language of ViiV's claim specifically excludes Gilead's accused compound as a matter of law.  *See* Doc. Nos. 257, 282.  If the Court elects to instruct the jury on the doctrine of equivalents, however, Gilead submits that the proposed language would be appropriate, subject to the foregoing objections.

**ViiV's Position:**  ViiV has long asserted infringement of claim 6 under the doctrine of equivalents, and Gilead provides no basis for excluding that theory at this late stage.  In fact, the Court has already rejected multiple prior attempts by Gilead to exclude ViiV's doctrine of equivalents theory from the case. D.I. 174 at 6 (holding that "the disclosure-dedication rule does not bar ViiV from alleging equivalence infringement of claim 6 of the #385 patent"), 12 (denying Gilead's motion to exclude the doctrine of equivalents pending claim construction of "are independently"); D.I. 352 at 6 (holding that "the specific exclusion principle does not bar ViiV from alleging that bictegravir infringes claim 6 under the doctrine of equivalents"); *see also* Claim Construction Hearing Transcript at 70:11-71:6 (Mar. 20, 2019).

To prove infringement of an asserted claim, ViiV must prove that it is more likely than not that (1) the Accused Product meets claim 6 of the '385 patent by equivalents, and (2) Gilead has imported, offered to sell, or sold the Accused Product in the United States.

A claim element is literally present if it exists in the Accused Product as it is described in the claim language. For any component of the Accused Product that does not literally infringe a particular claim element, you must decide whether it is more probable than not that the Accused Product infringes that element under the doctrine of equivalents. Here, ViiV does not allege that Gilead literally infringes claim 6 of the '385 patent.

To show infringement under the doctrine of equivalents, ViiV must show that, to a person having ordinary skill in the art, it is more likely than not that the differences between the claim element and a corresponding aspect of the Accused Product are insubstantial. One way to determine equivalence is to look at whether the corresponding aspect of the Accused Product is insubstantially different from that element in claim 6 of the '385 patent. **[ViiV's Proposal:** Another way to determine equivalence is to look at whether or not the corresponding aspect of the Accused Product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the element in the claimed invention. The role played by each claim element in the context of the specific patent claim

will inform the inquiry as to whether a substitute component substantially matches the function, way, and result of the claimed element, or whether the corresponding component plays a role insubstantially different from the claimed element.][8][**Gilead's Proposal:** If the Accused Product is missing an equivalent part

---

[8] **ViiV's Position:** ViiV's proposed jury instruction includes an accurate recitation of the perennial function-way-result test for determining infringement under the doctrine of equivalents, which Gilead's proposal omits. Contrary to Gilead's suggestion, the Federal Circuit has embraced at least two tests for the doctrine of equivalents: the function-way-result test and the insubstantial differences test. ViiV's infringement expert, Dr. Wipf, provided extensive opinions in his infringement report (*see, e.g.*, Dr. Wipf's Nov. 15. 2019 Opening Infringement Report at ¶¶ 346–352, 380–393, 407–409) regarding the function-way-result test for evaluating equivalency. In Dr. Wipf's opinion, the function-way-result test, along with the insubstantial differences test, demonstrates the equivalency between bictegravir and the elements of claim 6. Gilead has not sought to exclude those opinions and now—for the first time—seeks to preclude him from providing his function-way-result opinions to the jury. If Gilead believes ViiV's expert's function-way-result test "border[s] on the absurd," the appropriate means for excluding that testimony would have been through a *Daubert* motion or motion for summary judgment, where the Court would have been provided with a complete evidentiary record from both parties upon which it could base a decision. *Cf. Bowers v. Nat'l Collegiate Athletic Ass'n*, 563 F. Supp. 2d 508, 531 (D.N.J. 2008) ("[a]n *in limine* motion is not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence to support a particular claim or defense, because that is the function of a motion for summary judgment, with its accompanying and crucial procedural safeguards.") (quotations and citations omitted); *Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1378 (Fed. Cir. 2012) ("the district court essentially converted Meyer's motion *in limine* into a motion for summary judgment. In doing so, the court did not allow for full development of the evidence and deprived Bodum of an opportunity to present all pertinent material to defend against the dismissal of its inequitable conduct defense.").

In this case, ViiV has proffered sufficient evidence to support a finding that both tests are satisfied and, as the party that bears the burden of proof on the issue of

infringement, ViiV should be permitted to present its evidence without being restrained to a single test.  To the extent Gilead argues only the insubstantial differences test is relevant here, ViiV disagrees.  Courts routinely consider both tests in determining equivalency.  *See, e.g.*, *Tomita Techs. USA, LLC v. Nintendo Co.*, 681 F. App'x 967, 971 (Fed. Cir. 2017).  Indeed, even in the "chemical arts," Courts have relied on the function-way-result test for finding equivalency.  *See, e.g.*, *Galderma Labs., L.P. v. Amneal Pharm. LLC*, 806 F. App'x 1007, 1011–12 (Fed. Cir. 2020); *Intendis GMBH v. Glenmark Pharm. Inc., USA*, 822 F.3d 1355 (Fed. Cir. 2016); *United Therapeutics Corp. v. Sandoz, Inc.*, No. 12-cv-01617, 2014 WL 4259153, at *24–28 (D.N.J. Aug. 29, 2014).  That chemical compounds and their component parts may "have multiple different chemical and biological functions depending on the property being studied or the assay being used" is an inherent difficulty regardless of what test is used to evaluate equivalency because it divorces the asserted claim from the context required for evaluating equivalency.  As ViiV's proposal makes clear, context is required for determining equivalency.  *See Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 609 (1950) ("[w]hat constitutes equivalency ***must be*** determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect.") (emphasis added).  Unlike the aspirin and ibuprofen example proffered by Gilead below, Dr. Wipf's function-way-result articulation for claim 6 compounds accounts for substantial chemical structural changes in the context of claim 6 and the '385 patent.  *See id.* at ¶¶ 346–352.  That is, Dr. Wipf's infringement opinions are not based solely on the fact that bictegravir and claim 6 compounds are "integrase strand transfer inhibitors that act by inhibiting the integrase enzyme," but that bictegravir (and its component parts) "inhibit[] HIV integrase strand-transfer" through a "polycyclic carbamoyl pyridone scaffold that includes an oxygen-containing heterocycle . . . that interferes with HIV integrase activity."  *Id.*  And, consistent with the Federal Circuit's decision in *Aurobindo*, Dr. Wipf's articulation of the function-way-result test is capable of capturing substantial differences between claim 6 compounds and other integrase inhibitors, including the accused compound.  *See Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 869 (Fed. Cir. 2017) ("the FWR test may be less appropriate for evaluating equivalence in chemical compounds ***if*** it cannot capture substantial differences between a claimed and accused compound") (emphasis added).  For example, first-generation integrase inhibitors, raltegravir and elvitegravir, are also "integrase strand transfer inhibitors that act by inhibiting the integrase enzyme" but would not be equivalent under Dr.

Wipf's function-way-result test because they perform this function using a chemical structure substantially different from ViiV's chemical scaffold. Therefore, ViiV expects that the jury will hear its expert's function-way-result opinions and believes this accurate legal instruction is required for the jury.

**Gilead's Position**: The function-way-result test is inappropriate on the facts of this case. As the Federal Circuit has noted, "The Supreme Court was surely correct in stating that non-mechanical cases may not be well-suited to consideration under the FWR test. That seems to be particularly true in the chemical arts." *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 867 (Fed. Cir. 2017). The court explained that "[e]specially when evaluating an equivalents dispute dealing with chemical compositions having many components, chemical compounds with many substituents (which are usually claimed as separate limitations), and those having a medical or biological use, it is often not clear what the 'function' or 'way' is for each claim limitation." *Id.*; *see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39–40 (1997) (stating that there "seems to be substantial agreement that" the function-way-result test "often provides a poor framework for analyzing" non-mechanical products.) Such is the case here. Claim 6 of the '385 patent claims specific chemical compounds. These compounds and their components/substituents have multiple different chemical and biological functions depending on the property being studied or the assay being used. It is unclear in such circumstances how the function-way-result test could operate clearly on a limitation-by-limitation basis. *See PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005) (function-way-result test requires "particularized evidence and linking argument" between each component of the claimed invention and accused product). ViiV's citation to *Intendis* proves Gilead's point. What ViiV does not mention about *Intendis* is that the court went out of its way to make clear that it was not evaluating the structural similarity between the different compounds at issue immediately after reciting the function-way-result standard. *Intendis GMBH v. Glenmark Pharm. Inc., USA*, 822 F.3d 1355, 1361 (Fed. Cir. 2016) ("To be clear, we are not presented with the issue of the substantiality of the differences between the chemical structures of isopropyl myristate, triglyceride, and lecithin.").

Further, the function-way-result test is inapt here because it likely cannot capture substantial differences between the claimed and accused compounds. *E.g.*, *Aurobindo Pharma Ltd.*, 857 F.3d at 869 (illustrating that the insubstantial differences test can be more appropriate in chemical cases by explaining how aspirin and ibuprofen would seem to be equivalents under the function-way-result test

31

despite not meeting the insubstantial differences test). ViiV seeks to do exactly what the court in *Aurobindo* discussed unfavorably—confuse the jury into thinking that bictegravir is equivalent to the claim 6 compounds because they are both integrase strand transfer inhibitors that act by inhibiting the integrase enzyme rather than examine the substantial differences between the compounds.

ViiV fails to grapple with whether the function-way-result test is appropriate in this case, instead pointing to its "infringement expert's" opinions regarding the function-way-result test and noting that in other cases, courts have considered both the function-way-result and insubstantial differences test. ViiV's expert, Dr. Peter Wipf, provides only cursory opinions on the function-way-result test, as the opening reports of ViiV's three other infringement experts focus on the insubstantial differences test. Dr. Wipf's claimed function of claim 6 is either to inhibit integrase or to add three-dimensional volume or structure.  With respect to the inhibition of integrase, this is the same type of opinion that the Federal Circuit counseled against in *Aurobindo*. ViiV's recitation of the compound's structure does not add anything to this inquiry because all ViiV is pointing to are similarities between the compounds – not differences. In other words, the function-way-result inquiry they propose simply evaluates the equivalence of shared aspects of the compound – not the function of the differences between the compounds. As a result, the analysis provides no insight into whether the differences between bictegravir and dolutegravir matter, which is the central inquiry in an equivalents case.  Dr. Wipf's backup "functions" for bictegravir's A-ring border on the absurd: to exist in three dimensions or provide structure. Wipf Rep. ¶ 381 ("A POSITA would appreciate that ring A substituents provide three- dimensional volume to that region of the molecule."). Any atom exists in three dimensions and provides "structure." And again Dr. Wipf analyzes bictegravir based on the shared aspects of bictegravir and dolutegravir – not their differences.

Finally, regardless, whether Gilead sought to exclude ViiV's expert's opinions on the function-way-result test has no bearing on whether the function-way-result test is appropriate in this case. And citations to other cases (particularly non-chemical cases) are unhelpful, as which test is appropriate must be determined based on the "particular facts" of the case. *Id.* at 869–70.

32

to a certain element of the asserted patent claim (meaning that the Accused Product is not insubstantially different from any element of the asserted claim), it cannot infringe the claim under the doctrine of equivalents.][9]

Application of the doctrine of equivalents is on an element-by-element basis, meaning that for a product to infringe an asserted claim under the doctrine of equivalents, the Accused Product contains an equivalent for each element of the claim that is not literally present in the Accused Product. The question is not whether the Accused Product as a whole is equivalent to the claimed invention as a whole.

Here, Gilead has obtained its own patent claiming bictegravir. That fact is relevant but not dispositive to your determination whether the Accused Product infringes claim 6 of the '385 Patent under the doctrine of equivalents. The fact of Gilead's patent alone does not negate infringement of the Asserted Patent. In considering the issue of infringement under the doctrine of equivalents, [**Gilead proposal:** you may consider that Gilead obtained a patent on bictegravir as evidence that the differences between bictegravir and the Asserted Claim are substantial. You

---

[9] **Gilead's Position:** This language is an accurate statement of the law, helpful to the jury, and derived from jury instructions given by this Court in another doctrine of equivalents case. *f'real Food, LLC v. Hamilton Beach Brands, Inc.*, No. 1:16-cv-00041-CFC, Trial Tr. Vol. 4 at 1168 (D. Del. May 2, 2019).

**ViiV's Position:** Gilead's proposed instruction is confusing and redundant in light of the other instructions provided in this section.  Furthermore, its phrase "an equivalent part of a certain element" is vague and confusing.

may still also consider other evidence regarding whether the differences between bictegravir and the Asserted Claim are substantial.] [**ViiV proposal**: you may consider Gilead's patent, but you must still also consider other evidence and determine whether the Accused Product infringes claim 6 of the '385 patent under the doctrine of equivalents based upon the instructions I give you on the law of equivalents.][10]

---

[10] **Gilead's position**: There are two disputes concerning the proposed instruction describing the role Gilead's own patent plays in the jury's infringement determination under the doctrine of equivalents. First, ViiV opposes the language explaining why Gilead's patent is relevant: it is "evidence that the differences between bictegravir and the Asserted Claim are substantial." This language comes directly from the instruction in the Federal Circuit's *St. Gobain* decision. *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1276–77 (Fed. Cir. 2011) (separate patent "may be some evidence that the differences between the [accused product and patent claim] are substantial."). ViiV is dismissing the role that separate patentability plays in the equivalence inquiry notwithstanding the Federal Circuit's holdings to the contrary. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 493 F.3d 1368, 1379–80 (Fed. Cir. 2007) (finding of equivalency "at least considerably more difficult to make out" when accused product subject of a separate patent); *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996) (separate patent "relevant to the issue of whether the change therein is substantial); *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954 (Fed. Cir. 1993) ("Thus, the PTO must have considered the accused product to be nonobvious with respect to the patented composition. Accordingly, the issuance of that patent is relevant to the equivalence issue."); *Nomos Corp. v. BrainLAB, Inc.*, 230 F. Supp. 2d 430, 438–39 (D. Del. 2003) (separate patent "is relevant in determining whether the [accused] device is substantially different from the claimed invention"); *Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.*, No. CV 17-1734-RGA, 2021 WL 982729, at *8 (D. Del. Mar. 16, 2021) ("The fact of separate patentability is relevant, and is entitled to due weight."). Second, ViiV contends that Gilead's separate patent cannot alone be sufficient evidence of noninfringement. But the jury is entitled to find as a factual matter that Gilead's patent is itself sufficient

evidence of substantial differences between the Asserted Claim and bictegravir. The jury should not be instructed that it "must consider" other non-equivalence evidence in addition to the patent when the patent alone can suffice to prove substantial differences.

Finally, Gilead recognizes that, under current precedent, separate patentability is evidence of non-infringement, but "does not automatically avoid infringement, either literal or by equivalency." *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1191-92 (Fed. Cir. 1996). As such, Gilead does not ask for an instruction here that separate patentability demonstrates *per se* that an accused compound is not equivalent and does not infringe as a matter of law. Nevertheless, Gilead reserves its right to argue to the *en banc* Federal Circuit that *National Presto* was wrongly decided and that separate patentability is a *per se* bar to the doctrine of equivalents.

**ViiV's position:** Gilead's instruction that the jury may consider Gilead's patent "as evidence that the differences between bictegravir and the Asserted Claim are substantial" suggests an outcome to the jury (*i.e.,* that bictegravir is substantially different than the Asserted Claim) and thus threatens to give the impression that the jury must find substantial differences based on the existence of Gilead's patent. But that is not the law—as Gilead admits, the existence of its patent is not a complete defense to infringement, it is merely evidence. If Gilead's proposed instruction is adopted, it should be modified to exactly match the language from the case which Gilead cites in support. *See Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1276–77 (Fed. Cir. 2011) (separate patent "may be some evidence that the differences between the [accused product and patent claim] are substantial.").

Further, contrary to Gilead's position, ViiV's instruction does not "contend[] that Gilead's separate patent cannot alone be sufficient evidence of noninfringement." Rather, ViiV's proposed instruction accurately instructs the jury that it must consider all of the evidence in making an equivalence determination—*i.e.,* that Gilead's patent is "relevant but not dispositive," as noted in the parties' agreed-upon language in both Instructions 4.1 and 4.2. *See Siemens Med. Sols. USA, Inc.*, 637 F.3d at 1281.

### 4.3.    KNOWLEDGE OF THE PATENT AND INTENT TO INFRINGE ARE IMMATERIAL

[**ViiV's Proposal:** A party can infringe a patent without knowing of the patent or without knowing that what they are doing is patent infringement. They also may infringe a patent even though they believe in good faith that what they are doing is not an infringement of any patent. In other words, Gilead's knowledge of the asserted patent and Gilead's intent are irrelevant to your determination of infringement.][11]

---

[11] **ViiV's Position:** ViiV's proposed instruction is adapted directly from this Court's jury instruction in *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, No. 1:16-cv-00041-CFC, Trial Transcript at 1162:8-14 (D. Del. May 2, 2019).  The instruction from *f'real* has been modified to account for the fact that invalidity will not be decided by the jury in this case. ViiV's proposed instruction is a correct recitation of the law and is required to inform the jury that Gilead can infringe ViiV's patent regardless of its knowledge of the patent or intent. *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 761 n.2 (2011) ("a direct infringer's knowledge or intent is irrelevant.")  ViiV's proposed construction also makes clear that it is referring to "infringement" not "willful infringement."  Regardless of whether "Gilead's good-faith belief that its actions did not constitute patent infringement" is relevant to willfulness, Gilead's stated concern regarding confusion is addressed in the willfulness instruction.  *See* Section 4.6, *infra* ("In determining whether ViiV has proven that Gilead's infringement was willful, you must consider all of the circumstances").  And any confusion related to willfulness is substantially outweighed by the resulting confusion if the Court fails to instruct the jury that knowledge and intent are not necessary for a finding of infringement.

**Gilead's Position**: ViiV's proposed instruction introduces language not included in the instruction given by this Court in *f'real Foods*. Specifically, the Court's instruction stated that a party may infringe a patent "even though it believes in good faith the patent is invalid," not "even though they believe in good faith that what they are doing is not an infringement of any patent." *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, No. 1:16-cv-00041-CFC, Trial Transcript at 1162:8-14 (D. Del. May 2, 2019). ViiV's proposal risks confusion, as Gilead's good-faith belief that its

[**Gilead's Proposal:** The Defendant's knowledge of the asserted patent and the Defendant's intent are irrelevant to your determination of infringement.]¹²

---

actions did not constitute patent infringement *is* relevant to the question of willful infringement. *See SRI Int'l Inc. v. Cisco Sys., Inc.*, 13-cv-1534-RGA, 2020 WL 1285915, at *4 (D. Del. Mar. 18, 2020). Gilead's more concise proposal avoids any possible confusion while ensuring the jury receives the necessary instruction. It also fully apprises the jury that "knowledge and intent are not necessary for a finding of infringement," undermining ViiV's claimed prejudice.

¹² **Gilead's Position**: Gilead's proposed instruction is an accurate, concise statement of the law based on instructions given by another court in this District. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 761 n.2 (2011) ("[A] direct infringer's knowledge or intent is irrelevant."); *Pacific Biosciences of California, Inc. v. Oxford Nanopore Techs., Inc., et al.*, No. 1:17-cv-00275-LPS, D.I. 476 at 18 (D. Del. Mar. 17, 2020).

**ViiV's Position:** Gilead's proposed instruction denies the jury the necessary explanation for understanding the role of knowledge and intent in deciding the issue of infringement.  The Court should follow its previous instructions given on this same topic.

### 4.4.    [GILEAD'S PROPOSAL: LIMITATIONS ON THE DOCTRINE OF EQUIVALENTS

There are certain situations where resorting to the doctrine of equivalents to find infringement is not permitted or is limited.][13]

---

[13] **Gilead's Position**: Gilead's proposed instructions on the limitations on the doctrine of equivalents are supported by governing precedent and are adapted from model instructions and instructions given by courts in this District. Gilead's "preserving limitations" instruction (4.4.1) derives from this Court's instruction in *f'real Foods* and the Federal Circuit's opinion in *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320 (Fed. Cir. 1991). *f'Real Food, LLC v. Hamilton Beach Brands, Inc.*, No. 1:16-cv-00041-CFC, Trial Tr. Vol. 4 at 1169:15–20 (D. Del. May 2, 2019) ("You may not determine that an alternative aspect of a product is equivalent to an unmet requirement of a claim if a finding of infringement under the doctrine of equivalents would effectively eliminate that requirement."); *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1327 (Fed. Cir. 1991). That this Court denied Gilead's motion for summary judgment does not alter the requirement that the doctrine of equivalents cannot be used to eliminate claim limitations.

Gilead's "consisting of" instruction (4.4.2) derives from the American Intellectual Property Law Association's 2020 Model Patent Jury Instructions and from governing Federal Circuit Precedent. AIPLA's 2020 Model Patent Jury Instructions at 15, available online at https://www.aipla.org/docs/default-source/publications/2019-11-13---aipla-model-patent-jury-instructions.pdf?sfvrsn=1787faa5_0; *Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1382–83 (Fed. Cir. 2000). Gilead is not arguing in the context of this instruction that "consisting of" language forecloses infringement under the doctrine of equivalents as a matter of law. And Gilead never raised the "consisting of" limitation at summary judgment to argue that bictegravir avoids infringement as a matter of fact. Instead, Gilead identified this language as bearing on the legal issue of whether claim 6 specifically excluded compounds like bictegravir as a matter of law. But when the jury determines the factual issue of infringement, it should be instructed on the permissible scope of alternatives based on the claim language ViiV selected. That issue was not resolved at summary judgment. ViiV's cited authority also does not bear on the question of how "consisting of" language can limit a claim. *Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*, 738 F.2d 1237 (Fed. Cir.

1984) involves only a challenge to the lower court's award of attorney fees. *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282 (Fed. Cir. 2010) addresses whether the district court correctly found that prosecution history estoppel precluded the patentee from advancing a doctrine of equivalents theory. Neither expounds on the impact of "consisting of" claim language on the doctrine of equivalents inquiry. Gilead's proposed instructions on the limitations on the doctrine of equivalents are supported by governing precedent, and any failure to instruct the jury on these limitations would prejudice Gilead. Finally, Gilead has cited cases holding that its instruction is the law – regardless whether this precise issue has been otherwise litigated in the jury-instruction setting.

**ViiV's Position:** Gilead is attempting to resurrect noninfringement defenses it previously asserted—and this Court already rejected—during summary judgment. *See* D.I. 257 at 1–3 (asserting "where a patentee employs a broad term in one claim, but a narrower term . . . in another claim, the implication is that infringement of the second claim can be avoided by not meeting the narrower term," and that claim 6 "deploys closed 'consisting of' transition language with special meaning in patent law.") (citations omitted); D.I. 352 at 6–7 (concluding that "the specific exclusion principle does not bar ViiV from alleging that Bictegravir infringes claim 6 under the doctrine of equivalents" and that "*Malta* makes no mention of specific exclusion and has never been cited by a court for the proposition that a broader limitation in one claim specifically excludes a patentee from alleging equivalency infringement of a narrower limitation in another claim."). Gilead's proposed instructions for "Limitations on the Doctrine of Equivalents" are legal defenses to the doctrine of equivalents for the Court to decide, not the jury. Indeed, regarding Gilead's "Preserving Limitations" instruction, the law is clear that claim vitiation is a legal defense to the doctrine of equivalents. *See, e.g.*, *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998) ("If a theory of equivalence would vitiate a claim limitation, however, then there can be no infringement under the doctrine of equivalents as a matter of law.") Notably, the model instructions Gilead cites only provide two limitations on the doctrine of equivalents and explicitly state that those limitations are "determined by the Court" "as a matter of law." *See* AIPLA's 2020 Model Patent Jury Instructions at 16–17. Other model jury instructions have completely removed instructions addressing limitations on the doctrine of equivalents for the same reason. *See* Fed. Cir. Bar. Association Model Patent Jury Instructions at 23 (May 2020) ("This instruction has been removed, as the applicability of these limitations is ultimately decided by the Court."). Given the legal nature of Gilead's defenses, it is not surprising that "this precise issue has [not]

### 4.4.1. [GILEAD'S PROPOSAL: PRESERVING LIMITATIONS

The doctrine of equivalents cannot be used to expand a claim so broadly that it effectively eliminates a limitation of that claim altogether. Accordingly, where a patentee employs a broad term in one claim, but a narrower term in another claim, the implication is that infringement of the second claim can be avoided by not meeting the narrower term.]

---

been otherwise litigated in the jury-instruction setting."  Additionally, ViiV is only asserting claim 6 of the '385 patent.  The jury should not be instructed to compare the scope of claim 6 to the scope of other non-asserted, non-construed claims in the patent.

Regarding Gilead's "'Consisting Of' Claims" instruction, Gilead has already raised this defense in its motion for summary judgment, which the Court denied.  *See* D.I. 257 at 1–3 (asserting that claim 6 "deploys closed 'consisting of' transition language with special meaning in patent law.").  But the law does not prevent a patentee from asserting equivalents on claims reciting "consisting of."  *See Bayer Aktiengesellschaft v. Duphar Int'l. Research B.V.*, 738 F.2d 1237 (Fed. Cir. 1984); *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282 (Fed. Cir. 2010).  Indeed, the Court in *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377 (Fed. Cir. 2000) (cited by Gilead) agreed on this point.  *See id.* at 1383 ("the drafter's choice of the phrase 'consisting of' does not foreclose infringement under the doctrine of equivalents").  Tellingly, Gilead fails to identify a single jury instruction from any judicial district providing Gilead's proposed "Consisting Of" instruction to a jury to limit the doctrine of equivalents.  Whether claim 6's use of "consisting of" "limits the range of equivalents" in a way to preclude Gilead's bictegravir is an issue the Court has already correctly decided.

Therefore, the Court should not instruct the jury on Gilead's failed legal defenses that the jury will not—and cannot—decide.

40

### 4.4.2. [GILEAD'S PROPOSAL: "CONSISTING OF" CLAIMS

Claim language can limit the range of equivalents. The preamble to claim 6 uses the phrase "A compound selected from the group consisting of." The phrase "consisting of" means "including the following and excluding others." Although this language does not foreclose infringement under the doctrine of equivalents, it emphasizes the claim's specific limitation to the structures recited.

Similarly, if you find that Gilead's product includes all of the elements in claim 6, either literally or by equivalents, and that Gilead's product includes additional components, you must find that Gilead's product does not infringe claim 6.]

**4.5.      [GILEAD'S PROPOSAL: SAFE HARBOR**

Gilead's making or using dolutegravir during its research development program does not infringe Plaintiffs' patent if Gilead had a reasonable basis for believing that use of the patented invention might yield information that would be appropriate to include in a submission to the U.S. Food and Drug Administration.][14]

---

[14] **Gilead's Position**: Gilead expects that the jury will hear testimony about Gilead's use of dolutegravir during its development of bictegravir. This instruction ensures the jury will not find Gilead liable of patent infringement on that basis, as such conduct does not constitute patent infringement. 35 U.S.C. § 271(e); *Merck KGaA v. Integra Lifesciences I Ltd.*, 545 U.S. 193, 206 (2005); *Momenta Pharm., Inc. v. Amphastar Pharm., Inc.*, 686 F.3d 1348, 1356–57 (Fed. Cir. 2012). It is also important for the jury to understand that U.S. patent law encourages researchers to use patented inventions to develop important new medical therapies. The instruction is necessary to provide context to the fact that Gilead synthesized dolutegravir during its research and development of bictegravir. This conduct is specifically protected by U.S. patent law, and the instruction is warranted to rebut any suggestion by ViiV that this aspect of Gilead's conduct was untoward or supports a finding of willfulness. Gilead is not arguing that the safe-harbor provision is a defense to any alleged infringement occurring after FDA approval, and the instruction cannot be fairly read to imply that. Further, the risk of juror confusion is higher if the jury is unaware that Gilead's pre-FDA approval activity was entirely consistent with the law. Gilead expects ViiV to argue that there was something untoward about Gilead's synthesis of dolutegravir during the development of bictegravir even though that is statutorily protected activity. Though ViiV contends that it is not asserting that Gilead's manufacture and use during research and development infringed the '385 patent, it refused to agree to a stipulation saying as much.

**ViiV's Position:** ViiV is not asserting that Gilead's manufacture and use of dolutegravir during research and development infringed the '385 patent. Therefore, this instruction is irrelevant to any issue the jury will be asked to decide and will confuse the jury. And even if Gilead's manufacture and use of dolutegravir "to develop important new medical therapies" "is specifically protected by U.S. patent law," the safe harbor provision of 35 U.S.C. § 271(e) does not excuse or otherwise

### 4.6.     WILLFUL INFRINGEMENT[15]

In this case, ViiV alleges both that Gilead infringed and, further, that Gilead willfully infringed the '385 patent. If you determine that claim 6 is infringed, you must go on and address the additional issue of whether or not the infringement was willful.

Willfulness requires you to determine whether ViiV has proven that it is more likely than not that Gilead had knowledge of the '385 patent and that Gilead **[ViiV's Proposal:** infringed intentionally or acted with reckless disregard of or deliberate indifference to the '385 patent.   An accused infringer's knowledge of a patent, without more, is insufficient to establish willfulness.   However, you may find that

---

justify Gilead's copying and willful infringement of Plaintiffs' patented compounds, either before or after FDA approval.  Allowing Gilead to argue otherwise with this instruction will create jury confusion and is prejudicial to ViiV.  Additionally, Gilead has failed to identify any jury instruction from any judicial district adopting its proposed instruction.  In response to Gilead's stipulation comment, ViiV does not believe it is necessary or efficient for the parties to stipulate to every allegation and defense that is not being advanced—or even alleged—in this case.

[15] **Gilead's Position:** For the reasons explained above, n.2, *supra*, Gilead believes it is inappropriate to instruct the jury on willfulness. Gilead conditionally agrees to a proposed instruction on willfulness subject to the competing proposals detailed throughout this instruction 4.6, in the event the Court permits willfulness to go to the jury.

**ViiV's Position:** For the reasons explained above, n.2, *supra*, ViiV believes it is appropriate to instruct the jury on willfulness.

Gilead's actions were willful if it acted in reckless disregard of, or with deliberate indifference to, ViiV's '385 patent rights, or if Gilead was willfully blind to ViiV's '385 patent rights.  To demonstrate such reckless disregard, ViiV must persuade you that Gilead actually knew, or it was so obvious that Gilead should have known, that its actions constituted infringement of a valid and enforceable patent.][16][**Gilead's Proposal:** intentionally infringed it.

---

[16] **ViiV's Position:** ViiV's instruction properly instructs the jury regarding reckless disregard and willful blindness, whereas Gilead's does not (instead, Gilead's instruction elevates the standard to "deliberate and intentional").  In *SRI Int'l, Inc. v. Cisco Sys., Inc.*, the Federal Circuit simply clarified that the upper threshold for willful infringement is not "wanton, malicious, and bad faith behavior," (which instead "refers to 'conduct warranting enhanced damages,'"); but is rather "***no more than*** deliberate or intentional infringement."  2021 WL 4434231, at *4 (Fed. Cir. Sept. 28, 2021) (emphasis added) (citing *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020); *Halo*, 136 S. Ct. at 1933). Indeed, Federal Circuit precedent makes clear that willful infringement is not limited to "deliberate and intentional" conduct.  For example, in *Arctic Cat*, the Federal Circuit "reject[ed] [the defendant's] argument that the district court's jury instruction was erroneous. The district court instructed the jury that as to willful infringement, 'Arctic Cat must prove … that BRP actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.'"  *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017), *cert. denied*, 139 S. Ct. 143 (2018).  That "should have known" standard is broader than only "deliberate and intentional" conduct: it includes recklessness and willful blindness.

Moreover, the Federal Circuit has addressed jury instructions on willful infringement and affirmed that subjective willfulness is the correct instruction. *See*, *e.g.*, *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 970 (Fed. Cir. 2018); *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017). In *Halo*, the Supreme Court stated that the subjective willfulness standard requires "that the risk of infringement 'was either known or so obvious that it should

For example, you may consider whether Gilead's behavior was deliberate or intentional. However, you must not find that Gilead's infringement was willful merely because Gilead knew about the patent, without more.][17]

---

have been known to the accused infringer.'" *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1930 (2016). ViiV's willful infringement instruction is consistent with previous jury instructions given in this District post-*Halo*. *See, e.g.*, *Int'l Bus. Machines Corp. v. Groupon, Inc.*, No. 16-cv-00122-LPS, Trial Transcript at 1189:12-17 (D. Del. July 25, 2018). For the reasons explained in n.22 , *infra*, Gilead is incorrect that ViiV's instruction "minimizes its burden to prove willfulness."

**Gilead's Position**: ViiV's proposed instruction minimizes its burden to prove willfulness and is legally incorrect. In *Halo*, the Supreme Court "rejected the objective recklessness requirement" but "did not disturb the substantive standard for subjective willfulness." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 20-11685, slip op. at 6-7 n.1 (Fed. Cir. Sept. 28, 2021). As a result, the standard for willfulness requires finding "deliberate or intentional infringement." *Id.* at 10. Indeed, ViiV's proposed instruction is out-of-step with even the caselaw and instructions it cites. *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 970 (Fed. Cir. 2018) (jury was instructed pre-*Halo*, court evaluated whether infringement was "known or so obvious that it should have been known"); *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (jury instructed that "Arctic Cat must prove by clear and convincing evidence that BRP actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent) (emphasis omitted); *Int'l Bus. Machs. Corp. v. Groupon, Inc.*, No. 16-cv-00122-LPS, Trial Tr. at 1889:12–17 (D. Del. July 25, 2018) (including, after ViiV's proposed language, the following sentence: "An accused infringer's knowledge of a patent, without more, is insufficient to establish willfulness."). The Court should reject ViiV's proposal and adopt Gilead's proposal, which, as explained below, is consistent with Supreme Court precedent and instructions given in patent cases in this District.

[17] **Gilead's Position**: Gilead's proposed language is consistent with the Supreme Court's description of what is required to establish willful infringement and tracks the instructions given by courts in this District, including this Court. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933, 195 L. Ed. 2d 278 (2016); *Roche*

In determining whether ViiV has proven that Gilead's infringement was willful, you must consider all of the circumstances **[ViiV's Proposal:** and assess Gilead's knowledge at the time the challenged conduct occurred. Your determination of willfulness should incorporate the totality of the circumstances based on the evidence presented.  Willfulness can be established by circumstantial evidence.   Indeed, because direct evidence of wrongful conduct may be rare, circumstantial evidence may be the best evidence available.**]**[18]**[Gilead's Proposal:** surrounding the alleged infringement, including:

_____

*Diagnostics Corp. v. Meso Scale Diagnostics*, No. 1:17-cv-00189-LPS, D.I. 274 at 49 (D. Del. Nov. 25, 2019); *f'real Food, LLC v. Hamilton Beach Brands, Inc.*, No. 1:16-cv-00041-CFC, Trial Tr. Vol. 4 at 1172 (D. Del. May 2, 2019). Gilead's proposed instruction likewise tracks the Federal Circuit's most recent opinion "eliminat[ing] the confusion" over what must be shown to prove willfulness. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 20-11685, slip op. at 10 (Fed. Cir. Sept. 28, 2021) ("As we said in *Eko Brands*, '[u]nder *Halo*, the concept of 'willfulness' requires a jury to find no more than deliberate or intentional infringement.'"). Finally, ViiV's proposed instruction does not describe a recklessness standard, instead substituting one for negligence, *i.e.*, what Gilead "should have known."

**ViiV's Position:** ViiV disagrees that the standard for a jury finding of willful infringement requires Gilead to engage in "deliberate and intentional" conduct. While such conduct would be sufficient to establish willful infringement, it is not necessary to do so.  Rather, all that is required is that Gilead acted recklessly.  *See supra* n. 21.

[18] **ViiV's Position:** ViiV believes this instruction is necessary because as stated in *Halo*, "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct."  *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933 (2016).  Also, should Gilead be permitted to provide argument, testimony, evidence, or examination about Gilead's '996 patent, ViiV would seek to

46

1. Whether Gilead reasonably believed that it acted consistently with the standards of behavior for its industry;

2. Whether Gilead intentionally copied a product of Plaintiff's that is covered by the patents in-suit;

3. Whether Gilead reasonably believed it did not infringe;

---

add the following to its proposed willfulness instruction: "You have heard evidence that Gilead has its own patent, the '996 patent, that allegedly covers bictegravir. Whether Gilead has its own patent or patents in the same field as the asserted patent is not relevant to determining whether Gilead willfully infringed." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1309 (Fed. Cir. 2001) ("The fact that Medtronic's '556 patent might read on the Falcon catheter [accused product] is ***totally irrelevant*** to the question of whether Medtronic ***willfully*** infringed another patent."). Instructing the jury that Gilead's patent is relevant to willful infringement, is prejudicial, reversible, and highly confusing to the jury.

**Gilead's Position**: Gilead's proposed language, which instructs the jury to consider, among other factors, whether Gilead "reasonably believed it did not infringe or that the asserted patent was invalid," addresses the issue of Gilead's knowledge at the time of the challenged conduct. In addition, ViiV provides no support for its instruction. The case that ViiV cites in support concerns literal infringement, not infringement under the doctrine of equivalents. *See Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1306 (Fed. Cir. 2001). On willfulness, the Federal Circuit held in *Advanced Cardiovascular* that the defendant could not introduce patents that covered "features" of the accused product. *Id.* at 1302, 1309. Gilead's patent covers the entire compound that ViiV accuses of infringement, and Gilead obtained that patent after disclosing ViiV's asserted patent to the United States Patent and Trademark Office. Such a fact is relevant to the totality of the circumstances surrounding Gilead's state of mind when evaluating whether it willfully infringed under the doctrine of equivalents. The Court should reject ViiV's alternative instruction.

4. Whether Gilead made a good-faith effort to avoid infringing the asserted patents, for example, whether Gilead attempted to avoid infringement by designing around the patent claims, even if that attempt was unsuccessful; and

5. Whether Gilead tried to cover up its infringement.][19]

---

[19] **Gilead's Position**: Gilead's proposed language will assist the jury in its evaluation of willful infringement by providing it with a list of non-exclusive factors to consider and is consistent with Federal Circuit precedent regarding mitigating factors that the jury must take into account. *See Toro Co. v. Ariens Co.*, 232 F.3d 915 (Fed. Cir. 2000) (table). In fact, the Federal Circuit recently affirmed jury instructions containing the same illustrative factors for the jury to assess whether the defendant had the requisite state of mind to establish willful infringement. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. 20-11685, slip op. at 4-5(Fed. Cir. Sept. 28, 2021). The only modification is to make clear that the focus is on Gilead's intention rather than objective standards regarding industry behavior. Providing the jury with a list of non-exclusive factors after instructing it to consider all circumstances that could bear on willful infringement in no way suggests to the jury that there is a limit on the facts it should consider when evaluating willful infringement and will cause no confusion. In fact, Gilead's proposal is consistent with instructions given by this Court, *f'real Food, LLC v. Hamilton Beach Brands, Inc.*, No. 1:16-cv-00041-CFC, Trial Tr. Vol. 4 at 1172 (D. Del. May 2, 2019), and by other Courts in the District. *Cirba, Inc. d/b/a Densify et al. v. VMware, Inc.*, No. 1:19-cv-00724-LPS, D.I. 526 at 35 (D. Del. Jan. 22, 2020). ViiV's threat of "further disputes" is not a basis on which to reject Gilead's well-supported proposal. Finally, because the jury will already be instructed that any fact can be proven through direct versus circumstantial evidence in Instruction No. 10, it is unnecessary to repeat that standard for willfulness.

**ViiV's Position:** Gilead's proposed language will lead to jury confusion because it attempts to limit the facts the jury should consider when evaluating willful infringement. Explicitly listing factors will at a minimum prejudicially focus the jury attention on only those factors.  As stated earlier in the same instruction, the jury "must consider *all* of the circumstances" when evaluating Gilead's conduct, not just the circumstances Gilead wishes to emphasize.  Gilead's reliance on *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 2021 WL 4434231, at *4 (Fed. Cir. Sept. 28, 2021) is misplaced. There, the Federal Circuit made clear that "[t]he jury was instructed under the

If you do decide that there was willful infringement, that decision must not affect any damages award you give in this case.

---

*Seagate* willful infringement standard," the Supreme Court since issued *Halo*, and "neither party ever challenged [the jury instruction] on appeal." *Id.* at n.1, *2. Despite this, and "[b]ased on [those] unchallenged jury instructions, [the Federal Circuit] presume[d] that the jury found that Cisco knew of the patent, took action to encourage its customers to infringe, and knew that its customers actions (if taken) would infringe." *Id.* at *4. Furthermore, Gilead's proposed instruction presupposes that its listed factors will actually be presented to the jury. Adoption of Gilead's proposed instructions will lead to further disputes between the parties regarding which facts were actually presented to the jury and which facts should be highlighted in this instruction. These issues can be resolved by rejecting Gilead's proposed instruction. Courts in this District routinely provide willfulness instructions that omit explicit factors for the jury to consider. *See, e.g.*, *Int'l Bus. Machines Corp. v. Groupon, Inc.*, No. 16-cv-00122-LPS, Trial Transcript at 1189:8–1890:4 (D. Del. July 25, 2018).

## 5.    DAMAGES

### 5.1.    DAMAGES GENERALLY

I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case on any issue.

Any damages you award must be adequate to compensate ViiV for any infringement you determine to have occurred. Damages are not meant to punish an infringer. Your damages award, if you reach this issue, should put ViiV in approximately the same financial position that it would have been in had the infringement not occurred.

ViiV has the burden to establish the amount of its damages by a preponderance of the evidence. While ViiV is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork. In other words, you should award only those damages that ViiV established that it more likely than not suffered.

There are different types of damages that ViiV may be entitled to recover. In this case, ViiV seeks lost profits and a reasonable royalty. Lost profits consist of any actual reduction in business profits ViiV can prove it has suffered as a result of Gilead's alleged infringement. A reasonable royalty is defined as the amount of

money that ViiV, on the one side, and Gilead, on the other side, would have agreed upon as a fee for the use of the invention before the infringement began.

I will give you more detailed instructions regarding damages shortly. If you find that claim 6 is infringed, then you must consider what amount of damages to award ViiV. If you find that the asserted patent claim is not infringed, then you should not consider damages in your deliberations.

## 5.2.    LOST PROFITS—"BUT FOR" TEST

In this case, ViiV seeks to recover lost profits for the sales of its products as a result of some of Gilead's sales of the Accused Product and, where lost profit damages are not available, a reasonable royalty. To recover lost profits, ViiV must show a causal relationship between the infringement and ViiV's loss of profit. In other words, ViiV must show that, but for the infringement, there is a reasonable probability that ViiV would have earned higher profits. To show this, ViiV must show that it is more likely than not that, if there had been no infringement, ViiV would have made at least some portion of the sales that Gilead made of its product.

[**Gilead's Proposal:** The Plaintiffs must support their lost profits analysis with sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture. It is important to remember that the profits I have been referring to are the profits allegedly lost by Plaintiffs, not the profits, if any, made by Gilead on sales of Biktarvy®.]

[**ViiV's Proposal:** It is important to note that the "but-for" test uses a hypothetical market where Biktarvy® is not available to evaluate the profits ViiV would have made if Biktarvy® had never been sold. There is no requirement that

ViiV present evidence that Biktarvy® could or would have been held off the market

in the real world.][20]

---

[20] **ViiV's Position:**  Gilead's proposal will lead to jury confusion.  The Federal Circuit in *Grain Processing* used the phrase, "sound economic proof of the nature of the market," to refer to the type of proof needed to show lost sales within the but-for market.  *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).  ViiV's proposed instruction sets forth the proof required to establish lost profits, rendering Gilead's proposal redundant.  In addition, Gilead seeks to use the *Grain Processing* language out of context to read in an additional requirement of proof that the infringing product could have actually been withheld from the real world market.  *See* D.I. 340.  There is no such requirement, as the but-for market assumes a world without the infringing product.  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995).  Thus, ViiV's proposal should be adopted to clarify that there is no requirement to prove that the infringing product could have actually been withheld from the real world market.

**Gilead's Position**: Gilead's proposed language is consistent with Federal Circuit precedent, which makes clear that the Plaintiffs must present "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1379 (Fed. Cir. 2015) (quoting *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999)). Providing the jury with instructions that accurately state the law will not lead to jury confusion. The law is similarly clear that lost profits refer to the profits lost by the patent holder, *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007), and courts in this District instruct juries accordingly. *Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, No. 16-cv-284-LPS-CJB, D.I. 442 at 52 (D. Del. Jan. 23, 2019); *Pacific Biosciences of California, Inc. v. Oxford Nanopore Techs., Inc., et al.*, No. 1:17-cv-00275-LPS, D.I. 476 at 39 (D. Del. Mar. 17, 2020). ViiV's proposed language goes beyond setting forth the proof required to establish lost profits and attempts to usurp the jury's factfinding role by instructing that the jury should not consider whether ViiV would have held Biktarvy off the market. ViiV must establish the economic plausibility of the but-for world constructed by its damages expert Mr. Sims. D.I. 351. And Gilead may introduce evidence that Mr. Sims's but-for world is unduly speculative, including by introducing evidence and testimony that ViiV would not have kept Biktarvy® off the market. *Grain Processing Corp.*, 185 F.3d at 1350. In

ViiV is entitled to lost profits if it establishes each of the following:

1.      There was a demand for the patented product;

2.      There were no acceptable, non-infringing alternatives to the patented inventions that were available to Gilead or its customers;

3.      ViiV had the manufacturing and marketing capacity to make any infringing sales actually made by Gilead and for which ViiV seeks an award of lost profits—in other words, that ViiV was capable of satisfying the demand; and

4.      The amount of profit that ViiV would have made if Gilead had not infringed.

---

short, the unique nature of the HIV market and ViiV's decision not to seek an injunction in this case is directly relevant to the feasibility of Mr. Sims's but-for world. Gilead's proposal is an accurate statement of the law and should be adopted.

## 5.3.    LOST PROFITS—DEMAND

Demand for the patented product can be proven by significant sales of a patented product or significant sales of an infringing product containing the patented features.

## 5.4.   LOST PROFITS—NONINFRINGING SUBSTITUTES

[**ViiV's Proposal:** In order for a product to be an "acceptable, noninfringing substitute" it must: (1) have the advantages of the patented invention that were important to people who purchased the Accused Product; (2) not infringe the Asserted Patent; and (3) have been available at the time of the infringement. Gilead bears the burden of showing that an acceptable, non-infringing alternative was available.

If purchasers of the Accused Product were motivated to buy the Accused Product because of features covered by the Asserted Patent, then some other product that does not include those patented features is not an "acceptable, noninfringing substitute," even if it otherwise competed with the patented and Accused Product.

If Gilead can prove that acceptable, non-infringing alternatives existed in the marketplace and would likely have captured some of the sales made by Gilead, then ViiV is entitled to lost profits in proportion to what its market share would have been in the hypothetical market absent infringement.][21]

---

[21]**ViiV's Position:** ViiV disagrees with Gilead's attempt to leave out discussion of the burden of producing evidence of acceptable non-infringing alternatives to rebut ViiV's claim of lost profits. *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 117 (D. Del. 2016) ("One way that an accused infringer can rebut a patent owner's claim for lost sales is by presenting evidence of available non-infringing alternatives."). This is particularly important in this case, as Gilead did not submit affirmative expert testimony supporting non-infringing alternatives.

**[Gilead's Proposal:** In order for a product to be an "acceptable, noninfringing substitute" it must: (1) have had one or more of the advantages of the patented

---

**Gilead's Position**: If the Court accepts ViiV's proposal, Gilead requests that the Court omit the final paragraph and ViiV's proposed language stating that "Gilead bears the burden of showing that an acceptable, non-infringing alternative was available." ViiV's proposed language improperly attempts to shift its burden of establishing the absence of acceptable non-infringing substitutes to Gilead. *Panduit* and ensuing Federal Circuit precedent are clear that ViiV bears the burden of establishing each element of its alleged lost profits damages, including the *Panduit* factor "absence of acceptable non-infringing substitutes." *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978) ("To obtain as damages the profits on sales he would have made absent the infringement . . . a patent owner must prove: . . . (2) absence of acceptable noninfringing substitutes."); *Presidio Components, Inc. v. American Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017). That "an accused infringer can rebut a patent owner's claim for lost sales [] by presenting evidence of available non-infringing alternatives" does not change the fact that the patent owner holds the burden to show it would have made the asserted sales by establishing the *Panduit* factors. *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 117 (D. Del. 2016).

If the Court elects to include a paragraph regarding market share in this instruction, Gilead further requests that the Court alter it to read: "If ViiV cannot prove the absence of acceptable non-infringing alternatives that would likely have captured some of the sales made by Gilead, then ViiV may meet its burden of proof by establishing profits in proportion to what its market share would have been in the hypothetical market absent infringement." Again, Federal Circuit law is clear: The patentee bears the burden of proof for the second *Panduit* factor, which it must meet *either* by proving the absence of acceptable non-infringing alternatives *or* by proving its market share among its competitors. *Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 518–19 (D. Del. 2017) (Bryson, J.) ("The market share approach allows a patentee to 'satisfy the second Panduit element by substituting proof of its market share for proof of the absence of acceptable alternatives . . . .'" (*quoting BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1219 (Fed. Cir. 1993)).

invention that were important to people who purchased the Accused Product; (2) not infringe the Asserted Patent; and (3) have been available during the damages period.

If the realities of the marketplace are such that Gilead's sales would not have been made by the Plaintiffs, despite a difference in the products, then Plaintiffs are not entitled to lost profits on those sales.][22]

---

[22] **ViiV's Position:** First, as described above, Gilead's proposal improperly leaves out discussion of the burden of producing evidence of acceptable non-infringing alternatives.  Second, Gilead's addition of "one or more" before "the advantages of the patented invention" is confusing and unnecessary.  *See Hologic Inc. v. Minerva Surgical, Inc.*, 1:15-cv-01031-JFB-SRF, Dkt. No. 485 (D. Del. July 17, 2018). Lastly, the final paragraph of Gilead's proposal attempts to explain the market share approach to lost profits but is likely confusing.  ViiV's proposal uses clearer language that tracks Federal Circuit precedent.  *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989).

**Gilead's Position:** Gilead's proposal is an accurate, concise statement of the law. As described above, ViiV's proposal improperly attempts to shift its burden to prove the absence of noninfringing substitutes to Gilead. There is no need to reiterate that burden in this instruction because Instructions 5.1 and 5.2 sufficiently explain ViiV's burden with respect to damages, but Gilead does not object to the inclusion of additional language in Instruction 5.4 reiterating ViiV's burden. Further, Gilead's proposed language is not confusing, as evidenced by the fact that it is based on instructions commonly given in this district. *Pacific Biosciences of California, Inc. v. Oxford Nanopore Techs., Inc., et al.*, No. 1:17-cv-00275-LPS, D.I. 476 at 42 (D. Del. Mar. 17, 2020); *Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, No. 16-cv-284-LPS-CJB, D.I. 442 at 55 (D. Del. Jan. 23, 2019); *Ateliers De La Haute-Garonne v. Broetje Automation-USA Inc.*, No. 09-cv-598-LPS, D.I. 442 at 55 (D. Del. Jan. 23, 2019). In fact, the final paragraph of Gilead's instructions is identical to language in the instructions given in those cases and even appears in the "Non-Infringing Substitutes" instruction cited by ViiV. *See Hologic Inc. v. Minerva Surgical, Inc.*, 1:15-cv-01031-JFB-SRF, D.I. 485, at 19 (D. Del. July 17, 2018). Further, that language is in line with Federal Circuit precedent. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991) ("[I]f

the realities of the market are that others would likely have captured sales made by the infringer, despite a difference in the products, it follows that the 'but for' test is not met.").

## 5.5.    LOST PROFITS—CAPACITY

This factor asks whether ViiV had the manufacturing and marketing capacity to make the sales it said it lost due to Gilead's infringement. This means ViiV must prove it is more probable than not that it could have made and sold, or could have had someone else make and sell for them, the additional products it says it could have sold but for the infringement.

## 5.6.      LOST PROFITS—AMOUNT OF PROFIT

A patent holder may calculate its lost profits on lost sales by computing the lost revenue for sales it claims it would have made but for the infringement and subtracting from that figure the amount of additional costs or expenses it would have incurred in making those lost sales, such as cost of goods, sales costs, packaging costs, and shipping costs. Certain fixed costs that do not vary with increases in production or scale, such as taxes, insurance, rent, and administrative overhead, should not be subtracted from a patent holder's lost revenue.

[**Gilead's Proposal:** Plaintiffs seek only the profits lost by named Plaintiff ViiV Healthcare UK (No. 3) Limited. Plaintiffs may not be compensated for lost profits of any of their affiliates or subsidiaries.][23]

---

[23] **Gilead's Position**: Gilead's proposed instruction is accurate: Plaintiffs seek only the profits lost by ViiV Healthcare UK (No. 3) Limited, *see, e.g.*, D.I. 332 Ex. A (Sims Report) ¶¶83, 101, 109, 114, 115, 141, 143, 150, and Plaintiffs are not entitled to the lost profits, if any, of their affiliates and subsidiaries. *See Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 604–05 (D. Del. 2007).

**ViiV's Position**:  Gilead's proposed instruction is incorrect, unnecessary, and potentially confusing.  ViiV is entitled to any lost profits directly suffered by any plaintiff that may be proved at trial.  ViiV has not limited its determination of lost profits (in the form of both lost sales and price erosion) to any particular plaintiff. D.I. 332 at Ex. A (Sims Report) ¶¶64-69, 72-84, 88-93.  Gilead has no basis for limiting lost profits to only one plaintiff.

## 5.7.    LOST PROFITS—MARKET SHARE

If a patent holder establishes it would have made some, but not all, of an alleged infringer's sales but for the infringement, the amount of sales that the patent holder lost may be shown by proving the patent holder's share of the relevant market, excluding infringing products. A patent holder may be awarded a share of profits equal to its market share even if there were noninfringing substitutes available. In determining a patent holder's market share, the market must be established first, which requires determining which products are in that market. Products are considered in the same market if they are considered "sufficiently similar" to compete against each other.  Two products are sufficiently similar if they do not have significantly different prices or characteristics.

## 5.8.      LOST PROFITS – PRICE EROSION

ViiV can recover additional damages if it can establish that it is more likely than not that, if there had been no infringement, ViiV would have been able to charge higher prices for its products. A price erosion analysis should consider the effect of a higher price on demand for the product as well as the impact of acceptable non-infringing substitutes on the market. If price erosion is established, you may award as additional damages the difference between:

1. the amount of profits ViiV would have made by selling its products at the higher price; and

2. the amount of profits ViiV actually made by selling its products at the lower price ViiV actually charged for its products.

This type of damage is referred to as price-erosion damage.

If you find that ViiV suffered price erosion, you may also use the higher price in determining ViiV's lost profits from sales that were lost because of the infringement. In calculating ViiV's total losses from price erosion, you must take into account any drop in sales that would have resulted from charging a higher price.

You may also award as damages the amount of any increase in ViiV's costs, such as additional marketing costs, caused by competition from the infringing product.

### 5.9.     REASONABLE ROYALTY—ENTITLEMENT

If you find that ViiV has not proved its claim for lost profits, or have proved its claim for lost profits for only a portion of the infringing sales, then you may award ViiV a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages.

## 5.10.    REASONABLE ROYALTY AS A MEASURE OF DAMAGES

A royalty is a payment made to a patent holder in exchange for the right to make, use, sell, offer to sell, or import the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and the infringer would have agreed to in a hypothetical negotiation taking place at a time just prior to when the infringement first began. In considering this hypothetical negotiation, you should focus on what the expectations of ViiV, on the one side, and Gilead, on the other side, would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed the patent was valid and infringed, and the patent holder and infringer were willing to enter into an agreement. The relevant date for the hypothetical license negotiation is on or about February 7, 2018.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from the hypothetical negotiation.

## 5.11.    FACTORS FOR DETERMINING A REASONABLE ROYALTY

In determining the reasonable royalty, you should consider all of the facts known and available to the parties at the time that the infringement began. Some of the kinds of factors that you may consider in making your determination are:[24]

---

[24] **ViiV's Position**:  In the 16 *Georgia-Pacific* factors below, ViiV's proposals reflect the language actually used in the *Georgia-Pacific* case itself and by both parties' economic experts in this case.  *See Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified sub nom*, *Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971).  On the other hand, Gilead's proposals make either arbitrary or self-serving changes to the language of the factors that differ from the language used in the *Georgia-Pacific* case.  In addition, the language ViiV proposes reflects the wording used by the experts in this case, including Gilead's own economic expert, Dr. Christopher Vellturo, in his report.  *See* D.I. 212 at Ex. Q (Vellturo Report) ¶¶ 390-480.  The use of inconsistent terminology to describe the same concepts will be potentially confusing to the jury.

With regard to Factor 12, Gilead provides no basis for the apparent prejudice it would suffer from instructing the jury on the complete set of *Georgia-Pacific* factors.  ViiV's proposal is a complete and accurate statement of the law.

**Gilead's Position**:  Gilead's proposals are substantively identical to the language proposed by ViiV, used in the *Georgia-Pacific* case, and used by both parties' economic experts. Gilead's proposed changes are not "arbitrary" or "self-serving;" they are intended to help the jury better understand and apply the factors in the context of this case. For example, it is easier to understand what is meant by "achieving similar results" than "working out similar results; it is similarly easier to understand what is meant by preserving "exclusivity" than preserving a "monopoly;" and "components" is a better fit than "elements" when describing a multi-drug product. That Gilead's proposals are not word-for-word identical to the language used by its expert is immaterial; ViiV's proposed language is similarly not word-for-word identical to the language used by its expert, Mr. Raymond Sims.

Gilead specifically rejects ViiV's proposal regarding Factor 12 because it raises issues that are not relevant in this case. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773

1.     The royalties, if any, received by ViiV for the licensing of the Asserted Patent, proving or tending to prove an established royalty;

2.  The royalties, if any, Gilead paid to license other patents comparable to the Asserted Patent;

3.  The nature and scope of the license, such as whether the license is exclusive or non-exclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold;

4.  The utility and advantages of the patented property over the old modes or devices, if any, that had been used for **[ViiV's Proposal:** working out**][Gilead's Proposal:** achieving**]** similar results;

---

F.3d 1201, 1231–32 (Fed. Cir. 2014) (explaining that a district court should instruct the jury on only those factors relevant on the record before it). In his analysis of this *Georgia Pacific* factor, ViiV's damages expert Mr. Sims offers no opinions whatsoever regarding "the existing value of the invention to ViiV as a generator of sales of its own non-patented items; and the extent of such collateral sales." D.I. 332 Ex. A (Sims Report) ¶¶151–53. Therefore, it would be confusing and unhelpful to the jury, and unduly prejudicial to Gilead, to instruct the jury on these aspects of Factor 12. Specifically, it would be prejudicial to Gilead to include an instruction that suggests ViiV is entitled to additional damages in the form of collateral sales when its damages expert makes no such claim. And to the extent there is any evidence in the record regarding "the effect of selling the patented product in promoting the sales of other products by Gilead," it is undisputed that Gilead diverted sales of its other products by selling Biktarvy®. *E.g.* D.I. 332 Ex. A (Sims Report) Ex. 6.3. Therefore, it would be similarly prejudicial to Gilead to give an instruction that improperly suggests that the effect of selling Biktarvy® somehow increases sales of other products by Gilead.

5. **[ViiV's Proposal:** Whether ViiV had an established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;**][Gilead's Proposal:** Whether Plaintiffs have an established policy and marketing program of granting licenses or retaining the patented invention as an exclusive right or licensing patents under special conditions designed to preserve exclusivity;**]**

6. The portion of the realizable profits that should be credited to the invention as distinguished from non-patented **[ViiV's Proposal**: elements**][Gilead's Proposal:** components**]**, the manufacturing process, the business risks, or significant features or improvements added by Gilead;

7. The commercial relationship between ViiV, on the one hand, and Gilead, on the other hand, such as whether they are competitors in the same line of business, or whether they are inventor and promoter;

8. The duration of the Asserted Patent and the term of the hypothetical license;

9. The established profitability of the product made under the patent, its commercial success, and its current popularity;

10. The nature of the patented invention; the character of any commercial embodiment of it as owned and produced by ViiV, and the benefits to those who have used the invention;

11. The extent to which Gilead has made use of the invention and any evidence probative of the value of that use;

12. **[ViiV's Proposal:** The effect of selling the patented product in promoting the sales of other products by Gilead; the existing value of the invention to ViiV as a generator of sales of its own non-patented items; and the extent of such collateral sales**]; [Gilead's Proposal:** The effect of selling the patented product in promoting or diverting the sales of other products by Gilead**];**

13. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

14. The opinion testimony of qualified experts;

15. The existence of any licenses that are technically and economically comparable to the license to be negotiated at the hypothetical negotiation; and

16. The amount that a licensor (such as ViiV) and a licensee (such as Gilead) would have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be

able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty Gilead would have been willing to pay and ViiV would have been willing to accept, acting as normally prudent business people. The final factor establishes the framework which you should use in determining a reasonable royalty.

### 5.12. USE OF COMPARABLE LICENSE AGREEMENTS

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patent in question, or for rights to similar technologies. A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between ViiV and Gilead in order for you to consider it. However, if you choose to rely on evidence from any **[ViiV's Proposal:** license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between ViiV and Gilead when you make your reasonable royalty determination.**][Gilead's Proposal:** other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license when you make your reasonable royalty determination. For example, you must account for any differences between the technology at issue here and the technology involved in other license agreements, and you must account for differences in the economic circumstances of the parties to the hypothetical negotiation and the parties to other license agreements. It is not appropriate to derive a reasonable royalty based on other licenses that include rights broader than the patents-in-suit without considering whether any discounting of the licensing fee is necessary to account for amounts paid for other rights. Licenses that

71

were not the product of an arms-length negotiation should be adjusted accordingly.][25]

---

[25] **ViiV's Position**: ViiV's proposal is a succinct and correct description of what the jury should consider with regard to comparable license agreements. Gilead's proposal improperly attempts to inject its litigation arguments into the jury instruction. As demonstrated in its motion *in limine* briefing, Gilead intends to argue that one of the licenses on which ViiV's expert Ray Sims relied—the "ViiV-Shionogi License"—was not the product of an arms' length transaction and that the royalty rate in that license accounted for assets other than the patent-in-suit. As ViiV's responsive briefing explained, these arguments are meritless. However, while Gilead is free to cross-examine Mr. Sims on these topics at trial, it should not be allowed to prejudice the jury by inserting its attorney arguments into the jury instructions. Moreover, ViiV's proposal more closely reflects the language that is commonly used in jury instructions in this district. *Wasica Finance GmbH et al v. Schrader International Inc.*, No. 1:13-cv-01353-LPS, D.I. 215 at 43 (D. Del. Feb. 13, 2020); *Integra LifeSciences Corporation et al v. HyperBranch Medical Technology, Inc.*, No. 1:15-cv-00819-LPS, D.I. 749 at 75 (D. Del. Jun. 7, 2018); *Siemens Industry, Inc. v. Westinghouse Air Brake Technologies Corporation d/b/a Wabtec Corporation et al*, 1:16-cv-00284-LPS, D.I. 442 at 68 (D. Del. Jan. 23, 2019).

**Gilead's Position**: Gilead's proposal is an accurate description of *how* the jury should account for the differences between a comparable license agreement and the hypothetically negotiated license between Gilead and ViiV, which derives from language given by courts in this district in other patent cases. *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-cv-152-RGA, D.I. 470 at 35 (D. Del. Nov. 13, 2018); *Roche Diagnostics Corp. v. Meso Scale Diagnostics*, No. 1:17-cv-00189-LPS, D.I. 274 at 48 (D. Del. Nov. 25, 2019). These instructions are in line with Federal Circuit precedent. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014); *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1377–78 (Fed. Cir. 2015), *reinstated by* 824 F.3d 1334 (Fed. Cir. 2016) ("[R]oyalties paid by related parties have little probative value as to the patent's value."); *Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d 787, 790 (Fed. Cir. 1990) ("The prices at which Browning Mfg. sold to Browning, however, could be the basis for determining a reasonable royalty only if those prices had been 'established in normal, bona fide, arms-length transactions,' as the license agreement required.").

### 5.13.   [GILEAD'S PROPOSAL: USE OF MULTI-COMPONENT LICENSE AGREEMENTS

In this case, you have received evidence concerning license agreements entered into by both ViiV and Gilead. While you may consider these licenses in your assessment of a reasonable royalty, they may be considered only for the limited purpose of evaluating the value of the patented technology, and you must ensure that any royalty award you make includes only the features of Biktarvy® that are covered by claim 6 of ViiV's patent.][26]

_____

Gilead's proposed language is not prejudicial simply because ViiV disagrees with Gilead's substantive argument about how the "ViiV-Shionogi License" is different from the hypothetical Gilead-ViiV license. ViiV is free to argue, as it does in its motion _in limine_ briefing, that Gilead's interpretation of the "ViiV-Shionogi License" is incorrect. Gilead's proposed language does not purport to answer that factual dispute for the jury.

[26] **ViiV's Position:** Gilead's proposed instruction on "Use Of Multicomponent License Agreements" is unnecessary because it provides no guidance on how the jury should consider a supposedly "multicomponent license agreement"—Gilead's professed basis for this instruction.  The previous instruction on comparable licenses (5.12) provides sufficient instruction on how the jury should consider comparable licenses.   This proposed instruction is also duplicative of Gilead's proposed instruction on apportionment (5.15).   These instructions together fulfill any need to caution the jury on the consideration of the comparable license agreements in this case, rendering Gilead's proposed instruction entirely superfluous.

**Gilead's Position**: ViiV complains that Gilead's proposed instruction is unnecessary because it provides no guidance, while criticizing Gilead's proposed language regarding comparable license agreements for providing that guidance. In any event, ViiV is incorrect. Gilead's proposal guards against misuse of multicomponent license agreements by reminding the jury that it must consider only

## 5.14.   REASONABLE ROYALTY - AVAILABILITY OF NON-INFRINGING ALTERNATIVES

In determining a reasonable royalty, you may also consider evidence concerning whether Gilead had an acceptable non-infringing alternative at the time of the hypothetical negotiation with ViiV, and the cost of such an alternative.

---

the value of the patented invention. The Federal Circuit has determined that the risk of misuse of multicomponent license agreements warrants a specific instruction. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1228 (Fed. Cir. 2014) ("[W]hen licenses based on the value of a multi-component product are admitted, or even referenced in expert testimony, the court should give a cautionary instruction regarding the limited purposes for which such testimony is proffered if the accused infringer requests the instruction. The court should also ensure that the instructions fully explain the need to apportion the ultimate royalty award to the incremental value of the patented feature from the overall product."). ViiV's proposed instructions in 5.12 and 5.15 together do not fulfill the need to caution the jury on the consideration of multi-component license agreements precisely because ViiV has objected to Gilead's proposed language, which is intended to do so.

## 5.15.    REASONABLE ROYALTY – APPORTIONMENT

The amount you find as damages must be based on the value of the accused product attributable to the patented technology, as distinct from features of the Accused Product not attributable to ViiV's patent, or other factors such as marketing or advertising, or Gilead's size or market position. **[ViiV's Proposal:** The process of determining the value of the Accused Product attributable to the patented technology is called apportionment.  An award of damages must be apportioned based on the value of the accused product attributable to the patented technology.  In determining the appropriate royalty base and the appropriate royalty rate, the ultimate combination of both the royalty rate and the royalty base must reflect the value attributable to the patented technology.

To recover damages as a percentage of revenues or profits attributable to the entire accused product, ViiV must show that it is more likely than not that the patented technology creates the basis for customer demand or substantially creates the value of the Accused Product.]**[Gilead's Proposal:** That is, you must apportion the damages between the patented and the unpatented components of the accused product.

Therefore, when applying the factors I've just discussed with you, the royalty base should include only the portion of the value of Biktarvy® that is attributable to Plaintiffs' patent and not the portion of value associated with its other elements, such

as features, components, or improvements developed by Gilead. In the case of a multi-component product like Biktarvy®, if demand for the entire product is not attributable to the patented feature, you may not base the royalty on the price or revenues of the entire product.

It is not sufficient to use a royalty base that is too high and then adjust the damages downward by applying a lower royalty rate. Similarly, it is not appropriate to select a royalty base that is too low and then adjust it upward by applying a higher royalty rate. Rather, you must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.][27]

---

[27] **ViiV's Position:**   ViiV's proposal is an accurate and concise description of apportionment for patent infringement damages.  Gilead's proposal is potentially confusing to the jury and prejudicial to ViiV.  Gilead intends to argue that Mr. Sims was required to apportion the royalty base of Biktarvy® sales to account for the relative value of bictegravir in Biktarvy®.  *See* D.I. 331.  However, Mr. Sims apportioned "by adjustment of the royalty rate so as to discount the value of … non-patented features," which is entirely proper under Federal Circuit precedent. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  Regarding the last paragraph of Gilead's proposed instruction, which is potentially confusing to the jury, ViiV's proposal is more consistent with instructions often used in this district.  *Helios Software LLC v. SpectorSoft Corporation*, 1:12-cv-00081-LPS, D.I. 608 at 54 (D. Del Jun. 19, 2015); *Boston Scientific Corporation v. Edwards Lifesciences Corporation*, 1:16-cv-00275-JFB, D.I. 563 at 74 (D. Del. Dec. 11, 2018); *SRI International Inc. v. Cisco Systems Inc.*, 1:13-cv-01534-RGA, D.I. 336 at 41 (D. Del. May. 11, 2016).

**Gilead's Position**: Gilead's proposal is an accurate and comprehensible statement of the law of apportionment for patent infringement damages and is based on Federal

Circuit precedent and the American Intellectual Property Law Association's model jury instructions. *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014); AIPLA's 2020 Model Patent Jury Instructions at 52, available online at https://www.aipla.org/docs/default-source/publications/2019-11-13---aipla-model-patent-jury-instructions.pdf?sfvrsn=1787faa5_0. Again, Gilead's proposed final paragraph, which appears to be the target of ViiV's complaint that Gilead's proposed instruction is prejudicial, is not prejudicial or confusing simply because ViiV disagrees with Gilead about how the law should be applied in the context of this case. The final paragraph of Gilead's proposal is identical to the American Intellectual Property Law Association model jury instruction on apportionment and to instructions given in this District and around the country. *Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, No. 16-cv-284-LPS-CJB, D.I. 442 at 64 (D. Del. Jan. 23, 2019); *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, No. 1:15-cv-07025-RMB-JS, D.I. 794, 66 (D.N.J. Sep. 26, 2019); AIPLA's 2020 Model Patent Jury Instructions at 52, available online at https://www.aipla.org/docs/default-source/publications/2019-11-13---aipla-model-patent-jury-instructions.pdf?sfvrsn=1787faa5_0.

## 6.    DELIBERATIONS AND VERDICT

### 6.1.    INTRODUCTION

That concludes the part of my instructions on the law. I will end by explaining some things about how you will conduct your deliberations in the jury room and about your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally should be sent through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages. Do not write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. Your votes should stay secret until you are finished.

## 6.2.    UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without disregarding your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinions, if convinced they are erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.

Remember at all times that you are not partisans. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. I will review it with you in a moment. You will take the form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form. You will then return to the courtroom and my deputy will read aloud your verdict. Do not show the completed verdict form to anyone or share it with anyone until you are in the courtroom.

79

Unless you are directed otherwise in the verdict form, you must answer all of the questions posed, and you all must agree on each answer.

It is proper to add the caution that nothing said in these instructions, and nothing in the form of a verdict, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. Determining what the verdict shall be is your sole and exclusive duty and responsibility.

### 6.3.    DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that—your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds. Listen carefully to what the other jurors have to say, and then decide for yourself.

## 6.4.    SOCIAL MEDIA

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cellphone, smartphone, tablet or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chatroom, blog, website, or app such as Facebook, LinkedIn, Snapchat, YouTube, Twitter, or Instagram to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

### 6.5.    COURT HAS NO OPINION

Let me finish by repeating something I have said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourself based on the evidence presented.

Dated: November 19, 2021

MCCARTER & ENGLISH, LLP

*/s/ Daniel M. Silver*
Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
mkelly@mccarter.com
dsilver@mccarter.com
ajoyce@mccarter.com

Of Counsel:
John M. Desmarais
Paul A. Bondor
Justin P.D. Wilcox
Todd L. Krause
Lindsey E. Miller
David J. Shaw
Alyssa B. Monsen
Kyle G. Petrie
Julianne M. Thomsen
Kimberly A. Kennedy
Amanda A. Potter
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone:  (212) 351-3400
Facsimile:  (212) 351-3401
jdesmarais@desmaraisllp.com
pbondor@desmaraisllp.com
jwilcox@desmaraisllp.com
tkrause@desmaraisllp.com
lmiller@desmaraisllp.com
dshaw@desmaraisllp.com
amonsen@desmaraisllp.com

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

Of Counsel:
Philip S. Beck
J. Scott McBride
Mark S. Ouweleen
Matthew R. Ford
Reid Bolton
Nevin M. Gewertz
Tulsi E. Gaonkar
Rebecca T. Horwitz
Michael A. Nance
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
(312) 494-4400
philip.beck@bartlitbeck.com
scott.mcbride@bartlitbeck.com
mark.ouweleen@bartlitbeck.com
matthew.ford@bartlitbeck.com
reid.bolton@bartlitbeck.com
nevin.gewertz@bartlitbeck.com
tulsi.gaonkar@bartlitbeck.com
rebecca.horwitz@bartlitbeck.com
michael.nance@bartlitbeck.com

John M. Hughes
Meg E. Fasulo

84

kpetrie@desmaraisllp.com
jthomsen@desmaraisllp.com
kkennedy@desmaraisllp.com
apotter@desmaraisllp.com

*Attorneys for Plaintiffs*

BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
(303) 592-3100
john.hughes@bartlitbeck.com
meg.fasulo@bartlitbeck.com

E. Joshua Rosenkranz
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019
(212) 506-5380
jrosenkranz@orrick.com

Nao Takada
TAKADA LEGAL, P.C.
112-01 Queens Blvd.
Forest Hills, NY 11375
(212) 380-3100
naotakada@takadalegal.com

Eugene M. Paige
KEKER VAN NEST
633 Battery Street
San Francisco, CA 94111
epaige@keker.com

*Attorneys for Defendant*